## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

FRANKLIN MANAGED TRUST *et al.*,

*Plaintiffs*,

v.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION *et al.*,

*Defendants*.

</td><td>

No. 1:06-cv-00139 (RJL)

</td></tr>
</table>

## MOTION TO DISMISS OF DEFENDANT KPMG LLP

Principally for the reasons stated in the accompanying memorandum, Defendant KPMG

LLP respectfully moves to dismiss the claims against it in this action.  KPMG also adopts and

incorporates by reference the arguments raised by Fannie Mae and the individual defendants to

the extent those arguments apply to the claims against KPMG.

Respectfully submitted this 15th day of May 2006.

/s/ Andrew Tulumello
F. Joseph Warin
Andrew S. Tulumello
Melanie L. Katsur
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for KPMG LLP*

100001483_3.DOC

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FRANKLIN MANAGED TRUST *et al.*,

*Plaintiffs*,

v.                                              No. 1:06-cv-00139 (RJL)

FEDERAL NATIONAL MORTGAGE
ASSOCIATION *et al.*,

*Defendants*.

## MEMORANDUM OF DEFENDANT KPMG LLP IN SUPPORT OF MOTION TO DISMISS

F. Joseph Warin
Andrew S. Tulumello
Melanie L. Katsur
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for KPMG LLP*

2

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................4

    A.    KPMG And Its Role As An Independent Auditor. ......................................5

    B.    Fannie Mae...................................................................................................6

    C.    The Role Of Derivatives In Fannie Mae's Business....................................7

    D.    FAS 133 .......................................................................................................8

    E.    FAS 91 ......................................................................................................11

    F.    Other Accounting Standards ......................................................................12

    G.    Plaintiffs' Liability Allegations ................................................................12

    H.    Plaintiffs' Loss Allegations.......................................................................15

SUMMARY OF ARGUMENT .................................................................................15

ARGUMENT............................................................................................................17

    I.    The Complaint Does Not Adequately Allege That KPMG Violated
        Section 10(b) and Rule 10b-5. ...................................................................17

        A.    To The Extent The Complaint Alleges That KPMG "Reviewed
            And Approved" Statements Made By Fannie Mae, The Complaint
            Must Be Dismissed. ...................................................................................19

        B.    The Complaint Does Not Allege Facts With Particularity That
            Give Rise To A Strong Inference That KPMG Acted With
            Scienter. ....................................................................................................20

            1.    Plaintiffs' Allegations That KPMG Violated GAAS And
                 GAAP Are Insufficient To Establish Scienter.............................22

            2.    Allegations That Fannie Mae's Fraud Was Large Do Not
                 Establish That KPMG Acted With Scienter. ...............................24

            3.    Allegations That KPMG Received Audit Fees From Fannie
                 Mae Do Not Establish That KPMG Acted With Scienter. ...........25

## Table of Contents
### (Continued)

Page

4. Allegations That KPMG Had Access To Fannie Mae's Records Do Not Demonstrate KPMG Acted With Scienter..........27

5. Allegations That KPMG Knew Of What Plaintiffs Characterize As "Red Flags" Do Not Establish That KPMG Acted With Scienter....................................................................28

6. Plaintiffs Have Not Pleaded Facts With Particularity That Collectively Warrant A Strong Inference That KPMG Acted With Extreme Recklessness. ...............................................33

C. Plaintiffs Have Not Adequately Pleaded Loss Causation..........................34

II. Because Fannie Mae's Securities Are Not Subject To The Securities Act Of 1933, KPMG Cannot Be Liable Under Section 11 Of The Act. .....................37

III. Plaintiffs' Claims Against KPMG Under Section 11 of the Securities Act And Under Section 18 Of The Exchange Act Are Time-Barred. .........................39

A. Plaintiffs' Section 11 And Section 18 Claims Are Governed By A One-Year Statute Of Limitations. ...............................................................40

B. Sarbanes-Oxley Did Not Alter The Limitations Period Applicable To Plaintiffs' Section 11 And Section 18 Claims. ....................................40

C. The Putative Class Actions In *In Re Fannie Mae Securities Litigation* Did Not Toll The Statute Of Limitations Applicable To Plaintiffs' Claims. ....................................................................................42

IV. Plaintiffs' State-Law Claims Must Be Dismissed. ................................................44

CONCLUSION..................................................................................................................45

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987) ............................ 48

*Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)......................................................... 46, 48

*Anixter v. Home-Stake Production Co.*, 77 F.3d 1215 (10th Cir. 1996)...................................... 21

*Belizan v. Hershon*, 434 F.3d 579 (D.C. Cir. 2006) .................................................................. 30

*Bily v. Arthur Young & Co.*, 834 P.2d 745 (Cal. 1992) ............................................................... 6

*Burns v. Ersek*, 591 F. Supp. 837 (D. Minn. 1984) ...................................................................... 48

*Caulfield v. Stark*, 2006 WL 564049 (D.C. App. Mar. 9, 2006) ................................................. 49

*Central Bank of Denver v. First Interstate Bank of Denver N.A.*, 511 U.S. 164 (1994) ........ 16, 21

*Crown, Cork & Seal Co. Inc. v. Parker*, 462 U.S. 345 (1983) .................................................... 46

*D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719 (E.D. Mich. 2003)................................. 3

*Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697 (E.D. Ill. 2005)............................................................ 32

*Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111 (2d Cir. 1982) .................................................. 23

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990)................................................................ 28

*DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002)........... 23, 26, 30

*Duncan v. Pencer*, 94 Civ. 0321, 1996 WL 19043 (S.D.N.Y. Jan. 18, 1996)............................. 29

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)........................................................... passim

*Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003)........ 40

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)............................................................... 22, 26

*Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 359 F.3d 851 (8th Cir. 2005).................. 25, 27

*Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2004).................................................................. 3, 21, 27

*Fidel*, 392 F.3d ........................................................................................... 25, 26, 30, 34

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645 (8th Cir. 2001) ....................... 20

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) .................................................. 9

*Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002) .................................................. 20

*Helwig v. Vencor, Inc.*, 251 U.S. 540 (6th Cir. 2001) .................................................. 20

*In re Alstom SA*, 406 F. Supp. 2d 402 (S.D.N.Y. 2005) .................................................. 45

*In re Bisys Secs. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005) .................................................. 4

*In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410 (3d Cir. 1997) .................................................. 14

*In re Cardinal Health Inc. Sec. Litig.*, 2006 WL 932017 (S.D. Ohio Apr. 12, 2006) ........... 29, 36

*In re Direct General Corp. Secs. Litig.*, 398 F. Supp. 2d 888 (M.D. Tenn. 2005) ........................ 4

*In re Ikon Office Solutions Inc.*, 277 F.3d 658 (3d Cir. 2002) .................................................. 33, 34

*In re Interbank Funding Corp. Sec. Litig.*, 329 F. Supp. 2d 84 (D.D.C. 2004) ..................... 30, 31

*In re PEC Solutions, Inc. Secs. Litig.*,
    418 F.3d 379 (4th Cir. 2005) .......................................................... 1

*In re Raytheon Secs. Litig.*, 157 F. Supp. 2d 131 (D. Mass. 2001).................................................. 4

*In re SCB Computer Tech, Inc. Secs.  Litig.*, 149 F. Supp. 2d 334 (W.D. Tenn. 2001) ......... 27, 33

*In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970 (9th Cir. 1999) .................................................. 8

*In re Smartalk Teleservices, Inc. Secs. Litig.*, 124 F. Supp. 2d 505 (S.D. Ohio 2000)................. 23

*In re Spear & Jackson Secs. Litig.*, 399 F. Supp. 2d 1350 (S.D. Fla. 2005).................................. 4

*In re Stone & Webster, Inc. Secs. Litig.* 414 F.3d 187 (1st Cir. 2005) ...................... 30, 31, 32, 33

*In re Van Wagoner Funds, Inc.*, 382 F. Supp. 2d 1173 (N.D. Cal. 2004) .................................... 37

*In re WorldCom Secs. Litig.*, 294 F. Supp. 2d 431 (S.D.N.Y. 2003)....................................... 45, 47

*In re WorldCom, Inc. Secs. Litig.*, 308 F. Supp. 2d 236 (S.D.N.Y. 2004).............................. 48, 49

*In re Worlds of Wonder Secs. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) .......................................................... 2, 28

*Kidder Peabody & Co., Inc. v. Unigestion Int'l, Ltd.*, 903 F. Supp. 479 (S.D.N.Y. 1995) .......... 42

*Kowal v. MCI Comms. Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .................................................. 24

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991)........................................................ 8

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991) .......................... 44

*Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49 (D. Mass. 1995) ..................... 48

*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015 (5th Cir. 1996) ................................................ 8

*Magna Inv. Corp. v. John Does One through Two Hundred*, 931 F.2d 38 (11th Cir. 1991) ....... 43

*Nappier v. Pricewaterhouse Coopers LLP*, 227 F. Supp. 2d 263 (D. N.J. 2002) .......................... 4

*P.R. Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ................................................................................... passim

*Rahr v. Grant Thornton LLP*, 142 F. Supp. 2d 793 (N.D. Tex. 2000 ........................................... 47

*Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d. 1003 (S.D. Cal. 2000) ........... 2, 3, 27

*Riggs Partners LLC v. Hub Group, Inc.*, No. 02 C 1188, 2002 WL 31415721 (N.D. Ill. 2002) . 32

*Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) ........................................................... 40

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) .......................................................................... 23

*Rust v. Johnson*, 597 F.2d 174 (9th Cir. 1979) ............................................................................ 42

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ........................................................................ 22

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ......................................................... 40

*Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87 (1995) ............................................................... 23

*Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997) ......................................................................... 21

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ................................................... 24

*Wachovia Bank & Trust Co., N. A. v. Nat'l Student Mktg. Corp.*, 650 F.2d 342 (D.C. Cir. 1980) .................................................................................................................................. 47

*Wiggins v. Janus Capital Group Inc.*, No. 04-818, 2006 WL 709853 (D. Md. Feb. 27, 2006) ... 39

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) ........................................................ 21

*Wyser-Pratt Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553 (6th Cir. 2005) ............. 44, 45, 47, 48

*Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27 (D.C. Cir. 1987) ........................................ 22, 40

**Statutes**

12 C.F.R. §§ 1730.1-1730.4 (2005) ............................................................................................... 42

12 U.S.C. § 1716 ......................................................................................................... 7

12 U.S.C. § 1719(d) ................................................................................................... 42

15 U.S.C. § 77c(a)(2) ................................................................................................ 41

15 U.S.C. § 77c(a), (a)(2) ......................................................................................... 42

15 U.S.C. § 77k .......................................................................................................... 41

15 U.S.C. § 77m ......................................................................................................... 44

15 U.S.C. § 78b(f) ................................................................................................ 18, 49

15 U.S.C. § 78r(a) ...................................................................................................... 43

15 U.S.C. § 78u-4(b)(2) ....................................................................................... 19, 34

28 U.S.C. § 1658(b) ................................................................................................... 34

Federal Rule of Civil Procedure 9(b) ..................................................................... 7, 37

## Other Authorities

*The 2001 Top 100 Tax and Accounting Firms*, Accounting Today (Mar. 19, 2001) .................. 15

*The 2002 Top 100 Tax and Accounting Firms*, Accounting Today (Mar. 18, 2002) .................. 15

*The 2003 Top 100 Firms*, Accounting Today (Mar. 17, 2003) (KPMG's revenues from 2002... 15

*The 2004 Accounting Today Top 100 Firms*, Accounting Today (Mar. 15, 2004) ..................... 15

The American Institution of Certified Public Accountants Statements on Auditing Standards ("AU") § 110.03 ................................................................................................. 6

Todd Davenport, *The Uneven Evolution of Accounting Standards*, American Banker, July 28, 2004 ........................................................................................................... 10

**<u>INTRODUCTION</u>**

Plaintiffs' case against KPMG LLP rests, at bottom, on the claim that KPMG incorrectly performed audits of Fannie Mae's financial statements and permitted Fannie Mae to misapply complicated accounting principles. The law requires more—***much more***—for Plaintiffs to plead a successful claim against KPMG. The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes demanding requirements on securities fraud plaintiffs. And that demanding burden is at its apex when the plaintiffs seek to proceed against outside auditors like KPMG, because there is a distinctive legal regime that defines the liability of outside auditors in the securities fraud context.

Under the precedent established in Section 10(b) cases against accountants, Plaintiffs must plead and prove that KPMG deliberately participated with Fannie Mae and its executives to defraud investors. That charge finds no support in the Complaint's allegations and flies in the face of common sense. Unlike Fannie Mae and defendants Howard, Raines, and Spencer (whose compensation was tied directly to financial performance metrics), KPMG stood to gain nothing from such a conspiracy. Its incentive would be to avoid any such "plot" and avoid the onslaught of civil liability prompted by eventual revelation of the scheme. Whatever the merits of Plaintiffs' claims against the four defendants, Plaintiffs have not pleaded legally sufficient facts to support their charge against KPMG.

Indeed, Plaintiffs must overcome many legal obstacles that are unique to auditors to state a valid securities fraud claim. These obstacles include:

- ***"[M]isapplication of accounting principles by an independent auditor does not establish scienter***." *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 389 (4th Cir. 2005) (internal quotation marks and citation omitted).

- ***"[T]he meaning of recklessness in securities fraud cases is especially stringent when the claim is brought against an outside auditor. Recklessness on the part***

> ***of an independent auditor entails a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company."*** *P.R. Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004) (internal quotation marks, alteration, and citation omitted).

- ***"Scienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all . . . ."*** *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (internal quotation marks, alteration, and citation omitted).

The court in *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d. 1003, 1007-08 (S.D.

Cal. 2000), summarized the reasons why these stringent ***pleading*** requirements apply to auditors:

> First, a large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud. Unlike the officers and directors of the companies it represents, an independent accountant has no ability to line its pockets through insider trading, and no incentive to cover up corporate mismanagement. The accountant's success depends on maintaining a reputation for honesty and integrity, ***requiring a plaintiff to overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud of a single client***.

*Id.* at 1007 (emphasis added).

Second, an auditor necessarily possesses less information concerning the financial data

that support the financial documents than does its client. Auditors, by definition, audit the

financial statements that are ***prepared by management***. Hence, "it is almost always more

difficult to establish scienter on the part of the accountant than on the part of its client." *Id.* at

1007-08.

Finally,

> the report generated by an independent accountant often represents a ***professional opinion*** based on numerous and complex factors. Although ultimately expressed in shorthand form, the report is the final product of a complex process involving discretion and judgment on the part of the auditor at every stage. Using different initial assumptions and approaches, different sampling techniques, and the wisdom of 20-20 hindsight, few CPA audits are immune from criticism.

*Reiger*, 117 F. Supp. 2d at 1008 (emphasis added and internal quotation marks, alteration, and citation omitted). These considerations are simply not present in a claim against an issuer, and "make it ***exceedingly*** difficult for a securities plaintiff to plead facts suggesting that an independent accountant acted with the deliberate state of mind now required to withstand a motion to dismiss." *Id.* Not only must Plaintiffs satisfy this particularly high pleading standard, but they also must do so with specific and particularized ***facts***—not boilerplate legal conclusions. S*ee D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 740 (E.D. Mich. 2003), *aff'd*, 133 Fed. Appx. 994 (6th Cir. 2005) (noting that the PSLRA's pleading standards are even more stringent as against auditors due to the "auditor's dependence on information supplied by the client, application of complex accounting and auditing standards, and varying degrees of professional judgment") (citing *Reiger*, 117 F. Supp. 2d at 1007-08).

Given the more demanding pleading standard applicable to outside auditors, it is not surprising that courts regularly grant motions to dismiss by outside auditors while denying such motions brought by defendants affiliated with the auditor's client.[1] And dismissal of the claims against KPMG is precisely what is warranted—and legally mandated—here.

---

[1] *See, e.g.*, *Fidel v. Farley*, 392 F.3d 220, 223 (6th Cir. 2004) (noting that the district court denied motions to dismiss brought by the company defendants but granted it as to the outside auditor, and affirming district court's judgment as to the outside auditor); *In re Cardinal Health Inc. Sec. Litig.*, No. 04-575, 2006 WL 932017, at *55, *68 (S.D. Ohio Apr. 12, 2006) (in accounting fraud action against a company, finding that plaintiffs adequately pleaded scienter against executives but not against outside auditor); *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 898-900 (M.D. Tenn. 2005) (same); *In re Bisys Sec. Litig.*, 397 F. Supp. 2d 430, 449-50 (S.D.N.Y. 2005) (same); *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1359, 1362-64 (S.D. Fla. 2005) (same); *Nappier v. PricewaterhouseCoopers LLP*, 227 F. Supp. 2d 263, 268, 281-82 (D.N.J. 2002) (noting that motions to dismiss were denied against company defendants in related proceedings but granting outside auditors' motion to dismiss as to claim arising out of the same facts); *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 154, 156 (D. Mass. 2001) (same).

## BACKGROUND[2]

This is an unusual securities fraud case, in that it is uncontested that Fannie Mae was a successful and profitable enterprise throughout the period of the alleged fraud, and remains so today.  In most securities fraud cases, the central allegation is that the defendants deceived investors about the financial health of the company and papered over substantial losses.  But unlike the typical case, no one has alleged that Fannie Mae was losing money—or even that its business was faltering in any significant way.  Fannie Mae's underlying economic health has forced Plaintiffs to make an innovative claim:  KPMG participated in a massive accounting fraud to help certain Fannie Mae executives secure large bonuses by "smoothing" earnings growth.

It is also customary for securities fraud plaintiffs to find themselves drafting allegations in a relative vacuum of underlying facts; frequently, the central facts are limited to what plaintiffs have gleaned from statements by the company.  In contrast, the plaintiffs here have at their disposal a wealth of public information about the purported accounting irregularities at Fannie Mae.  On September 17, 2004, the Office of Federal Housing Enterprise Oversight ("OFHEO") issued a 198-page report (the "OFHEO Report") detailing what it believed were deficient accounting practices at Fannie Mae.  Compl. ¶ 1.  That report was based on a review of more than "200,000 documents," as well "as interviews and sworn testimony from numerous current and former Fannie Mae employees."  *Id.*  Subsequently, Congress held hearings to investigate these allegations, producing yet more testimony and documents.  And as extensive as these investigations were, they were dwarfed by the special report issued by Paul Weiss attorney Senator Warren Rudman (the "Rudman Report").  The 615-page Rudman Report was

---

[2]  While the facts Plaintiffs have pleaded must be accepted as true for purposes of this motion, KPMG does not agree with many of these facts.

commissioned by a special review committee of Fannie Mae's Board of Directors.  In preparing

the Rudman Report, Paul Weiss conducted 241 interviews of Fannie Mae employees and

reviewed more than four million documents.  Rudman Report at 13-14.

Notwithstanding this veritable mountain of information, Plaintiffs have resorted to rote

and conclusory allegations of accounting mistakes that provide no connective tissue between

Fannie Mae's purported misconduct and KPMG's culpability.

### A.    KPMG And Its Role As An Independent Auditor.

KPMG is one of the "Big 4" accounting and professional services firms in the United

States and served as the independent auditor of Fannie Mae's financial statements from 1969 to

December 2004.  Compl. ¶ 65.

Plaintiffs' allegations against KPMG arise from KPMG's role as Fannie Mae's

independent auditor.  It is essential for the Court to keep in mind the unique and limited role of

an outside auditor when considering this motion to dismiss.  Generally Accepted Auditing

Standards ("GAAS") make it crystal clear that the company's management—not the

independent, outside auditor—is responsible for preparing the company's financial statements:

> The financial statements are management's responsibility.  The auditor's
> responsibility is to express ***an opinion*** on the financial statements.  Management
> is responsible for adopting sound accounting policies and for establishing and
> maintaining internal control that will, among other things, initiate, record,
> process, and report transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.

The American Institution of Certified Public Accountants Statements on Auditing Standards

("AU") § 110.03 (emphasis added).[3]  Indeed, even the Lead Plaintiffs (in the class case)

---

[3]  The American Institute of Certified Public Accountants is the main professional organization
for accountants.  It is responsible for promulgating auditing standards, which are known as

[Footnote continued on next page]

repeatedly acknowledge this point. *See*, *e.g.*, Lead Pls.' Consolidated Compl. ¶ 77

("[m]anagement is responsible for preparing financial statements that conform to GAAP").

     In *Bily v. Arthur Young & Co.*, 834 P.2d 745, 762 (Cal. 1992), the California Supreme

Court explained the auditor's limited role (compared to the company) in presentation of the

company's financial statements:

> An auditor is a watchdog, not a bloodhound. As a matter of commercial reality,
> audits are performed in a client-controlled environment. The client typically
> prepares its own financial statements; it has direct control over and assumes
> primary responsibility for their contents . . . . Because the auditor cannot in the
> time available become an expert in the client's business and record-keeping
> systems, the client necessarily furnishes the information base for the audit.

*Id*. (citations omitted).

     Put in the proper context of KPMG's limited role as outside auditor, and the stringent

pleading standards that apply under the PSLRA and Federal Rule of Civil Procedure 9(b), the

complaint's pleading deficiencies are glaring.

### B.    Fannie Mae

     The Federal National Mortgage Association, known colloquially as "Fannie Mae," is a

federally chartered corporation established in 1938 to increase the availability and affordability

of homeownership for low-, moderate-, and middle-income Americans. Fannie Mae operates

primarily in the secondary mortgage market, replenishing the supply of money available for

housing loans by buying mortgages and mortgage securities from primary lenders. Compl. ¶ 36.

Fannie Mae has been shareholder-owned since 1968. Compl. ¶ 37.

---

[Footnote continued from previous page]

> Generally Accepted Auditing Standards ("GAAS"). Fannie Mae is required to have audits
> performed under GAAS.

Fannie Mae is a unique institution.  Unlike wholly private financial institutions, Fannie

Mae's public charter requires it to buy mortgages and thereby maintain liquidity in the housing

market.  *See* 12 U.S.C. § 1716.  In carrying out its congressionally mandated role, Fannie Mae

has become the nation's largest mortgage lender.  Compl. ¶ 36.  Its role in the market and the

sheer volume of transactions create substantial accounting challenges.

Fannie Mae's size is critical to putting any alleged accounting errors in context.  In 2003,

Fannie Mae had over $1 trillion in assets and $7.9 billion in *net income*.  2003 10-K at 24.[4]

These numbers were similar from 2000 ($675.2 million in assets, $4.4 billion in net income)

through 2003 ($1.009 trillion in assets, $7.9 billion in net income).

Fannie Mae is also one of the most regulated companies in the United States, subject to

oversight from many agencies, including the Department of Housing and Urban Development

("HUD"), OFHEO, the United States Department of Treasury, and, of course, the Securities and

Exchange Commission ("SEC").  Compl. ¶ 38.  Indeed, in 1992 Congress created OFHEO for

the sole purpose of regulating Fannie Mae and Freddie Mac.  *See* Compl. at ¶ 39; OFHEO

Mission Statement, available at http://www.ofheo.gov/mission.asp (last visited April 20, 2006).

### C.    The Role Of Derivatives In Fannie Mae's Business.

Derivatives are an integral part of Fannie Mae's business, serving to reduce and manage

business risks (such as credit and interest rate risk) in Fannie Mae's portfolio.  From 2000 to

2004, Fannie Mae was one of the world's largest users of derivatives.  Unlike many other

---

[4] When considering a motion to dismiss, it is appropriate to consider SEC filings where those filings are referred to the complaint.  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents . . . ."); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (same).

derivative investors, "Fannie Mae does not trade or speculate in derivatives to make money." Fannie Mae 2003 Annual Report at 6. Instead, Fannie Mae relies on derivatives to reduce the risk inherent in holding a large portfolio of assets whose value is tied to volatile interest rates.

Fannie Mae has used derivatives to hedge against that risk since the early 1980s. It has used a variety of derivative instruments, but their essential function is similar: if interest rates rise, the derivatives Fannie Mae has issued also rise in value. This offsets losses from increased interest payments on debt, effectively buying "insurance" against interest rate changes.

### D.    FAS 133

Statement 133, *Accounting for Derivative Instruments and Hedging Activities*, available at http://www.fasb.org/pdf/fas133.pdf (last visited April 20, 2006) ("FAS 133"), is a relatively new and highly complex accounting standard promulgated by the Financial Standards Accounting Boards ("FASB").[5] Absent hedge accounting treatment under FAS 133, holders of derivative hedging instruments are required to recognize gains and losses on such instruments (and the corresponding debt) in ways that may not reflect the underlying economic values of the instruments (or debt). FAS 133 permits companies not to recognize losses on instruments that qualify for "hedge accounting"; in these circumstances the company simply calculates and discloses such gains and losses elsewhere in its financial statements.

If Fannie Mae were not able to apply hedge accounting treatment, Fannie Mae's earnings would be subject to volatility that did not match economic reality. This would occur because of a mismatch between the accounting treatment of Fannie Mae's debt and the instruments it uses to

---

[5] FASB is the standard-setting body for accounting and audit procedures. "The SEC treats the FASB's standards as authoritative." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 n.4 (2d Cir. 2000); s*ee also* Facts about FASB, available at http://www.fasb.org/facts/ (last visited on April 23, 2006).

hedge against the interest-rate risk of its debt.  The hedges would be included as earnings as their

value changes.  But changes in the value of the underlying debt would not be included in

earnings.  Instead, the debt would be booked at original, or "face," value, regardless of its present

value.  So, if interest rates rise, the value of Fannie Mae's debt decreases, but the value of the

hedge increases.  The increased value of the hedge would be included in earnings, but the

decrease in value of the debt would not.  This would lead to higher earnings:  the accounting

would reflect the increased value of the hedge, but not the decreased value of the debt.

For most companies, derivatives play only a minor role in their business, so this is a small

problem.  But it is a significant concern for a few companies—like Fannie Mae—whose business

model requires them to keep a huge and complex portfolio of derivatives.  Absent hedge

accounting, therefore, FAS 133 would lead to fluctuations in these companies' financial

statements that would not reflect economic reality.

Hedge accounting solves this problem, but it is far from straightforward to apply.  FAS

133 imposes a complex and confusing set of rules.  This is probably an understatement.  Since its

inception in 2001, FAS 133 has been the subject of much disagreement and bewilderment over

its meaning.  *See, e.g.*, Todd Davenport, *The Uneven Evolution of Accounting Standards*,

American Banker, July 28, 2004, at 16 ("It is hard to make the case for generally accepted

accounting principles when they are not even generally understood.") (discussing FAS 133).  The

standard spans more than 870 pages, including hundreds of implementation issues.  It proved so

impracticable upon promulgation that there already have been three amendments.[6]  Indeed, FAS

---

[6]  Statement No. 138: Accounting for Certain Derivative Instruments and Certain Hedging
     Activities—an amendment of FASB Statement No. 133 (Issued June 2000); Statement No.
     149: Amendment of Statement 133 on Derivative Instruments and Hedging Activities (Issued

[Footnote continued on next page]

133 was so mystifying and unworkable that FASB (which has issued more than a hundred accounting statements) took the unprecedented step of creating a special task force just to oversee this single accounting standard—the Derivatives Implementation Group ("DIG"). The DIG is a task force of experts whose function is to "identify practice issues that arise from applying the requirements of Statement 133 and advise FASB on how to resolve those issues." *See* FAS 133. Despite FASB's and DIG's best efforts, compliance problems with FAS 133 were so widespread that in June 1999, its effective date was delayed until June 15, 2000. *See Accounting for Derivative Instruments and Hedging Activities, FASB Statement No. 137— Deferral of the Effective Date of FASB Statement No. 133*, available at http://www.fasb.org/pdf/fas137.pdf (last visited April 20, 2006). FAS 133 accounting was first implemented by Fannie Mae for its financial statements for the year ended December 31, 2001.

FAS 133's mystifying mandate produced widespread confusion. Difficulties implementing FAS 133 are legion, and have plagued all of the Big Four accounting firms and many of the most prominent financial corporations in the United States. Since 2003, when the SEC expressed its reservations about Fannie Mae's accounting, ***ninety-seven public companies*** have restated their earnings because of difficulties complying with FAS 133. Among these eighty-two are companies audited by ***all*** of the "Big Four" accounting firms, and major corporations such as AIG, Bank of America, CIT Corp, Freddie Mac, General Electric, and Toyota Motor Credit.

---

[Footnote continued from previous page]

April 2003); Statement No. 155: Accounting for Certain Hybrid Financial Instruments—an amendment of FASB Statements No. 133 and 140 (Issued February 2006).

### E.     FAS 91

Statement 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases*, available at http://www.fasb.org/pdf/fas91.pdf (last visited April 20, 2006) ("FAS 91"), governs the amortization of purchase premiums and discounts on securities and loans, including mortgage loans that Fannie Mae purchases from primary lenders.  When Fannie Mae purchases mortgage loans from primary lenders, it usually does not do so at face value.  Instead, it pays a premium or a discount—depending on whether interest rates have risen or fallen.[7]  This premium or discount is amortized—that is, spread—over the life of the mortgage, in accordance with FAS 91.

The proper application of FAS 91 depends on a host of complex and subjective judgments.  To take just one example, it is very difficult to predict what the "life" of a mortgage will be.  To be sure, mortgages have a specified term (such as 30 years).  But prepayments and refinances are not uncommon, making it probable in a declining interest rate environment that any given mortgage will be paid in full before its term is reached.  For instance, if interest rates fall, many people will refinance and pay off their original mortgage.  Or if a family moves into a new home, they may sell their old home and use the proceeds to pay off their existing mortgage.  These and other factors make it difficult to predict the "life" of a mortgage, and thus the proper rate of amortization under FAS 91.

Notably, FAS 91 ***does not*** specify how expectations of prepayments should be reflected in an amortization calculation.  The standard simply states that:

---

[7]  If interest rates have risen since the mortgage was originally issued to the home buyer, Fannie Mae will get a discount because the mortgage loan is not as valuable as a loan issued at the new, higher rate.  Conversely, if interest rates have fallen, then Fannie Mae will pay a premium to reflect the fact that the mortgage's interest rate is better than the present rate.

> [i]f the enterprise holds a large number of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated, the enterprise may consider estimates of future principal prepayments in the calculation of the constant effective yield necessary to apply the interest method.

FAS 91 ¶ 19. The standard is silent as to how and by what method a company should "reasonably estimate[]" future principal prepayments. This terse provision is the sole guidance provided by the accounting standards, and it is left to individual companies to fashion a reasonable methodology for predicting the life of a mortgage.

### F.    Other Accounting Standards

Plaintiffs' complaint principally focuses on alleged errors in Fannie Mae's application FAS 91 and FAS 133. Compl. ¶¶ 114-43. But it also includes a laundry list of other purported accounting errors. Specifically, the complaint allege errors in applying FAS 5, FAS 65, FAS 115, FAS 140, as well as the improper use of Qualified Special Purpose Entities, improper recognition of interest expense, and improper accounting for investments in low-income housing tax credit partnerships. Compl. ¶¶ 144-173. There is much that could be said about these accounting standards and their application to a complex business like Fannie Mae—indeed, many books, articles, and professional careers have been devoted to these standards. But what is notable here is the simple fact that there is no allegation that KPMG knew of any fraudulent intent behind the alleged errors associated with the standards, or how they might be connected to a fraudulent scheme to "smooth" Fannie Mae's earnings.

### G.    Plaintiffs' Liability Allegations

Plaintiffs allege that KPMG issued fraudulent audit opinions on Fannie Mae's financial statements for the years ending on December 31, 2000, 2001, 2002, and 2003. Compl. ¶ 65. The bulk of Plaintiffs' complaint consists of allegations of GAAP violations at Fannie Mae, the occasional statement that KPMG "reviewed and approved" Fannie Mae's financial statements,

Compl. ¶¶ 222, 229, 256, 260, 285, 300, 321, 333, 340, 360, 363, 370, 373, and the conclusory allegation that "KPMG either knew or should have known of all the flaws" in Fannie Mae's accounting. Compl. ¶ 198. Plaintiffs' only meaningful attempt to state a claim against KPMG comes in the section entitled "KPMG's scienter and violations of GAAS in its audits of Fannie Mae's financial statements." Compl. ¶¶ 446-89.[8] At bottom, Plaintiffs' allegation is that "[g]iven the pervasive nature and magnitude of the Company's GAAP violations . . . it strains credulity to even consider that KPMG was unaware of what was taking place on its watch." Compl. ¶ 455.

Plaintiffs list a series of alleged facts that purport to show KPMG must have participated in the fraud, including:

1. KPMG objected to Fannie Mae's deferral of a $200 million expense in 1998, and then listed the $200 million as an "audit difference" when Fannie Mae rejected KPMG's recommendation. Compl. ¶ 448.

2. After hearing the concerns expressed by Roger Barnes (a Fannie Mae employee) about Fannie Mae's internal controls and management's response, KPMG performed an allegedly "perfunctory investigation" of Mr. Barnes's complaints Compl. ¶ 185.

3. KPMG knew that derivatives were important to Fannie Mae's business and that Fannie Mae had adopted FAS 133 in 2001. Compl. ¶ 451.

---

[8] "[GAAP] comprise[s] a set of basic postulates and broad accounting principles pertaining to business enterprises. These principles, approved by the [AICPA], establish guidelines for measuring, recording and classifying the transactions of a business entity." *Reiger*, 117 F. Supp. 2d at 1009 (citations omitted). GAAP does not prescribe a fixed set of rules, but rather represents "the range of reasonable alternatives that management can use." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 n.10 (3d Cir. 1997). In contrast, GAAS "embod[ies] the general standards prescribed by the AICPA for the conduct of auditors in the performance of an examination." *Reiger*, 117 F. Supp. 2d at 1009.

4. KPMG had access to Fannie Mae's files and employees, and thus the opportunity to commit fraud. Compl. ¶ 460.

5. KPMG had a financial motive and sought to "reap rich rewards" for its alleged complicity in Fannie Mae's fraud. Compl. ¶ 459. From 2000 to 2003, KPMG received approximately $7.3 million in audit fees, and another $18 million in non-audit fees. Compl. ¶ 459. According to Plaintiffs, these fees—which are insignificant against KPMG's firmwide revenues of almost $16 billion in this period[9]—motivated KPMG to participate in a fraud to help certain executives get a higher bonus. There is no allegation or explanation for why KPMG's professionals would jeopardize their careers (or, if Plaintiffs are to be believed, their freedom) by defrauding investors in this way.

6. Plaintiffs also include a table of what they term "Red Flags," which Plaintiffs claim should have put KPMG on notice of the purported fraud. Compl. ¶ 464. For the most part, this table of Red Flags simply restates the alleged GAAP and GAAS violations recited elsewhere in the complaint. It also states various "facts" about management, such as "bonuses [for Fannie Mae management] were tied to meeting certain EPS levels." Compl. ¶ 464. There are no allegations that would explain when or how KPMG learned of Fannie Mae's internal bonus structure, much less that KPMG knew its officers' intent in making accounting judgments was to achieve an earnings target.

---

[9] *See The 2001 Top 100 Tax and Accounting Firms*, Accounting Today (Mar. 19, 2001) (KPMG's revenues for 2000 were $5.4 billion); *The 2002 Top 100 Tax and Accounting Firms*, Accounting Today (Mar. 18, 2002) (KPMG's revenues from 2001 were $3.4 billion, not including KPMG Consulting, Inc., which completed an IPO on Feb. 8, 2001); *The 2003 Top 100 Firms*, Accounting Today (Mar. 17, 2003) (KPMG's revenues from 2002 were $3.4 billion); *The 2004 Accounting Today Top 100 Firms*, Accounting Today (Mar. 15, 2004) (KPMG's revenues from 2003 were $3.793 billion).

### H.    Plaintiffs' Loss Allegations

Plaintiffs are various investment companies affiliated with Franklin Templeton Investments.  They allege that they purchased Fannie Mae common stock between January 26, 2001, and September 28, 2005 in reliance on Fannie Mae's financial statements.[10]  Compl. ¶¶ 5, 10-35.  They claim that the price of these holdings dropped significantly between September 21, 2005, and September 28, 2005, and that this drop was attributable to the revelation in Fall 2004 of Fannie Mae's supposed accounting fraud.  Compl. ¶¶ 404, 514.  Notably, there is no allegation that the stocks were sold, when they were sold, what loss was actually sustained, or what was the proximate cause of the loss.

### SUMMARY OF ARGUMENT

This Complaint must be dismissed for several reasons.

***First***, Plaintiffs' allegations that KPMG "reviewed and approved" financial statements by Fannie Mae are not actionable under Section 10(b) as a matter of law.  *See Cent. Bank of Denver v. First Interstate Bank of Denver N.A.*, 511 U.S. 164, 191 (1994).  The vast majority of allegations against KPMG are statements made by Fannie Mae.  Because KPMG cannot be held liable for statements, the complaint must be dismissed as to those allegations.

***Second***, the complaint fails to allege particular facts that lead to the strong inference that KPMG acted with extreme recklessness or fraudulent intent, or deliberately conspired to enrich Fannie Mae officers by committing fraud.  Plaintiffs' allegations amount to the claim that Fannie Mae's application of GAAP was incorrect and that KPMG failed to follow GAAS procedures.

---

[10]  As Fannie Mae and the individual defendants point out, the loss period should end on September 21, 2004, even under Plaintiffs' own theory of loss.  Because the contents of the OFHEO report were disclosed on September 22, 2004, the alleged accounting fraud could not have caused any losses for stock purchased on or after that date.

But these allegations—which are not uncommon in securities fraud suits against accountants—at most state a claim for professional negligence, not deliberate fraud. Courts have repeatedly rejected efforts by plaintiffs to meet the scienter requirements simply by pleading that GAAP and GAAS errors were dramatic and obvious.

*Third*, Plaintiffs also fail to plead specific facts showing that KPMG caused the losses they allege to have sustained. Under *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), the Plaintiffs must allege that conduct by KPMG—and not some other source—proximately caused their loss. But nowhere in their complaint is there any specific allegation identifying when Plaintiffs sold their shares and what loss they suffered. Moreover, Plaintiffs make no effort to establish that it was KPMG's audit opinions—as opposed to the many alleged acts of the Fannie Mae defendants (such as public statements by Fannie Mae's officers to the marketplace)—that caused their loss.

*Fourth*, Plaintiffs cannot state a Section 11 claim against KPMG. Section 11 imposes liability on companies who file registration statements pursuant to the Securities Act of 1933. Fannie Mae is not a registrant under that Act; it has voluntarily registered with the SEC pursuant to the *Securities Exchange Act of 1934*, to which Section 11 is inapplicable. Because the only basis of the Section 11 claim against KPMG is that KPMG consented to inclusion of an audit opinion in an exempt registration statement, it is not liable under Section 11 of the Securities Act.

*Fifth*, Plaintiffs' claims under Section 11 and Section 18 of the Exchange Act (which imposes liability for misleading statements contained in documents filed with the SEC) are time-barred. Both must be brought within a year that the alleged wrong was discovered, and

Plaintiffs—who filed in January 2006, but who allege to have discovered the fraud in September 2004, Compl. ¶ 516—missed that one-year window.

*Sixth*, Plaintiffs' state common-law fraud claim is preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). SLUSA preempts state-law claims that are based on securities fraud. SLUSA's preemptive scope reaches any group of at least fifty plaintiffs that "proceed as a single action for ***any purpose***" in the same court. 15 U.S.C. § 78bb(f) (emphasis added). Here Plaintiffs are, at a minimum, proceeding together with the consolidated class action brought by Lead Plaintiffs, and Plaintiffs' state law claims are therefore preempted. Moreover, Plaintiffs' failure to plead a securities fraud claim with particularity also dooms their common-law fraud claim, which also requires knowing or intentional misconduct to be pleaded with particularity.

## <u>ARGUMENT</u>

### I.    The Complaint Does Not Adequately Allege That KPMG Violated Section 10(b) and Rule 10b-5.

Plaintiffs have failed to state a legally sufficient claim that KPMG violated Section 10(b) and Rule 10b-5. To state a claim for relief under those provisions, they must allege that KPMG (1) made a material misrepresentation or omission, (2) in connection with the purchase and sale of a security, and (3) acted with scienter; and that (4) Plaintiffs relied on these misrepresentations, and (5) KPMG's misrepresentation caused Plaintiffs economic loss. *Dura Pharm.*, 544 U.S. at 584-85.

Plaintiffs shoulder a heavy burden of ***pleading*** these elements. Federal Rule of Civil Procedure 9(b) and the PSLRA together require Plaintiffs to plead each element of their claim for securities fraud with particularity. "In all averments of fraud or mistake," Rule 9(b) instructs, "the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b).

And the PSLRA imposes *additional*—and even more stringent—pleading requirements. It requires not simply that the complaint state facts "with particularity" with respect "to each act or omission alleged"—as opposed to legal conclusions—but also that the particular facts "giv[e] rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "In other words, not only must the complaint make particular factual allegations, but the inference of scienter which those allegations generate must be strong." *P.R. Diamonds, Inc. v. Chandler*, 364 F.3d 671, 682 (6th Cir. 2004).

The PSLRA therefore significantly alters traditional pleading standards, which require all factual inferences to be drawn in the plaintiff's favor. The particular facts pleaded in the complaint must give rise to a ***strong*** inference. This means that if the complaint admits two or more reasonable inferences—fraud and no fraud—the court can, and should, infer that no fraud occurred.[11] Plaintiffs' complaint does not satisfy these pleading requirements.

---

[11] *See Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (holding that PSLRA requires "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs'); *Helwig v. Vencor, Inc.*, 251 U.S. 540, 553 (6th Cir. 2001) (holding that the "strong inference" requirement means that "plaintiffs are entitled only to the most plausible of competing inferences"); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001) (holding that under the PSLRA, "inferences of scienter survive a motion to dismiss only if they are both reasonable and strong inferences" (internal quotation marks and citation omitted)). *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 224 (3d Cir. 2002) (noting that securities-fraud plaintiffs "may not benefit from inferences flowing from vague or unspecific allegations-inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis").

**A.    To The Extent The Complaint Alleges That KPMG "Reviewed And Approved" Statements Made By Fannie Mae, The Complaint Must Be Dismissed.**

According to the complaint, KPMG is the author of *four* of the multiple, purportedly misleading statements it identifies—the professional opinions it rendered on Fannie Mae's financial statements from 2000-2003.

As the Complaint itself recognizes, all the other statements are attributable to Fannie Mae and its executives.[12]  KPMG's only alleged association with those statements is Plaintiffs' boilerplate allegation, repeated throughout the complaint, that KPMG "reviewed and approved" certain financial data Fannie Mae executives incorporated into these statements.  Compl. ¶¶ 222, 229, 256, 260, 285, 300, 321, 333, 340, 360, 363, 370, 373.  Those paragraphs do not allege that KPMG ratified, adopted, or otherwise endorsed these financial figures—only that KPMG reviewed and approved them.

Under well-settled precedent, the Plaintiffs' "reviewed and approved" allegations do not state claims against KPMG for securities fraud.  In *Central Bank of Denver v. First Interstate Bank of Denver N.A.*, 511 U.S. 164, 191 (1994), the Court held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)."  As several courts have recognized, *Central Bank* means that an auditor is liable for securities fraud only for misstatements attributable to it,

---

[12]  Compl. ¶¶ 207, 233-234, 246-247 (speeches by Fannie Mae's executives); 209, 236-237, 268-269, 274, 277, 282, 284-285, 288-289, 291, 293, 299, 320, 323, 327, 332, 335, 339, 346, 349, 353-354, 356-358, 362-363, 365, 372-373, 375 (financial statements and other representations contained in annual reports and SEC filings) 212, 218, 239, 271-272 (statements directed to shareholders) 214-215, 217, 222-224, 226-227, 229-31, 241-242, 244, 249-251, 256-257, 259-261, 263, 285, 300-301, 328-329, 340, 359-360, 369-370 (press releases issued by Fannie Mae); 253-255, 264-266, 297, 303-304, 306, 308-312, 314-315, 318, 342-343 (news conferences, and both conference calls and interviews with securities analysts and reporters).

*not* for misstatements attributable to others.[13]  To hold otherwise would subject accounting firms to liability on the theory that they "facilitated" or "aided" a fraud.  Indeed, even before *Central Bank*, it was the law in this Circuit that an accountant who "is not alleged to have prepared or certified any part of the audit report that was distributed to the investors" is not liable under Section 10(b) and Rule 10b-5.  *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 36 (D.C. Cir. 1987).  Thus, Plaintiffs' allegations that KPMG "reviewed and approved" various statements by the other defendants are simply irrelevant to KPMG's liability for securities fraud and the complaint should be dismissed as to all of those allegations.

### B.    The Complaint Does Not Allege Facts With Particularity That Give Rise To A Strong Inference That KPMG Acted With Scienter.

The Complaint's allegations regarding the statements attributable to KPMG directly are also legally insufficient, because Plaintiffs have failed to "state with particularity facts giving rise to a strong inference that" KPMG "acted with the required state of mind."  Section 10(b) makes actionable only false statements that are "knowing or intentional."  *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197 (1976).  That standard "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially [inflating] the price of securities."  *Id.*

---

[13]  *See*, *e.g.*, *Fidel v. Farley*, 392 F.3d 220, 235 (6th Cir. 2004)  (holding that auditor cannot be liable for "either its alleged implicit endorsement of . . . financial figures or for its failure to insist on a correction to these figures" because to do so "would effectively revive aider and abettor liability in contravention of the Supreme Court's holding in" *Central Bank*); *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175-76 (2d Cir. 1998) (holding that auditor was not liable for allegedly misleading financial statements where plaintiff alleged that accountant "reviewed and approved" statements because the complaint failed to allege that the auditor "communicated misrepresentations to investors"); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996) ("in order for accountants to 'use or employ' a 'deception' actionable under the antifraud law, they must *themselves* make a false or misleading statement (or omission) that they know or should know will reach potential investors"); *In re Cardinal Health Inc. Sec. Litig.*, No. 04-575, 2006 WL 932017, at *59 n.83 (S.D. Ohio Apr. 12, 2006)  (same).

at 199.  In the D.C. Circuit, this standard is demanding.  It means "*extreme* recklessness" indicating "an *extreme* departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992) (emphases added).

 As high as that burden is, it is even higher where, as here, the defendant is an independent auditor alleged to have issued misleading audit opinions in violation of the federal securities laws.  To begin with, "[r]ecklessness on the part of an independent auditor entails a mental state so culpable that it 'approximates an actual intent to aid in the fraud being perpetrated by the audited company.'"  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004) (quoting *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982)); *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (same).  "When the standard of recklessness for an auditor is overlaid with the pleading requirements of the PSLRA, a simple rule emerges:  to allege that an independent accountant or auditor acted with scienter, the complaint must allege specific facts showing that the deficiencies in the audit were so severe that they strongly suggest that the auditor must have been aware of the corporation's fraud."  *In re Smartalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 505, 514 (S.D. Ohio 2000); *see DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388-89 (9th Cir. 2002) (plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct").

 This standard is even more exacting where the auditor's statement is an opinion, rather than a historical fact.  All of the "misrepresentations the complaint attributes to KPMG fall

squarely within the realm of opinion.[14] A "statement of opinion is not the same as a statement of historical fact. Instead, it is an expression of belief, made by an actor at a particular time, under particular conditions, and based on known information." *D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 740 (E.D. Mich. 2003), *aff'd* 133 Fed. Appx. 994 (6th Cir. 2005). Opinions by auditors "generally involve issues such as the auditor's dependence on information supplied by the client, application of complex accounting and auditing standards, and varying degrees of professional judgment." *Id.* (citations omitted). The burden is therefore much higher for plaintiffs to plead scienter in this context.

Plaintiffs' complaint alleges no particular facts, either taken individually or collectively, that warrant the inference that KPMG knowingly conspired with Fannie Mae as to ***any*** of the four KPMG audit opinions it claims were intentionally false and misleading.

> **1.    Plaintiffs' Allegations That KPMG Violated GAAS And GAAP Are Insufficient To Establish Scienter.**

Most of Plaintiffs' scienter allegations can be set aside without extended discussion under the settled rule that allegations of violations of GAAP and GAAS do not in and of themselves establish at the pleading stage that an outside auditor engaged in extremely reckless or intentional misconduct. *See*, *e.g.*, *Fidel*, 392 F.3d at 230 ("the failure to follow generally

---

[14] The complaint alleges that KPMG issued four misleading audit ***opinions*** stating that, in its view, Fannie Mae's annual financial statements from the years 2000 through 2003 were stated "fairly" and were compliant with GAAP in all "material" respects, *see* Compl. ¶¶ 211, 238, 270, 347. "[I]n issuing an opinion," however, "the auditor certifies only that it exercised appropriate, not flawless, levels of professional care and judgment." *In re Ikon Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 673 (3d Cir. 2002); *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995) (noting that "GAAP is not [a] lucid or encyclopedic set of pre-existing rules"); *Thor Power Tool Co. v. CIR*, 439 U.S. 522, 544 (1979) (noting that GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management"). The statements do not guarantee the accuracy of Fannie Mae's financial data.

accepted accounting procedures does not in and of itself lead to an inference of scienter"); *P.R. Diamonds*, 364 F.3d at 694 ("it is well-settled that violations of GAAP and GAAS, standing alone, do not create an inference of scienter, much less a strong one" (internal quotation marks and citation omitted)); *Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395 F.3d 851, 855 (8th Cir. 2005) (citing cases).

And that is the core of Plaintiffs' claims. Plaintiffs' allegations consist almost entirely of the claim that Fannie Mae departed from GAAP and KPMG misapplied GAAS. The complaint is replete with long quotations pulled from auditing standards promulgated by the American Institute of Certified Public Accountants, assertions that Fannie Mae's financial statements were false and misleading, topped off with a conclusory assertion that KPMG "must have" violated GAAS because of its failure to detect the accounting mistakes later uncovered at Fannie Mae. Compl. ¶¶ 454, 456, 463, 465, 466-472, 476, 479, 488. To give a representative example, in paragraph 466, Plaintiffs allege that Fannie Mae's financial statements contained "misstatements," that KPMG issued unqualified audit opinions on Fannie Mae's annual financial statements and, "accordingly," that KPMG "violated the reporting standards of GAAS."[15]

This is a far cry from pleading with particularity facts that KPMG issued false audit opinions intentionally or with extreme recklessness in order to help Fannie Mae and certain

---

[15] *See also* Compl. ¶¶ 455 (arguing that "[g]iven the pervasive nature and magnitude of the Company's GAAP violations . . . it strains credulity to even consider that KPMG was unaware of what was taking place"); 456 (arguing, without specific factual support, that "had KPMG complied with . . . GAAS standards in a non-reckless fashion, it" would have discovered Fannie Mae's accounting errors); 457-458 (listing various "control deficiencies" with Fannie Mae's accounting and arguing, without specific factual support, that these "should have been obvious" to KPMG); 470 (arguing that KPMG violated GAAS by not issuing a qualified audit opinion given the misstatements in Fannie Mae's annual financial statements).

officers achieve bonus targets and smooth earnings growth. Indeed, it is telling that Plaintiffs frame most of their allegations in terms of how KPMG "should have" scrutinized Fannie Mae's accounting practices.[16] Allegations about what KPMG "should have" done are classic claims of negligence. These are claims that KPMG did not exercise the appropriate duty of care; that its audits were fundamentally flawed; and that its practices did not reflect the exercise of ordinary diligence. But claims of **negligence** are not cognizable under Section 10(b). *See, e.g.*, *Ernst & Ernst*, 425 U.S. at 215; *DSAM*, 288 F.3d at 390 ("mere allegations that an accountant negligently failed to review files or follow GAAP cannot raise a strong inference of scienter"). Even a "seriously botched audit," *DSAM*, 288 F.3d at 388—one that plainly does not comply with GAAP or GAAS—is not actionable under Section 10(b) as a matter of law. *See, e.g.*, *Fidel*, 392 F.3d at 230; *Chandler*, 364 F.3d at 694; *Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 359 F.3d at 855. Yet that is the fundamental core of what Plaintiffs allege here.

### 2. Allegations That Fannie Mae's Fraud Was Large Do Not Establish That KPMG Acted With Scienter.

Plaintiffs also allege that the size of the restatement is so large as to establish that KPMG issued an audit opinion believing it was false. Compl. ¶¶ 455-456, 465. But "[a]llowing an inference of scienter based on the magnitude of the fraud 'would eviscerate the principle that

---

[16] *See* Compl. ¶¶ 451 ("KPMG *should have* been scrutinizing Fannie Mae's accounting for derivatives particularly closely"); 454 (alleging that GAAS "*should have* guided KPMG in planning adequate audit procedures . . ."); 457 (internal control deficiencies uncovered by government regulators "*should have been* readily obvious to KPMG"); 463 (various "'red flags' . . . *should have* triggered KPMG to amend and extend its audit procedure"); 464 ("KPMG ignored the following facts . . . which *should have* tipped it off to the fraud"); 465 (GAAS "*should have* provided a roadmap for KPMG to uncover the accounting fraud"); 472 ("KPMG, as Fannie Mae's longstanding auditor *should have* uncovered the Company's significant departures from GAAP"); 484 ("KPMG's quarterly review procedures *should have* included" various additional steps).

accounting errors alone cannot justify a finding of scienter.'" *Fidel* 392 F.3d at 231 (quoting *In re SCB Computer Tech, Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 359 (W.D. Tenn. 2001)). Moreover, "[i]t would also allow the court to engage in speculation and hindsight, both of which are contrary to the PSLRA's mandates." *Id.* In particular,

> "[i]nferring scienter from the magnitude of the fraud invites a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show the accountant acted with scienter [and] obscure[s] the potentially infinite number of innocuous reasons an accountant may fail to detect a fraud of large magnitude. For example, the magnitude of the fraud could flow from improprieties in transactions that fell outside the scope of the audit, or from manipulations the company concealed from its accountant and the public.

*Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000). The PSLRA does not permit this: it requires securities-fraud plaintiffs to plead particular *facts* demonstrating KPMG's awareness of the fraud, not simply the fraud itself.

### 3. Allegations That KPMG Received Audit Fees From Fannie Mae Do Not Establish That KPMG Acted With Scienter.

Nor can Plaintiffs make legally sufficient allegations of scienter from KPMG's purported "motive and opportunity" to commit fraud. Compl. ¶¶ 459-460, 489. KPMG's "motive" for perpetrating this alleged fraud, the complaint alleges, was to earn $25.3 million in fees from Fannie Mae from 2000-2003 for professional services rendered.

As a matter of law, these allegations do not give rise to a strong inference that KPMG knowingly issued false audit opinions as part of an effort to help Fannie Mae officers by hitting earnings targets. It simply belies common sense that a large, respected accounting firm such as KPMG would risk its reputation and invite massive legal liability for $25.3 million in audit fees from Fannie Mae over a period time in which the firm earned *billions* of dollars in revenue annually. Plaintiffs in securities fraud cases are not permitted to have the court draw illogical and fundamentally irrational "inferences." As Judge Easterbrook has explained, "[a]n

accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work.  Fees for two years of audits"—no less than the four years of audits at issue here— "could not approach the losses [KPMG] would suffer from a perception that it would muffle a client's fraud," *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990), let alone from the resulting legal liability.  *See also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 n.7 (9th Cir. 1994) ("[i]t is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees" (citation and internal quotation marks omitted)).

As Judge Preska has explained, for an auditor to participate in an accounting fraud to procure auditing fees is simply irrational:

> I am not prepared to assume . . . that a Big Six (or, indeed, other) accounting firm like Coopers & Lybrand would knowingly condone a client's fraud in order to preserve a fee that, at best, is an infinitesimal percentage of its annual revenues and, by doing so, jeopardize its reputation and license, as well as subject itself to potential damages literally tens of thousands of times as large as its fee and subject the partner involved to potential professional and financial extinction.  Such action by certified public accountants would be economically irrational.  As such, it makes no sense . . . and no court should leap to this conclusion absent facts from which one could infer manifestly economically irrational behavior by these professionals.

*Duncan v. Pencer*, 94 Civ. 0321, 1996 WL 19043, at *10 (S.D.N.Y. Jan. 18, 1996).  That principle is dispositive here.  There is no allegation in the complaint to explain why the court should draw an inference that KPMG deliberately engaged in securities fraud simply to procure an audit fee from Fannie Mae.  *See*, *e.g*., *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d at 224.

Even an allegation that KPMG's fees from Fannie Mae were a "large percentage" of its total revenue would have been insufficient to plead KPMG's scienter—and Plaintiffs have not even made such an allegation.  *See In re Cardinal Health Inc. Sec. Litig*., 2006 WL 932017, at

*59 (S.D. Ohio Apr. 12, 2006) (declining to infer an auditor's scienter from allegation that auditor "received a large percentage of its total fees for its non-audit work" from the client accused of accounting fraud).  Indeed, in every case where there is an audit failure and the audit does not comply with GAAP, or the auditor did not comply with GAAS, the auditor was compensated.  If these facts were enough to establish that the auditor knowingly engaged in fraud, the PSLRA would be a dead letter.  That is why courts have recognized that "absent truly extraordinary circumstances, an auditor's motivation to continue a profitable business relationship"—and Plaintiffs do not even trouble to allege that KPMG's relationship with Fannie Mae was "profitable"—"is not sufficient by itself to support a strong inference of scienter."  *In re Stone & Webster, Inc. Sec. Litig.* 414 F.3d 187, 215 (1st Cir. 2005).  Plaintiffs' allegations create ***no*** inference—let alone the "strong inference"—that KPMG knew of any misconduct on Fannie Mae's part.

### 4.    Allegations That KPMG Had Access To Fannie Mae's Records Do Not Demonstrate KPMG Acted With Scienter.

Equally unavailing is Plaintiffs' allegation that KPMG had the "opportunity" to commit fraud because it had access to Fannie Mae's internal financial and corporate business information.  Compl. ¶ 460.  An allegation that an auditor "had access to . . . documents that revealed" accounting fraud "does not strongly compel an inference of intentional or deliberately reckless conduct."  *DSAM*, 288 F.3d at 390.  Nowhere do Plaintiffs allege what KPMG "might have learned from its access to the company's confidential information, what [it] might have known based on its consulting engagement, or even what documents [it] reviewed as part of its 'unfettered access.'"  *Fidel*, 392 F.3d at 229-30.  Indeed, as Judge Bates recently concluded, "were plaintiffs' theory correct, all GAAP violations of a certain magnitude would give rise to a cause of action under section 10(b) and Rule 10b-5 against an issuer's brokers and accountants."

*In re Interbank Funding Corp. Sec. Litig.*, 329 F. Supp. 2d 84, 90 (D.D.C. 2004), *vacated and remanded in part on other grounds sub. nom*, *Belizan v. Hershon*, 434 F.3d 579 (D.C. Cir. 2006) (citing cases).

*Every* auditor has access to a company's internal books and records and charges fees. To hold that these *generic* allegations of "motive and opportunity" give rise to the strong inference that an auditor engaged in extremely reckless conduct would eviscerate the PSLRA's requirement to plead *particular* facts demonstrating fraud. As Judge Bates noted, "that is not the law." *In re Interbank Funding Corp. Sec. Litig.*, 329 F. Supp. 2d at 90.

### 5. Allegations That KPMG Knew Of What Plaintiffs Characterize As "Red Flags" Do Not Establish That KPMG Acted With Scienter.

Plaintiffs also allege that KPMG acted with scienter because it overlooked a laundry-list of what they label "red flags." "However, the mere fact that an auditor missed what a plaintiff labels warning signs gives little support on its own to the conclusion that an auditor was reckless, much less willfully blind, with respect to the falsity of information in a financial statement." *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d at 214. Here, as in *In re Stone and Webster*, "the so-called 'red flags' were so described without particularized allegations supporting the recklessness of [KPMG] in missing them when conducting its audits." *Id.*

Virtually all of the "red flags" that Plaintiffs cite are simply restatements of Fannie Mae's alleged accounting errors and general, in-and-of-themselves innocent features of Fannie Mae's management structure. Taking these generic facts—which in themselves are legally insufficient to establish scienter—and putting them into a chart captioned "Red Flags" does not magically

transmute the complaint into a legally sufficient pleading.[17]  The complaint never says that

KPMG **knew** of any particularized **facts** specifically alerting it to these accounting errors.  The

very accounting errors that KPMG is alleged to have missed completely cannot be a "red flags";

instead "[r]ed flags are 'specific, highly suspicious facts and circumstances available to the

auditor at the time of the audit.'"  *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 718 (E.D. Ill. 2005)

(quoting *Riggs Partners LLC v. Hub Group, Inc.*, No. 02 C 1188, 2002 WL 31415721, at *9

(N.D. Ill. 2002)).  Plaintiffs allege no particular facts suggesting that at the time of the audit

KPMG knew that Fannie Mae had committed accounting fraud or that KPMG affirmatively

desired to enter into a conspiracy with Fannie Mae.

Similar pleading infirmities led the First Circuit to uphold the dismissal of a securities-

fraud complaint containing very comparable allegations of GAAS violations.  *In re Stone &*

*Webster, Inc. Securities Litigation*, 414 F.3d 187 (1st Cir. 2005).  In that case, the plaintiffs

alleged that an outside auditor had violated GAAS by ignoring various "red flags" indicating that

the financial statements it was auditing were false and misleading.  Though the complaint

asserted that the auditor "missed various 'red flag' warning signs," the court held that the

---

[17]  *See* Compl. ¶¶ 163 (alleging that KPMG ignored "fact" that Fannie Mae violated SFAS 133);
*id.* (KPMG ignored "fact" that "Fannie Mae manipulated and misapplied market data"); *id.*
(KPMG ignored "fact" that "Fannie Mae purchased fictitious insurance policies to defer loan
losses"); 164 (saying that KPMG ignored the "fact" that "Fannie Mae did not properly
document its hedging activities"); *id.* (KPMG ignored "fact" that Fannie Mae "made
discretionary and unsupported adjustments to financial statements and had 'cookie jar'
reserves"); *id.* (KPMG ignored "fact" that "Fannie Mae's Office of Auditing failed to
investigate problems identified by Fannie Mae employees"); *id.* (KPMG ignored "fact" that
the Office of Auditing was not "independent"); *id.* (KPMG ignored "fact" that "[c]apitalized
adjustment differences were amortized over a period of time up to 30 years, yet KPMG
insisted on a policy to consistently amortize 'catch up' adjustments"); *id.* (KPMG ignored
"fact" that "'on top' adjustments were made to the Company's books at the corporate level,
for the sole purpose of minimizing volatility and achieving desired financial results").

complaint nonetheless "lack[ed] concreteness as to how the conduct of the audit *related* to the missed warning signs."  *Id.* at 214 (emphasis added); s*ee also In re Interbank Funding*, 329 F. Supp. 2d at 92 (dismissing securities fraud complaint for failure to comply with this requirement because "plaintiffs' factual allegations as a whole are plagued with imprecision").  That is the case here: as in *In re Stone & Webster*, the complaint "lacks concreteness as to how the conduct of the audit[s] related to the missed warning signs."  414 F.3d at 214.

The only two facts that even arguably address this point do nothing to support an inference that KPMG intentionally participated in Fannie Mae's fraud or acted with scienter. Plaintiffs first point to KPMG's objection to a $200 million deferral of the amortization catch-up that they say should have been recognized in 1998, and allege that KPMG listed this amount as an "audit difference."  Compl. ¶¶ 80, 448.  An "audit difference" is nothing more than a difference between the issuer's numbers and the auditor's conclusions.  *See In re Ikon Office Solutions Inc.*, 277 F.3d 658, 676 (3d Cir. 2002).  Noting an "audit difference," therefore, does not show that fraud occurred or that KPMG helped Fannie Mae engage in fraud.  Nor does it mean that KPMG thought this to be a *material* misapplication of GAAP or a violation of GAAS. Indeed, courts have recognized that where an auditor disagrees with its client on the application of accounting principles, the auditor's "refusal to record the proposed adjustments [is] within the bounds of its discretions."  *In re SCB Computer Technology, Inc. Securities Litigation*, 149 F. Supp. 2d 334, 365-66 (W.D. Tenn. 2001).  As GAAS recognizes, "when an auditor concludes that a company's financial statements are not materially misstated, the auditor has no duty to add any disclosures to the audit opinion even if the company does not make recommended changes to its financial statements."  *Id.* (citing AU § 312).

Moreover, Plaintiffs' **own** allegations about the audit difference reflect KPMG's diligence in conducting its audit and establish that KPMG did **not** intend to defraud or aid in defrauding investors. According to Plaintiffs, KPMG audited Fannie Mae's FAS 91 accounting at the end of 1998, recommended that Fannie Mae record $400 million of expense, consulted with Fannie Mae and objected to Fannie Mae's decision to amortize $200 million of expense, noted an audit difference of $200 million, and reported the audit difference to the Audit Committee. Compl. ¶¶ 80, 448. If KPMG intended to engage in fraud regarding Fannie Mae's deferral of $200 million of expense, it would not have listed that amount as an audit difference and it certainly would not have raised the issue with anyone on the Audit Committee.

Besides, this audit difference says nothing about whether KPMG had knowledge of accounting difficulties in any of the four audit opinions alleged to have been misleading, none of which concerned fiscal year 1998, let alone whether that single instance was material. *See Fidel*, 392 F.3d at 229 (rejecting relevance to an auditor's scienter of "red flags [that] occurred in 1996, two years before the audit in question in this case"); *In re Ikon Office Solutions Inc.*, 277 F.3d at 670 (rejecting as irrelevant evidence of an auditor's misconduct outside the time period the allegedly fraudulent audit opinion concerned). Plaintiffs do not use KPMG's audit opinions from 1998 as an independent basis for alleging securities fraud—wisely, as any such claim would be time-barred. *See* 28 U.S.C. § 1658 (b) (requiring securities-fraud plaintiffs to bring their claims no later than five years after the violation). The complaint is silent about whether similarly particularized instances occurred during the actual fiscal years in question in this case—even though the PSLRA requires scienter to be alleged "with respect **to each act or omission alleged to violate this title**." 15 U.S.C. § 78u-4(b)(2) (emphasis added). That language

precludes Plaintiffs from using prior knowledge of accounting differences that occurred years before the audit opinions at issue in this litigation were issued.

Second, Plaintiffs allege that KPMG knew of Fannie Mae's accounting irregularities because KPMG was present at a meeting at which a lone Fannie Mae employee claimed that the company was not following GAAP and then performed only a "perfunctory investigation." Compl. ¶¶ 185, 188-189, 449. That allegation says absolutely nothing about whether KPMG had a reasonable basis for the audit opinions it issued for the years 2000-2003, all of which ***predated*** the revelation of Roger Barnes' allegations to KPMG.

And even as to the only audit opinion to which it could conceivably be relevant—the audit report issued on Fannie Mae's 2003 financial statement—the complaint sheds no light on how Roger Barnes' particular allegations affected the accuracy of KPMG's audit opinion, much less whether Barnes' allegations of accounting mistakes concerned ***material*** mistakes in Fannie Mae's accounting, much, much less whether any such errors were corrected prior to KPMG's issuance of its unqualified audit opinion in connection with Fannie Mae's 2003 10-K filing. Even according to Plaintiffs' complaint, moreover, it is simply not true that Barnes' allegations were "shrugged off," Compl. ¶ 189, or not taken "seriously," Compl. ¶ 449. Plaintiffs' own allegations belie this. The complaint shows that Barnes' allegations were indeed taken seriously. First, Fannie Mae executives met with Barnes and discussed his allegations. Compl. ¶ 184. Next, Fannie Mae's internal audit team investigated his allegations. Compl. ¶ 185. Finally, Fannie Mae held an internal meeting, with KPMG present, specifically for the purpose of discussing and addressing his allegations. Compl. ¶ 186. Barnes' concerns were also communicated to the Audit Committee. Compl. ¶ 187. In the end, KPMG disagreed with Barnes' claims that Fannie Mae was not following GAAP, Compl. ¶ 186. This is the stuff of an

honest disagreement after a reasonable investigation on the application of complicated accounting principles.  It is not fraud.

For all Plaintiffs' complaint says, KPMG could have, consistent with the unqualified auditor's report it provided on Fannie Mae's 2003 financial statements, reasonably believed that Barnes' allegations were overheated and insubstantial.  Remarkably, Plaintiffs' complaint inadvertently confirms this by alleging that KPMG ***disagreed*** with Barnes' assessment that Fannie Mae was violating GAAP.  Compl. ¶ 186.  That KPMG disagreed would explain why (according to Plaintiffs' allegations at least) KPMG did not do more to investigate Barnes' allegations.  Compl. ¶¶ 189, 449.  Plaintiffs cannot satisfy their pleading obligation by invoking a theory of scienter that is at war with their own factual allegations.

> **6.    Plaintiffs Have Not Pleaded Facts With Particularity That Collectively Warrant A Strong Inference That KPMG Acted With Extreme Recklessness.**

Even taking Plaintiffs' allegations as a whole, they still fail to give rise to a strong inference that KPMG acted with the required scienter.  Because "Plaintiffs have failed to allege [the auditor's] scienter as to any of these alleged mistakes ***individually***, their allegations must also fail when considered in their totality."  *In re Cardinal Health Inc. Sec. Litig*., No. 04-575, 2006 WL 932017, at *67 (S.D. Ohio Apr. 12, 2006) (emphasis in original).  As the Third Circuit has explained, "fraud allegations should be analyzed individually to determine whether each alleged incident of fraud has been pleaded with particularity."  *In re Rockefeller Ctr. Props. Inc. Sec. Litig.*, 311 F.3d 198, 224 (3d Cir. 2002).  Thus, "[i]f, after alleging a number of events purportedly substantiating a claim of fraud, none of those events independently satisfies the pleading requirement of factual particularity, the complaint is subject to dismissal under" the PSLRA.  *Id.*  For the reasons explained above, each of Plaintiffs' numerous individual bids to plead KPMG's scienter fails.  It follows that the allegations as a whole fail to do so as well.

33

### C.    Plaintiffs Have Not Adequately Pleaded Loss Causation.

Plaintiffs also have failed to plead loss causation in a manner that complies with *Dura Pharm*.  The PSLRA provides that in all private actions brought under the Exchange Act, the plaintiff has the burden of "proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  The standard requires that Plaintiffs demonstrate not simply that they purchased Fannie Mae stock in reliance on an actionable misrepresentation, but also that they show how the misrepresentation "proximately cause the relevant economic loss."  *Dura Pharm*, 544 U.S. at 342.  Moreover, like all other elements of a fraud claim, Federal Rule of Civil Procedure 9(b) requires Plaintiffs to plead loss causation with particularity.  *See In re Van Wagoner Funds, Inc.*, 382 F. Supp. 2d 1173, 1188 (N.D. Cal. 2004).

*Dura Pharm* makes clear that Plaintiffs' burden of pleading this element is no empty formality.  In *Dura Pharm*, the plaintiffs claimed that the allegation they purchased stock at prices "artificially inflated" by defendant's misrepresentations satisfied their burden of pleading that the misrepresentations caused them economic harm.  The Supreme Court disagreed on several grounds.  First, it noted that "at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment . . . *at that instant* possesses equivalent value."  *Dura Pharm*, 544 U.S. at 342.  Second, it pointed out that "if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."  *Id.*  Finally, it noted that, even if the purchaser subsequently resells shares at a loss, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Id.* at 343.

34

*Dura Pharm* demonstrates that Plaintiffs' complaint fails to allege that the four audit opinions issued in connection with Fannie Mae's 2000-2003 financial statements caused Plaintiffs' economic loss. Like the complaint the Supreme Court held insufficient in *Dura Pharm*, Plaintiffs allege little more than that they purchased shares at "artificially inflated prices" as a result of the various defendants' misrepresentations. Compl. ¶ 512.

In particular, Plaintiffs allege that "Fannie Mae's stock price was massively inflated as the result of the Defendants' long-standing, comprehensive scheme to misrepresent Fannie Mae's financial results." Compl. ¶ 512. By Plaintiffs' own admission, they are "investors that *collectively purchased* over $350 million in Fannie Mae common stock between January 26, 2001, and September 28, 2005." Compl. ¶ 5 (emphasis added). Plaintiffs do say that when this fraud was revealed, Fannie Mae's stock price dropped as a result. Compl. ¶¶ 513-514. They also say that they "lost over $45 million as a result of these purchases of these securities." Compl. ¶ 5. But Plaintiffs never back up that conclusion with particular factual allegations demonstrating that causal connection—whether or, if so, when, they *sold* their shares. *See* Compl. ¶¶ 10-35 (noting Plaintiffs' various stock purchases, but no sales). For all Plaintiffs' complaint says, Plaintiffs could well have sold their shares before the point at which Fannie Mae's stock price began to fall and hence suffered no loss whatsoever, or they might have held onto those shares for some sustained period of time. Plaintiffs accordingly have failed to link the drop in Fannie Mae's stock price to any injury suffered *by them*.

On facts nearly identical to these, Judge Motz recently dismissed a securities-fraud class action for failure to demonstrate loss causation. The plaintiffs defined the putative class as those individuals who purchased securities "at artificially inflated prices." *Wiggins v. Janus Capital Group Inc.*, No. 04-818, 2006 WL 709853, at *1 (D. Md. Feb. 27, 2006). The plaintiffs also

alleged that the defendants' misrepresentations caused a decline in the value of those securities. *Id.* Nonetheless, Judge Motz found that the plaintiffs had failed to prove loss causation because "the putative class is not defined to include only investors who purchased Janus Capital securities during the Class Period ***and who sold them after the market timing revelations were made*.**" *Id.* (emphasis added). "Rather, the definition encompasses every investor who purchased the securities of Janus Capital between July 21, 2000 and September 2, 2003 . . . and who were damaged thereby." *Id.* "Thus, plaintiffs' allegation of loss causation depends solely upon their allegedly having paid 'artificially inflated prices,' which is precisely the type of allegation the Supreme Court found to be insufficient in *Dura Pharmaceuticals*." *Id.* The same is true here. Plaintiffs allege only that they purchased at artificially inflated prices and ***never allege that they sold them and suffered loss from the decline in price***.

Equally fundamentally, Plaintiffs do not attempt to isolate the effect of KPMG's particular audit opinions on the decline in Fannie Mae's stock price. The complaint elides the distinction between KPMG's conduct and the conduct of all the rest of the defendants, instead simply alleging that "the Defendants' fraudulent scheme" and the "revelations of accounting fraud at Fannie Mae," *en masse*, caused the decline in Fannie Mae's stock. This is insufficient; Plaintiffs' burden is to show that ***KPMG's*** audit opinions were an independently substantial factor in causing the loss. *See Robbins v. Koger Props.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (noting that the plaintiff must prove that the defendant's act was a "significant, contributing cause"); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 187 (3d Cir. 2000) (requiring the defendant's "alleged misrepresentations [to be] a substantial cause of the inflation in the price of a security and in its subsequent decline in value"). This failure to allege anything that separates the effect of KPMG's purportedly misleading fraudulent statements from the conduct of the rest

36

of the defendants fails to satisfy their burden of pleading with particularity that KPMG's audit opinion specifically caused their loss, if any.

Plaintiffs do, of course, sprinkle their complaint with conclusory allegations that had KPMG not issued unqualified audit opinions on Fannie Mae's financial statements, they would not have invested in Fannie Mae stock. Compl. ¶¶ 473, 487. Those allegations, however, at most address the distinct element of *transaction* causation, not *loss* causation. Transaction causation concerns whether a defendant's misrepresentation induced the plaintiff to enter *into* a transaction, not whether the misrepresentation caused the plaintiff's *loss*. *See, e.g.*, *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 35 n.5 (D.C. Cir. 1987) (noting that "under § 10(b), a plaintiff must show not only that the fraud caused economic harm, or 'loss causation,' but also that the fraud caused the plaintiff to engage in the transaction in question, which is 'transaction causation'"); *Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196-97 (2d Cir. 2003). The two elements are fundamentally distinct, as *Dura Pharm* makes clear by holding that a securities-fraud plaintiff must "show not only that had he known the truth he would not have acted *but also* that he suffered actual economic loss" as a result of the defendant's misrepresentation. 544 U.S. at 343 (emphasis added). The complaint therefore does not allege with particularity that KPMG's audit opinions caused Plaintiffs any loss whatsoever.

## II.     Because Fannie Mae's Securities Are Not Subject To The Securities Act Of 1933, KPMG Cannot Be Liable Under Section 11 Of The Act.

Plaintiffs' claim against KPMG under Section 11 of the Securities Act should be dismissed because Fannie Mae's securities are not subject to the Securities Act and, indeed, were never registered under the Securities Act. Section 11 of the Securities Act imposes liability on individuals who sign statements registering securities with the SEC under the Securities Act if those statements are materially false or misleading. Specifically, Section 11 imposes liability

when "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k.  Section 2 of the Securities Act defines "registration statement" as "the statement provided for in section 6" of the Act.  Id. § 77b(a)(8).  Section 6, in turn, defines the procedure for registering securities under the Securities Act.  Id. § 77f.

Fannie Mae, however, has filed no such registration statement and was not required to do so under the Securities Act.  Fannie Mae was not required to do so because it is a "federal instrumentality," and therefore exempt from the registration requirements of the Securities Act.  15 U.S.C. § 77c(a)(2).  Although Fannie Mae did voluntarily register its securities with the SEC in 2003, it did so pursuant to the *Exchange Act*—not under Section 11 of the *Securities Act*.  *See* Compl. ¶ 281 (noting that "Fannie Mae filed its General Form for Registration of Securities Pursuant to Section 12(b) or (g) of the Securities Exchange Act of 1934"); *see also* Fannie Mae 2003 Registration Statement at 1; 12 C.F.R. §§ 1730.1-1730.4 (2005).  Section 3 of the Securities Act provides that "unless as hereinafter expressly provided, the provisions of this subchapter"—*i.e.*, the Securities Act—"shall *not* apply to . . . [a]ny security issued or guaranteed by . . . any person controlled or supervised by and acting as an instrumentality of the Government of the United States pursuant to authority granted by Congress of the United States."  15 U.S.C. § 77c(a), (a)(2) (emphasis added).  Fannie Mae is a federally created entity that is deemed to be an instrumentality of the federal government subject to federal supervision.  *See Rust v. Johnson*, 597 F.2d 174, 177-78 (9th Cir. 1979) (holding that Fannie Mae is a federal instrumentality "engaged in the performance of government functions").  Moreover, 12 U.S.C. § 1719(d)—under which Fannie Mae issues its securities—provides that Fannie Mae's

securities "shall, to the same extent as securities which are direct obligations of or obligations guaranteed as to principal and interest by the United States, be deemed to be exempt securities within the meaning of laws administered by the Securities and Exchange Commission." This statutory framework shows that Fannie Mae is exempt from the Securities Act. *See Kidder Peabody & Co., Inc. v. Unigestion Int'l, Ltd.*, 903 F. Supp. 479, 495-96 (S.D.N.Y. 1995) (holding that Fannie Mae's securities are exempt securities under the Securities Act).

Because the only basis of the Section 11 claim against KPMG is that KPMG consented to including its audit report in Fannie Mae's 2003 registration statement, Compl. ¶¶ 281-283, the Section 11 claim against KPMG must be dismissed.

## III.    Plaintiffs' Claims Against KPMG Under Section 11 of the Securities Act And Under Section 18 Of The Exchange Act Are Time-Barred.

Plaintiffs' Section 11 claim and their claim under Section 18 of the Exchange Act are both time-barred. Section 18 of the Exchange Act imposes liability on those who make misleading statements in documents filed with the SEC. 15 U.S.C. § 78r(a). To state a prima facie case under Section 18, a plaintiff must allege: (1) a false and misleading statement made by defendant; (2) that is material; (3) contained in an SEC filing; (4) upon which plaintiffs relied in their purchase of a security. *Magna Inv. Corp. v. John Does One through Two Hundred*, 931 F.2d 38, 39 (11th Cir. 1991).

Plaintiffs admit that they knew of KPMG's alleged misrepresentations, at the latest, by September 22, 2004. Compl. ¶ 516 ("Plaintiffs did not know . . . the falsity of Fannie Mae's financial statements . . . before September 22, 2004."). Yet they did not sue KPMG until January 24, 2006, well over a year from the time they discovered the facts that formed the basis of their claims. These claims come too late; the statutes of limitations applicable to both of these claims required Plaintiffs to bring them no later than one year after they discovered their factual basis.

### A.    Plaintiffs' Section 11 And Section 18 Claims Are Governed By A One-Year Statute Of Limitations.

The plain terms of the Securities Act and the Exchange Act apply a one-year statute of limitations to both Section 11 and Section 18 claims.  Section 13 of the Securities Act governs the period applicable to Section 11 claims.  It provides that "[n]o action shall be maintained to enforce any liability created under section 11 . . . unless brought within *one year* after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m (emphasis added).  Similarly, Section 18(c) of the Exchange Act provides that "[n]o action shall be maintained to enforce any liability created under this section unless brought within *one year* after the discovery of the facts constituting the cause of action."  Both of these provisions could not be more clear: they directly govern Section 11 and Section 18 actions and require Plaintiffs to plead these claims less than one year after the date the basis of the claims comes to light.

### B.    Sarbanes-Oxley Did Not Alter The Limitations Period Applicable To Plaintiffs' Section 11 And Section 18 Claims.

We anticipate Plaintiffs will contend that the longer two-year statute of limitations created for securities fraud actions by the Sarbanes-Oxley Act of 2002, Pub. L. 107, § 804(a) (2002) (codified at 28 U.S.C. § 1658) amended these express limitations provisions *sub silentio*.  Plaintiffs' counsel made, and the court rejected, precisely this argument in *Wyser-Pratt Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 568-69 (6th Cir. 2005).  As the legislative history and statutory construction, and the judicial authority interpreting the effect of the Sarbanes-Oxley Act, demonstrate, that argument of the Plaintiffs is incorrect.

Spurred by various high-profile accounting scandals, Congress in the Sarbanes-Oxley Act of 2002 overruled a Supreme Court case called *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991).  *Lampf* held that that federal securities-fraud claims brought

under Section 10(b) of the Exchange Act are governed by the statute of limitations set forth in Section 9(e) of the Exchange Act, which requires claims to be brought within one year from the discovery of the violation. *See id.* at 364 & n.9. The Court did so by "borrowing" that limitations period, since no statute of limitation expressly applies to claims brought under Section 10(b). *See id.* at 355. Congress intended Sarbanes-Oxley to supplant *Lampf* and govern fraud actions brought under Section 10(b). By its plain terms, Sarbanes-Oxley governs claims of "fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws."

Sections 11 and 18 are ***not*** antifraud provisions. As Justice Kennedy explained in his *Lampf* dissent—which Congress cited approvingly when enacting Section 1658(b)—these sections do ***not*** "rest on the common-law fraud model underlying most §10(b) actions." 501 U.S. at 376. Courts therefore have rightly and repeatedly concluded that the general language of Sarbanes-Oxley does not modify the specific statutes of limitations applicable to Section 11 and Section 18 claims. *See*, *e.g.*, *Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 568-69 (6th Cir. 2005) (rejecting the argument that Section 11 claims are subject to a two-year statute of limitations); *In re WorldCom Sec. Litig.*, 294 F. Supp. 2d 431, 451 (S.D.N.Y. 2003) (the conclusion that the statute did not modify the statute of limitations for non-fraud claims—such as Section 11—is "compelled by the text of Sarbanes-Oxley, the text of other securities statutes, relevant precedent, and the legislative history of Sarbanes-Oxley"). The "overwhelming body of judicial opinion" has properly concluded that the statute of limitations for Section 11 and Section 18 claims remains one year. *In re Alstom SA*, 406 F. Supp. 2d 402, 412-13, 418-21 (S.D.N.Y. 2005) (collecting cases). Section 11 and Section 18 claims remain subject to a one-year limitations period and must be dismissed.

**C.     The Putative Class Actions In *In Re Fannie Mae Securities Litigation* Did Not Toll The Statute Of Limitations Applicable To Plaintiffs' Claims.**

Plaintiffs also allege that "the statute of limitations on Plaintiffs' claims have been tolled since September 23, 2004, due to the filing of a securities class action complaint . . . .  Plaintiffs were members of the putative class in that action."  Compl. ¶ 517.  Contrary to this assertion, Plaintiffs do not benefit from class tolling as to their Section 11 and 18 claims against KPMG for two reasons.  *First*, class tolling applies only to individuals who opt-out *after* class certification is settled.  *Second*, class tolling cannot be applied to claims against defendants not named in the class action—such as KPMG—or to claims not raised in the consolidated class action—such as Section 11 and Section 18 claims.

The filing of a putative class action ordinarily tolls the limitations period applicable to the claims asserted by the putative class for the putative class members.  *See Crown, Cork & Seal Co. Inc. v. Parker*, 462 U.S. 345, 350 (1983); *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554-55 (1974).  The Court created that rule to avoid encouraging putative class members to file premature opt-out suits before the district court decides whether to certify the class, creating a "needless multiplicity of actions."  *Crown, Cork, & Seal*, 462 U.S. at 351.

The *American Pipe* rule and its underlying rationale, however, are wholly inapplicable to Plaintiffs' opt-out action.  "*American Pipe* and *Crown, Cork, and Seal* address only actions brought by putative class members *after* certification was denied."  *In re WorldCom Sec. Litig.*, 294 F. Supp. 2d 431, 451 (S.D.N.Y. 2003) (emphasis in original).  And with good reason.  "The purposes of *American Pipe* tolling," as the Sixth Circuit has explained, "are not furthered when plaintiffs file independent actions before decision on the issue of class certification."  *Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 569 (6th Cir. 2005).  Indeed, "[a]pplying the tolling doctrine to separate actions filed prior to class certification would create the very

inefficiency that *American Pipe* tolling sought to prevent." *In re WorldCom Sec. Litig.*, 294 F. Supp. 2d at 451.

For these reasons, the D.C. Circuit has held that *American Pipe* tolling is inapplicable where, as here, opt-out plaintiffs bring their action ***before*** a decision on class certification. *Wachovia Bank & Trust Co., N. A. v. Nat'l Student Mktg. Corp.*, 650 F.2d 342, 346 n.7 (D.C. Cir. 1980). Although the district court was reversed because it applied the incorrect statute of limitations, the D.C. Circuit endorsed the district court's treatment of the class tolling doctrine. *Id.* ("The district court correctly ruled that appellants fail[ed] to qualify for the *American Pipe* tolling rule."). It is not surprising that other courts have repeatedly endorsed the same reasoning. *See Wyser-Pratt*, 413 F.3d at 569-70; *In re WorldCom Sec. Litig.*, 294 F. Supp. 2d at 451-52; *Rahr v. Grant Thornton LLP*, 142 F. Supp. 2d 793, 800 (N.D. Tex. 2000).

Moreover, *American Pipe* tolling is only applicable where opt-outs assert the ***same claims*** against the ***same defendants*** named in the initial putative class action. The initial class action is supposed to "notif[y] the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *American Pipe*, 414 U.S. at 555. KPMG had no such notice. It was not named as a defendant in the initial class action and the initial class action asserted no Section 11 or Section 18 claims. Application of *American Pipe* tolling to KPMG and the other newly named defendants is therefore improper.[18] Plaintiffs should not be permitted to abuse

_____

[18] *See Wyser-Pratte*, 413 F.3d at 556-68 (refusing to apply *American Pipe* tolling to newly named defendants); *Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49, 53-55 (D. Mass. 1995) (holding that *American Pipe* tolling applies only where the opt-outs assert the same claims against the same defendants as the class action); s*ee also Burns v. Ersek*, 591 F. Supp. 837 (D. Minn. 1984), *partially abrogated on other grounds by Agency Holding*

[Footnote continued on next page]

*American Pipe* by springing these new claims—claims that no defendant received notice of until after the statute of limitations had run.

## IV.    Plaintiffs' State-Law Claims Must Be Dismissed.

Finally, Plaintiffs' state-law claims are preempted under the Securities Litigation Uniform Standards Act of 1998  ("SLUSA") and should be dismissed because they do not plead fraud with particularity.  SLUSA broadly preempts state law claims based on securities fraud, including state-law claims brought in federal court.  *In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp. 2d 236, 246 (S.D.N.Y. 2004).  Among other actions, it preempts state-law claims in

> any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—
>
> (I) damages are sought on behalf of *more than 50 persons*; and
> (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for ***any purpose***.

15 U.S.C. § 78b(f) (emphasis added); *see also id.* § 77p(b).  Plaintiffs have essentially conceded that if their suit is consolidated with the consolidated class action their state law claims will be preempted under SLUSA.  Pls.' Obj. to Consolidation ¶ 9 ("consolidating Plaintiffs' claims in the Class Action may prevent Plaintiffs from pursuing valuable state law claims, which they are entitled to pursue in an individual action but which cannot be maintained in a class action").  *See also In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp. 2d at 246-47 (finding that consolidated cases were clearly a "group of lawsuits" under SLUSA).  That very same principle, however, equally applies if Plaintiffs' case is merely coordinated, rather than consolidated, with the main action. The language of SLUSA is cast broadly enough to cover even unconsolidated lawsuits, so long

---

[Footnote continued from previous page]

Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 148 (1987) ("a defendant is put on notice by the initial class action only as to the claims that were raised in that action").

as they "proceed together as a single action for ***any purpose***." 15 U.S.C. § 78b(f) (emphasis

added). Plaintiffs have conceded that their action should "proceed as a single action" for

discovery purposes—including taking joint depositions. Pls.' Obj. to Consol. ¶ 10. This sort of

coordinated action equally triggers the broad preemption provisions of SLUSA.

Finally, Plaintiffs' common-law fraud claim fails for the same reason as their securities

fraud claim. To state a common-law fraud claim under D.C. law, the plaintiff must prove, by

clear and convincing evidence, (1) that the defendant made a false representation (2) of material

fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) on which the

plaintiff relied. *Caulfield v. Stark*, 893 A.2d 970, 974 (D.C. 2006). Fraud, moreover, "must be

particularly pleaded." *Id.*

For the same reasons Plaintiffs have failed to plead scienter and causation with

particularity under Section 10(b) and Rule 10b-5, they have also failed to show under D.C. law

that KPMG made any misleading statements in its audit opinions "with knowledge of its falsity,"

"with the intent to deceive" or that caused their losses. *See supra*, at I.B. Therefore, Plaintiffs

have not stated a claim for common-law fraud.

## <u>CONCLUSION</u>

For the foregoing reasons, KPMG's motion to dismiss should be granted.

Respectfully submitted this 15th day of May 2006.

  /s/ Andrew Tulumello
F. Joseph Warin
Andrew S. Tulumello
Melanie L. Katsur
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for KPMG LLP*

## CERTIFICATE OF SERVICE

I hereby certify that I caused electronic copies of the foregoing to be transmitted on May

15, 2006 to the following counsel:

Stuart M. Grant
Megan D. McIntyre
Grant & Eisenhofer, P.A.
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801

*Counsel for the Franklin Templeton Plaintiffs*

Michael J. Walsh, Jr.
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

*Counsel for Defendants Fannie Mae, Thomas P. Gerrity, Taylor C. Segue, III, William R. Harvey, Joe Pickett, Kenneth M. Duberstein, Manuel Justiz, H. Patrick Swygert, and Leslie Rahl*

Michelle D. Schwartz
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5091

*Counsel for Defendant Franklin D. Raines*

Eldad Zvi Malamuth
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006-1101

*Counsel for Defendant Leanne G. Spencer*

Steven M. Salky
Eric R. Delinsky
Ellen D. Marcus
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, D.C. 20036-2638

*Counsel for Defendant Timothy J. Howard*

Erica Lynne Salmon
Piper, Rudnick, Gray & Carey LLP
1200 19th Street N.W. Suite 700
Washington, D.C. 20036

*Counsel for Defendants Stephen B. Ashley, Donald B. Marron, and Ann Korologos*

Julie A. Richmond
Kathleen M. Donovan-Maher
Jeffery C. Block
Berman Devalerio Pease Tabacco Burt & Pucillo
One Liberty Square
Boston, MA 02190

Joshua S. Devore
Steven J. Toll
Cohen, Milstein, Hausfeld & Toll P.L.L.C
West Tower, Suite 500
1100 New York Ave. N.W.
Washington, DC 20005

Stanley M. Chesley
James R. Cummins
Waite, Schneider, Bayless & Chesley Co., L.P.A.
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, OH 45202

*Counsel for Plaintiff Ohio Public Employees Retirement System*

Robert Romano
Bonnie Altro
Morgan, Lewis & Bockius
101 Park Avenue
New York, NY 10178-0060

*Counsel for Defendant Thomas P. Gerrity*

David I. Ackerman
James Hamilton
Swidler Berlin LLP
3000 K Street N.W. Suite 300
Washington, D.C. 20007

*Counsel for Defendant Joe Pickett*

Daniel John Healy
John H. Doyle, III
Rhonda D. Orin
Anderson Kill & Olick LLP
2100 M Street N.W. Suite 650
Washington, DC 20037

*Counsel for Defendant Leslie Rahl*

Fred F. Fielding
Barbara Van Gelder
Wiley Rein & Fielding LLP
1776 K Street NW
Washington, D.C. 20006

*Counsel for Defendants Anne M. Mulcahy and Frederic V. Malek*

Julie E. Guttman
Baker Botts LLP
The Warner
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400

*Counsel for Defendant Jamie S. Gorelick*

James E. Anklam
Jamie Wareham
Carolyn E. Morris
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005

*Counsel for Defendant Daniel H. Mudd*

Shannon Ratliff
Ratliff Law Firm
600 Congress Avenue
Suite 3100
Austin, TX 78701

*Counsel for Manuel Justiz*

＿＿/s/  Melanie L. Katsur＿＿＿＿＿＿
            Melanie L. Katsur