UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In Re Fannie Mae Securities Litigation | ) ) ) | Consolidated Civil Action No. 1:04-cv-1639 (RJL) |

| | | |
|---|---|---|
| Franklin Managed Trust, et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 1:06-cv-00139 (RJL) |
| v. | ) ) | JURY TRIAL DEMANDED |
| Federal National Mortgage Association, Franklin D. Raines, Timothy Howard, Leanne G. Spencer, Thomas P. Gerrity, Anne M. Mulcahy, Frederick V. Malek, Taylor C. Segue, III, William R. Harvey, Joe Pickett, Stephen B. Ashley, Kenneth M. Duberstein, Jamie S. Gorelick, Manuel J. Justiz, Ann Korologos, Donald B. Marron, Daniel H. Mudd, H. Patrick Swygert, Leslie Rahl, KPMG LLP, Radian Group Inc., and John Doe, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## AMENDED COMPLAINT

GRANT & EISENHOFER P.A.
Stuart M. Grant (D.C. Bar # 450895)
Megan D. McIntyre
Christine M. Mackintosh
Chase Manhattan Centre
1201 N. Market St.
Wilmington, DE 19801
(302) 622-7000
(302) 622-7100 (facsimile)
Attorneys for Plaintiffs

## TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ................................................................................... 1

II.    JURISDICTION AND VENUE .......................................................................... 8

III.   THE PARTIES........................................................................................................ 9

    A. Plaintiffs .................................................................................................................. 9

    B. Defendants .............................................................................................................. 13

       1.    Fannie Mae............................................................................................................ 13

       2.    Officer Defendants.............................................................................................. 15

       3.    Audit Committee Defendants ......................................................................... 17

       4.    Director Defendants........................................................................................... 19

       5.    KPMG ...................................................................................................................... 21

       6.    Radian Group Inc................................................................................................ 22

       7.    John Doe .................................................................................................................. 22

IV.   DEFENDANTS' FRAUDULENT SCHEME ............................................... 23

    A. Overview ................................................................................................................. 23

    B. The Genesis of Fannie Mae's Accounting Fraud ...................................... 27

       1.    Fannie Mae's Compensation Policies Encouraged And Led To Accounting Fraud .... 27

       2.    Defendants Needed To Portray Stability In The Company's Earnings In Order To Maintain The Benefits Of Government Sponsorship...................... 35

       3.    The Fate Of Freddie Mac Loomed Large Over The Fannie Mae Defendants.............. 38

    C. Defendants' Violations of Pertinent SEC Regulations ............................ 41

    D. Defendants' Violations of OFHEO Regulations........................................ 42

    E. Defendants' Violations of GAAP .................................................................. 44

       1.    Fannie Mae's Improper Accounting For Deferred Price Adjustments ........................ 47

       2.    Fannie Mae's Improper Accounting For Derivative Transactions and Hedging Activities........................................................................................... 56

       3.    Fannie Mae's Improper Accounting For Commitments .............................. 73

       4.    Fannie Mae's Improper Classification of Loans Purchased From Lenders.................. 78

       5.    Fannie Mae's Failure To Record Asset Impairments On Guaranty Fees Violated GAAP........................................................................................... 83

       6.    Fannie Mae's Improper Accounting For The Allowance For Loan Losses ................. 83

i

7.  Fannie Mae's Improper Accounting for Dollar-Roll Repurchase Agreements ............ 88

8.  Fannie Mae's Accounting For Insurance In Violation of GAAP ................................. 92

9.  Fannie Mae's Failure to Consolidate Results of Qualified Special Purpose Entities in Violation of SFAS 140 and FIN 46 ............................................................................. 98

10. Fannie Mae's Improper Timing of Recognition of Certain Income and Expense Amounts .................................................................................................................... 100

11. Fannie Mae's Improper Accounting for Investments in Low-Income Housing Tax Credit Partnerships ..................................................................................................... 102

12. Fannie Mae's Improper Accounting For Other-Than-Temporary Impairment of Manufactured Housing Bonds and Aircraft Asset-Backed Securities ....................... 103

13. Fannie Mae's Improper Accounting For Interest-Only Mortgage-Backed Securities 106

14. Fannie Mae's Improper Accounting For The Amortization Of Callable Debt Expense ............................................................................................................. 109

15. Fannie Mae Improperly Accounted For Realignments And Its Security Master Project ....................................................................................................................... 111

16. Fannie Mae's Improper Capitalization Of Payments To Its Partner In Its Short-Lived Minority Lending Initiative .................................................................... 115

17. Fannie Mae Accounted For Real Estate-Owned And Foreclosed Property Expense In Violation Of SFAS 144 .......................................................................................... 117

18. Fannie Mae Improperly Accounted For Troubled Debt Restructurings In Violation Of SFAS 15 And 114 ............................................................................... 122

19. Fannie Mae Improperly Accrued Interest Income On Seriously Delinquent Loans .. 123

20. Fannie Mae Improperly Accounted For Certain Guaranty Fees And Obligations In Connection With Mortgage Backed Securities Trusts ................................................ 124

21. Fannie Mae Created REMICs With No Legitimate Business Purpose ...................... 125

22. Recording Of Excess Tax Reserves Related To Investment In Synfuel Partnerships 129

V.    DEFENDANTS MADE NUMEROUS BUSINESS DECISIONS THAT WERE MOTIVATED BY THE COMPANY'S DESIRE TO REPORT SMOOTH EARNINGS AND TO MEET EPS TARGETS .................................................................................. 133

A. Fannie Mae Restructured Existing Corporate Owned Life Insurance Policies To Manage Earnings ...................................................................................................... 133

B. Fannie Mae Executed Debt Repurchase Transactions To Enable The Company To Hit EPS Targets ..................................................................................... 135

VI.   THE DEFENDANTS IGNORED WHISTLEBLOWERS ............................................ 137

VII.  FANNIE MAE'S DEFICIENT INTERNAL CONTROLS ........................................... 146

VIII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................ 164

A. Raines' December 15, 2000 Speech ........................................................................ 164

B.  The 2000 Annual Report ........................................................................................ 165

C.  The April 17, 2001 Press Release ........................................................................... 168

D.  The 2001 Proxy ...................................................................................................... 169

E.  The July 17, 2001 Press Release ............................................................................ 170

F.  The October 15, 2001 Press Release ....................................................................... 171

G.  The January 14, 2002 Press Release ....................................................................... 172

H.  The February 11, 2002 Credit Suisse First Boston Financial Services Conference ....... 175

I.  The 2001 Annual Report ...................................................................................... 176

J.  The April 15, 2002 Press Release ........................................................................... 178

K.  The June 5, 2002 Sanford Bernstein Strategic Decisions Conference ........................... 180

L.  The July 15, 2002 Press Release ............................................................................ 182

M.  The July 15, 2002 Conference Call ......................................................................... 183

N.  The October 15, 2002 Press Release ....................................................................... 184

O.  The January 15, 2003 Press Release ....................................................................... 186

P.  The January 15, 2003 Conference Call .................................................................... 188

Q.  The 2002 Annual Report ........................................................................................ 190

R.  The 2002 10-K ....................................................................................................... 194

S.  The Registration Statement .................................................................................... 199

T.  April 15, 2003 8-K ................................................................................................. 201

U.  The May 2003 10-Q ............................................................................................... 201

V.  The June 17, 2003 Interview .................................................................................. 205

W.  The July 15, 2003 8-K ............................................................................................ 205

X.  The July 15, 2003 Conference Call ......................................................................... 206

Y.  The July 30, 2003 Conference Call ......................................................................... 207

Z.  The July 30, 2003 News Conference ....................................................................... 210

AA.  The August 2003 Form 10-Q ................................................................................. 212

BB.  The October 16, 2003 8-K ...................................................................................... 215

CC.  The November 2003 10-Q ....................................................................................... 216

DD.  The January 21, 2004 8-K ...................................................................................... 220

EE. The January 21, 2004 Conference Call .................................................................... 220

FF. The 2003 10-K ....................................................................................................... 221

GG.  The 2004 Proxy ...................................................................................................... 225

HH.  The 2003 Annual Report ........................................................................................ 226

II.  The April 19, 2004 Press Release ................................................................. 227

JJ.  The May 2004 10-Q .......................................................................................... 227

KK. The July 21, 2004 Press Release ................................................................. 231

LL. The August 2004 10-Q...................................................................................... 231

IX.  FALSITY OF DEFENDANTS' STATEMENTS CONCERNING FANNIE MAE...... 235

X.  PLAINTIFFS' RELIANCE ON DEFENDANTS' FALSE STATEMENTS................. 241

XI.  THE TRUTH BEGINS TO EMERGE, CAUSING PLAINTIFFS TO
    INCUR LOSSES............................................................................................................. 243

XII.  THE FANNIE MAE DEFENDANTS' SCIENTER....................................................... 260

XIII.  KPMG'S SCIENTER AND VIOLATIONS OF GAAS IN ITS AUDITS OF FANNIE
    MAE'S FINANCIAL STATEMENTS............................................................................. 271

    A.  KPMG Violated GAAS By Ignoring Numerous "Red Flags" That Should Have
        Alerted It To Fannie Mae's Materially False And Misleading Financial
        Statements ............................................................................................................... 283

    B.  KPMG Violated GAAS By Recklessly Certifying That Fannie Mae's Financial
        Statements Complied With GAAP ....................................................................... 288

    C.  KPMG Violated GAAS By Failing To Develop Adequate Audit Procedures
        To Evaluate The Reasonableness Of The Market Data And Modeling Factor
        Estimates Fannie Mae Used To Determine Premium And Discount Amortization
        Amounts...................................................................................................................... 291

    D.  KPMG Violated GAAS By Failing To Obtain Sufficient Competent
        Evidential Matter .................................................................................................... 292

    E.  KPMG Violated GAAS By Improperly Determining That The Disclosures In Fannie
        Mae's Annual Reports Filed With The SEC On Form 10-K And Its 2000 And 2001
        Annual Reports Were Adequate .......................................................................... 293

    F.  KPMG Violated GAAS By Failing To Report That Material Modifications Were
        Necessary For Fannie Mae's Forms 10-Q To Conform With GAAP ........................... 293

    G.  KPMG Violated GAAS By Failing To Maintain Independence From Fannie Mae....... 295

XIV.  THE AUDIT COMMITTEE DEFENDANTS' SCIENTER............................................. 295

XV.  THE CULPABILITY OF THE DIRECTOR DEFENDANTS ...................................... 309

XVI.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................ 319

XVII.  APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD
    ON THE MARKET ...................................................................................................... 320

XVIII. LOSS CAUSATION.................................................................................................... 321

XIX.  TOLLING OF THE STATUTE OF LIMITATIONS................................................... 322

COUNT I...............................................................................................................................324

COUNT II………………………………………………………………………325

COUNT III……………………………………………………………………327

COUNT IV……………………………………………………………………329

COUNT V ……………………………………………………………………331

COUNT VI……………………………………………………………………332

COUNT VII ………………………………………………………… 334

COUNT VIII …………………………………………………………… 335

COUNT IX…………………………………………………………… 337

Plaintiffs, by their undersigned counsel, make this complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation by their counsel, which has included review and analysis of annual reports and publicly filed documents of the Federal National Mortgage Association ("Fannie Mae" or the "Company"); press releases; news articles; analysts' statements; conference call transcripts; transcripts/scripts from speeches and remarks given by the defendants; testimony before the House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises; reports and statements issued by the Office of Federal Housing Enterprise Oversight, including but not limited to those discussed herein; and the Report to the Special Review Committee of the Board of Directors of Fannie Mae issued by Paul, Weiss, Rifkind, Wharton & Garrison LLP. Plaintiffs make the following allegations against Fannie Mae, Franklin D. Raines, Timothy Howard, Leanne G. Spencer, Daniel H. Mudd, Thomas P. Gerrity, Anne M. Mulcahy, Frederick V. Malek, Taylor C. Segue, III, William R. Harvey, Joe Pickett, Stephen B. Ashley, Kenneth M. Duberstein, Jamie S. Gorelick, Manuel J. Justiz, Ann Korologos, Donald B. Marron, H. Patrick Swygert, Leslie Rahl, KPMG, LLP, Radian Group Inc., and "John Doe" (a subsidiary or affiliate of Radian Group Inc. whose identity is presently unknown to Plaintiffs but can be ascertained through discovery) (collectively, "Defendants").  Based on the foregoing, Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein, which Plaintiffs will find after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This action arises out of a scandal of tremendous proportions, involving billions of dollars, at Fannie Mae.  On September 22, 2004, Fannie Mae disclosed that the Office of Federal Housing Enterprise Oversight ("OFHEO") had issued a report (the "Interim OFHEO Report" or the "Interim Report") finding that Fannie Mae had systematically manipulated its

earnings in order to minimize fluctuations (thus understating risk) and to meet compensation targets for senior executives. After the close of trading that day, OFHEO released its detailed 198-page Interim Report to the public. The Interim Report, which was based upon OFHEO's review of over 200,000 documents and e-mails, as well as interviews and sworn testimony from numerous current and former Fannie Mae employees, concluded that Fannie Mae's management had (a) violated generally accepted accounting principles ("GAAP") in accounting for derivative transactions and hedging activities; (b) violated GAAP in accounting for amortization of purchase premiums and discounts and other deferred charges; (c) failed to ensure adequate internal controls; (d) deferred expenses to achieve bonus compensation targets; and (e) maintained a corporate culture that emphasized earnings stability at the expense of accurate financial disclosures.

2.      In its Interim Report, OFHEO stated in bold print: **"The matters detailed in this report are serious and raise concerns regarding the validity of previously reported financial results, the adequacy of regulatory capital, the quality of management supervision, and the overall safety and soundness of [Fannie Mae]."** In the cover letter to the Fannie Mae Board of Directors (the "Board") which accompanied the Interim Report, OFHEO further stated that its findings "cannot be explained as mere differences in interpretation of accounting principles" but instead involved "clear instances in which management sought to misapply and ignore accounting principles for the purposes of meeting investment analyst expectations; reducing volatility in reported earnings; and enabling fragmented process and systems, and an ineffective controls environment to exist."

3.      A formal SEC investigation and a criminal probe by the United States Justice Department followed close on the heels of the release of the Interim OFHEO Report, as did a

significant drop in Fannie Mae's stock price, from $75.65 on September 21, 2004, to $70.69 following the Company's announcement of September 22, 2004, to $67.15 on September 23, 2004 following the public release of the Interim Report, to $63.40 on September 30, 2004.   This represents a decline in market capitalization of over $11.85 billion during the 9 days following the initial disclosure.

4.     Unfortunately, the revelations of September 2004 were only the tip of the iceberg. Since that time, the Company and its new management have been engaged in the process of trying to clean up the Company's books, and as recently as May 9, 2006, disclosed that new accounting errors had been uncovered as a result of that process.

5.      In the wake of the OFHEO investigation, a Special Review Committee of Fannie Mae's Board retained the law firm of Paul, Weiss, Rifkind, Wharton & Garrison, LLP ("Paul Weiss") to conduct a full investigation into Fannie Mae's accounting, internal controls, compensation regime and corporate governance practices.  In connection with this investigation, Paul Weiss reviewed over 4 million hardcopy and electronic documents from, among others, the Company and its former auditor, KPMG LLP.  In addition, Paul Weiss conducted 241 interviews with 148 of the Company's current and former employees and various third parties.

6.     On February 23, 2006, Paul Weiss issued a 600+ page report detailing massive and widespread fraud at Fannie Mae (the "Paul Weiss Report").  The Paul Weiss Report confirmed OFHEO's findings and outlined a number of disturbing conclusions concerning Fannie Mae's corporate culture, accounting practices, and internal controls, including the following:

> • "[M]anagement's accounting practices in virtually all of the areas that [Paul Weiss] reviewed were not consistent with GAAP, and, in many instances, management was aware of the departures from GAAP…."

- There was "evidence amply supporting the conclusion that management's adoption of certain accounting policies and financial reporting procedures was motivated by a desire to show stable earnings growth, achieve forecasted earnings, and avoid income statement volatility."

- "[E]mployees who occupied critical accounting, financial reporting and audit functions at the Company were either unqualified for their positions, did not understand their roles, or failed to carry out their roles properly. This deficiency was most clearly manifested by employees who occupied senior positions in the Office of the Controller ('Controller's Office') and the Office of Auditing ('Internal Audit')."

- "The Company's accounting systems were grossly inadequate."

- "Howard, the former CFO, and Leanne Spencer, the former Controller, were primarily responsible for adopting or implementing accounting practices that departed from GAAP, and … they put undue emphasis on avoiding earnings volatility and meeting EPS targets and growth expectations. As for former Chairman and CEO Franklin D. Raines, we did not find that he knew that the Company's accounting practices departed from GAAP in significant ways. We did find, however, that Raines contributed to a culture that improperly stressed stable earnings growth and that, as Chairman and CEO of the Company from 1999 through 2004, he was ultimately responsible for the failures that occurred on his watch."

- "[A]lthough management paid lip service to a culture of openness, intellectual honesty, and transparency, the actual corporate culture suffered from an attitude of arrogance (both internally and externally) and an absence of cross-enterprise teamwork (with a 'siloing' of information), and discouraged dissenting views, criticism, and bad news."

7.    In a public statement issued in conjunction with the release of the Paul Weiss Report, Fannie Mae's Chairman, Stephen Ashley, characterized Paul Weiss's findings as "disturbing, disappointing and very serious."

8.    Following the release of the Paul Weiss Report, Fannie Mae continued its internal investigation into its accounting errors. This investigation uncovered a number of additional accounting errors that neither OFHEO nor Paul Weiss had detected. The Company disclosed these additional errors in Form 12b-25 filings with the SEC on March 13, 2006 (the "March 2006 Form 12b-25") and May 9, 2006 (the "May 2006 Form 12b-25").

9.      On May 23, 2006, OFHEO released its Report of the Special Examination of Fannie Mae (the "Final OFHEO Report" or the "Final Report").  In addition to confirming the existence of the previously-announced accounting violations, the Final Report made clear that Fannie Mae's senior officers intentionally orchestrated the fraud to enrich themselves at the expense of the investing public, while the Company' Board of Directors contributed to the problems by falling asleep at the wheel and failing to exercise the requisite oversight over the Company's activities.  The Final Report also revealed that, while Fannie Mae claimed publicly to "welcome" the OFHEO investigation, in reality the Defendants were maneuvering behind the scenes to discredit the investigation in an attempt to prevent Plaintiffs and the investing public from learning the truth.

10.     The investigation leading to the issuance of the Final Report was extensive. OFHEO reviewed approximately 2.8 million pages of hardcopy documents and 4.1 million pages of electronic documents from Fannie Mae and the Special Review Committee; more than 700,000 pages of work papers and other documents from KPMG and Ernst & Young (advisor to Fannie Mae's counsel during the OFHEO investigation); documents provided to it by Paul Weiss; memoranda documenting 241 interviews conducted by Paul Weiss; and transcripts of 47 interviews of current and former Fannie Mae and KPMG employees conducted by the SEC. Further, OFHEO conducted 26 informal interviews and 55 formal, on-the-record interviews of current and former Fannie Mae employees and Board members, as well as formal interviews of 7 current and former KPMG employees who had been assigned to the Fannie Mae engagement.

11.     In its press release announcing the release of the Final Report, OFHEO's Acting Director James B. Lockhart  ("Lockhart") stated:

> [T]he image of Fannie Mae as one of the lowest-risk and 'best in class' institutions was a façade . . .  Our examination found an

> environment where the ends justified the means. Senior
> management manipulated accounting; reaped maximum,
> undeserved bonuses; and prevented the rest of the world from
> knowing. They co-opted their internal auditors. They stonewalled
> OFHEO.
>
> Fannie Mae's executives were precisely managing earnings to the
> one-hundredth of a penny to maximize their bonuses while
> neglecting investments in systems internal controls and risk
> management . . . The combination of earnings manipulation,
> mismanagement and unconstrained growth resulted in an estimated
> $10.6 billion of losses, well over a billion dollars in expenses to fix
> the problems, and ill-gotten bonuses in the hundreds of millions of
> dollars.
>
> *****
>
> As a government-sponsored enterprise, Fannie Mae has a unique
> position among American corporations and an extremely important
> mission . . . It is also the second largest borrower in the world,
> only behind the U.S. government. As such, Fannie Mae has a
> special mandate and position of public trust. The previous
> management team violated that trust and did serious harm to
> Fannie Mae.

OFHEO also announced on May 23, 2006 that Fannie Mae had reached a settlement with

OFHEO and the SEC requiring the Company to pay a $400 million penalty and to implement a

host of corrective measures. In discussing this penalty during testimony before the Senate

Committee on Banking, Housing and Urban Affairs (the "Banking Committee") on June 15,

2006, SEC Chairman Christopher Cox noted that it "represents a meaningful sanction that is

necessary to address the egregiousness of Fannie Mae's conduct. Fraudulent financial reporting

directly undermines the fairness of our capital markets, and the very purpose of those markets to

allocate capital to its best uses." Chairman Cox reinforced the gravity of Fannie Mae's fraud,

noting:

> *The significance of the corporate failings at Fannie Mae cannot be*
> *overstated.* The [C]ompany has said that it estimates the
> restatement of its financial statements for the years ended
> December 31, 2003, and 2002, and for the quarters ended June 30,

2004, and March 31, 2004, will result in at least an $11 billion reduction of previously reported net income. *In all likelihood this will be one of the largest restatements in American corporate history.*

(emphasis added).

12.    OFHEO Acting Director Lockhart also testified before the Banking Committee on June 15, 2006.  Lockhart left little doubt that Fannie Mae's management and Board of Directors were to blame for the widespread fraud detailed herein, noting:

> As a GSE, Fannie Mae has a special mandate and position of public trust.  The previous management team, led by Chairman and Chief Executive Officer (CEO) Franklin Raines, violated that trust. By encouraging rapid growth, unrestrained by proper internal controls, risk management and other systems, they did serious harm to Fannie Mae while enriching themselves through earnings manipulation.
>
> *            *            *
>
> The Board of Directors, the last line of defense, failed to be sufficiently informed and independent.  Their oversight failings meant that they did not discover, let alone correct, the unsafe and unsound practices at Fannie Mae . . .

13.    Further, Lockhart blamed Fannie Mae's external auditors for continuing to issue "clean" audit reports in the face of clear violations of GAAP:

> [E]xternal audits performed by KPMG failed to include an adequate review of Fannie Mae's significant accounting policies for GAAP compliance.  KPMG was aware of the non-GAAP provisions of Fannie Mae's FAS 91 policy as well as the non-GAAP practices the Enterprise was using in the application of FAS 133.  That notwithstanding, KPMG issued unqualified opinions on Fannie Mae's financial statements for the years in question when these statements included significant departures from GAAP.

14.    In the face of these serious allegations of intentional wrongdoing, Fannie Mae has acknowledged that its previously-filed financial statements for the periods from January 2001 through the second quarter of 2004 are false and must be restated.  While the Company has

7

estimated that this restatement will at least have an approximate $11 billion impact on its financial statements, the Company does not expect to issue the restatement until the second half of 2006. Fannie Mae's stock is now trading in the $50 range, and the Company has lost over $25 billion in market capitalization since September 21, 2004.

15.    Plaintiffs are institutional investors that collectively purchased over $350 million in Fannie Mae common stock between January 26, 2001 and September 28, 2005 (the "Loss Period"), in reliance on financial information and disclosures which, unbeknownst to Plaintiffs, were materially false and misleading. Plaintiffs collectively lost over $45 million as a result of their purchases of these securities and their decline in value following the revelation of the falsity of the financial information upon which they were based.

## II.    <u>JURISDICTION AND VENUE</u>

16.    The claims herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder; Section 18 of the Exchange Act, 15 U.S.C. § 78r; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); Section 20A of the Exchange Act, 15 U.S.C. § 78t-1; Title 4 California Corporations Code §§ 25400 and 25500; and common law.

17.    In connection with the acts, conduct, and course of conduct alleged in the Complaint, the Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

18.    This Court has jurisdiction over this matter and over the Defendants pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; pursuant to 28 U.S.C. §§ 1331 and 1337(a); and pursuant to principles of supplemental jurisdiction, 28 U.S.C. § 1367.

19.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1391(b). The Company's principal place of business is located

in this District, and many of the acts alleged herein, including the preparation and dissemination of false and misleading statements to the investing public, occurred in substantial part in this District.

## III.    THE PARTIES

### A.    Plaintiffs

20.    The Plaintiffs are affiliates of Franklin Templeton Investments, which collectively paid over $350 million to purchase Fannie Mae common stock during the Loss Period.  Each of the Plaintiffs' purchases was made in reliance upon the financial statements and other financial information of Fannie Mae which was publicly available at the time of the purchase, and which was later revealed to be false and misleading.

21.    Plaintiff Franklin Managed Trust ("FMT") is a Delaware statutory trust with its principal place of business at One Franklin Parkway, San Mateo, California.  FMT purchased 1,113,200 shares of Fannie Mae's stock at a purchase price of $78,513,041 during the Loss Period.[1]

22.    Plaintiff Institutional Fiduciary Trust ("IFT") is a Massachusetts business trust with its principal place of business at One Franklin Parkway, San Mateo, California.  IFT purchased 2,563 shares of Fannie Mae's stock at a purchase price of $181,649 during the Loss Period.

23.    Plaintiff Franklin Investors Securities Trust ("FIST") is a Massachusetts business trust with its principal place of business at One Franklin Parkway, San Mateo, California.  FIST purchased 311,600 shares of Fannie Mae's stock at a purchase price of $20,771,553 during the Loss Period.

---

[1]    All data herein relating to Plaintiffs' purchases of Fannie Mae stock has been adjusted for stock splits.

24.    The Franklin Value Investors Trust ("FVIT") is a Massachusetts business trust with its principal place of business at One Franklin Parkway, San Mateo, California. FVIT purchased 47,000 shares of Fannie Mae's stock at a purchase price of $3,408,480 during the Loss Period.

25.    Plaintiff Franklin Strategic Series ("FSS") is a Delaware statutory trust with its principal place of business at One Franklin Parkway, San Mateo, California. The Franklin Blue Chip Fund, a series of FSS, purchased 32,000 shares of Fannie Mae's stock at a purchase price of $2,212,304 during the Loss Period.

26.    Plaintiff Franklin Capital Growth Fund is a Delaware statutory trust with its principal place of business at One Franklin Parkway, San Mateo, California. Franklin Capital Growth Fund purchased 160,000 shares of Fannie Mae's stock at a purchase price of $11,535,845 during the Loss Period. Additionally, on June 5, 2003, the Franklin Large Cap Growth Fund merged into the Franklin Capital Growth Fund. Prior to that merger, and during the Loss Period, the Franklin Large Cap Growth Fund purchased 55,400 shares of Fannie Mae's stock at a purchase price of $4,275,404 in reliance upon Fannie Mae's financial statements, which were later revealed to be false and misleading. Franklin Capital Growth Fund is the successor-in-interest to the Franklin Large Cap Growth Fund.

27.    Plaintiff Franklin Templeton Investment Funds ("FTIF") is an association incorporated under the laws of the Grand Duchy of Luxembourg, with its principal place of business in Luxembourg. FTIF purchased 266,950 shares of Fannie Mae stock at a purchase price of $17,590,522 during the Loss Period.

28.    Plaintiff Franklin Templeton Variable Insurance Products Trust ("FTVIPT") is a Massachusetts business trust with its principal place of business at One Franklin Parkway, San

Mateo, California.  FTVIPT purchased 982,000 shares of Fannie Mae stock at a purchase price of $67,497,152 during the Loss Period.

29.    Plaintiff Franklin Custodian Funds, Inc. ("FCF") is a Maryland corporation with its principal place of business at One Franklin Parkway, San Mateo, California.  FCF purchased 2,500,000 shares of Fannie Mae's stock at a purchase price of $141,455,650 during the Loss Period.

30.    Plaintiff Franklin Templeton International Trust ("FTIT") is a Delaware statutory business trust with its principal place of business at One Franklin Parkway, San Mateo, California.  FTIT purchased 30,220 shares of Fannie Mae's stock at a purchase price of $1,635,591 during the Loss Period.

31.    Plaintiff Templeton MPF Investment Funds is a marketing provident fund organized under the laws of Hong Kong, with its principal place of business in Hong Kong.  It purchased 29,658 shares of Fannie Mae's stock at a purchase price of $1,819,413 during the Loss Period.

32.    Plaintiff Franklin Flex Cap Growth Corporate Class is a unit trust registered under the laws of Ontario, Canada, with its principal place of business in Canada.  It is the successor-in-interest to the Franklin U.S. Large Cap Growth Fund – Canada, which purchased 16,000 shares of Fannie Mae's stock at a purchase price of $1,241,121 during the Loss Period.

33.    Plaintiff Franklin Templeton Funds is a company incorporated under the laws of the United Kingdom with its principal place of business in Edinburgh, Scotland.  It purchased 13,900 shares of Fannie Mae's stock at a purchase price of $859,569 during the Loss Period.

34.    Plaintiff Franklin Templeton Global Fund is an umbrella unit trust constituted under the laws of Ireland, with its principal place of business in Edinburgh, Scotland.    It

purchased 10,700 shares of Fannie Mae's stock at a purchase price of $733,737 during the Loss Period.

35.     Plaintiff Bissett Canadian Equity Fund is a unit trust registered under the laws of Ontario, Canada, with its principal place of business in Toronto.  The fund purchased 1,300 shares of Fannie Mae's stock at a purchase price of $98,447 during the Loss Period.

36.     Plaintiff Bissett Institutional Balanced Trust is an institutional pooled unit trust registered under the laws of Alberta, Canada, with its principal place of business in Toronto.  It purchased 1,200 shares of Fannie Mae's stock at a purchase price of $91,300 during the Loss Period.

37.     Plaintiff Franklin Templeton U.S. Rising Dividends Fund, which until October 21, 2005 was known as the Bissett American Equity Fund, is a unit trust registered under the laws of Ontario, Canada, with its principal place of business in Toronto.  It purchased 1,000 shares of Fannie Mae's stock at a purchase price of $75,728 during the Loss Period.

38.     Plaintiff Franklin World Growth Corporate Class is a unit trust registered under the laws of Ontario, Canada, with its principal place of business in Toronto.  It is the successor-in-interest to the Franklin World Growth Fund, which purchased 2,600 shares of Fannie Mae's stock at a purchase price of $204,267 during the Loss Period.

39.     Plaintiff Franklin Global Trust ("FGT") is a Delaware statutory trust with its principal place of business at One Franklin Parkway, San Mateo, California.  FGT purchased 1,200 shares of Fannie Mae's stock at a purchase price of $95,227 during the Loss Period.

40.     Plaintiff Franklin MPF U.S. Equity Fund  is a marketing provident fund organized under the laws of Hong Kong, with its principal place of business in Hong Kong.  It purchased 450 shares of Fannie Mae's stock at a purchase price of $24,300 during the Loss Period.

41.     Plaintiff Lyxor/Templeton Global Long Short Fund Limited is a limited liability company with its principal place of business in the Bahamas.  It purchased 7,980 shares of Fannie Mae's stock at a purchase price of $440,033 during the Loss Period.

42.     Plaintiff Templeton Global Long-Short Fund Plc is an investment company organized under the laws of Ireland with its principal place of business in Ireland.  It purchased 20,690 shares of Fannie Mae's stock at a purchase price of $1,119,800 during the Loss Period.

43.     Plaintiff Templeton Global Long-Short Fund Ltd. is a limited liability company with its principal place of business in the Cayman Islands.  It purchased 1,350 shares of Fannie Mae's stock at a purchase price of $73,066 during the Loss Period.

44.     Plaintiff University of Hong Kong General Endowment Fund is an endowment fund established by the University of Hong Kong, with its principal place of business in Hong Kong.  It purchased 800 shares of Fannie Mae's stock at a purchase price of $65,350 during the Loss Period.

45.     Plaintiff University of Hong Kong Staff Provident Fund is a trust organized under Hong Kong law, with its principal place of business in Hong Kong, which provides pension and retirement benefits to employees of the University of Hong Kong.  It purchased 3,500 shares of Fannie Mae's stock at a purchase price of $255,619 during the Loss Period.

B.     **Defendants**

1.     **Fannie Mae**

46.     Defendant Federal National Mortgage Association, also known as Fannie Mae, is the nation's largest source of funds for mortgage lenders, providing resources for its customers to make additional mortgage loans or investments in mortgage-related securities.  Fannie Mae operates primarily in the secondary mortgage market by purchasing mortgages and mortgage-related securities from primary market institutions.

47.    Fannie Mae was established in 1938 under Title III of the National Housing Act as a United States government entity.  In 1968, pursuant to the Federal National Mortgage Association Charter Act, 12 U.S.C. § 1716, *et. seq.* (the "Charter Act"), it became a shareholder-owned company, although it continues to operate under a federal charter.  The Charter Act provides that Fannie Mae will continue until dissolved by an act of Congress.  Fannie Mae is exempt from taxation by states, counties, municipalities, or local taxing authorities, except for taxation on its real property.  In addition, Fannie Mae is entitled by statute to conduct its business without regard to any qualification or similar statutes in any state, the District of Columbia, the Commonwealth of Puerto Rico, or any territories of the United States.  Fannie Mae's common stock is traded on the New York Stock Exchange under the symbol "FNM."

48.    As a federally chartered corporation, Fannie Mae is subject to Congressional legislation and oversight and is regulated for various purposes by the United States Department of Housing and Urban Development ("HUD"), OFHEO, and the U.S. Department of Treasury, to the extent authorized by statute, as well as by the SEC.  On April 30, 2003, regulations promulgated by OFHEO went into effect which require Fannie Mae to file with the SEC all reports, proxy statements, and forms that are required to be filed under Sections 14(a) and (c) of the Exchange Act and the rules and regulations promulgated under those sections and which also require Fannie Mae's directors and officers to file all reports and forms that are required to be filed under Section 16 of the Exchange Act and the rules and regulations thereunder.

49.    Federal law establishes minimum capital and risk-based capital requirements for Fannie Mae.  OFHEO, an independent office within HUD, is responsible for ensuring that Fannie Mae is adequately capitalized under both of these standards.  To satisfy the minimum capital standard, Fannie Mae's core capital must equal or exceed the minimum capital and a

lower "critical" capital requirement.  Core capital is defined by OFHEO as the stated value of common stock, the stated value of outstanding noncumulative perpetual preferred stock, paid-in capital, and retained earnings, less treasury stock.  Minimum capital is the sum of 2.5% of on-balance sheet assets, 0.45% of outstanding mortgage-backed securities ("MBS"), and 0.45% of adjusted off-balance sheet obligations.  Equivalent critical capital levels are set at 1.25%, 0.25%, and 0.25%, respectively.

50.    To meet the risk-based capital requirements, Fannie Mae's total capital (*i.e.*, the sum of core capital and the total allowance for loan losses and guaranty liability for MBS, less the specific loss allowance), must exceed a certain threshold.  That threshold is established by a risk-based capital stress test (implemented on September 13, 2002), which requires Fannie Mae to hold enough capital to withstand a severe 10-year stress period, characterized by extreme interest-rate movements and credit losses occurring simultaneously, plus 30% of that amount for management and operations risk.

## 2.    Officer Defendants

51.    Defendant Franklin D. Raines ("Raines") was Chairman of the Board and Chief Executive Officer ("CEO") of Fannie Mae from January 1999 until December 21, 2004, and was Chairman of the Board and Chief Executive Officer-Designate of Fannie Mae from May 1998 to December 1998.  In addition, at all relevant times Raines was Chairman of the Executive Committee of Fannie Mae's Board, a committee that has all the authority of the Board during interim periods between Board meetings, with certain limited exceptions set forth in the Company's bylaws.  Previously, Raines was Vice Chairman of the Board of Fannie Mae from September 1991 to September 1996.  From 1996 to 1998, he was the Director of the U.S. Office of Management and Budget ("OMB"), with responsibility for overseeing the preparation of the Federal government's budget.  Before joining Fannie Mae in 1991, Raines was a partner with the

Wall Street investment banking firm of Lazard Freres & Co., which he joined in 1979. Raines signed Fannie Mae's Form 10-K filings for 2002 and 2003. In addition, Raines signed certifications attesting to the accuracy of the financial and other information in those Form 10-K filings and in the Form 10-Q filings for the quarterly periods ending March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, and June 30, 2004, which certifications were appended to the Company's Form 10-K and 10-Q filings for the respective periods.

52.    Defendant Timothy Howard ("Howard") joined Fannie Mae in 1982, and was the Company's Chief Financial Officer ("CFO") from February 1990 until his resignation effective December 21, 2004. As CFO, Howard had responsibility for the Company's financial reporting and accounting. Howard was also Vice Chairman of the Board and a director of Fannie Mae from May 2003 until January 31, 2005. Howard signed Fannie Mae's annual reports for 2000 and 2001 and its Form 10-K filings for 2002 and 2003. In addition, Howard signed certifications attesting to the accuracy of the financial and other information in those Form 10-K filings and in the Form 10-Q filings for the quarterly periods ending March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, and June 30, 2004, which certifications were appended to the Company's Form 10-K and 10-Q filings for the respective periods.

53.    Defendant Leanne G. Spencer ("Spencer") was Senior Vice President and Controller of Fannie Mae from November 1998 until January 31, 2005. Prior to that, from June 1993 to November 1998, she served as the Company's Vice President of Financial Reporting. As the Company's Controller during the entire time period during which the Company perpetrated its accounting fraud, Spencer had the responsibility and authority to formulate and approve Fannie Mae's accounting policies. Spencer signed Fannie Mae's annual reports for 2000 and 2001, its Form 10-K filings for 2002 and 2003, and its Form 10-Q filings for the

quarterly periods ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, and June 30, 2004.  Spencer resigned her positions with the Company in January 2005, after the SEC had concluded that Fannie Mae's accounting policies violated GAAP.  She continued to serve as Special Advisor to the Company until January 31, 2006.

54.    Defendants Raines, Howard, and Spencer are hereinafter referred to as the "Officer Defendants."

### 3.    Audit Committee Defendants

55.    Defendant Thomas P. Gerrity ("Gerrity") has been a director of Fannie Mae since 1991, Chairman of its Audit Committee (the "Audit Committee") since at least 1998, and a member of its Executive Committee and Nominating and Corporate Governance Committee since at least 2000.  Gerrity is a Professor of Management and former Dean at The Wharton School of Business, and Director of the Wharton Electronic Business Initiative.  Gerrity signed Fannie Mae's Form 10-K filings for 2002 and 2003, and as a member of the Audit Committee, he participated in the review and approval of the financial statements contained therein.  On May 19, 2006, just days before the release of the Final OFHEO Report, Fannie Mae announced that Gerrity would be replaced as Chairman of the Audit Committee, would step down as a member of that committee, and would leave the Board by the end of 2006.

56.    Defendant Anne M. Mulcahy ("Mulcahy") has been a director of Fannie Mae since 2000, a member of its Audit Committee since 2001, a member of its Executive Committee since 2002, a member of its Compensation Committee since at least 2000, and Chairman of its Compensation Committee since 2002.  She was also a member of the Board's Assets and Liabilities Policy Committee in at least 2000.  Mulcahy has been designated by the Board as an "audit committee financial expert" under the SEC's rules and regulations.  Mulcahy also serves as Chairman and Chief Executive Officer of Xerox Corporation, and as a director of Target

17

Corporation. Mulcahy signed Fannie Mae's Form 10-K filings for 2002 and 2003, and as a member of the Audit Committee, she participated in the review and approval of the financial statements contained therein.

57. Defendant Frederick V. Malek ("Malek") has been a director of Fannie Mae and a member of its Audit Committee and Assets and Liabilities Policy Committee since 2002. Malek has been designated by the Board as an "audit committee financial expert" under the SEC's rules and regulations. Malek is the Chairman of Thayer Capital Partners, a private equity investment firm. Malek signed Fannie Mae's Form 10-K filings for 2002 and 2003, and as a member of the Audit Committee, he participated in the review and approval of the financial statements contained therein. On November 8, 2005, Malek announced that he would retire from the Board effective December 31, 2005.

58. Defendant Taylor C. Segue, III ("Segue") was a director of Fannie Mae and a member of its Audit Committee from 2001 until May 25, 2004, a member of its Assets and Liabilities Policy Committee in 2001 and 2002, and a member of its Compensation Committee from 2003 until May 25, 2004. From June 2002 through the date he left the Audit Committee and the Board, Segue was a member of the law firm of Howard and Howard, a firm that has represented and continues to represent KPMG LLP in connection with, *inter alia*, the defense of securities class action litigation. Segue signed Fannie Mae's Form 10-K filings for 2002 and 2003, and as a member of the Audit Committee, he participated in the review and approval of the financial statements contained therein.

59. Defendant William R. Harvey ("Harvey") was a director of Fannie Mae and a member of its Audit Committee from 2001 until May 25, 2004. Harvey is the President of Hampton University and the owner of the Pepsi-Cola Bottling Company of Houghton, Michigan.

Harvey signed Fannie Mae's Form 10-K filings for 2002 and 2003, and as a member of the Audit Committee, he participated in the review and approval of the financial statements contained therein.

60.    Defendant Joe Pickett ("Pickett") has been a director of Fannie Mae since 1996, a member of its Audit Committee since 2003, and a member of its Compensation Committee since 2002. Pickett was a member of the Board's Executive Committee in at least 2001-2002, and a member of its and Assets and Liabilities Policy Committee in at least 2001. Pickett was Chairman and Chief Executive Officer of HomeSide International, Inc. from 1996 until 2001, and of HomeSide Lending, Inc. from 1990 to 1999. Pickett signed Fannie Mae's Form 10-K filings for 2002 and 2003, and as a member of the Audit Committee, he participated in the review and approval of the financial statements contained in the 2003 Form 10-K.

61.    Defendants Gerrity, Mulcahy, Malek, Segue, Harvey and Pickett are hereinafter referred to as the "Audit Committee Defendants."

### 4.    Director Defendants

62.    Defendant Stephen B. Ashley ("Ashley") has been a director of Fannie Mae since 1995, and a member of its Nominating and Corporate Governance Committee since at least 2000. On December 21, 2004, Ashley became Chairman of the Company's Board. Ashley signed Fannie Mae's Form 10-K filings for 2002 and 2003.

63.    Defendant Kenneth M. Duberstein ("Duberstein") has been a director of Fannie Mae since 1998 and has served as Chairman of its Assets and Liabilities Policy Committee and a member of its Executive Committee since at least 2000. Duberstein is Chairman and Chief Executive Officer of The Duberstein Group, Inc., a strategic planning and consulting company that has provided services to the Company since 1991. Duberstein signed Fannie Mae's Form 10-K filings for 2002 and 2003.

64.    Defendant Jamie S. Gorelick ("Gorelick") was a director and Vice Chair of the Board of Fannie Mae (an executive officer position) from 1997 until May 20, 2003.  Gorelick signed Fannie Mae's Form 10-K filing for 2002.

65.    Defendant Manuel J. Justiz ("Justiz") was a director of Fannie Mae and a member of its Assets and Liabilities Policy Committee from 2001 until May 25, 2004.  Justiz signed Fannie Mae's Form 10-K filings for 2002 and 2003.

66.    Defendant Ann Korologos ("Korologos") has been a director of Fannie Mae since 1994, a member of its Compensation, Nominating, and Corporate Governance Committees since at least 2000, and a member of its Executive Committee since 2001.  Korologos signed Fannie Mae's Form 10-K filings for 2002 and 2003.

67.    Defendant Donald B. Marron ("Marron") has been a director of Fannie Mae and a member of its Nominating and Assets and Liabilities Policies Committees since 2001.  Marron was formerly the President and Chief Executive Officer of Paine Webber Group, Inc. (prior to its merger with UBS AG), and Chairman of UBS America from the time of the UBS-Paine Webber merger until September 2003.  Marron signed Fannie Mae's Form 10-K filings for 2002 and 2003.

68.    Defendant Daniel H. Mudd ("Mudd") was Vice Chairman of the Board, a director, and Chief Operating Officer of Fannie Mae from February 2000 until December 21, 2004, when he was appointed as the Company's interim CEO.  Mudd signed Fannie Mae's Form 10-K filings for 2002 and 2003.

69.    Defendant H. Patrick Swygert ("Swygert") has been a director of Fannie Mae and a member of its Assets and Liabilities Policy Committee since 2000.  Swygert is President of Howard University and a director of Hartford Financial Services Group, Inc. and United

Technologies Corporation.  His son is an employee of Fannie Mae.  Swygert signed Fannie Mae's Form 10-K filings for 2002 and 2003.

70.    Defendant Leslie Rahl ("Rahl") has been a director of Fannie Mae and a member of its Assets and Liabilities Policy Committee since February 2004.  She is the founder and has been President of Capital Market Risk Advisors, Inc., a financial advisory firm specializing in risk management, hedge funds, and capital market strategy since 1994.  Previously, she spent 19 years at Citibank, including nine years as Vice President and Division Head, Derivatives Group-North America.  Rahl signed Fannie Mae's Form 10-K filing for 2003.

71.    Defendants Ashley, Duberstein, Gorelick, Justiz, Korologos, Marron, Mudd, Swygert and Rahl, together with the Audit Committee Defendants, are hereinafter referred to as the "Director Defendants."

72.    The Officer Defendants and the Director Defendants are sometimes collectively referred to herein as the "Individual Defendants."

### 5.    KPMG

73.    Defendant KPMG LLP ("KPMG") is an international accounting firm that at all relevant times provided accounting and auditing services to Fannie Mae.  KPMG is a global network of professional service firms providing Audit, Tax and Advisory services.  KPMG operates in 148 countries and has around 6,500 partners, 70,000 client service professionals, and 17,000 administration and support staff working in member firms around the world.  KPMG audited Fannie Mae's annual financial statements every year from 1969 through 2003, and issued materially false and misleading audit opinions on Fannie Mae's financial statements for each of the years ended December 31, 2000, 2001, 2002, and 2003.  With KPMG's consent, those audit opinions were included in the Company's annual reports for 2000 and 2001 and Form 10-K

filings for 2002 and 2003. On December 21, 2004, KPMG was dismissed as the Company's outside auditor.

### 6.    Radian Group Inc.

74.    Defendant Radian Group Inc. ("Radian Group") is a global credit risk management company with more than 1000 employees in the United States and the United Kingdom. Radian Group offers products and services in three primary business lines: mortgage insurance; financial guaranty; and financial services.

75.    Radian Group conducts its mortgage insurance and financial guaranty operations through its subsidiaries as follows:

- Radian Asset Assurance, Inc., which provides financial guaranty insurance and reinsurance to issuers of municipal bonds, asset-backed securities, and structured finance transactions;

- Radian Asset Assurance Limited, a subsidiary of Radian Asset Assurance, Inc., which offers solutions for an array of asset classes including asset-backed securities, collateralized debt obligations, and mortgage-backed securities;

- Radian Financial Products Limited, a subsidiary of Radian Asset Assurance, Inc., which offers a range of derivatives-based solutions for clients in the United Kingdom and throughout the European Union;

- Radian Guaranty Inc., which provides mortgage insurance to protect lenders against loan default and to enable home buyers to purchase homes more quickly and with smaller down payments; and

- Radian Insurance Inc., a subsidiary of Radian Guaranty Inc., which writes non-traditional mortgage insurance for second and high loan-to-value mortgages.

76.    Radian Group is the parent of Defendant John Doe, defined below.

### 7.    John Doe

77.    Defendant John Doe ("Doe"), a subsidiary of Defendant Radian Group, is an insurance company that sold at least one "finite insurance" policy to Fannie Mae which, as

discussed in Fannie Mae's Form 12b-25 filing with the SEC dated November 10, 2005 (the "November 2005 Form 12b-25"), did not transfer sufficient risk to the insurer to qualify as insurance for accounting purposes.  In collusion with Fannie Mae and with Radian Group's knowledge and consent, Doe disguised its product as legitimate insurance, when it was actually only a loan to Fannie Mae which Fannie Mae improperly accounted for as insurance in order to mask known losses.  The identity of Doe has not been publicly disclosed, and is not known to Plaintiffs, but can be ascertained through discovery from, *inter alia*, Radian Group.  Radian Group and Doe will be collectively referred to herein as "Radian."

## IV.    DEFENDANTS' FRAUDULENT SCHEME

### A.    Overview

78.    During the Loss Period, Fannie Mae and the Officer Defendants (at times together referred to as the "Fannie Mae Defendants") engaged in a fraudulent scheme and course of conduct by implementing and executing company-wide accounting policies that blatantly violated GAAP.  In this manner, the Company created the illusion that it was meeting its overly aggressive earnings targets, and the Officer Defendants earned astronomical bonus compensation for purportedly hitting those targets.  These Defendants, along with the Director Defendants (who approved and signed the SEC filings and other documents containing Fannie Mae's financial results) and KPMG (which issued unqualified opinions on the Company's financial statements), publicly misrepresented the Company's reported earnings by more than $11 billion, a figure which may increase as the Company's ongoing internal investigation continues.  As of today, investors still have not been provided with truthful financial information for any time period since 2000.  In terms of sheer dollar amounts, the fraud at Fannie Mae is second only to WorldCom.

23

79.     The Defendants' motives for the fraud were simple:  (1) to achieve earnings targets which triggered the Officer Defendants' entitlement to lucrative bonuses, and (2) to mask volatile earnings in order to reassure the market of Fannie Mae's soundness and to reassure the government that Fannie Mae was worthy of all the perks it received as a government-sponsored enterprise (including a low cost of capital, a line of credit from the Treasury, and exemption from state and local taxes).  By engaging in a variety of improper and unsupported accounting practices, Fannie Mae was able to report financial results that met the expectations of investment analysts, minimized reported earnings volatility, secured the government's continued confidence in the enterprise, and allowed the Officer Defendants to collect lucrative, undeserved bonus compensation.

80.     In numerous public statements, the Company's top executives -- Howard (CFO), Raines (Chairman and CEO), and Spencer (Controller) -- presented Fannie Mae to Plaintiffs and other investors as a conservative, stable, and safe investment.  They boasted of Fannie Mae's steady quarter-over-quarter earnings increases, even in times of market volatility, and prepared financial statements that materially misrepresented Fannie Mae's financial results by over $12 billion.  In reality, Fannie Mae had developed strained applications of GAAP and systematically manipulated its earnings, thereby understating its risk and artificially inflating its stock price. KPMG, the Company's outside auditor, issued unqualified opinions on the Company's financial statements, and the Director Defendants -- including the Audit Committee Defendants who were specifically charged with overseeing the audit and financial reporting process -- turned a blind eye to the fraud and approved the issuance and dissemination of the false financial statements to unsuspecting investors.

81.    The fraud continued unabated until September 22, 2004, when Fannie Mae was forced to publicly disclose that OFHEO had uncovered significant problems with its accounting. OFHEO issued an exhaustive, derisive report finding that the Company had violated many basic accounting principles, including Statement of Financial Accounting Standards No. 91 ("SFAS 91") and Statement of Financial Accounting Standards No. 133 ("SFAS 133"), due to intentional manipulation of GAAP and a lack of adequate internal controls.    In his testimony before Congress on October 6, 2004 regarding OFHEO's findings, OFHEO Director Armando Falcon, Jr. ("Falcon") described the Company's "pervasive and willful misapplication of [GAAP]" as matters which "cannot be dismissed as mere differences of interpretation in accounting rules." Falcon unambiguously concluded that "Fannie Mae understood the rules and simply chose not to follow them."

82.    On December 15, 2004, the SEC's Office of the Chief Accountant informed Fannie Mae of its conclusion that "from 2001 to mid-2004, Fannie Mae's accounting practices did not comply in material respects with the accounting requirements in Statement Nos. 91 and 133," and ordered the Company to restate its financial results to "eliminate the use of hedge accounting."  Fannie Mae reported this in a Form 8-K filed on December 16, 2004.

83.    On December 22, 2004, Fannie Mae announced that its previously issued financial statements should not be relied upon, and that the Company would restate its financial statements for 2001 through mid-2004.  As such, Fannie Mae has admitted that its financial statements issued for each of these periods were false and that the net overstatements of income were material.  GAAP (specifically, Accounting Principles Board Opinion No. 20, *Accounting Changes*) provides that financial statements should only be restated in limited circumstances; that is, when there is a change in a reporting entity, there is a change in accounting principles

used, or to correct an error in previously issued financial statements. Fannie Mae's planned restatements are not due to a change in reporting entity or a change in accounting principles, but rather to correct errors in previously issued financial statements which rendered those statements materially false. In its December 22, 2004 statement, Fannie Mae stated that the restatement was due to SFAS 91 and SFAS 133 issues, and the impact on earnings was expected to be about $9 billion.

84.     Fannie Mae is now mired in a massive restatement process, which it has stated it will not complete until the second half of 2006. During the course of the restatement process, Fannie Mae's new management has uncovered additional accounting problems not addressed in the Interim OFHEO Report, which have been disclosed in various public filings, including a Form 8-K filed on February 23, 2005; the November 2005 Form 12b-25; the March 2006 Form 12b-25; and the May 2006 Form 12b-25. The Company has publicly stated that it expects the derivative-related aspects of the restatement alone to be in the $11 billion range.

85.     On April 6, 2005, Falcon testified before the House Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises regarding some of the new accounting problems found at Fannie Mae, noting: "As with previous accounting problems we have uncovered, they reflect Fannie Mae's tendency toward overly aggressive interpretations of GAAP, or in certain instances – when compliance with GAAP would negatively affect the company – *a willful disregard of accounting rules*. They also reflect situations where Fannie Mae's accounting policies actually do comply with GAAP, but Enterprise personnel have failed to follow those policies." (emphasis added).

86.     After exposing the rampant fraud, OFHEO characterized Fannie Mae as severely undercapitalized. Fannie Mae has been forced to take extreme measures to restore its capital

shortfall, including conducting a $5 billion private offering and cutting its common stock dividend in half.

**B.    The Genesis of Fannie Mae's Accounting Fraud**

**1.    Fannie Mae's Compensation Policies Encouraged And Led To Accounting Fraud**

87.    Fannie Mae's senior executive compensation structure throughout the Loss Period involved several key components:  (1) basic compensation, which included base salary and other annual compensation; (2) Annual Incentive Plan ("AIP") awards (*i.e.*, bonuses); and (3) long-term incentive plan ("LTIP") awards, which included substantial "performance share" stock awards under the Performance Share Plan  ("PSP").

88.    Two of the three components of executive compensation at Fannie Mae—AIP bonuses and PSP stock awards—depended directly on the Company's attainment of earnings per share ("EPS") targets, a metric easily manipulated by the executives who stood to receive these awards.  Since 1993, Fannie Mae has based 100% of its senior-most executives' AIP cash bonuses on corporate performance, setting a range of bonus opportunities for top managers of four or more times their base pay if Fannie Mae hit its 12-month EPS targets.  Additionally, awards under the PSP were based in substantial part upon the achievement of financial goals tied to growth in EPS.

89.    Fannie Mae's compensation policies – which were reviewed and approved each year by the Compensation Committee of the Board, including Defendants Korologos, Mulcahy, Segue and Pickett – created a strong incentive for the Company's executives to manipulate its financial reporting to create the appearance that the EPS targets had been met, even if they had not been.  This incentive was particularly strong for the Company's senior-most executives.  As Fannie Mae explained in its 1999 Report to Congress:

> The company must attain a specific corporate performance threshold before any awards become payable.  If this threshold level of performance is met or surpassed, then one is eligible for payments linked to a mix of personal and corporate performance. *The more senior the employee, the greater the weight given to corporate performance.*

(emphasis added).  For the top senior executives---including Raines, Gorelick (from 1998-2003), Howard (from 2003-2004), and former Company President and Chief Operating Officer Lawrence M. Small ("Small") (until 2000)—the *entire* annual bonus payout depended on the Company meeting its EPS goals.

90.    As evidence of senior management's intent focus on meeting the EPS targets that were necessary to secure the maximum possible bonuses, Small wrote a memorandum to rising CEO Raines on August 10, 1998, warning him of the consequences he would face if the Company failed to meet those targets:

> For 1998, I'm reasonably confident there's enough in the 'non-recurring earnings piggy bank' to get us to $3.21.  While that number should satisfy investors, you should be aware that last year the AIP paid out just short of the maximum.  This year, the maximum is $3.23, so at $3.21 the bonus pool will be noticeably lower than in 1997, a fact which will, of course, be rapidly observed by officers and directors come January.

Plainly, meeting Wall Street's EPS forecasts ($3.21 for 1998) would not be enough to satisfy the Officer Defendants.  To keep his people happy, Raines knew he had to make sure the maximum bonuses were awarded, even if the Company had to manipulate its reported earnings to get there.

91.    Despite the Company's focus on pay-for-performance and the risks that it created, Fannie Mae's Compensation Committee never implemented a policy that mandated the return of bonus compensation if the Company's earnings were later determined to be misstated. Accordingly, Defendants did not have the threat of disgorgement to deter them from committing accounting fraud.

92.     At least as early as 1998, the Officer Defendants began to implement policies that flouted GAAP in order to meet EPS targets.  In 1998, a drop in interest rates in the third quarter motivated millions of homeowners to prepay their existing mortgages and refinance them at lower rates.  If accounted for under GAAP, these prepayments would have adversely affected Fannie Mae's bottom line because SFAS 91 requires a company to record an immediate upward adjustment to interest expense if actual prepayments exceed the company's projections.  At the end of 1998, Fannie Mae's amortization models showed that an estimated $439 million of interest expense had been incurred.  Consistent with the constant effective yield calculation required under SFAS 91, these expenses should have been immediately recognized as an adjustment to interest expense.  Recording this adjustment in full, however, would have prevented the Company from meeting the minimum EPS target necessary for the Officer Defendants to receive bonuses that year.

93.     Faced with the unwelcome prospect of losing their lucrative bonuses, the Officer Defendants formulated a scheme to manage the Company's expense reporting so that they would still hit their EPS target.  On January 7, 1999, Spencer directed Shaun Ross, a project manager in the Controller's Officer, to run various expense reporting scenarios (the "Earnings Alternatives") to determine how much of the $439 million in interest expense the Company could record while still achieving the target EPS.  Based on these scenarios, the Officer Defendants concluded that the Company could record $240 million for 1998 without jeopardizing their bonuses.

94.     Spencer and Howard presented the Earnings Alternatives to Raines during an 8:00 a.m. meeting on January 8, 1999.  Other attendees at this meeting included Small, Gorelick, and the head of Internal Audit, Sam Rajappa.  Spencer and Howard convinced Raines to record only

$240 million of the expenses in 1998, and to defer the remaining $199 million, despite the clear requirement that the entire $439 million be recorded pursuant to SFAS 91.

95.    KPMG was fully aware of this deferral of interest expense, and of the fact that it violated GAAP.  In fact, KPMG identified it as an "audit difference" during its audit of Fannie Mae's 1998 financial statements and reported this difference to the Audit Committee.  Despite its knowledge that Fannie Mae had violated SFAS 91 by not recording the full amount of interest expenses incurred that year (and, accordingly, that its financial statements for that year were misstated), KPMG issued Fannie Mae a clean audit opinion for 1998.

96.    While the deferral of $199 million in expenses was enough to permit the Officer Defendants to earn bonuses for 1998, it was not enough to drive EPS up to the level needed for them to earn the *maximum* possible bonuses.  Deferring $199 million in expenses would have pushed the Company's EPS for 1998 up to $3.2285—just shy of the $3.2300 needed for the Officer Defendants to earn their maximum bonuses.[2]

97.    Unwilling to settle for anything less than the maximum possible bonuses, the Officer Defendants came up with another accounting trick to push reported EPS up to $3.2300. On the day the Company closed its books for 1998, the Officer Defendants caused the Company to reverse $3.9 million in aged credit items into income from a suspense account known by the number 162200 ("Account 162200").  The after-tax impact of the $3.9 million reversal was to increase 1998 EPS by approximately $0.0024, allowing Fannie Mae to report EPS of $3.2309 for the year—a mere $0.0009 more than the Officer Defendants needed to "earn" their maximum bonuses for the year.

---

[2]    While the Company typically rounded to two decimal places for public reporting purposes, it carried EPS to four decimal places when calculating bonus payouts, a fact of which the Officer Defendants were well aware.

98.    While KPMG had notified the Company of its belief that the credit balance in Account 162200 should be reconciled and taken into income as early as 1994, Spencer had identified that very Account back in 1996 as something "up [her] sleeve to solve an earnings shortfall." The Officer Defendants held this trump card for two years, playing it to the tune of $27 million in bonus compensation in 1998. This maneuver was especially lucrative for Raines and Howard, who received $1,109,589 and $493,750, respectively, in bonuses in 1998.

99.    As if the temptation to manipulate EPS results were not high enough already, Fannie Mae raised the EPS-linked stakes in 1999 when management recommended that the Board of Directors approve a special stock option grant to provide an incentive for doubling EPS to $6.46 over the five-year period ending in 2003 (the "EPS Challenge Grant"). The Board approved the EPS Challenge Grant by resolution dated November 16, 1999. Thereafter, the Officer Defendants aggressively pursued the challenge to double EPS by 2003, employing whatever means necessary and checking GAAP at the door.

100.    Defendants, however, did not want EPS to grow "too" much. Because Fannie Mae's AIP bonus system "capped out" at the maximum EPS range (*i.e.*, Defendants did not get larger bonuses for exceeding the EPS target for the maximum AIP bonus payout), the Officer Defendants attempted to minimize the amount by which EPS exceeded that target. In the event that EPS appeared in danger of significantly exceeding that target, they took steps to defer income to later periods to "carry over" the benefits of a strong year and make it easier to meet EPS goals in future years. Such manipulations are described more fully below in Section IV.E.8, *Fannie Mae's Accounting for Insurance In Violation of GAAP*.

101.    In late 2001, a short-term interest rate decline of more than 400 basis points created a "windfall" effect on Fannie Mae's EPS, pushing the year-end EPS number far above

what was necessary to achieve the maximum bonus payout.  Because it was too late for Fannie Mae to hide its increased income by deferring it to later years, the Officer Defendants pushed the Board of Directors to authorize a "special award" for employees.  In November 2001, the Director Defendants approved a "Special Award" for executive officers equal to 20% of the AIP bonuses, to be paid in stock.  While the Company did not award the stock until 2002, approving the grants in 2001 permitted Fannie Mae to accrue compensation expenses in the EPS "windfall" year, making it easier for the Company to hit EPS goals in future years.

102.   Defendants were richly rewarded for these accounting shenanigans.  As noted below, from 1999 throughout their tenure at Fannie Mae, Raines, Howard, Gorelick and Mudd received lucrative compensation and ever-increasing cash bonuses:

| Year | Base Salary | Bonus | Other Annual Compensation[3] | Total Cash Compensation | Stock Options[4] |
|---|---|---|---|---|---|
| **Franklin D. Raines** | | | | | |
| 1999 | $945,000 | $1,890,000 | $35,007 | $2,870,007.00 | 373,500 |
| 2000 | $992,250 | $2,480, 625 | $23,635 | $3,496,510.00 | 421,358 |
| 2001 | $992,250 | $3,125,650 | $20,519 | $4,138,419 | 277,335 |
| 2002 | $992,250 | $3,300,000 | $163,923 | $4,456,173.00 | 311,731 |
| 2003 | $992,250 | $4,180,365 | $237,246 | $5,409,861.00 | 135,020 |
| **Timothy Howard** | | | | | |
| 1999 | $414,800 | $518,500 | $6,009 | $939,309.00 | 47,300 |
| 2000 | $435,540 | $544,425 | $16,996 | $996,961.00 | 72,570 |
| 2001 | $463,315 | $694,983 | $10,853 | $1,169,151.00 | 75,617 |

---

[3]   Annual Compensation includes, among other things, tax advice, financial planning services, transportation, and relocation costs.
[4]   Options vest 25 percent "per year beginning on the first anniversary of the grant date."  Options expire 10 years after the grant date.  2004 Proxy at 26 n.1.

| Year | Base Salary | Bonus | Other Annual Compensation[3] | Total Cash Compensation | Stock Options[4] |
|---|---|---|---|---|---|
| 2002 | $498,614 | $781,250 | $1,169 | $1,281,033.00 | 81,661 |
| 2003 | $645,865 | $1,176,145 | $858 | $1,822,868.00 | 112,968 |
| **Jamie Gorelick** | | | | | |
| 1999 | $595,400 | $818,675 | n/a | $1,414,075 | 1,975,501 |
| 2000 | $625,170 | $859,609 | n/a | $1,484,779 | 2,516,927 |
| 2001 | $656,429 | $1,083,109 | n/a | $1,739,538 | 2,498,108 |
| 2002 | $689,124 | $911,250 | n/a | $1,600,374 | n/a |
| 2003 | n/a | n/a | n/a | n/a | n/a |
| **Daniel Mudd** | | | | | |
| 1999 | n/a | n/a | n/a | n/a | n/a |
| 2000 | $537,063 | $735,130 | n/a | $1,272,193 | 2,516,927 |
| 2001 | $656,429 | $1,083,109 | n/a | $1,739,538 | 2,498,108 |
| 2002 | $689,124 | $911,250 | n/a | $1,600,374 | 1,776,933 |
| 2003 | $714,063 | $1,288,189 | n/a | $2,002,252 | 2,355,030 |

103.    These bonuses were made possible, in large part, by the Company's ability to manipulate its accounting to report year-end EPS that matched nearly to the penny the EPS target need for maximum bonus payouts, as set forth below:

| Year | EPS Target for Maximum AIP Bonus Payout | Reported Year-End EPS |
|---|---|---|
| 1998 | $3.230 | $3.2309 |
| 1999 | $3.690 | $3.7199 |
| 2000 | $4.274 | $4.2874 |

| 2001 | $4.926 (14.9%)[5] | $5.1963 |
| 2002 | $6.288 (21.0%) | $6.3137 |
| 2003 | $7.3240 (16%) | $7.2947 |

104.    The Officer Defendants' receipt of bonuses and stock options in 1999-2003 was, as in 1998, due in large part to the use of improper accounting methods to manipulate the Company's financial results.  For example, in 2002 the Committee awarded Raines $4,456,173 in cash compensation and 311,731 stock options based upon, *inter alia*, "record financial results;" "record-breaking business volumes;" "near record low credit losses;" and "strong portfolio margin performance and interest-rate risk management."  In its Interim Report, OFHEO determined that most of these achievements were made possible only by the Officer Defendants' deliberate departures from GAAP.  Further, OFHEO noted in its Final Report that two compensation grants tied directly to meeting EPS goals—the AIP Bonus and the EPS Challenge Grant—accounted for more than $20 million of Raines' approximately $90 million in compensation in the six years from 1998 through 2003, and that the three-year EPS goal played a crucial role in determining the size of his approximately $32 million in PSP awards during that six-year period.

105.    Given the critical importance of meeting EPS goals to ensuring that the Officer Defendants "earned" the maximum possible compensation, it is hardly surprising that the December 2001 job descriptions for Raines, Howard, Mudd and Gorelick each listed meeting EPS targets as the first performance indicator for their positions.  According to the Final OFHEO Report, achieving these targets "preceded performance indicators associated with other corporate

---

[5]    Beginning in 2001, Fannie Mae established EPS goals as percentages rather than as dollar numbers.

goals and objectives, affordable housing, and safety and soundness considerations." These Defendants, therefore, had a special interest in ensuring that the Company met its EPS goals.

### 2. Defendants Needed To Portray Stability In The Company's Earnings In Order To Maintain The Benefits Of Government Sponsorship

106.    The Fannie Mae Defendants had another motive for fraudulently misrepresenting Fannie Mae's financial results: the desire to portray Fannie Mae as a consistent generator of stable and growing earnings in order to maintain the enviable perquisites the Company enjoyed as a quasi-government entity, and to maintain the confidence of Wall Street. Unlike its competitors, the Company enjoyed a low cost of capital, a line of credit from the Treasury, and exemption from state and local taxes. As such, private companies could not compete, and the Fannie Mae Defendants could expect to enjoy escalating profits, along with the concomitantly escalating compensation packages described above.

107.    Concealing its GAAP violations and maintaining the illusion of stability in earnings and sound financial policies, procedures, and internal controls was crucial to Fannie Mae's survival, since the Company was facing increased criticism concerning the unfairness of its governmental subsidies, its burgeoning size, and the prospect of a multi-billion dollar taxpayer bailout should the Company collapse.

108.    Together, Fannie Mae and The Federal Home Loan Mortgage Corporation ("Freddie Mac") own approximately a trillion and a half dollars in assets. This exceeds the gross domestic product of every country but Japan, Germany, and the United States. Their combined debt – also measured in the trillions – is poised to outpace that of the United States federal government. The Economist called Fannie Mae and Freddie Mac "arguably the most worrying concentrations of risk in the global financial system."

109.    According to its critics, Fannie Mae's primary objective is not – as it maintains – helping millions of Americans fulfill their dreams of becoming homeowners. Instead, critics point to the fact that the mortgages and mortgage-backed securities which Fannie Mae owns have grown ten-fold over the past 15 years only because the Company's implicit government backing allows it to borrow money at below-market rates and then to invest that money at market rates. This spread between the Company's borrowing costs and its profit undermines Fannie Mae's public mission to provide affordable mortgages; eliminates competition; is subsidized by taxpayers; and enriches its executives more than anyone else.

110.    Fannie Mae's status as a government-sponsored corporation also gave it an edge when it came to attracting investors, many of whom invested their money with Fannie Mae based on the assumption that they would be repaid by the federal government should the housing market tumble and the Company collapse.

111.    Fannie Mae preserves its special quasi-government status, in part, by spending million of dollars each year on an influential team of Washington lobbyists. Notwithstanding Fannie Mae's powerful lobbying arm, in recent years the Company's many detractors have included (but are by no means limited to) several governmental agencies and influential private and public sector individuals. These critics have concluded that the implied backing of Fannie Mae by the federal government – which includes permanent access to a line of credit, exemption from state and local taxes, and exemption from disclosure and registration rules – represent unjustified taxpayer subsidies.

112.    For instance, the Congressional Budget Office ("CBO") has determined that governmental subsidies to Fannie Mae and Freddie Mac are worth at least $11 billion per year, and for every $3 of the subsidy that the company passes on to homeowners, it keeps almost

another $2.  In other words, taxpayers are subsidizing billions of dollars of Fannie Mae's profits each year.

113.    Federal Reserve Chief Alan Greenspan ("Greenspan") and the Treasury Department have endorsed the CBO's findings.  Noted economist Bert Ely stated:  "This is worse than $600 toilet seats."  These and other critics endorse the full privatization of Fannie Mae, and the termination of the Company's government subsidies.  Indeed, in 2000 and many times over the past several years, Greenspan has publicly complained that Fannie Mae's federal subsidies are not warranted, and that its size places taxpayers and the Company's bondholders at significant risk should the Company fail.

114.    In June 2000, the Competitive Enterprise Institute's President Fred Smith testified before the House Sub-Committee on Capital Markets.  He advocated complete market regulation on the grounds that "privatizing the profit side of the ledger while socializing the loss side" would eventually lead to a debacle resembling the S&L crisis in the 1980s.

115.    Despite Fannie Mae's detractors, its voracious lobbying ensured that the Company maintained sufficient support in Congress to avoid losing its special status.  With Fannie Mae under such intense scrutiny, however, the Defendants knew that Fannie Mae risked losing its Congressional supporters if it reported volatile earnings, since that would suggest its vulnerability to market changes and highlight the risk of a taxpayer-funded bail-out should the Company fail.  Thus, it was critical to Fannie Mae's continued governmental support that it portray consistently stable, pristine earnings, which gave no fodder to its critics' argument that taxpayers would one day have to foot the bill for a bail-out.

116.    Motivated by their desire to maintain the charade of stable earnings, Fannie Mae and the Officer Defendants cultivated an unhealthy atmosphere at the Company, where

adherence to GAAP-violative accounting policies and practices designed to smooth earnings was encouraged – even mandated.  As described more fully below, the Fannie Mae Defendants distorted key GAAP provisions such as SFAS 91 and SFAS 133 in order to suit their dishonest objectives.  To the same end, they silenced or ignored complaints voiced by employees who understood the Company's misinterpretations of GAAP, and rewarded those who towed the line.

117.    In his written testimony submitted to the U.S. House of Representatives Subcommittee on Capital Markets, Insurance and Governmental Sponsored Enterprises in connection with their October 6, 2004 hearing on the Interim OFHEO Report, Roger Barnes ("Barnes"), the Company's former manager of Financial Accounting, described the culture in the Controllers' Division at Fannie Mae as follows:

> The atmosphere and culture, particularly within the Controllers' division, is one of intimidation, restraint of dissenting opinions, and pressure to be part of the "Team" giving Chairman Franklin Raines and Vice Chairman Tim Howard the numbers the Office of the Chairman desired to please the markets.  Employees like myself who refused to go along with this agenda were ostracized and subjected to retaliation.

118.    Notwithstanding their public certifications in SEC filings and other public statements to the contrary, the Officer Defendants failed to maintain anything resembling effective internal accounting controls. This practice contributed to their success in closely controlling all accounting policies and procedures at Fannie Mae and ensuring the accomplishment of their objective – presenting the government and investors with stable earnings even in the face of interest rate volatility.

### 3.    The Fate Of Freddie Mac Loomed Large Over The Fannie Mae Defendants

119.    Fannie Mae's maintenance of the illusion of stability assumed heightened significance after OFHEO's investigation of Freddie Mac, which began in 2000 and concluded in

2003, exposed massive accounting fraud and GAAP violations which were very similar to those that existed at Fannie Mae. Moreover, the fact that Freddie Mac made significant concessions to OFHEO and the SEC in December 2003 which led to the ruination of several of that company's officers (including its CEO and CFO) surely inspired the Officer Defendants to conceal their ongoing fraud at all costs.

120.    On November 23, 2003, following the release of OFHEO's findings regarding Freddie Mac, Freddie Mac announced that it had misstated profits by $5 billion over three years (2000 through 2002), and that it would restate its 2000, 2001 and 2002 financial statements. In a consent decree that Freddie Mac entered into with OFHEO, it admitted that it violated GAAP in order to hide the fact that its financials were highly volatile and subject to significant fluctuations.

121.    Freddie Mac's fraud was strikingly similar to the fraud that OFHEO later uncovered at Fannie Mae, and included:

- Lack of adequate internal accounting controls and personnel expertise;

- Failure to adhere to GAAP, including SFAS 133, by engaging in a complex series of sham transactions designed to make the Company's earnings seem much more stable than they actually were;

- Using improper accounting techniques to smooth earnings by lowering earnings results in good times and inflating results when business conditions deteriorated;

- Providing investigators with altered records to conceal improper accounting techniques; and

- Creating "cookie jar" reserves to boost earnings and mask losses.

122.    As with the Fannie Mae Defendants, Freddie Mac's CEO, Leland Brendsel ("Brendsel"), its CFO, Vaughn Clarke ("Clarke"), and other executives orchestrated the scheme

and were awarded millions of dollars in bonuses for meeting analysts' earnings expectations and maintaining the faith of the federal government.

123.    The fate of Freddie Mac's CEO, CFO and other officers surely alarmed the Fannie Mae Defendants and particularly Raines and Howard.  On June 6, 2003, Brendsel and Clarke both "retired" from Freddie Mac.  On December 18, 2003, OFHEO filed Notices of Charges against both men and against Freddie Mac which demanded, among things, that Freddie Mac retroactively reclassify their resignations as terminations for cause (thereby depriving them of generous severance packages) and that the two return their bonuses received in fiscal years 2000 and 2001 to Freddie Mac.  Freddie Mac complied, collecting more than $33 million from Brendsel and nearly $4 million from Clarke.

124.    Like Brendsel and Clarke, Raines and Howard stood to lose significant benefits if they were terminated "for cause."  According to Raines' employment contract, which was in effect until shortly before the release of the Interim OFHEO Report, if his employment was terminated other than "for cause," he would receive yearly pension payments of $1.4 million for life.  The Company also owed him $8.7 million in deferred compensation.  Raines held vested options for 1.6 million shares of stock, plus options for 368,800 shares for which he became eligible upon retirement.  In addition, Raines' severance package provided a life insurance benefit of $5 million until age 60, with a benefit of $2.5 million thereafter.

125.    Howard's employment contract made him eligible for $36,071 in monthly pension payments and deferred compensation of $4 million.  Howard held vested options for 481,600 shares.  He was also eligible for $84,000 in salary through January 2005.  In addition, Howard's severance package provided a life insurance benefit of $2 million until 2009 and a benefit of $1 million indefinitely thereafter.

126.    Given the Officer Defendants' strong motivations to conceal the fraud at Fannie Mae and to avoid being terminated "for cause," it is not surprising that on July 31, 2003 Raines conducted a two-hour conference call with analysts during which he made every effort to distinguish Fannie Mae's accounting policies and procedures from those at Freddie Mac.  In particular, Raines focused on Fannie Mae's purported compliance with SFAS 133 and the Company's purportedly fine internal control systems.  It may have been for naught, however, because OFHEO eventually discovered the truth, and in the days before OFHEO's scathing Interim Report was issued, Fannie Mae rewrote Raines' and Howard's employment contracts to allow their severance payments to be withheld if they were fired for "fraudulent actions."

## C.    Defendants' Violations of Pertinent SEC Regulations

127.    The SEC regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience."  SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120 at 17,095-3, 17 C.F.R. § 241.20560 (Jan. 13, 1984).

128.    The SEC requires that public companies prepare their financial statements in accordance with GAAP.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).

129.    In Accounting Series Release 173, the SEC reiterated the duty to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

130.    Defendants violated Accounting Series Release 173 and SEC Rule 4-01(a) of SEC Resolution S-X by filing financial statements with the SEC for the years 2002 and 2003

(including interim quarterly periods) which were not prepared in accordance with GAAP (as discussed in detail below), and which created an impression that was inconsistent with the business realities of Fannie Mae's financial position and operations. Because those financial statements did not comply with GAAP, they are presumptively misleading.

### D. Defendants' Violations of OFHEO Regulations

131. Congress created OFHEO to operate as a "financial safety and soundness regulator." 12 U.S.C. § 4501 et. seq. Accordingly, Congress determined that OFHEO should have the authority to establish capital standards, require financial disclosure, prescribe adequate standards for books and records and other internal controls, conduct examinations when necessary, and enforce compliance with the standards and rules that it establishes.

132. Consistent with this purpose, OFHEO's Director is charged with the duty of ensuring that Fannie Mae is adequately capitalized and operating safely, in accordance with the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the "Safety and Soundness Act"). To that end, OFHEO has produced regulations, guidance and examination documents that inform Fannie Mae of OFHEO's expectations with respect to safety and soundness. In evaluating Fannie Mae's conduct, OFHEO looks to these explicit standards, as well as to Fannie Mae's own policies, applicable laws, and standards promulgated by industry.

133. On December 19, 2000, OFHEO issued its Policy Guidance, *Minimum Safety and Soundness Requirements,* PG-00-001. This Guidance set forth minimum safety and soundness standards in eight broad areas of concern. Subsequently, on August 30, 2002, OFHEO published its *Final Rule: Safety and Soundness Regulation,* 67 Fed. Reg. 55, 691 (codified at 12 C.F.R. Part 1720), incorporating that Guidance. Thereunder, Fannie Mae is bound by the following standards, among others:

- *Board and Management Responsibilities and Functions* – Each Enterprise's Board of Directors must work with management to establish strategies and goals and must ensure (1) that management is held accountable for meeting the goals and objectives of the Enterprise, (2) that the board is provided with accurate information about the operations and financial condition of the Enterprise, (3) that the organizational structure and assignment of responsibilities of the Enterprise provide clear accountability and controls, and (4) that management establishes an effective risk management framework including a periodic review of that framework to monitor its effectiveness and take steps to correct any weakness.

- *Internal Controls* – Each Enterprise should maintain and implement internal controls that, at a minimum, provide for an organizational structure and assignment of responsibility that provide for accountability and controls including adherence to policies and procedures; a control framework commensurate with the Enterprises' risks; policies and procedures adequate to safeguard assets; and compliance with applicable laws, regulations and policies.

- *Audits* – Each Enterprise should establish and implement internal and external audit programs (1) to monitor the internal controls, (2) to maintain the independence of the audit function, (3) to assure that qualified professionals and management conduct and review the audit functions, (4) to adequately test and review audited areas and to adequately document findings and recommendations, and (5) to verify and review measures and actions taken to address identified material weaknesses. OFHEO's statute specifically names a failure to maintain adequate books and records as a failure to meet safety and soundness standards.

- *Information Reporting and Documentation* – Each Enterprise should establish and implement policies and procedures for generating and retaining reports and documents that, *inter alia*, (1) enable the board of directors to make informed decisions and to exercise its oversight function by providing all such relevant information in an appropriate level of detail as necessary, and (2) ensure decision makers have appropriate and necessary information about particular transactions and business operations, and (3) ensure timely and complete submissions of reports of financial condition and operations, as well as annual and other periodic reports and special reports to OFHEO.

134.    OFHEO amplified these standards of prudent business operation in subsequent regulations, including a corporate governance rule that requires Fannie Mae's Board of Directors and senior officers to undertake focused efforts to meet their obligations and, in particular, for the Board of Directors to oversee corporate operations effectively. These corporate governance rules establish the following minimum standards for safety and soundness affecting Fannie Mae's corporate governance policy and practices, including:

- *Board of Directors* – OFHEO requires that the Enterprise's board of directors exercise oversight necessary to ensure policies are in place to assure that (1) qualified managers are hired; (2) management sets policies and controls to implement the strategies of the Enterprise; (3) management is held accountable for meeting the Enterprise's goals and objectives; and (4) management provides the members of the board of directors with accurate information about the operations and financial condition of the enterprise in a timely fashion and sufficient to enable them to effect their oversight duties and responsibilities.

- *Compensation* – Compensation shall be reasonable and appropriate, commensurate with the duties and responsibilities of the employee, and consistent with the long term goals of the enterprise, shall not focus solely on earnings performance, and shall take into account risk management, operational stability, and legal and regulatory compliance.

- *Conduct and Responsibility of the Board of Directors* – The board of directors shall have policies and procedures in place to assure oversight of (1) corporate strategy, legal and regulatory compliance, prudent plans for growth and allocation of resources to manage risk; (2) hiring qualified executive management; (3) compensation programs; (4) integrity of accounting and financial reporting systems including audit and internal control; and, among other things, (5) process and adequacy of reporting, disclosures and communications with investors.

135.    Despite these clear regulations, Fannie Mae was not operating safely and soundly. Rather, as described herein, the Company was a house of cards built on the shaky foundation of fraudulent accounting and non-existent internal controls, while its Board of Directors failed in its obligation to serve as effective overseers of the Company's regulatory compliance, accounting, and financial reporting.

### E.    Defendants' Violations of GAAP

136.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.   GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA").   With the SEC's permission (Accounting Series Release 150), the AICPA established its GAAP principles through three successor groups:   the Committee on Accounting Procedure; the

Accounting Principles Board (the "APB"); and the Financial Accounting Standards Board (the "FASB").

137.    The financial statements that were issued by Fannie Mae for at least the years 2001, 2002, and 2003, and 2004 (including the related quarterly periods) and for the quarters ended March 31, 2004 and June 30, 2004, did not fairly and accurately represent the Company's financial position and operations because they violated the following principles of GAAP:

- That financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (FASB Statement of Concepts ("CON") No. 1, ¶ 34);

- That financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (CON No. 1, ¶ 40);

- That financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibilities to owners for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (CON No. 1, ¶ 50);

- That financial reporting should be reliable in that it represents what it purports to represent -- that information should be reliable as well as relevant is a central principle of accounting (CON No. 2, ¶¶ 58-59);

- That information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (CON No. 2, ¶¶ 79,80);

- That conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risk inherent in business situations are adequately considered (CON No. 2, ¶¶ 95, 97);

- That revenues and gains generally should not be recognized until realized or realizable, and that revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues (CON No. 5, ¶ 83); and

45

- That the costs of services be matched with, *i.e.*, recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (CON No. 6, ¶ 145).

138.    More specifically, Fannie Mae's financial statements for at least the years 2001, 2002, and 2003, and 2004 (including the related quarterly periods) and for the quarters ended March 31, 2004 and June 30, 2004 were materially false and misleading because the Fannie Mae Defendants engaged in a fraudulent scheme to manipulate the Company's reported financial results through a host of accounting practices which directly violated specific GAAP provisions. These improper accounting practices included, *inter alia*, the following, which are discussed in greater detail in the paragraphs below:

- Improperly accounting for deferred price adjustments in violation of SFAS 91;

- Improperly accounting for derivative transactions and hedging activities in violation of SFAS 133;

- Improperly accounting for forward-commitments in violation of SFAS 149;

- Improperly classifying loans intended to be securitized as "held-for-investment" in order to avoid recording changes in valuation allowances on the Company's income statement in violation of SFAS 65;

- Failing to record asset impairments on guaranty fees in violation of SFAS 115;

- Improperly accounting for the Company's allowance for loan losses in violation of SFAS 5 and SFAS 114;

- Improperly accounting for dollar-roll repurchase agreements in violation of SFAS 140;

- Improperly accounting for at least one finite insurance policy in violation of SFAS 5;

- Failing to consolidate the financial results of Qualified Special Purpose Entities on Fannie Mae's financial statements in violation of SFAS 140 and FASB Interpretation No. 46;

46

- Recognizing income and expenses in the incorrect accounting periods;

- Improperly accounting for investments in qualified low-income housing tax credit partnerships in violation of GAAP;

- Improperly accounting for other-than-temporary impairment of manufactured housing bonds and aircraft asset-backed securities in violation of SFAS 115;

- Improperly accounting for interest-only mortgage backed securities;

- Improperly accounting for amortization of callable debt expense in violation of Accounting Principles Board of Opinion No. 21;

- Improperly accounting for realignments and the Company's Security Master Project in violation of Accounting Principles Board of Opinion No. 20;

- Improperly capitalizing payments to its partner in its minority lending initiative in violation of SFAS 91;

- Improperly accounting for real estate-owned and foreclosed property expense in violation of SFAS 144 and SFAS 66;

- Improperly accounting for troubled debt restructurings in violation of SFAS 15 and 114;

- Improperly accruing interest income on seriously delinquent loans;

- Improperly accounting for certain guaranty fees and obligations in connection with mortgage-backed securities;

- Creating Real Estate Mortgage Investment Conduits with no legitimate purpose; and

- Maintaining excess tax reserves related to investments in synthetic fuel partnerships.

1.    **Fannie Mae's Improper Accounting For Deferred Price Adjustments**

139.    SFAS No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases*, is the GAAP provision that establishes the method of accounting for nonrefundable fees and costs associated with lending,

committing to lend, or purchasing loans or groups of loans.  The provisions of this Statement apply to all types of loans, including debt securities, as well as to all types of lenders.

140.    SFAS 91 requires a company to record purchases of loans and investments in mortgage-backed securities at the purchase price, net of any premiums, discounts, and other deferred purchase and guarantee fee price adjustments.  All premiums, discounts, and other deferred purchase and guarantee fee price adjustments are required to be recognized as adjustments to income using the "effective yield method."

141.    Under the effective yield method, a company must estimate a "constant effective yield" for loans and investments in mortgage-backed securities each time its financial results are reported.  In doing so, the company must consider the anticipated rate of prepayment for the loans and securities in determining the appropriate amortization period for such loans and securities.  If new information causes this anticipated amortization period to change, a retrospective adjustment must be recorded currently into income and a prospective change must be made to the anticipated amortization period.  This adjustment was referred to at Fannie Mae as "catch-up."  SFAS 91's requirement that adjustments based on changes in amortization periods be recorded into income can lead to significant earnings volatility in a large mortgage portfolio like Fannie Mae's.

142.    Both OFHEO and Paul Weiss found that Fannie Mae management began in early 1999 to formulate accounting policies to manage the amortization of deferred price adjustments.  Many of the policies that were considered, and those that were ultimately adopted in December 2000, were contrary to GAAP and were designed to provide earnings flexibility and minimize earnings volatility.

   a.    **Fannie Mae Ignored SFAS 91 By Adopting A Policy For Accounting For Deferred Price Adjustments Designed To Minimize Earnings Volatility**

143.    In late 1998 or early 1999, hot on the heels of the $199 million expense deferral incident described above, KPMG asked Fannie Mae to develop a policy formalizing the Company's SFAS 91 accounting policy (the "SFAS 91 Policy").  Prior to 1999, Fannie Mae had operated under an informal understanding that KPMG would not require the Company to record catch-up if the amount fell within a threshold of plus or minus $100 million, even though KPMG would treat the unrecognized catch-up as an audit difference.  To avoid the earnings fluctuations that would result from complying with SFAS 91, Fannie Mae management conceived a plan to manage catch-up by recording it "prospectively"—*i.e.*, Fannie Mae would estimate and recognize small catch-up amounts in periods after catch-up was measured, to avoid having to recognize too large a catch-up amount in any one reporting period.

144.    KPMG agreed with Fannie Mae's prospective treatment of catch-up, as long as the Company established a materiality threshold to limit the amount of current period unrecorded catch-up, a principle that KPMG knew had no support in GAAP.  Ken Russell, who at the time was the lead engagement partner for Fannie Mae, stated in a memorandum he prepared summarizing a meeting he had with Howard on August 11, 1998:

> I told Tim that in regard to FAS 91 amortization of premiums and discount relating to its loan portfolio, that we agree that significant quarterly adjustments would not be the best way to react to changes in prepay rates, however, possibly more frequent prospective adjustments should be made by Fannie Mae to keep the FAS 91 difference at a lesser significant level.  *He appeared to agree that there should be some level of materiality established and the Company should look into how they could stay within that level*.  The increase [sic] frequency seems to be a consideration that he found to be acceptable.  He was going to check with Leanne [Spencer] as to the possibilities of establishing some policy like that.

(emphasis added).

145.    The Officer Defendants were aware that compliance with SFAS 91 would lead to earnings volatility long before KPMG asked them to develop a formal policy on this accounting standard.  An internal memorandum dated November 7, 1995 tellingly states: "Since true FAS-91 would introduce excessive variance in income recognition from quarter to quarter, we have adopted a 'prospective method.'"[6]  Accordingly, by the time KPMG approached management about SFAS 91 in 1999, Fannie Mae had had plenty of time to devise a policy that would permit it to "work around" SFAS 91.

146.    Fannie Mae's first step in establishing a GAAP-violative SFAS 91 Policy was to place control of its development in the hands of the Controller's Office, not in those of the Financial Standards group, which was the department at Fannie Mae that was charged with issuing accounting policies.  In addition, Fannie Mae was able to subject its SFAS 91 Policy to a lower-than-usual degree of scrutiny by internally characterizing it as an "operational framework" rather than as an official "accounting policy."

147.    Janet Pennewell of the Controller's Office led the process of developing the SFAS 91 Policy under the direction of her supervisor, Spencer, with active participation from Thomas A. Lawler (Senior Vice President - Portfolio Analytics), Jeffrey Juliane (Director - Accounting and Audit) and Rene LeRouzes (Controller's Office).  Howard also played a key role in the development of the Policy, expounding some of its key components and retaining overall approval authority over the Policy.

148.    In drafting the SFAS 91 Policy, the Controller's Office sought to embody the following themes:

---

[6]    Paul Weiss discovered this document, titled "PDMA Analysis and Recommendation" in Financial Standards' files.  It is unclear at this time who authored this document.

- Minimizing earning volatility;

- Using an average of multiple interest rate scenarios around the Company's base interest rate forecast to determine the catch-up for a given period;

- Developing a predetermined threshold, targeted value, or "cushion" below which the Company would consider the catch-up to be immaterial;

- Managing the catch-up so that it would not exceed the targeted value; and

- Reducing the catch-up balance over a period in the future if it exceeded a certain amount.

149.    None of these themes were based on SFAS 91.  Rather, they sought to advance Fannie Mae's dual goals of (1) reducing earnings volatility and (2) giving management as much discretion as possible in managing the impact of catch-up on the Company's income statements.

150.    The Officer Defendants, including Howard, were well aware that SFAS 91 unambiguously required catch-up to be recorded in the period in which it was estimated.  In a September 23, 1999 memorandum, Pennewell stated to Howard:

> *Accounting policy requires us to record any catch-up to adjust prior period amortization in the current period.*  However, we believe it may be appropriate to adjust the catch-up over time if the amount is not material.

(emphasis added).

151.    While Pennewell suggested that catch-up could be adjusted over time if the amount was not "material," her memorandum clearly informed Howard that the SEC had issued a Staff Accounting Bulletin  ("SAB") on August 12, 1999, namely, SAB 99, *Materiality,* that reflected "the SEC's concern about the tendency of companies, with the acquiescence of their auditors, to manage earnings by designating certain transactions or events below a certain percentage threshold as 'immaterial.'"  Thus, the Officer Defendants knew that adopting an SFAS 91 Policy that included predetermined materiality thresholds would not pass muster under GAAP (as interpreted by the SEC), yet they adopted such a Policy anyway.

152.    Flatly dismissing Pennewell's warning that the SEC did not look favorably upon attempts to manage earnings through the use of materiality thresholds, Howard bullied her into crafting an overly aggressive SFAS 91 Policy that contained just such a rule.  In an October 27, 1999 memorandum, Howard asked Pennewell to consider "'where we would like our [catch up target] to be' in order to minimize the amount and frequency of PDA [purchase/discount amortization] adjustments we would have to make as interest rates moved [sic] (as we know they will)."  Further, the memorandum instructed Pennewell to target a catch-up balance that would shield the Company from having to record adjustments in the event of interest rate changes.

153.    Fannie Mae's SFAS 91 Policy was finalized in December 2000.  The SFAS 91 Policy contained three features initially proposed by Howard:  (1) calculating catch-up using the average of five scenarios; (2) a range within which the catch-up was to be considered the "functional equivalent of zero;" and (3) a time horizon over which the Company could bring the catch-up into income.  The net effect of the SFAS 91 Policy was to permit the Company to not record catch-up, in violation of SFAS 91, if the catch-up did not exceed a certain pre-determined materiality threshold *and* to permit the Company (in the event catch-up did exceed the pre-determined materiality threshold) to manage the reporting of catch-up by allowing a three-year window in which to bring the catch-up into income.

154.    The SEC and OFHEO determined that Fannie Mae violated SFAS 91 by establishing policies that allowed the Company to recognize adjustments to the loans only if the adjustments exceeded Company-developed materiality thresholds.  This allowed Fannie Mae, consistent with its intent in developing its SFAS 91 Policy, to avoid making adjustments that otherwise were required under SFAS 91.

155.    Howard, as the Company's CFO, and Spencer, as the Company's Controller, knew or should have known that the SFAS 91 policy they had crafted did not comply with GAAP, yet insisted on its adoption.  In fact, both Spencer and Pennewell have since conceded that this "three year catch up management" provision had no support in GAAP, but was included to appease Howard.  Further, Senior Vice President of Financial Standards Jonathan Boyles, who reported to Spencer and was one of the people upon whom she relied to inform her whether Fannie Mae was complying with GAAP, told OFHEO that Fannie Mae's SFAS 91 Policy did not comport with GAAP.

156.    Moreover, Fannie Mae prepared its SFAS 91 Policy in response to a direct request from KPMG to develop such a Policy.  KPMG had the opportunity to review Fannie Mae's SFAS 91 Policy before its adoption, and knew, or should have known, that the Policy did not comply with GAAP.

> **b.    *Fannie Mae Violated SFAS 91 In Its Recording Of Deferred Price Adjustments***

157.    Having implemented its SFAS 91 Policy with little regard for GAAP, it comes as no surprise that Fannie Mae actually violated SFAS 91 when it put its Policy into effect.  Both the SEC and OFHEO found that Fannie Mae violated SFAS 91 by failing to timely adjust the recorded amounts of loans as a result of changes in the speed of prepayments.  Indeed, in Fannie Mae's Form NT-10-Q filed on November 15, 2004, the Company admitted that the methodologies used to calculate the required adjustments for 2001 and 2002 were not in accordance with GAAP.

158.    Moreover, armed with an SFAS 91 Policy that had been deliberately designed to permit the Company to minimize earnings volatility, the Fannie Mae Defendants would stop at

nothing to achieve this result—even if they needed to ignore the terms of the Policy in the process. According to the Paul Weiss Report:

> The evidence of the manner in which management implemented the [SFAS 91] Policy further demonstrated that, notwithstanding the Policy, management's primary goal was to manage the catch-up's impact on the Company's income statements.
>
> . . . [E]vidence showed that management also recorded catch-up in ways that deviated from the terms of the Policy. In particular, management used a variety of other tools to manage the catch-up balance, including booking on-top adjustments, changing interest rate paths, and editing CPRs that fed into the modeling system. Significantly, management also recognized catch-up that fell *within* the 'precision threshold' through 2002, even though by the Policy's own terms, any amount within the range was the 'functional equivalent of zero.' Finally, until 2003, management failed to calculate catch-up as of the interim balance sheet date. Instead, it used an estimate of year-end catch-up to determine whether the catch-up would fall within the 'precision threshold' by year-end. If the results of that analysis indicated that catch-up would not be within the threshold, management made periodic on-top adjustments to bring catch-up within the threshold.

159.    OFHEO reported the following additional violations of SFAS 91:

- Use of discretionary "on-top" adjustments to the financial statements solely for the purpose of minimizing volatility and achieving desired financial results. During the second and third quarters of 2003, on-top adjustments were recorded which, after adjusting for the effect of income taxes, allowed Fannie Mae to meet, or come very close to meeting, analysts' estimates. Such "on-top" adjustments violated SFAS 91, since GAAP requires that all adjustments to the premium and discount amortization be made currently through the income statement in order to maintain the constant effective yield. The "on-top" adjustments were catch-up entries designed to compensate for prior differences that were not properly adjusted for in accordance with SFAS 91. In addition, the use of these adjustments was a direct violation of SAB No. 99, *Materiality*, which states that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings, and that investors presumably also would regard this as a significant accounting practice which, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.

54

- Accumulation of reconciliation differences and errors as "phantom assets and liabilities," which were then amortized over a conventional 30-year mortgage life as opposed to being immediately corrected as required by SFAS 91, enabling the Officer Defendants to reduce earnings volatility by shifting income or expense from one accounting period to others. Amortizing errors over an extended period is also a violation of Accounting Principles Board Opinion No. 20, *Accounting Changes* ("ABP 20"), which requires the correction through restatement of the periods affected by the error.

- Development and use of estimation methods that were inconsistently applied to retrospective and prospective amortization, and selection of factors and market rate assumptions in order to achieve desired accounting results.

- Development of modeling capabilities to iteratively generate and evaluate estimates under varying assumptions in order to obtain the desired outcomes. OFHEO's investigation showed that Fannie Mae ran models of different scenarios of the amortization of premiums and their prospective effect on earnings, instead of determining the appropriate factors pursuant to SFAS 91.

- Maintenance of inadequate written procedures and documentation for amortization processes and systems, thereby impeding regulatory oversight.

160. Spencer admitted to OFHEO that Fannie Mae engaged in earnings management under the guise of compliance with SFAS 91. According to OFHEO, Spencer confirmed that it was management's practice to make "on top" adjustments because of the Company's asymmetric exposure so that Fannie Mae could achieve its desired earnings results. Further, Howard has admitted that he "made the judgment" that the Company should smooth out some of the volatility that would result from a strict application of SFAS 91.

161. As a result of the GAAP violations relating to SFAS 91, Fannie Mae repeatedly made materially false representations within its annual and quarterly filings during 2000, 2001, 2002, 2003, and 2004. In the financial statements in those filings, Fannie Mae misstated certain balances due to intentional errors relating to the assumptions it used in estimating the amortization rates of premiums and discounts on securities and loans. On the balance sheet, the

Company misstated mortgage related securities, loans (held for investment) and total assets.  On the income statement, the Company misstated interest income (mortgage and non-mortgage), interest expense, net income, and earnings per share (basic and diluted).

**2.    Fannie Mae's Improper Accounting For Derivative Transactions and Hedging Activities**

162.    Fannie Mae finances its mortgage and securities acquisitions in part by raising funds in the debt market.  The debt the Company issues has a variety of terms and features, including fixed and variable interest rates, call options, and terms ranging from a few days to ten years or more.  Generally, Fannie Mae seeks to maintain a spread between the interest it receives from its mortgage and securities portfolios and the interest it pays on its debt.  The Company's Portfolio Investment Committee sets up the debt strategy on a weekly basis with an eye towards maintaining the spread.  The Treasurer's Office is responsible for the issuance and management of the Company's debt.  The Controller's Office is responsible for debt accounting.

163.    During the 1990s, Fannie Mae's outstanding debt grew tremendously in response to the growth of its mortgage and securities portfolio.  While Fannie Mae reported total debt of $123.4 billion at the end of 1990, that figure had increased four-fold to $642.682 billion by the end of 2000.  The Company's debt continued to rise, with Fannie Mae reporting debt of $763.467 billion, $850.982 billion and $961.732 billion in 2001, 2002, and 2003, respectively.

164.    The size of Fannie Mae's debt portfolio exposed it to substantial interest rate risk.  Accordingly, the Company's ability to hedge this risk was a substantial component of its overall risk-management strategy.  Fannie Mae employed a wide variety of derivatives to hedge the interest-rate risk associated with its debt.  As its portfolio grew, the notional amount of the Company's derivative portfolio rapidly expanded, from just over $6.5 billion in 1990, to $128 billion by 1995, to over $1 *trillion* in 2003.  Given the size of the Company's derivatives

portfolio, the Fannie Mae Defendants knew that any changes in the accounting for such instruments would have a significant impact on Fannie Mae.

> a.    *Background On Accounting For Derivative Transactions And Hedging Activities*

165.    The FASB first considered the development of accounting principles for derivatives in 1983.  Following over a decade of study, the FASB issued SFAS 133, *Accounting for Derivative Instruments and Hedging Activities,* in June 1998.  SFAS 133 requires that all freestanding and certain embedded derivatives be carried as assets or liabilities on a company's balance sheet at fair value.  Unless a derivative is designated as a hedge and qualifies for hedge accounting under SFAS 133, it must be "marked to market" in each accounting period, with changes in its fair value recognized as gains or losses in current earnings.  This creates the potential for significant volatility in earnings for companies like Fannie Mae that are heavy participants in derivatives.

166.    Companies can avoid the earnings volatility associated with SFAS 133 by entering into "effective hedges," which can be accounted for using hedge accounting. "Effectiveness" refers to the extent to which changes in the fair value (or cash flows) associated with a derivative offset the changes in the fair value (or cash flows) associated with the hedged item (*e.g.,* a debt instrument).  If the offset is complete, then the hedge transaction is completely effective—the derivative and the hedged item can be said to form a "perfect hedge."  The extent to which the changes in the fair value (or cash flows) of the derivative do not offset the changes in the fair value (or cash flows) of the hedged item is referred to as "ineffectiveness" of the hedge.

167.    Because hedge accounting is an exception to the general rule requiring changes in the fair value of a derivative to be recognized in income, SFAS 133 establishes a number of criteria that must be met before hedge accounting can be used:

a.    Documentation.    A company must document the relationship at the inception of the hedge.  The documentation must identify the entity's risk management objective and strategy for undertaking the hedge, including identification of the hedging instrument, the hedged item, the nature of the risk being hedged, and how the effectiveness of the hedge will be assessed.

b.    Assessment of effectiveness.  Both at the inception of the hedge and on an ongoing basis, the hedging relationship must be determined to be "highly effective" in offsetting changes in the fair value (or cash flows) of the hedged instrument.  Periodic assessments are required whenever financial statements or earnings are reported and at least every three months.  A hedge is considered "highly effective" when changes in the fair value (or cash flows) of the derivative and the fair value (or cash flows) of the hedged instrument offset within a range of 80 to 125 percent.

c.    Measurement and recognition of ineffectiveness.    The methodology specified at the outset of the hedge must be used for the duration of the hedge both to determine whether the hedge relationship remains highly effective prospectively and to measure any ineffectiveness associated with the hedge retrospectively.

168.    Because hedge accounting under SFAS 133 is permitted only to the extent of a hedge's effectiveness, ineffectiveness is reflected in earnings.  In a fair value hedge, the changes in the fair value of the derivative and the hedged item are both recognized in income.  Any ineffectiveness in the hedge will result in an increase or decrease in reported income for the

relevant period.  In a cash flow hedge, the accounting involves a deferral in changes in the fair value of the derivative for the effective portion of the hedge.  To the extent the hedge is effective, the change in the fair value of the derivative is recognized as a component of other comprehensive income ("OCI").  Any ineffectiveness is reported in earnings.

169.    The process of assessing the effectiveness of a hedge relationship, measuring the ineffectiveness of a hedge transaction, and recognizing any ineffectiveness in income is referred to as the "long haul" method of hedge accounting.  To the extent that long haul accounting results in either (1) disqualification of hedge transactions for further hedge accounting or (2) ineffectiveness, regardless of whether hedge accounting continues, it will inject volatility into a company's income statements.  Further, the long haul method is widely acknowledged to be cumbersome and complex.

170.    SFAS 133 permits two alternatives to the long haul method of hedge accounting, referred to as the "matched-terms method" and the "shortcut method."  These alternatives are available *only* when the fair value of the derivative is zero at the outset of the hedge relationship, and when certain other criteria are met.

171.    The matched-terms method is permitted when the critical terms of the derivative instrument and of the entire hedged asset or liability or hedged forecasted transaction are the same.  In such a circumstance, the company can conclude that changes in the fair value or cash flow of the derivative and the changes in the fair value or cash flow of the asset or liability being hedged will completely offset each other at inception and on an ongoing basis.

172.    The shortcut method applies only to hedge transactions involving interest-rate swaps and recognized assets or liabilities.  To qualify for this method, the notional amount of the swap must match the principal amount of the hedged item; the expiration date of the swap must

match the maturity date of the hedged item (for fair value hedges); and the cash flows of the hedged asset or liability must match the cash flows of the hedged items and must be based on the same index (which is the designated benchmark interest rate). If all these requirements are met, the entity is not required to assess effectiveness or to measure ineffectiveness during the life of the hedge transaction.

   **b.   *Fannie Mae Ignored SFAS 133 By Adopting A Policy For Accounting For Derivative Transactions And Hedging Activities Designed To Minimize Earnings Volatility And To Prevent The Company From Having To Make Substantial Changes To Its Business Practices And Accounting Systems***

173. Fannie Mae undertook a two-year effort to implement SFAS 133 prior to the standard's effective date on January 1, 2001. Paul Weiss found that those efforts were improperly motivated by a desire to avoid earnings volatility, to avoid having to make substantial changes to the Company's business methods, and to avoid having to develop the new and complex accounting systems that would be needed to comply with SFAS 133.

174. Based on the evidence uncovered during its investigation, Paul Weiss concluded that the objective of Fannie Mae's SFAS 133 implementation project was to treat its hedge transactions as "perfect hedges," thereby permitting the Company to use the shortcut method of hedge accounting, and avoiding both the earnings volatility that would result from the recognition of ineffectiveness, and the need to implement complex changes to its business model or its accounting and financial reporting system. In order to achieve these results, the Company adopted policies that deviated from the requirements of SFAS 133. These GAAP-deviant policies were established with the knowledge and active involvement of, among others, Defendants Howard, Spencer, and KPMG.

175. In June 1998, a small group of Fannie Mae employees, including personnel from the Controller's Office and the Treasurer's Office, participated in an off-site meeting to study

SFAS 133 and how it would impact Fannie Mae. On September 14, 1998, Boyles prepared a memorandum summarizing this meeting in which he touted the benefits Fannie Mae would enjoy if its hedge transactions qualified as "perfect hedges":

> The final standard includes language regarding the concept of a 'perfect hedge' that we believe will prove beneficial in the adoption of the standard with a minimum of core accounting changes. *If Fannie Mae's derivative transactions can qualify under the 'perfect hedge' criteria, then we should be able to maintain our current 'accrual accounting' systems and there would be little impact on our income statement.* In instances where we do not qualify for 'perfect hedge' accounting treatment there would be some income volatility in earnings from the new standard. The basic premise I am using to evaluate the standard's impact on Fannie Mae is the effect on income.

(emphasis added). Boyles circulated this memorandum to, among others, Defendants Spencer and KPMG.

176. Fannie Mae's early efforts to address SFAS 133 were discussed at a meeting with Howard on December 4, 1998. Spencer prepared a memorandum and talking points for Howard in preparation for this meeting, which indicate that her objectives for the meeting included explaining that the Company had identified certain transactions that would not qualify for the 'perfect hedge' exception. This was unacceptable, as Spencer perceived "[t]he key tenet" of Fannie Mae's SFAS 133 implementation efforts to be "fit[ting] all of [its] transactions into the FASB's 'perfect hedge' exception."

177. Given the vast impact SFAS 133 would have on Fannie Mae, Howard instructed Spencer to form an inter-departmental working group to deal with it. This group considered a number of technical issues, reported periodically to senior management at the senior vice president level (including Spencer and Linda Knight, the Company's Treasurer), and consulted with Howard.

The inter-departmental working group led the Company's SFAS 133 implementation efforts during 1999 and 2000, with a focus on findings ways to avoid earnings volatility by fitting all of Fannie Mae's hedge transactions into the 'perfect hedge' category. A July 21, 2000 email by Mehmood Nathani, a participant in the SFAS 133 efforts from the Treasurer's Office, reporting on a meeting he had had with, among others, Howard, Spencer, Knight and Boyles, stated that "reduction of earnings volatility is still our numero uno objective."

178.    Fannie Mae took the subject of earnings volatility so seriously that it required its officers to take personal responsibility in the event a transaction could not be brought within the "perfect hedge" guidelines. During the SFAS 133 implementation process, Fannie Mae adopted a procedure that required the approval of three Company Senior Vice Presidents (namely, the Treasurer (Knight); the Senior Vice President - Portfolio Strategy (Peter Niculescu); and the Senior Vice President - Portfolio Management)) for any transaction that did not qualify as a "perfect hedge." Each of these Senior Vice Presidents was required to "sign off" on such transactions, with their signatures representing an acknowledgment of their "acceptance of accountability for earnings volatility" associated with long haul accounting. This policy was included in the December 2003 Derivatives Accounting Guideline discussed at length below. Plainly, this policy created a strong incentive for Fannie Mae employees in general, and the three Senior Vice Presidents named above in particular, to take whatever steps were necessary to bring transactions within the 'perfect hedge' guidelines.

179.    To further incentivize its employees to come up with creative solutions to SFAS 133's potential to inject earnings volatility into reported earnings, Fannie Mae rewarded those executives who did so. In October 2000, several senior executives involved in the SFAS 133

project—including Spencer and Knight—nominated others for a special Chairman's Award. The nomination forms stated:

> Never before has the adoption of a new accounting standard had such a significant impact on Fannie Mae's business practices. Had it not been for the hard work and ingenuity if this team, FAS 133 would have created billions of dollars in annual earnings volatility. As a result of their extraordinary efforts, Fannie Mae is now in a position to adopt FAS 133 on January 1, 2001 with a significantly reduced impact to its bottom line.

(emphasis added).

180.    Ultimately, the SFAS 133 working group prepared a volume called the Derivatives Accounting Guidelines, known internally as the "DAG," which set forth the Company's derivatives accounting policy. Among other things, the DAG contained a "menu" of permitted hedge transactions and the accounting associated with these transactions, many of which were deemed to qualify for treatment as perfect hedges under the shortcut method. KPMG approved the DAG.

181.    The internally-created DAG, and *not* the actual text of SFAS 133, became the standard for hedge accounting at Fannie Mae. According to the Paul Weiss Report, Controller's Officer personnel admitted that they treated the DAG as authoritative and *did not consider the language of SFAS 133 in determining the appropriate accounting for Fannie Mae's hedge transactions.* Spencer, as the Controller, knew or should have known that her staff improperly ignored the language of SFAS 133, yet stood idly by while the Company looked to an internally-created document, and not the text of SFAS 133, to determine how the Company would account for such a significant amount of its transactions.

182.    Fannie Mae also did not develop accounting systems capable of performing long haul accounting for its derivatives transactions. Rather, according to a document dated March 30, 2001 captioned "FAS 133 Implementation," which provided a retrospective outline of the

SFAS 133 implementation project, Fannie Mae's accounting "[s]ystems [were] *built to implement the short-cut method.*" (emphasis added). Even when the FASB extended the SFAS 133 effective date from January 1, 2000 to January 1, 2001, the Company made a conscious decision not to use the additional year to refine its approach to SFAS 133 by improving its systems capabilities. Plainly, Fannie Mae planned all along to force its derivative transactions to fit into the "short-cut method" box, regardless of whether such treatment was appropriate under SFAS 133.

183.    Further, Fannie Mae ignored the pronouncements of SFAS 138, by which the FASB amended SFAS 133 in June 2000, prior to the effective date of SFAS 133. In SFAS 138, the FASB removed from SFAS 133 a sentence that would have permitted transactions referred to as "term-out transactions" at Fannie Mae – *i.e.*, multiple instruments that are intended in the aggregate to result in a hedging relationship -- to be treated under the shortcut method. In ruling that such transactions did not qualify for the shortcut method, the FASB noted: "The hedging instrument does not have a fair value of zero at inception of the hedging relationship" and, thus, "the hedging instrument . . . does not meet the criterion . . . to qualify for the shortcut method."

184.    The FASB also indicated in the exposure draft of SFAS 138 that another transaction commonly used by Fannie Mae—the rollover of discount notes hedged by a pay-fixed swap—would not qualify for accounting under the shortcut method.

185.    Fannie Mae recognized the importance of these changes to its accounting. In a series of undated handwritten notes captioned "133 Amendment Issues," Kimberly Stone (Financial Standards) stated that certain transactions "[n]o longer qualify for shortcut method" under SFAS 138 and that the standard "[t]akes away [the Company's] argument to apply the shortcut method in other places." Further, Stone noted in a March 8, 2000 memorandum:

"Another surprise in the Exposure Draft release was that the FASB deleted the ability to qualify for the shortcut method in the Fannie Mae 'carve-out' in the standard. Jonathan [Boyles] will be following up with Leanne [Spencer] re: the implications this may cause."

186.    Although Fannie Mae clearly had notice that at least two types of transactions it routinely used would not qualify for the shortcut method, Financial Standards concluded that SFAS 138 would have no impact on how the Company planned to account for such transactions. In fact, Stone's undated notes state: "[A]s long as critical terms are the same, assume no ineffectiveness."  In short, the issuance of SFAS 138 did not alter the Company's approach to SFAS 133 insofar as the treatment of term-out transactions or hedging the rollover of discount notes were concerned.  Plainly, Fannie Mae was resolved to use the shortcut method at all costs and was willing to flout any GAAP standard that stood in its way.

187.    Howard admitted to OFHEO that he was responsible for adopting and implementing the Company's SFAS 133 policy.  Spencer was a co-author of that policy.  When questioned about Fannie Mae's hedge accounting policy, Spencer told OFHEO that it was tailored to "how Fannie Mae's business runs, and [we] made a judgment" on how SFAS 133 would be applied at Fannie Mae, which Spencer termed the "practical application" of GAAP. Boyles, another co-author of the Company's SFAS 133 accounting policy, told OFHEO that "[w]e [had] several known departures from GAAP in our adoption of [SFAS 133]."  Spencer and Howard knew that Fannie Mae did not properly apply SFAS 133, and manipulated Fannie Mae's accounting policy to suit their own purposes.  This departure from GAAP was deliberately hidden from investors.

c.    **Fannie Mae Violated SFAS 133 In Its Accounting For
Derivative Transactions And Hedging Activities**

188.    OFHEO, the SEC, and Paul Weiss all determined that Fannie Mae repeatedly

violated SFAS 133 in accounting for its derivative transactions and hedging activities.

According to the SEC, Fannie Mae's methodology of assessing, measuring and documenting

hedge ineffectiveness was inadequate and not in compliance with SFAS 133 requirements.  The

SEC stated: "Fannie Mae internally developed its own unique methodology to assess whether

hedge accounting was appropriate.  Fannie Mae's methodology, however, did not qualify for

hedge accounting because of deficiencies in its application of [SFAS] 133."  As a result, the SEC

ordered Fannie Mae to restate its 2001 to mid-2004 financial statements to totally eliminate the

use of hedge accounting.

189.    OFHEO determined that Fannie Mae implemented SFAS 133 in a manner that

placed minimizing earnings volatility and maintaining simplicity of operations above compliance

with GAAP.  Its findings included the following:

- Fannie Mae failed to maintain the documentation required under SFAS 133;

- Fannie Mae failed to perform the required assessment and recording of hedge effectiveness, and failed to determine the ineffective portion of hedge relationships;

- Fannie Mae adopted an assumption that the vast majority of its hedging relationships were "perfectly effective," even though many of them were not;

- Fannie Mae improperly assumed that re-designated derivatives were perfectly effective upon re-designation, even though the derivatives did not have a zero fair value;

- Fannie Mae inappropriately accounted for offsetting derivatives from the adoption of SFAS 133 in 2001 to the end of 2003.  Fannie Mae often entered into offsetting swaps rather than terminating an existing swap. The original swap and the offsetting swap were incorrectly treated as a perfect cash flow hedge, with the change in fair value recorded in Accumulated

Other Comprehensive Income ("AOCI"), instead of being recorded currently to earnings. AOCI represents changes in stockholders' equity that are not recorded in the income statement. At Fannie Mae, this included unrealized gains and losses on cash flow derivative hedges and on securities available for sale;

- Fannie Mae used an erroneous methodology to account for changes in the time value and intrinsic value components of purchased interest rate caps from the inception of SFAS 133 through the third quarter of 2002. In November 2002, Fannie Mae corrected its methodology and applied it prospectively, but failed to evaluate the errors in the previously reported results for restatement, in violation of APB No. 20, *Accounting Changes*. Fannie Mae's 2002 10-K incorrectly described this as a refinement of methodology rather than as a correction of an error; and

- Fannie Mae improperly applied the short-cut method, with the result that: (1) receive-fixed swaptions (options to enter into interest rate swaps) hedging the fair value of debt were incorrectly accounted for as perfect hedges; (2) the effectiveness of callable swaps hedging discount notes was determined without regard to option values in the derivative; (3) hedges of anticipated debt issuances were assumed perfectly effective based upon a duration comparison which is not part of SFAS 133; (4) swaps with non-zero values at inception were incorrectly treated as perfectly effective; (5) Fannie Mae improperly permitted up to a seven day mismatch on reset dates between the hedged item and the swap in cash flow hedges; and (6) Fannie Mae improperly permitted up to a 90 day mismatch of maturity dates between the hedged item and the swap in fair value hedges.

190.    The Paul Weiss Report devotes over seventy pages to Fannie Mae's implementation of SFAS 133 and its violations of that standard, detailing at great length: (1) the hedge accounting methodology Fannie Mae adopted when it implemented SFAS 133; (2) aspects of Fannie Mae's accounting that are inconsistent with that methodology; (3) Fannie Mae's hedge documentation; and (4) miscellaneous other deficiencies in the Company's application of SFAS 133. Based on its extensive investigation, Paul Weiss unequivocally concluded, as had OFHEO, that Fannie Mae intentionally developed its SFAS 133 policies for the purpose of avoiding income volatility in violation of clear SFAS 133 requirements:

> In our view, this evidence, viewed as a whole, demonstrates that Fannie Mae departed from clear FAS 133 requirements in order to

67

avoid the income statement volatility and administrative complexity associated with strict adherence to the standard.

191.    While Paul Weiss noted the same SFAS 133 violations as OFHEO had detailed in its Interim Report as discussed above, the Paul Weiss Report contains additional details concerning the severity of these violations.  For example, Paul Weiss noted the following:

> **i.**    ***Fannie Mae Knowingly Violated SFAS 133 By Permitting A Seven-Day Tolerance for Matching Repricing Dates***

192.    As noted above, OFHEO found that Fannie Mae had improperly permitted up to a seven day mismatch on reset dates between the hedged item and the swap in cash flow hedges. The Paul Weiss Report made clear that this SFAS 133 violation could not have been inadvertent.

193.    Under the shortcut method of accounting for cash flow hedges applied by Fannie Mae, the repricing dates of the variable rate leg of the derivative were required to "match" those of the variable rate asset or liability.  To the extent the term "match" was in any respect ambiguous, the FASB clarified in Implementation Issue E4, issued on July 28, 1999, that "[t]he verb *match* is used . . . to mean *be exactly the same or correspond exactly*."  Accordingly, Fannie Mae knew more than a year before the effective date of SFAS 133 that the shortcut method permitted no flexibility on the matching of repricing dates, yet adopted a policy that permitted a seven day mismatch.

194.    According to the Paul Weiss Report, Fannie Mae advanced two reasons to justify is seven-day mismatch policy, one based on practicality and the other based on materiality.  As to practicality, it was Fannie Mae's practice to issue benchmark bills on Wednesdays for reasons of market efficiency.  Fannie Mae did not wish to change this practice and concluded that it would not be feasible, in the ordinary course of its business, to obtain derivatives to hedge the debt instruments issued on a given day so that all of the derivatives would reprice on the same date.  Accordingly, Fannie Mae elected to ignore the plain requirement that the repricing dates

must match exactly, and adopted a policy that would permit it to continue its business practices unchanged.

195.    As to materiality, Fannie Mae simply decreed that any ineffectiveness associated with its seven day mismatch policy would be inconsequential.  Paul Weiss found "no evidence that the Company tested that proposition prior to the implementation of the rule."  To the extent that the Company did test this proposition before 2001, it did not do so in a way that would have mirrored the results of applying the required long-haul method.  Fannie Mae intentionally flouted GAAP to avoid the "inconvenience" that would have been associated with SFAS 133 compliance.

196.    KPMG's workpapers establish that it was aware of and agreed to Fannie Mae's GAAP-violative seven day mismatch policy:

> Fannie Mae Derivative Accounting Guideline Section IV (pages .20 and .21) discuss the policy for assuming no ineffectiveness for the issuance and rollover of discount notes.  Discount notes are considered forecasted fixed rate debt instruments, and Fannie Mae hedges the risk of changes in interest payments attributable to changes in the benchmark rate related to the forecasted issuance of discount notes.  Fannie Mae assumes no ineffectiveness and applies the shortcut method if the rollover date of the disc. Notes and the reset on the interest rate swap are w/in +/- 7 days of each other.  (A maximum of five business days).  *Although the policy is not in strict compliance with FAS 133 and DIG [Derivatives Implementation Group], KPMG reviewed and agreed to this policy at the time when Fannie Mae was preparing their accounting guidelines and implementing FAS 133.*

(emphasis added).

### ii.    *Fannie Mae Knowingly Violated SFAS 133 By Applying The Matched Terms Method To Hedges Of Forecasted Transactions Whose Maturities Did Not Match*

197.    The DAG, in violation of SFAS 133, permitted Fannie Mae to apply the matched terms method to hedges of forecasted transactions even if their maturities did not "match," as

long as they fell within a specified range. SFAS 133 specifically warned that ineffectiveness would result from mismatched maturities, requiring the use of long haul accounting. Fannie Mae ignored this aspect of SFAS 133.

198.    In December 2000, KPMG signed off on Fannie Mae's policy of using the matched terms method to account for hedges of forecasted transactions whose maturities did not match, despite knowing that this policy amounted to a plain violation SFAS 133.

199.    Fannie Mae monitored the impact of this policy and concluded, at the end of 2001 and 2002, that the total ineffectiveness associated with this policy (less than $3 million) was "immaterial." KPMG continued to sign off on the improper use of the matched terms method, despite knowing that it violated GAAP.

200.    Fannie Mae continued to misuse the matched terms method throughout 2003. When a more comprehensive analysis of the policy was conducted at the end of that year, Fannie Mae determined that the ineffectiveness associated with this policy was approximately $12 million ($21 million pre-tax). Fannie Mae apparently determined that this amount had crossed its self-determined materiality threshold and discontinued hedge accounting for anticipated debt issuances.

201.    In a March 2004 memo to the file discussing the discontinuation of this policy, Boyles acknowledged that the policy "*has been a known departure from strict compliance with GAAP*" (emphasis added). Fannie Mae knew the rules and knew that it was breaking them, yet continued this practice for a period of two years before discontinuing it.

        *iii.*     **Fannie Mae Knowingly Violated SFAS 133 By Inventing A "De Minimis" Test To Justify Hedge Accounting For Hedges Of Forecasted Transactions**

202.    To qualify for hedge accounting under SFAS 133, a hedge of a forecasted transaction must be highly effective. Accounting literature prior to SFAS 133 described a

"dollar offset" test which would permit hedge accounting if the fair value of one instrument offset the change in the fair value of the other instrument within a band of 80-125%. SFAS 133 required that the methodology used to assess hedge effectiveness remain consistent throughout the life of the hedge relationship.

203.   While Fannie Mae adopted the "dollar offset" methodology, it supplemented this approach with an alternative method it created known as the "de minimis" test that was not statistically acceptable. In so doing, Fannie Mae violated the requirement that the hedge effectiveness assessment methodology remain consistent throughout the life of the hedge relationship.

204.   The "de minimis" method permitted hedge accounting even if the dollar offset criterion was not met, as long as the interest rate on the issued debt, adjusted for the results of the hedge, was within fifteen basis points ("bps") of the target established on the date of the original forecast. Given the magnitude of Fannie Mae's debt issuances and the amount of ineffectiveness required to cause the actual rate to differ by more than fifteen bps from the target rate, the de minimis test allowed the Company to treat derivatives as hedges even when the extent of the dollar offset was significantly outside the 80-125% range.

205.   Fannie Mae adopted the de minimis rule prior to the issuance of SFAS 133, and imported it wholesale into the DAG without analyzing its consistency with SFAS 133. The DAG introduced the de minimis rule as follows:

> Dollar correlation alone has proven to be an unsatisfactory measure of hedge performance when there is very little interest rate movement over a hedge period. *The Deminimus [sic] rule was developed as an alternative means of evaluating the effectiveness of a hedge. To overcome such inequities in the correlation measurement, we have established an alternative for measuring the effectiveness of a hedge.*

(emphasis added).  Fannie Mae continued to use its self-created standard for measuring hedge effectiveness even after the FASB imposed a required standard under SFAS 133.

206.   Even worse than its persistence in following a pre-SFAS 133 standard for measuring hedge effectiveness, Paul Weiss uncovered evidence that Fannie Mae tweaked the de minimis standard to increase the percentage of transactions that would qualify for hedge accounting.  Prior to the adoption of SFAS 133, Fannie Mae's de minimis test permitted a window between the actual and target interest rates of only ten bps.  When the Company was developing its approach to SFAS 133, Treasurer's Office personnel were concerned that increased market volatility would push many hedge transactions outside that range.  Fannie Mae conducted an analysis of historic interest rate volatility in its debt issuances and concluded that a bps range of twenty would better protect its interests.  Fannie Mae attempted to convince KPMG to approve an expansion of the bps margin to twenty before settling on the fifteen bps range it ultimately included in the DAG.  Thus, KPMG was aware of Fannie Mae's use and expansion of the de minimis test.

207.   Fannie Mae adopted the de minimis test not because it believed this test was sanctioned under SFAS 133, but because it would inject greater flexibility into the Company's approach to hedge accounting so as to avoid the consequences of volatile markets.

> iv.   *Fannie Mae's Severe SFAS 133 Violations Caused Its Financial Statements For 2001 And All Subsequent Periods To Be Materially Misstated*

208.   As a result of the Company's numerous violations of SFAS 133, Fannie Mae was not entitled to use hedge accounting, and it significantly misstated its financial statements for 2001 and all subsequent periods.  In its November 2005 Form 12b-25, Fannie Mae admitted to violating SFAS 133, and stated that it "expect[s] that the impact of the misapplication of derivative accounting rules will be material to Fannie Mae's previously reported financial results

for many, if not all, periods . . . " Fannie Mae further stated that it "expects to record an estimated net cumulative after-tax loss of approximately $8.4 billion as of December 31, 2004" to correct the improper accounting for derivatives.

209.    The net losses related to SFAS 133 violations date back to their initial implementation in 2001.  As a result of the disclosed restatement estimates, it is clear that Fannie Mae repeatedly and materially misstated certain amounts within its annual and quarterly financial statements as a result of its SFAS 133 violations, including:

Balance Sheet:

Derivatives in gain positions, total assets, senior debt, derivatives in loss positions, total liabilities, AOCI, and total stockholders' equity due to the misapplied hedge accounting;

Income Statement:

Interest income-mortgage portfolio, interest expense, purchased options expenses, net income and earnings per share (basic and diluted) due to the misapplied hedge accounting; and

Statement of Cash Flows

Net income, purchased options expense within net cash provided by operating activities, and net payments to purchase or settle hedge instruments within net cash provided by financing activities, due to the misapplied hedge accounting.

210.    By accounting for derivatives transactions and hedging activities in violation of SFAS 133, the Officer Defendants not only smoothed earnings, but were able to maximize their compensation by hitting EPS targets for their bonus compensation.

### 3.    Fannie Mae's Improper Accounting For Commitments

211.    SFAS 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*, became effective on July 1, 2003.  SFAS 149 required commitments to purchase or sell mortgage loans and MBS to be treated as derivatives.  Accordingly, as of July 1, 2003 firm

commitments (like other derivatives covered by SFAS 133) were required to be recorded on the Company's balance sheet at fair value and subsequently marked to market at the end of each reporting period until the settlement date. Changes in the fair value of the commitments, therefore, would be reflected in the Company's earnings unless the derivative qualified as part of a hedging relationship.

212.    Fannie Mae designated many of its forward commitments as hedges of the risk resulting from changes in the price of the mortgage loans or MBS the Company would acquire or deliver when the commitment settled. Accordingly, the requirements of SFAS 133 (including the requirements that the forecasted transaction be identified in the hedge documentation with sufficient specificity to permit its identification when the hedged transaction occurs and that the forecasted transaction be probable of occurring) applied to these commitments effective July 1, 2003.

### a.    *Fannie Mae Failed In Its Efforts To Implement SFAS 149*

213.    The FASB issued an exposure draft of SFAS 149 in May 2002. Under the terms of the exposure draft, if there was a possibility that the commitment would settle net through the payment of a pair-off fee (*i.e.,* a fee paid by a nonperforming party to make the other party whole based on changes in the fair value of the commitment) or if the entity did not prepare the proper documentation to show that the commitment would not settle, then the commitment would be considered a derivative and would be subject to accounting as such under SFAS 133.

214.    While the initial exposure draft did not explicitly address commitments for the purchase of mortgage loans, the FASB voted unanimously on October 9, 2002 that "only loan commitments that relate to originating loans with potential borrowers" would qualify for an

SFAS 133 exemption.    Accordingly, it was beyond question as of October 9, 2002 that commitments to purchase mortgage loans were within the ambit of SFAS 149.

215.    This advance notice notwithstanding, Fannie Mae did not begin to prepare for SFAS 149 implementation until early 2003.  Fannie Mae did not even circulate an internal draft of its SFAS 149 policy until May 28, 2003, a mere thirty-three days before the standard's effective date.  Once this internal draft was circulated, Fannie Mae delayed an additional twenty-two days—until June 20, 2003—before sharing it with KPMG.

216.    A number of internal problems exacerbated Fannie Mae's recklessly late start to the SFAS 149 implementation process.  The Financial Standards group was understaffed and preoccupied with other matters (including, among others things, the Company's decision to become an SEC registrant, its first Form 10-K filing, and the problems plaguing Freddie Mac) from late 2002 through 2003.  Further, the Portfolio Group, which was responsible for providing the fair-value marks for the commitments, lacked adequate staffing.  As early as July 2, 2003, Lynda Maggio (Portfolio Middle Office) reported to her superiors in the Portfolio Group and to Spencer that she needed two additional full-time employees to deal with SFAS 149 implementation issues.  These staffing requests were largely ignored.  Fannie Mae filled these spots with an existing employee who had not been relieved of her previous duties and with an employee from the Company's Office of Internal Audit who was not available to begin working with Maggio's group until January 2004.

217.    The delays in implementing an SFAS 149 policy led to similar delays in the development of the Portfolio systems needed to mark the commitments to fair value and the financial reporting systems needed to account for the hedged transactions.  As late as June 2004, nearly one year after the effective date of SFAS 149, the Company was still drafting

specifications for the systems it would need to automate tracking and accounting for the commitment activity captured by SFAS 149.

218.    Fannie Mae's SFAS 149 implementation process was so slipshod that the Company understated total assets and stockholders' equity on its balance sheet by $1 billion during the third quarter of 2003, the first quarterly close in which SFAS 149 affected the financial statements.  According to Paul Weiss, this error resulted from the duplication of an adjustment relating to the valuation of the Company's outstanding commitments.  The calculations were done mainly on spreadsheets, as there was no integrated SFAS 149 system in place to make the necessary calculations.

219.    Before this error came to light, the Company had issued a press release announcing its quarterly results on October 16, 2003.  Fannie Mae faced the embarrassing task of publicly admitting that it had made this gargantuan mistake when it was forced to issue a new press release less than two weeks later on October 29, 2003 containing its true results.  This error should have been a red alert to everyone involved – including KPMG, the Audit Committee, and the Board – that there were severe deficiencies in the Company's internal controls and SFAS 149 compliance system.

220.    Fannie Mae's reckless, devil-may-care approach to dealing with SFAS 149 destroyed its ability to implement SFAS 149 timely, effectively and correctly.

> **b.    Fannie Mae Violated SFAS 149 In Its Accounting For Firm Commitments**

221.    Paul Weiss found that Fannie Mae's SFAS 149 policy violated GAAP in several respects.

222.    First, the Company failed to document its hedge transactions at inception with sufficient specificity.  Specifically, Fannie Mae never developed a procedure that properly

documented the link between a commitment (the derivative) and the purchase or sale of the underlying asset (the hedged item).

223. Second, Fannie Mae improperly applied cash flow hedge accounting to its commitments to purchase mortgage loans. To qualify for cash flow hedge accounting, SFAS 133 requires that the forecasted transaction be probable of occurring. In determining whether a particular forecasted transaction was probable of occurring, Defendants made assumptions based on the statistical percentage of *all* forecasted transactions in the prior 12-month period that had actually occurred. As long as 75% of all forecasted transactions in the prior 12 months had actually occurred, the Company applied cash flow hedge accounting to 100% of its new purchase and sale commitments, without regard to whether each individual transaction was probable of occurring. This approach did not create sufficient justification for the application of cash flow hedge accounting to these transactions.

224. In its November 2005 Form 12b-25, Fannie Mae admitted that it misapplied cash flow hedge criteria in accounting for its mortgage commitments. According to the filing, the Company estimates that the net cumulative amount of after-tax losses relating to mortgage commitments deferred in AOCI was approximately $2.4 billion as of December 31, 2004. Correction of that error would cause a $2.4 billion reduction in 2004 earnings, bringing the total estimated impact of the derivatives-related restatement to over $11 billion.

225. The net losses related to the SFAS 149 violations will affect periods after the SFAS 149 implementation effective July 1, 2003. As a result of the disclosed restatement estimates, it is clear that Fannie Mae repeatedly and materially misstated certain amounts within its annual and quarterly financial statements as a result of its SFAS 149 violations, including:

Balance Sheet:

> Loans (held for investment), mortgage related securities, total assets, AOCI, and total stockholders' equity due to the misapplied cash flow hedge accounting criteria for mortgage commitments;

Income Statement:

> Interest income-mortgage portfolio, net income and earnings per share (basic and diluted) due to the misapplied cash flow hedge accounting criteria for mortgage commitments; and

Statement of Cash Flows

> Net income, purchased options expense within net cash provided by operating activities, and net payments to purchase or settle hedge instruments within net cash provided by financing activities, due to the misapplied cash flow hedge accounting criteria for mortgage commitments.

**4.      Fannie Mae's Improper Classification of Loans Purchased From Lenders**

226.    Fannie Mae purchases mortgage loans from lenders, which it then either securitizes or retains as investments in its mortgage portfolio.  The loans retained in the portfolio are classified as held-for-investment pursuant to Fannie Mae's policies.  The mortgage loans that are securitized are either sold to a third party or held in its portfolio.

*a.      Violation of SFAS 65*

227.    Under SFAS 65, mortgage loans or mortgage-backed securities which are held-for-investment should be reported at amortized cost in the financial statements, while loans and securities which are held-for-sale should be reported at the lower of cost or market value ("LOCOM").  The amount by which the cost of a held-for-sale loan exceeds its market value is supposed to be accounted for as a valuation allowance, and changes in valuation allowances should be included in the determination of net income for the period in which the change occurs.

SFAS 65 further provides that loans should be designated as held-for-investment only if the entity has the intent and ability to hold the loans for the foreseeable future or until maturity.

228.    Fannie Mae followed a long-standing practice of improperly recording all loans intended to be securitized, including those it intended to sell, as held-for-investment.  This practice was the result of a faulty computer system that had been in existence since 1983, but was not detected or corrected until a systems upgrade in 2004.  Thus, faulty misclassifications of loans had continued for 21 years.  As a result, Fannie Mae recorded loans that were held-for-sale on its books at amortized cost rather than at LOCOM.  When those mortgage loans were later securitized and sold, the loans were taken off the books and gains or losses were recorded on the sale.

229.    OFHEO has directed Fannie Mae to re-classify and properly record those loans which do not qualify as held-for-investment.  Additionally, OFHEO has stated that "[t]he fact that Fannie Mae operated a faulty and inaccurate system for more than two decades reveals serious system weaknesses."

230.    Fannie Mae described its accounting for mortgage loans as follows in the Summary of Significant Accounting Policies included in its Form 10-K filed with the SEC on March 15, 2004 for the fiscal year ended December 31, 2003 (the "2003 Form 10-K"):

> We use the term 'loans' to refer to mortgage loans.  At the time of purchase, we classify loans on our balance sheet as either 'held-for-investment' or 'held for securitization or sale.'
>
> *        *        *
>
> We account for loans held for sale at the lower of cost or market ("LOCOM"), determined on a portfolio basis.  We recognize unrealized losses on these loans in current period earnings.  If we have entered into a commitment to sell a loan classified as held for sale, we designate the commitment as a fair value hedge and mark the loan and the related commitment to market through earnings in accordance with FAS 133.

231.    These statements were false.  In its March 2006 Form 12b-25, Fannie Mae disclosed its misclassification of loans that were being held for sale into securitization trusts, as follows:

> *Classification of Loans Held for Sale Into Securitization Trusts.* We made an error relating to the classification of certain loans held for sale into securitization trusts.  Our process for identifying loans held for sale did not identify the complete population of loans that were set aside for sale into securitization trusts due to an error in an accounting system.  This error resulted in loans destined for securitization at a future date being erroneously classified as held-for-investment rather than held-for-sale.  As a result, we did not record an appropriate adjustment at the lower of cost or market for loans held for sale during the periods being restated.  We are in the process of determining which loans were held for sale during the restatement period in order to record the correct adjustment amount.

232.    As a result of its SFAS 65 violations, Fannie Mae repeatedly made material misstatements within its annual and quarterly financial statements.  The Company's income statement line items for provision for losses and net income, and its balance sheet accounts for loans held-for-investment and loans held for securitization, were misstated due to Defendants' misclassification of loans as held for securitization in violation of SFAS 65.

### b.    *Violation of SFAS 115*

233.    Fannie Mae also violated SFAS 115, *Accounting for Certain Investments in Debt and Equity Securities,* in connection with its accounting for mortgage loans which it purchased and securitized.  SFAS 115 states:  "*At acquisition*, an enterprise shall classify debt and equity securities into one of three categories:  held-to-maturity, available-for-sale, or trading." (emphasis added).  Securities that are designated as held-to-maturity ("HTM"), unlike securities that are designated as available-for-sale ("AFS") or trading, are carried on a company's books at their amortized costs.  Classification of a security as HTM typically results in less volatility in earnings and equity than classifications as AFS or trading.

234.    SFAS 115 narrowly circumscribes the circumstances under which a company may transfer securities from one category to another.  Securities can only be moved from HTM to AFS or trading under six circumstances.  If a security is sold from the HTM category for any other reason, the sale "taints" the HTM portfolio.  The penalties for tainting the HTM portfolio are severe:  the company must reclassify all HTM securities as either AFS or trading and it will lose the right to classify any new acquisitions as HTM for up to two years.

235.    While SFAS 115 plainly required Fannie Mae to classify securities as HTM, AFS or trading "at acquisition," the Company adopted a policy that permitted it to classify its securities "in the month of acquisition."  Further, Fannie Mae's policy permitted it to re-designate the securities in its portfolio for accounting purposes at the end of the month in which they were acquired.  This "Intra-Month Re-Designation" ("IMRD") process allowed the Company to wait until the end of the month to decide whether to sell or hold the securities, and to base its designation on gains or losses occurring after the trade date or upon further analysis of the underlying collateral.  The Company referred to this process internally as "keep the best; sell the rest" because it enabled the Company to retain the high quality loans in its investment portfolio, while using the lower quality loans to fulfill matched buy and sell trades.

236.    KPMG had access to Fannie Mae's SFAS 115 policy and was aware that Fannie Mae permitted classification of its securities within the month of acquisition in violation of SFAS 115.  In fact, a KPMG workpaper dated August 2003 states:  "This [SFAS 115] classification requirement is extended by end-of-month financial reporting conventions; therefore, the final classification must be made within the month the security is acquired."  As professional auditors, KPMG knew, or should have known, that this policy plainly violated

SFAS 115. Yet, KPMG failed to object to these policies, thus permitting Fannie Mae to engage in clear GAAP violations with respect to the classification of the securities held in its portfolio.

237. OFHEO found that Fannie Mae's IMRD process not only violated GAAP, but "stands in stark contrast to the company's denials of engaging in 'cherry picking' when the matter was reviewed by a 2003 Task Force on Mortgage Backed Securities Disclosure."

238. As disclosed in a Form 12b-25 filing dated May 11, 2005 (the "May 2005 Form 12b-25") and in the November 2005 Form 12b-25, Fannie Mae has admitted that it violated SFAS 115. As stated in the May 2005 Form 12b-25:

> Fannie Mae employed an operational practice that, upon review, was determined to result in securities being transferred from the held-to-maturity category to available-for-sale, which generally is not permitted under [SFAS] 115. As a result, for accounting purposes Fannie Mae must reclassify all securities previously classified as held-to-maturity into the available-for-sale category and discontinue use of the held-to-maturity category until two years after the last transaction giving rise to this error. Fannie Mae will reclassify the securities for each restated period and record all unrealized gains and losses, net of taxes, at each reporting period to shareholders' equity, specifically through AOCI. AOCI will vary substantially from period to period as a result of this reclassification, primarily due to changes in interest rates.

239. As part of its ongoing accounting review, Fannie Mae is also evaluating whether a portion of the securities in its portfolio should be reclassified as "trading." To the extent that securities are classified as trading, unrealized gains and losses on those securities for each period will have to be recorded as a component of earnings.

240. As a result of these GAAP violations, Fannie Mae repeatedly made material misstatements within its annual and quarterly financial statements. On the balance sheet, the Company misstated the value of its mortgage related securities, non-mortgage related securities, total assets, accumulated other comprehensive income and total stockholders' equity. On the income statement, the Company misstated interest income, interest expense, net income and

earnings per share (basic and diluted) to the extent any misclassified debt and equity securities are reclassified as "trading."

### 5. Fannie Mae's Failure To Record Asset Impairments On Guaranty Fees Violated GAAP

241.    In its November 2005 Form 12b-25, Fannie Mae disclosed that, as part of its restatement, it anticipates recording asset impairments relating to certain guaranty assets that result from the "buy-up" of guaranty fees in connection with certain Fannie Mae mortgage-backed security issuances.  In certain transactions, Fannie Mae received upfront cash payments to adjust the coupon rates so they were in increments of a whole or half point, which tend to be more easily traded.  When Fannie Mae engages in these buy-up transactions, it increases its guaranty assets by the amount of the buy-up and recognizes income over the expected life of the mortgage-backed securities.  Fannie Mae did not periodically assess these buy-ups for impairment, as was required by SFAS 115.

242.    As a result of these GAAP violations, Fannie Mae repeatedly made materially false and misleading statements in its annual and quarterly financial statements.  The Company's balance sheet accounts for mortgage related securities and total assets, and the Company's income statement line items for guaranty fee income, fee and other income (expense), net income and earnings per share (basic and diluted), were misstated due to Defendants' failure to record asset impairments on "buy-up" guaranty fees in violation of SFAS 115.

### 6. Fannie Mae's Improper Accounting For The Allowance For Loan Losses

243.    Fannie Mae was permitted, under GAAP, to maintain an allowance for losses on loans in its mortgage portfolio and losses associated with its guarantees of loans underlying its MBS (collectively, the "Allowance").  Paul Weiss concluded, based on the results of its extensive investigation into Fannie Mae's accounting practices, that for seven years—from 1997

through 2003—Fannie Mae violated GAAP by maintaining, at a near-constant level, an insupportably high $800,000,000 Allowance that the Company had not calculated through any acceptable methodology and that bore no relation to the Company's actual loss exposure. This Allowance was maintained not because of an actual need to protect the Company against losses on its loans and guarantees but, rather, because Howard and Spencer wanted to maintain a "war chest" they could tap into should they need it to smooth earnings, meet EPS targets, or offset unrelated expenses.

### *a.    Accounting Principles Applicable To The Allowance*

244.    During a November 6, 1998 speech, Lynn E. Turner, then the Chief Accountant for the SEC, summarized the accounting principles that apply to an allowance for loan losses as follows:

> GAAP for loans and the allowance for loan losses can be found in FASB Statements No. 5 and 114 and in the AICPA Audit Guide for Banks and Savings Institutions (Audit Guide). The basic premise in this guidance is best summarized in paragraph 7.29 of the Audit Guide which states: '*The allowance for loan losses should be adequate to cover probable credit losses related to specifically identified loans as well as probable credit losses inherent in the remainder of the loan portfolio that have been incurred as of the balance sheet date*' . . . *GAAP does not permit providing losses for future events.*
>
> *            *            *
>
> . . . 'Unallocated reserves . . . must not be used to obfuscate the determination of the overall allowance adequacy, mask significant deteriorating trends in asset quality, or 'manage' earnings.' Additionally, Financial Reporting Release ('FRR') No. 28 requires the application of a systematic methodology and rationale in determining the allowance for loan losses.

(emphasis added).

b.      **Fannie Mae's Methodology For Setting The Allowance Violated GAAP**

245.    GAAP requires a company to follow detailed methodologies to assess probable loan losses based on, among other things, loss experience, economic conditions, and geographic concentrations.  Fannie Mae did not follow such methodologies but, rather, from at least 1997 through 2002, set its Allowance on a quarterly basis at an amount equal to charge-offs.

246.    By late 2000, the Fannie Mae Defendants knew the Company's method for setting the Allowance was problematic due to the absence of documentation to justify its reasonableness.  Although these problems were brought to Howard's attention and an alternative methodology for setting the Allowance was proposed, Howard refused to change the methodology.

247.    In June 2002, the Controller's Office made another presentation to Howard stressing the need to change the Company's Allowance-setting methodology.  The following month, Boyles (then head of Financial Standards) discussed this issue in a white paper that was circulated to Spencer, among others, stating:

> We do not believe our current method of accounting [for the Allowance] is the preferable method . . .  Under our current methodology we are increasing the [Allowance] by recording gains from the disposition of properties and reducing it through negative provisions.

Further, Boyles noted that the Company's Allowance-setting methodology made it "increasingly difficult for [the Company] to produce analytical support for [its] current [A]llowance balance."

248.    KPMG shared Boyles' concerns.    Mark Serock, who became KPMG's engagement partner for Fannie Mae in 2001, has admitted that the Company's Allowance practices prior to 2002 were "not preferable" because Fannie Mae lacked the documentation

needed to demonstrate how management had determined that the level of the Allowance was reasonable.

249.     During the fourth quarter of 2002, Fannie Mae began to use a new Loss Allowance Model ("LAM") to calculate the Allowance.  Even after the LAM was implemented, however, the Fannie Mae Defendants did not strictly follow the Model's results but, rather, continued to retain discretion in setting the Allowance.  According to Adolfo Marzol, then head of Credit Policy, at the quarterly Chairman's Loss Review meeting for the fourth quarter of 2002, management decided that the difference between the previous quarter's Allowance and the amount calculated by the LAM (approximately $100 million) would be carried over into an "unallocated portion" of the Allowance.  Richard DePetris, then Controller for the Multifamily Division, confirmed that an unallocated amount was added to the LAM modeled amount for the multifamily portion of the Allowance in the fourth quarter of 2002 to arrive at a level consistent with the previous quarter's Allowance.  Paul Weiss found no evidence that Fannie Mae had sought to substantiate the amount to be set aside for the "unallocated portion" of the Allowance.  Rather, the Company simply manipulated the Model's results to maintain the Allowance at the desired level.

250.     While Fannie Mae began to use the LAM during the fourth quarter of 2002, a version of the Model was not deemed to be complete until the third quarter of 2003.  Throughout 2003, the Company retained discretion over the amounts modeled by the LAM and abused this discretion to keep the Allowance at a flat $800 million.

251.     Throughout 2004, Fannie Mae reduced the amount of the Allowance by a total of $286.5 million, claiming that prior estimates had been determined to have been beyond the range of reasonableness.  Most of this reduction ($231 million) came in the fourth quarter of 2004, as a

result of OFHEO's Fall 2004 observation (and a similar observation by KPMG in November 2004) that the Allowance did not "behave directionally consistent with the book of business"—in other words, as Fannie Mae's credit loss declined even in the face of a tremendous growth in its book of business, the Allowance had remained static.

252.    As a result of these GAAP violations, Fannie Mae repeatedly made materially false and misleading statements within its annual and quarterly financial statements.   The Company's income statement line items for provision for losses were misstated due to Defendants' improper accounting for the Company's Allowance in violation of SFAS 5 and SFAS 114.   Further, the Company's balance sheet accounts for loan losses were misstated due to Defendants' improper accounting for the Company's Allowance in violation of SFAS 5 and SFAS 114

>    c.    *Fannie Mae Knew That The Allowance Was Overstated, But Intentionally Maintained It At Unsupportable Levels To Create A "War Chest" For Use In Connection With Unrelated Or Unexpected Costs*

253.    Paul Weiss determined that, as early as 1997, Fannie Mae management knew the Allowance exceeded the Company's actual credit loss experience.   On September 24, 1997, Spencer wrote notes to Howard concerning a presentation regarding Accounting Policies for Foreclosed Assets.   These notes make clear that Spencer considered the excess Allowance a "war chest" that the Company could exploit for a number of purposes down the road:

>    A Big Pro:  It gives us a vehicle to draw down our loss allowance

>    *        *        *

>    Consider drawing down provision allowance? *Over the planning horizon, we would have 'war chest' to draw down if necessary.* Could do a one time draw, a big event, to cover ideas as restructuring the portfolio, infusing capital into Foundation, settling a tax event (if one occurred), other ideas . . . *This would be linked to an even[t] that we would publicly talk about and the analysts would view positively.*

254.    Armed with the knowledge that the Allowance was overstated, the Fannie Mae Defendants set about determining how to best use the situation to their advantage.  Paul Weiss uncovered evidence that the Fannie Mae Defendants considered using the Allowance excess to offset unrelated events.  For example, notes that Spencer prepared for a September 22, 1998 meeting described as "Risk Review with CFO" suggested that, in order to offset the impact of recording a large year-end catch-up expense, "We would source those earnings from a reduction to our loss reserves."

255.    Further, a January 7, 1999 Earnings Alternative Schedule prepared under Spencer's direction reflected that the Fannie Mae Defendants considered offsetting the large amount of negative catch-up expense that would be recorded for 1998 by taking $100 million from the provision for losses.

256.    Most damning of all, Paul Weiss uncovered a September 2000 PowerPoint presentation, identifying Spencer as the presenter, which demonstrates that Spencer viewed the Allowance excess as a potential tool to smooth income and to enable the Company to make up for an EPS shortfall.  Specifically, one of the slides lists the "Loss Allowance" as an item under "Possible Ways to Fill the Shortfall" in the Company's EPS.  Another slide, titled "Loss Allowance," reads: "Potential to draw down a portion of the allowance for loan losses (currently at $809 million), *resulting in income recognition.*"  (emphasis added).

### 7.    Fannie Mae's Improper Accounting for Dollar-Roll Repurchase Agreements

257.    A "dollar-roll repurchase agreement" is a transaction pursuant to which the Company sells mortgage-backed securities and agrees to repurchase the same or substantially similar securities at a later date.  In a typical transaction, Fannie Mae borrowed funds from a counterparty for a specified period of time, using a security from its portfolio as collateral.  From

an execution standpoint, the borrowing was effected by Fannie Mae's "selling" the collateral and simultaneously entering into an agreement to repurchase a similar security at a future date. Dollar-rolls provided Fannie Mae with a ready form of short-term liquidity and were an important component of its business. According to the Company's general ledger accounts, the average end-of-month dollar-roll balance was $2.8 billion in 2003. In October 2003, this balance reached $7.8 billion.

258. Assuming that certain accounting standards were met, Fannie Mae could account for the dollar-roll's simultaneous sale/repurchase arrangement as a financing (*i.e.,* a short-term loan) rather than as a sale of the collateral and a purchase of a new security. If the counterparty did not meet its commitment to deliver a similar security at the maturity date, the dollar-roll would be treated as a "fail." If the Company could not obtain a similar security in the market, the "fail" would result in accounting for the transfer of the collateral as a sale.

259. Execution of a dollar-roll that did not comply with accounting requirements (or that resulted in a fail for which the Company could not purchase a substantially similar security) had two potential consequences for the Company. First, Fannie Mae would have to account for the transfer of collateral as a sale and the receipt of the security as a repurchase, with consequent recognition of gain or loss in the Company's earnings. Second, because Fannie Mae used securities from its HTM portfolio as collateral, treatment of the transfer of the collateral as a sale could result in a tainting event that could trigger the reclassification of all HTM-classified securities to AFS, as explained in Section IV.E.4., *Fannie Mae's Improper Classification Of Loans Purchased From Lenders,* above.

260. Under SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, a simultaneous sale/repurchase agreement (such as a dollar-

roll transaction) may be accounted for as a financing if the transaction satisfies all of the following conditions:

1.   The assets to be repurchased or redeemed are the same or substantially the same as those transferred;

2.   The transferor is able to repurchase or redeem them on substantially the agreed terms, even in the event of default by the transferee;

3.   The agreement is to repurchase or redeem them before maturity, at a fixed or determinable price; and

4.   The agreement is entered into concurrently with the transfer.

To satisfy subsection 2 above, SFAS 140 requires that the transferor "must at all times during the contract term have obtained cash or other collateral sufficient to fund substantially all of the costs of purchasing replacement assets from others."  In effect, this provision requires that either the transferor establish a mechanism to monitor the value of the collateral or that there be market practices that function to ensure the adequacy of the collateral.

261.    If the parties' agreement does not require the delivery of the same security to the transferor, the returned security must be "substantially the same" as the transferred security. This "substantially the same" requirement has been in effect since the 1996 issuance of SFAS 125, *Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities.*  For the securities to be "substantially the same," SFAS 140 (issued in 2000) requires, among other things, that the securities have the same maturity.

262.    Fannie Mae adopted accounting policies for dollar-rolls in the 1994 and 1996 versions of its Financial Accounting Policy Manuals.  Despite the introduction of SFAS 125 and SFAS 140 in 1996 and 2000, respectively, Fannie Mae did not revise its dollar-roll policy until 2003.  Accordingly, Fannie Mae's dollar-roll policy ignored SFAS 125 for seven years and

SFAS 140 for three years, and as a result its accounting for dollar-roll repurchase agreements did not comply with GAAP.

263.    Even after Fannie Mae revised its dollar-roll policy in 2003, it continued to violate SFAS 140 in several respects.  Specifically, Fannie Mae's policy did not mention the need to monitor the collateral to ensure that the Company received cash or other collateral sufficient to buy it back if the lender failed to deliver.  Further, Fannie Mae's policy considered securities to be "substantially the same" if their weighted average maturities ("WAMs") were within twenty-four months of each other.  These aspects of Fannie Mae's dollar-roll policy conflicted with the plain requirements of SFAS 140.

264.    Further, Fannie Mae did not have a system in place to ensure that the collateral returned at the end of the dollar-roll was "substantially similar" to the collateral the Company had posted.  Fannie Mae's own May 11, 2004 Portfolio Transactions Policy and Procedures Guideline acknowledged that this task was not performed systematically, stating:

> Portfolio Transactions management identified a control weakness surrounding the dollar rolls process.  Per the Fannie Mae accounting standards, there should be controls in place to perform characteristics checks on the collateral that is returned back.  Currently, WAM tests and yield change tests are not currently enforced by the back-office . . . .

265.    KPMG, as Fannie Mae's longtime auditor, had ready access to the Company's dollar-roll accounting policy and knew, or should have known, that the policy and the Company's accounting treatment of dollar-roll repurchases failed to comply with SFAS 140 throughout the Loss Period.  KPMG should have insisted that Fannie Mae revise its dollar-roll accounting policy and practices to conform to GAAP, but it failed to do so.

266.    Fannie Mae admitted in its March 2006 Form 12b-25 that it violated SFAS 140 in accounting for dollar-roll transactions, with the result of reducing earnings volatility:

> We made errors under SFAS 140 in our accounting for certain dollar-roll repurchase transactions …. We historically accounted for these transactions as financings and recognized interest expense on funds borrowed against the securities. We have determined that certain of these dollar-roll repurchase transactions did not meet the GAAP criteria for treatment as financings, and instead should have been accounted for as sales and purchases of the underlying mortgage-backed securities. Restating our previous financial statements for these errors relating to dollar-roll repurchase transactions will result in the reduction of previously recognized interest expense relating to those transactions and the recording of gains and losses on the sales and purchases, which will increase earnings variability from period to period.

267.    As a result of these GAAP violations, Fannie Mae repeatedly made material misstatements within its annual and quarterly financial statements.  Among other things, on the balance sheet the Company misstated the value of its mortgage-related securities, accumulated other comprehensive income and total stockholders' equity, and on its income statement, the Company misstated net income and earnings per share (basic and diluted).

### 8.    Fannie Mae's Accounting For Insurance In Violation of GAAP

268.    In its November 2005 Form 12b-25, Fannie Mae admitted to entering into at least one mortgage insurance policy that "did not transfer sufficient underlying risk of economic loss to the insurer, and therefore does not qualify for accounting as insurance."  Radian was the Company's counterparty in that transaction.  This policy was a "finite insurance" policy like those the SEC and New York Attorney General Eliot Spitzer have been investigating to determine whether they actually transfer risk to the insurers or are sold to companies to help them smooth earnings or hide losses.

269.    Fannie Mae purchases mortgage insurance in order to mitigate its exposure to credit losses on loans, to comply with the Charter Act to the extent it requires the Company to have credit enhancement for loans with a loan to value ("LTV") ratio equal or greater to 80%, and as part of its general risk mitigation strategy.  Beginning in 2001, Fannie Mae began to

consider purchasing finite risk insurance products and entering into other insurance transactions not only to mitigate the Company's exposure to losses, but also to further earnings-related goals.

270.    Credit Policy is the Fannie Mae department charged with managing the Company's credit risk and obtaining credit enhancements on loans.  Members of Credit Policy were very aware of how their work affected the Company's earnings.  Brian Graham, a former Senior Vice President of the Company, informed Paul Weiss that all credit enhancements had the effect of smoothing the impact of losses on the financial statements when such losses were incurred.  Further, Graham told Paul Weiss that Credit Policy's function was to mitigate the volatility of these losses (*i.e.,* to smooth losses).

271.    Between 2001 and 2004, Fannie Mae viewed credit enhancements as a source of revenue generation, in addition to their ostensible purpose of protecting Fannie Mae against credit losses.  In fact, Adolfo Marzol, head of Credit Policy, had informed top Fannie Mae management, including Raines and Gorelick, that he viewed generating revenue growth as part of his responsibilities.

272.    Further, members of the Controller's Office exhibited a willingness to manage the timing of claim reimbursement in order to manage the timing of income recognition.  In a December 12, 2001 email to Spencer, Graham stated that he had informed his team to "defer receipt" of payments owed to Fannie Mae on Secondary Market Coverage deals in order to avoid "exaccerbat[ing] [sic] your 4Q [earnings] situation."  Spencer approved of this instruction.

273.    During a quarterly business review in or about May 2001, Raines announced to the Company's Senior Leadership Team that Fannie Mae's revenue strength required a "mindset shift."  Marzol understood Raines to be asking the team to look for opportunities to make investments that would increase earnings in future years, instead of making investments to

maximize profits in the current year.  Raines directed this "mindset shift" because he realized that Fannie Mae was on target to meet its ambitious EPS goals for 2001.  Accordingly, Raines directed his staff to look for ways to shift income earned in 2001 to future years to ensure that Fannie Mae would continue to meet these ambitious goals in the coming years.

274.    In the summer of 2001, following Raines' guidance, Marzol told his team in Credit Policy that the Company was looking to make investments in the current year that would allow the Company to record earnings in the future.  Marzol asked Graham to make a list of items that Credit Policy had foregone in the past due to budget constraints.  Among the items on Graham's list was reducing the size of the deductible on a mortgage insurance policy he had obtained earlier in the year for Fannie Mae's Expanded Approval Timely Payment Rewards ("EA/TPR") loans.

275.    The EA/TPR loans, due to their potential default characteristics, were anticipated to result in Fannie Mae receiving a substantial amount of claim reimbursements in 2003 and 2004.  To offset these expected reimbursements and to assure smooth earnings, Fannie Mae sought to reinsure the EA/TPR loans with a policy that would require the Company to make significant premium payments in 2002.  This "income shifting" goal was well known within the Company.  For example, on November 20, 2001, Graham stated in an email to Robert Schaefer (Director - Credit Portfolio Strategies): "The goal [of the proposed reinsurance of the EA/TPR loans] is to have lots of loans that will fail quickly (albeit 18 months out) and in large enough numbers to generate the desired P&L result."  In a December 12, 2001 email, Marzol wrote to Mudd that the "goal [of the proposed reinsurance of the EA/TPR loans] is to take portions of the portfolio that we are absolutely sure will have losses in 2003 and 2004 and transfer that exposure for highly cost effective premium levels, with as much premium recognized in 2002 as possible.

Target portfolios include the 1% of initial loss not credit enhanced for EA/TPR loans . . . "
Mudd therefore knew that Marzol planned to use the proposed reinsurance of the EA/TPR loans
to shift income between reporting periods.  Mudd knew, or should have known, that this purpose
was improper, yet did not object to Marzol's plan.

276.    To accomplish the income-shifting goal, Fannie Mae purchased a "finite
insurance" policy from Radian at the end of January 2002 (the "Radian Transaction").  The
Radian Transaction, which Fannie Mae was later forced to admit had not transferred sufficient
risk to qualify as "insurance" for accounting purposes, went through several reviews by various
department heads at Fannie Mae before it was approved.  The Company's Financial Standards
group knew and understood that there must be a 10% chance that the insurer could suffer a loss
of 10% or more of the premium for the policy to transfer sufficient risk that it could be accounted
for as insurance.  In determining that the transaction could be accounted for as insurance,
however, the Financial Standards group improperly included Radian's costs of administering the
policy when it assessed Radian's risk of loss.  This plainly violated GAAP.

277.    SFAS 113, *Accounting and Reporting for Reinsurance of Short-Duration and
Long-Duration Contracts,* provides guidance on when an arrangement transfers sufficient risk to
qualify as insurance for accounting purposes:

> The ceding enterprise's [insured's] evaluation of whether it is
> reasonably possible for a reinsurer [insurer] to realize a significant
> loss from the transaction shall be based on the present value of all
> cash flows between the ceding [insured] and assuming [insurer]
> enterprises under reasonably possible outcome . . .

Because SFAS 113 makes clear that only "cash flows between the ceding [insured] and assuming
[insurer] enterprises" can be considering in determining possibility of loss, the FASB staff
plainly stated in their response to Question 16 of "Accounting For Reinsurance: Questions and
Answers about Statement 116," that SFAS 113 "*precludes considering other expenses of the*

*reinsurer in the calculation*" of possible loss (emphasis added). Accordingly, Fannie Mae

violated SFAS 113 by considering Radian's administrative costs in determining the possibility of

loss in evaluating the Radian Transaction.

278.    The Radian Transaction was reviewed and approved by Howard, in consultation

with Spencer and Pennewell. Further, Marzol presented the transaction to Mudd and discussed it

with the other Executive Vice Presidents, including Louis Hoyes, Executive Vice President -

Single Family Business. Hoyes objected to the transaction, asserting that it undermined Fannie

Mae's mission to the extent that its terms motivated the Company to foreclose on mortgagees

who were poor and/or had blemished credit. Hoyes plainly understood the Transaction's

income-shifting purpose and considered it a poor justification for entering into such a politically

unwise Transaction. Hoyes said as much in an email to Marzol (which copied, among others,

Defendants Mudd and Howard) on January 8, 2002: "*Should we be exposing Fannie Mae to this*

*type of political risk to 'move' $40 million of income? I believe not*." (emphasis added).

279.    Fannie Mae, over Hoyes' protests, executed the Radian Transaction at the end of

January 2002. At that time, Fannie Mae paid Radian a premium of approximately $35 million to

insure the Company's losses within the portfolio covered by the "policy," up to an aggregate of

approximately $39 million. At the time the "policy" was purchased, the Company either had

already incurred, or knew there was a high probability that it would incur, $39 million in losses

on the portfolio covered by the policy. Fannie Mae amortized the premium at approximately

$13.5 million in each of 2002 and 2003 and approximately $8 million in 2004, while receiving

approximately $39 million of payments under the policy during the same three-year period.

Accordingly, the net effect of the Transaction was to permit Fannie Mae to pay expenses upfront

to offset the claims reimbursements it expected to receive in future years, permitting the Company to report smooth earnings over the life of the policy.

280.    The Radian Transaction, as the Fannie Mae Defendants knew, did not transfer sufficient risk to qualify for accounting as insurance.  Fannie Mae has admitted as much and has announced that it will restate its accounting for this transaction. The Company's balance sheet accounts for other assets and total assets, and the Company's income statement line items for provision for losses or fee and other income (expense), net income, and earnings per share (basic and diluted), were misstated after January 2002 as a result of Defendants' improper accounting for the Radian Transaction as insurance under SFAS 5.  The effect of the restatement will be to record the premium paid as a deposit, net of recoveries from the policy, and to recognize credit losses with no reduction for any recoveries resulting from the insurance policy.  According to Fannie Mae's disclosure in the November 2005 Form 12b-25, the restatement relating to accounting for this policy will impact reported earnings for 2002, 2003 and 2004.

281.    Radian was also aware that the Transaction did not sufficiently transfer risk to qualify for accounting as insurance.  Radian knew that Fannie Mae needed to spread its losses in order to manage earnings, which is the essence of finite insurance policies and what makes them attractive to Radian's customers.  Radian also knew that since Fannie Mae's premium payments were equal to the value of Radian's "insurance coverage," there was no risk transfer and therefore Fannie Mae received nothing of value from Radian and the transaction should have been treated as a loan for accounting purposes.  Radian knew or recklessly disregarded that it was merely loaning money to Fannie Mae under the guise of a sham insurance policy, and that Fannie Mae was fraudulently recording its transactions with Radian in the Company's financials as "insurance" premium payments to Radian in violation of GAAP.  Radian participated in the

fraud because it found the sale of such illegally structured finite insurance policies to be more profitable than ordinary insurance premiums.

> **9.      Fannie Mae's Failure to Consolidate Results of Qualified Special Purpose Entities in Violation of SFAS 140 and FIN 46**

282.    Fannie Mae uses Qualified Special Purpose Entities ("QSPEs") to issue mortgage-backed securities.  Under FASB Interpretation No. 46 ("FIN 46"), *Consolidation of Variable Interest Entities,* an interpretation of Accounting Research Bulletin (ARB) No. 51, *Consolidated Financial Statements,* an entity that has the unilateral ability to liquidate or change a QSPE must consolidate that QSPE's financial results on the entity's own financial statements.

283.    Fannie Mae considered itself to have the unilateral ability to liquidate a QSPE if its owned 100% of the pool of mortgage-backed securities issued by the QSPE.  In many instances, Fannie Mae owned 100% of the mortgage-backed securities issued by a QSPE.  To avoid consolidating the QSPE's financial results on the Company's financial results, however, the Company would sell 1% of such securities to a third party.  In his testimony before Congress, OFHEO director Armando Falcon stated:  "We do not believe that Fannie Mae's actions constitute a sufficient relinquishment of ownership to counter the presumption that it retains the unilateral ability to liquidate, and therefore must consolidate under FIN 46."

284.    Fannie Mae's failure to consolidate the results of these QSPEs on its financial statements was a violation of GAAP.  Fannie Mae disclosed in its March 2006 Form 12b-25 that it must restate its financial results to consolidate the QSPE results in accordance with GAAP:

> In the normal course of business, we purchase Fannie Mae mortgage-backed securities ('Fannie Mae MBS') that we have issued into the marketplace.  It is not uncommon for us to own 100% of a particular Fannie Mae MBS issuance.  Pursuant to Statement of Financial Accounting Standards No. 140 (SFAS 140), *Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities,* and FASB Interpretation No. 46 ("FIN 46R"), *Consolidation of Variable Interest Entities, an*

> *Interpretation of Accounting Research Bulletin (ARB) No. 51, revised December 2003,* we anticipate having to restate our financial statements to consolidate specified Fannie Mae MBS trusts for which the company owns 100% of the related securities. Upon consolidation, the security positions will be reclassified from securities to loans.  In addition, where we were the original transferor of loans to a Fannie Mae MBS, we will consolidate trusts in which we own 90% or more of the related securities.  This consolidation will also result in the reclassification of security positions from securities to loans and will require us to record an MBS liability for the portion of the security position that is owned by third parties.  Loans that are consolidated in pools for which we were the original transferor will be classified as held-for-sale and be marked to the lower of cost or market, whereas loans for which we were not the transferor will be classified as held-for-investment and be considered in determining the allowance for loan losses.

285.    Fannie Mae further disclosed in the May 2006 Form 12b-25 that it had improperly treated certain trusts the Company used for securitization transactions (and trusts used by third-parties in certain securitization transactions in which Fannie Mae invested) as QSPEs in violation of SFAS 140.  Fannie Mae concluded that its treatment of these trusts as QSPEs violated SFAS 140 "primarily because activities permitted by the trust documents exceed the scope of activities permitted for a QSPE."  Fannie Mae disclosed that, as a result of its conclusion relating to the QSPE status of these trusts, the Company is required to consider the provisions of FASB Interpretation No. 46 (FIN 46R), *Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin (ARB) No. 51, revised December 2003,* to determine whether it must consolidate the assets and liabilities of these trusts into its financial statements.  The effect of such consolidation would be to increase the assets and liabilities the Company recorded on its balance sheet for any portion of these trusts that it does not own.  Such consolidation would also result in the reclassification of security positions from securities to the actual assets held by the trust (principally loans or Fannie Mae MBS) and would require the Company to record an MBS liability for the portion of the security position that is owned by

third parties.  In addition, such assets would have to be recorded at fair value on the date of

consolidation, which could result in a gain or loss.  Further, interest income on securities and

guaranty fee income related to these trusts would generally be reclassified to interest income on

loans during the periods that these trusts were consolidated.

286.    Fannie Mae expects to consolidate approximately $28.5 billion of assets and

liabilities as part of its restatement process:

> Based on our initial evaluation, we have estimated in our previous
> minimum capital submissions to OFHEO that we will be required
> to consolidate approximately $28.5 billion of both incremental
> assets and incremental liabilities as of December 31, 2005.  The
> $28.5 billion we will be required to consolidate relates to both our
> outstanding Fannie Mae MBS (approximately $25.5 billion) and
> third-party securitization transactions in which we invested
> (approximately $3.0 billion).  The $25.5 billion of Fannie Mae
> MBS we will be required to consolidate represents less than
> 2 percent of our total Fannie Mae MBS outstanding (excluding
> Fannie Mae MBS held in our portfolio) of $1.598 trillion as of
> December 31, 2005.  We will complete our consolidation analysis
> and record the necessary adjustments in the course of our ongoing
> restatement.

### 10.    Fannie Mae's Improper Timing of Recognition of Certain Income and Expense Amounts

287.    Paul Weiss uncovered evidence that Fannie Mae engaged in a practice of

"smoothing" the monthly interest expense and income on certain investments and borrowings.

Until early 2003, the Company's liquid investment portfolio ("LIP") and debt accounting

systems (known as ORION and STAR, respectively) determined interest expense and income on

all investments and debt instruments as if there were 30.4 days in each month (a "30/360"

convention), even if the instrument's terms required interest payments on either an "actual/365"

or "actual/360" basis.  As a result of this practice, Fannie Mae avoided the fluctuations in interest

income and expense that would have otherwise resulted from the fact that the twelve months of

the year (and the four calendar quarters) do not have the same number of days.

288.    The Company discontinued this practice in the second quarter of 2003 when it introduced a new version of the STAR system called iSTAR, whereupon the Company began to recognize interest income and expense in accordance with the actual terms of the instruments. However, Spencer and Howard were of the view that this practice could be resumed in the future if needed.  In a May 22, 2003 email to Pennewell, Richard Stawarz (Controller's Office), and Mary Lewers (Financial Reporting), Spencer stated:

> I did inform Tim [Howard] yesterday that we were officially stopping 'smoothing.'  He was fine with the decision.  *Told him we would revisit- if conditions warrant in the future.*

(emphasis added).

289.    In addition to the automatic smoothing accomplished by the Company's systems prior to the second quarter of 2003, the Company periodically accrued additional interest expense through on-top journal entries and amortized it over the remainder of the year.  For example, the Company recognized an additional expense of $13.5 million in February 2001; an additional $15.4 million in interest expense in February 2003; and posted an on-top interest expense adjustment in March 2002.  This "smoothing" had a material effect on the Company's financial statements.  According to an internal analysis prepared by Mona Patel, it reduced interest expense (and increased net income) by approximately $27.5 million in 2002.

290.    As a result of these GAAP violations, Fannie Mae repeatedly made materially false and misleading statements within its quarterly and annual financial statements for all periods up until it discontinued the "smoothing" practice in the second quarter of 2003.  The Company's balance sheet accounts for accrued interest receivable, total assets, accrued interest payable, other liabilities and total liabilities, and the Company's income statement line items for interest income (non mortgage related), interest expense (short term), administrative expenses,

net income, and earnings per share (basic and diluted) were misstated until the second quarter of 2003 as a result of the improper timing of income and expense recognition

### 11.    Fannie Mae's Improper Accounting for Investments in Low-Income Housing Tax Credit Partnerships

291.    Fannie Mae owns limited partnership investments in a number of qualified low-income housing tax credit ("LIHTC") partnerships.  Its level of investment in these partnerships reached $4 billion in 2000 and $6.4 billion in 2002.  Despite its significant investment in these partnerships, Fannie Mae failed to comply with GAAP in its accounting for these investments, as it admitted in its November 2005 Form 12b-25.

292.    The Company violated SOP No. 78-9, *Accounting for Investments in Real Estate Ventures*, and Emerging Issues Task Force ("EITF") No. 94-1, *Accounting for Tax Benefits Resulting from Investments in Affordable Housing Projects*, by improperly using the effective yield method instead of the equity method of accounting for LIHTC partnership investments.

293.    SOP No. 78-9 generally requires use of the equity method of accounting for limited partnership investments – not the effective yield method – unless the limited partner's interest is so minor that it has virtually no influence over partnership operating and financial policies.

294.    Fannie Mae's interests in these limited partnerships were not minor and did not qualify for the effective yield method, yet that is the method it used.  In this way, it amortized the initial cost of its investment over the period that the tax credits were allocated to the Company. This improper accounting is consistent with the "income smoothing" violations detailed above.

295.    The Company conceded in its November 2005 Form 12b-25 that restating these investments using the equity method will affect the timing of the recognition of its losses during the restatement period, and will result in more variability from period to period.

296.    Fannie Mae also incorrectly accounted for its LIHTC investments by recording certain of them on an "as funded" basis, rather than at the committed amounts as required by GAAP.  According to the November 2005 Form 12b-25, Fannie Mae's restatement of these investments will force it to record equal amounts to both assets and liabilities related to these investments.

**12.    Fannie Mae's Improper Accounting For Other-Than-Temporary Impairment of Manufactured Housing Bonds and Aircraft Asset-Backed Securities**

297.    Paul Weiss found that, prior to the second quarter of 2004, Fannie Mae violated GAAP by failing to properly account for other-than-temporary impairment ("OTTI") for manufactured housing bonds ("MH Bonds") and aircraft asset-backed securities ("Aircraft ABS").

298.    SFAS 115 requires companies to evaluate HTM and AFS securities for impairment and write them down to fair value if they are OTTI.  SFAS 115 provides:

> If it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition, an other-than-temporary impairment shall be considered to have occurred.  If the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the write-down shall be included in earnings (that is, accounted for as a realized loss).

SEC Staff Accounting Bulletin Topic 5-M, *Other Than Temporary Impairment of Certain Investments in Debt and Equity Securities* ("SAB Topic 5-M"), provides guidance on the factors companies should consider in determining whether securities are OTTI, including the length of time and the extent to which the market value has been less than cost, and the financial condition and near-term prospects of the issuer, including any specific events that may influence the operations of the issuer.

299.    Once OTTI has been identified, the investment must be written down to fair value by recording a charge to earnings in the present period.  SFAS 115 defines "fair value" as:

> The amount at which an asset could be bought or sold in a current transaction between willing parties, that is, other than in a forced or liquidation sale.  *Quoted market prices in active markets are the best evidence of fair value and should be used as the basis for the measurement, if available.*  If quoted market price is not available, the estimate of fair value should be based on the best information available in the circumstances.

(emphasis added).  While a company has some flexibility in determining fair value, GAAP reflects a clear preference that it be based on quoted market prices.

300.    After OTTI has been recorded, GAAP does not allow the investment to be "written up" if the fair value subsequently recovers.  However, GAAP does permit subsequent income recognition if the entity's expectation of receiving cash flow has significantly increased.

301.    Because SFAS 115 was effective as of 1994, management should have begun a formal evaluation of all of its HTM and AFS securities for OTTI at that time.  Instead, the Company ignored the existence of this standard for almost a decade.  Prior to the second quarter of 2004, Fannie Mae did not have a formal accounting policy for OTTI.  Only after OFHEO reviewed Fannie Mae's OTTI accounting for MH Bonds in the course of its 2004 Special Examination did Fannie Mae adopt such a policy.  Even after establishing a formal process, the Company did not monitor all AFS and HTM investments that had unrealized losses (and thus potential OTTI).

302.    Fannie Mae used discounted cash flow ("DCF") models, rather than market data, to estimate impairment loss for its MH Bonds for 2002 and most of 2003 because it claimed that market data was either unavailable or unreliable due to illiquidity of the MH Bond market.  KPMG was aware that Fannie Mae was using a DCF model, rather than market data, and did not object to this approach.

303.    Fannie Mae's use of a DCF model violated SFAS 115's directive that quoted market prices should be used to measure fair value where such prices are available.  Contrary to Fannie Mae's assertions, market data *did* exist for MH Bonds during the specified periods. Bid/ask pricing was readily available on Bloomberg's pricing service for most of the MH Bonds on which Fannie Mae recognized impairment during the period it was using DCF models to determine OTTI.  Moreover, Fannie Mae had received prices from dealers for some of the most illiquid of these Bonds in September 2002 when it transferred all of its MH Bonds from HTM to AFS.

304.    Paul Weiss found that management manipulated the DCF model to affect the amount of OTTI recorded for MH Bonds.  For example, in December 2002, the MH Bonds were modeled for loss according to five different servicing fee assumptions.  After these results were presented to Howard, Spencer and KPMG, the Company opted to record $51 million of OTTI. Up to $66.6 million in OTTI could have been recorded for the same securities had the Company selected one of the other four assumptions.  The Company did not provide a compelling rationale for its selection from among the competing assumptions.  Further, in March 2003, Fannie Mae management, including Howard, Marzol, and Graham, met and made adjustments to the default rate assumption used in the DCF model.  This also affected the Company's OTTI assessment.

305.    In September 2003, Howard and Spencer instructed Graham and others in Credit Policy to alter the DCF model results that were used to record MH Bond OTTI.  After Credit Policy completed its third quarter 2003 OTTI estimate based on the DCF, Howard directed Graham to exclude certain items from the estimate that he felt reflected "normal volatility."  In addition, Spencer directed Graham to exclude certain Bonds with losses from the estimate.

306.    Fannie Mae also used DCF models to estimate fair value for its Aircraft ABS, again claiming that the illiquid market for such securities justified this approach.  However, a July 7, 2003 memorandum from David Benson (Vice President and Assistant Treasurer – Portfolio) indicated that Fannie Mae determined to use the DCF model despite the fact that "[q]uoted indicative (not for trading) prices" showed even lower fair values.  Pursuant to SFAS 115, Fannie Mae should not have used the DCF model to assess the fair value of its Aircraft ABS when it had access to quoted prices for these securities.

307.    Further, Paul Weiss determined that Fannie Mae waited too long to evaluate OTTI on its Aircraft ABS and thus may have underreported OTTI on those investments.  While a March 14, 2003 internal memorandum from Paul Salfi (Financial Standards accountant) demonstrated that Fannie Mae was aware that several companies had recorded impairment related to aircraft investments as early as 2002, the Company did not begin to evaluate its own Aircraft ABS for impairment until mid-2003.

308.    As a result of these GAAP violations, Fannie Mae repeatedly made material misstatements within its annual and quarterly financial statements.  The Company's income statement line items for "fee and other income, net," and its balance sheet accounts for the held-to-maturity and available-for-sale categories of the non-mortgage investments, were misstated due to Defendants' failure to properly account for OTTI for MH Bonds and Aircraft ABS in violation of SFAS 115.

> **13.    Fannie Mae's Improper Accounting For Interest-Only Mortgage-Backed Securities**

309.    Paul Weiss also found that Fannie Mae had improperly accounted for its investments in interest-only mortgage-backed securities ("IO MBS") to avoid income statement volatility.

310.    An investment in IO MBS entitles the investor to a portion of the interest payments on the MBS.  Changes in the fair value of an investment in IO MBS are directly related to changes in interest rates—when interest rates increase, the fair value of the IO MBS increases; when interest rates decrease, the fair value of the IO MBS decreases.  This tie between interest rates and the fair value of IO MBS stems from the fact that, as a general matter, when interest rates decline, the speed at which borrowers prepay or refinance their mortgages increases.  Increased prepayments reduce the total amount of interest received over the life of the MBS; therefore, the cash flow to the holder of an investment in IO MBS will also decline.

311.    Fannie Mae began to invest in IO MBS in 1994.  The size of the Company's IO MBS portfolio rapidly increased to $524 million as of April 30, 1995.  Because Fannie Mae acquired its IO MBS investments when interest rates were high, it was exposed to the risk that it would have to recognize impairment on those investments if interest rates declined and borrowers refinanced their mortgages.  This began to happen in 1995, causing Fannie Mae concern that it would have to record a loss on its books.

312.    In late 1995, with KPMG's blessing, Fannie Mae began to combine its IO MBS with Real Estate Mortgage Investment Conduit ("REMIC") securities to create "Synthetic REMICs."  These securities were combined for accounting purposes only—that is, the Company did not enter into any transactions that would have been expected to change the characteristics of either the IO MBS or the REMIC security, as would have been necessary to justify combining them under GAAP.

313.    Fannie Mae's decision to combine its IO MBS with REMICs was motivated by its desire to avoid recognizing impairment of its IO MBS.  A document from 1998 entitled "IO/REMIC Package Briefing for Tim Howard" made clear that this was Fannie Mae's intent:

Financial Standards performed impairment tests on the IO portfolio in the fall of 1995 and determined that many of the IO's were either impaired or close to being impaired.

*To mitigate the potential earnings risk, Fannie Mae linked the IO's with specific REMICs that were purchased at the same time and were looked at together in the decision to purchase the securities.*

(emphasis added).   This document also revealed that, while KPMG had approved the IO MBS/REMIC combinations, its auditors appeared to have lost track of the issue and Fannie Mae was not doing anything to remind them:

> KPMG has apparently forgotten about these [synthetic MBS] transactions, and we have not brought these issues to their attention.   They have experienced significant turnover since we originally adopted the 'package' accounting and, as a result, there is currently only one member of the audit team that remaining [sic] from the fall of 1995.  The accounting team they currently have on the audit is more technically proficient, and if they stumble across these packages, may not be as easily convinced of the current accounting treatment.   We have made every effort to keep our analysis confidential.

314.   In addition to the IO MBS/REMIC combinations, Fannie Mae accounted for seven pairs of IO and principal-only ("PO") securities acquired between 1999 and 2002 on a combined basis.  Again, Fannie Mae had not entered into any transactions that would have been expected to change the characteristics of either it IO MBS or its PO MBS and, therefore, should have accounted for these securities separately.

315.   A January 28, 2002 email from Spencer to Howard demonstrates that she was aware of Fannie Mae's questionable accounting for IO MBS, and that KPMG was oblivious to the issue even though Fannie Mae's accounting in this area differed from that of Freddie Mac. The email stated:  "There is at least one thing that we know of where we have a favorable accounting treatment and that is on the IO's we have on our books.   Freddie is doing IO accounting and we are not.  *KPMG has not figured that out*." (emphasis added).  Spencer,  like

Howard, did nothing to correct this accounting violation.  KPMG's failure to follow up on the IO

MBS accounting, and to uncover its impropriety, was grossly reckless.

316.    As a result of these GAAP violations, Fannie Mae repeatedly made material

misstatements within its annual and quarterly financial statements during the Loss Period.  The

Company's income statement line items for interest income-mortgage portfolio, and its balance

sheet accounts for mortgage-related securities held-to-maturity and available-for-sale, were

misstated due to Defendants' failure to properly account for IO MBS.

### 14.    Fannie Mae's Improper Accounting For The Amortization Of Callable Debt Expense

317.    Fannie Mae improperly accounted for the amortization of callable debt expense in

violation of Accounting Principles Board of Opinion No. 21, *Interest on Receivables and

Payables* ("APB 21").

318.    Fannie Mae issued both callable and noncallable debt to finance its activities.  The

Company incurred various expenses in connection which these debt issuances (such as

commissions and legal fees) which were required to be amortized over the life of the debt under

APB 21.  Any difference between the face amount of the debt and the proceeds from its issuance

gave rise to a premium or discount which was also required to be amortized over the life of the

debt.

319.    Under APB 21, debt issuance expense, premium or discount must be amortized

over the time period between the debt's issuance and maturity.  ABP 21 does not distinguish

between noncallable and callable debt.  Accordingly, unless and until the call option is exercised,

debt issuance expenses must be amortized over the period between issuance and contractual

maturity.  If the debt is called prior to maturity, any unamortized costs must be recognized in the

period in which the debt is repaid.

320.    Despite these clear rules, Fannie Mae developed its own approach to the amortization of callable debt expense.  Under that approach, the Company determined the likely date on which it would call the debt and amortized its expenses over the period from issuance to that date.  Further, Fannie Mae's policy permitted the Company to review the estimated life "as needed" and to adjust its amortization accordingly.  This policy is in plain violation of ABP 21.

321.    Not only did Fannie Mae implement a policy for the amortization of callable debt expense that violated GAAP, but it then disregarded that policy when needed to further its own interests.  Paul Weiss found that, on at least one occasion during the third quarter of 2002, the Company recorded $35.3 million of additional amortization expense through an on-top entry, to smooth reported earnings.  Had the Company not recorded this adjustment, its net interest income would have increased 3.7% over its net interest income for the second quarter of 2002.  This on-top adjustment permitted the Company to record a more palatable 2.3% increase.  This is yet another example of the Company's use of improper accounting maneuvers to smooth earnings.  Spencer and Pennewell knew about, and participated in, this on-top entry.

322.    KPMG, as Fannie Mae's longtime auditor, had access to the Company's policy for the amortization of callable debt expense and knew, or should have known, that this policy did not comply with ABP 21.  Further, KPMG knew that the Company had made an impermissible on-top adjustment in the third quarter of 2002, yet nonetheless issued a "clean" audit opinion for that year.

323.    As a result of these GAAP violations, Fannie Mae repeatedly made material misstatements within its annual and quarterly financial statements.  The Company's income statement line items for interest expense (short term or long term) and its balance sheet accounts

for senior debt (due within one year of after one year) were misstated due to Defendant's failure to properly account for the amortization of callable debt expense in violation of APB 21.

### 15. Fannie Mae Improperly Accounted For Realignments And Its Security Master Project

324.    OFHEO and Paul Weiss found that, from 2002 through 2004, Fannie Mae improperly accounted for the differences generated in the process of identifying and correcting the errors and mismatches between its amortization database and its loan and securities database, in violation of Accounting Principles Board Opinion No. 20, *Accounting Changes* ("APB 20").

325.    Fannie Mae's premium and discount amortization system, iPDI,[7] calculates and records premium and discount amortization to the Company's general ledger by applying amortization factors to the original premium and discount amounts.  The original premium and discount amounts upon which iPDI relies are received monthly, for new acquisitions, from systems known as STAMPS (for MBS) and Delivery (for whole loans).  STAMPS and Delivery also provide the original premium and discount data to databases known as STATS (for MBS) and LASER (for whole loans).  STATS and LASER track the Company's portfolios of MBS and whole loans at a security or loan level.

326.    After STAMPS and Delivery provide the original premium and discount data to iPDI, STATS, and LASER, any changes to the classification of the loan or security (or to the amount of original premium and discount) are made to the data in STATS and LASER.  Because there is no automatic feed from STATS and LASER to iPDI, Fannie Mae periodically conducted manual "realignments" so that the original premium and discount balances in iPDI matched those in STATS ("STATS Realignment") and LASER ("LASER Realignment") (collectively, the "Realignments").  These Realignments caused changes to the original premium and discount

---

[7]    iPDI was historically known as PDS and PDI.  PDS, PDI and iPDI will be referred to collectively herein as "iPDI."

balances in iPDI, which resulted in corresponding changes to the accumulated amortization balances in iPDI and, ultimately, to the Company's balance sheet. Instead of recognizing these changes as adjustments to earnings, the Company most often deferred the recognition of these amounts.

327.    APB 20 requires a company to determine the impact of an error on prior periods, as well as the impact of correcting the cumulative error on the current period. If any of these impacts are determined to be material, then the company must report the error as a prior period adjustment and disclose the error in the current period financial statements. If all of the impacts are determined to be immaterial, however, the company can simply record the cumulative error in the current period without any disclosure.

328.    Paul Weiss found that Fannie Mae's accounting for the Realignments' impacts on earnings violated GAAP because it allowed the Company to defer the recognition of income or expense resulting from errors in amortization over multiple years. The impact of the Realignments should have been analyzed as the correction of an error pursuant to APB 20.

329.    In 2000 and roughly once a year thereafter, the Company performed a STATS Realignment analysis which compared iPDI to STATS and determined the Realignment's impact on the balance sheet. In 2000, the STATS Realignment's impact was approximately $81.9 million of additional expense. Instead of analyzing this impact under APB 20, the Company deferred the impact by recording it in two balance sheet accounts. Approximately $77.1 million of the $81.9 million adjustment was recorded to an account that typically contained amortization on-top amounts that had not yet been applied to certain accumulated amortization accounts. The remaining $4.8 million, inexplicably, was recorded to another balance sheet account. This approach had no support in GAAP.

330.    In August 2001, the Company again performed a STATS Realignment analysis, but did not record any adjustments as a result of the differences identified in that analysis. Although these differences were never explained or resolved, the Company inexplicably recorded the amounts identified in this STATS Realignment analysis a year later.

331.    From 2002 to 2003, the Company's practice was to record the impact of the STATS Realignments to the balance sheet and amortize these amounts into income over time. Paul Weiss concluded that this practice was inappropriate because the Realignments should have been accounted for as a correction of an error under APB 20.  Richard Stawarz (Fannie Mae's Director of Financial Planning) informed Paul Weiss that the decisions to defer the impact of the STATS Realignments were made in multiple meetings attended by him, Roger Barnes, Mary Lewers, Pennewell and Spencer.

332.    Beginning in 2002, the Company undertook what became known as the "Security Master Project."  The Security Master Project was intended to set rules for the assignment of SFAS 91 types to securities, which would then permit the reclassification of any securities in STATS that had been assigned the wrong SFAS 91 types, and would automate the process of assigning SFAS 91 types to securities in STATS going forward.  The Company anticipated recognizing a realignment impact as a result of implementing the Security Master Project, and included an estimate for this impact in its SFAS 91 amortization calculations in the first quarter of 2003.

333.    In its amortization calculation for the second quarter of 2003, the Company revised its estimate of the impact of implementing the Security Master Project.  The Company also opted to include in that calculation the cumulative amount of the STATS Realignments that had previously been deferred.  Subsequently, Pennewell made the decision to include all

outstanding cumulative Realignment deferrals in the amortization calculation for the third quarter of 2003.  According to Pennewell, KPMG concurred with that decision.

334.    By including the estimated impacts of the Security Master Project and the cumulative Realignment deferrals in the catch-up analysis, the Company was able to reduce the size of, or avoid altogether, the on-top adjustment it would have recorded under the Company's Amortization Policy during the first three quarters of 2003.  Paul Weiss found that these shenanigans permitted the Company to manipulate its reported EPS for these quarters as follows:

- In the first quarter of 2003, the estimated catch-up before the inclusion of the estimated Security Master Project impact was roughly $177.2 million in income.  The Amortization Policy threshold in this quarter was $99.6 million, and therefore a $77.6 million adjustment to increase interest income would have been required under the Policy to bring the catch-up to the precision threshold.  By including the $118.5 million estimated expense for the Security Master Project, the catch-up number was reduced from $177.2 million to $58.7 million, which fell within the Policy threshold, and thus no adjustment was recorded.  If the Company had not included the estimated impact of Security Master Project in the calculation of catch-up, the Policy would have required it to record the $77.6 million of catch-up income, which would have increased Core EPS from the reported amount of $1.84 to $1.89 for the quarter.  By reducing the amount of the catch-up that would have had to be recognized as additional interest income, the Company was able to avoid a spike in net interest income that may have made it difficult to meet EPS growth targets in future periods;

- In the second quarter of 2003, the estimated catch-up before inclusion of a Security Master Project estimate and any cumulative Realignment deferral was $220.5 million of income.  The Policy threshold in this quarter was $105.2 million, that would have required the Company to recognize an additional $115.3 million of interest income to bring the catch-up to the threshold.  The Company reduced the catch-up adjustment to $126.4 million by including a revised Security Master estimate and cumulative STATS realignment deferral totaling $94.1 million of deferred expense.  Accordingly, an adjustment to recognize additional interest income of only $21.2 million was recorded.  If the Company had not included these Realignment adjustments into the calculation of catch-up, it would have had to record an additional $94.1 million of interest income, which would have increased Core EPS from the reported $1.86 to $1.92 for the quarter; and

- In the third quarter of 2003, the calculated catch-up was $298.1 million of additional interest income. Since the Policy threshold in this quarter was $111 million, an adjustment to recognize an additional $187.1 million of interest income would have been required. By including adjustments which totaled a net of $79.6 million of expense, the calculated catch-up amount was reduced to $218.5 million of income. The new catch-up amount required only the recognition of an additional $107.5 million of interest income. Had the Company not included these Realignment adjustments, it would have been required to record an additional $79.6 million of interest income under the Policy, which would have increased Core EPS from the reported $1.83 to $1.88 for the quarter. By treating Realignments as the Company did, it avoided a spike in net interest income and net income for the quarter that may have made it difficult to meet future EPS growth targets.

335.    Paul Weiss found that the inclusion of both the estimated impact of the Security Master Project and the cumulative deferred Realignment amounts was motivated by the Company's desire to reduce the calculated catch-up to an amount closer to the Amortization Policy's threshold, and thereby avoid the earnings volatility that would have resulted from recording large catch-up adjustments to interest income.

336.    As a result of these GAAP violations, Fannie Mae repeatedly made material misstatements within its annual and quarterly financial statements during the Loss Period. The Company's income statement line items for interest income, interest expense and net income, and its balance sheet accounts for unamortized premiums (discounts), deferred price adjustments (net), and other liabilities were misstated due to Defendants' failure to properly account for realignments in violation of APB 20.

### 16.    Fannie Mae's Improper Capitalization Of Payments To Its Partner In Its Short-Lived Minority Lending Initiative

337.    Paul Weiss uncovered evidence that Fannie Mae improperly capitalized payments it made to Resource Bancshares Mortgage Group, Inc. ("RBMG"), its partner in its short-lived minority lending initiative ("MLI"), in violation of SFAS 91. The Company implemented the MLI in 2002 to increase its financial support for mortgages to African-American homeowners.

In connection with the MLI, Fannie Mae purchased loans from RBMG which RBMG had made to minorities.  Because the majority of these loans had LTV ratios of 97% or more, the Company was required under the Charter Act to obtain credit protection for these loans.

338.    Fannie Mae's Credit Policy department arranged for a mortgage insurer to cover these loans under an existing policy.  Because these new loans had lower credit scores than the loans this policy was originally written to cover, Credit Policy provided verbal assurance to the insurer that it could cancel the policy after a one-year period.

339.    After the one-year period, Fannie Mae's insurer opted to cancel the policy. Because Fannie Mae no longer had the required credit protection, the loans in the MLI pipeline fell out of compliance with the Charter Act.  To cure this deficiency, Fannie Mae reached an agreement with a company called Self Help, whereby Self Help would purchase loans from RBMG that Fannie Mae had previously committed to purchase directly from RBMG.  Self Help would then re-sell the loans to Fannie Mae with a six-month recourse period.

340.    Because these loans had been originated at interest rates that were extremely favorable given the borrowers' credit ratings, RMBG agreed to sell the loans to Self Help at a discount to the price Fannie Mae had committed to pay for them.  In order to make RMBG whole for this difference, Fannie Mae made a series of payments to RMBG equal to the difference between the price at which Self Help acquired the loans and the price at which the Company had committed to buy the loans, for a total of $35,536,254.42.

341.    Fannie Mae capitalized these payments.  SFAS 91, however, provides that only those fees paid to the party from whom loans are acquired may be capitalized as part of the purchase price.  Because Fannie Mae had acquired these loans from Self Help (not from

RMBG), it should have recorded its $35,536,242.42 payments to RMBG as an expense, not capitalized them.

### 17. Fannie Mae Accounted For Real Estate-Owned And Foreclosed Property Expense In Violation Of SFAS 144

342.    Fannie Mae disclosed in the March 2006 Form 12b-25 that it had improperly accounted for real estate-owned and foreclosed property expense in violation of SFAS 144. Specifically, Fannie Mae stated:

> We made certain errors related to our accounting for real estate owned ("REO") and foreclosed property expense, including making inappropriate determinations of the initial cost basis of REO assets at foreclosure and the amounts charged-off against the allowance for loan losses, and not expensing costs related to foreclosure activities in the proper period. These errors will be corrected for the periods being restated and are expected to change the timing of certain losses and shift amounts between charge-offs to the allowance for loan losses and foreclosed property expense.

343.    Fannie Mae's REO accounting did not comply with GAAP. Due to a weak operating environment, numerous errors existed throughout the REO accounting process. In addition, Fannie Mae inappropriately set annual Company-wide REO charge-off and expense targets for appraiser analysts working in its National Property Disposition Center, when it should have emphasized accurate and efficient appraisal work.

344.    Accounting for REO includes three stages: (1) foreclosure, which entails accounting for reclassification of the loan receivable to REO and establishing an initial valuation; (2) possession, which is the period from foreclosure to property disposition that involves monitoring both REO classification and the carrying amount for impairment, as well as recording costs for maintenance and disposition; and (3) disposition, which entails recording the sale of REO and related accounting entries. Fannie Mae violated GAAP at all three stages.

### a.  *Improperly Accounting For REO At The Time Of Foreclosure*

345.    Fannie Mae violated GAAP in its accounting for REO at the time of foreclosure in several ways, two of which related to timing.  The Company should have recorded a foreclosure, *i.e.*, reclassified the loan receivable to REO, when it took physical possession of a mortgaged property or when it took title to the property, whichever came first.  Instead, Fannie Mae waited until it received notification of title transfer, which, in most cases occurred after it took possession, to record a foreclosure.  For loans where Fannie Mae shared risk with counterparties (*e.g.*, back-end credit enhancements), it failed to reclassify them as REO until after the properties were sold and Fannie Mae was made whole by the credit enhancement.

346.    Fannie Mae also improperly shifted losses from charge-offs (which reduced the Allowance) to Foreclosed Property Expenses (FPE) and vice versa.  Before it foreclosed on delinquent loans that backed its mortgage-backed securities, Fannie Mae repurchased them out of those securities so that it owned them at the time of foreclosure.  During the Loss Period, the Company improperly failed to include adjustments to the face values of such loans—*i.e.*, premiums or discounts—when determining charge-offs.

347.    In addition, Fannie Mae should have written off accrued interest on foreclosed loans only to the extent it was sure it could not recover that accrued interest.  Instead, the Company prematurely reversed a portion of the accrued interest when determining the related REO investment and associated charge-off.

348.    Further, in calculating the fair market value of REO assets at foreclosure, Fannie Mae did not subtract selling costs.  Fannie Mae charged the incremental losses to the Foreclosed Property Expenses when the REO was sold, instead of charging those incremental losses to the Allowance at the time of foreclosure as required under GAAP.

349.    Further, Fannie Mae improperly recorded all charge-off gains as credits to the Allowance.  An entity may write down the value of loans and record charge-offs prior to foreclosure when it believes it has already incurred those losses.  If, upon foreclosure, the entity calculates net gains, it should credit such gains against the Allowance only to the extent of prior charge-offs.  During the Loss Period, Fannie Mae recorded all charge-off gains as credits to the Allowance without regard to the amount or existence of prior charge-offs.  This caused excessive amounts to be credited to the Allowance instead of reducing Foreclosed Property Expenses.

350.    In addition, according to the Final Report:

> While performing Sarbanes-Oxley testing, KPMG found a second GAAP violation with respect to charge-off gains.  Fannie Mae had accrued a mortgage insurance receivable above the contractual amount owed.  Mortgage insurance companies are only obligated to pay an amount that, at most, makes the insured whole.  Because the accrued mortgage insurance proceeds were not capped at the estimated charge-off loss amount (the make-whole amount), the financial statements reflected charge-off gains that were not likely to materialize.  That error also inflated the Allowance for Loan Losses.

351.    OFHEO found that the senior management of Fannie Mae was well aware that its accounting for charge-off gains at foreclosure was incorrect for years prior to taking action to correct it.

### b.    *Improper Accounting Related To Possession In Accounting For REO*

352.    Fannie Mae violated GAAP in its accounting for REO related to the possession stage in a number of ways that affected either the allocation of losses between charge-offs and FPE, or the timing of the recognition of expenses.

353.    GAAP permitted Fannie Mae to use a temporary property valuation in determining charge-offs, and to adjust that amount only if it obtained a fair market value within a reasonable period.  Because appraisals were frequently not available at the time of foreclosure,

Fannie Mae often recorded temporary valuations. But then, regardless of how much time elapsed before it received an appraisal, the Company increased or decreased the REO investment and adjusted the related charge-offs. In the case of unreasonably late appraisals, Fannie Mae should not have recorded resulting gains until they were recognized through the sale of the REO. The Company should have credited these gains against FPE, not recorded them as charge-offs.

354. Further, under SFAS 144, an entity must institute the LOCOM principle for REO. Impairment losses that occur when the fair value of a property falls below its carrying amount are charged to Foreclosed Property Expense. Fannie Mae's written policy called for at least quarterly review of its REO valuations to determine the extent of such impairment losses, but this policy was not followed. Failure to perform the impairment assessments or to document their performance reflects a breakdown in internal control, and creates the potential for unrecorded impairments that would understate Foreclosed Property Expense and overstate asset value during the possession period.

> c. **Improper Accounting Related To Disposition In Accounting For REO**

355. Under SFAS 66, *Accounting for Sales of Real Estate,* the "[r]ecognition of all of the profit at the time of sale" is known as the "full accrual method." To qualify for that method, "the collectibility of the sales price [must be] reasonably assured," and the seller must not be "obliged to perform significant activities after the sale to earn the profit." If both conditions are not met, "recognition of all or part of the profit shall be postponed." In some instances when Fannie Mae extended financing to parties purchasing their REO, those conditions were not met, yet the Company recognized all profit when it sold the REO, thus overstating revenue and earnings.

### d. *Fannie Mae Created Inappropriate Incentives for Appraisers In Connection With REO*

356.   Apart from specific accounting violations discussed above, Fannie Mae created inappropriate incentives for its appraisal staff that were inconsistent with safety and soundness. According to OFHEO, "[t]hose incentives suggest that the obsession of management with low volatility extended to the loss line."  During the course of its Special Examination, OFHEO obtained seven of Fannie Mae's National Property Distribution Center ("NPDC") performance plans for appraiser analysts that required them to "[m]anage the quality of values [of REOs] such that . . . NPDC goals [for all appraisal analysts] are supported to maintain charge-off and REO expense at $127.3 million, while monitoring exceptions to avoid ... audit findings."  The phrasing of that performance standard shows that the Company created incentives for employees to obtain specific numbers rather than accurate values.

357.   In sum, OFHEO noted the following regarding Fannie Mae's accounting for REO:

> The majority of Fannie Mae's accounting policies for REO was not in compliance with GAAP and, therefore, violated the Charter Act. The number and dispersion of the errors throughout all three stages of the REO cycle demonstrates a complete breakdown in internal controls and management oversight as well as weak accounting expertise.  Failed internal controls and ineffective oversight, in turn, created conditions that management could exploit to manage earnings.  The extent of the breakdowns in overseeing the National Property Distribution Center and accounting for its activities, together with the inappropriate incentives created by setting specific charge-off goals, reflect unsafe and unsound practices.

358.   In Fannie Mae's March 2006 Form 12b-25, the Company admitted that it did not follow its own accounting policies, and that it violated GAAP, by making inappropriate determinations of the initial cost basis of REO assets at foreclosure and the amounts charged-off against the allowance for loan losses.  Correcting these yet-to-be quantified errors will change

the timing of certain amounts charged by Fannie Mae to provision for losses and foreclosed property expense in the Company's income statements.

### 18.    Fannie Mae Improperly Accounted For Troubled Debt Restructurings In Violation Of SFAS 15 And 114

359.    According to SFAS 15, *Accounting by Debtors and Creditors for Troubled Debt Restructurings,* if a creditor, for economic or legal reasons related to the debtor's financial difficulties, grants a concession to the debtor that it would not otherwise have considered, the restructuring constitutes a troubled debt restructuring for GAAP purposes. SFAS 114, *Accounting by Creditors for Impairment of a Loan*, amended SFAS 15 to address accounting for loans that are restructured in a troubled debt restructuring involving a modification of terms. Generally, GAAP requires that if the restructured loan will provide lower future cash payments to the lender, a loss on the restructuring must be recognized, and normal earnings on the reduced principal sum will be recognized until the loan is fully amortized.

360.    Fannie Mae disclosed in the March 2006 Form 12b-25 that it had improperly accounted for troubled debt restructurings in violation of SFAS 15 and 114:

> *Accounting for Troubled Debt Restructurings.* We historically did not recognize modifications that granted concessions to borrowers as troubled debt restructurings as required by Statement of Financial Accounting Standards No. 15, *Accounting by Debtors and Creditors for Troubled Debt Restructurings*, as amended by Statement of Financial Accounting Standards No. 114, *Accounting by Creditors for Impairment of a Loan*. This error will be corrected for the periods being restated resulting in some modifications being recognized as troubled debt restructurings.

361.    Upon information and belief, these GAAP violations served to understate the provision for losses and overstate net income in Fannie Mae's income statements, and to understate the allowance for loan losses in its balance sheets for the periods to be restated.

### 19.    Fannie Mae Improperly Accrued Interest Income On Seriously Delinquent Loans

362.    The Summary of Significant Accounting Policies included in Fannie Mae's 2002 10-K and 2003 10-K stated:

> We do not accrue interest income on nonperforming loans. We classify conventional single-family and multifamily loans as nonperforming and reverse previously accrued interest against current period income when the loan is 90 days or more delinquent and we estimate the principal and interest to be uncollectible. We return loans to accrual status when the borrower is less than 90 days delinquent because the probability of default is low and management believes collections of future payments are reasonably assured.

363.    These statements were materially false and misleading because, as Fannie Mae admitted in its March 2006 Form 12b-25, it continued to accrue interest income (at a reduced rate) on loans that were more than 90 days delinquent:

> *Interest Accrual on Seriously Delinquent Loans.* We misapplied our policy of placing seriously delinquent loans on non-accrual status. When payments on loans became more than three months past due, we placed the loans on non-accrual status, which required us to cease to accrue payments due under the loans. However, we continued to accrue interest income on the loans at a reduced amount. . . . In addition, for loans more than three months past due, we reserved a portion of previously accrued interest and determined the amount of the reserve based on an estimate of collectibility that was incorrectly determined. . . .

364.    Not only were the above-quoted statements of the Company's accounting policy false, but as a result of the improper interest accruals, the Company's income statement line items for mortgage portfolio interest income, net income and provision for losses, and its balance sheet accounts for mortgage portfolio, net and allowance for loan losses, were misstated during the Loss Period.

### 20.    Fannie Mae Improperly Accounted For Certain Guaranty Fees And Obligations In Connection With Mortgage Backed Securities Trusts

365.    In Fannie Mae MBS transactions, the Company guaranteed the timely payment of principal and interest on Fannie Mae MBS to the MBS trust in exchange for a guaranty fee. The Company recognized a guaranty obligation on its balance sheet at the inception of the guaranty based on the fair value of its ongoing obligation to remit payments to the MBS trust in the event of any shortfall in borrower payments over the term of the guaranty. It also recorded a corresponding guaranty asset on its balance sheet, representing the present value of guaranty fees it expected to receive from the MBS trust over the life of the guaranty.

366.    Fannie Mae disclosed in its March 2006 Form 12b-25 that it had "failed to recognize certain guaranty fees as retained interests and certain recourse obligations in connection with the Fannie Mae MBS trusts for which we were the transferor of loans to the trusts."

367.    Fannie Mae subsequently disclosed in its May 2006 Form 12b-25 that it had also improperly reduced its recorded guaranty asset and obligation for Fannie Mae MBS held in the Company's portfolio. Fannie Mae explained this error as follows:

> Historically, we reduced our recorded guaranty asset and obligation by an amount equal to the pro rata portion of the Fannie Mae MBS held in our mortgage portfolio relative to the total amount of Fannie Mae MBS. In addition, we reclassified a pro rata portion of our recorded guaranty fee income to interest income in an amount equal to the ratio of the Fannie Mae MBS held in our mortgage portfolio relative to the total amount of Fannie Mae MBS. This historical accounting was determined to be an error. As guarantor of all outstanding Fannie Mae MBS, including the Fannie Mae MBS held in our mortgage portfolio, we have a legal obligation to remit payments in the event of any shortfall in borrower payments to the MBS trust, as well as a corresponding legal right to receive the related guaranty fees from the MBS trust. Because each MBS trust to which we have a guaranty obligation, and from which we have the right to receive guaranty fees, is a legal entity separate from us, we should not have reduced our

124

recorded guaranty asset and guaranty obligation or reclassified guaranty fee income with respect to the Fannie Mae MBS held in our portfolio.

368.    Fannie Mae stated that, to correct these errors, it will reverse (1) any previously recorded reductions in the guaranty asset and guaranty obligation; and (2) any reclassification of guaranty fee income related to Fannie Mae MBS held in its mortgage portfolio.

### 21.    Fannie Mae Created REMICs With No Legitimate Business Purpose

369.    The Final Report reveals for the first time that, in December 2001 and March 2002, Fannie Mae created $20 billion and $10 billion REMIC transactions—Fannie Mae REMIC Trusts 2001-81 and 2002-21, respectively—to shift $107 million of earnings into future years (the "income-shifting REMICs"). Neither transaction had any economic purpose other than to shift income between accounting periods. Entering into transactions that have no economic purpose other than shifting income, even when otherwise GAAP-compliant, is itself a violation of GAAP.

370.    The income-shifting REMICs transformed a 90% pro rata share of cash flows from a pool of mortgages into sequential pay-bond tranches, which Fannie Mae retained. The remaining 10% of the cash flows were configured as REMIC tranches with varying characteristics and sold to investors.

371.    The income-shifting REMICs were highly unusual because of their large size and because Fannie Mae provided the collateral and retained most of the resulting securities. The initial $20 billion transaction was twice as large as any REMIC Fannie Mae had previously issued.

372.    The sequential-pay securities Fannie Mae retained were priced to yield increasing rates of interest, consistent with their average lives. Varying yields were effected through premium and discount pricing; shorter tranches were priced at premiums and larger tranches at

discounts.  As a result, instead of recognizing income at a constant yield on the MBS, after the transactions Fannie Mae recognized lower income in the early years and increasingly higher income as the shorter, lower yielding tranches paid down.

373.    Under SFAS 140, when an entity transfers assets to a QSPE, it can sell as little as a 10% interest in the QSPE and still receive sales treatment (*i.e.,* recognizing a gain or loss) on the sold portion.  Ownership interests retained by the transferring entity are re-characterized as interests in the QSPE (in this case, the REMIC tranches Fannie Mae retained).  The carrying value of the retained portion is reallocated on the entity's books to the retained interests based on their relative fair values.

374.    To maintain QSPE status and avoid consolidation, SFAS 140 requires independent parties to hold at least 10% of the fair value of the interests in the QSPE.  A transferor that retains interests in a QSPE must disclose its methodology for valuing retained interests both at inception and at every subsequent reporting date.  In the case of the income-shifting REMICs, meeting its earnings management objective required that Fannie Mae never own more than 90% of the REMIC securities.  Fannie Mae made an assessment of the fair value of the QSPEs to avoid consolidation at inception, but did not address the measurement of retained assets relative to the overall QSPE over its life as required by SFAS 140.

375.    According to Senior Vice President for Portfolio Analytics Thomas Lawler, when Fannie Mae entered the income-shifting REMIC transactions, there was concern that the steep decline in interest rates in 2001 would cause higher near-term and lower long-term recognition of income under GAAP.  Lawler explained that the income-shifting REMICs arose in the context of developing strategies to address that concern, and acknowledged during a June 24, 2004 interview with OFHEO that the motive for creating the REMICs was to effect "a change in the

expected [pattern of] recognition [of income]." According to slides presented by Goldman Sachs to Fannie Mae on November 19, 2001:

> Replacing a MBS pass-through portfolio with a sequentially tranched basket of CMO [i.e., REMIC] classes representing the same cash flows allows [Fannie Mae] to better manage the recognition of income for GAAP purposes.

376.    An undated "Summary of Potential December REMIC transactions" outlined possible REMIC structures. In a meeting with Spencer, Niculescu, and others, Howard selected from the "Summary" the structure which had the greatest income-shifting effect for the December 2001 transaction.

377.    At the time Fannie Mae executed the December 2001 REMIC, Vice President Portfolio Management Ramon DeCastro reminded his colleagues that "there are a whole lot of steps still left in this transaction before these are realized income effects." Accomplishing income-shifting required the amortization of individual tranche discounts and premiums on a level-yield basis. Fannie Mae's implementation of FAS 91, the accounting rule governing the amortization of premiums and discounts, involved aggregation of many securities into a number of amortization buckets. Aggregating the cash flows from the different REMIC tranches obscured the differential yields on the various securities, so the income-shifting effect could not be captured. Jeff Juliane, responsible for discount and premium amortization, indirectly described this problem when he stated that "the current infrastructure of the REMIC model could not support the underlying structure of the deals." According to Juliane, work-arounds to address that problem resulted in errors, discovered in mid-2002, that caused the understatement of income by $9 million and the subsequent revision of SFAS 91 amortization factors for the affected buckets. The inadequate justification for those factor revisions was one of a number of concerns Barnes raised concerning Fannie Mae's misuse of its systems implementing SFAS 91.

378.    Fannie Mae's December 2001 income-shifting transaction, which was twice as large as any REMIC transaction the Company had previously issued, generated much discussion in the marketplace.  Fannie Mae never disclosed its true role in the transaction, the transaction's economic purpose, or that the $20 billion issuance masked the fact that only $2 billion of the transaction was actually sold to investors.   Shortly after the December REMIC was priced, rumors circulated on Wall Street that Fannie Mae had done "a $20 billion 'tax driven' REMIC." Although Fannie Mae wanted to hide the true nature of the transaction, it also wanted to dispel inaccurate, unfavorable rumors.  DeCastro drafted talking points to respond to public inquiries. As DeCastro put it in a December 19, 2001 email to Howard, among others: "The talking points are light because they are very close to saying 'no comment.'"   The talking points evaded questions asking about the motivation for the transaction and whether collateral from the transaction came from Fannie Mae's portfolio.  Howard showed a specific interest in the public "spin" on the transaction, asking in a December 20, 2001 email to, among others, Niculescu and Senior Vice President for Investor Relations Shontell, "Who's working on the public response? I'd like to see it before it goes final."

379.    The income-shifting REMICs also violated SFAS 91.   The income shifting objectives of these transactions were a function of premium and discount amortization accounting.   Accomplishing income-shifting required the amortization of individual tranche discounts and premiums on a level-yield basis.  Fannie Mae's infrastructure for the REMIC model could not support the structure of these deals, and its work-arounds to accomplish this amortization resulted in errors and Fannie Mae made unsupported factor revisions to the amortization calculations, in direct violation of SFAS 91.

380.     In addition to the GAAP-violative nature of the income-shifting REMICs, Fannie Mae did not comply with the corporate disclosure requirements of SFAS 140 for the 2001 reporting year.  Under SFAS 140, if an entity has securitized financial assets, it must disclose its policies for valuing any retained interests both at inception and at every subsequent reporting date.  According to the Final Report, "Although Fannie Mae disclosed such information in its 2002 annual report, it did not in its 2001 annual report."

381.     As a result of the income-shifting REMICS, Fannie Mae understated income by approximately $102 million, $74 million, and $30 million in 2001, 2002, and 2003 respectively. Fannie Mae also understated unamortized premiums (discounts) and deferred price adjustments, net in the Company's balance sheets by these amounts, and understated interest income and income before federal income taxes and cumulative effect of change in accounting principles in the income statement by the same amounts

### 22.     Recording Of Excess Tax Reserves Related To Investment In Synfuel Partnerships

382.     Beginning in 1998, Fannie Mae acquired limited partnership interests in three Internal Revenue Code Section 29 synthetic fuel facilities.  Investing in these alternative energy facilities allowed the Company to earn tax credits.  Fannie Mae booked tax credits generated by the investments and claimed tax deductions for the partnership-generated operating losses.

383.     Because the IRS's treatment of these investments was uncertain, Fannie Mae reserved against the possibility that the IRS would ultimately issue an adverse ruling on its tax treatment of these investments.  SFAS 5, *Accounting for Contingencies,* governs recognition of liabilities for tax-related contingencies.  Under SFAS 5, a liability for a tax contingency cannot be recognized unless it is probable that the liability had been incurred and the amount of the potential loss can be reasonably estimated.

384.    Because certain of Fannie Mae's tax-advantaged transactions created temporary differences (*i.e.,* differences between the book and tax basis of assets and liabilities), the Company was also required to comply with SFAS 109, *Accounting for Income Taxes*, in accounting for these investments.  SFAS 109 sets forth the objectives of accounting for income taxes, which are to recognize: (1) the amount of taxes payable or refundable for the current year; and (2) deferred tax liabilities and assets for the future tax consequences of events that have been recognized in an enterprise's financial statements or tax return.

385.    To guard against the possibility that the IRS would later rule that Fannie Mae's investments in the synfuel partnerships were not eligible for tax credits, the Company established reserves relating to these investments at quarterly tax reserve meetings.  Personnel from Corporate Tax and the Legal Department attended these tax reserve meetings to consider the likelihood that the IRS would prevail in disputes over potential tax issues.  Once the group reached a consensus on the percentage likelihood of such a loss, this percentage was used to compute a tax reserve for each item.

386.    Because recording tax reserves was ultimately a matter of financial accounting, the head tax accountant met with the Company's Controller after the quarterly tax meetings to review the decisions that had been made with respect to the tax reserve.  Spencer had ultimate authority over the amount of tax reserves that were booked for potentially disputed items, including Fannie Mae's investment in the synfuel partnerships, during her tenure as Controller from 1999 through 2005.

387.    Paul Weiss uncovered evidence during its investigation which strongly suggests that management, including Spencer and Howard, recorded amounts to the Company's tax reserve for inappropriate earnings management purposes.  For example, a 1996 memorandum

from Spencer to Howard suggests that Spencer contemplated making adjustments to the tax forecasts (and possibly to the tax provision or the tax reserve) based on decisions unrelated to known tax liabilities, in violation of SFAS 5 and SFAS 109.  Spencer made the following remarks concerning the Company's forecast for the third quarter of 1996:

> We've done the following: . . .  reversed a tax entry we booked in September for qtr [sic] management of $2.3 million and assumed that reversal would occur in Dec. 96 . . . *[a]nd, I have now held nothing back such as the previous earnings management items that I've been plugging to the tax line over the last several forecasts, with the reversing of the tax entry*.

(emphasis added).  While Paul Weiss was unable to question Spencer regarding this document, it concluded that this memorandum "suggests that Spencer may have been over-reserving for tax liabilities that she later reversed to income."

388.    Further, a September 28, 1998 memorandum from Fannie Mae tax attorney Hal Gann to Howard, entitled "Usefulness of a 'Cushion' for Deferred Taxes," suggests that Fannie Mae could create a "cushion" by "not booking into current earnings all of the savings projected for various tax-advantaged transactions."  This "cushion" could later be used to smooth the Company's reported earnings:

> [A] book 'cushion' can help you maintain consistent growth in *earnings*.  If we find an idea that can trim $35 million off of our 1999 tax expense by capturing a permanent loss of up to $100 million, should we execute all $100 million and risk depressing 2000 earnings by comparison if we do not find as many good ideas in that year? Should we limit ourselves to $60 million of losses-$21 million tax savings- just to avoid setting the bar too high for 2000? *A 'cushion' may offer a compromise that allows us to capture all $100 million of loss on the tax return, but to book only $21 million of the savings into 1999 earnings.  The additional $14 million of reserved tax savings can be managed, like a reserve for credit losses, to walk that fine line between saving enough for a rainy day and depressing earnings by being overly pessimistic.*

(emphasis added).  Plainly, Fannie Mae management at the highest levels considered over-reserving for potential tax liabilities as a means to manage earnings down the road.

389.    In 2002, the IRS began auditing numerous synfuel syndicators, including two of Fannie Mae's synfuel partnerships.  Fannie Mae used this increased scrutiny as justification for over-reserving for its investments in these partnerships.  While the participants in a quarterly tax reserves meeting in 2002 determined that 25% of the total expected tax benefit would be an appropriate amount to reserve for a potential adverse IRS ruling (*i.e.*, about $17 million), the Company actually reserved approximately $45 million—more than $27 million in excess of the agreed-to 25% reserve.  An October 14, 2002 spreadsheet indicated that the "excess" reserve amount would be released at year end.  This proposed "year end release" violates APB 20, which would require Fannie Mae to release the excess immediately upon determining that it had over-reserved.

390.    Even worse than holding off on releasing the excess reserve until the end of 2002, Fannie Mae – with KPMG's knowledge and acquiescence -- continued to hold the excess reserve into 2003.  A Fannie Mae document found by Paul Weiss in a February 2004 KPMG workpaper indicates that the Company knew that its reserve level at the end of 2002 was $28.6 million in excess of the 25% "required reserve" amount, yet a September 2003 tax reserve schedule continued to note a $28 million excess reserve associated with the synfuel tax credits.

391.    Fannie Mae was forced to end these reserves shenanigans after the IRS stated, in November 2003, that investments in synfuel partnerships would be eligible for tax credits. Fannie Mae, accordingly, no longer had a valid basis to continue reserving for these investments. Fannie Mae released $28,570,379 of its synfuel reserves during the third quarter of 2003, and another $30,481,304 near the end of the fourth quarter of 2003.

## V.    DEFENDANTS MADE NUMEROUS BUSINESS DECISIONS THAT WERE MOTIVATED BY THE COMPANY'S DESIRE TO REPORT SMOOTH EARNINGS AND TO MEET EPS TARGETS

392.    In addition to the numerous GAAP violations discussed above, Paul Weiss uncovered evidence that Defendants made business decisions that, while not improper *per se*, were motivated by Defendants' desire to continue to report smooth earnings to maintain the public's perception of Fannie Mae as a stable investment and, in some instances, to hit EPS targets to trigger their entitlement to bonuses.  That Defendants made business decisions based on these extraneous considerations is further evidence of their scienter in connection with the fraudulent scheme described herein.

### A.    Fannie Mae Restructured Existing Corporate Owned Life Insurance Policies To Manage Earnings

393.    Paul Weiss found that Fannie Mae restructured corporate owned life insurance ("COLI") policies for improper earnings management purposes.  During 2001 and 2002, Credit Policy analyzed whether it could restructure existing COLI policies to accelerate the payment of deferred acquisition costs that the Company had been paying through a reduction in the return on the policy.  Because the Company had the ability to pay costs in 2001 and 2002, restructuring the COLI would permit the Company to depress earnings in those years to enable it to more easily report higher earnings in the future.  Marzol informed Paul Weiss that this proposed restructuring was another item the Company considered in response to Raines' guidance to invest in the future by incurring expenses in the present.

394.    Fannie Mae restructured one COLI with MetLife in response to Raines' guidance.  Graham told Spencer, Pennewell and Marzol in a December 18, 2001 email that the impact of this restructuring would be to reduce "miscellaneous income in the period it is taken; future earnings would be enhanced since yields would no longer be depressed by amortization

expense." As a result of this restructuring, Fannie Mae recorded $11 million in miscellaneous expense during the second quarter of 2002, which represented an acceleration of the deferred acquisition costs and state premium taxes that Fannie Mae was originally scheduled to pay, through reductions in the return on the policy, through December 31, 2007.

395.    Fannie Mae considered restructuring other policies in 2002 pursuant to Pennewell's guidance that "there [was] additional opportunity to accelerate expenses" into 2002 and that the Company was "looking at initiatives that will add income in 2004 and 2005."

396.    Paul Weiss found that the restructuring of the COLI was part of a broader effort, directed by Howard with guidance from Spencer, to identify transactions that would result in the recognition of expenses in the present reporting period to increase reported earnings in subsequent years. In an email dated December 31, 2002 to Graham and Spencer, Howard stated:

> Leanne [Spencer] is the right person to take the lead on this. *We're trying to build up an inventory of these sorts of transactions.* Ideally, we can get a notion of the economics and payback of each without the party that came up with the idea having to do too much work. That won't be the case all the time, unfortunately. *As we get into the quarter, we should have a better sense of which ones we want to do.*

(emphasis added). Paul Weiss found that the email demonstrated that "management would decide between transactions that presumably were economically viable based on where they were during the quarter in relation to earnings forecasts, and only those transactions that would not impair the Company's ability to meet analysts' expectations would be executed."

397.    While the COLI restructuring did not violate GAAP, Fannie Mae's pursuit of this transaction reinforces its willingness to structure its business dealings to further its goal of reporting smooth earnings.

**B.**     **Fannie Mae Executed Debt Repurchase Transactions To Enable The Company To Hit EPS Targets**

398.     Paul Weiss uncovered evidence that Fannie Mae executed a number of debt repurchase transactions to impact the Company's reported earnings and hit certain EPS goals (thus triggering management's entitlement to bonuses).

399.     From time to time, Fannie Mae extinguished debt by repurchasing previously issued noncallable debt at market rates or by exercising its option for callable debt securities (collectively, "buybacks").   Fannie Mae recorded the buybacks as gains or losses on the repurchase of debt.   These transactions were a significant facet of the Company's business, allowing it to recognize cumulative pre-tax losses of approximately $3.5 billion from 2001 to 2003.

400.     In its published financial statements, the Company offered two primary reasons for entering into buybacks:  (1) management of the Company's interest rate risk; and (2) the reduction of future debts.  While the Company was motivated, in part, by these reasons, Fannie Mae's management set the parameters for the buybacks based on current quarter earnings forecasts, and executed such buybacks strategically within those parameters to achieve specific, to-the-penny EPS figures.

401.     For example, in a September 24, 2003 email to Spencer and Niculescu, Howard recounted a conversation he had with Raines in which the two contemplated using buybacks to control EPS growth for the third quarter of 2003 to achieve a double-digit increase over the previous year:

> I was able to get to Frank this evening on the buyback loss for the third quarter . . .
>
> *His thought for the third quarter- which I think is a good one- was to come in at an EPS number that would be a double-digit increase from the third quarter 2002.  A third quarter EPS of $1.79 would*

*do that*- it would be 10.5% above the $1.62 we reported for the third quarter of 2003.

*If that's what we want to do, doing $400 million buyback tomorrow would cause us to fall short of our objective.* Using Leanne [Spencer]'s numbers, a $400 million buyback would put us at $1.78. And of course, that's without any cushion.

*So- we need a lower cap.* Without doing any analysis, I'd be inclined to say $350. *A $375 million cap would give us a penny cushion ($1.80 versus our $1.79 target). Leanne, how much of a cushion would you like, if we're shooting for double-digit growth for Q3 2003? Your view of the right cushion should determine the maximum loss number we give to Dave.*

(emphasis added). In its Final Report, OFHEO found that this e-mail shows that "Raines set an EPS target with the apparent understanding that Mr. Howard and Ms. Spencer would achieve it through any means necessary."

402. Similarly, a September 5, 2001 email from Howard to Spencer and Pennewell states:

[Fannie Mae] could generate losses in the $40 to $50 million range. The current projection has us doing $80 million in losses on buybacks, so- assuming the rest of the projection remains unchanged and we do indeed wish to come in at $1.31 on third quarter EPS- this would leave us with $30 to $40 million to do later on this month in the long zeros or 30 years.

403. Another objective of the buyback strategy was to diminish earnings in the present period so the Company could more easily achieve future EPS growth goals. Management strategically used buybacks as one of several means to achieve the challenge laid down by Raines in 1999 to double EPS in five years. Marzol informed Paul Weiss that Fannie Mae repurchased debt for just this purpose. Similarly, Niculescu informed Paul Weiss that management, and Howard in particular, sought buybacks as a means to pursue a "stable pattern of earnings," which he confirmed meant sequential earnings growth. Pennewell, Knight and

Niculescu all told Paul Weiss that Howard retained and exercised authority to set the budget for buybacks and to sign-off on buyback transactions.

404.    Paul Weiss, based upon its extensive investigation, concluded that Fannie Mae had deliberately manipulated its buyback program for the purpose of achieving certain EPS numbers and, thereby, to ease Defendants' ability to collect bonuses:

> This EPS related strategy for buybacks was . . . a possible motivation for management because management's bonus plan was tied to final reported EPS without regard for non-operating or non-recurring items.  Had the Company not executed buybacks in these years, the Company would have achieved EPS numbers that were even higher than the actual results.  Such results, however, would have set a higher bar for showing growth for years 2003 and 2004.  By engaging in transactions that depressed the EPS in 2001 and 2002, management lowered the base year for purposes of measuring subsequent years' EPS growth, which was the metric used for setting bonuses.

## VI.    THE DEFENDANTS IGNORED WHISTLEBLOWERS

405.    On September 6, 2004, Roger Barnes ("Barnes"), the former Manager of Financial Accounting, Deferred Assets in Fannie Mae's Controller's Office, submitted written testimony to the United States House of Representatives for their October 2004 hearing on the Interim OFHEO Report.  Barnes was one of the few employees in the Controller's Office who was a CPA and had a Masters Degree in Business Administration.

406.    In his testimony, Barnes described in detail management's knowledge of and active participation in or approval of the accounting improprieties and GAAP violations which had rendered Fannie Mae's financial statements materially misleading for at least four years, and which he had tried unsuccessfully to stop.  He stated:

> Fannie Mae espouses a policy of adherence to good corporate governance, emphasizing the importance of integrity. . . .    The reality, however, is far different. . . .    The atmosphere and culture, particularly within the Controller's Division, is one of intimidation, restraint of dissenting opinions, and pressure to be part of the

'Team,' giving Chairman Franklin Raines and Vice Chairman Tim Howard the numbers the Office of the Chairman desired to please the markets.  Employees like myself who refused to go along with this agenda were ostracized and subjected to retaliation. . . . [Fannie Mae is] plagued by a corporate culture that uses threats, intimidation, and reprisal, to create an atmosphere where even those employees with great integrity . . . who rightfully feel duty-bound to report improprieties and irregularities . . . cannot risk doing so, fearing the retaliation they know will follow.

\*    \*    \*

Indeed, the culture in the Controller's division was such that many employees knew or suspected that the Company was regularly engaging in improper income management, and it became a joke that the Controller's division could produce any income statement that the Company wanted.

407. Barnes testified that, beginning in 1999 and every year thereafter, he "repeatedly alerted Fannie Mae management to improper accounting practices, including the fact that the Company's Amortization Integration Modeling System ('AIMS') used inaccurate methods that violated [GAAP], in particular [SFAS] 91."  He stated that he had "repeatedly advised management that it appeared that the AIMS had been designed and employed to manipulate the level of income reported by Fannie Mae in its earnings statement and/or other public filings, which would constitute fraudulent conduct that violates federal law."

408. In 2000, when Barnes continued to raise concerns about AIMS with Juliane, Pennewell, and Lewers (Barnes' direct supervisor), they dismissed his concerns and told him that AIMS was established "to accomplish the objective set by Leanne Spencer . . . and Tim Howard . . . which was to reduce the Company's earnings volatility."

409. Barnes testified that on January 4, 2001, he was advised by Mr. Juliane that:

[T]he rapid fall of [interest] rates had led senior management to consider adjusting the 'on-tops' – a term the Controller's division used to refer to manual journal entries that could be used to adjust arbitrarily the Company's income as the books were closed each month.  Senior management had stated that 'on-tops' could be used

to reflect a desired amount of income for December 2000, which would maintain margin and net interest income levels.  Mr. Juliane added that if the Company decided not to make 'on tops' adjustments, he would produce modeling runs to support the desired income results.  *Mr. Juliane indicated that he was prepared to generate any results desired by Ms. Spencer and Mr. Howard* through the modeling process.  I was extremely troubled by what was clearly improper income management and asked Mr. Juliane if management agreed with this approach, which seemed to violate GAAP.  *Mr. Juliane told me that the Company's management embraced this approach.*

(emphasis added).

410.    Barnes testified that in June 2001, he discovered that the Company's management had posted a $10 million "on-top" entry in order to increase the Company's reported income and meet the earnings and margin goals previously set by senior management.  According to Barnes, "even if the Company did not actually meet the goals set by management, the use of the 'on tops' adjustments allowed Fannie Mae to make it appear that it had met those goals in the relevant time period."

411.    In November 2001, Barnes learned that management had requested a change in an amortization factor which resulted in a $100 million boost to the Company's interest income.  He saw this as "concrete evidence that the AIMS system . . .  produced grossly inaccurate and unreliable results" and informed his supervisor that "the integrity of the AIMS system was seriously compromised."  No corrective action was taken, and management approved the factor change.

412.    In September 2002, Barnes raised his concerns formally in a memo to Raines and Howard, detailing the serious accounting and financial improprieties of which Barnes was aware. The concerns that Barnes raised included matters which OFHEO later found to have significantly contributed to the fraud, including flaws in the modeling of amortization factors, significant internal control deficiencies in AIMS, and insufficient segregation of duties and responsibilities

among Fannie Mae employees.   Among other things, the memo indicated that income was being

routinely misstated; that income was being managed to meet the Company's desired objectives;

that "on-top" adjustments were being used to manage income and margin calculations; that a

miscellaneous balance sheet account was being used to shift income to periods other than when it

was received; that reconciliation differences from systems were being input as future deferrals

instead of current income and expenses; that the Controller's Office was intentionally limiting

the AIMS system capabilities so it would not provide audit trails for modeling; and that the

Controller's Office was using negative factors in amortization and allowing amortization to

exceed 100%.   The memo further indicated that the problems with amortization of purchased

discount and premium were so severe that "the possible impact reache[d] hundreds of millions of

dollars and possibly affect[ed] the integrity of the current financial statements and those [the

Company] will issue after beginning compliance with SEC reporting in 2003."   The Officer

Defendants ignored the warnings in order to continue to perpetrate the fraud.

413.    In his testimony, Barnes indicated that Spencer was not only aware of accounting

manipulations, but was very conscious of the need to prevent their discovery:

> On January 2, 2003, Ms. Lewers informed me that Ms. Spencer
> and Ms. Pennewell had decided that a more than $20 million
> correction to Fannie Mae's income would not be posted because of
> a concern that the correction would be noticed and questioned by
> the Company's Internal Audit division. . . .   In an effort to control
> the information conveyed to the internal auditors about the
> Company's use of 'on-top' accounts, Ms. Lewers instructed me not
> to volunteer any information about these adjustments, and not to
> discuss the "on-top" accounting unless specifically asked.   Ms.
> Lewers also reminded me of Ms. Spencer's standing instruction
> that lower-level staff were not to speak with the Internal Audit
> division under any circumstances.

414.    In late July and early August 2003, Barnes brought his concerns about financial

fraud at Fannie Mae to the attention of the Company's Internal Audit department and, according

to his testimony, "provided [them] a wealth of materials documenting the pervasive and systematic nature of the accounting abuses about which [he] had repeatedly complained."  He also alerted them, during an August 4, 2003 meeting, to a recent manual change in a factor in the Company's amortization system that had resulted in a transfer of $6.5 million in amortization expense from future periods to the third quarter of 2003.  The result was to increase the quarter's income by $6.5 million, the very amount by which the Company's net interest income for July 2003 had fallen short of management's projections.  Barnes alleged that the change was made for the purpose of making the numbers in the system "agree" with forecasted figures.

415.    On August 5, 2003, Barnes gave Spencer a copy of the detailed memorandum which he had provided to the Internal Audit division, outlining the ways in which Fannie Mae was violating GAAP, and providing 60 specific examples of such misconduct from the period ended June 30, 2003.    Pennewell, Lewers, Stawarz, and Juliane were copied on this memorandum.  The recipients of the memorandum, including Spencer, convened a meeting with Barnes and berated him for providing that information to Fannie Mae's Internal Audit division.

416.    That same day, Rajappa called a meeting with Paul Jackson (Director of Finance for Internal Audit) and Joyce Philip (Internal Audit Manager) to begin an investigation into Barnes' concerns.  Rajappa selected Jackson and Philip to conduct this investigation because they had just completed an audit of the Company's amortization system in July 2003.  However, Paul Weiss found that "Internal Audit had a conflict-of-interest in performing this work because of its previous audit of the same area.  Specifically, to substantiate Barnes's allegations, the auditors would have had to find that their own conclusions during the July [2003] audit were incorrect."

417.    After meeting with Jackson and Philip, Rajappa secretly briefed Howard, Gerrity and Raines, as well as Mark Serock and Harry Argires of KPMG, on Barnes' allegations and Fannie Mae's plan to investigate those allegations.  Each of these Defendants knew that Fannie Mae's CEO/CFO Certification deadline was fast approaching and that Barnes' allegations might affect Raines' and Howard's ability to sign these certifications.  Accordingly, Raines, Howard, Gerrity and KPMG rubber-stamped what was, from the outset, an obviously conflicted investigatory process.

418.    After performing a perfunctory investigation into the manual factor change that had led to the $6.5 million transfer of amortization expense, Jackson and Philip concluded that it was not supported by documentation, but failed to reach a conclusion about whether the change was valid.  This was due, in part, to the fact that the modeling group had not responded to information requests, and to Internal Audit's failure to pursue the matter.  Barnes testified that "this was not surprising given the climate at Fannie Mae – a climate in which inquiries by the [Internal] Audit division were stonewalled and drowned out by the convoluted and deceptive explanations of managers who were determined to meet executive management's goal to depict stable and growing earnings regardless of the economic realities."

419.    Paul Weiss found that Internal Audit had been pressured to "sign off" on the results of the Barnes investigation due to the pending Form 10-Q filing deadline, noting:

> There is no doubt that Internal Audit felt pressure to produce the results of its investigation in an unreasonably short period of time due to the upcoming CEO/CFO certifications, and it appears that Rajappa himself was the source for that pressure.  Our conclusion in based primarily on the fact that Rajappa provided "conclusions" from the investigation to Raines and Gerrity after only three days of what eventually became a two-month process.  It was inappropriate for Rajappa to inform Raines and the Audit Committee that the investigation was complete when, in fact, a substantial amount of test work remained to be performed.

420.    A meeting was held to discuss Barnes' allegations on August 8, 2003, which was attended by Rajappa, Jackson, Philip, Ann Eilers, and Gunes Kulaligil of Internal Audit; Spencer, Pennewell, Lewers, Boyles, and Juliane of the Controller's Office; Serock and Michael Tascher of KPMG; Deborah House of the Company's Legal Department; and Barnes. Barnes testified that the purpose of the meeting appeared to him to be "to determine how to justify the improper practices [he] had identified so that Mr. Raines could certify Fannie Mae's financial statements by an August 15, 2003 deadline." Juliane provided a complex and contradictory explanation for the accounting issues raised by Barnes, which the Internal Audit division accepted. KPMG's representatives stated (incorrectly) that GAAP was being followed. No further action was taken.

421.    Following the August 8, 2003 meeting, Rajappa individually briefed Raines, Howard and Gerrity on Internal Audit's conclusions regarding Barnes' allegations. While Rajappa informed them that Internal Audit's testing was complete, Jackson and Philip were, in fact, still performing tests on Barnes' allegations regarding manual amortization factor changes - tests which would not be complete until the end of September 2003. Given that the investigation had begun at the earliest on August 5, 2003, Raines, Howard and Gerrity should have known that Internal Audit's investigation could not possibly have been complete, let alone completed properly. However, they blindly accepted Rajappa's representations that the investigation had been completed in a mere three-day period, thereby clearing the way for Raines and Howard to sign their CEO and CFO certifications as scheduled.

422.    On August 12, 2003, the Audit Committee held a previously scheduled telephonic meeting to discuss certification of the previous quarter's financial results. Upon information and belief, Gerrity, Mulcahy, Malek, Segue, Harvey and Pickett all participated in this call. During

the call, Gerrity discussed Barnes' concerns with the other Audit Committee Defendants and Kappler provided a report on the Legal Department's investigation into these allegations. Rajappa informed the Audit Committee that the Company and KPMG had found that these issues posed no obstacles to Raines' and Howard's ability to sign their Sarbanes Oxley certifications as scheduled.  Two day later, the Audit Committee Defendants and full Board approved, and the Company filed, its Form 10-Q for the quarter ended June 30, 2003.

423.    Given the significance of the concerns Barnes raised concerning the Company's application of SFAS 91 and SFAS 133, the Individual Defendants and KPMG knew, or should have known, that the paltry seven day window between Barnes' initial August 5, 2003 report of these issues and the Company's "conclusion" of its investigation provided insufficient time for the Company and KPMG to have fully and adequately investigated these issues.  Moreover, Barnes' concerns about SFAS 91 and SFAS 133 should have raised a red flag for the Individual Defendants and KPMG as to Fannie Mae's overall accounting polices and practices.  Barnes raised additional red flags about the lack of internal controls at Fannie Mae, which undermined Fannie Mae's accounting policies and procedures as a whole.

424.    Instead of adequately investigating Barnes' concerns, the Audit Committee Defendants and KPMG shrugged them off.  Further, the Officer Defendants and other management at Fannie Mae retaliated against Barnes, repeatedly excluding him from meetings and passing him over for promotions in an effort to silence him.  Barnes explained Stawarz's reaction, to whom Barnes also directed his concerns, as follows:

> Mr. Stawarz agreed that there were significant problems, but told me that in Fannie Mae's corporate climate, a climate in which employees actually joked about improper income management because it was such a regular occurrence, and a climate in which employee morale suffered because management offered

> promotions, bonuses and perks only to employees who supported
> management's improper goals, I should not raise my concerns . . .

425. Had KPMG and the Audit Committee taken Barnes' allegations more seriously, perhaps Defendants' fraud would have been uncovered sooner.

426. In addition to the Barnes allegations, another employee, Michelle Skinner, expressed serious concerns about Fannie Mae's accounting directly to Defendant Mudd on September 9, 2003 during one of a series of meetings he held periodically with Company employees known as "Unplugged" meetings. Skinner's concerns related to a number of areas, including amortization accounting, and were similar to the Barnes allegations. Skinner expressly referred to passages from the report of Baker Botts LLP on the Freddie Mac investigation (the "Baker Botts Report") and noted that some of the practices identified in the Baker Botts Report resembled practices at Fannie Mae. Skinner emailed Mudd after the "Unplugged" meeting to follow up on her concerns, stating:

> . . . Janet Pennewell once told me that KPMG had given her a 'margin' of plus or minus $90 million to work with in calculating PDS [amortization database] results (not an exact quote, just my memory of what she said). I got the distinct impression that the $90 million cushion could be used to make our EPS hit more closely to analysts' expectations.
>
> . . . Another concern is the fact that we have difficulty reconciling the information in STATS [amortization account sub-ledger] to the information in PDS. 'Realignments' between the two have periodically occurred, and I do not know the most recent results. But I believe some of the differences have been significant.
>
> . . . My comment this morning regarding some of the similarities between what happens at Fannie Mae and the Baker Botts report center around pages 62-67 of the report, . . . if I were in your shoes . . . I would ask some folks with history and knowledge . . . to walk me through each sentence of that section. And I would ask them to compare and contrast what each sentence says about Freddie Mac, to what Fannie Mae has done . . . I can only say that when I read that section, for a number of sentences, I said to myself, 'wow, that sure sounds familiar.'

427.    Mudd asked his special assistant, Pilar O'Leary, to investigate Skinner's complaints and report back to him.  O'Leary contacted Rajappa for assistance.  Rajappa prepared an analysis of Skinner's concerns and, according to the Final Report, "essentially validated the majority of them."  Rajappa then provided his analysis to Kappler for her review.

428.    Kappler prepared two draft responses for Mudd, one to send to Skinner and the other to send to the other attendees at the "Unplugged" meeting.  In both responses, Kappler ignored Rajappa's comments concerning the validity of Skinner's concerns and instead reassured everyone that Fannie Mae's accounting was proper.  On September 26, 2003, Mudd distributed a single response via email to Skinner and the other participants at the "Unplugged" meeting, assuring everyone that Fannie Mae's accounting was proper.

429.    Mudd violated Fannie Mae's Code of Business Conduct by referring this matter to the legal department instead of the Audit Committee.  OFHEO's Final Report noted:

> When Ms. Skinner brought her concerns to Mr. Mudd's attention in September, she specifically referenced similarities between what she knew happened at Fannie Mae and how that was similar to what was reported in the Baker Botts report.  Therefore, Mr. Mudd missed an opportunity to recognize that perhaps there were similarities between Freddie Mae and Fannie Mae . . .  At a minimum, Mr. Mudd should have spoken to Mr. Rajappa to determine what the latter's conclusions were, if he, Mudd, was unaware of these conclusions.  Clearly, the matters should have been referred to the Audit Committee.

## VII.    FANNIE MAE'S DEFICIENT INTERNAL CONTROLS

430.    OFHEO guidance indicates that Fannie Mae should "maintain and implement internal controls appropriate to the nature and scope of its business activities."  Those control must provide for:

- An organizational structure and assignment of responsibility that provide for accountability and controls, including adherence to policy and procedures;

- A control framework commensurate with the Enterprise's risk;

- Policies and procedures adequate to safeguard and to manage assets; and

- Compliance with applicable laws, regulations, and policies.

Raines, Howard, Spencer, Mudd, and Chief Technology Officer Julie St. John shared responsibility for Fannie Mae's internal control system.

431.    OFHEO found that Fannie Mae's violations of GAAP and the fraud committed by the Officer Defendants were facilitated by serious internal control deficiencies and by a corporate culture that placed more emphasis on achieving specific numbers than on reporting accurate financial results.  In describing Fannie Mae's violations of SFAS 91 and SFAS 133, the Interim OFHEO Report explained:

> The problems relating to these accounting areas differ in their specifics, but they have emerged from a culture and environment that made these problems possible.  Characteristics of this culture include:
>
> - management's desire to portray Fannie Mae as a consistent generator of stable and growing earnings;
>
> - a dysfunctional and ineffective process for developing accounting policies;
>
> - an operating environment that tolerated weak or non-existent internal controls;
>
> - key person dependencies and poor segregation of duties;
>
> - incomplete and ineffective reviews by the Office of Auditing;
>
> - an inordinate concentration of responsibility vested with the Chief Financial Officer; and
>
> - an executive compensation structure that rewarded management for meeting goals tied to earnings-per-share, a metric subject to manipulation by management.

432.    In its Final Report, OFHEO similarly noted:

During the period covered by this report, Fannie Mae's internal control system was grossly inadequate and contravened OFHEO's supervisory standards . . .  Those weaknesses included, but were not limited to:

- An absence of policy guidance and requirements for supporting documentation or independent review of journal entries;

- Weak internal control and accounting policies relating to dollar rolls;

- Weak internal controls and accounting policies relating to real estate owned (REO):

- No formal procedures for the approval of structured transactions;

- An absence of a formal process for assessing the economic benefits and costs of debt repurchases or formal procedures for approving such transactions;

- Serious weaknesses in accounting policies and practices for low-income housing tax credits (LIHTC) and the amortization of purchase price discounts and premiums under FAS 91; and

- Inadequate internal control, policies, practices and procedures for determining the adequacy of the allowance for loan losses (ALL), which provided management with the opportunity to use the allowance to manage earnings.

The existence of those and other deficiencies in internal control at Fannie Mae resulted from action and inactions of Enterprise senior management that contravened OFHEO standards and were in themselves unsafe and unsound practices.  That conduct included:

- A failure to ensure appropriate segregation of duties;

- A failure to provide adequate resources to accounting and financial reporting;

- Tolerance of key person dependencies;

148

- A failure to implement sound policy development and oversight; and

- A failure to avoid conflicts of interest within the Legal Department.

433.    The Interim OFHEO Report identified the following internal control deficiencies, among others, as having undermined the process of amortization of deferred price adjustments to such a grave extent that the material accuracy of that amortization could not be reasonably assured:

a.    Insufficient segregation of duties and key person dependencies, including the fact that, beginning in July 2003, Juliane had responsibility for both the modeling and accounting for amortization. The Company's Internal Audit department raised concerns about this during the August 8, 2003 meeting, while discussing Barnes' allegation that Juliane was involved in making amortization factor adjustments to cause actual amortization to more closely align with forecasts – an allegation that indicated that the failure to segregate these modeling and accounting functions was not merely a theoretical problem, but was resulting in actual manipulation of the Company's financial results. Yet, nothing was done to address those concerns, even though they were brought to the attention of the Officer Defendants, the Audit Committee, and KPMG.

b.    Company management was using its amortization modeling system to produce desired results. After the close of each quarter and year, the Controller's Office would process multiple sensitivity runs, using varying scenarios in terms of rates, prepayment speeds, prospective catch-up adjustments, and other parameters, to see what each scenario would produce as the amount of "catch-up." There was no legitimate business purpose for these multiple runs. Moreover, even if the runs were necessary, they could have been conducted well before the close of an accounting period because they were based on information from prior periods. Management processed these runs for the sole purpose of manipulating the Company's financial results by identifying (and then adopting) the set of assumptions that best suited their desire to achieve a particular outcome.

c.    There were significant differences between the balances reflected in the Company's amortization system and in the systems that were the source of the information to be used in the amortization system.

> When reconciling the two systems, management made manual adjustments to the catch-up sensitivity analysis which were not always adequately supported, and were sometimes inconsistently treated.

> d.    The Company's amortization system (AIMS) produced illogical and anomalous results, including amortization factors that were negative (which would cause a premium or discount to increase over time) or greater than one (which could cause a premium to amortize beyond the original balance and become a discount). These anomalies, which were well known within the Fannie Mae Controller's Office, made it virtually impossible to correlate amortization results to actual performance of the underlying loans/securities.    Moreover, OFHEO found that certain of the factor anomalies represented errors and may also constitute departures from GAAP.

434.    OFHEO also identified "critical resource shortages and lack of technical accounting expertise within the Controller's Department which resulted in key person dependencies" and found that a "lack of proper segregation of duties exists within [the] Controller's Department which has created an environment that is not conducive for developing safe and sound financial reporting practices."  For example, OFHEO found:

- A lack of technical accounting expertise and a shortage of resources within the Controller's Office, where accounting policies were recommended (by Jonathan Boyles of the Financial Standards Group), approved (by Spencer, who was not a C.P.A.), and purportedly enforced (by Howard, also not a C.P.A.);

- A "circular" accounting policy development structure, where the Financial Standards group essentially developed and also approved accounting policies by virtue of Spencer's reliance on the Financial Standards Group (due to her lack of expertise regarding GAAP);

- A Vice President for Financial Accounting, Mary Lewers, who lacked sufficient knowledge of GAAP to adequately perform her duties;

- A wide range of functions that fell within Howard's purview of responsibility, several of which potentially impaired his independence;

- That the Senior Vice-President of Financial Reporting, Janet Pennewell, had responsibility not only for financial reporting, but also for forecasting income for business planning purposes, which created a conflict of interest

and undermined the integrity of the financial reporting process because she had the ability to affect the amount of reported income in order to achieve forecasted results;

- That a single individual, Jeff Juliane, was responsible for modeling, reporting, and accounting for amortization of deferred price adjustments, and thus there was no independent check on those processes;

- That Rajappa, the head of the Company's Internal Audit department, reported to Howard instead of independently reporting to the Audit Committee, and that Howard participated in Rajappa's performance evaluations and in setting his compensation; and

- That Rajappa was the Company's Controller before becoming the head of the Internal Audit function, a fact that impaired his independence because he was auditing his own work.

435.    OFHEO explicitly found that "Howard failed to provide adequate oversight to key control and reporting functions within Fannie Mae" and that the Controller's Office, over which Howard had direct responsibility, "does not possess the skills required to ensure that Fannie Mae has appropriate accounting policies, the resources to appropriately implement such policies, nor an effective system of internal controls."  In sum, the Controller's Office, for which Howard and Spencer were directly responsible, was in a state of disarray.

436.    Similarly, Paul Weiss found that Fannie Mae's Controller's Office suffered from a number of deficiencies.  As of September 2004, the Controller's Office was divided into six units:  (1) Accounting Policy & Corporate Tax (a/k/a "Financial Standards"); (2) Financial Reporting and Planning ("Financial Reporting"); (3) Operations & Systems; (4) Financial & Procurement Services; (5) Corporate Risk & Insurance Management; and (6) Housing & Community Development.  The Controller's Office, through these various units, was responsible for the preparation of the Company's financial statements and its internal and external reporting functions; handling its accounting, payroll, tax, insurance and procurement activities; managing the Company's budget and expenses; and performing the Company's business planning.  Despite

the highly technical areas for which the Controller's Office was responsible, Fannie Mae permitted Spencer, who is not a certified public accountant, to serve as Controller from 1999 through the beginning of 2005.

437.    The Controller's Office was also inadequately staffed.  During Spencer's tenure as Controller, the Controller's Office assumed substantial new responsibilities after absorbing a number of functions from other areas of the Company, including e-business billing, processing of accounts receivable, securities accounting and procurement.  Further, it became subject to new reporting requirements arising from the Company's SEC registration.  Moreover, it had to accommodate Fannie Mae's growing business and the introduction of such complex new accounting standards as SFAS 133 and SFAS 149.  Despite the significant increase in workload between 2000 and 2003, headcount in the Controller's Office increased by only 13 employees during that period.

438.    In addition to the headcount problem, the Controller's Office employed individuals in senior positions who lacked the requisite expertise to perform or supervise the complex tasks they were assigned.  For example, Boyles, the Company's designated expert on accounting policy, had only limited experience in consulting on technical accounting matters prior to joining Fannie Mae.  This problem was exacerbated by the fact that Spencer, his supervisor, did not have the requisite accounting experience to act as a meaningful check on Boyles' development of accounting policies.  Similarly, Lewers, as Vice President-Financial Accounting, was responsible for supervising debt accounting, derivatives accounting, securities accounting, and portfolio analytics, as well as for developing systems to support these accounting areas, yet she admitted to Paul Weiss that she had to rely heavily upon Financial Standards and her staff to ensure that Fannie Mae's derivatives portfolio complied with GAAP.

439.    Further, Paul Weiss noted that the Financial Reporting unit of the Controller's Office lacked formal written policies and procedures to support the closing process, analytical review, journal entries, or account reconciliations until 2004.  It was not until the summer of 2004, as Sarbanes-Oxley implementation required the Company to formally document policies and procedures, that Financial Reporting took action to address these deficiencies.

440.    Prior to May 2004, the Controller's Office lacked standard requirements for documentation to support journal entries.   As a result, Controller's Office staff employed inconsistent practices as to the amount of supporting detail they provided.  In some instances, no meaningful supporting documentation (or no supporting documentation at all) was provided for journal entries.

441.    Further, the Controller's Office failed to support the closing process with adequate technology.  The Controller's Office maintained numerous spreadsheets (referred to at Fannie Mae as "End User Controls" or "EUCs") and ad-hoc reporting tools to compensate for poorly integrated systems.  Extensive reliance on EUCs and the manual processing and analysis of data created a weak control environment conducive to errors and intentional fraud.

442.    Fannie Mae's Internal Audit function was also severely deficient.   Internal Audit's mission statement, as set forth in its charter, provided that the department was (1) to "[c]ontribute to the achievement of Fannie Mae's objectives, by promoting effective management of financial and operational risks and maintenance of an effective internal control environment;" and (2) to support the Board by providing independent and objective audit, assurance, and risk assessment services and the prompt communication of audit and follow-up results to senior management and the Board.

443.    Internal Audit was plagued by a lack of experienced leadership.  Rajappa, who headed Internal Audit from 1999 through January 2005, did not have a formal background in auditing or training as an auditor.  In addition to being tasked with job functions in areas in which he had no formal experience, Rajappa also served as the Company's Senior Vice President-Operations Risk, creating significant distraction from his Internal Audit duties, as well as conflicts of interest.

444.    While Rajappa had a direct line reporting relationship with the Audit Committee, he also had a "dotted line" reporting relationship to senior management, initially to the COO and, from 2002 on, to Howard.  This "dual reporting" structure blurred Internal Audit's reporting responsibilities and compromised its independence, particularly in light of Rajappa's prior tenure as a direct subordinate to Howard while Rajappa was the Company's Controller.  In fact, Paul Weiss found "troubling evidence that Internal Audit's leadership viewed itself as accountable to senior management, rather than the Audit Committee."  Both Howard and Rajappa acted as if Rajappa were Howard's direct subordinate, even on matters relating to Rajappa's communications with the Audit Committee Defendants.  For example, in March 2004, Audit Committee Chairman Gerrity contacted Rajappa directly concerning OFHEO's finding that the Company had numerous outmoded manual accounting systems.  Howard became incensed when he learned that Rajappa had responded directly to Gerrity without vetting it with him first.  In a March 3, 2004 email to Spencer concerning this situation, Howard stated:

> I just got off the phone with Sam [Rajappa].  I made it 'blisteringly clear' to him that on any future calls he gets from the Chairman of our Audit Committee on accounting-related issues he must run the question or issue by you before he or anyone else gets back to Gerrity.  He said he got the message and would do so in the future. (He said that he'd agreed to call Tom back before realizing you weren't here on Friday, so he spoke with Janet [Pennewell] instead.  I responded that going forward that would not be good

> enough. He had to reach either you or me before responding to
> Gerrity on any accounting-related question he was asked. He said
> he understood.)

(emphasis added). The Audit Committee Defendants should have been aware of these limitations on Rajappa's ability to communicate with them directly, and should have taken proactive measures to ensure that there were open lines of communication between Internal Audit and themselves.

445.    Further, like the Company's other employees, bonus compensation for employees in Internal Audit was tied to EPS targets. In an address to his group on February 16, 2000, Rajappa stressed the importance of meeting EPS targets:

> By now every one of you must have 6.46 branded in your brains.
> You must be able to say it in your sleep, you must be able to recite
> it forwards and backwards, you must have a raging fire in your
> belly that burns away all doubts, you must live, breathe and dream
> 6.46. You must be obsessed on 6.46 . . .  *After all thanks to Frank
> [Raines] we all have a lot of money riding on it* . . .  We must do
> this with a fiery determination, not on some days, not on most days
> but day in and day out, give it your best, not 50%, not 75%, not
> 100%, but 150%. *Remember, Frank [Raines] has given us an
> opportunity to earn not <u>just</u> our salaries, benefits, raises, ESPP,
> but substantially over and above if we make 6.46.* So it is our
> <u>moral obligation</u> to give well above our 100%, and if we do this,
> we would have made tangible contributions to Frank's goals.

(emphasis added) (underscores in original). Rajappa, evidently, was so proud of his devotion to Raines' EPS mission that he even forwarded a copy of his speech to Raines, with a handwritten note saying, "I thought you may be interested in knowing what I told my Audit group about how they can help achieve $6.46." At a minimum, this compensation structure compromised the appearance (if not the fact) of Internal Audit's independence and objectivity.

446.    Internal Audit also suffered from significant resource deficiencies. While Internal Audit's workload increased significantly during Rajappa's tenure due, among other things, to the

Company's SEC registration and the advent of Sarbanes-Oxley, its staff was not commensurate with these increased demands, either in terms of numbers or qualifications.

447.    For most of Rajappa's tenure, staffing levels in Internal Audit were stagnant. Between 1999 and 2002, authorized headcount increased by only one employee, while actual headcount increased by only three employees.  In 2003, Rajappa sought only a modest increase in authorized headcount (three employees), even though he informed management that (i) in the previous five years, virtually no new auditors had been added to accommodate his department's increased workload; and (ii) staffing constraints were forcing Internal Audit to limit the scope of its reviews; to combine, postpone, or cancel audits; to delay department initiatives such as updates to the audit manual; and to work excessive overtime.

448.    At the beginning of 2004, despite Internal Audit's recognition that staffing shortages would require a reduction in its audit activities for 2004, the audit plan called for no further increase in authorized headcount.  Instead, the 2004 audit plan reduced the number of planned audits to half of those planned for 2003.  While Internal Audit's authorized headcount increased from fifty-seven to sixty-five during the second half of 2004, Internal Audit still had difficulty completing its tasks for the year.  By the end of 2004, Internal Audit had cancelled five audits and postponed or delayed completion of eleven audits.  The Audit Committee Defendants should have been aware of the inadequate staffing of the Internal Audit division and done something to correct it.

449.    In addition to a headcount shortage, Internal Audit lacked employees with certain critical skill sets.  Particularly troubling was the lack of uniform and adequate accounting experience among Internal Audit staff.  This created key person dependencies within the Department.  For example, Rajappa warned Howard, Mudd and Spencer on June 18, 2004 that

Internal Audit had only one employee with the public accounting background necessary to audit the Financial Reporting function in the Controller's Office, and that only one "level 5" employee was qualified to audit all aspects of Fannie Mae's crucial derivatives operations. In an October 24, 2003 e-mail, Rajappa informed Howard that "[w]e are bleeding from inside and outside on recruitment" and identified the "need for a temporary moratorium on hiring from Internal Audit." In February 2004, he warned Howard that Internal Audit had experienced a 23% attrition rate during 2003, including the loss of key staff with critical skills and that it was "imperative" that he stabilize staff given the external pressures created by Sarbanes-Oxley.

450.    In terms of insufficient segregation of duties, OFHEO noted in its Final Report that Howard was responsible for an extremely broad range of financial activities at Fannie Mae. Howard's responsibilities allowed him to recommend Fannie Mae's core business EPS target, approve asset acquisition and hedge transactions, approve the strategies used to manage the risks posed by those transactions, approve the measures used to report that risk, and approve accounting policies that established (1) how the transactions were reported in the Company's financial statements and (2) whether core EPS targets were achieved. Accordingly, Howard was in a position to determine the overall level of interest rate risk Fannie Mae took, how much the public knew about that risk, and how much the Company's financial statements reflected the volatility of the returns from that risk-taking. Further, Howard's relationship with Rajappa gave him the ability to control Rajappa's communications with the Audit Committee Defendants.

451.    OFHEO found that centralization of all of those responsibilities in one executive was unusual and inconsistent with best practices in the financial services industry. Nonetheless, Raines and the Board of Directors continued to expand Howard's duties, making him both the CFO and the Chief Risk Officer ("CRO") in 2004, despite being advised that Fannie Mae's

research had found no other companies with such an arrangement. In an email to Rebecca Senhauser (Senior Vice President for Human Resources) and Emmanuel Bailey (Director for Human Resources) dated August 13, 2004, Jill Blickstein (Vice President and Assistant to the Chairman) detailed a discussion between herself (referred to below as "ME") and Raines (referred to below as "FDR"):

> This was FDR's feedback to the benchmarking information:
>
> FDR: Well, we're ok, because just as I thought, lots of companies don't have CCOs [Chief Credit Officers].
>
> ME: But, Frank, the companies who do not have CCOs do have CROs.
>
> FDR: But Tim is our CRO.
>
> ME: But we haven't announced that externally yet.
>
> FDR: Well, we can do that.
>
> ME: And no companies have CFOs and CROs who are the same person.
>
> FDR: But that's because in most companies the CFO is a more junior position. So there's nothing wrong with combining the two.
>
> ME: (Sigh.)

452. Raines knew, but recklessly disregarded, that no other companies had assigned the roles of CFO and CRO to the same person, yet nonetheless insisted on assigning Howard both of these roles despite the attendant risk.

453. Other internal control deficiencies identified by OFHEO included:

- The failure to document hedging activity as required by SFAS 133, demonstrating "a poor control framework" and constituting "a significant safety and soundness problem";

- A process of accounting policy development that lends itself to the formation of aggressive and non-GAAP-compliant policies;

158

- A lack of formally documented accounting policy development procedures;

- The absence of a centralized database of all Fannie Mae accounting policies;

- The inability of the Company's portfolio accounting system (known as STATS) to reliably perform the calculations fundamental to properly account for the Company's portfolio, including estimating amortization of deferred price adjustments in accordance with SFAS 91; marking the mortgage-backed securities portfolio to market; accounting for dollar-roll repurchase agreements; accounting for mortgage revenue bonds; or accounting for interest-only strips pursuant to EITF Issue No. 99-20;

- The use of a faulty and inaccurate system for designating mortgage loans as held-for-investment or held-for-sale, and the failure to detect or correct the problem for 21 years;

- Over-reliance on end-user applications such as spreadsheets; and

- The insufficiency of controls surrounding database modifications, which led to a widespread practice of low-level employees overwriting and changing database records at the direction of management (referred to internally as "DB mods,") with no documentation or independent approvals.

454.    OFHEO's Final Report also noted that Fannie Mae's internal controls were ineffective with respect to the income-shifting REMICs. OFHEO found that, although Fannie Mae maintained extensive controls and procedures relating to its REMIC production, these controls focused on routine transactions in which dealers supplied collateral and Fannie Mae provided the guarantee of the resulting REMIC securities. Fannie Mae applied those controls and procedures to the production of the income-shifting REMICs, but they were inadequate to respond correctly to the issues raised by the unique nature of these REMICs. Unlike the typical transactions to which Fannie Mae's REMIC controls were designed to apply, in the income-shifting REMICS Fannie Mae supplied the collateral and retained by far the largest portion of the REMIC securities created. Accordingly, OFHEO found Fannie Mae's internal controls with regard to the income-shifting REMICs to be deficient in a number of respects.

455. First, Fannie Mae had no formal procedures for the approval of income-shifting REMICs. Howard ultimately approved the transactions, but did not follow any established formal process in so doing. Second, there was inadequate communication among Portfolio Management, which initiated the transactions; Fannie Mae's Legal Department (outside counsel was unaware of any involvement by the Legal Department), which should have opined on the legality of the transactions; Structured Transactions, which executed the deals; and the Controller's Office, which had responsibility for ongoing accounting for the transactions. Third, Fannie Mae had no formal written procedures for approving or processing that kind of transaction, or for obtaining necessary outside tax and accounting advice. Fourth, Fannie Mae had no system in place to ensure that the issuer's counsel was informed of any special characteristics of a given REMIC that might require disclosure. Finally, at the time the transactions were executed, Fannie Mae's iPDI system could not accurately account for the resulting security premiums and discounts under SFAS 91.

456. The lack of internal controls over Fannie Mae's accounting fostered an environment in which the Fannie Mae Defendants were able to, and did, smooth earnings volatility and distort financial results through accounting manipulations and fraudulent transactions.

457. As detailed below, Raines and Howard specifically represented to investors that Fannie Mae's internal controls were solid. Both certified in SEC filings that they were responsible for "establishing and maintaining disclosure controls and procedures;" that they had "designed such disclosure controls and procedures or caused [the same] to be designed under [their] supervision;" and that they had evaluated the effectiveness of the Company's disclosure controls and procedures and found them to be effective. These representations were materially

false because Raines and Howard knew of the serious, unresolved internal control problems described above.

458.    KPMG, meanwhile, repeatedly issued unqualified audit opinions on Fannie Mae's financial statements in spite of these gross internal control deficiencies.  GAAS – specifically, AU §§ 319, 312, and 722 – requires auditors to (a) obtain an understanding of their client's internal controls sufficient to enable the auditors to plan effective audits; (b) assess the company's audit risk and materiality associated with poor internal controls; and (c) examine their client's internal control systems and identify material weaknesses which might impact the accuracy of its financial statements.

459.    As Fannie Mae's longtime auditor, KPMG either knew or should have known of all of the flaws in the Company's internal controls.  Moreover, KPMG was specifically aware of certain internal control problems at Fannie Mae by virtue of its participation in discussions regarding Barnes' allegations of impropriety.  If KPMG had complied with GAAS and conducted its audits of Fannie Mae's financial statements in a non-reckless manner, it would have changed its audit procedures to compensate for the internal control deficiencies described above, and declined to issue unqualified opinions unless those deficiencies were cured.

460.    The Audit Committee Defendants are also culpable for ignoring and/or failing to discover the serious internal controls issues at Fannie Mae.  The Audit Committee's written charters charged the Audit Committee with, among other things:

- "Monitoring the integrity of the corporation's financial statements and the independence and performance of its internal . . .  auditors . . . ";

- Reviewing the Company's "major risks and risk management processes, including the quality and effectiveness of internal controls";

- Reviewing the creation and administration of financial controls;

- Reviewing the performance of Fannie Mae's Internal Audit functions;

- Reviewing and discussing with management, the head of the Internal Audit department, and the outside auditor the adequacy and effectiveness of the Company's internal controls and disclosure controls;

- Overseeing and discussing the Internal Auditing activities and performance;

- Obtaining periodic reports from the head of the Internal Audit department regarding Internal Audit findings and the Company's progress in remedying material control deficiencies; and

- Establishing procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls, or auditing matters.

461.    Had the Audit Committee Defendants adequately discharged these duties, they would have known about all of Fannie Mae's deficient and/or nonexistent internal controls and should have acted to correct them.  Instead, the Audit Committee Defendants sat passively by as these problems led to the material misstatements of the Company's financial statements.

462.    In addition to poor controls concerning accounting and financial reporting, Paul Weiss and OFHEO found that the Company had deficient ethics and compliance functions. Specifically, Paul Weiss could find no evidence, prior to 2005, of systematic, written reporting by management to the Board concerning ethics and compliance matters.   The Director Defendants knew, or should have known, that they were not receiving the type of information they needed to assess the effectiveness of the Company's ethics and compliance functions.  The absence of information on such critical areas should have caused the Director Defendants to seek out information on such topics from the Officer Defendants and, additionally, should have heightened the Director Defendants' awareness to the possibility that the Officer Defendants were not providing complete and accurate information to them on other areas affecting the Company.

463.    On April 6, 2005, Armando Falcon, Jr. ("Falcon"), the Director of OFHEO, testified before the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises about the effect of poor internal controls on the accounting fraud that OFHEO had uncovered at Fannie Mae.  He testified that "lapses in internal controls, even though we often speak of them after the accounting issues, I think, are just as, if not more, serious than the accounting problems."

464.    Among other things, Falcon expressed alarm concerning an instance in which Fannie Mae's practically nonexistent internal controls caused an employee to change an accounting formula which resulted in the improper reporting of one billion dollars.  He stated:

> I think [the internal control weaknesses] were substantial.  I do think they were because there were almost no controls in some instances.  There was one example where one employee was allowed, through the lack of internal controls, to make a change in an accounting formula on the spreadsheet that resulted in an improper reporting of a billion dollars.   It is that type of lack of controls that concern me.  With proper internal controls, one employee could not go and make those changes without a couple of layers of verification before changes like that are made.

465.    Falcon also testified that signatures were falsified on Fannie Mae accounting documents that were used to support executives' entitlement to bonuses.

466.    Fannie Mae has now agreed to implement sweeping reforms to remove the widespread internal control deficiencies described in the OFHEO and Paul Weiss Reports, in effect admitting that its internal controls were inadequate.  On March 7, 2005, Fannie Mae and OFHEO entered into a Supplemental Agreement to, as Fannie Mae stated, "address events that have occurred since September 27, 2004, including concerns at OFHEO with internal controls and resolution of other organizational problems . . . "  Fannie Mae, by signing the Agreement, admitted that it engaged in improper accounting and had inadequate internal controls, as the agreement requires Fannie Mae to, among other things:

- Implement controls surrounding accounting ledger journal entries including policies that prohibit the falsification of signatures;

- Develop and implement a plan to address deficiencies in the portfolio accounting systems;

- Adopt internal controls that limit the ability of personnel to overwrite database records supporting the general ledger;

- Separate the positions of Chairman and CEO;

- Review legal and regulatory compliance structures; and

- Create an Office of Compliance and Ethics at Fannie Mae to review internal complaints.

## VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

467.    As a result of Fannie Mae's fraudulent accounting scheme and internal control deficiencies, every financial statement and earnings announcement issued by Fannie Mae from at least 2000 through the second quarter of 2004 was materially false and misleading.  Defendants' dissemination of these and other false and misleading statements as set forth below caused the artificial inflation of Fannie Mae stock.  When the truth about Fannie Mae's unlawful scheme was finally disclosed, investors lost billions of dollars as the price of Fannie Mae's shares declined in response to those disclosures.

### A.    Raines' December 15, 2000 Speech

468.    Fannie Mae's ability to convince the investing public that it was a conservative, safe and stable investment was a critical component to the success of the scheme described above.   In furtherance of this scheme, Fannie Mae executives regularly trumpeted the Company's soundness.   For example, during a speech at the Brookings Institution in Washington, D.C. on December 15, 2000, Raines touted Fannie Mae's financial strength, stating:

> What we have now is an unparalleled, multi-layered approach to safeguarding our financial strength, an overlapping system with fail-safe redundancies.  As a result, Fannie Mae is not only one of

> the financially strongest companies in the world [sic]. Our safety and soundness regime is unmatched by any financial institution in the world, a new global standard if you will.
>
> If every financial company had Fannie Mae's regime of capital standards, regulatory supervision and market transparency, we could all be a lot more confident in the stability of the financial system going forward. We invite—we encourage—all financial supervisors, policy makers, and industry participants to take a close, fresh look at Fannie Mae's cutting-edge safety and soundness regime.

469.    These and similar public statements made by Fannie Mae executives were materially false and misleading because Fannie Mae's "cutting-edge safety and soundness regime" was, in reality, mere smoke and mirrors. Rather than "safeguarding [the Company's] financial strength" with a "system [of] fail-safe redundancies," Defendants perpetrated a massive accounting fraud which was made possible by seriously deficient internal controls.

### B.    The 2000 Annual Report[8]

470.    On or about March 15, 2001, Fannie Mae issued its Annual Report to its investors for the year ended December 31, 2000 (the "2000 Annual Report"). In the 2000 Annual Report, Fannie Mae portrayed itself as a conservative, stable and safe investment. For example, in his letter to shareholders that was contained in the 2000 Annual Report, Raines stated:

> In 2000, Fannie Mae enhanced our record of providing stability to the entire financial system.
>
> *        *        *
>
> . . . Fannie Mae has consistently delivered exceptional financial performance through a wide range of credit and interest-rate environments. *Indeed, our 14 years of steady earnings growth demonstrates that Fannie Mae defies the conventional wisdom that financial company earnings are always sensitive to changes in the*

---

[8]    "Although debt, equity and mortgage-related securities that Fannie Mae issues are exempt from SEC registration, [Fannie Mae] announced a voluntary initiative to register [its] common stock under Section 12(g) of the Securities Exchange Act of 1934. [Fannie Mae's] common stock registration became effective on March 31, 2003." http://www.fanniemae.com/faq/231001y.jhtml?p=FAQ. Fannie Mae did not file its financial results with the Securities and Exchange Commission until December 31, 2002, when it began to voluntarily file its results.

> economy or interest rates.  Fannie Mae's management of credit
> and interest rate risk contributes stability to the global financial
> system.  We are a systemic 'shock absorber,' which keeps low-cost
> capital circulating between investors and home buyers no matter
> what economic conditions prevail.

(emphasis added).

471.  The 2000 Annual Report contained audited financial statements for 2000, which indicated that Fannie Mae had generated earnings of $4.48 billion for the year, representing an increase of $536 million over 1999, and that it had total taxable-equivalent revenues of $7.825 billion, total assets of $675.072 billion, and total liabilities of $654.234 billion.  The 2000 Annual Report stated that Fannie Mae had posted its 14th consecutive year of record earnings, and that its EPS had increased 15% to $4.29 per share in 2000, keeping Fannie Mae on track to reach its five-year goal of doubling EPS by 2003.

472.  Defendant KPMG consented to the inclusion of its *Independent Auditors' Report* in the 2000 Annual Report, which stated that KPMG had conducted audits in accordance with GAAS and that the financial statements in the 2000 Annual Report "present fairly, in all material respects, the financial position of Fannie Mae as of December 31, 2000, and 1999, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States of America."

473.  Further, in their own letter to shareholders (which was contained in the 2000 Annual Report), Howard and Spencer stated:

> The management of Fannie Mae is responsible for the preparation,
> integrity, and fair presentation of the accompanying financial
> statements and other information appearing elsewhere in this
> report.  In our opinion, the financial statements have been prepared
> in conformity with accounting principles generally accepted in the
> United States of America appropriate in the circumstances, and the

other financial information in this report is consistent with such statements.

*    *    *

The management of Fannie Mae is also responsible for maintaining internal control over financial reporting that provides reasonable assurance that transactions are executed in accordance with appropriate authorization, permits preparation of financial statements in conformity with accounting principles generally accepted in the United States of America, and establishes accountability for the assets of the corporation.

Internal control over financial reporting includes controls for the execution, documentation, and recording of transactions, and an organizational structure that provides an effective segregation of duties and responsibilities. Fannie Mae has an internal Office of Auditing whose responsibilities include monitoring compliance with established controls and evaluating the corporation's internal controls over financial reporting. Organizationally, the internal Office of Auditing is independent of the activities it reviews.

*    *    *

Management recognizes that there are inherent limitations in the effectiveness of any internal control environment. However, management believes that, as of December 31, 2000, Fannie Mae's internal control environment, as described herein, provided reasonable assurance as to the integrity and reliability of the financial statements and related financial information.

474.    The 2000 Annual Report was reviewed and approved prior to its dissemination by Raines, Howard, Spencer, Mudd, Gorelick, Korologos, Mulcahy, Ashley, Duberstein, Gerrity, Pickett and Swygert. In addition, the document was prepared in substantial part by, and contains signatures of, Raines, Howard and Spencer. All of these Defendants knew, or recklessly disregarded, that the foregoing statements, as well as the financial statements (including notes) in the 2000 Annual Report were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

C.     **The April 17, 2001 Press Release**

475.    On April 17, 2001, the Individual Defendants caused Fannie Mae to issue a press release announcing its financial results for the first quarter of 2001 (the "April 17, 2001 Press Release").  In the April 17, 2001 Press Release, Fannie Mae reported net income of $1.238 billion and diluted EPS of $1.20 for the first quarter of 2003.  These figures were reviewed and approved by KPMG before they were released.

476.    In the April 17, 2001 Press Release, Fannie Mae announced that it had implemented SFAS 133 on January 1, 2001, stating:

> Fannie Mae adopted [SFAS] 133, Accounting for Derivative Instruments and Hedging Activities, on January 1, 2001.  [SFAS] 133 requires that Fannie Mae mark to market only its purchased options and none of its option-based debt or the mortgage investments it hedges with purchased options.  At adoption, the mark-to-market of the time value of the purchased options that the company uses as a substitute for callable debt resulted in a cumulative gain of $258.3 million, or $167.9 million after tax.  The change in the market value of Fannie Mae's purchased options during the first quarter of 2001 was a loss of $237.6 million.  This amount includes $64.1 million in option cost amortization that formerly was included in net interest income.
>
> [SFAS] 133 also requires that the company record certain derivatives, primarily interest rate swaps it uses as substitutes for non-callable debt, on the balance sheet at their fair values, with an offsetting entry recorded in a separate component of stockholders' equity called other comprehensive income.  At implementation on January 1, 2001, Fannie Mae recorded a $3.9 billion reduction in the other comprehensive income component of stockholders' equity.  This amount was a reduction of $5.7 billion, or 0.9 percent of the net mortgage balance, at March 31, 2001.  Other comprehensive income is not a component of core capital.  At March 31, 2001 Fannie Mae's core capital was $21.5 billion.

477.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading for the reasons set forth in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

478.    In addition, Defendant Howard stated in the April 17, 2001 Press Release that the "growth in Fannie Mae's business and the increase in its net interest margin in the first quarter of 2001 had given the company excellent earnings momentum."  Further, Howard stated: "With our first quarter results we now expect growth in operating EPS for 2001 to be above the 14.9 percent growth rate required to double our EPS in the five years ending 2003."   Defendants knew, or recklessly disregarded, that this statement was materially false and misleading because, as set forth above, the Company's purported growth in EPS was not based on the strength of Fannie Mae's first quarter results but, rather, on the fraudulent accounting scheme described herein.

**D.    The 2001 Proxy**

479.    On or about April 19, 2001, Fannie Mae mailed its proxy statement dated April 2, 2001 and accompanying form of proxy (the "2001 Proxy") to its shareholders.  In the 2001 Proxy, Fannie Mae recommended, among other things, that its shareholders ratify the retention of KPMG as the Company's "independent" auditor.

480.    Fannie Mae again portrayed itself as a solid performer and "superior" investment, stating:

> The corporation met the[] stringent corporate performance measures [needed to be achieved for executives to receive bonuses] in 2000.  During the year, management continued to demonstrate an exceptional ability to turn steady business growth into consistently high growth in earnings per share.  *Fannie Mae achieved its fourteenth consecutive year of record earnings and established new records of financial performance by once again achieving the double-digit operating earnings per share growth that the corporation has posted over a decade, a record only four other companies in the S&P 500 have the possibility of matching. Over these fourteen years, Fannie Mae has been able to grow its earnings consistently in a wide range of interest rate and credit environments.*

*            *            *

169

> *Fannie Mae has continued to be a superior investment opportunity*, with 2000 yet another extraordinary year following a decade of consistent double-digit growth in operating EPS.

2001 Proxy at 10-11 (emphasis added).

481.    In addition, Fannie Mae again described itself as financially sound, noting: "Under Mr. Raines' guidance, Fannie Mae set a new global standard for financial institution safety and soundness protections."  2001 Proxy at 11.

482.    The 2001 Proxy was reviewed and approved by, and issued in the name of, Fannie Mae's Board which, at the time, included Raines, Ashley, Duberstein, Gerrity, Gorelick, Korologos, Mudd, Mulcahy, Pickett and Swygert.  All of these Defendants knew, or recklessly disregarded, that the foregoing statements in the 2001 Proxy were materially false and misleading because Fannie Mae's purported "new records of financial performance" and "double-digit operating earnings per share growth" were only achieved as a result of accounting fraud and misapplication of GAAP, as alleged herein.

### E.    The July 17, 2001 Press Release

483.    On July 17, 2001, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the second quarter of 2001 (the "July 17, 2001 Press Release"). In the July 17, 2001 Press Release, Fannie Mae reported net income of $1.314 billion and EPS of $1.27 for the second quarter of 2003.  These figures were reviewed and approved by KPMG before they were released.

484.    Commenting on Fannie Mae's performance, Defendant Raines stated: "With very strong business and revenue growth and well contained credit losses, Fannie Mae is extremely well-positioned to continue to play a critical role in providing mortgage credit to the economy, *while extending our enviable record of superior financial performance*."  (emphasis added).

485.    Fannie Mae again stated that it had adopted SFAS 133 on January 1, 2001, noting:

> Fannie Mae adopted Financial Accounting Standard No. 133 (SFAS 133), *Accounting for Derivative Instruments and Hedging Activities,* on January 1, 2001.  SFAS 133 requires that Fannie Mae mark to market only its purchased options and none of its option-based debt or the mortgage investments it hedges with purchased options.  At adoption, the mark-to-market of the time value of the purchased options that the company uses as a substitute for callable debt resulted in a cumulative gain of $258.3 million, or $167.9 million after tax.  The change in the market value of Fannie Mae's purchased options during the second quarter of 2001 was a net gain of $35.4 million. This amount includes $100.1 million in option cost amortization that formerly was included in net interest income.
>
> SFAS 133 also requires that the company record certain derivatives, primarily interest rate swaps it uses as substitutes for non-callable debt, on the balance sheet at their fair values, with an offsetting entry recorded in a separate component of stockholders' equity called other comprehensive income, or OCI.  At June 30, 2001, the OCI component of stockholders' equity included a $3.7 billion reduction, or 0.6 percent of the net mortgage balance.  The comparable reduction to OCI was $5.7 billion at March 31, 2001.  Other comprehensive income is not a component of core capital.

486.    Defendants knew, or recklessly disregarded, that the foregoing statements were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

**F.    The October 15, 2001 Press Release**

487.    On October 15, 2001, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the third quarter of 2001 (the "October 15, 2001 Press Release").  In the October 15, 2001 Press Release, Fannie Mae reported net income of $1.377 billion and EPS of $1.33 for the third quarter of 2001.  These figures were reviewed and approved by KPMG before they were released.

488.    Fannie Mae again announced that it had implemented SFAS 133 on January 1, 2001, stating:

Financial Accounting Standard No. 133 (SFAS 133), *Accounting for Derivative Instruments and Hedging Activities* requires that Fannie Mae mark to market only its purchased options and none of its option-based debt or the mortgage investments it hedges with purchased options.  The change in the market value of Fannie Mae's purchased options during the third quarter of 2001 was a net loss of $413.1 million.  This amount includes $186.9 million in option cost amortization that formerly was included in net interest income and is currently included in adjusted net interest income.

SFAS 133 also requires that the company record certain derivatives, primarily interest rate swaps it uses as substitutes for non-callable debt, on the balance sheet at their fair values, with an offsetting entry recorded in a separate component of stockholders' equity called other comprehensive income, or OCI.  At September 30, 2001, the OCI component of stockholders' equity included a $10.6 billion reduction, or 1.5 percent of the net mortgage balance. The comparable reduction to OCI was $3.7 billion at June 30, 2001 and $5.7 billion at March 31, 2001.  Other comprehensive income is not a component of core capital.

489.    Defendants knew, or recklessly disregarded, that the foregoing statements were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

G.    **The January 14, 2002 Press Release**

490.    On January 14, 2002, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the fiscal year ended December 31, 2001 and for the fourth quarter of 2001 (the "January 14, 2002 Press Release").  In the January 14, 2002 Press Release, Fannie Mae reported net income of $5.367 billion and EPS of $5.20 for 2001.  Further, Fannie Mae reported net income of $1.438 billion and EPS of $1.40 for the fourth quarter of 2001.  These figures, which were reviewed and approved by KPMG before they were released, were materially false and misleading as a result of the Company's non-compliance with GAAP, as more fully set forth below with respect to the publication of the Company's financial statements for these periods in its 2001 Annual Report.

491.    Defendant Raines praised the Company's performance, stating that 2001 "was an extraordinary year for Fannie Mae in every respect."  Further, Raines stated that "the company's exceptional financial performance was likely to continue in 2002" and that "Fannie Mae's performance in 2001 and prospects for 2002 ma[d]e it very likely that the company would achieve the goal it set in May 1999 of doubling earnings per share between 1998 and 2003." Raines noted: "At the time we set this goal . . . few expected us to attain it.  Not only are we very likely to, we will do so without increasing our risk profile, and with unwavering focus on our housing mission."   These statements were materially false and misleading because the Company's "exceptional financial performance" in 2001 was merely an illusion created by the Defendants' accounting fraud, and Raines had no reasonable basis for his statement that the Company's performance in 2001 made it likely that the Company's EPS would double between 1998 and 2003.

492.    With respect to SFAS 133, the January 14, 2002 Press Release stated:

> During 2001 Fannie Mae adopted Financial Accounting Standard No. 133 (SFAS 133), *Accounting for Derivative Instruments and Hedging Activities*. SFAS 133 resulted in changes to accounting presentations on both the company's income statement and balance sheet.
>
> SFAS 133 requires that Fannie Mae mark to market on its income statement the changes in the time value of its purchased options... The change in the time value of Fannie Mae's purchased options during 2001 was a net loss of $37.4 million. This amount includes $590.1 million in option cost amortization expense that formerly was included in net interest income and is currently included in adjusted net interest income. The company recorded a cumulative gain of $258.3 million, or $167.9 million after tax upon adoption of SFAS 133 on January 1, 2001.
>
> At December 31, 2001 the notional balance of Fannie Mae's purchased options - consisting of pay-fixed interest rate swaptions, receive-fixed interest rate swaptions, and interest rate caps - totaled $219.9 billion. At December 31, 2000 the notional balance of Fannie Mae's purchased options was $82.5 billion.

SFAS 133 also requires that the company record any change in the fair values of certain derivatives, primarily interest rate swaps it uses as substitutes for non-callable debt, on the balance sheet in a separate component of stockholders' equity called other comprehensive income, or OCI. SFAS 133 does not require non-callable debt to be marked to market. At December 31, 2001, the OCI component of stockholders' equity included a $7.4 billion reduction, or 1.0 percent of the net mortgage balance, from the marking to market of derivatives. The comparable reductions to OCI were $10.6 billion at September 30, 2001 and $3.7 billion at June 30, 2001. Other comprehensive income is not a component of core capital.

At December 31, 2001 Fannie Mae had $281.8 billion in interest rate swaps that were marked to market through other comprehensive income. The company had $202.5 billion in comparable derivatives.

493.    Defendants knew, or recklessly disregarded, that these statements regarding the Company's derivatives were materially false and misleading because, as set forth more fully above:

a.    Defendants applied accounting methods and practices that did not comply with SFAS 133 to the Company's derivative transactions and hedging activities;

b.    The Company did not properly document its hedging activity as required by SFAS 133; and

c.    The Company's balance sheet accounts for derivatives in gain positions, total assets, senior debt, derivatives in loss positions, total liabilities, accumulated other comprehensive income, and total stockholders' equity; the Company's income statement line items for interest income (mortgage portfolio), interest expense, purchased options expenses, net income and earnings per share (basic and diluted); and the line items on the Company's statement of cash flows for net income, purchased options expense within net cash provided by operating activities and net payments to purchase or settle hedge instruments within net cash provided by financing activities, were misstated as a result of Defendants' misapplication of hedge accounting under SFAS 133.

**H.    The February 11, 2002 Credit Suisse First Boston Financial Services Conference**

494.    On February 11, 2002, Howard spoke at the Credit Suisse First Boston Financial Services Conference in Dana Point, California on the topic of "the investment case for Fannie Mae." This conference was attended by numerous institutional investors and securities analysts who published research reports on Fannie Mae. Howard's remarks were also published on Fannie Mae's website.

495.    Howard touted Fannie Mae's track record of consistent performance, its ability to continue to grow EPS in the face of interest rate volatility, and its corporate disclosure practices. Specifically, Howard stated:

> First, we have a superior record of earnings performance.
>
> In a world of promises, performance matters. We are coming off an outstanding year in 2001 - during which we posted growth in operating earnings per share of 21 percent, well above the expectation for our growth at the beginning of the year. We also have an enviable long-term track record. We are one of only three companies in the Standard and Poor's 500 to achieve double-digit growth in operating EPS for each of the past 15 years.
>
> Second, we have excellent prospects for long-term growth.
>
> *        *        *
>
> Third, we have just two primary business risks, which we manage uniquely well.
>
> Our two main risks are interest rate and credit risk. We have unmatched tools and a highly disciplined set of processes for managing these risks. As a consequence, our earnings are little affected by movements in interest rates or changes in the economic environment.
>
> Fourth, we are closely aligned with the country's policy priorities.
>
> . . .  [W]ith the collapse of Enron putting financial statement transparency and disclosure under sharper focus, Fannie Mae is a model for corporate disclosure practices.

175

Finally, Fannie Mae shares offer compelling value . . .

496.    Howard knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth more fully above, Fannie Mae's 2001 financial results were artificially inflated by the fraudulent accounting scheme described herein.  Additionally, the reason Fannie Mae's reported earnings were "little affected by movements in interest rates or changes in the economic environment" was not that the Company had "unmatched tools and a highly disciplined set of processes for managing these risks," but rather that the Company was using improper income-smoothing techniques and engaging in other accounting practices that violated GAAP.  Further, far from being a "model for corporate disclosure practices," Fannie Mae frequently made materially false and misleading statements in its corporate disclosures as set forth herein.

## I.    The 2001 Annual Report

497.    On or about March 19, 2002, Fannie Mae issued its Annual Report to its investors for the year ended December 31, 2001 (the "2001 Annual Report").  The 2001 Annual Report contained audited financial statements for 2001, which reported operating earnings of $5.367 billion and operating EPS of $5.20 for the year.  Fannie Mae attributed its increase in earnings to its "strong portfolio and net interest margin growth."  *Id.*  In addition, Fannie Mae reported total taxable-equivalent revenues of $10.187 billion, total assets of $799.791 billion and total liabilities of $781.673 billion.

498.    In addition to trumpeting its purportedly "exceptional operational and financial results" it posted in 2001 (2001 Annual Report at 22), Fannie Mae again touted itself as a model of corporate governance.  In his letter to shareholders, Raines stated:

> [I]n 2001, Fannie Mae set an important new standard for corporate best practices by implementing the strongest transparency and disclosure practices of any large financial institution in the country.

> At a time when the market, shareholders, policy makers, and the public are seeking ─ and deserve ─ additional assurance and confidence in their public companies, *Fannie Mae is a model for openness, transparency, regulatory oversight, capital protections, and market discipline.*

(emphasis added).

499.    Defendant KPMG consented to the inclusion of its *Independent Auditors' Report* in the 2001 Annual Report, which stated that KPMG had conducted its audits in accordance with GAAS and that the financial statements in the 2001 Annual Report "present fairly, in all material respects, the financial position of Fannie Mae as of December 31, 2001, and 2000, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States of America."

500.    In their letter to shareholders as part of the 2001 Annual Report, Howard and Spencer stated:

> The management of Fannie Mae is responsible for the preparation, integrity, and fair presentation of the accompanying financial statements and other information appearing elsewhere in this report.  In our opinion, the financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America appropriate in the circumstances, and the other financial information in this report is consistent with such statements.
>
> *            *            *
>
> The management of Fannie Mae is also responsible for maintaining internal control over financial reporting that provides reasonable assurance that transactions are executed in accordance with appropriate authorization, permits preparation of financial statements in conformity with accounting principles generally accepted in the United States of America, and establishes accountability for the assets of the corporation.
>
> Internal control over financial reporting includes controls for the execution, documentation, and recording of transactions, and an

organizational structure that provides an effective segregation of duties and responsibilities.  Fannie Mae has an internal Office of Auditing whose responsibilities include monitoring compliance with established controls and evaluating the corporation's internal controls over financial reporting.  Organizationally, the internal Office of Auditing is independent of the activities it reviews.

\*      \*      \*

Management recognizes that there are inherent limitations in the effectiveness of any internal control environment.  However, management believes that, as of December 31, 2001, Fannie Mae's internal control environment, as described herein, provided reasonable assurance as to the integrity and reliability of the financial statements and related financial information.

2001 Annual Report at 73.

501.    The 2001 Annual Report was reviewed and approved prior to its dissemination by Raines, Howard, Spencer, Mudd, Gorelick, Ashley, Duberstein, Gerrity, Harvey, Justiz, Korologos, Marron, Mulcahy, Pickett, Segue, and Swygert.  In addition, the document was prepared in substantial part by, and contains signatures of, Raines, Howard, and Spencer.  All of these Defendants knew, or recklessly disregarded, that the foregoing statements, as well as the financial statements (including notes) in the 2001 Annual Report were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

**J.      The April 15, 2002 Press Release**

502.    On April 15, 2002, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the first quarter of 2002 (the "April 15, 2002 Press Release").  In the April 15, 2002 Press Release, Fannie Mae reported net income of $1.519 billion and EPS of $1.48 for the first quarter of 2002.  These figures were reviewed and approved by KPMG before they were released.

503.    Defendant Raines again praised the Company's performance, stating: "Continued strong growth in top-line revenues enabled Fannie Mae to report its 57th consecutive quarterly increase in operating earnings per share during the first quarter of 2002.  This is a performance record few other companies can match."

504.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

505.    In addition, Fannie Mae made the following disclosures concerning its use of derivatives and SFAS 133:

> Fannie Mae's primary use of derivative instruments is as a substitute for noncallable and callable debt issued in the cash markets.  Fannie Mae uses derivatives to help match the cash flow characteristics of its debt with those of its mortgages to reduce the interest rate risk in its portfolio.
>
> Fannie Mae accounts for its derivatives under Financial Accounting Standard No. 133 ([SFAS] 133), Accounting for Derivative Instruments and Hedging Activities.  The company implemented this standard, which resulted in changes to accounting presentations on both the company's income statement and balance sheet, on January 1, 2001.
>
> [SFAS] 133 requires that Fannie Mae mark to market on its income statement the changes in the time value of its purchased options -- interest rate swaptions and interest rate caps -- although it does not permit the company to mark to market its options embedded in debt or mortgage investments.  The mark to market of Fannie Mae's purchased options during the first quarter of 2002 resulted in a net loss of $787.2 million compared with a net gain of $577.9 million in the fourth quarter of 2001.  The large change in the time value of Fannie Mae's purchased options between the fourth quarter of 2001 and the first quarter of 2002 was primarily the result of a significant change in interest rate volatility, which affected the time value of all options.  Purchased options expense in the first quarter of 2002 includes $310.2 million in amortization of the cost to purchase these options, which was included in net interest income prior to the adoption of [SFAS] 133 and currently

is included in adjusted net interest income and in operating earnings.

At March 31, 2002 the notional balance of Fannie Mae's purchased options totaled $238 billion.  At December 31, 2001 the notional balance of Fannie Mae's purchased options was $220 billion.

[SFAS] 133 also requires that the company record any change in the fair values of certain derivatives, primarily interest rate swaps it uses as substitutes for noncallable debt, on the balance sheet in a separate component of stockholders' equity called accumulated other comprehensive income, or AOCI.  For these types of transactions, [SFAS] 133 does not require or permit noncallable debt to be marked to market.  At March 31, 2002, the AOCI component of stockholders' equity included a $4.8 billion reduction, or 0.7 percent of the net mortgage balance, from the marking to market of these derivatives, down from $7.4 billion at December 31, 2001. Accumulated other comprehensive income is not a component of core capital.

At March 31, 2002 Fannie Mae had $290 billion in interest rate swaps that were marked to market through accumulated other comprehensive income.   The company had $282 billion in comparable derivatives at December 31, 2001.

506.    Defendants knew, or recklessly disregarded, that these statements regarding derivatives were materially false and misleading because, as set forth more fully above, Fannie Mae did not properly apply hedge accounting in accordance with SFAS 133.

**K.**    **The June 5, 2002 Sanford Bernstein Strategic Decisions Conference**

507.    On June 5, 2002, Raines spoke at the Sanford Bernstein Strategic Decisions Conference in New York City.   This Conference was attended by numerous institutional investors and securities analysts who published research reports on Fannie Mae.   Raines' remarks were published on Fannie Mae's website.

508.    At this Conference, Raines described Fannie Mae as a company that could be counted on "to do the right thing," stating:

Today I want to talk to you about four topics that often come up when we meet with investors—performance, growth, risk, and the

policy issues in Washington. As you will see, our approach to these matters has a common thread that draws them together. *They all demonstrate that you can count on Fannie Mae to do the right thing.*

Reliability is always important. But in times like these when there is so much uncertainty and even disappointment in the market, having an investment you can count on becomes especially valuable. So let me touch on four areas that illustrate our reliability, starting with performance.

\*     \*     \*

What I mean by performance is that we set big goals, and then we meet them.

Some companies have had grand ambitions and failed. Some have achieved their goals with smoke and mirrors. Some have even gone back and adjusted their promises to match their performance.

\*     \*     \*

Let's talk about interest rates. The fact is that interest rates have gone up and rates have gone down and we've still produced record earnings. Again, that's our disciplined credit risk management at work.

\*     \*     \*

[O]ur disclosures now meet or exceed SEC requirements in all material respects, and without disrupting the housing finance system. And we're working with our regulator and others to make sure that our disclosures are the best in class.

\*     \*     \*

*We operate with obsessive safety.*

(emphasis added).

509. Raines knew, or recklessly disregarded, that these statements were materially false and misleading because Defendants, far from following through on Fannie Mae's purported commitment to "do the right thing" and "operate with obsessive safety," perpetrated the fraudulent accounting scheme described herein. To the extent Fannie Mae met its performance

goals, it did so only through the type of "smoke and mirrors" that Raines attributed only to other companies.  Further, Fannie Mae's reporting of record earnings despite interest rate fluctuations was not the result of "disciplined credit risk management," but rather of the use of improper income-smoothing techniques and other accounting practices that violated GAAP.

> ### L.    The July 15, 2002 Press Release

510.    On July 15, 2002, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the second quarter of 2002 (the "July 15, 2002 Press Release"). In the July 15, 2002 Press Release, Fannie Mae reported net income of $1.573 billion and EPS of $1.55 for the second quarter of 2002.  These figures were reviewed and approved by KPMG before they were released.

511.    Raines again praised Fannie Mae's consistent performance, stating: "Strong business volumes, a rising net interest margin, and a continued low level of credit losses enabled Fannie Mae to report its 58th consecutive quarterly increase in operating earnings per share during the second quarter of 2002."  Further, Raines stated: "Th[e] initial application of the OFHEO risk-based standard confirms that Fannie Mae is managing its business risks with exceptional discipline and prudence."

512.    Fannie Mae made the following statements concerning its use of derivatives and its application of SFAS 133:

> Fannie Mae primarily uses derivative instruments as substitutes for noncallable and callable debt issued in the cash markets to help match the cash flow characteristics of its debt with those of its mortgages and reduce the interest rate risk in its portfolio.  Fannie Mae accounts for its derivatives under Financial Accounting Standard No. 133 ([S]FAS 133), *Accounting for Derivative Instruments and Hedging Activities*, which was adopted on January 1, 2001....
>
> [S]FAS 133 requires that Fannie Mae mark to market on its income statement the changes in the time value of its purchased

options -- interest rate swaptions and interest rate caps -- although it does not permit the company to mark to market its options embedded in debt or mortgage investments. The mark to market of Fannie Mae's purchased options during the second quarter of 2002 resulted in a net unrealized loss of $498.2 million. Purchased options expense in the second quarter of 2002 includes $330.4 million in amortization of the cost to purchase these options, which was included in net interest income prior to the adoption of [SFAS] 133 and currently is included in adjusted net interest income and in operating earnings.

[S]FAS 133 also requires that the company record any change in the fair values of certain derivatives, primarily interest rate swaps it uses as substitutes for noncallable debt, on the balance sheet in accumulated other comprehensive income (AOCI), which is a separate component of stockholders' equity. For these types of transactions, [SFAS] 133 does not require or permit noncallable debt to be marked to market. At June 30, 2002, the AOCI component of stockholders' equity included a reduction of $9.5 billion, or 1.3 percent of the net mortgage balance, from the marking to market of these derivatives, up from a reduction of $4.8 billion at March 31, 2002. Accumulated other comprehensive income is not a component of core capital.

At June 30, 2002, the notional balance of Fannie Mae purchased options totaled $251 billion compared with $238 billion at March 31, 2002. Fannie Mae also had $305 billion in interest rate swaps that were marked to market through accumulated other comprehensive income at June 30, 2002. The company had $290 billion in comparable swaps at March 31, 2002.

513.    Defendants knew, or recklessly disregarded, that the foregoing statements were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

**M.    The July 15, 2002 Conference Call**

514.    On July 15, 2002, Raines and Howard presided over a conference call to discuss Fannie Mae's earnings for the second quarter of 2002 (the "July 15, 2002 Conference Call"). Conference call participants included numerous sell-side securities analysts, including representatives of Raymond James & Associates, Prudential Securities, Salomon Smith Barney,

Banc of America Securities, Lehman Brothers, Goldman Sachs, Bear Stearns, UBS, T. Rowe Price, and Wachovia.

515.    Howard praised Fannie Mae's corporate disclosures, asserting that "our corporate disclosures are among the most thorough, clear and frequent of any company in America." Howard knew, or recklessly disregarded, that this statement was materially false and misleading because, as set forth at length above, Fannie Mae's disclosures in its 2000 Annual Report, 2001 Annual Report, 2001 Proxy, April 17, 2001 Press Release, July 17, 2001 Press Release, October 15, 2001 Press Release, January 14, 2002 Press Release, April 15, 2002 Press Release, and July 15, 2002 Press Release were materially false and misleading.

516.    Raines also discussed Fannie Mae's compensation structure, noting, "[W]e use a mix of cash and stock and options, and try to have a balance so that *we don't have people focused on simply moving one number in order to enhance their compensation*." (emphasis added).  Raines knew, or recklessly disregarded, that this statement was materially false and misleading because he and the other Officer Defendants had strong incentives to (and did) manipulate the Company's recording of expenses to achieve a target level of EPS that would ensure they received the maximum possible bonuses.

### N.    The October 15, 2002 Press Release

517.    On October 15, 2002, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the third quarter of 2002 (the "October 15, 2002 Press Release").  In the October 15, 2002 Press Release, Fannie Mae reported net income of $1.631 billion and EPS of $1.62 for the third quarter of 2002.  These figures were reviewed and approved by KPMG before they were released.

518.    Fannie Mae made the following statements concerning its use of derivatives and its compliance with SFAS 133:

Fannie Mae primarily uses derivative instruments as substitutes for noncallable and callable debt issued in the cash markets to help match the cash flow characteristics of its debt with those of its mortgages and reduce the interest rate risk in its portfolio. Fannie Mae accounts for its derivatives under [SFAS] 133, Accounting for Derivative Instruments and Hedging Activities, which was adopted on January 1, 2001. The implementation of this standard resulted in significant accounting presentation changes to both the company's income statement and balance sheet.

[SFAS] 133 requires that Fannie Mae mark to market on its income statement the changes in the time value, but not the total value, of its purchased options -- interest rate swaptions and interest rate caps. The mark to market of the time value of Fannie Mae's purchased options during the third quarter of 2002 resulted in a net unrealized loss of $1.378 billion, which is reported on the purchased option expense line of the income statement. Purchased options expense in the third quarter of 2002 includes $399.2 million in amortization expense, which was included in net interest income prior to the adoption of [SFAS] 133 and currently is included in adjusted net interest income and in operating earnings. This amortization expense represents the straight-line amortization of the up-front premium paid to purchase the options.

The unrealized loss in the time value component of purchased options in the third quarter was driven by the significant change in interest rates during that quarter, partially offset by an increase in interest rate volatility. This unrealized loss in time value was more than offset by an increase in the intrinsic value of the purchased options, which is not reflected on the income statement. Because Fannie Mae holds options to maturity or exercise, the mark-to-market losses in time value will never be realized. The total purchased option expense recorded over the life of the options will be equal to the amortization expense.

[SFAS] 133 also requires that the company record any change in the fair values of certain derivatives, primarily interest rate swaps it uses as substitutes for noncallable debt, on the balance sheet in accumulated other comprehensive income (AOCI), which is a separate component of stockholders' equity. For these types of transactions, [SFAS] 133 does not require or permit noncallable debt to be marked to market. At September 30, 2002, the AOCI component of stockholders' equity included a reduction of $16.5 billion, or 2.2 percent of the net mortgage balance, from the marking to market of these derivatives, compared with a reduction of $9.5 billion at June 30, 2002. Partially offsetting the reduction in AOCI from the mark to market of derivatives was a $5.0 billion

unrealized gain on the available-for-sale securities portfolio. Accumulated other comprehensive income is not a component of core capital.

519.    Defendants knew, or recklessly disregarded, that the foregoing statements were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

520.    In addition, Defendant Raines stated in the October 15, 2002 Press Release that "[v]ery strong volumes and stable-to-increasing business margins enabled Fannie Mae to produce another record quarter of operating earnings per share."  Defendant Raines knew, or recklessly disregarded, that this statement was materially false and misleading because Fannie Mae's "record quarter of operating earnings per share" was not due to "[v]ery strong volumes and stable-to-increasing business margins" but, rather, to the fraudulent accounting scheme described herein.

### O.    The January 15, 2003 Press Release

521.    On January 15, 2003 the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the fourth quarter of 2002 and the fiscal year ended December 31, 2002 (the "January 15, 2003 Press Release").  In the January 15, 2003 Press Release, Fannie Mae reported net income of $4.619 billion and EPS of $4.53 for 2002.  In addition, Fannie Mae reported net income of $952 million and EPS of $0.94 for the fourth quarter of 2002.  These figures, which were reviewed and approved by KPMG before they were released, were materially false and misleading for the reasons set forth below with respect to Fannie Mae's publication of its financial statements for these periods in its 2002 Annual Report.

522.    Fannie Mae made the following statements concerning its use of derivatives and its purported compliance with SFAS 133:

Fannie Mae primarily uses derivative instruments as substitutes for noncallable and callable debt issued in the cash markets to help match the cash flow characteristics of its debt with those of its mortgages and reduce the interest rate risk in its portfolio. Fannie Mae accounts for its derivatives under [SFAS] 133, which was adopted on January 1, 2001. The implementation of this standard resulted in significant accounting presentation changes to both the company's income statement and balance sheet.

[SFAS] 133 requires that Fannie Mae mark to market on its income statement the changes in the time value, but not the total value, of its purchased options -- interest rate swaptions and interest rate caps. The mark-to-market of the time value of Fannie Mae's purchased options during 2002 resulted in a net mark-to-market loss of $4.545 billion, which is reported on the purchased option expense line of the income statement. Purchased option expense in 2002 includes $1.814 billion in amortization expense, which was included in net interest income prior to the adoption of [SFAS] 133 and currently is included in adjusted net interest income and in operating net income. This amortization expense represents the straight-line amortization of the up-front premium paid to purchase the options over the expected life of the options.

[SFAS] 133 also requires that the company record any change in the fair values of certain derivatives, primarily interest rate swaps it uses as substitutes for noncallable debt, on the balance sheet in accumulated other comprehensive income (AOCI), which is a separate component of stockholders' equity. For these types of transactions [SFAS] 133 does not require or permit noncallable debt to be marked to market. At December 31, 2002, the AOCI component of stockholders' equity included a reduction of $16.3 billion, or 2.0 percent of the net mortgage balance, from the marking to market of these derivatives. The comparable reductions to AOCI were $16.5 billion at September 30, 2002 and $9.5 billion at June 30, 2002. Partially offsetting the reduction in AOCI from the mark to market of derivatives was a $4.5 billion mark-to-market gain on the available-for-sale securities portfolio. Accumulated other comprehensive income is not a component of core capital.

523. Defendants knew, or recklessly disregarded, that these statements regarding derivatives were materially false and misleading because, as set forth more fully above, Defendants had applied accounting methods and practices that did not comply with SFAS 133 to the Company's derivative transactions and hedging activities.

524.    Further, Raines again praised the Company's results, stating: "In an extremely difficult business environment that affected virtually every company in America, Fannie Mae's operating results in 2002 were among the best in the company's history."  Further, Raines stated that "Fannie Mae's disciplined risk management in the fast-growing market of residential mortgage finance has enabled us to achieve a record of growth and consistency of earnings over the past decade and a half that is without equal in financial services."  Defendant Raines knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth above, Fannie Mae achieved the "record of growth" that was purportedly "without equal" not as a result of its "disciplined risk management" but, rather, as a result of the fraudulent accounting scheme described herein.

### P.    The January 15, 2003 Conference Call

525.    On January 15, 2003, Defendants Howard and Spencer presided over a conference call to discuss Fannie Mae's earnings for the fourth quarter of 2002 (the "January 15, 2003 Conference Call").   Conference call participants included numerous sell-side securities analysts, including representatives of JP Morgan, Sanford Bernstein, Bear Stearns, Lehman Brothers, Raymond James & Associates, UBS, Wachovia, Neuberger Berman, Goldman Sachs and Sandler O'Neil.

526.    During the call, Howard praised Fannie Mae's performance, stating:

> We came into 2002 with high expectations for ourselves.  After all the challenges and uncertainties presented in the economy, the financial markets, and corporate America, we ended the year not only meeting those expectations, but exceeding them.
>
> *        *        *
>
> The last two years saw exceptional growth in operating EPS of over 21% each year.

527.    Further, Howard touted Fannie Mae's risk management practices, attributing Fannie Mae's consistent growth in EPS to its fastidious adherence to sound risk management standards:

> We have, for the past dozen years or so, followed risk management strategies consistent with the attainment of our objective of low risk growth.  Low risk growth is exactly what it sounds like, growth but only if it can be obtained consistent with well defined, conservatively set risk parameters.  Those risk parameters come first, but the internally-set guidelines are our statutory risk-based capital standard.  We take our risk guidelines very seriously, and our financial results show it.  We have a decade and a half record of earnings growth and consistency that would not have been possible without strict adherence to very conservative risk standards.
>
> *        *        *
>
> Given the rigor of our risk based capital standard, our objective from the time it was first described in statute has been to asset liability structure and an approach to underwriting and reinsuring credit risk that would enable us to pass the risk base[d] capital test with a comfortable cushion. . . .  Because of the rigor of the standard, we believe that investors, policy makers and others can be assured that we're operating at an exceptionally high level of safety as long as our risk base[d] capital is less than core capital.  We think we have struck the right balance between disciplined risk management and the potential for long-term earnings growth.

528.    Howard knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth at length above, Fannie Mae's "decade and a half record of earnings growth and consistency" was not due to its "strict adherence to very conservative risk standards," but, rather, to the fraudulent accounting scheme described herein. Moreover, Fannie Mae had not "struck the right balance between disciplined risk management and the potential for long-term earnings growth," but, rather, was a ticking time bomb destined to explode under the weight of its fraudulent accounting scheme.

Q.    **The 2002 Annual Report**

529.    On or about March 19, 2003, Fannie Mae issued its Annual Report to its investors for the year ended December 31, 2002 (the "2002 Annual Report"). The 2002 Annual Report contained audited financial statements for 2002, which reflected net income of $4.619 billion; diluted EPS of $4.53; total taxable-equivalent revenues of $11.896 billion; total assets of $887.515 billion; and total liabilities of $871.227 billion.

530.    Fannie Mae again touted its stability and its purportedly conservative business model:

> Fannie Mae produced this record year in spite of a weak economy and volatile markets for a very simple reason: Our business is structured and managed to maintain disciplined growth and to keep expanding homeownership in America throughout all economic conditions, both good and challenging.
>
> *        *        *
>
> Fannie Mae's growth . . . is "disciplined," meaning that we put a premium on stable financial performance and consistent return to investors under all economic conditions. The result has been extraordinarily low volatility and high stability in core business earnings growth for 16 years in a row. The fact that 2002 was an exceptional year for Fannie Mae in spite of the slow economy and unusually volatile interest rates is a testament to our disciplined growth model.

531.    Defendant KPMG consented to the inclusion of its *Independent Auditors' Report*, which stated that KPMG had conducted its audits in accordance with GAAS and that the financial statements in the 2002 Annual Report "present fairly, in all material respects, the financial position of Fannie Mae as of December 31, 2002, and 2001, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States of America."

532.    In his letter to shareholders which was contained in the 2002 Annual Report,

Raines stressed the importance of corporate accountability, stating:

> As Chairman and CEO, I am personally responsible for ensuring
> that Fannie Mae operates in an effective, ethical manner that
> produces long-term value for shareholders. . . .  Also, it is my duty
> to ensure that I know how Fannie Mae earns income and the risks
> we are undertaking in the course of business.  Indeed, before it was
> required of us, Fannie Mae announced that our CEO and Chief
> Financial Officer would sign and certify as to the honesty and
> accuracy of our financial statements, and we have a rigorous
> review process to ensure that.
>
> As a CEO, one of the most offensive things about the corporate
> scandals that emerged recently was to hear the CEOs claim that
> they did not know, they could not know, and they could not be
> expected to know about the activities that brought down their
> companies.

533.    Further, in their letter to shareholders, as in past years, Howard and Spencer

stated:

> The management of Fannie Mae is responsible for the preparation,
> integrity, and fair presentation of the accompanying financial
> statements and other information appearing elsewhere in this
> report.  In our opinion, the financial statements have been prepared
> in conformity with accounting principles generally accepted in the
> United States of America appropriate in the circumstances, and the
> other financial information in this report is consistent with such
> statements.
>
> *        *        *
>
> The management of Fannie Mae is also responsible for
> maintaining internal control over financial reporting that provides
> reasonable assurance that transactions are executed in accordance
> with appropriate authorization, permits preparation of financial
> statements in conformity with accounting principles generally
> accepted in the United States of America, and establishes
> accountability for the assets of the corporation.
>
> Internal control over financial reporting includes controls for the
> execution, documentation, and recording of transactions, and an
> organizational structure that provides an effective segregation of
> duties and responsibilities.  Fannie Mae has an internal Office of

Auditing whose responsibilities include monitoring compliance with established controls and evaluating the corporation's internal controls over financial reporting. Organizationally, the internal Office of Auditing is independent of the activities it reviews.

\*　　　\*　　　\*

Management recognizes that there are inherent limitations in the effectiveness of any internal control environment. However, management believes that, as of December 31, 2002, Fannie Mae's internal control environment, as described herein, provided reasonable assurance as to the integrity and reliability of the financial statements and related financial information.

534.    The 2002 Annual Report contained the following statements concerning the Company's buyback program:

**Debt Extinguishments**

Fannie Mae strategically repurchases or calls debt securities and related interest rate swaps on a regular basis as part of our interest rate risk management efforts and to reduce future debt costs. We record gains and losses on debt extinguishments in this category.

. . . *Market conditions during 2002 and 2001 made it advantageous for us to repurchase $8 billion and $9 billion, respectively, of debt securities that were trading at historically wide spreads to other fixed-income securities* . . .

(emphasis added).

535.    These statements were materially false and misleading because they failed to disclose that Fannie Mae set the parameters for its "debt extinguishments" based on current quarter earnings forecasts, not on whether market conditions made such repurchases "advantageous" to the Company. In fact, the Company had not performed any contemporaneous analysis of the economic advantages of entering into buyback transactions. Further, Defendants failed to disclose that the buyback transactions were executed strategically within those parameters to achieve specific, to-the-penny EPS figures, enabling the Officer Defendants to earn lucrative bonuses.

536.    Further, Raines stated the following regarding the Company's portfolio:

> Even though we took actions to rebalance our portfolio [in response to the fall of interest rates to a 40 year low], the actions were routine . . .  and had no material impact on our business or core business earnings.  In fact, our core business earnings per share increased 21 percent during 2002.

537.    These statements were materially false and misleading because they failed to disclose that the change in the duration gap on the Company's portfolio occurred because Fannie Mae had not fully hedged its exposure to mortgage prepayments (*i.e.*, senior management had taken significant interest rate risk).  Further, contrary to Raines' assertions, the decline in interest rates had a multi-billion dollar impact—the market value of the Company's assets had risen much less than the market value of its liabilities, so that its net asset value had declined.

538.    Further, Fannie Mae made the following cryptic and incomplete disclosure regarding the income-shifting REMICs in its 2002 Annual Report: "In some cases, we create REMICs using assets from our mortgage portfolio and retain an interest in the REMICs."  This statement was materially false and misleading because the Fannie Mae Defendants knew, but failed to disclose, the existence of the income-shifting REMICs and their expected effects on the timing of earnings.  This lack of complete disclosure is flatly at odds with SEC guidance on this issue.   In her testimony before the Senate Permanent Subcommittee on Investigations, Committee on Governmental Affairs on December 11, 2002, Annette Nazareth, the Director of the SEC's Division of Market Regulation, stated:

> [S]tructured finance transactions . . .  have at times been used inappropriately to achieve a specific accounting or tax result or provide 'window dressing' for financial statements . . .  *[I]f a company relies on a structured finance transaction for a one-time boost in earnings or liquidity, or a series of structured transactions to continue a trend, the investing public absolutely must understand that when evaluating the company.  Transparent financial reporting facilitates this evaluation process.*

(emphasis added).  The Fannie Mae Defendants knew that the income-shifting REMICs had been entered into to maintain the smooth earnings trend.  Accordingly, applicable SEC guidance mandated that they disclose the existence and purpose of these transactions.  Their failure to do so was, under these circumstances, materially false and misleading.

539.    The 2002 Annual Report was reviewed and approved by Raines, Howard, Spencer, Mudd, Gorelick, Ashley, Duberstein, Gerrity, Harvey, Justiz, Korologos, Malek, Marron, Mulcahy, Pickett, Segue, and Swygert.  The document was prepared in substantial part by, and contains signatures of, Raines, Howard and Spencer.  All of these Defendants knew, or recklessly disregarded, that the foregoing statements, as well as the financial statements (including notes), in the 2002 Annual Report were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

**R.      The 2002 10-K**

540.    On March 31, 2003, Fannie Mae filed its first annual report on Form 10-K with the SEC, for the year ended December 31, 2002 (the "2002 10-K").  Like the 2002 Annual Report, the 2002 10-K reported net income of $4.619 billion; EPS of $4.53; total taxable-equivalent revenues of $11.896 billion; total assets of $887.515 billion; and total liabilities of $871.227 billion.  Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

541.    The 2002 10-K contained the same financial statements and KPMG audit opinion as the 2002 Annual Report.  Those statements were materially false and misleading for the reasons set forth above with respect to the 2002 Annual Report.

542. Defendants Raines, Howard, Spencer, Ashley, Duberstein, Gerrity, Gorelick, Harvey, Justiz, Korologos, Malek, Marron, Mudd, Mulcahy, Pickett, Segue, and Swygert signed the 2002 10-K.

543. Further, Defendants Raines and Howard each signed certifications in their capacities as CEO and CFO, respectively (the "2002 10-K Certifications"), stating the following:

> I have reviewed this annual report on Form 10-K of Fannie Mae (formally, the Federal National Mortgage Association);
>
> Based on my knowledge, *this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods presented in this annual report*;
>
> Based on my knowledge, *the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report*;
>
> The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have:
>
> a.   *designed such controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;*
>
> b.   *evaluated the effectiveness of the registrant's disclosure controls and procedures* as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and
>
> c.   presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

> The registrant's other certifying officers and I *have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors . . . :*
>
> a.    *all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and*
>
> b.    *any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and*
>
> The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(emphasis added).

544.    Raines and Howard knew, or recklessly disregarded, that because the 2002 10-K was materially false and misleading as alleged above, the statements in the 2002 10-K Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

545.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the 2002 10-K Certifications that "the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report," were also materially false and misleading.

546.    In addition, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae had not established an adequate internal controls system to ensure that accounting policies were appropriately developed, implemented and reviewed, and/or to ensure the accuracy of the Company's financial reporting as set forth above, the statements contained in paragraphs 4, 5 and 6 of the 2002 10-K Certifications, as set forth above, were also materially false and misleading.

547.    The 2002 10-K contained the following disclosures containing the Company's loan loss Allowance:

> Over the past five years, our combined allowance for loan losses and guarantee liability for MBS have remained relatively stable although our book of business has expanded. *This trend reflects improvement in the credit performance of our book of business*.

(emphasis added).  These statements were materially false and misleading because the relative stability of the Company's Allowance did not reflect improvement in the credit performance of the Company's book of business but, rather, Defendants' decision to apply GAAP-violative methodologies to the calculation of the Allowance to permit the Company to maintain a "war chest" to be used to further the Company's interests down the road, as set forth more fully above in Section IV.E.6, *Fannie Mae's Improper Accounting For The Allowance For Loan Losses*.

548.    Further, the 2002 10-K contained the following statements concerning the Company's buyback program:

**Debt Extinguishments**

> Fannie Mae strategically repurchases or calls debt securities and related interest rate swaps on a regular basis as part of our interest rate risk management efforts and to reduce future debt costs. We record gains and losses on debt extinguishments in this category.

> We recognized a pre-tax loss of $710 million in 2002 from the call and repurchase of debt, compared with a pre-tax loss of

$524 million in 2001. *Market conditions during 2002 and 2001 made it advantageous for us to repurchase $8 billion and $9 billion, respectively, of debt securities that were trading at historically wide spreads to other fixed-income securities.* We also called over $174 billion of high-coupon debt securities and notional principal of interest rate swaps in 2002 and $173 billion in 2001. The weighted-average cost of redeemed debt and interest rate swaps in 2002 and 2001 was 5.36 percent and 6.23 percent, respectively. During 2000, we repurchased or called $18 billion in debt securities and notional principal of interest rate swaps carrying a weighted-average cost of 7.10 percent and recognized a gain of $49 million.

During the second quarter of 2002, we adopted Financial Accounting Standard No. 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections* ("FAS 145"). This standard eliminates the extraordinary treatment of the gains and losses on our debt repurchases because debt extinguishment is a normal and recurring component of our interest rate risk management strategy. For comparative purposes, we have reclassified all prior periods to conform to the current presentation.

(emphasis added).

549. These statements were materially false and misleading because they failed to disclose that Fannie Mae set the parameters for its "debt extinguishments" based on current quarter earnings forecasts, not on whether market conditions made such repurchases "advantageous" to the Company. In fact, the Company had not performed any contemporaneous analysis of the economic advantages of entering into buybacks. Further, Defendants failed to disclose that the buybacks were executed strategically within those parameters to achieve specific, to-the-penny EPS figures, enabling the Officer Defendants to earn lucrative bonuses.

550. The Summary of Significant Accounting Policies included in the 2002 10-K stated:

We do not accrue interest income on nonperforming loans. We classify conventional single-family and multifamily loans as nonperforming and reverse previously accrued interest against current period income when the loan is 90 days or more delinquent

and we estimate the interest to be uncollectible. We return loans to accrual status when the borrower is less than 90 days delinquent because the probability of default is low and management believes collections of future payments are reasonably assured.

This statement was materially false and misleading because the Company was continuing to accrue interest income on loans that were more than 90 days past due.

### S.     The Registration Statement

551.   Fannie Mae filed its General Form for Registration of Securities Pursuant to Section 12(b) or (g) of the Securities Exchange Act of 1934 on Form 10 with the SEC on March 31, 2003.  Raines signed the Registration Statement.

552.   Fannie Mae incorporated the 2002 10-K by reference and attached it as an exhibit to the Registration Statement.  Accordingly, the Registration Statement was materially false and misleading because the 2002 10-K was materially false and misleading.

553.   KPMG consented to the inclusion of its *Independent Auditors' Report* in the Registration Statement.  The *Independent Auditors' Report* stated that KPMG had conducted audits in accordance with GAAS and that the financial statements in the Registration Statement and the attached 2002 10-K "present fairly, in all material respects, the financial position of Fannie Mae as of December 31, 2002, and 2001, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States of America."  These statements were materially false and misleading because KPMG had not conducted its audits in accordance with GAAS, and because the financial statements which were incorporated in the Registration Statement (by reference to the 2002 10-K) did not "present fairly, in all material respects," the financial position and results of Fannie Mae.

554.    The Registration Statement contained the following statements concerning the

Company's buyback program:

> **Debt Extinguishments**
>
> Fannie Mae strategically repurchases or calls debt securities and related interest rate swaps on a regular basis as part of our interest rate risk management efforts and to reduce future debt costs. We record gains and losses on debt extinguishments in this category.
>
> We recognized a pre-tax loss of $710 million in 2002 from the call and repurchase of debt, compared with a pre-tax loss of $524 million in 2001. *Market conditions during 2002 and 2001 made it advantageous for us to repurchase $8 billion and $9 billion, respectively, of debt securities that were trading at historically wide spreads to other fixed-income securities.* We also called over $174 billion of high-coupon debt securities and notional principal of interest rate swaps in 2002 and $173 billion in 2001. The weighted-average cost of redeemed debt and interest rate swaps in 2002 and 2001 was 5.36 percent and 6.23 percent, respectively. During 2000, we repurchased or called $18 billion in debt securities and notional principal of interest rate swaps carrying a weighted-average cost of 7.10 percent and recognized a gain of $49 million.
>
> During the second quarter of 2002, we adopted Financial Accounting Standard No. 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections* ("FAS 145"). This standard eliminates the extraordinary treatment of the gains and losses on our debt repurchases because debt extinguishment is a normal and recurring component of our interest rate risk management strategy. For comparative purposes, we have reclassified all prior periods to conform to the current presentation.

(emphasis added).

555.    These statements were materially false and misleading because they failed to

disclose that Fannie Mae set the parameters for its "debt extinguishments" based on current

quarter earnings forecasts, not on whether market conditions made such repurchases

"advantageous" to the Company.  In fact, the Company had not performed any contemporaneous

analysis of the economic advantages of entering into buybacks.  Further, Defendants failed to disclose that the buybacks were executed strategically within those parameters to achieve specific, to-the-penny EPS figures, enabling the Officer Defendants to earn lucrative bonuses.

**T.    April 15, 2003 8-K**

556.    On April 14, 2003, the Individual Defendants caused Fannie Mae to issue a press release announcing its financial results for the quarter ended March 31, 2003 (the "April 14, 2003 Press Release"), which was filed with the SEC on April 15, 2003 as an exhibit to a Form 8-K signed by Spencer (the "April 15, 2003 8-K").

557.    In the April 14, 2003 Press Release, Fannie Mae reported net income of $1.941 billion and diluted EPS of $1.93 for the first quarter of 2003.  These figures were reviewed and approved by KPMG before they were released.  Further, Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

558.    Defendants knew, or recklessly disregarded, that the foregoing statements were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

559.    In the press release, Raines continued to portray Fannie Mae as a conservative and stable investment, stating that "Fannie Mae recorded extremely strong and balanced growth during the first quarter of 2003, continuing a record of financial performance that few other companies have matched."  These statements were materially false and misleading because Fannie Mae's "record of financial performance" and growth during the first quarter of 2003 were only achieved through accounting fraud.

**U.    The May 2003 10-Q**

560.    On May 15, 2003, Fannie Mae filed its Form 10-Q for the quarter ended March 31, 2003 with the SEC (the "May 2003 10-Q"), signed by Howard and Spencer.  The May 2003

10-Q contained the Company's financial statements for the first quarter of 2003, which KPMG reviewed and approved, reporting quarterly net income of $1.941, diluted EPS of $1.93, total revenue of $4.029 billion, total assets of $913.264 billion, and total liabilities of $895.360 billion. Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

561. Defendants knew, or recklessly disregarded, that the May 2003 10-Q and the financial statements contained therein were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

562. Further, the May 2003 10-Q contained certifications signed by Defendants Raines and Howard in their capacities as CEO and CFO, respectively (the "May 2003 10-Q Certifications"), stating the following:

> I have reviewed this quarterly report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association);
>
> Based on my knowledge, *this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods presented in this quarterly report*;
>
> Based on my knowledge, *the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report*;
>
> The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures …. for the registrant and we have:
>
> a. *designed such controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;*

b.    *evaluated the effectiveness of the registrant's disclosure controls and procedures* as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c.    presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

The registrant's other certifying officers and I *have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)*:

a.    all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b.    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

The registrant's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(emphasis added).

563.    Raines and Howard knew, or recklessly disregarded, that because the May 2003 10-Q was materially false and misleading as alleged above, the statements in the May 2003 10-Q Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

564.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie

Mae did not comply with GAAP, as set forth above, the statements in the May 2003 10-Q

Certifications that "the financial statements, and other financial information included in this

quarterly report, fairly present in all material respects the financial condition, results of

operations and cash flows of the registrant as of, and for, the periods presented in this quarterly

report," were also materially false and misleading.

565.    In addition, Raines and Howard knew, or recklessly disregarded, that because

Fannie Mae had not established an adequate internal controls system to ensure that accounting

policies were appropriately developed, implemented and reviewed, or to ensure the accuracy of

the Company's financial reporting, as set forth above, the statements contained in paragraphs 4,

5 and 6 of the May 2003 10-Q Certifications, as set forth above, were also materially false and

misleading.

566.    The May 2003 10-Q contained the following statements concerning the

Company's buyback program:

**Debt Extinguishments**

We recognized $392 million in losses from the call and repurchase
of $48 billion in debt in the first quarter of 2003.  In comparison,
we recognized $172 million in losses on the call and repurchase of
$30 billion of debt in the first quarter of 2002.  We regularly call or
repurchase debt as part of our interest rate risk management
strategy.

567.    These statements were materially false and misleading because they failed to

disclose that the buybacks were executed strategically to achieve specific, to-the-penny EPS

figures, enabling the Officer Defendants to earn lucrative bonuses.

### V.    The June 17, 2003 Interview

568.    As reported in *Business Week,* Raines gave an interview to Senior Writer Paula Dwyer on June 17, 2003 during which he discussed the Freddie Mac scandal (the "June 17, 2003 Interview").  *Frank Raines Takes On The Critics; Fannie CEO says its accounting practices aren't Freddie's, Business Week*, June 30, 2003.  Raines attempted to distinguish Fannie Mae from Freddie Mac, stating, "I don't know that much about how Freddie operates.  But when it came to accounting for our derivatives, we spent millions of dollars on internal systems (and) we maintain strict control over what kind of derivatives can be used and our accounting for them.  Everyone who has looked at it, from our external auditors to our regulators, found that we are doing this in a state-of-the-art way.  We are compulsive about managing risk."

569.    Raines knew, or recklessly disregarded, that these statements were materially false and misleading because, despite Fannie Mae's alleged "compuls[ion] about managing risk" and its alleged "state-of-the art" accounting for derivative transactions, as set forth more fully above, the Company's accounting for its derivative transactions did not comply with GAAP.

### W.    The July 15, 2003 8-K

570.    On July 15, 2003, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the second quarter of 2003 (the "July 15, 2003 Press Release").  The July 15, 2003 Press Release was filed with the SEC on July 15, 2003 as an exhibit to a Form 8-K (the "July 15, 2003 8-K"), signed by Spencer.

571.    In the July 15, 2003 Press Release, Fannie Mae reported net income of $1.102 billion and diluted EPS of $1.09 for the second quarter of 2003.  These figures were reviewed and approved by KPMG before they were released.  In addition, Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

572.     Raines continued to portray Fannie Mae as a conservative and stable investment, stating, "Financial discipline is at the core of Fannie Mae's business.  Our intent in updating our risk management strategies, and making them explicit to investors and policymakers, is to make as clear as possible that as we continue to carry out our housing mission in a growing mortgage market *our commitment to financial safety and soundness will be absolute.*"  (emphasis added).

573.     Defendants knew, or recklessly disregarded, that these statements and the Company's reported financial results were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

## X.     The July 15, 2003 Conference Call

574.     On July 15, 2003, Howard presided over a conference call to discuss Fannie Mae's earnings for the second quarter of 2003 (the "July 15, 2003 Conference Call"). Conference call participants included numerous sell-side securities analysts, including representatives of Bear Stearns, Lehman Brothers, Morgan Stanley and Banc of America Securities.

575.     During the July 15, 2003 Conference Call, Howard boasted of Fannie Mae's achievements, noting:

> [L]ast quarter we posted another extremely strong set of financial results, once again, demonstrating our balance and disciplined strategies for growth.
>
> Our core earnings per share in the second quarter were $1.86, 20% above the second quarter of 2002.  This means that for eight of the last nine quarters, our core EPS has been 20% or more above the comparable period the previous year.

576.     Defendant Howard knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth more fully above, Fannie Mae's "strong set of financial results," rather than "demonstrating [the Company's] balance and disciplined

206

strategies for growth," was based on the fraudulent accounting scheme described herein. Further, the Company's reported EPS was materially overstated as a result of that scheme.

577.    Defendant Howard continued falsely to portray Fannie Mae as a safe investment, stating:

> Fannie Mae has a track record of exceptional risk management in the past and we now have set forth an even more ambitious public commitment to superior risk management going forward. Furthermore, we intend to maintain very high stand-alone credit ratings and *the goal we've set to have our long-term earnings growth be more stable than the median double A or triple A company should make our earnings dramatically more stable than the typical S&P 500 company overall.*
>
> *All of which makes for a very straightforward investment proposition.* A company that is likely to produce above average earnings growth with significantly lower than average uncertainty, and to do so with much higher than average credit quality, may before too much longer, be accorded a multiple that's considerably higher than half of what's bestowed on a typical S&P 500 company today.

(emphasis added).

578.    Defendant Howard knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth more fully above, he intended to create the illusion of "long-term earnings growth [which was] more stable than . . . the typical S&P 500 company overall" through the fraudulent accounting scheme described herein. Moreover, Defendant Howard knew, or recklessly disregarded, that Fannie Mae was not a "straightforward investment proposition" but, rather, a house of cards built on the fraudulent accounting scheme described herein.

### Y.    The July 30, 2003 Conference Call

579.    On July 30, 2003, Raines presided over a two-hour conference call with stock market analysts to discuss accounting irregularities that had been discovered at Freddie Mac (the

"July 30, 2003 Conference Call"). Raines used the July 30, 2003 Conference Call to further his agenda of bolstering Fannie Mae's reputation, falsely representing that the Company had not engaged in improper accounting practices similar to those uncovered at Freddie Mac.

580.    At the outset of the Call, Raines indicated that Fannie Mae had no apprehension concerning OFHEO's investigation of Fannie Mae, stating:

> We welcome the review by OFHEO, because we have a great deal
> of confidence in our application of appropriate accounting
> principles. And having just gone through the process of registering
> with the SEC, we have the benefit of having third parties look at
> our accounting policies and ask us detailed questions about them.
> Out external auditor, KPMG, has always treated us as though we
> were an SEC registrant, and has applied those standards throughout
> history. So we feel quite comfortable with our accounting policies.

581.    Further, Raines represented that Fannie Mae "[did] not have any of the same issues" and [had] not had any of the same transactions" that OFHEO found problematic at Freddie Mac. Moreover, Raines stated that Fannie Mae, presumably in contrast to Freddie Mac, had "applied quite conservative accounting principles."

582.    In addition, Raines chastised Freddie Mac for attempting to use SFAS 133 to smooth its earnings and falsely represented that Fannie Mae had engaged in no such impropriety. Raines stated: "[T]hat was the decision that Freddie Mac made to not simply adopt SFAS 133, but then to try to influence the impact of SFAS 133 on [Freddie Mac's] earnings. *I can tell you that at Fannie Mae we took no steps whatsoever to try to ameliorate the impact of SFAS 133. In fact we did just the opposite*." (emphasis added).

583.    In support of his assertion that Fannie Mae endeavored to comply with SFAS 133, Raines stated: "We spent millions of dollars on new systems, hired new people, made sure our people were up on this very complicated accounting standard, so that they could apply it appropriately."

208

584.    Raines knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth more fully above and on page 84 and note 225 of the Interim OFHEO Report, Fannie Mae's explicit policy in applying SFAS 133 was to minimize earnings volatility, leverage existing systems, and keep operating earnings simple.  In fact, Fannie Mae did not properly apply SFAS 133, as alleged herein and as set forth in the Interim OFHEO Report.

585.    In response to an audience member's question as to whether Fannie Mae had ever "used any accounting practices . . .  that [had] either distorted [its] financial presentations or that might appear questionable if known to the public," Raines stated:

> With regard to Fannie Mae, *the question of the appropriateness of our accounting is something I'm quite focused on*.  Because as an SEC registrant, I am required every quarter to personally certify that I believe that the financial statements that we provided and the information we provide with those financial statements fairly represents our financial condition.  So I, every quarter, put my name on the line saying that these statements represent our financial results.

(emphasis added).

586.    In addition, during the July 30, 2003 Conference Call, one analyst asked Raines if "Fannie Mae used any accounting judgment that either its employees or its auditors considered debatable[.]"  Raines categorically denied that Fannie Mae had made any "debatable" accounting judgments, stating:

> *The answer to that is clearly no.  We have not.  If we had, I would have violated the law in certifying our financial results.  If we had, our auditors would be obligated to publicly do something about that*.  So I do not think there is any question on that, of our taking any steps to subvert accounting.  And I think that is an important thing to get across.

(emphasis added).

587.    Raines knew, or recklessly disregarded, that these statements were materially false and misleading.  In fact, Raines had received a memorandum from Barnes almost a year earlier advising Raines of "serious financial improprieties" at Fannie Mae and warning that "the possible impact reaches hundreds of millions of dollars and possibly affects the integrity of current financial statements and those we will issue after beginning compliance with SEC reporting in 2003."  Raines thus knew that at least one employee had considered Fannie Mae's accounting judgments to be "debatable," yet denied that such questions had been raised.

588.    Raines knew, or recklessly disregarded, that the statements made during the July 30, 2003 Conference Call regarding Fannie Mae's accounting practices in general (and its application of SFAS 133 in particular) were materially false and misleading because, as set forth more fully above, Fannie Mae's accounting practices violated GAAP in numerous respects as set forth more fully below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

### Z.    The July 30, 2003 News Conference

589.    As reported in the *Washington Post* on July 31, 2003, Raines defended Fannie Mae's accounting practices in the wake of the Freddie Mac scandal during a news conference on July 30, 2003.  David H. Hilzenrath, *Fannie Mae Defends its Reputation; CEO Decries Confusion With Freddie Mac Woes*, Washington Post, July 31, 2003, at E1.  Raines is quoted as having stated, "I've jokingly said to friends that I now know what the definition of collateral damage is, and we have suffered a lot of that, I think unfairly . . . *Unlike Freddie Mac, we didn't do any of those things.*" (emphasis added).  Further, Raines is quoted as having stated that Fannie Mae had "*not undertaken any transactions to distort our true financial condition.*" (emphasis added).

590.    Raines knew, or recklessly disregarded, that these statements were materially false and misleading because Fannie Mae had undertaken transactions and used inappropriate accounting methods to distort its true financial condition, just as Freddie Mac had done.

591.    As noted in the Final Report, Raines also stated the following during the July 20, 2003 news conference in an effort to distinguish Fannie Mae from Freddie Mac:

> So it is possible to run these things properly, but you've got to make the investments.  You've got to say that this has got to stand scrutiny internal and external.  *You can't just go get [sic] by saying, Well, let's do the cheapest or easiest thing to do.*  So *Fannie Mae has always made the investments.*  We made the investments over Y2K.  *We've made the investments in our accounting systems.*  We've centralized our accounting so we don't have to go all over the company to find out what the facts are you can [come] to one place.
>
> So for some reason if we made a mistake on our accounting, and someone said, Oh, it's not A, it should be B.  We could go very quickly in a fairly short period of time and change A to B., and tell you what the results were, but that's management.  That has nothing to do with [Freddie Mac] being a GSE, or it being a complicated company, that's just plain old fashioned management.  Do you have the systems in place, or don't you? They have said they didn't do it.  I wish to God they had done it, we wouldn't be having these problems, or certainly they would have been able to resolve them in a much shorter period of time.
>
> But there is a difference in management.  *Management does matter, and a management that cares a lot about internal control does matter.  I think that's really the important difference.  It would not take 500 people for us to go back, even if we had made the same mistakes, because we have these systems automated and we can go back and quickly adjust them.*

(emphasis added).

592.    Raines knew, or recklessly disregarded, that these statements were materially false and misleading.  Contrary to Raines' statement that Fannie Mae had not "do[ne] the cheapest or easiest thing to do," Fannie Mae <u>did</u> do the "cheapest" and "easiest" thing with regard to its SFAS 133 implementation process.  As set forth at length above, Fannie Mae's

SFAS 133 implementation process was largely driven by the Company's desire to leverage its existing accounting systems and to force all of its hedge transactions to qualify for the "shortcut" method or the "matched terms" method of accounting.  In fact, Fannie Mae did not even develop accounting systems capable of performing the "long haul" method of accounting for derivatives.  Under these circumstances, Raines' claims that Fannie Mae had "made the investments in [its] accounting systems" were patently false.  Moreover, Raines' statement that Fannie Mae could "go back and quickly adjust" any mistakes it had made due to is "automated" systems was also materially false and misleading.  Fannie Mae had not developed <u>any</u> systems that would permit it to perform the required "long haul" method of accounting, let alone "automated" systems that would permit the Company to "go back and quickly adjust" mistakes.  The falsity of this statement is further underscored by the fact that more than seventeen months have elapsed since the SEC's order that Fannie Mae restate its financials, with no restatement in sight.

### AA.    <u>The August 2003 Form 10-Q</u>

593.    On August 14, 2003, Fannie Mae filed its quarterly report for the quarter ended June 30, 2003 with the SEC on Form 10-Q (the "August 2003 10-Q").  Howard and Spencer signed the August 2003 10-Q.

594.    The August 2003 10-Q contained the Company's quarterly financial statements, which KPMG had reviewed and approved, reporting second quarter net income of $1.102 billion, diluted EPS of $1.09, total quarterly revenues of $4.365 billion, total assets of $923.795 billion, and total liabilities of $906.43 billion.  Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

595.    Defendants knew, or recklessly disregarded, that the August 2003 10-Q and the financial statements contained therein were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

596.    The August 2003 10-Q also contained certifications signed by Defendants Raines and Howard in their capacities as CEO and CFO, respectively (the "August 2003 10-Q Certifications"), stating:

> I have reviewed this quarterly report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association);
>
> Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;
>
> Based on my knowledge, the financial statements, and other financial information included in this report, *fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;
>
> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ... for the registrant and have:
>
> a.    *designed such controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*
>
> *            *            *
>
> b.    *evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> c.    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is likely to materially affect, the registrant's control over internal control over financial reporting; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors . . . :

a.    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(emphasis added).

597.    Raines and Howard knew, or recklessly disregarded, that because the August 2003 10-Q was materially false and misleading as alleged above, the statements in the August 2003 10-Q Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

598.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the August 2003 10-Q Certifications that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," were also materially false and misleading.

599.    In addition, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae had not established an internal controls system to ensure that accounting policies were appropriately developed and reviewed, as set forth above, the statements contained in

paragraphs 4 and 5 of the August 2003 10-Q Certifications, as set forth above, were also materially false and misleading.

600.    The August 2003 10-Q contained the following statement concerning the Company's buyback program:

> **Debt Extinguishments**
>
> We recognized $740 million and $1.132 billion in losses on debt extinguishments during the second quarter and first half of 2003, respectively, up from $225 million and $396 million in losses on debt extinguishments that we recognized during the second quarter and first half of 2002. These losses resulted from the call and repurchase of $73 billion and $121 billion of debt during the second quarter and first half of 2003, respectively, and the call and repurchase of $30 billion and $60 billion of debt during the second quarter and first half of 2002, respectively. *The year-over-year increase in debt extinguishment activity was driven by attractive opportunities to repurchase relatively high-cost debt.* We regularly call or repurchase debt as part of our interest rate risk management strategy.

(emphasis added).

601.    These statements were materially false and misleading because they failed to disclose that the buybacks, rather than being driven by "attractive opportunities to repurchase relatively high-cost debt," were executed strategically to achieve specific, to-the-penny EPS figures, enabling the Officer Defendants to earn lucrative bonuses.  Further, Defendants failed to disclose that the Company had not performed any contemporaneous analysis of the economic advantages of entering into buyback transactions.

### BB.    The October 16, 2003 8-K

602.    On October 16, 2003, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the third quarter of 2003 (the "October 16, 2003 Press Release").  The October 16, 2003 Press Release was filed with the SEC on the same date as an exhibit to a Form 8-K (the "October 16, 2003 8-K"), signed by Spencer.

603.    In the October 16, 2003 Press Release, Fannie Mae reported net income of $2.666 billion and diluted EPS of $2.69 for the first quarter of 2003.  These figures were reviewed and approved by KPMG before they were released.

604.    Raines noted that Fannie Mae's disciplined growth strategies enabled it to succeed despite volatility in the fixed income markets, stating:

> Fannie Mae delivered outstanding financial results in the third quarter, driven by record business volume and portfolio growth.  In a quarter marked by historic levels of volatility in the fixed income markets, our company continued to benefit from the disciplined strategies for growth that have resulted in consistently strong financial performance through a wide range of economic and financial environments.

605.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading because Fannie Mae's results were not based on its "disciplined strategies for growth," but, rather, on the fraudulent accounting scheme described herein.

606.    Moreover, Defendants knew, or recklessly disregarded, that the statements concerning the results for the third quarter 2003, as announced in the October 16, 2003 Press Release, were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

**CC.    The November 2003 10-Q**

607.    On November 14, 2003, Fannie Mae filed its quarterly report for the quarter ended September 30, 2003 with the SEC on Form 10-Q (the "November 2003 10-Q").  Howard and Spencer signed the November 2003 10-Q.

608.    The November 2003 10-Q contained the Company's quarterly financial statements for the third quarter of 2003, which KPMG had reviewed and approved, reporting quarterly net income of $2.666 billion, diluted EPS of $2.69, total quarterly revenues of $4.206

billion, total assets of $1.019171 trillion, and total liabilities of $1.001647 trillion.  Fannie Mae

stated that its reported results were based on GAAP, which include the effects of SFAS 133.

609.    Defendants knew, or recklessly disregarded, that the November 2003 Form 10-Q

was materially false and misleading for the reasons set forth below in Section IX, Falsity of

Defendants' Statements Concerning Fannie Mae.

610.    Further, the November 2003 10-Q contained certifications signed by Defendants

Raines and Howard (the "November 2003 10-Q Certifications"), stating the following:

> I have reviewed this quarterly report on Form 10-Q of Fannie Mae
> (formally, the Federal National Mortgage Association);
>
> Based on my knowledge, this report does not contain any untrue
> statement of a material fact or omit to state a material fact
> necessary to make the statements made, in light of the
> circumstances under which such statements were made, not
> misleading with respect to the period covered by this report;
>
> Based on my knowledge, the financial statements, and other
> financial information included in this report, fairly present in all
> material respects the financial condition, results of operations and
> cash flows of the registrant as of, and for, the periods presented in
> this report;
>
> The registrant's other certifying officer and I are responsible for
> establishing and maintaining disclosure controls and procedures ...
> for the registrant and have:
>
> a.    designed such controls and procedures, or caused such
>       disclosure controls and procedures to be designed under our
>       supervision, to ensure that material information relating to
>       the registrant, including its consolidated subsidiaries, is
>       made known to us by others within those entities,
>       particularly during the period in which this report is being
>       prepared;
>
> *       *       *
>
> c.    evaluated the effectiveness of the registrant's disclosure
>       controls and procedures and presented in this report our
>       conclusions about the effectiveness of the disclosure

controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.       disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is likely to materially affect, the registrant's control over internal control over financial reporting; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors . . . :

a.       all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.       any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(emphasis added).

611.    Raines and Howard knew, or recklessly disregarded, that because the November 2003 10-Q was materially false and misleading as alleged above, the statements in the November 2003 10-Q Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

612.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the November 2003 10-Q Certifications that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and

cash flows of the registrant as of, and for, the periods presented in this report," were also materially false and misleading.

613.   Further, Raines and Howard knew or recklessly disregarded, that because Fannie Mae had not established an internal controls system to ensure that accounting policies were appropriately developed and reviewed, as set forth above, the statements contained in paragraphs 4 and 5 of the November 2003 10-Q Certifications, as set forth above, were also materially false and misleading.

614.   The November 2003 10-Q contained the following statements concerning the Company's buyback program:

**Debt Extinguishments**

We recognized $902 million and $2.034 billion in losses on debt extinguishments during the third quarter and first nine months of 2003, respectively, compared with losses of $138 million in the third quarter and $534 million during the first nine months of 2002. The losses resulted from the call and repurchase of $64 billion and $185 billion of debt during the third quarter and first nine months of 2003, respectively, and the call and repurchase of $66 billion and $127 billion of debt during the third quarter and first nine months of 2002, respectively. We regularly call or repurchase debt as part of our interest rate risk management strategy. *The year-over-year increase in debt extinguishment activity was driven by attractive opportunities to repurchase relatively high-cost debt, which we believe will lower our debt costs in the future*.

(emphasis added).

615.   These statements were materially false and misleading because they failed to disclose that the buybacks, rather than being "driven by attractive opportunities to repurchase relatively high-cost debt," were executed strategically to achieve specific, to-the-penny EPS figures, enabling the Officer Defendants to earn lucrative bonuses.  Further, Defendants failed to disclose that the Company had not performed any contemporaneous analysis of the economic advantages of entering into buyback transactions.

DD.    **The January 21, 2004 8-K**

616.    On January 21, 2004, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the fourth quarter of 2003 (the "January 21, 2004 Press Release").  The January 21, 2004 Press Release was filed with the SEC on the same date as an exhibit to a Form 8-K (the "January 21, 2004 8-K"), signed by Spencer.

617.    In the January 21, 2004 Press Release, Fannie Mae reported net income of $7.905 billion and diluted EPS of $7.91 for the fourth quarter of 2003.  These figures were reviewed and approved by KPMG before they were released.  Further, Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

618.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

EE.    **The January 21, 2004 Conference Call**

619.    Defendants Howard and Spencer presided over a conference call on January 21, 2004 to discuss Fannie Mae's earnings for the fourth quarter of 2003 (the "January 21, 2004 Conference Call").  Conference call participants included numerous sell-side securities analysts, including representatives of Prudential Securities, UBS, Credit Suisse First Boston, Lehman Brothers, Salomon Smith Barney, Bear Stearns and Piper Jaffray.

620.    Howard and Spencer continued to portray Fannie Mae as safe, financially sound, and in compliance with all relevant accounting standards.  Howard stated that "[r]isk management continued to be a strength for us last year and we expect it will be a strength again this year."  Spencer, in response to a question regarding the OFHEO investigation, stated that "we're very comfortable with our accounting."

621.    Howard and Spencer knew, or recklessly disregarded, that these statements were materially false and misleading because, despite their asserted confidence in Fannie Mae's risk management and accounting practices, the Company was engaged in numerous GAAP violations which caused its reported financial results to be materially inflated, as alleged herein.

**FF.    The 2003 10-K**

622.    On March 15, 2004, Fannie Mae filed its 10-K for the fiscal year ended December 31, 2003 (the "2003 10-K"), which was signed by Defendants Raines, Howard, Spencer, Ashley, Duberstein, Gerrity, Harvey, Justiz, Korologos, Malek, Marron, Mudd, Mulcahy, Pickett, Rahl, Segue, and Swygert.

623.    The 2003 10-K contained audited financial statements of Fannie Mae for 2003, reflecting net income of $7.905 billion; diluted EPS of $7.91; total revenue of $16.417 billion; total assets of $1.009569 trillion; and total liabilities of $987.196 billion.  Further, Fannie Mae reported that, in 2003, its core net interest income grew by almost 20% to $10.5 billion; its guarantee fee income rose 32.8% to $2.4 billion; and its core capital rose to $34.4 billion. Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

624.    Defendant KPMG consented to the inclusion of its *Independent Auditors' Report* in the 2003 10-K, which stated that the financial statements in the 2003 10-K "present fairly, in all material respects, the financial position of Fannie Mae as of December 31, 2003, and 2002, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America."

625.    Defendants knew, or recklessly disregarded, that the foregoing statements and the financial statements in the 2003 10-K were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

626.    Further, the 2003 10-K contained certifications signed by Defendants Raines and Howard in their capacities as CEO and CFO, respectively (the "2003 10-K Certifications"), stating:

> I have reviewed this annual report on Form 10-K of Fannie Mae (formally, the Federal National Mortgage Association);
>
> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ... for the registrant and have:
>
> a.    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b.    *evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> c.    disclosed in this report any change in the registrant's internal control over financial reporting that occurred

during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors . . .:

a.    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(emphasis added).

627.    Raines and Howard knew, or recklessly disregarded, that because the 2003 10-K was materially false and misleading as alleged above, the statements in the 2003 10-K Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

628.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the 2003 10-K Certifications that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," were also materially false and misleading.

629.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae had not established an internal controls system to ensure that accounting policies were appropriately developed and reviewed, as set forth above, the statements contained in paragraphs 4 and 5 of the 2003 10-K Certifications, as set forth above, were also materially false and misleading.

630.    The 2003 10-K contained the following statements concerning the Company's buyback program:

> **Debt Extinguishments, Net**
>
> Fannie Mae strategically repurchases or calls debt securities and related interest rate swaps on a regular basis as part of our interest rate risk management efforts and to reduce future debt costs. Gains and losses on debt extinguishments and related interest rate swaps are reflected in this category.
>
> *. . . The substantial increase in debt extinguishment activity during 2003 was driven by several factors.* The historically low interest rate environment that persisted through the first half of 2003 made it economical for us to call or redeem high cost debt. In anticipation of increasing liquidations in our mortgage portfolio as a result of heavy refinancing activity, we replaced the higher cost debt with shorter-term, lower-cost debt. This dynamic resulted in a temporarily elevated spread between the yield on our mortgage assets and our funding cost. We chose to reinvest a portion of the income generated from these temporary circumstances in debt repurchases to reduce our future debt costs. A loss realized on a debt repurchase in the current year results in correspondingly lower debt costs in the future. The debt cost savings will be realized over the period remaining until the scheduled maturity of the debt repurchased. We select individual securities to repurchase based on which securities we believe are trading at attractive prices in the market as well as asset/liability risk management purposes. We expect a significant reduction in the level of debt repurchases in 2004.

(emphasis added).

631.    These statements were materially false and misleading because they failed to disclose that Fannie Mae set the parameters for its "debt extinguishments" based on current

quarter earnings forecasts, not on whether market conditions made such repurchases "economical" to the Company. Further, Defendants failed to disclose that the buybacks, rather than being "driven" by the above-enumerated factors, were executed strategically within those parameters to achieve specific, to-the-penny EPS figures, enabling the Officer Defendants to earn lucrative bonuses. In fact, the Company had not performed any contemporaneous analysis of the economic advantages of entering into buyback transactions.

632.    The Summary of Significant Accounting Policies included in Fannie Mae's 2003 10-K stated:

> We do not accrue interest income on nonperforming loans. We classify conventional single-family and multifamily loans as nonperforming and reverse previously accrued interest against current period income when the loan is 90 days or more delinquent and we estimate the principal and interest to be uncollectible. We return loans to accrual status when the borrower is less than 90 days delinquent because the probability of default is low and management believes collections of future payments are reasonably assured.

633.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading because, as Fannie Mae admitted in its March 2006 Form 12b-25, it had continued to accrue interest income on loans that were ninety days or more delinquent.

**GG.    The 2004 Proxy**

634.    Fannie Mae filed its definitive proxy for 2004 on Form 14A with the SEC on April 23, 2004 (the "2004 Proxy"). In the 2004 Proxy, Fannie Mae recommended that its shareholders ratify the retention of KPMG as the Company's "independent" auditor.

635.    With respect to its corporate governance philosophy, Fannie Mae stated:

> Fannie Mae continually strives to attain best-in-class corporate governance and transparency. Fannie Mae puts a premium on upholding corporate governance principles of openness, integrity, responsibility and accountability, and believes that such principles

are essential to the success and efficient operation of our business
and the accomplishment of our mission.

636.    These statements were materially false and misleading because, as set forth more fully above and despite Fannie Mae's purported commitment to attaining "best-in-class corporate governance and transparency," the Fannie Mae Defendants were engaged in a pervasive, ongoing scheme of accounting fraud which had caused all of the Company's financial disclosures since at least 2001 to be materially false.

**HH.    The 2003 Annual Report**

637.    On April 26, 2004, Fannie Mae issued its Annual Report to its investors (the "2003 Annual Report"). The 2003 Annual Report contained the same year-end financial statements and KPMG audit opinion as the 2003 10-K, which were materially false and misleading for the same reasons as discussed above with respect to the 2003 10-K.

638.    In addition, the 2003 Annual Report acknowledged "a series of computational errors in [its] application of new accounting rules for mortgage purchase commitments found in [its] October quarterly earnings press release." Fannie Mae praised itself for having "promptly announced and corrected" the error, and Raines reassured investors that similar accounting mistakes would not be made in the future by stating that "Fannie Mae *strives to make our accounting systems 100 percent error free*" and that it "continuously review[s] and update[s] [its] processes and procedures so that [it] can *meet and exceed the high standards of transparency and accuracy that [its] investors expect and deserve*." These statements were materially false and misleading, in light of the numerous intentional GAAP violations which were ongoing at Fannie Mae and which were causing its reported financial results to be materially inflated.

639.    In the 2003 Annual Report, Fannie Mae again touted itself as a stable and conservative company.  Raines stated: "Fannie Mae places a high premium on strong and consistent financial performance under all market conditions.  The fact that we have been able to deliver strong results in both of the past two years, despite a soft economy and historic levels of interest rate volatility, is a testament to our disciplined growth model."  This statement was materially false and misleading because Fannie Mae's results in the past two years, rather than being a "testament to [its] disciplined growth model," were a product of the fraudulent accounting scheme described herein.

## II.    The April 19, 2004 Press Release

640.    On April 19, 2004, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the first quarter of 2004 (the "April 19, 2004 Press Release").  The April 19, 2004 Press Release was filed with the SEC on the same date as an exhibit to a Form 8-K (the "April 19, 2004 8-K"), signed by Spencer.

641.    In the April 19, 2004 Press Release, Fannie Mae reported net income of $1.899 billion and diluted EPS of $1.90 for the first quarter of 2004.  These figures were reviewed and approved by KPMG before they were released.  Further, Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

642.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

## JJ.    The May 2004 10-Q

643.    On May 10, 2004, Fannie Mae filed its quarterly report for the quarter ended March 31, 2004 with the SEC on Form 10-Q (the "May 2004 10-Q").  Howard and Spencer signed the May 2004 10-Q.

644.    The May 2004 10-Q contained the Company's financial statements for the first quarter of 2004, which KPMG had reviewed and approved, reporting first quarter net income of $1.899 billion, diluted EPS of $1.90, total revenues of $3.935 billion, total assets of $995.268 billion, and total liabilities of $974.463 billion.  Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

645.    Defendants knew, or recklessly disregarded, that the May 2004 10-Q and the financial statements contained therein were materially false and misleading, for the reasons discussed above with respect to the April 19, 2004 Press Release.

646.    Further, the May 2004 10-Q contained certifications signed by Defendants Raines and Howard in their capacities as CEO and CFO, respectively (the "May 2004 10-Q Certifications"), stating:

> I have reviewed this quarterly report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association);
>
> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ... for the registrant and have:
>
> a.    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others

within those entities, particularly during the period in which this report is being prepared;

b.    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c.    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors . . .:

a.    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

647.    Raines and Howard knew, or recklessly disregarded, that because the May 2004 10-Q was materially false and misleading as alleged above, the statements in the May 2004 10-Q Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

648.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the May 2004 10-Q

Certifications that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," were also materially false and misleading.

649.    In addition, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae had not established an internal controls system to ensure that accounting policies were appropriately developed and reviewed, as set forth above, the statements contained in paragraphs 4 and 5 of the May 2004 10-Q Certifications, as set forth above, were also materially false and misleading.

650.    The May 2004 10-Q contained the following statement concerning the Company's buyback program:

> **Debt Extinguishments, Net**
>
> *We called or repurchased a significant amount of debt during 2003 as a result of the historically low interest rate environment, steep yield curve, and opportunities relative to the swaps market which created opportunities to replace longer-term, higher-cost debt with shorter-term, lower-cost debt.* The result was to temporarily elevate our net interest margin, which provided the company with substantial income that we chose to reinvest in the repurchase of above-market debt to reduce our future debt costs. We began to curb our debt repurchase activity in the first quarter of 2004 as interest rates rose at the end of the quarter and our net interest margin began to narrow.

(emphases added).

651.    These statements were materially false and misleading because they failed to disclose that the buybacks were executed, not because of the factors enumerated above, but rather to achieve specific, to-the-penny EPS figures, enabling the Officer Defendants to earn lucrative bonuses.  In fact, the Company had not performed any contemporaneous analysis of the economic advantages of entering into buyback transactions.

### KK.    The July 21, 2004 Press Release

652.    On July 21, 2004, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the second quarter of 2004 (the "July 21, 2004 Press Release"). The July 21, 2004 Press Release was filed on the same date as an exhibit to the Form 8-K, signed by Spencer.

653.    In the July 21, 2004 Press Release, Fannie Mae reported net income of $1.112 billion and diluted EPS of $1.10 for the second quarter of 2004.  These figures were reviewed and approved by KPMG before they were released.  Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

654.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading for the reasons set forth below in Section IX, Falsity of Defendants' Statements Concerning Fannie Mae.

### LL.    The August 2004 10-Q

655.    On August 9, 2004, Fannie Mae filed its quarterly report for the quarter ended June 30, 2004 with the SEC on Form 10-Q (the "August 2004 10-Q").  Howard and Spencer signed the August 2004 10-Q.

656.    The August 2004 10-Q contained the Company's financial statements for the second quarter of 2004, which KPMG had reviewed and approved, reporting first quarter net income of $1.112 billion, diluted EPS of $1.10, total quarterly revenues of $3.6 billion, total assets of $989.341 billion, and total liabilities of $963.220 billion.  Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

657.    Defendants knew, or recklessly disregarded, that the August 2004 10-Q and the financial statements contained therein were materially false and misleading, for the reasons discussed above with respect to the July 21, 2004 Press Release.

658.    Further, the August 2004 10-Q contained certifications signed by Defendants Raines and Howard in their capacities as CEO and CFO, respectively (the "August 2004 10-Q Certifications"), stating:

> I have reviewed this quarterly report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association);
>
> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ... for the registrant and have:
>
> a.    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b.    *evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> c.    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors . . .:

a.     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(emphasis added).

659.    Raines and Howard knew, or recklessly disregarded, that because the August 2004 10-Q was materially false and misleading as alleged above, the statements in the August 2004 10-Q Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

660.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the August 2004 10-Q Certifications that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," were also materially false and misleading.

661.    In addition, Raines and Howard knew or recklessly disregarded, that because Fannie Mae had not established an internal controls system to ensure that accounting policies were appropriately developed and reviewed, as set forth above, the statements contained in

paragraphs 4 and 5 of the August 2004 10-Q Certifications, as set forth above, were also materially false and misleading.

662.    The August 2004 10-Q contained the following statements concerning the Company's buyback program:

**Debt Extinguishments, Net**

. . . We repurchase or call debt securities and related interest rate swaps on a regular basis as part of our interest rate risk management efforts and to reduce future debt costs.  Because debt repurchases, unlike debt calls, may require the payment of a premium and therefore result in higher extinguishment costs, *we generally repurchase high interest rate debt at times (and in amounts) when we believe Fannie Mae has sufficient income available to absorb or offset those higher costs*.

*We called or repurchased a significant amount of debt during 2003 as a result of the historically low interest rate environment, steep yield curve, and debt spreads relative to the swap market which created opportunities to replace longer-term, higher-cost debt with shorter-term, lower-cost debt*.  This environment also contributed to a temporary elevation of our net interest margin and provided Fannie Mae with substantial income that we chose to reinvest in the repurchase of above-market debt to reduce our future debt costs.  We began to curb our debt repurchase activity in 2004 as interest rates rose and our net interest margin began to narrow, which reduced the level of earnings available to invest in significant debt repurchases.

(emphases added).

663.    These statements were materially false and misleading because they failed to disclose that the buybacks were executed not because of the factors enumerated above but, rather, to achieve specific, to-the-penny EPS figures, enabling the Officer Defendants to earn lucrative bonuses.  Further, Defendants failed to disclose that the Company set the parameters for its "debt extinguishments" based on current quarter earnings forecasts, not on whether it believed that it had "sufficient income available to absorb or offset" associated costs.  In fact, the

Company had not performed any contemporaneous analysis of the economic advantages of entering into buyback transactions.

## IX. <u>FALSITY OF DEFENDANTS' STATEMENTS CONCERNING FANNIE MAE</u>

664.   Each of the statements identified in the foregoing Section VIII, Defendants' False and Misleading Statements, including the financial statements and audit opinions contained in the Registration Statement and in all of the Company's Annual Reports and Forms 10-Q and 10-K during the Loss Period, were materially false and misleading because, *inter alia:*

> a.   The Company's earnings were misstated as a result of Defendants' deliberate misapplication of GAAP to minimize earnings fluctuations and conceal risk;
>
> b.   The financial statements in the 2000 Annual Report did not "present fairly, in all material respects" Fannie Mae's financial condition and results in conformity with GAAP;
>
> c.   KPMG did not conduct its audits of Fannie Mae in accordance with GAAS;
>
> d.   The Company's balance sheet accounts for mortgage related securities, loans (held for investment) and total assets, and the Company's income statement line items for interest income (mortgage and non-mortgage), interest expense, net income and earnings per share (basic and diluted), were misstated due to Defendants' errors in estimating the amortization rates of premiums, discounts, and deferred price adjustments on securities and loans in violation of SFAS 91;
>
> e.   The Company's balance sheet accounts for mortgage related securities, non-mortgage related securities, total assets, accumulated other comprehensive income and total stockholders' equity were misstated as a result of Defendants' misapplication of SFAS 115 in classifying debt and equity securities as "held-to-maturity;"
>
> f.   The Company's income statement line items for interest income, interest expense, net income, and earnings per share (basic and diluted) were misstated to the extent any misclassified debt and equity securities are reclassified to "trading" in the restated financials as a result of misapplications of SFAS 115;
>
> g.   The Company's balance sheet accounts for mortgage related securities and total assets, and the Company's income statement line items for guaranty

fee income, fee and other income (expense), net income and earnings per share (basic and diluted) were misstated due to Defendants' failure to record asset impairments on "buy-up" guaranty fees in violation of SFAS 115;

h.      The Company's balance sheet accounts for mortgage-related securities, total assets, accumulated other comprehensive income and total stockholders' equity, and its income statement figures for net income and earnings per share (basic and diluted) were misstated due to Defendants' improper accounting for dollar-roll repurchase agreements in violation of SFAS 140;

i.      The Company's balance sheet accounts for loans held-for-investment and loans held for securitization and its income statement line items for provision for losses and net income were misstated due to Defendants' misclassification of loans as held for securitization in violation of SFAS 65;

j.      The Company's balance sheet accounts for mortgage portfolio, net and allowance for loan losses and its income statement line items for mortgage portfolio interest income, net income and provision for losses were misstated due to Defendants' improper accounting for the accrual interest on seriously delinquent loans in violation of SFAS 114;

k.      The Company's balance sheet accounts for loan losses and its income statement line item for provision for losses were misstated due to Defendants' improper accounting for the Company's allowance for loan losses in violation of SFAS 5 and SFAS 114;

l.      The Company's balance sheet accounts for the held-to-maturity and available-for-sale categories of the non-mortgage investments and its income statement line items for "fee and other income, net" were misstated due to Defendants' failure to properly account for OTTI for MH Bonds and Aircraft ABS in violation of SFAS 115;

m.      The Company's balance sheet accounts for mortgage-related securities held-to-maturity and available-for-sale and its income statement line items for interest income-mortgage portfolio were misstated due to Defendants' failure to properly account for IO MBS;

n.      The Company's balance sheet accounts for senior debt (due within one year of after one year) and its income statement line items for interest expense (short term or long term) were misstated due to Defendants' failure to properly account for amortization of callable debt expense in violation of APB 21;

o.      The Company's balance sheet accounts for unamortized premiums (discounts), deferred price adjustments (net), and other liabilities and its

income statement line items for interest income, interest expense and net income were misstated due to Defendants' failure to properly account for realignments in violation of APB 20;

p.  Defendants failed to consolidate the results of its QSPEs on its financial statements, as required by GAAP;

q.  Defendants incorrectly accounted for the Company's LIHTC investments;

r.  Defendants improperly accounted for certain guaranty fees and obligations in connection with Fannie Mae mortgage MBS securities trusts;

s.  Defendants improperly accounted for wholly-owned Fannie Mae MBS in violation of SFAS 140 and FASB Interpretation No. 46;

t.  Defendants improperly accounted for REO and foreclosed property expense in violation of SFAS 144;

u.  Defendants improperly recognized all profit from the sale of its real estate-owned, regardless of whether it qualified for the accrual method of accounting, in violation of SFAS 66;

v.  Defendants improperly accounted for troubled debt restructurings in violation of SFAS 15 and 114;

w.  Defendants improperly treated certain trusts the Company used for securitization transactions as QSPEs in violation of SFAS 140;

x.  Defendants improperly reduced its recorded guaranty asset and obligation for Fannie Mae MBS held in the Company's portfolio;

y.  Defendants improperly created two REMICs which had no legitimate purpose in violation of GAAP;

z.  Defendants had not established an adequate internal control system to ensure (a) that accounting policies were appropriately developed, implemented, and reviewed, or (b) that the Company's financial statements were materially accurate;

aa.  Defendants had established and maintained a corporate culture that emphasized stable earnings at the expense of accurate financial disclosures and compliance with GAAP;

bb.  Fannie Mae's organizational structure did not provide an effective segregation of duties and responsibilities; and

cc.  Fannie Mae's internal Office of Auditing was completely ineffective and lacked independence.

665.   In addition, each of the statements relating to the time period after January 1, 2001 identified in the foregoing Section VIII, Defendants' False and Misleading Statements, was materially false and misleading because:

  a.   Defendants applied accounting methods and practices that did not comply with SFAS 133 to the Company's derivative transactions and hedging activities;

  b.   The Company did not properly document its hedging activity as required by SFAS 133; and

  c.   The Company's balance sheet accounts for derivatives in gain positions, total assets, senior debt, derivatives in loss positions, total liabilities, accumulated other comprehensive income, and total stockholders' equity; the Company's income statement line items for interest income (mortgage portfolio), interest expense, purchased options expenses, net income and earnings per share (basic and diluted); and the line items on the Company's statement of cash flows for net income, purchased options expense within net cash provided by operating activities and net payments to purchase or settle hedge instruments within net cash provided by financing activities, were misstated as a result of Defendants' misapplication of hedge accounting under SFAS 133.

666.   Further, the following statements identified in the foregoing Section VIII, Defendants' False and Misleading Statements, were materially false and misleading because the Company's balance sheet accounts for other assets and total assets, and the Company's income statement line items for provision for losses or fee and other income (expense), net income, and earnings per share (basic and diluted) were misstated as a result of Defendants' improper accounting for transactions that failed to qualify as insurance under SFAS 5:

  a.   The April 15, 2002 Press Release;

  b.   The July 15, 2002 Press Release;

  c.   The October 15, 2002 Press Release;

  d.   The April 15, 2003 8-K;

  e.   The May 2003 10-Q;

  f.   The July 15, 2003 8-K;

g.      The August 2003 10-Q;

h.      The October 16, 2003 8-K;

i.      The November 2003 10-Q;

j.      The January 21, 2004 8-K;

k.      The 2003 10-K;

l.      The April 19, 2004 Press Release; and

m.      The July 21, 2004 Press Release.

667.    Further, the following statements identified in the foregoing Section VIII, Defendants' False and Misleading Statements, were materially false and misleading because the Company's balance sheet accounts for loans (held for investment), mortgage related securities, total assets, accumulated other comprehensive income and total stockholders' equity; the Company's income statement line items for interest income (mortgage portfolio), net income, and earnings per share (basic and diluted); and the line items on the Company's statement of cash flows for net income, purchased options expense within net cash provided by operating activities, and net payments to purchase or settle hedge instruments within net cash provided by financing activities were misstated due to Defendants' misapplication of cash flow hedge accounting criteria for the Company's mortgage commitments under SFAS 149:

a.      The October 16, 2003 8-K;

b.      The November 2003 10-Q;

c.      The January 21, 2004 8-K;

d.      The 2003 10-K;

e.      The April 19, 2004 Press Release; and

f.      The July 21, 2004 Press Release.

668.    The following statements identified in the foregoing Section VIII, Defendants' False and Misleading Statements, were materially false and misleading because the Company's balance sheet accounts for accrued interest receivable, total assets, accrued interest payable, other liabilities and total liabilities, and the Company's income statement line items for interest income (non mortgage related), interest expense (short term), administrative expenses, net income, and earnings per share (basic and diluted) were misstated as a result of the improper timing of income and expense recognition:

    a.    The 2000 Annual Report;

    b.    The April 17, 2001 Press Release;

    c.    The July 17, 2001 Press Release;

    d.    The October 15, 2001 Press Release;

    e.    The January 14, 2002 Press Release;

    f.    The 2001 Annual Report;

    g.    The April 15, 2002 Press Release;

    h.    The July 15, 2002 Press Release;

    i.    The October 15, 2002 Press Release;

    j.    The January 15, 2003 Press Release;

    k.    The 2002 Annual Report;

    l.    The Registration Statement;

    m.    The April 15, 2003 8-K; and

    n.    The May 2003 10-Q.

669.    Further, the following statements identified in the foregoing Section VIII, Defendants' False and Misleading Statements, were materially false and misleading because they contained false and misleading disclosures concerning the Company's buyback program:

a.      The 2002 Annual Report;

b.      The 2002 10-K;

c.      The Registration Statement;

d.      The May 2003 10-Q;

e.      The July 15, 2003 Conference Call;

f.      The August 2003 10-Q;

g.      The November 2003 10-Q;

h.      The 2003 10-K;

i.      The 2003 Annual Report;

j.      The May 2004 10-Q; and

k.      The August 2004 10-Q.

670.    Finally, the Defendants' statements in the 2002 Annual Report regarding Fannie Mae's creation of REMICs using assets from its mortgage portfolio, as identified in the foregoing Section VIII, Defendants' False and Misleading Statements, were materially false and misleading because Defendants knew, but failed to disclose, the existence of the income-shifting REMICs and their expected effects on the timing of earnings.

## X.      **PLAINTIFFS' RELIANCE ON DEFENDANTS' FALSE STATEMENTS**

671.    Plaintiffs' representatives participated in the Company's quarterly conference calls, and read the Company's press releases and Form 10-Q and 10-K filings (including the financial statements and notes thereto) promptly following their publication. Plaintiffs read and relied on the Company's financial statements, and relied on the accuracy and completeness of all

of the Defendants' public disclosures, when making their investment decisions.  In addition, Plaintiffs reviewed KPMG's audit opinions to ensure that they were unqualified, and relied on those unqualified opinions when making their investment decisions.

672.    Plaintiffs' investment decisions regarding Fannie Mae throughout the Loss Period were based, in significant part, upon Plaintiffs' financial analysis of various line items from the Company's reported financial statements, including but not limited to:  revenue, net income, earnings per share, interest income, other comprehensive income, fee and other income, interest expense, total assets, loans held for investment, mortgage related securities, and stockholders' equity.  Each of these items in the Company's financial statements was materially false, as alleged herein.

673.    Plaintiffs also read and relied on Defendants' statements during the Loss Period regarding the size of Fannie Mae's hedging portfolio, the nature of its derivative transactions, and the Company's compliance with FAS 133.  In the wake of the derivative accounting scandal at Freddie Mac, Plaintiffs relied on Defendants' assurances that Fannie Mae did not engage in the same types of transactions or have the same problems with derivative accounting as Freddie Mac.  Had the Company disclosed the truth – *i.e.*, that it was not accounting for derivatives in accordance with FAS 133 – Plaintiffs would have known that the Company's regulatory capital requirements were significantly higher than what the Company led investors to believe, and the market price of Fannie Mae's stock would have been significantly lower.

674.    On December 22, 2004, the Company disclosed that its previously-issued financial statements should no longer be relied upon because they were not prepared in accordance with GAAP.  However, that disclosure – which Plaintiffs relied upon as being truthful and complete – identified the only GAAP violations as those relating to SFAS 91 and

SFAS 133.  There were numerous other GAAP violations that were not disclosed.  Plaintiffs had no reason to believe, until the Company's subsequent disclosure of numerous additional GAAP violations, that the Company's financial statements were misstated for reasons or by amounts unrelated to the FAS 91 and FAS 133 violations, or that the fraud within Fannie Mae was as pervasive as would later be revealed.

675.    Because they (unlike the Individual Defendants) had no access to Fannie Mae's internal or non-public information, Plaintiffs did not know and had no way of knowing that the financial information or audit reports upon which they were relying were materially false.  Nor did they have any reason to know that the Officer Defendants were untrustworthy, that the Defendants were improperly accounting for derivatives, that the Company's revenues and other financial metrics were significantly weaker than what the financial statements indicated, that the Company's minimum regulatory capital requirement was higher than what its financial statements indicated, that the Company's financial statements failed to comply with GAAP in numerous respects, that the Company had severe internal control deficiencies, or that KPMG had failed to conduct its audits in accordance with GAAS.  Had Plaintiffs known the truth, they either would not have purchased Fannie Mae securities at all, or would have done so only at substantially lower prices.

## XI.    THE TRUTH BEGINS TO EMERGE, CAUSING PLAINTIFFS TO INCUR LOSSES

676.    OFHEO began investigating Fannie Mae in July 2003, after it uncovered an accounting scandal at Freddie Mac in mid-2003 that resulted in the ouster of Freddie Mac's CEO and the imposition of a $125 million civil fine.

677.    OFHEO investigated Fannie Mae for more than fifteen months before issuing its blistering 198 page report dated September 17, 2004, detailing widespread accounting fraud at

Fannie Mae. Before that date, Plaintiffs and other investors had no inkling that such fraud was occurring. Indeed, all of Defendants' public statements had denied the existence of any problems at Fannie Mae like those at Freddie Mac.

678.   Falcon, the Director of OFHEO, sent a draft copy of the Interim OFHEO Report to Fannie Mae's Board of Directors on September 20, 2004. In his cover letter, Falcon stated:

> I am transmitting to you a report I have received on our findings to date. *The findings raise such serious safety and soundness concerns that immediate action is warranted, rather than waiting until the completion of the full special examination.*
>
> \*       \*       \*
>
> [T]he report documents how Fannie Mae 1) applied accounting methods and practices that do not comply with GAAP in accounting for the enterprise's derivative transactions and hedging activities, 2) employed an improper 'cookie jar' reserve in accounting for amortization of deferred price adjustments under GAAP, 3) tolerated related internal control deficiencies, 4) in at least one instance deferred expenses apparently to achieve bonus compensation targets, and 5) maintained a corporate culture that emphasized stable earnings at the expense of accurate financial disclosures.
>
> *These findings cannot be explained by mere differences in interpretation of accounting principles, but clear instances in which management sought to misapply and ignore accounting principles for the purposes of meeting investment analyst expectations; reducing volatility in reported earnings; and enabling fragmented processes and systems, and an ineffective controls environment to exist.*

(emphasis added).

679.   OFHEO released its damning Interim Report to the public on September 22, 2004. As detailed in the Interim Report, OFHEO found that Fannie Mae had misapplied SFAS 91 and SFAS 133 in all of its financial statements from January 2001 through the second quarter of 2004. The Interim Report slammed Fannie Mae's accounting policies, noting:

The misapplications of GAAP are not limited occurrences, but are pervasive and reinforced by management. **The matters detailed in this report are serious and raise concerns regarding the validity of previously reported financial results, the adequacy of regulatory capital, the quality of management supervision, and the overall safety and soundness of the Enterprise.**

(emphasis in original).

680.    OFHEO found that Fannie Mae management violated SFAS 91 by:

- deliberately developing and adopting accounting policies to spread estimated income or expense that exceeded predetermined thresholds over multiple reporting periods;

- establishing a materiality threshold for estimated income and expense, within which management could avoid making adjustments that would otherwise be required under SFAS 91;

- making discretionary adjustments to the financial statements, for the sole purpose of minimizing volatility and achieving financial results;

- forecasting and managing the future unrecognized income associated with misapplied GAAP;

- capitalizing reconciliation differences as "phantom" assets or liabilities and amortizing them at the same speeds as 30-year-fixed-rate mortgages;

- developing estimation methods that were inconsistently applied to retrospective and prospective amortization required by SFAS 91 for current and future periods;

- developing and implementing processes to generate multiple estimates of amortization with varying assumptions in order to select estimates that provided optimal accounting results;

- failing to properly investigate an employee's concerns regarding illogical or anomalous amortization results, along with that employee's further allegation of an intent to misstate reported income;

- tolerating significant weaknesses in internal controls surrounding the amortization process; and

245

- inappropriately deferring $199 million of estimated amortization expense in 1998, which had significant effects on executive compensation.

681.    In addition, OFHEO found that Fannie Mae management had "implemented SFAS 133 in a manner that placed minimizing earning volatility and maintaining simplicity of operations above compliance with GAAP."   Moreover, OFHEO "found that in many cases Fannie Mae [did] not assess and record hedge ineffectiveness as required by SFAS 133, and applie[d] hedge accounting to hedging relationships that [did] not qualify." As a consequence, OFHEO found that Fannie Mae's earnings were misstated.

682.    Further, OFHEO found that "Fannie Mae ha[d] applied the 'short cut' method, or the 'matched terms' method, for a broad range of hedge relationships where these methods [were] inappropriate."   Accordingly, Fannie Mae's "accounting for offsetting derivatives was inappropriate through the end of 2003, because Fannie Mae incorrectly treated the original swap and the offsetting swap as perfect cash flow hedges and recorded changes in their fair value in accumulated other comprehensive income (AOCI), instead of earnings."

683.    OFHEO noted that "[f]or derivatives not qualifying for hedge accounting, fair value changes should be reflected in earnings in the period in which the value change occurred . . . **The possible reclassification of such amounts into retained earnings could have a significant effect on Fannie Mae's regulatory capital.**" (emphasis in original).

684.    In addition to the accounting violations, OFHEO found that Fannie Mae's management had created a corporate culture that enabled these serious and widespread accounting problems to go unchecked, noting:

> The problems relating to these accounting areas differ in their specifics, but they have emerged from a culture and environment that made these problems possible.  Characteristics of this culture include:

- management's desire to portray Fannie Mae as a consistent generator of stable and growing earnings;

- a dysfunctional and ineffective process for developing accounting policies;

- an operating environment that tolerated weak or non-existent controls;

- key person dependencies and poor segregation of duties;

- incomplete and ineffective reviews by the Office of Auditing;

- an inordinate concentration of responsibility vested with the Chief Financial Officer; and

- an executive compensation structure that rewarded management for meeting goals tied to earnings-per-share, a metric subject to manipulation by management.

685.    OFHEO found that Fannie Mae management "intentionally developed accounting policies and selected and applied accounting methods to inappropriately reduce earnings volatility and to provide themselves with inordinate flexibility in determining the amount of income and expense recognized in any accounting period." OFHEO also found that Fannie Mae management "failed to establish an internal control system to ensure that accounting policies [were] appropriately developed and reviewed."

686.    In the aftermath of the Interim Report, Fannie Mae's Board entered into an agreement with OFHEO on September 27, 2004 (the "September 2004 Agreement"). The September 2004 Agreement required the Board to retain independent counsel and an accounting firm to conduct reviews of several areas, including: (1) Fannie Mae's internal controls relating to accounting; (2) Fannie Mae's accounting and other corporate policies; (3) Fannie Mae's organizational structure and staffing, particularly relating to its CFO, Controller's Office, accounting, audit, financial reporting, business planning and forecasting, and modeling and

financial standards functions; (4) Fannie Mae's compensation regime as related to strategic planning, and its impact on accounting and transaction decisions; and (5) Fannie Mae's governance procedures.

687.    The Board selected Paul Weiss as independent counsel pursuant to the September 2004 Agreement.  Paul Weiss's mandate was, among other things, to conduct a comprehensive review of the Company's accounting policies and practices to ensure that they accurately reflected the Board's objectives in complying with the law and regulations and in overseeing the operations of Fannie Mae.

688.    During testimony before the Congressional Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises on October 6, 2004, Falcon made clear just how seriously OFHEO was treating Fannie Mae's incorrect accounting:

> Let me state plainly that Fannie Mae's accounting was just wrong, and must be fixed properly.  The stakes are too high to just forgive past sins.  If any company, especially a government sponsored enterprise, is allowed to get away with this type of accounting misconduct, then no regulator can do its job and no investor is safe. A regulator and an investor must be able to trust the books and records of a company.

(emphasis added).

689.    Further, Falcon condemned both Fannie Mae and KPMG for standing behind what OFHEO deemed clear violations of straightforward accounting principles:

| Congressman Castle: | . . . Could this be another example of just a difference of opinion as to the application of GAAP . . . [o]r is it something else? |
|---|---|
| Mr. Falcon: | We feel strongly that these are black and white accounting issues.  These are not issues of interpretation.  They are not issues where reasonable people can disagree.  We have taken prompt, strong action in trying to deal with this because |

> *we do think they were clear violations of accounting principles.*

> Congressman Castle:    So i.e. KPMG then in standing by this is at fault in terms of the clear accounting principles which exist. Is that what your statement is basically?

> Mr. Falcon:    *If they are standing behind this accounting treatment, then yes, they are wrong as well.*

(emphasis added).

690.    Finally, Falcon unequivocally stated that OFHEO believed Fannie Mae had engaged in willful violations of GAAP:

> Congressman Oxley:    . . . Is it your understanding that Fannie was aware of the fact that their accounting was not GAAP compliant, but they chose not to comply because, to do so, would be too burdensome and costly? Or is it your opinion that Fannie Mae made a material misapplication of the GAAP rules?

> Mr. Falcon:    I think it is both, Mr. Chairman. One, they wanted to maintain the accounting principles that they thought were best suited to the company. At the same time, they willfully did not apply accounting rules properly. This is an important point because it was not just a matter of these rules being too complex for this large, sophisticated company. *They understood the rules. They chose not to follow them.*

(emphasis added).

691.    Immediately following the release of the Interim Report, the price of Fannie Mae's stock began to plummet. By the close of trading on September 22, 2004, the day the Interim Report was released to the public, Fannie Mae stock had dropped to $70.69 per share (on

a trading volume of 17,700,500 shares), down from $75.65 per share (on a trading volume of 2,643,300 shares) the day before the announcement.

692.    Fannie Mae stock continued to fall throughout the month of September 2004, closing at $63.40 a share (on a trading volume of 16,314,500 shares) on September 30, 2004. This stock drop translated into an $11.8 billion loss in market capitalization within the first eight days of the release of the Interim Report (dropping from approximately $73.2 billion as of September 21, 2004 down to $61.4 billion as of September 30, 2004).

693.    In addition to losing $11.8 billion in market capitalization, Fannie Mae came under attack from a variety of government entities in the weeks following the release of the Interim Report.

694.    On October 6, 2004, the U.S. Attorney's Office for the District of Columbia opened a criminal investigation against Fannie Mae and directed it to preserve certain documents, including documents relating to the matters discussed in the Interim OFHEO Report.

695.    On October 19, 2004 the SEC informed Fannie Mae that it had opened a formal investigation relating to the matter sets forth in the Interim Report.

696.    The Company announced on November 15, 2004 that it would not file the required 2004 third quarter financial report with the SEC by the November 15, 2004 deadline because KPMG was unable to complete its review of Fannie Mae's interim unaudited financial statements for that quarter.

697.    On December 15, 2004, Donald T. Nicolaisen, Chief Accountant for the SEC, announced the results of the SEC's review of Fannie Mae's accounting practices.  The SEC found that Fannie Mae's accounting practices from 2001 through the second quarter of 2004 did not comply with SFAS 91 and SFAS 133, stating:

> Regarding [SFAS] No. 91 … Fannie Mae failed to record timely adjustments to the recorded amount of its loans based on changes in the estimated speed with which those loans would be prepaid….
>
> It also appears that, contrary to [SFAS] 91, Fannie Mae recognized adjustments to the carrying amount of its loans only if they exceeded a self-defined materiality limit, referred to as a "precision threshold."
>
> Regarding [SFAS] 133, one of the principles underlying the statements is that derivative instruments are to be recorded at their fair value with changes in fair value reported in earnings. If certain hedge criteria are met, however, [SFAS] 133 affords special accounting for the hedge relationship. If the specific hedging requirements are not met, then the special hedge accounting is not appropriate.
>
> Fannie Mae internally developed its own unique methodology to assess whether hedge accounting was appropriate. Fannie Mae's methodology, however, did not qualify for hedge accounting because of deficiencies in its application of [SFAS] 133. Among other things, Fannie Mae's methodology of assessing, measuring, and documenting hedge ineffectiveness was inadequate and was not supported by [SFAS 133].

698. Based on its findings, the Office of the Chief Accountant of the SEC ordered the Company to restate its financial statements filed with the SEC to eliminate the use of hedge accounting, and to correct any material misstatements that resulted from non-compliance with SFAS 91.

699. Fannie Mae's Audit Committee announced on December 17, 2004 that all of the Company's financial statements for fiscal years 2001, 2002, 2003 and the first two quarters of 2004 were prepared applying accounting practices that did not comply with GAAP and should no longer be relied upon. Fannie Mae subsequently announced on December 22, 2004 that it would restate its financial results for 2001, 2002, 2003 and the first two quarters of 2004. This constitutes an admission that the representations made in the original financial statements and

other financial information contained in the Company's SEC filings concerning the compliance of those financial statements with GAAP were materially false and misleading when made. Under GAAP, financial statements are to be restated *only* when the facts that necessitate the restatement were material and known or knowable at the time the financial statements were originally issued.

700.    In the wake of the scandal, on December 21, 2004, Raines announced his retirement.  Raines acknowledged that his early retirement was motivated by the accounting fraud, stating: "I previously stated that I would hold myself accountable if the SEC determined that significant mistakes were made in the Company's accounting . . .  By my early retirement, I have held myself accountable."  The same day, Howard announced his resignation, and the Board's Audit Committee dismissed KPMG as the Company's independent auditor.  KPMG's dismissal was announced in a September 28, 2004 Form 8-K filing stating that, prior to its dismissal, KPMG had "notified the company that there existed strong indicators of material weaknesses in internal control over financial reporting, which included OFHEO's determination of weaknesses in such controls, the [SEC's Office of the Chief Accountant's] determination that Fannie Mae's application of FAS 91 and FAS 133 did not comply in material respects with the accounting requirements of those standards, and observed deficiencies in Fannie Mae's process of closing its accounting records for the quarter ended September 30, 2004 that resulted in post-closing entries to the interim financial information." Spencer announced her resignation on January 17, 2005.

701.    On January 19, 2005, Fannie Mae announced that it would cut its quarterly dividend in half to save $1 billion a year to help it amass a required additional $12.5 billion of capital.  Fannie Mae's stock dropped $3.50 a share in response to this announcement, declining

from its close at $69.70 the day before the announcement to a close at $66.20 the day after the announcement.

702.    On February 9, 2005, SEC Chief Accountant Donald Nicolaisen testified before the Congressional Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises concerning the SEC's findings regarding Fannie Mae's accounting practices.  He made clear that it was the SEC's view that Fannie Mae's accounting errors could not merely be "chalked up" to differences of opinion regarding the application of unduly complex regulations:

| | |
|---|---|
| Chairman Baker: | In your finding, it appears that the accounting methodology was not just an aberrant act.  It wasn't with regard to a single transaction.  It wasn't with regard to a single quarter.  It wasn't with regard to an annual statement.  It was year-over-year practice, is that correct? |
| Mr. Nicolaisen: | With respect to the two issues that we looked at [namely, SFAS 91 and SFAS 133], they were across all of the years that I referred to 2001 through 2004. |
| Chairman Baker: | Some have suggested that this could have been what is discussed as an interpretive judgment:  Two artists looking at the same picture would see two different things.  In your view of the findings and the determinations made, was this  just a matter of interpretive judgment where two people could have come to varying conclusions, or was this clearly outside professional accounting standards? |
| Mr. Nicolaisen: | *In my view, it was outside professional accounting standards.* |
| Chairman Baker: | Is it so difficult for a public operating company to comply with [SFAS] 91 and 133 that it is pattern and practice within the rest of the public operating company world that companies just don't get it right? Or are there other companies out |

| | |
|---|---|
| | there who, in your view, do find appropriate manner in which to comply with the rules as you see them? |
| Mr. Nicolaisen: | Well, I believe that other companies are complying with Statements 91 and 133. I have reason to believe that the standards are workable and are being followed. |
| Chairman Baker: | It may be difficult, but as a matter of customary practice, accountants and CPAs in public operating companies across the country do conform with your rules on a day-to-day basis? |
| Mr. Nicolaisen: | Yes. |

(emphasis added).

703.   Further, Mr. Nicolaisen testified that, while SFAS 91 and 133 may contain areas of complexity, Fannie Mae had violated "very crystal-clear rules" with respect to its hedging activities:

| | |
|---|---|
| Congresswoman Biggert: | Some have said that [SFAS] 91 and [SFAS] 133 are overly complex accounting standards. Do you think that is a fair statement? |
| Mr. Nicolaisen: | Well, I tried to address that a bit with Mr. Kanjorski. The statements are long. They do have a lot of attendant and interpretive guidance that is provided with it. The reasons for that, I don't think, are because the statement is particularly complex. I think it is because the business world has reasonably complex transactions and iterative developments of different products sometimes require new interpretations. The basic principle is pretty straightforward. As I described, [derivative instruments] are recorded at fair- in the financial statements, derivative instruments that bear value with adjustments running through the income statement. The exception to that is for |

254

> hedging. *And where hedging is required, the hedging rules are straightforward, clear. Each company will have some interpretive aspects, no doubt, that they would have to deal with to various degrees as they apply, but I think they are very crystal-clear rules.*

(emphasis added).

704. At the time of its December 22, 2004 announcement, Fannie Mae estimated that a loss of hedge accounting under SFAS 133 for all derivatives could result in its recording into earnings of a net cumulative loss on derivative transactions of approximately $9 billion as of September 30, 2004. Further, Fannie Mae stated that there would be a corresponding decrease in retained earnings and, accordingly, regulatory capital. Finally, Fannie Mae stated that it expected that the impact of these restatements would be material to its reported financial and core business results for many, if not all, of the periods at issue. However, as would later be revealed through a series of supplemental disclosures between February 23, 2005 and May 9, 2006, the fraud that had been disclosed as of December 22, 2004 was only the tip of the iceberg.

705. On February 23, 2005, Fannie Mae announced and reported on a Form 8-K that OFHEO had notified its Board of Directors and management of additional accounting and internal control issues that had arisen during its ongoing investigation. Specifically, OFHEO identified issues relating to Fannie Mae's application of the following accounting standards:

- SFAS 115, *Accounting for Certain Investments in Debt and Equity Securities;*

- SFAS 65, *Accounting for Certain Mortgage Banking Activities;*

- SFAS 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities;*

- SFAS 46, *Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin No. 51;*

- SFAS 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*; and

- SFAS 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases.*

706.    Fannie Mae disclosed that the proper application of SFAS 149 alone could cause it to record an additional estimated net cumulative after-tax loss of $2.4 billion as of December 31, 2004.  These newly-disclosed GAAP violations were clearly material, as they increased the impact of the expected restatement by over 25% (*i.e.*, an increase in net cumulative after-tax loss from $9 billion to $11.4 billion).  Fannie Mae's stock dropped by almost $1 per share in response to this announcement, down from its close at $57.80 the day before the announcement to its close at $56.95 the day after the announcement.

707.    In light of the revelation of these additional accounting problems, Fannie Mae and OFHEO entered into a supplemental agreement on March 7, 2005 (the "March 2005 Agreement").  The March 2005 Agreement called for a number of additional internal reviews, including reviews of (1) Fannie Mae's procedures relating to the preparation and recording of journal entries; (2) Fannie Mae's internal controls relating to modifications to the databases supporting the Company's general ledger; (3) Fannie Mae's legal and regulatory compliance structures; and (4) Fannie Mae's bylaws and codes of conduct.  The March 2005 Agreement also required the Company to conduct a reaudit and restatement for prior earnings periods, as necessary, and to review its accounting for standards in addition to SFAS 91 and SFAS 133, including SFAS 115, SFAS 140, SFAS 65, SFAS 149 and FIN 46.

708.    In light of its ongoing problems, Fannie Mae announced on March 17, 2005 that it would not be able to file its Form 10-K for the year ended December 31, 2004.  The March 17, 2005 announcement had an immediate negative effect on Fannie Mae's stock price, which

dropped from its close on March 16, 2005 at $56.95 a share (on a trading volume of 5,257,500 shares) to its close on March 17, 2005 at $54.50 (on a trading volume of 16,207,400 shares).

709.    On April 6, 2005, Falcon again testified before the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, this time to address the additional accounting errors OFHEO had identified during its ongoing investigation as disclosed by Fannie Mae on February 23, 2005.  Falcon testified that the additional accounting errors, like those initially uncovered by OFHEO, were not mere mistakes but, rather, willful violations of accounting rules.  Moreover, to the extent Fannie Mae's accounting policies were GAAP-compliant, the Company's personnel simply disobeyed the rules:

> OFHEO's special examination of Fannie Mae has revealed a significant number of new accounting problems at the enterprise. As with previous accounting problems, they reflect Fannie Mae's tendency towards overly aggressive interpretation of GAAP, or, in certain instances, *a willful disregard of accounting rules.  They also reflect situations where Fannie Mae's accounting policies actually comply with GAAP, but enterprise personnel have failed to follow those policies.*

(emphasis added).

710.    Falcon reinforced the role poor internal controls played in permitting Defendants to perpetrate the fraud described herein and cautioned of the significance of these deficiencies. In response to a question from Congressman Kanjorksi concerning the significance of these defects, Falcon testified:

> I view the weaknesses in internal controls as very significant.  As you know, there are many examples in history where lapses in internal controls have brought down large old financial institutions almost overnight.  Barings Bank is one example of how internal controls can bring down a company, even a well-capitalized company.  So lapses in internal controls, even though we often speak of them after the accounting issues, I think, are just as, if not more, serious than the accounting problems.

711.    Falcon also testified that OFHEO had uncovered numerous problems involving the Company's procedures for preparing, reviewing, validating, authorizing, and recording journal entries, including falsification of signatures on journal entries; failure to require that preparers of journal entries understand the purpose of the entries; failure to require supporting documentation for journal entries; lack of independent review of journal entries; and the absence of written policies concerning journal entry procedures.  According to Falcon, one Fannie Mae employee revealed that from 1999 through 2002, his/her signature had been forged on post-closing journal entries relating to amortization.

712.    On May 11, 2005, Fannie Mae announced that it would be unable to file its Form 10-Q for the quarter ended March 31, 2005.

713.    On August 9, 2005, Fannie Mae announced that it similarly would be unable to file its Form 10-Q for the quarter ended June 30, 2005.  Further, Fannie Mae announced that it would not complete its restatement of billions of dollars in previously reported earnings until the second half of 2006.  Fannie Mae's stock price dropped following the August 9, 2005 announcement from its close at $54.83 (on a trading volume of 2,774,700 shares) on August 9, 2005 to its close at $52.64 (on a trading volume of 8,485,200 shares) on August 10, 2005.

714.    On September 28, 2005, Fannie Mae's stock price fell to an eight-year low of $41.71 – a 44.8% decrease from its $75.65 closing on September 21, 2004 – after Dow Jones reported that the Company's internal investigation (headed by former U.S. Senator Warren Rudman) had revealed "new and pervasive accounting violations," in addition to those previously reported.  Dow Jones reported that persons "close to, or who have been involved" in the investigation had indicated that Company executives had inflated Fannie Mae's earnings by overvaluing assets, underreporting credit losses, and misusing tax credits, including by

purchasing "finite insurance policies" to hide earnings losses after they were incurred.  These violations had not previously been disclosed to the public.

715.    The November 2005 Form 12b-25 confirmed the discovery of the additional accounting violations referenced in the September 28, 2005 Dow Jones report.

716.    On February 23, 2006, Paul Weiss issued its 600+ page Report detailing the findings of its investigation.  The Paul Weiss report confirmed OFHEO's findings and outlined a number of disturbing conclusions concerning Fannie Mae's corporate culture, accounting practices, and internal controls, as discussed herein.

717.    Fannie Mae's internal investigation has continued to uncover additional accounting violations.  Fannie Mae announced such violations in the March 2006 Form 12b-25 and again in the May 2006 Form 12b-25.  The full extent of Fannie Mae's fraud, plainly, remains to be seen.

718.    On May 23, 2006, OFHEO released its Final Report, which noted that "Fannie Mae management expected to write the rules that applied to the Enterprise and to impede efforts at effective safety and soundness regulation.  Those rules included managerial latitude in deciding when to comply with [GAAP] and engaging in and concealing improper earnings management for the purpose of achieving announced earnings targets."  The Final Report further concluded that "Fannie Mae's Board of Directors contributed to those problems by failing to be sufficiently informed and to act independently of its chairman, Franklin Raines, and senior management, and by failing to exercise the requisite oversight over the Enterprise's operations."  According to OFHEO, "[t]hat misconduct ultimately led to the [SEC] directing Fannie Mae to restate its financial results for 2002 through mid-2004, the departure of [Raines and Howard], losses of tens of billions of dollars in market capitalization for Fannie Mae shareholders, and

expenses for the restatement process, regulatory examinations, investigations, and litigation that the Enterprise has recently estimated will exceed $1.3 billion in 2005 and 2006 alone."

719.    Also on May 23, 2006, Fannie Mae announced that it had reached an agreement with the SEC and OFHEO relating to their investigations into the Company's fraudulent accounting.  The agreement requires Fannie Mae to pay a $400 million fine and to implement a host of corrective remedies.

## XII.    THE FANNIE MAE DEFENDANTS' SCIENTER

720.    Throughout the Loss Period, the Fannie Mae Defendants intentionally, or at the very least recklessly, made materially false and misleading statements and concealed material information regarding Fannie Mae's financial condition, as alleged herein.  Many of the misstatements and omissions were the result of intentional deception and intentional violations of GAAP by these defendants, for the purposes of meeting EPS bonus targets and reducing earnings volatility.

721.    Fannie Mae and the Officer Defendants had actual knowledge of serious misconduct and internal control deficiencies in the Company's Controller's Office – which had responsibility for the Company's accounting and financial reporting.  For example, in September 2002, Barnes sent Raines and Howard an inter-office memorandum, which Spencer also received, advising them of the following accounting problems, which Barnes stated would affect the Company's reported financials:

- Reconciliation differences from systems were being input as future deferrals instead of the current period's income and expenses;

- The Controller's Office was intentionally limiting the AIMS system's capabilities so that it would not provide audit trails for modeling;

- The Controller's Office had a practice of using negative factors in amortization and allowed amortization to exceed 100%;

- The Controller's Office routinely understated and overstated income;

- The Controller's Office managed income to meet the Company's desired objectives;

- The Controller's Office used "on-top" entries in order to manage income and margin calculations;

- The Company was using a miscellaneous balance sheet account in order to manage reporting of income in periods other than when it was received; and

- There were serious problems with the amortization of purchase discounts and premiums, and that "the possible impact reaches hundreds of millions of dollars and possibly affects the integrity of the current financial statements, and those [the Company] will issue after beginning compliance with SEC reporting in 2003."

722.    Fannie Mae is charged with the knowledge possessed by its senior officers, including Raines, Howard, Spencer, and Barnes.

723.    Howard's intentional misconduct also included, *inter alia*: (a) authoring and enforcing improper accounting practices and demanding that Fannie Mae's employees misapply GAAP in order to mask the effect of market volatility on the Company's financials; (b) assuming tight controls over Fannie Mae's accounting policies and procedures when his decisions should have been vetted with others at Fannie Mae; and (c) failing to establish adequate internal controls which he admitted was his responsibility to do.

724.    Paul Weiss specifically found that Howard and Spencer knew or should have known that the Company's approach to hedge accounting was motivated by improper concepts including, as set forth more fully above, the desire to minimize earnings volatility, to leverage existing accounting systems so as to avoid the expense of creating new systems to properly implement SFAS 133, and to simplify the Company's financial reporting. Moreover, Spencer, as the senior accountant involved in the SFAS 133 implementation process, knew or should have known that the Company's accounting did not meet the requirements of SFAS 133 in many

significant respects, as discussed at length above in Section IV.E.2, *Fannie Mae's Improper Accounting For Derivative Transactions And Hedging Activities*.

725.    During the Loss Period, Raines and Howard signed each of Fannie Mae's Annual Reports, Forms 10-K, and Forms 10-Q with knowledge that they falsely represented Fannie Mae's financial results, or with reckless disregard for their truth or falsity.  Additionally, their conduct in signing certifications in the Company's Form 10-K and 10-Q filings, thereby personally attesting to the accuracy of the financial statements and in particular that they conformed with GAAP and that Fannie Mae's internal controls were effective, was intentional or at least reckless since they knew that these things were false.

726.    Raines and Howard had a motive to commit the fraud alleged herein, because their receipt of lucrative bonuses was dependent upon the Company's achievement of certain financial targets.  By manipulating the Company's accounting to create the illusion that those targets had been achieved, Raines and Howard created an entitlement to bonuses they would not have received if the Company's financial results were accurately reported.

727.    The Fannie Mae Defendants also had a motive to commit fraud by virtue of their desire to maintain Fannie Mae's status as a government-sponsored enterprise and all of the benefits that flowed from that status.  Toward that end, Fannie Mae and the Officer Defendants reassured the market of Fannie Mae's soundness by masking the volatility of its earnings.

728.    Fannie Mae had an obvious opportunity to commit fraud, because it published and controlled the content of its own financial statements and other public statements, and because it controlled its own accounting and financial reporting functions, by which the fraud was perpetrated.

729.    As CEO, CFO, and Controller of Fannie Mae during the Loss Period, Raines, Howard, and Spencer also had the opportunity to commit fraud.  Raines and Howard were the public voices of Fannie Mae and were therefore in a position to communicate, as they did during conference calls and in press releases and other public documents, false and misleading statements concerning the Company's financial condition, its compliance with GAAP, the soundness of its internal controls, and the veracity of its financials.  Raines signed or authorized all of the Company's SEC filings, Annual Reports, and press releases during the Loss Period. Howard and Spencer signed many of the Company's SEC filings and Annual Reports, as alleged herein.  Further, Howard and Spencer oversaw the Company's accounting and financial reporting, were responsible for creating and approving accounting policies and procedures, and were directly involved in the preparation of the Company's financial statements.  Thus, Raines, Howard and Spencer all had the ability to control the Company's accounting as well as the content of its financial statements and disclosures.  All of them had the motive and the opportunity, which they took, to commit fraud.

730.    The Officer Defendants' scienter is also established by their insider trading during the Loss Period.  Since Fannie Mae did not register with the SEC until 2002, the Officer Defendants were not required to publicly disclose their stock trades and there is no publicly available data about their stock trades prior to 2002.  However, from the time the Officer Defendants began publicly reporting their stock sales in April 2002 through October 2004, Raines, Howard and Spencer all sold substantial amounts of stock at artificially inflated prices while in possession of materially adverse inside information, as evidenced by (a) the chart attached hereto as Schedule A, and (b) the narratives below.

731.    On January 15, 2003, the Company publicly announced its fourth quarter and 2002 year-end results in a press release wherein Raines stated that Fannie Mae's operating results in 2002 were among the best in the Company's history.  The Officer Defendants all knew this statement to be false, and that the Company's reported financial condition was a house of cards built on fraud.  On that same day, Howard sold over 470 shares of Fannie Mae stock for proceeds of $32,564.  Shortly thereafter, on January 21, 2003, Raines sold 20,908 shares for proceeds of $1.45 million, Howard sold another 5,019 shares for proceeds of approximately $350,000, and Spencer sold 1,044 shares for proceeds of over $72,000, thereby benefiting from the inflated stock price which the false statements had created and maintained.

732.    On January 21, 2004, Fannie Mae issued a press release announcing, *inter alia*, that net income for the year ended December 31, 2003 was up 71.1% and that diluted EPS were up 75% from the prior year.  Two days later, on January 23, 2004, Howard sold 7,825 shares of stock for proceeds of $612,815, Raines sold 24,874 shares for proceeds of $1,984,007, and Spencer sold 1,230 shares for proceeds of $96,327.  Four days later, on January 27, 2004, Spencer sold an additional 3,000 shares for $237,000.  Three weeks later, when the stock was still selling at artificially inflated prices of over $79 per share, Spencer sold an additional 6,800 shares for proceeds of $541,730.  These trades occurred during the height of Fannie Mae's fraud, while the Officer Defendants were in possession of materially adverse information, including that the Company's stock price was artificially inflated.

733.    Between November 2003 and September 21, 2004, while the OFHEO investigation was ongoing and the Officer Defendants were in the possession of undisclosed, materially adverse information (*i.e.*, that the Company's stock price was inflated by fraudulent accounting practices which were likely to be uncovered by OFHEO), Howard sold 124,854

shares of Fannie Mae stock, reaping $8,983,369 in proceeds; Raines sold 54,538 shares for proceeds of $4,157,827; and Spencer sold 6,994 shares for proceeds of $555,038. The shares sold by Howard and Raines during this period represented 67% and 41%, respectively, of the shares of Fannie Mae stock beneficially owned by each as of April 1, 2003. By selling these shares based on inside information before the results of the OFHEO investigation were disclosed, the Officer Defendants received profits while Plaintiffs purchased shares at inflated prices not knowing the truth.

734.    Fannie Mae's attempts to interfere with OFHEO's examination of its accounting further demonstrates its scienter. OFHEO noted that Fannie Mae's Government and Industry Relations Department had a special relationship of cooperation and support with select Congressional staff. In the spring and fall of 2004, Fannie Mae lobbyists, with the knowledge and support of the Officer Defendants, used their longstanding relationships with Congressional staff to attempt to interfere with OFHEO's special examination.

735.    According to OFHEO, Fannie Mae lobbyists succeeded in generating a Congressional request for the Inspector General of HUD to investigate OFHEO's conduct in connection with the Special Examination. Between October 2002 and June 2004, there had been three previous Congressional requests for investigations of OFHEO by the HUD Inspector General. The topics of those investigations were:

- The compensation levels of OFHEO's public and Congressional relations staff;

- The results of OFHEO's annual examinations and the basis for its conclusions regarding Fannie Mae and Freddie Mac; and

- Whether OFHEO was in compliance with a provision of the VA-HUD Independent Agencies Appropriation Act for Fiscal Year 2004 that required the agency to allocate at least 60 percent of its budget to examinations and safety and soundness.

According to OFHEO, Fannie Mae lobbyists had been directly involved in the initiation of the third investigation. Specifically, staff in the Company's Government and Industry Relations Department helped formulate the language of the provision of the FY 2004 VA-HUD Independent Agencies Appropriations that provided the rationale for the third investigation.

736.    In April 2004, the HUD Inspector General received a Congressional request to conduct a fourth investigation. The subject was OFHEO's conduct of its ongoing special examination of Fannie Mae, especially the allegation that OFHEO had improperly leaked confidential information about the Company obtained during that examination. OFHEO found a draft of the Congressional request letter on Fannie Mae's computer system that was nearly identical to the request letter that was ultimately sent to the HUD Inspector General. That draft is dated April 15, 2004, almost two weeks before the actual request letter was sent.

737.    Duane Duncan, head of Fannie Mae's Government and Industry Relations Department at that time, admitted under oath in his interview with OFHEO on April 4, 2006 that Fannie Mae had generated the request for the fourth HUD Inspector General investigation.

> Q: [T]hen at some point thereafter, another letter went over to the HUD IG to conduct an investigation ….
>
> A: Yes, sir.
>
> Q: I don't want to put words in your mouth, but somebody looking at that would say, you know, it was instituted on the basis of Fannie Mae's request.
>
> A. Yes, sir.
>
> Q: It was?
>
> A. Yes.

738.    In the same interview, Duncan commented on the strong interest of Fannie Mae senior management in the report on the HUD Inspector General's fourth investigation becoming

public.  Duncan received direction from his superiors during Monday morning External Affairs meetings.  Raines, Howard, Thomas Donilon, and sometimes Mudd attended those meetings, with Raines and Donilon deciding what positions Fannie Mae would take on any given issue. Duncan implemented the decisions made at those meetings.

739.   According to OFHEO, Fannie Mae's senior management hoped that the report of the HUD Inspector General's fourth investigation (the "HUD Report") would discredit OFHEO's anticipated Interim Report on the findings of its Special Examination of Fannie Mae. Duncan explained Fannie Mae's intense interest in the publication of the HUD Report as follows during the same interview:

> Q:  Okay.  I am sort of curious myself.  Why would you be, you Fannie Mae, be so interested in seeing the report and getting it out?
>
> A: I think at the highest levels of the company, I think that the opinion was that the HUD IG report, again not knowing its contents until it came out, would serve to put the special exam, at least the preliminary report, in a perspective with a bias or with a—would kind of show that it was done in a way different than full objectivity, I guess, from the company's perspective … *I think the company at the highest levels thought that the HUD Inspector General's report would discredit or show the lack of objectivity in the OFHEO report in September or at least the preliminary report*.

(emphasis added).

740.   To achieve its goals, however, Fannie Mae needed to have the HUD Report published, even if it contained legally restricted, nonpublic information.   Accordingly, the Company began a campaign to enlist support for the release of the report.   Fannie Mae eventually succeeded in getting the document published on a Congressional website for one hour, during which time the Company obtained the report for further dissemination.  Through these efforts, Fannie Mae created a large volume of negative publicity about the OFHEO Report in an effort to distract attention from the Company's multibillion dollar accounting errors.

741.    OFHEO saw right through Fannie Mae's stratagem,  noting:

> In summary, it is clear that Fannie Mae sought to use the fourth
> investigation of OFHEO by the HUD Inspector General to attempt
> to undermine the special examination.  That initiative, although
> conceived and executed by the Government and Industry Relations
> Department, was well known by many members of senior
> management, including Chairman and Chief Executive Officer
> Franklin Raines, Executive Vice President for Law and Policy
> Thomas Donilon (to whom Mr. Duncan reported), and Senior Vice
> President and General Counsel Ann Kappler.  The unquestioning
> execution of the initiative by Mr. Duncan and other lobbyists in the
> department indicates that corporate-wide policy was to support it.

742.    Fannie Mae's deployment of its formidable lobbying arm to force the release of

the HUD Report in the hopes of discrediting the OFHEO Report demonstrates Fannie Mae's and

the Officer Defendants' scienter.

743.    In a further effort to impede OFHEO's investigation, Fannie Mae called for the

withholding of appropriations from OFHEO unless Falcon was replaced.  According to OFHEO,

in the period immediately preceding and succeeding the issuance of the Interim Report, Fannie

Mae lobbyists attempted to force the insertion of language into the VA-HUD-Independent

Agencies Appropriation Act for Fiscal Year 2005 that would withhold $10 million from the

OFHEO agency appropriation until a new director was appointed.  Fannie Mae's attempt to

interfere with the investigation by cutting off OFHEO's funding further demonstrates its scienter.

744.    In addition, Spencer's conduct during the OFHEO and Paul Weiss investigations

demonstrates her scienter.  Paul Weiss found that Spencer deliberately failed to disclose a

document from her files (the "Spencer Document") that strongly suggested that Fannie Mae had

improperly delayed recording $199 million in expenses in 1998 to permit the Company to

achieve the EPS needed for Defendants to earn the maximum possible bonuses that year.

Spencer had not voluntarily produced the Spencer Document to Paul Weiss, even though it was

responsive to its document requests to Fannie Mae dating back to October 2004.  Paul Weiss also

learned around that same time that Spencer had brought home two boxes of documents that were never reviewed for responsiveness to either OFHEO's or Paul Weiss' requests.

745.    Fannie Mae discovered the Spencer Document on April 27, 2005, in connection with its efforts to ensure that all responsive materials from Spencer had been collected and reviewed.  Fannie Mae launched this initiative after discovering that three boxes from Spencer's former office that had not been collected or reviewed contained responsive materials.  Fannie Mae sent a team into Spencer's office without warning while she was not present and photocopied these three boxes, where the Spencer Document was discovered.

746.    The Spencer Document is an agenda entitled "Risk Review with CFO; Tuesday, September 22, 1998."  The referenced meeting was attended by Howard, Spencer, Boyles, Lawler, Rajappa, and Joseph Amato (Vice President-Portfolio Strategies).  The Spencer Document indicates that Spencer spoke about "Amortization of Core Book (PDAMS)" at this meeting.  Notes under a section of the agenda titled "PDAMS" state:

> When we last met with you, _____, we had run some stress scenarios on PDAMS around a sustained high liquidation pattern

> *        *        *

> Explain how we compare to that now.

> What we've done to make it better:  Rather than assume constant cpr speeds for a long view, we've implemented a short view (six months) and then to a long view.  This has made some significant difference.

> Problem:  We need to have a plan for bringing catchup into compliance.

> We need to speed up amortization recognition in light of low rate environment being sustained.

> Recommendation:  Our plan is to book an additional amortization expense as we generate additional portfolio income growth during

the remainder of the year while managing to eps expectations of $3.21.

Incorporate a rate change in PDAMS to align with Scenario__ forecast assumptions.

Book additional amortization in 1998 as NII performance allows.

Consider booking anything in addition to a catchup level of "X" monthly, in arrears.

Consider charging directly to expense each month any "excess" buyup.

Our core book is our most manageable of our risks.

Our core book is the risk area where the most knowledge exists.

(emphasis added). The Spencer Document establishes that Spencer led discussions concerning the management of "catch-up" to meet EPS targets.

> 747.    Paul Weiss found that Spencer had deliberately concealed this document, noting:

> Unquestionably, a number of different attorneys from Wilmer [Cutler Pickering Hale & Dorr, LLP, Fannie Mae's outside counsel with respect to the Interim OFHEO Report] and Fannie Mae's Legal Department, as well as people working on responding to Paul, Weiss's requests, had met with Spencer on several occasion[s] to collect responsive documents, including those documents relating to the 1998 event. *Spencer herself was interviewed several times by OFHEO, by Paul, Weiss, and by Company lawyers about 1998 events, and therefore plainly understood the relevance of the Spencer Document to the 1998 event. Nevertheless, Spencer did not voluntarily produce these documents.*

> *                *                *

> *Given that the Spencer Document flatly contradicted Spencer's previous assertions to OFHEO and Paul, Weiss that the decision to record only $240 million in catch-up expense in 1998 was based on her belief that it was the best estimate and that the decision had nothing to do with EPS, it is difficult to believe that Spencer's failure to produce the document was a mere oversight.* Indeed, based on the statements made by Spencer in her Paul, Weiss interviews before the document was discovered, we think that it is entirely possible that Spencer had reviewed the document as late as

> January 2005 in preparation for the Paul, Weiss interview, but
> never produced the document.

(emphasis added).  Spencer's actions in deliberately withholding key evidence from OFHEO and

Paul Weiss concerning the 1998 expense deferral demonstrate that she (1) knew this accounting

maneuver violated GAAP; (2) knew the Spencer Document would show that she had been

involved in the decision to improperly defer the recognition of these expenses; and (3)

deliberately concealed this document from OFHEO and Paul Weiss in an attempt to prevent the

discovery of her involvement in the Company's fraud.  Spencer's conduct strongly demonstrates

that she acted with scienter with respect to Fannie Mae's fraud.

## XIII.  KPMG'S SCIENTER AND VIOLATIONS OF GAAS IN ITS AUDITS OF FANNIE MAE'S FINANCIAL STATEMENTS

748.    KPMG served as Fannie Mae's purportedly independent auditor and principal

accounting firm from at least 1969 through December 22, 2004.  KPMG acted in these capacities

pursuant to contracts it had with Fannie Mae that, among other things, required KPMG to audit

Fannie Mae's financial statements in accordance with generally accepted auditing standards

("GAAS"), and to report the results of those audits to Fannie Mae, its Board of Directors, its

Audit Committee, and the members of the investing public, including Plaintiffs.  KPMG was

also responsible for, among other things, examining Fannie Mae's systems of internal controls to

identify any material weaknesses or reportable conditions which might impact the accuracy or

reliability of their financial statements, and reporting any such material weaknesses or reportable

conditions to management and the Audit Committee.

749.    As Fannie Mae's outside auditor, KPMG reviewed the Company's quarterly

financial statements and the text that accompanies them in the Company's Forms 10-Q and

audited the annual financial statements and the disclosures that accompany them in the

Company's Annual Reports and Forms 10-K.  Each year, KPMG issued an unqualified opinion

on Fannie Mae's financial statements, stating that those financial statements fairly presented the Company's financial condition and results in all material respects.

750.    KPMG issued its unqualified opinions despite having direct knowledge throughout the Loss Period of the Company's propensity to violate GAAP in order to achieve financial targets and smooth earnings, and of management's refusal to comply with GAAP.  In early 1999, KPMG initially objected to the Company's deferral of $199 million in premium amortization expenses from 1998 to future years, and recommended that management recognize the full amount of expenses in the 1998 financial statements, but management refused.  KPMG listed the matter as an "audit difference" in its year-end audit papers, meaning it was an item as to which KPMG disagreed with the Company's accounting.  KPMG also knew that the deferral of these expenses enabled the Company's senior management to receive the maximum possible bonuses in 1998, whereas they would have received no bonuses whatsoever if they had complied with GAAP and recorded all of the expenses in 1998.  This incident placed KPMG on notice that the Officer Defendants were willing to play "fast and loose" with the accounting rules for their own personal gain.

751.    Further, KPMG ultimately waived its audit difference relating to the deferral of $199 million in premium and amortization expenses on the grounds that this deferral was not "material."  In so doing, KPMG auditors ignored the materiality guidance issued by their own Department of Professional Practice.   During the three months prior to the waiver, the Department had issued several letters describing the focus on earnings management by the SEC and the press.  In a discussion of former SEC Chairman Levitt's September 28, 1998 speech detailing his concerns about earnings management, one of these letters noted an earnings

management gimmick related to materiality that was particularly relevant to Fannie Mae's SFAS 91 accounting:

> 'Materiality' or 'abuse of materiality,' by intentionally recording errors within a defined percentage ceiling that is deemed 'immaterial' to achieve a desired reporting result.
>
> The SEC staff has indicated that they view materiality with respect to 'on purpose' errors as close to zero.

752.    Another KPMG letter stated the following regarding Chairman Levitt's September 28, 1998 speech:

> One of the 'gimmicks' identified was 'the misuse' of the concept of materiality in preparing financial statements by intentionally not adjusting for errors that are less than a defined materiality level (i.e., immaterial misapplications of generally accepted accounting principles).    The SEC rejects the notion that the concept of materiality can be used to excuse deliberate misstatements and has further indicated that materiality is not a bright-line cutoff of three or five percent.
>
> Rather, it requires consideration of all relevant factors (qualitative as well as quantitative) that could impact an investor's decision.

753.    Despite its own internal guidance warning that the $199 million deferral could not be justified on the grounds that it was "immaterial," KPMG recklessly signed off on Fannie Mae's financial statements for 1998 without insisting that it record the full amount of the premium and amortization expenses.

754.    Rajappa briefed KPMG on August 5, 2003 concerning a number of serious allegations Barnes had raised regarding accounting violations, internal control deficiencies and rampant earnings management.    KPMG turned a deaf ear to the alarm Barnes was ringing, acquiescing in Rajappa's suggestion that the conflicted Internal Audit department review Barnes' allegation and taking no steps of its own to investigate these serious charges.    Instead, it accepted management's explanations at face value.    Had KPMG done its job, it would have discovered on

its own (and long before August 2003) the problems described by Barnes and declined to issue unqualified audit opinions on the Company's financial statements. Moreover, even if it was otherwise unaware of those problems in August 2003, KPMG was reckless in failing to take Barnes' report seriously and investigate his allegations before issuing review reports and unqualified audit opinions on the Company's financial statements.

755.    Additionally, throughout the Loss Period KPMG knew that derivatives were a material part of the Company's financial statements. The amounts recorded for derivative transactions affect virtually every aspect of Fannie Mae's financial position and operating results, including the following line items on its financial statements: mortgage portfolio (net) non-mortgage investments, derivatives in gain positions, debentures, bonds and notes (net) derivatives in loss positions, interest income, interest expense, purchased option expense, and other comprehensive income. Thus, Fannie Mae's financial statements are rendered virtually useless if derivatives are misstated, and any auditor engaged to audit or review Fannie Mae's annual or quarterly statements would understand the necessity of ensuring that its derivatives were accounted for properly.

756.    In addition to knowing the importance of derivatives to Fannie Mae's financial statements, KPMG knew that the Company's accounting for derivatives changed significantly when the Company adopted SFAS 133 in January 2001, and that numerous other entities had encountered serious financial problems – even bankruptcy – as the result of improper derivatives activity in the recent past. Therefore, throughout the Loss Period KPMG should have been scrutinizing Fannie Mae's accounting for derivatives particularly closely. This scrutiny should have been heightened even further in 2003, when it was disclosed that Freddie Mac – Fannie

Mae's sister company – had materially misstated its financial statements due to improper accounting for derivatives.

757.    In fact, in light of the complexity of accounting for derivative transactions, AU §332 requires auditors of companies that engage in derivative transactions to perform additional procedures.  Specifically, AU § 332 states:

> An auditor should perform the following procedures to obtain sufficient competent evidential matter to substantiate the presentation of derivative instruments and securities:
>
> • Develop an understanding of the derivative/security;
>
> • Consider audit risk and materiality;
>
> • Design appropriate substantive procedures;
>
> • Consider management's intent in hedge transactions; and
>
> • Consider management's intent in security transaction.

758.    The "substantive procedures" an auditor should follow in evaluating accounting for derivative transactions under AU § 332 include, *inter alia*:

> • Confirming balances or transactions with the issuer;
>
> • Confirming derivatives with counterparties;
>
> • Requesting counterparties to provide complete descriptions of the transactions;
>
> • Inquiring of previously active counterparties about whether they are parties to any current transactions;
>
> • Physically inspecting derivative contracts and related documentation;
>
> • For derivatives that are hedges, obtaining evidence that demonstrates that management has complied with the hedge accounting requirements of GAAP;
>
> • Performing analytical procedures; and

- Reading other information such as minutes of meetings of the board of directors or relevant committees.

759.    AU § 332 should have guided KPMG in planning adequate audit procedures to evaluate the reasonableness and accuracy of derivative amounts included in Fannie Mae's financial statements.

760.    Moreover, KPMG was involved from the outset in the Company's SFAS 133 implementation process and, accordingly, had more than ample opportunity to perform the procedures outlined in AU § 332. Nonetheless, as discussed at length above in Section IV.E.2, *Fannie Mae's Improper Accounting For Derivative Transactions And Hedging Activities*, Fannie Mae's SFAS 133 policies violated GAAP in numerous material respects. Despite its intimate involvement with the SFAS 133 implementation process, the guidance AU § 332 provided it in terms of planning audit procedures to evaluate the reasonableness of the derivatives included in Fannie Mae's financial statements, and the opportunity to perform such procedures, KPMG stood idly by while Fannie Mae developed and implemented an SFAS 133 policy that plainly violated GAAP.

761.    Despite the significance of derivatives to Fannie Mae's financial statements and the severe derivatives-related problems recently experienced by other companies (including Freddie Mac), KPMG opted to blindly accept Fannie Mae's assessment that all of its hedging relationships were perfectly effective rather than following the procedures required under AU § 332. This allowed Fannie Mae to overstate its earnings and other comprehensive income by more than $10 billion due to non-compliance with SFAS 133. KPMG either knew of the SFAS 133 violations (and the resulting misstatements) and ignored them, or was grossly reckless in failing to discover them in the face of numerous warning signs that should have caused KPMG to investigate Fannie Mae's derivatives accounting thoroughly.

762.    Further, KPMG knew that the Company's compensation program created incentives for Defendants to manipulate its accounting to achieve EPS results, but did not take steps to adequately investigate whether such manipulation was occurring.  For example, in a December 31, 1999 memorandum titled "KPMG Fannie Mae Strategic Analysis Memorandum," KPMG observed:

> The earnings objective is tied to the employees' incentive goals and performance based compensation, *which could result in the managing of earnings to meet corporate goals and objectives.*

(emphasis added).  KPMG further noted that such an occurrence was "possible" and that the magnitude of the impact of such an occurrence was "high."

763.    Similarly, in a 2002 risk analysis, KPMG noted:

> Management has incentive to meet earnings targets in order to meet analyst expectations and to preserve their personal wealth as incentive compensation is linked to meeting established targets and because of ownership of company stock and stock options.

764.    Given its knowledge of Fannie Mae management's incentives to manage earnings, KPMG had a duty to closely scrutinize whether that conduct was occurring, and to plan its audits to counter this serious risk of fraud.  Given the extent of such earnings management, KPMG's failure to discover the fraud compels the conclusion that KPMG acted, at the very least, recklessly with regard to its audits of Fannie Mae.

765.    Indeed, the pervasive nature and magnitude of the Company's massive GAAP violations over three fiscal years (2001-2003) and half of a fourth (2004) -- including those which OFHEO, Paul Weiss and Fannie Mae itself uncovered during their investigations -- and the fact that these were blatant and obvious violations and not ones that could have been the subject of reasonable differences of professional opinion, compels the conclusion that KPMG knew about, or was reckless in failing to discover, *all* of the misrepresentations in the

Company's annual and quarterly financial statements and Form 10-K and 10-Q filings and in its

own audit opinions.  In fact, the Paul Weiss Report provides significant evidence of KPMG's

knowledge of and apathy towards the Company's ongoing blatant disregard for GAAP in order

to maintain a smooth earnings history.  For example, KPMG was aware of the following

instances in which the Company disregarded GAAP in its attempts to report smooth earnings:

- KPMG permitted Fannie Mae to prospectively record catch-up, as long as the Company established a materiality threshold to limit the amount of current period unrecorded catch-up -- a principle that KPMG knew had no support in GAAP;

- KPMG permitted Fannie Mae to apply hedge accounting to derivative transactions which did not qualify for such treatment, allowing the Company to minimize earnings volatility;

- KPMG permitted Fannie Mae to set its Allowance through practices that it knew were "not preferable," allowing the Company to create a "war chest" it could use in the future to smooth earnings;

- KPMG knew that Fannie Mae continued to use an outdated dollar-roll accounting policy for several years after the enactments of SFAS 125 and SFAS 140, respectively, and that the dollar-roll accounting policy Fannie Mae ultimately adopted in response to these standards continued to violate GAAP in a number of respects;

- KPMG permitted Fannie  Mae to combine IO MBS with REMICs for accounting purposes, thus allowing the Company to avoid earnings volatility; and

- KPMG knew that the Company had made an impermissible on-top adjustment with regard to the amortization of callable debt expense in the third quarter of 2002, which permitted the Company to minimize earnings volatility, yet nonetheless issued a "clean" audit opinion for that year.

766.    The serious and relatively obvious nature of the Company's numerous internal

control deficiencies also demonstrate KPMG's scienter.  AU § 319 requires an auditor to obtain

an understanding of his client's internal controls that is sufficient to enable him to plan an

effective audit.  AU § 312 requires an auditor to assess the audit risk and materiality associated

with poor internal controls.  AU § 722 required KPMG to examine Fannie Mae's internal control

systems and identify material weaknesses which might impact the accuracy of the Company's financials. Had KPMG complied with these and other GAAS standards in a non-reckless fashion, it could not have helped but discover numerous deficiencies which rendered the Company's financial statements and internal controls completely unreliable.

767.    Among the internal control deficiencies that were uncovered by OFHEO and Paul Weiss -- and which should have been readily obvious to KPMG as the Company's auditor, which had the express responsibility to look for such deficiencies – were the following:

a.    management's manipulation of the amortization modeling system, including the processing of multiple sensitivity runs, to produce desired results;

b.    frequent unsupported manual adjustments to the Company's amortization system to reconcile the balance in that system with those in the source systems;

c.    anomalous results from the amortization system, including amortization factors that were negative or greater than one;

d.    the failure to document hedging activity as required by SFAS 133;

e.    the inability of the Company's portfolio accounting system to reliably perform the calculations fundamental to properly account for the Company's portfolio;

f.    the use of a faulty and inaccurate system for designating mortgage loans as held-for-investment or held-for-sale, which went undetected for 21 years;

g.    the practice that allowed the Company to classify purchased securities up to the end of the month of acquisition as opposed to immediately "at acquisition" as required by SFAS 115;

h.    the lack of a formal process for monitoring investments in MH Bonds and Aircraft ABS for OTTI up to mid-2003;

i.    the lack of a detailed and documented assessment of the loss exposure inherent in the loan portfolio prior to 2004;

j.    the failure to properly test dollar-roll transaction to ensure the accounting qualified as lending transactions, rather than as sales;

k.    the failure to prepare economic analysis on the merits of debt buybacks before the Company entered into such transactions;

l.    the use of portfolio management and debt accounting systems that determined interest income and expense on all instruments on a "30/360" convention, regardless of the required terms of the instruments;

m.    the lack of automatic feeds to "realign" the underlying securities data between the iPDI database, on the one hand, and the STATs and LASER databases, on the other hand;

n.    the widespread practice of "D[ata]B[ase] mods" whereby database records were overwritten and changed with no documentation or independent approval;

o.    Howard's maintenance of overlapping responsibilities and job functions (including both CFO and Chief Risk Officer) which impaired his independence and allowed him to act without independent checks on his behavior;

p.    a reporting structure whereby the head of the Internal Audit department reported to Howard instead of reporting directly to the Audit Committee;

q.    a compensation system whereby Howard had input into the compensation of the head of the Internal Audit department;

r.    lack of technical accounting expertise and shortage of resources within the Controller's department;

s.    development and approval of accounting policies by the same small group of individuals;

t.    Janet Pennewell's overlapping responsibilities for financial reporting and for income forecasting, which created a conflict of interest and undermined the integrity of the financial reporting process;

u.    Jeff Juliane's overlapping responsibilities for modeling, reporting, and accounting for amortization of deferred price adjustments;

v.    allowing the Company's former Controller to serve as head of the Internal Audit department;

w.    absence of formally documented accounting policy development procedures; and

x.    absence of a centralized database of Company accounting policies.

768.    KPMG either failed to adequately test the Company's internal controls, or it tested them and detected these deficiencies, yet continued to issue unqualified audit opinions on the Company's financial statements.  In either case, KPMG acted recklessly, at best, in failing to take these internal control flaws into account when planning its audits, thereby allowing these grossly deficient internal controls to persist and enabling Fannie Mae to perpetrate the massive fraud described above.

769.    KPMG's silence enabled it to continue to reap rich rewards for its long-time service as Fannie Mae's outside auditor and accounting firm.  In 2000, KPMG received over $7.8 million in fees from Fannie Mae, of which approximately $1.2 million were audit fees.  The fees Fannie Mae paid KPMG in 2000 included fees for work associated with the SFAS 133 implementation process.  In 2001, KPMG received over $8 million in fees from Fannie Mae, of which approximately $4 million were audit or audit-related fees.  In 2002, KPMG received approximately $9.5 million in fees from Fannie Mae, of which approximately $5.7 million were audit or audit-related fees.  In 2003, KPMG received approximately $11 million in fees from Fannie Mae, of which approximately $7.3 million were audit or audit-related fees.  The other fees KPMG received from Fannie Mae – totaling over $18 million from 2000 through 2003 – were for non-audit related services, including financial information systems design and implementation (in 2000), securitization transactions, tax services, financial planning services for certain Fannie Mae officers, and a contract and procurement processing review.  These fees provided KPMG with a motive to refrain from blowing the whistle on the fraud at Fannie Mae.

770.    The impact of these fees hit home particularly hard for Kenneth Russell (KPMG's engagement partner for Fannie Mae until 2001) and Mark Serock (the engagement partner from 2001 through 2004).  Russell and Serock, as the individuals ultimately responsible for KPMG's

audits of Fannie Mae, were obligated to ensure that KPMG planned and performed its audits in accordance with GAAS so that KPMG could obtain reasonable assurance that the Company's financial statements were free of material misstatements.  As lead engagement partners, Russell and Serock were also responsible for maintaining and increasing KPMG's revenue stream from the Fannie Mae account.  In light of the pervasive nature of Fannie Mae's GAAP violations, it is plain that Russell and Serock took the latter responsibility more seriously than they did their obligations to protect the investing public from fraud.

771.    KPMG also had the opportunity to detect and prevent the fraud at Fannie Mae. By virtue of its position as outside auditor to Fannie Mae, KPMG had access to the Company's files and key employees at all relevant times.  As a result of the auditing and other services KPMG provided to Fannie Mae, KPMG personnel were frequently present at Fannie Mae's corporate headquarters throughout each year.  Moreover, KPMG personnel had continual access to and knowledge of Fannie Mae's confidential internal corporate, financial, operating, and business information, including internal monthly financial records, Board minutes and other internal memoranda.  KPMG reviewed and approved each of the Company's financial statements during the Loss Period.

772.    KPMG had not only the opportunity but the obligation to observe and review the Company's business and accounting practices and to test the Company's internal accounting information, its publicly reported financial results, and its internal controls and structures. Accordingly, KPMG was, or should have been, aware of the true facts as alleged herein concerning the actual nature of Fannie Mae's accounting practices, its internal controls and structures, and its overall financial condition.

773.   In addition to the foregoing, KPMG's scienter is demonstrated by its reckless failure to follow GAAS in numerous other aspects of its audits of Fannie Mae.  Some examples are discussed below.

### A.   KPMG Violated GAAS By Ignoring Numerous "Red Flags" That Should Have Alerted It To Fannie Mae's Materially False And Misleading Financial Statements

774.   AU § 316, *Consideration of Fraud in a Financial Statement,* requires auditors to plan and perform audits to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud.  AU § 316 identifies various "red flags" that auditors need to consider in determining audit risk relating to misstatements arising from fraudulent financial reporting.  The following are among the "red flags" that were present at Fannie Mae which should have caused KPMG to amend and extend its audit procedures:

- intentional misapplication of accounting standards;

- significant estimates and material concentrations that were not disclosed in accordance with SOP 94-6;

- analytical relationships that did not make sense;

- excessive interest by management in maintaining the earnings trend;

- domineering management;

- failure to segregate incompatible duties;

- lack of appropriate documentation for transactions;

- an ineffective Internal Audit department that was not independent;

- audit "catch up" and "on top" adjustments, "realignments," and account reconciliation differences that were not corrected;

- management setting aggressive earnings targets; and

- compensation structures that tied pay to meeting certain targets.

775.    KPMG ignored the following facts, described more fully above, which should have tipped it off to the fraud:

| "Red Flags" | Facts Ignored By KPMG |
|---|---|
| Intentional misapplication of accounting principles | 1. Fannie Mae, in violation of SFAS 133, applied hedge accounting to derivatives that did not qualify for hedge accounting. |
| | 2. Fannie Mae adopted SFAS 133 accounting policies that violated SFAS 133. |
| | 3. Fannie Mae did not have systems capable of performing long haul accounting for derivatives. |
| | 4. Fannie Mae improperly deferred $199 million of estimated expenses in 1998, in violation of SFAS 91. |
| | 5. Fannie Mae adopted premium and discount amortization policies that were not in accordance with SFAS 91. |
| | 6. Fannie Mae adopted and followed a policy allowing it to re-classify securities as HTM, AFS, or trading after the date of acquisition, in violation of SFAS 115. |
| | 7. Fannie Mae improperly accounted for its allowance for loan losses in violation of SFAS 5 and 114. |
| | 8. Fannie Mae utilized dollar-roll accounting policies that did not comply with SFAS 140. |
| | 9. Fannie Mae improperly accounted for the finite insurance policy it purchased from Radian in violation of SFAS 5. |
| | 10. Fannie Mae failed to consolidate the financial results of QSPEs on its financial statements in violation of SFAS 140 and FIN 46. |
| | 11. Fannie Mae recognized income and expenses in incorrect accounting periods. |
| | 12. Fannie Mae improperly accounted for its investments in qualified LIHTC |

| "Red Flags" | Facts Ignored By KPMG |
|---|---|
| | partnerships. |
| | 13. Fannie Mae failed to properly account for OTTI of MH Bonds and Aircraft ABS in violation of SFAS 115. |
| | 14. Fannie Mae failed to properly account for IO MBS. |
| | 15. Fannie Mae improperly accounted for the amortization of callable debt expense in violation of ABP No. 21. |
| | 16. Fannie Mae improperly accounted for realignments in violation of ABP No. 20. |
| | 17. Fannie Mae improperly accounted for the accrual of interest on seriously delinquent loans in violation of SFAS 114. |
| | 18. Fannie Mae improperly created two REMICs which had no legitimate purpose in violation of GAAP. |
| | 19. Fannie Mae deliberately misapplied GAAP to minimize earnings fluctuations and conceal risk. |
| | 20. Barnes' allegations of earnings management. |
| Significant estimates | 1. Fannie Mae manipulated and misapplied market data and modeling factors in estimating the amortization rates for premiums, discounts and deferred charges on securities and loans, as was discussed with KPMG during an August 8, 2003 meeting. |
| | 2. Fannie Mae had no supporting model to evaluate the adequacy of the Allowance until 2003. |
| Analytical relationships that did not make sense | 1. Fannie Mae continued to report stable and growing financial results, despite the Company's particular vulnerability to changes in interest rates. |
| | 2. Fannie Mae's Allowance remained unchanged for seven years, despite the fact that its credit experience improved significantly over that period. |

| **"Red Flags"** | **Facts Ignored By KPMG** |
| --- | --- |
| Excessive interest by management in maintaining the earnings trend | 1. Intense focus by management on reporting stable earnings and meeting EPS compensation targets.<br><br>2. Fannie Mae purchased a fictitious earnings management insurance policy from Radian to defer income to future periods.<br><br>3. Fannie Mae considered buying a finite risk insurance product from MMC to defer income to future periods.<br><br>4. Fannie Mae created two REMICs to shift income to subsequent years. |
| Domineering management | 1. Fannie Mae vested an inordinate amount of responsibility in the CFO, who was also the Chief Risk Officer and Vice Chairman of the Board.<br><br>2. The CFO/ Chief Risk Officer/ Vice Chairman set financial targets and had the authority to meet the targets.<br><br>3. The culture in the Controller's Office was to satisfy senior management's demands to meet certain financial targets, and efforts to "do the right thing" were firmly discouraged. |
| Failure to segregate incompatible duties | 1. One director had the responsibility of modeling, reporting and accounting for purchase premiums and discount amortization.<br><br>2. Roles of CFO and Chief Risk Officer were held by the same person. |
| Lack of appropriate documentation for transactions | 1. Fannie Mae did not properly document its hedging activities.<br><br>2. Fannie Mae made discretionary and unsupported adjustments to financial statements and had "cookie jar" reserves.<br><br>3. Fannie Mae maintained no support for economic analyses to determine the merits of debt buybacks.<br><br>4. Fannie Mae failed to maintain |

286

| **"Red Flags"** | **Facts Ignored By KPMG** |
|---|---|
| | documents sufficient to demonstrate that the "substantially similar" test required to account for dollar-roll repurchase agreements as financing had been met.<br><br>5.  Fannie Mae lacked documentation to support management's determination of its loan loss allowance. |
| An ineffective Internal Audit department that was not independent. | 1.  Fannie Mae's Internal Audit department failed to investigate problems identified by Fannie Mae employees.<br><br>2.  The Internal Audit department was not independent because its compensation levels were set by the CFO, and because its staff's bonuses were tied to EPS.<br><br>3.  The Internal Audit department was headed by the former Controller, who was essentially auditing his own work.<br><br>4.  Rajappa reported to the CFO on a "dotted line" basis and was instructed not to have direct communications with the Audit Committee unless he had first vetted such communications with the CFO. |
| Audit "catch-up" and "on-top" adjustments, "realignments" and account reconciliation differences that were not corrected | 1.  Capitalized adjustment differences were amortized over a period of time up to 30 years.<br><br>2.  "On top" adjustments were made to the Company's books at the corporate level, for the sole purpose of minimizing volatility and achieving desired financial results.<br><br>3.  "Realignment" errors between the amortization and securities and loan systems were deferred and recognized over multiple years. |
| Management set aggressive earnings targets | 1.  Raines, in 1999, set the ambitious goal of doubling EPS by 2003.<br><br>2.  Without fraudulently deferring $199 million of expenses in 1998, with KPMG's approval, management would not have received any bonuses that year. |

| "Red Flags" | Facts Ignored By KPMG |
|---|---|
| Compensation structures that tied pay to meeting certain targets | 1. Bonuses were tied to meeting certain EPS levels.<br><br>2. Management would not have received any bonuses in 1998 had Fannie Mae not deferred $199 million in expenses that year.<br><br>3. The Compensation Committee did not require the return of bonuses awarded based on meeting EPS goal if it was subsequently discovered that these results had been achieved only through accounting fraud. |

776.    AU § 316 required KPMG to look for circumstances that lent themselves to fraudulent activities.  While AU § 316 should have provided a roadmap for KPMG to uncover the accounting fraud perpetrated by Defendants, the glaring warning signs set forth above either went undetected or were ignored.  Even the most rudimentary audit would have uncovered a fraud of this magnitude.  KPMG's failure to expose Fannie Mae's fraud compels the inescapable conclusion that KPMG knew of this fraud, yet simply looked the other way.  KPMG's audits of Fannie Mae for 2000, 2001, 2002 and 2003 represent a complete departure from the standards set forth in AU § 316.

**B.    KPMG Violated GAAS By Recklessly Certifying That Fannie Mae's Financial Statements Complied With GAAP**

777.    Fannie Mae's financial statements for 2000, 2001, 2002, 2003, and the first two quarters of 2004, as set forth above, were replete with misstatements resulting from GAAP violations.  Nonetheless, KPMG issued unqualified audit opinions in which it represented that Fannie Mae's financial statements were presented fairly and in accordance with GAAP for each of the years ended December 31, 2000; December 31, 2001; December 31, 2002; and December

31, 2003.  Accordingly, KPMG violated the reporting standards of GAAS, including AU §§ 411, 508 and 544.

778.    AU § 411 provides:

> [I]n determining whether a client's financial statements are presented fairly and in conformity with generally accepted accounting principles, the auditor must make the following judgments:
>
> - The accounting principles selected and applied have general[] acceptance.
>
> - The accounting principles are appropriate under the circumstances.
>
> *    *    *
>
> - The financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations, and cash flows stated within a range of acceptable limits, that is, within limits that are reasonable and practicable to attain in financial statements.

779.    KPMG violated AU § 411 in certifying that Fannie Mae's financial statements were presented fairly and in conformity with GAAP.  The sheer magnitude of the transactions that were recorded contrary to GAAP, combined with the penchant of Fannie Mae management for overriding internal accounting controls, as set forth at length above, demonstrate that KPMG either (1) failed to perform its audits in accordance with GAAS; or (2) knew that the financial statements were materially false and misleading but recklessly ignored the ramifications that issuing unqualified audit opinions would have on investors.

780.    AU § 544 requires regulated entities like Fannie Mae to prepare their financial statements in accordance with GAAP, regardless of whether such statements are to be filed with the agency that regulates it.  AU § 544 requires the auditor of a regulated agency to "determine whether a qualified opinion or an adverse opinion must be expressed on the financial statements"

"[i]f the regulated enterprise does not revise its general-purpose financial statements to conform to the auditing standards established by SAS-69 (AU 411)."

781.    AU § 508 mandates that an auditor issue either a qualified or an adverse opinion where, as here, its client has significantly departed from GAAP.  AU § 508 states:

> The selection of the appropriate opinion depends on the materiality of the departure, the effects of the departure, and the number of accounts affected by the departure.  An unqualified opinion can be issued if the departure is not significant to the fair presentation of the financial statements.  If the departure affects the fairness of the financial statements but overall the statements can be relied upon, a qualified opinion can be issued.  *On the other hand, when the departure is so significant that the financial statements should not be relied on, an adverse opinion must be issued.*

(emphasis added).

782.    Fannie Mae's accounting practices, as set forth above, represented significant departures from GAAP.  In fact, Fannie Mae has admitted that it expects the impact of its restatements to be material to its reported financial results for many, if not all, of the fiscal years ended December 31, 2000; December 31, 2001; December 31, 2002; December 31, 2003; and the first two quarters of the fiscal year ended December 31, 2004.

783.    KPMG, as Fannie Mae's longstanding auditor and accountant, should have uncovered the Company's significant departures from GAAP and, at a minimum, insisted that Fannie Mae adjust its financial statements prior to issuing unqualified audit opinions.  If Fannie Mae refused, AU §§ 508 and 544 required KPMG to issue, at best, qualified opinions.

784.    Had KPMG issued qualified or adverse audit opinions, as required under AU §§ 508 and 544, Fannie Mae's investors, including Plaintiffs, would have been notified of the substantial risk they were assuming by investing in Fannie Mae.  Thus, KPMG's issuance of unqualified audit opinions facilitated, prolonged, and prevented the detection of Fannie Mae's fraud.

C.    **KPMG Violated GAAS By Failing To Develop Adequate Audit Procedures To Evaluate The Reasonableness Of The Market Data And Modeling Factor Estimates Fannie Mae Used To Determine Premium And Discount Amortization Amounts**

785.    The amounts recorded as mortgage portfolio (net), non-mortgage investments, interest income, interest expense and unamortized premiums (discounts), and deferred price adjustments are significant components of Fannie Mae's financial statements. Moreover, these metrics are materially affected by the amounts recorded for premium and discount amortization. Accordingly, any auditor engaged to audit or review Fannie Mae's quarterly or annual financial statements would understand the importance of ensuring that the market data and modeling factor estimates used to determine premium and discount amortization amounts were correct.

786.    AU § 342 provides guidance for auditors faced with the task of auditing estimates. Specifically, AU § 342 outlines the following specific steps an auditor should perform to determine if there is sufficient evidence to support the estimate:

- evaluate whether management has communicated the need for an accurate estimate;

- accumulate reliable data to support the amount of the estimate;

- review the reasonableness of the assumptions underlying the amount;

- consider deviations from historical patterns and changes in methodology;

- recalculate the amount; and

- develop an independent examination of the estimate.

787.    KPMG violated AU § 342 by failing to develop adequate audit procedures to evaluate the reasonableness of the market data and modeling factor estimates Fannie Mae used to determine premium and discount amortization amounts. Had KPMG developed an independent calculation of the expected yield on Fannie Mae's portfolio, it would have discovered that a

company vulnerable to changes in interest rates like Fannie Mae could not logically report stable and growing financial results quarter after quarter.

788.    KPMG's failure to comply with AU § 342 in auditing Fannie Mae's premium and discount amortization amounts enabled Fannie Mae to misstate its financial statements by billions of dollars.

**D.    KPMG Violated GAAS By Failing To Obtain Sufficient Competent Evidential Matter**

789.    Obtaining and evaluating evidential matter are at the core of an audit and are the foundation for an audit opinion.  Accordingly, AU § 326 requires an auditor to obtain sufficient competent evidential matter prior to issuing his opinion.

790.    As alleged herein, Fannie Mae made numerous entries in its accounting records, including discretionary "on-top" adjustments, that lacked any adequate basis.  By way of example, Fannie Mae made claims in its financial statements about the yield on its portfolio affected by premium and discount amortization amounts and derivative gains and losses which were not supported by persuasive audit evidence.  As a result, losses on derivatives that were incorrectly classified as hedges, and losses on mortgage securities where the effective yield was manipulated, went unrecorded.  Because Fannie Mae covered up its losses with this type of deceptive accounting, KPMG could not possibly have obtained valid audit evidence to support the amount of losses Fannie Mae recorded in its financial statements for 2000, 2001, 2002, 2003 and the first two quarters of 2004.

791.    KPMG's obligation under AU § 326 is clear.  KPMG should have either (1) refrained from forming an audit opinion unless it had sufficient competent evidential matter to support such an opinion; (2) issued a qualified opinion; or (3) disclaimed an opinion altogether. KPGM violated AU § 326 by issuing unqualified opinions on Fannie Mae's financial statements

for 2000, 2001, 2002 and 2003 without having obtained sufficient competent evidential matter to support such an opinion.

**E.  KPMG Violated GAAS By Improperly Determining That The Disclosures In Fannie Mae's Annual Reports Filed With The SEC On Form 10-K And Its 2000 And 2001 Annual Reports Were Adequate**

792.    AU § 431 provides that an auditor "must use professional judgment to determine whether the disclosure in the financial statement is adequate.  If the auditor concludes that adequate disclosure has not been achieved, the auditor's report should be qualified or an adverse opinion should be expressed."  AU § 431.

793.    As set forth at length above, the 10-Ks were replete with misleading disclosures. While Fannie Mae falsely attested that its financial statements conformed with GAAP, in reality Fannie Mae selected accounting policies that would permit it to minimize earnings volatility, regardless of whether such policies conformed with GAAP.

794.    Rather than reconciling the disclosures made by Fannie Mae in its Form 10-K filings and Annual Reports to the accounting policies Fannie Mae actually used to prepare the financial statements, KPMG allowed the misleading disclosures to remain in these filings in violation of AU § 431.

**F.  KPMG Violated GAAS By Failing To Report That Material Modifications Were Necessary For Fannie Mae's Forms 10-Q To Conform With GAAP**

795.    KPMG performed interim reviews of Fannie Mae's financial statements on a quarterly basis as required by the SEC.  AU § 722 states that the purpose of interim financial reviews "is to provide the accountant with a basis for reporting whether material modifications are necessary for the interim financial information to be in conformity with [GAAP]."  KPMG violated GAAS (AU § 722) by failing to report that material modifications were necessary for

Fannie Mae's May 2003 10-Q, August 2003 10-Q, November 2003 10-Q, May 2004 10-Q and August 2004 10-Q (collectively, the "10-Qs") to conform with GAAP.

796.    KPMG's quarterly review procedures should have included, *inter alia*:

- Acquiring knowledge of Fannie Mae's business and internal controls;

- Performing analytical procedures and making related inquiries to provide a basis for inquiry into financial relationships that appeared to be unusual;

- Inquiring with Fannie Mae's financial executives about changes to its business activities; and

- Analyzing significant transactions and infrequently occurring transactions to determine how they should be correctly reported in the quarterly financial statements.

AU § 722.

797.    If KPMG had performed the required procedures in reviewing Fannie Mae's interim financial reports, it would have discovered the rampant GAAP violations set forth at length above. If KPMG had discovered these material deviations from GAAP during its quarterly reviews, it should have "modif[ied] the review report on interim financial information by . . . including an explanatory paragraph (or paragraphs) that describes the deviation and, if possible, the effects of the deviation on the interim financial information . . ." AU § 722. KPMG did not do so.

798.    KPMG's violation of AU § 722 permitted Fannie Mae to file 10-Qs that falsely led the investing public, including Plaintiffs, to believe that the 10-Qs did not require material modifications to make them GAAP-compliant, thus lulling Plaintiffs and the investing public into a false sense of security concerning Fannie Mae's financial results.

### G.    KPMG Violated GAAS By Failing To Maintain Independence From Fannie Mae

799.    GAAS requires that an auditor be independent with respect to the company being audited.  Under AU § 220, KPMG was to maintain "an independence in mental attitude" in all matters relating to its annual audits and quarterly reviews of Fannie Mae's financial statements.  Moreover, KPMG was to conduct its work with impartiality, recognizing its obligation of fairness to investors and creditors who would rely upon its audit reports.

800.    As alleged herein, KPMG received significant fee revenues from Fannie Mae, including fees for non-audit work.  KPMG also had been serving as Fannie Mae's auditor since 1969.  These facts are inconsistent with the notion that KPMG could be completely impartial when auditing Fannie Mae.

## XIV.    THE AUDIT COMMITTEE DEFENDANTS' SCIENTER

801.    For the 2000 audit year, the Audit Committee was composed of Gerrity (as Chairman), and non-defendants Vincent Mai, Garry Mauro and Eli J. Segal.  For the 2001 audit year, it was composed of Gerrity (as Chairman), Harvey, Mulcahy, Segue, and non-defendant Vincent Mai.  For the 2002 audit year, it was composed of Gerrity (as Chairman), Harvey, Mulcahy, Segue, and Malek.  For the 2003 audit year, it was composed of Gerrity (as Chairman), Harvey, Mulcahy, Segue, Malek, and Pickett.

802.    The Audit Committee was responsible for overseeing the Company's financial reporting and accounting, the integrity of the Company's financial statements, the Company's internal controls, and the performance of the Company's internal and outside auditors.  A review of the charters which were adopted by the Board to govern the Audit Committee confirms the broad scope of the Audit Committee Defendants' responsibilities, which they utterly failed to fulfill.

803.    At the beginning of the Loss Period, the operative charter for the Audit Committee was the one that had been adopted in April 2000 and attached to the Company's proxy statement dated April 2, 2001 (the "2000 Charter").  The 2000 Charter stated that the Audit Committee "shall through regular or special meetings with management, internal auditors, and the corporation's outside auditor, develop in depth and specialized knowledge on matters relating to the Committee's responsibilities, including monitoring the integrity of the corporation's financial statements and the independence and performance of its internal and outside auditors . . . "   The 2000 Charter required the Audit Committee to receive periodic reports from management, the Internal Audit department, and the outside auditors, and to meet privately with the outside auditors, and separately in private with the Internal Auditors, at least once a year.

804.    The 2000 Charter also required the Audit Committee to review, among other things:

    a.    the annual audit plans of the internal and outside auditors;

    b.    the results of the internal and outside auditors' activities;

    c.    the Company's financial reporting practices including the significant issues and judgments made in connection with the preparation of the audited financial statements included in its annual report to shareholders;

    d.    all matters that Statement on Auditing Standards No. 61 requires to be discussed with the outside auditors;

    e.    the status of compliance with accounting, legal, regulatory, tax, and other developments of major significance to the corporation;

    f.    the Company's Code of Business Conduct and the activities of management's Business Conduct Committee; and

    g.    the Company's major risks and risk management process including the quality and effectiveness of internal controls, and compliance with established limits on derivatives risk.

805.    Additionally, the 2000 Charter provided the Audit Committee with authority to "cause an investigation to be made into any matter within the scope of its responsibility that is brought to its attention," and permitted the Audit Committee to "engage such independent resources to assist in its investigations, as it deems necessary."

806.    In 2002, the Board adopted a new charter (the "2002 Charter") for the Audit Committee.  The 2002 Charter, which was attached to the Company's proxy statement dated April 17, 2003, states that the purpose of the Audit Committee was to oversee:

> a.    the accounting, reporting, and financial practices of Fannie Mae including the integrity of Fannie Mae's financial statements;
>
> b.    the creation and administration of financial controls;
>
> c.    Fannie Mae's compliance with legal and regulatory requirements;
>
> d.    the outside auditors' qualifications and independence; and
>
> e.    the performance of Fannie Mae's Internal Audit function and Fannie Mae's outside auditors.

807.    The 2002 Charter provides that, among its duties and responsibilities, the Audit Committee "shall":

> a.    be directly responsible for the appointment, compensation, retention, and oversight of the work of the outside auditor;
>
> b.    at least annually, consider the independence of the outside auditor, including whether the outside auditor's performance of non-audit services is compatible with its independence;
>
> c.    at least annually, obtain and review a report by the outside auditor describing the outside auditor's internal quality-control procedures;
>
> d.    review and evaluate the lead partner of the outside auditor team;
>
> e.    approve in advance all audit engagement fees;
>
> f.    review and discuss with the outside auditor:  the scope of the audit; the result of the annual audit; any difficulties the auditor encountered; any restrictions on the scope of the auditor's activities or on access to

requested information; any significant disagreements with management; the scope and resources of the Internal Audit function; and any reports of the outside auditor for interim periods;

g.    review and discuss with management and the outside auditor the annual audited and quarterly unaudited financial statements of the Company, including the outside auditor's judgment as to the quality of the Company's accounting principles; significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including any significant changes in the Company's selection or application of accounting principles and financial statement presentations; and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

h.    receive, review and discuss reports from the outside auditors on all critical accounting policies and practices to be used; all alternative treatments of financial information within GAAP that have been discussed with management (including the ramifications of their use, and the treatment preferred by the outside auditor); and other material written communications between the outside auditor and management, such as management letters or schedules of unadjusted differences;

i.    review earnings releases, and review and discuss generally the types of information to be disclosed and the type of presentations to be made;

j.    review and discuss with management, the head of the Internal Audit department, and the outside auditor the adequacy and effectiveness of the Company's internal controls and disclosure controls;

k.    review and discuss with the CEO and CFO the basis for the certifications provided in the Company's Form 10-K and 10-Q filings;

l.    review and discuss with management and the outside auditor any correspondence with regulators or governmental agencies which raises material issues regarding the Company's financial statements, financial disclosures or accounting policies;

m.    review and discuss with management the Company's major risk exposures, management's policies on risk management and risk assessment, and the Company's compliance with those policies;

n.    oversee and discuss the internal auditing activities and performance;

o.    obtain periodic reports from the head of the Internal Audit department regarding Internal Audit findings and the Company's progress in remedying material control deficiencies;

p.    review and discuss the status of compliance with accounting, legal, regulatory, tax, and other developments of major significance to the Company;

q.    review and discuss the Company's Code of Business Conduct and the activities of management's Business Conduct Committee; and

r.    establish procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or audit matters.

808.    In sum, it was the Audit Committee's job to detect and prevent precisely the type of fraud which was allowed to run rampant at Fannie Mae.

809.    The members of the Audit Committee had actual knowledge of serious problems with the Company's accounting and internal controls, yet did nothing to correct them. For example, KPMG informed the Audit Committee in early 1999 that it disagreed with the Officer Defendants' deferral of $199 million in expenses from 1998 to subsequent years. KPMG informed the Audit Committee that it had recommended that the expenses not be deferred, but that management had persisted in deferring them. The deferral of these expenses enabled the Officer Defendants to achieve their financial targets and receive bonuses they would not have received if the expenses had been recorded in 1998. Thus, Gerrity (a member of the Audit Committee in 1999) had knowledge of management's willingness to bend the rules in order to achieve desired financial results. This should have caused him to keep a particularly watchful eye on management, and to question KPMG and management closely about the aggressiveness and propriety of the Company's other accounting practices, but he failed to do so.

810.    On August 12, 2003, the director of the Company's Internal Audit department met with the Audit Committee (which then included Gerrity, Harvey, Mulcahy, Segue, Malek, and Pickett) and told them of Barnes' concerns regarding serious accounting improprieties, GAAP violations, and internal control deficiencies. This report should have raised red flags to the Audit Committee Defendants and caused them to speak directly with Barnes, and to investigate his

allegations thoroughly. In reckless disregard for their responsibility to the Company's shareholders and the investing public, they did neither. Instead, they voted a mere two days later to approve the Company's financial statements and Form 10-Q filing for the quarter ended June 30, 2003.

811. Throughout the Loss Period, the Audit Committee Defendants were well aware that derivatives were one of the most significant items on the Company's financial statements. They were also well aware that GAAP with respect to accounting for derivatives changed dramatically in January 2001, when the Company adopted SFAS 133. Further, they were aware (as any reasonably sophisticated businessperson would have been) that a number of other entities, such as Orange County, California, Proctor & Gamble, and Gibson Greetings had found themselves in dire financial straits during the late 1990s due to the improper use of derivatives. And certainly, by 2003 the Audit Committee Defendants knew that Freddie Mac, an entity closely aligned with and in the same industry as Fannie Mae, had been caught materially misstating its financial results due (in large part) to improper accounting for derivatives. Given these facts, and the Audit Committee Defendants' responsibility for overseeing the Company's financial reporting and accounting, it was incumbent upon the Audit Committee Defendants to scrutinize the Company's accounting for derivatives very closely. Either they failed to do so (which would be grossly reckless under the circumstances), or they did so but failed to see the blatant violations of SFAS 133 which OFHEO and the SEC later found (which would also be grossly reckless), or they were actually aware of the SFAS 133 violations but did nothing to correct them (which would constitute intentional fraud).

812. The Audit Committee Defendants were also reckless in failing to investigate and discover the similarities between Freddie Mac's improper accounting and Fannie Mae's. In light

of the severity of the allegations against Freddie Mac that surfaced in 2003, it was incumbent upon the Audit Committee Defendants to independently review Fannie Mae's accounting to determine if any issues uncovered during the Freddie Mac investigation were applicable to Fannie Mae. Instead, of doing so, they relied upon Spencer – clearly a biased source – to inform them whether any of the Freddie Mac issues were applicable to Fannie Mae.

813.    The Audit Committee Defendants were also grossly reckless in adopting and/or failing to correct severely deficient internal controls. For example, the Audit Committee Defendants allowed the following clearly inappropriate structural problems – which should have been readily obvious to them – to persist at Fannie Mae:

     a.    Howard's maintenance of overlapping responsibilities and job functions (including both CFO and Chief Risk Officer) which impaired his independence and allowed him to act without independent checks on his behavior;

     b.    A reporting structure whereby the head of the Internal Audit department reported to Howard instead of reporting directly to the Audit Committee;

     c.    A compensation system whereby Howard had input into the compensation of the head of the Internal Audit department;

     d.    Lack of technical accounting expertise and shortage of resources within the Controller's department;

     e.    Development and approval of accounting policies by the same small group of individuals;

     f.    Janet Pennewell's overlapping responsibilities for financial reporting and for income forecasting, which created a conflict of interest and undermined the integrity of the financial reporting process;

     g.    Jeff Juliane's overlapping responsibilities for modeling, reporting, and accounting for amortization of deferred price adjustments;

     h.    Allowing the Company's former Controller to serve as head of the Internal Audit department;

     i.    Absence of formally documented accounting policy development procedures; and

j.    Absence of a centralized database of Company accounting policies.

814.    The foregoing internal control problems are in addition to the numerous system-related problems and other internal control deficiencies alleged herein which it was the Audit Committee's job to know about, but which they either recklessly failed to discover, or discovered but recklessly failed to address and correct.

815.    Further, OFHEO found that the Audit Committee failed to properly oversee the Internal Audit function.  According to OFHEO, "[t]hose failures primarily involved a lack of appropriate concern for safeguarding the independence of the internal audit function from the financial reporting and business functions, and a lack of engagement in the planning and evaluation of internal audits."  Under the Charter, the Audit Committee is responsible for hiring and firing the head of the Internal Audit department.  In addition to conducting a thorough evaluation of the qualification and credentials of a candidate, the Audit Committee was responsible for ensuring that the appointment in no way jeopardized the independence of the internal audit function.  As set forth above, the appointment of former Controller Rajappa to head Internal Audit posed a number of potential conflicts of interest.  In addition to these problems, OFHEO found no evidence that the Audit Committee had critically evaluated the sufficiency of Rajappa's education, training, experience (for example, the fact that he was not a CPA), or his ability to oversee the Internal Audit function objectively, given his former position of Controller.  The Audit Committee was reckless in appointing Rajappa as head of the Internal Audit department without effective, diligent oversight of this appointment.

816.    The problems caused by the Audit Committee Defendants' failure to object to Rajappa's appointment as the head of the Internal Audit department were further compounded during the annual review process.  The Audit Committee Charter dictates that the Audit Committee is jointly responsible for the budget and staffing of the Internal Audit department.

However, Rajappa's performance evaluations (which were the basis for salary increases and bonuses) were written and presented by his supervisors—COO Small, COO Mudd, and ultimately, CFO Howard—with input from Gerrity. Gerrity's involvement in the process appears to have been limited to a review of the evaluation prepared by Howard. Plainly, this arrangement gave Howard undue influence over the Internal Audit department.

817.    The Audit Committee Defendants also were reckless in failing to ensure the independence of the Internal Audit function. First, they allowed the compensation of the Internal Audit staff to be tied to EPS targets, thus creating incentives for Internal Audit that were directly contrary to its role as a watchdog against earnings management. Second, the Audit Committee Defendants did not require that the head of Internal Audit department report directly (and exclusively) to the Audit Committee, and instead allowed Rajappa to maintain a "dotted line" reporting relationship, first with Mudd (until 2002) and then with Howard. According to the OFHEO Final Report, Rajappa recalled that Audit Committee Chair Gerrity approved of the shift in Rajappa's reporting relationship to Howard, without discussing the issue with Rajappa. Thereafter, Rajappa expressed reservations to Gerrity regarding the reporting shift, yet the shift occurred nonetheless. The Final Report concluded: "Gerrity's insensitivity to any perceived or actual breach of independence is evidenced by his failure to conduct any evaluation of the change in reporting or to discuss it with the Audit Committee as a whole. *As a result of the inaction of the Audit Committee and the concomitant lack of clear guidelines, Mr. Howard was in a position to exert inappropriate influence on the Office of Auditing*." (emphasis added).

818.    Further, OFHEO found that the Audit Committee failed to properly oversee the development and implementation of critical accounting policies. These failures were most notable with regard to the Company's SFAS 91 and SFAS 133 policies.

819.    In early 1999, as part of the year-end audit work for 1998, KPMG met with Audit Committee Chairman Gerrity, advised him of the audit difference relating to the Company's deferral of $199 million of expenses, and informed him that the Company's SFAS 91 systems needed improvements.  OFHEO noted:

> For several reasons, Mr. Gerrity should have considered the audit difference material.  First and foremost, the size of the difference should have been a red flag.  Mr. Gerrity has stated that he now would consider a $200 million audit difference to be material.  The reduction in amortization expense also had an important effect on executive compensation.  It boosted EPS by over 12¢ per share, and without that boost EPS would not have met the minimum needed for an AIP bonus for 1998.  That effect on executive compensation alone should have been sufficient to deem the difference material, irrespective of Fannie Mae's quantitative parameters for determining materiality.

820.    According to the Final Report, "Even after the SFAS 91 audit differences were disclosed to the Audit Committee by Ms. Spencer in February 2000, . . . [n]either Mr. Gerrity [n]or the full Audit Committee followed up to confirm that a[n SFAS 91] policy had even been implemented."  Nor did they question KPMG again regarding this issue.  Given KPMG's view that Fannie Mae's practices were imprecise, reasonable inquiry by the Audit Committee Defendants would have exposed the lack of a formal policy.  OFHEO found that the Audit Committee Defendants failed to fulfill its responsibilities with respect to SFAS 91:

> The Audit Committee failed in its oversight role by not demanding that a formal policy for FAS 91 be put in place and that such a policy, when put into place, be endorsed by the Financial Standards group of the Enterprise and the external auditor.  In doing so, the Committee failed to insure the integrity of financial results.  The Audit Committee also failed to adequately oversee the development of the annual audit plan.  Armed with the knowledge of KPMG's audit differences in 1998 and 1999 related to amortization of purchase premiums and discounts, the Audit Committee had a responsibility to ensure that the Office of Auditing conducted an internal audit of that area.  Such an audit was not conducted until 2003.

821.   The Audit Committee Defendants were reckless in their failure to oversee the SFAS 91 implementation process and in their failure to ensure that the Company adopted an SFAS 91 policy that complied with GAAP.   This reckless failure permitted the Company to misstate its financial statements for all periods after SFAS 91's effective date.

822.   Further, OFHEO found that the Audit Committee Defendants had opportunities to question the Company's implementation of SFAS 133 but failed to exercise their duty to do so.   The minutes of an Audit Committee update on the SFAS 133 effort in April 2000 reflect comments of KPMG partner Julie Theobold that KPMG intended to perform a significant amount of testing of financial reporting and planning during the year 2000.   She stated that KPMG's test work would emphasize the system and accounting changes required to account for hedges under the new standard.   In his February 2001 report to the Board of Directors, Howard criticized the standard and focused on the effect the standard would have on Fannie Mae's financial statements.   Minutes of those meetings, however, do not reflect any discussion of the principles used to implement SFAS 133 at Fannie Mae, the critical decisions that the Company made regarding systems development or accounting, or the results of any KPMG testing that had preceded implementation.   OFHEO found that "[t]he Audit Committee [Defendants] should have inquired about that information in order to gain sufficient understanding to judge whether appropriate accounting decisions had been made and effective systems were in place."   Their reckless failure to do so enable Fannie Mae to adopt an SFAS 133 policy that violated GAAP in numerous respects, as described at length above.

823.   Furthermore, OFHEO noted that the inconsistency between the Company's aggressive lobbying efforts to delay the implementation of SFAS 133 and the alleged ability of Fannie Mae to qualify virtually all of its derivatives for hedge accounting under the "short cut"

method, as described above, should have prompted the Audit Committee Defendants to explore more closely Fannie Mae's implementation of the standard.

824.    OFHEO also noted that the Audit Committee Defendants failed to adequately oversee the Company's Sarbanes-Oxley Section 404 compliance implementation.  The Audit Committee is responsible for the budget and staffing of the Internal Audit department, the establishment of the annual audit plan, and evaluation of any restrictions or limitations placed on that department.  Thus, the Audit Committee Defendants should have been aware of the heavy workload placed upon the Internal Audit department and the inadequacy of its resources, as discussed at length above.  In April 2004, the Audit Committee was presented with an opportunity to address the staffing limitations that resulted from Sarbanes-Oxley activities.  The audit plan for 2004 only scheduled 54 internal audits, compared with an average of 120 audits performed in past years.  That reduction should have been a clear indication to the Audit Committee Defendants that resources in Internal Audit were stretched too thin.  While the Audit Committee Defendants inquired as to what more could be accomplished were the Internal Audit department to receive additional resources, they fell short by approving an abbreviated audit plan and authorizing only temporary contract employees to assist in technical writing and flowcharting.  As OFHEO noted:

> [E]ven assuming that the Audit Committee possessed a positive view of the Office of Auditing, the importance of ensuring Fannie Mae's SOX compliance required that it obtain sufficient information as to how those SOX responsibilities at Fannie Mae would be carried out.  There is no indication of any discussion, let alone debate, in any of the Board Minutes or Audit Committee minutes that OFHEO reviewed.  Rather, it appears that Fannie Mae's management assigned those new responsibilities to the Office of Auditing without any meaningful Audit Committee participation.

825.    OFHEO also found that the Audit Committee Defendants failed to adequately oversee KPMG as required by OFHEO guidance and regulations, and that the Audit Committee Defendants missed critical opportunities for meaningful inquiry into KPMG's audit activities associated with Fannie Mae's implementation of critical accounting estimates and significant accounting policies that may have revealed deficiencies in the independent audit program. Instead, the Audit Committee Defendants passively waited for KPMG to raise issues to them.

826.    OFHEO found that the Audit Committee Defendants also failed to inquire about the work KPMG performed, or failed to perform, to determine that Barnes' allegations regarding Fannie Mae's amortization accounting purportedly were without merit.  OFHEO noted:

> Had the Audit Committee questioned KPMG, they would have learned that KPMG had not performed sufficient review or test work to make a determination about the merits of Barnes' accounting allegations and that KPMG audit partners had misrepresented their position to Fannie Mae staff, to Mr. Barnes, and to the Audit Committee.

827.    In sum, the Audit Committee Defendants were intimately involved with and controlled the Company's accounting and its financial reporting, and knew facts or had access to information suggesting that the Company's financial statements, and public statements, were false.  For example, the Audit Committee members knew, or should have known, that the Company's internal controls were severely deficient or non-existent; that an inordinate concentration of responsibility was vested in the CFO; that the Company's Internal Audit reviews were incomplete and/or ineffective; that the Company's compensation structure created an incentive for management to manipulate earnings-per-share; that the Company's corporate culture emphasized the stability of earnings over accuracy in financial reporting; that (as OFHEO found) "the desire by management to minimize earnings volatility was a central organizing principle in the development of key accounting policies;" and that the Company's accounting

violated GAAP in numerous respects – violations which the Interim Report characterizes as "pervasive and . . . reinforced by management."

828.    In light of their specific responsibilities for overseeing the Company's financial reporting process, and in light of the adverse information discussed above which was known to (or recklessly disregarded by) the Audit Committee Defendants, any purported reliance by the Audit Committee Defendants upon KPMG or the Officer Defendants with respect to the accuracy of the Company's financial statements and/or the integrity of its internal controls was inherently unreasonable.  The Audit Committee Defendants merely rubber-stamped what was brought to them by KPMG and management, without bringing to bear the critical eye and independent judgment which investors legitimately expected them to apply.

829.    If the Audit Committee Defendants had not been reckless, they would have detected the deficiencies in the Company's internal controls and the accounting improprieties that led to the material misstatement of the Company's financial statements, and should have acted to ensure that the Company's financial condition was accurately reported.  Instead, during each quarterly and annual period relevant to this action, the Audit Committee recommended that the Board of Directors approve the Company's financial statements for inclusion in the Company's annual and quarterly reports.

830.    The recklessness of Audit Committee Defendants Mulcahy, Pickett, and Segue is even more egregious given their positions as members of the Company's Compensation Committee, with responsibility for overseeing Fannie Mae's executive compensation.  Mulcahy was a member of the Compensation Committee in each of the years from 2000 through 2003, serving as Chair of the Committee in 2002 and 2003.  Defendant Picket was a member of the Compensation Committee in 2002 and 2003, and Defendant Segue was a member in 2003.

OFHEO found that the Compensation Committee failed in its responsibilities in three main ways:

- Having approved an EPS-based executive compensation program that provided strong incentives for earnings management, the Compensation Committee failed to monitor it or ensure that the proper checks and balances were in place to prevent manipulation of earning targets or results;

- Together with the Audit Committee, the Compensation Committee permitted executive management to compensate senior internal auditors under the same EPS-biased plans that created the perverse incentives to manipulate earnings and undermined their independence; and

- The Committee allowed management to script its meetings and rubberstamped executive compensation proposals made by senior management.

## XV.    THE CULPABILITY OF THE DIRECTOR DEFENDANTS

831.    During the course of its extensive investigation, OFHEO uncovered significant evidence indicating that the full Board of Directors of Fannie Mae acted recklessly, or at best negligently, with respect to the fraud described herein.  Indeed, the Final Report paints a picture of a Board that was asleep at the switch, sitting passively by while Fannie Mae perpetrated a multibillion dollar fraud on the investing public.  For example, the Final Report states:

> The actions and inactions of the Board of Directors inappropriately reinforced rather than checked the tone and culture set by Mr. Raines and other senior managers.  The Board failed to be sufficiently informed and independent of its chairman, Mr. Raines, and senior management, and failed to exercise the requisite oversight to ensure that the Enterprise was fully compliant with applicable law and safety and soundness standards.  Those failures signaled to management and other employees that the Board did not in fact place a high value on strict compliance with laws, rules, and regulations.  That message contributed to the Enterprise's many failures to comply with safety and soundness standards and the many unsafe and unsound practices documented in this report.

832.    OFHEO corporate governance regulations charge the Board of Directors with furthering the Company's safety and soundness, and set forth affirmative duties that must be undertaken by the Board.  For example, OFHEO requires the Board to:

[D]irect the conduct and affairs of the Enterprise in furtherance of the safe and sound operation of the Enterprise and . . . remain reasonably informed of the condition, activities, and operations of the Enterprise. The responsibilities of the Board include having in place adequate policies and procedures to assure its oversight of, among other matters, the following:

(1) Corporate strategy, major plans of action, risk policy, programs for legal and regulatory compliance and corporate performance…;

(2) Hiring and retention of qualified senior executive officers and succession planned for such senior executive officers;

(3) Compensation programs of the enterprise;

(4) Integrity of accounting and financial reporting systems of the Enterprise, including independent audits and systems of internal control;

(5) Process and adequacy of reporting disclosures, and communications to shareholders, investors, and potential investors …

833.    The fact that Fannie Mae's Board of Directors delegated certain aspects of its responsibilities to various Board committees (*e.g.*, the Audit Committee) does not absolve the Board of those responsibilities.   To the contrary, OFHEO's corporate governance regulation specifically provides that "no committee shall operate to relieve the board of directors or any board member of a responsibility imposed by applicable law, rule, or regulation."

834.    The failures of the full Board of Directors to properly discharge its duties were myriad.  The OFHEO Final Report summarized these failures, discussed in more detail below, as follows:

Fannie Mae's full Board of Directors failed in numerous ways that put the safety and soundness of the Enterprise at risk.  The Board of Directors failed to stay informed about Fannie Mae corporate strategy, major plans of action, and risk policy.  Having approved an executive compensation program that created incentives to manipulate earnings, members of the Board of Directors failed to monitor against such manipulations.  The Board failed to provide delegations of authority to management that reflected the current

310

size and complexity of the Enterprise. The Board failed to ensure the effective operation of its own Audit and Compensation Committees. The Board of Directors failed to act as a check on the authority of Chairman and CEO Franklin Raines. The Board failed to initiate an independent inquiry into Fannie Mae's accounting following the announcement of Freddie Mac's restatement and subsequent investigation or allegations of Roger Barnes, both of which involved earnings management. The Board failed to assure itself that Fannie Mae's regulators were properly informed of Mr. Barnes' allegations. Finally, the Board of Directors failed to ensure timely and accurate reports to Federal regulators.

### a.    *The Director Defendants Failed To Stay Informed*

835.    OFHEO requires that members of the Board ensure that they receive accurate, timely, and sufficient information about Fannie Mae's operations and financial condition. The Board is also responsible for working with executive management to establish the Company's strategies and goals in an informed manner. OFHEO found that the Director Defendants failed to ask appropriate questions and otherwise stay informed of corporate strategy, thus preventing them from properly discharging their duties.

836.    For example, the Director Defendants knew, or should have known, that compliance with SFAS 133 had the potential to inject significant earnings volatility into Fannie Mae's financial statements. The Director Defendants should have questioned Fannie Mae's continued ability to report minimal earnings volatility after the implementation of this new standard, but they failed to do so.

837.    The Director Defendants were aware of Fannie Mae's extraordinary success at meeting analysts' EPS expectations with minimal volatility. Howard made a presentation to the Board in July 2002 entitled "Corporate Risk Appetite," which included a slide of Fannie Mae's EPS growth pattern from December 1990 through projections for December 2002. The chart indicated very little earnings volatility over the twelve-year period. For comparison, Howard

also presented EPS growth charts for three other companies: Alcoa, Fifth Third Bank, and Citigroup. These three charts showed significant volatility in EPS growth.

838. Even in the face of well-publicized media coverage of the SEC's concerns about earnings management concerns (which the Board had heard as early as 1998), OFHEO found little evidence that the Board showed any concern over the consistent "good news" earnings reports of management. The Director Defendants never questioned the Officer Defendants as to how Fannie Mae was able to meet EPS targets with to-the-penny precision and with little earnings volatility. OFHEO also found no indication that the Director Defendants questioned Fannie Mae's ability to show smooth earnings when other financial companies subject to the same interest rate environment showed significant earnings volatility. The Director Defendants' failure to question whether the pattern of reported earnings could be an indication of improper earnings management, especially in light of the intense public focus on the issue, demonstrates a failure in their responsibility to oversee the safe and sound operation of the enterprise.

839. Given the information available to various committees of the Board, the Director Defendants either knew or were reckless in failing to recognize that there were significant risks of earnings management at Fannie Mae. The Audit Committee routinely received reports on EPS targets and achievements from Howard and Spencer, and the Compensation Committee received reports detailing the links between management bonuses and EPS targets. Every year from 1998 through 2004, there was at least one Board member who was assigned to both the Audit and Compensation Committees. In fact, in 2003 three Board members (Defendants Mulcahy, Segue, and Pickett) sat on both Committees. OFHEO found no evidence that those Directors questioned the compensation structure at Fannie Mae or recognized that such a structure could lead to improper earnings management.

840.    Fannie Mae's uncanny ability to meet its EPS targets with precision, thus entitling the Officer Defendants to the maximum possible bonuses, should have caused the Director Defendants to question whether the Company was engaged in improper earnings management. Despite indications from management and in the wider financial community of the uniqueness of that record, the Board failed to recognize that the focus on earnings targets could lead (and was leading) to deliberate manipulations by the Officer Defendants to circumvent GAAP and to the Company's entering into dubious transactions to achieve those targets.

### b.    The Director Defendants Failed To Review Major Business Decisions And Ensure The Appropriate Delegation of Authority

841.    OFHEO found that the Director Defendants failed to review major business decisions and to ensure that authority was appropriately delegated.

842.    Fannie Mae operates under a corporate governance model that includes broad delegation of authority to management.  The Company's bylaws grant broad powers to the Chairman of the Board to make virtually all business decisions, with periodic reporting to the Board on major decisions.  However, OFHEO found that the Officer Defendants did not generally bring issues relating to business operations or major transactions to the Board for deliberation or approval, but rather simply reported to the Board on initiatives that were already underway.

843.    As late as June 2004, Monica Medina, Vice President and Deputy General Counsel for Corporate Governance, recounted Fannie Mae's lack of a formal policy for Board approval of large transactions and management's discretion on whether or not to inform the Board of such transactions, stating in an email to a student at the Wharton School of Business:

> In other areas, such as approval of large transactions, there are no firm guidelines or standards, and the board and management have until now made the decision of whether to notify the Board or seek its approval on a case by case basis.

313

844.     In an interview with Paul Weiss during the course of the Special Examination, Director Defendant Marron indicated that the Board was aware of Fannie Mae's debt buyback program, but that management never sought the Board's consent before making even the largest repurchases.  An OFHEO memorandum memorializing that interview states:

> [A]ll of Howard's presentations regarding debt buybacks had been historical — meaning Howard would present to the Board what the Company did the quarter before, not on its plans for buying back debt in the future.  Marron could not recall there being any boundaries on the Company's practice of buying back debt or management looking to the Board for consent as to the size or parameters of the purchases.

When OFHEO asked Marron whether he "challenged" management's failure to obtain Board approval:

> Marron … said that he had asked why the company was buying back debt, what it was doing to replace the capital spent and whether the repurchases were made pursuant to normal policy. Marron noted that the transactions sometimes caused the company to incur losses in the magnitude of "billions" of dollars.  However, Marron said that he was told that management had "all bases covered" and that the Company's policy regarding buying back debt had been around a long time.

845.     Thus, Marron's "challenge" to management was summarily dismissed with assurances by Howard.   OFHEO found that the Director Defendants did not respond appropriately in the face of those assurances, noting:

> [The] failure to ensure adequate controls of those transactions, which can affect executive compensation directly, is contrary to OFHEO corporate governance regulation. Under applicable law, the Board should not have accepted dismissive assurances from management. Given the oversight responsibility and authority vested in Boards of Directors, it is incumbent on Board members to carefully delegate authority but retain their ability to stay informed of and provide oversight of Enterprise business activities. The Board's failure to insist upon guidelines requiring that such major transactions receive Board approval was a significant dereliction of duty and a safety and soundness violation.

314

c.    *The Director Defendants Failed To Ensure That Committees Functioned Effectively*

846.    As set forth above and in the OFHEO Final Report, the Audit Committee and the Compensation Committee failed to properly discharge their duties.  OFHEO found that the Director Defendants' "lax oversight of key committees contributed to their failures . . .  The Committee failures meant that the delegated areas of responsibility were not receiving an appropriate level of attention and care.  Further, because of the Committee failures, the full Board received inaccurate reports based upon inadequate information from poorly functioning Committees."  Having delegated significant responsibility to the Audit Committee and the Compensation Committee, the Director Defendants were required to monitor these Committees' performance.

d.    *The Director Defendants Failed To Act As A Check On Management*

847.    OFHEO found that the Director Defendants failed to act as a check on management.  As discussed above, Raines insisted upon placing excessive power and conflicting responsibilities in the hands of Howard, who then used that power to stifle criticism and manipulate earnings to enrich senior executives.  During the Loss Period, Howard was the CFO and also informally referred to himself as the Company's "Chief Risk Officer."  Beginning in 2000, Howard assumed responsibility for financial risk management.  Then, in August 2004, Howard announced a reorganization of Fannie Mae's Credit Policy function that placed him in charge of *all* risk management.  The failure to segregate the responsibilities of the CFO and CRO eliminated the inherent checks and balances in having different lines of responsibility for those areas. As described above, the combination of those functions was a serious internal control weakness, was contrary to OFHEO regulations, and contravened industry best practices.

848.    In August 2004, following a presentation by Defendant Mudd to the Board of Directors on the reorganization, Defendant Ashley contacted Mudd to express his concerns that Mudd had not clearly identified where the responsibility for credit risk oversight would reside. Yet, the Director Defendants failed to do anything to ensure the separation of the CFO and CRO responsibilities.

849.    Further, Raines' 2002 change in the administrative reporting relationship of Rajappa to Howard should have alerted the Director Defendants that the independence of the Internal Audit function was in jeopardy.  The Director Defendants knew of, and failed to object to, this reporting relationship.

### e.    The Director Defendants Failed To Order Independent Investigations Of Fannie Mae

850.    The Director Defendants' failure to exercise proper oversight over Fannie Mae is further demonstrated by their ineffective and complacent response to the Freddie Mac accounting debacle and to Barnes' allegations of earnings management.

851.    Freddie Mac's 2003 admission that it had manipulated its accounting to report artificially lower earnings volatility should have caused the Director Defendants to closely scrutinize Fannie Mae's accounting policies to ensure that the problems plaguing Freddie Mae were not present at Fannie Mae, especially in light of the Officer Defendants' repeated public statements stressing (1) Fannie Mae's continued ability to report smooth earnings despite the interest rate volatility to which its business was exposed; and (2) the complete absence of the problems plaguing Freddie Mac at Fannie Mae.  The similarities between the two enterprises in terms of markets, business risks, products, and history of uniquely steady earnings growth should have made the Director Defendants skeptical about the Officer Defendants' assertions that Fannie Mae had none of the accounting issues of its sister enterprise.

852.    The Officer Defendants' repeated assurances that Fannie Mae's results were attributable to the strength of its business model, and not to accounting manipulations, were not consistent with the real-world relationship between risk and return.  Fannie Mae's ability to report smooth earnings despite its exposure to significant interest rate risk should have caused the Director Defendants to more closely examine how Fannie Mae achieved these impressive results.

853.    Even if the Director Defendants somehow believed that this "academic" relationship between risk and return somehow did not apply to Fannie Mae, the admission by Freddie Mac (which took on less interest rate risk than Fannie Mae, yet reported more volatile earnings) that it had achived its reported results through accounting fraud should have led the Director Defendants to question how Fannie Mae had achieved its comparatively more impressive results.

854.    Given the gravity of the allegations against Freddie Mac and the significant chance that at least some of the same accounting problems were present at Fannie Mae, the Director Defendants should have initiated their own immediate investigation into accounting practices at Fannie Mae, rather than waiting for OFHEO to investigate.  They opted instead to blithely rely on the Officer Defendants' assertions that Fannie Mae's accounting practices were sound.  As OFHEO concluded in its Final Report:

> Considering the similarities between the two Enterprises, the Board should have commissioned an independent inquiry into the accounting practices of Fannie Mae.  Not until eighteen months later, after OFHEO had issued its report of September 2004 and the Securities and Exchange Commission had ruled against Fannie Mae on determinations made by OFHEO, did the Board initiate its own investigation.
>
> The allegations of earnings manipulation by senior management at Freddie Mac that surfaced publicly in *The Washington Post* on July 10, 2003, were serious.  *Knowing that its regulator had begun an*

*unprecedented special examination on the same issues announced on July 17, 2003, the Board of Directors contravened statute, regulation, and industry best practices by continuing to rely on the representations of senior management until the SEC's ruling of December 2004.*

(emphasis added).

855.   In fact, OFHEO found no evidence that the Director Defendants even discussed the Freddie Mac restatement until approximately six months after Freddie Mac announced that it would be restating its financial results.  OFHEO noted: "That level of complacency on the part of the Board is particularly disturbing since the two Enterprises share the same business objectives and associated risks."

856.   The Director Defendants' complacency in the face of the Freddie Mac debacle is all the more egregious, given the Officer Defendants' continued focus on the reporting of smooth and stable earnings.  On July 14-15, 2003, at the Fannie Mae Board of Directors' Strategic Retreat, Howard made his annual presentation on risk management objectives, stressing that a key corporate financial discipline objective of Fannie Mae was to ensure a "high degree of net income stability."  Howard's message to the Director Defendants was clear:  for Fannie Mae to capitalize on its unparalleled debt market access and capital requirements, Fannie Mae "must be, and be perceived to be, a low-risk company," and must achieve a stable pattern of earnings.

857.   The Baker Botts Report was published on July 22, 2003, one week after the above-referenced Strategic Retreat.  That report disclosed critical findings regarding Freddie Mac's efforts to defer income recognition and avoid earnings volatility.  Despite the media attention surrounding the Baker Botts Report and their knowledge that Fannie Mae shared Freddie Mac's objective of mitigating income volatility, the Director Defendants again failed to adequately investigate whether Fannie Mae suffered from similar accounting problems.  In fact, although the Director Defendants were given copies of the Executive Summary of the Baker

Botts Report and were told that the full text was publicly available on Freddie Mac's website, both Audit Committee Chairman Gerrity and Defendant Ashley told OFHEO that they ***did not even read the Baker Botts Report***.

858.    OFEHO also found that the Director Defendants were "derelict when, in October 2003, counsel for Mr. Barnes threatened suit, alleging earnings manipulations by senior management and asserting that Mr. Barnes had written the senior management directly about that manipulation a year before."  Under SEC regulations, the Director Defendants were required to conduct an independent investigation into Barnes' allegations.  Further, OFHEO regulations required Fannie Mae to inform the SEC or OFHEO about the charges.  According to OFHEO: "Neither requirement was fulfilled, nor is there any record that either was considered."  OFHEO flatly condemned the Director Defendants for this failure, noting:

> In its passivity, the Board missed its last chance to require an independent investigation or review that would have allowed the Enterprise to resolve its own problems.  Here, as in many other instances, the Board simply accepted representations of senior management and exercised no discernable oversight responsibility.

859.    In sum, the Director Defendants recklessly (or at least negligently) failed to properly discharge their duties and, as a result, permitted Fannie Mae's rampant fraud to continue unabated.

## XVI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

860.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements complained of concern Fannie Mae's financial statements and historical and/or current conditions affecting the Company.  Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made.  To the extent any forward-looking statements were identified as such, there were no meaningful cautionary statements

identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements.  Any warnings contained in the press releases and the financial statements quoted herein were generic statements of the kind of risks that affect any company and misleadingly contained no specific factual disclosure of any of Fannie Mae's accounting irregularities.

861.    Alternatively, to the extent that the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, lacked a reasonable or good faith basis for believing the statement to be accurate, knew and failed to disclose adverse information relating to the statement, and/or the statement was authorized and/or approved by an executive officer of Fannie Mae who knew that the statement was materially false and misleading when made.

## XVII. APPLICABILITY OF PRESUMPTION OF RELIANCE:   FRAUD ON THE MARKET

862.    At all relevant times, the market for Fannie Mae securities was an efficient market for, *inter alia*, the following reasons:

    a.    Fannie Mae's common stock met the requirements for and was listed on the New York Stock Exchange;

    b.    Fannie Mae's trading volume was substantial;

    c.    While Fannie Mae's common stock is exempt from SEC registration requirements, Fannie Mae began to file its results with the SEC on December 31, 2002 as part of a voluntary initiative, and even before that, the Company's Annual Reports containing its annual financial statements were widely disseminated and were published on Fannie Mae's website;

    d.    Fannie Mae regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major news wire services and other wide-ranging public disclosures, such as communication with the financial press and other similar reporting services;

e.   The market reacted swiftly to public information disseminated regarding Fannie Mae; and

f.   Fannie Mae was followed by numerous national securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

863.   As a result of the foregoing, the market for Fannie Mae securities promptly digested current information regarding Fannie Mae from all publicly available sources and reflected such information in Fannie Mae's securities prices at all relevant times.  Under these circumstances, Plaintiffs, as purchasers or acquirers of Fannie Mae securities, suffered injury through their purchase or acquisition of Fannie Mae's securities at artificially inflated prices and a presumption of reliance applies.

864.   In addition to the foregoing, Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding Fannie Mae's business, financial results and business prospects.

## XVIII.  LOSS CAUSATION

865.   Throughout the Loss Period, Fannie Mae's stock price was massively inflated as the result of the Defendants' long-standing, comprehensive scheme to misrepresent Fannie Mae's financial results.  Not only did Defendants publish materially false statements of Fannie Mae's financial results, but they also publicly misrepresented that Fannie Mae's accounting policies and practices complied with GAAP and that the Company maintained adequate internal financial controls.

866.   Fannie Mae's financial results and purported compliance with GAAP were material information to Plaintiffs.  Had Plaintiffs known the truth – that the Company's reported financial results were materially false and painted a rosier picture of the Company's results and

stability than the true facts warranted – Plaintiffs either would not have purchased Fannie Mae stock at all, or would have done so only at substantially lower prices than the artificially inflated prices which they actually paid.

867.    The Defendants' fraudulent scheme was gradually revealed to the market through announcements concerning SEC and OFHEO investigations, earnings releases, SEC filings, and other public statements.  As alleged herein, these revelations caused progressive declines in the price of Fannie Mae's stock, causing Plaintiffs – who continued to hold Fannie Mae stock at the time of these disclosures -- to suffer significant losses.

868.    In total, the Company's stock price fell 44.8% -- from $75.65 on September 21, 2004 to $41.71 on September 28, 2005.  These declines are directly attributable to the market's reaction to revelations of accounting fraud at Fannie Mae, and to its adjustment of the stock price to reflect the newly emerging truth about Fannie Mae's financial condition and results.  Thus, these price declines were directly caused by the misstatements alleged herein, and by the market's response to the subsequent partial corrective disclosures.

869.    The fraud perpetrated by the Defendants described in this Complaint proximately caused foreseeable losses to the Plaintiffs.

## XIX.    TOLLING OF THE STATUTE OF LIMITATIONS

870.    Plaintiffs did not know, and could not reasonably have discovered before September 22, 2004, that Fannie Mae's financial statements and Defendants' other public statements regarding the Company's financial condition were materially false and misleading. Prior to that date, the statutes of limitations on Plaintiffs' claims were tolled by Defendants' active and continuing concealment of the falsity of their statements.  On September 22, 2004, the Company first disclosed OFHEO's finding that Fannie Mae's financial results had been intentionally distorted.  However, the Company failed to reveal the full magnitude and extent of

the fraud.  On February 23, 2005, the Company disclosed additional GAAP violations that would cause its anticipated restatement to increase by more than 25%, from $9 billion to at least $11.4 billion.  On September 28, 2005, Fannie Mae's stock price fell to an eight-year low when it was revealed that the Company's internal investigation had uncovered yet more "new and pervasive accounting violations" that had not been disclosed previously.  Defendants' continued fraudulent concealment of these material aspects of the fraud – which Plaintiffs could not have discovered on their own – caused the statutes of limitations on Plaintiffs' claims to remain tolled through September 28, 2005.  Even as of today, the full extent of the fraud is not known, as additional accounting violations continue to be revealed and the Company has yet to publish restated financial statements.

871.    Further, the statutes of limitations on Plaintiffs' claims have been tolled since September 23, 2004, due to the filing of a securities class action complaint on that date in *Vinci v. Federal National Mortgage Association, et al.* (now pending as *In re Fannie Mae Securities Litigation*), No. 1:04-cv-01639-RJL in the United States District Court for the District of Columbia.  Plaintiffs were members of the putative class in that action, which asserts claims against Fannie Mae, Raines, Howard, and Spencer pursuant to Section 10(b), Rule 10b-5 and Section 20(a) of the Exchange Act.  Those claims arise out of the same facts and circumstances as the claims in this Complaint.

872.    All of Plaintiffs' claims have been brought within the applicable statutes of limitations, after giving effect to tolling and the relation-back doctrine.

## COUNT I

**Violations of Section 10(b) of the Exchange Act and Subsections (a), (b), and (c) of
Rule 10b-5 Promulgated Thereunder
(Against Fannie Mae, the Officer Defendants, the Audit Committee Defendants, and
KPMG (the "10b-5 Defendants"))**

873.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

874.    As described above, the 10b-5 Defendants made and disseminated numerous false and misleading statements that were directly attributable to them.  The 10b-5 Defendants were provided with or had unlimited access to copies of the Company's financial statements, internal reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to, but did not, prevent the issuance of the statements or cause the statements to be corrected.

875.    As described above, the 10b-5 Defendants carried out a fraudulent scheme and course of conduct and/or business which was intended to and did, as alleged herein: (i) deceive Plaintiffs; (ii) artificially inflate and maintain the market price of Fannie Mae securities; and (iii) cause Plaintiffs to purchase Fannie Mae securities at inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the 10b-5 Defendants took the actions set forth herein, which operated as fraud and deceit upon Plaintiffs as purchasers of Fannie Mae securities.

876.    As alleged above, the 10b-5 Defendants acted with scienter in that they knew or were reckless in not knowing that Fannie Mae's press releases, public statements, Annual Reports, Forms 10-K, Forms 10-Q, Forms 8-K, Registration Statement, and Proxy Statements during the periods referenced above, as well as the 10b-5 Defendants' own public statements set forth herein, were materially false and misleading as detailed above; knew that such statements

or documents would be issued or disseminated to Plaintiffs; and knowingly or recklessly participated in a fraudulent scheme and course of conduct or business as primary violators of federal securities laws.

877.    As a direct and proximate result of the 10b-5 Defendants' wrongful conduct in violation of Section 10(b) and Rule 10b-5, the market prices of Fannie Mae stock purchased by Plaintiffs were artificially inflated.  In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by the 10b-5 Defendants, or upon the integrity of the market, Plaintiffs purchased Fannie Mae securities at artificially inflated prices.

878.    Had Plaintiffs known the truth concerning the misrepresented and omitted facts described above, they either would not have purchased or otherwise acquired their Fannie Mae securities at all, or would have done so at substantially lower prices.

879.    Plaintiffs were substantially damaged as a result of their purchases of Fannie Mae securities at artificially inflated prices and the subsequent decline in price of those securities when the fraud was disclosed.

## COUNT II

**(Violation of Section 10(b) of the Exchange Act and Subsections (a) and (c) of
Rule 10b-5 Promulgated Thereunder)
(Against Defendants Radian Group and Doe)**

880.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

881.    As described above, Radian Group and Doe carried out a fraudulent scheme and course of conduct and/or business which was intended to and did: (i) deceive Plaintiffs; (ii) artificially inflate and maintain the market price of Fannie Mae securities; and (iii) cause Plaintiffs to purchase Fannie Mae securities at inflated prices.  In furtherance of this unlawful

scheme, plan and course of conduct, Radian Group and Doe took the actions set forth herein, which operated as fraud and deceit upon Plaintiffs as purchasers of Fannie Mae securities.

882.    Radian Group's and Doe's actions in furtherance of the fraudulent scheme included the sale of a finite insurance policy to Fannie Mae which Radian Group and Doe knew or recklessly disregarded would be improperly accounted for by Fannie Mae as a means of manipulating its reported financial results.

883.    As alleged above, Radian Group and Doe acted with scienter in that they knew or were reckless in not knowing that Fannie Mae's Annual Reports, Forms 10-K, Forms 10-Q, Forms 8-K, Registration Statement, and Proxy Statements during the periods referenced above were materially false and misleading as detailed above; knew that such statements or documents would be issued or disseminated to Plaintiffs; and knowingly or recklessly participated in a fraudulent scheme and course of conduct or business as a primary violator of federal securities laws.

884.    During the Loss Period, Radian Group and Doe knew or recklessly disregarded that they were merely loaning money to Fannie Mae but that Fannie Mae was fraudulently recording its transactions with Doe in the Company's financials as "insurance" premium payments to Doe in violation of GAAP.

885.    As a direct and proximate result of Radian Group's and Doe's wrongful conduct in violation of subsections (a) and (c) of Rule 10b-5, the market prices of Fannie Mae stock purchased by Plaintiffs were artificially inflated.  In ignorance of this artificial inflation, and relying directly or indirectly on the integrity of the market, Plaintiffs purchased Fannie Mae securities at artificially inflated prices.

886.    Had Plaintiffs known the truth, they either would not have purchased or otherwise acquired their Fannie Mae securities at all, or would not have done so at substantially lower prices.

887.    Plaintiffs were substantially damaged as a result of their purchases of Fannie Mae securities at artificially inflated prices and the subsequent decline in price of those securities when Radian Group's and Doe's fraud was disclosed.

## COUNT III

### Violation of Section 18 of the Exchange Act
### (Against All Defendants Except Radian and Doe)

888.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

889.    This claim is brought by all Plaintiffs pursuant to Section 18 of the Exchange Act, against Defendants Fannie Mae, Raines, Howard, Spencer, Mudd, Gerrity, Mulcahy, Malek, Pickett, Segue, Harvey, Ashley, Duberstein, Gorelick, Justiz, Korologos, Marron, Swygert, Rahl, and KPMG.

890.    As set forth above, these Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed by Fannie Mae with the SEC pursuant to the Exchange Act, including the Registration Statement and the Company's Form 10-K filings for the years 2002 and 2003.

891.    In connection with the purchase of securities, Plaintiffs specifically read and relied upon the Company's SEC filings, including its Registration Statement and the Forms 10-K for the years 2002 and 2003 and the financial statements and audit opinions contained therein. Plaintiffs relied on those statements as being materially complete, and as not omitting material

information.  Among other things, Plaintiffs read and relied on the line items in the Company's financial statements for revenue, net income, earnings per share, interest income, other comprehensive income, fee and other income, interest expense, total assets, loans held for investment, mortgage related securities, and stockholders' equity.  Plaintiffs' decisions to purchase Fannie Mae stock were based, in significant part, on Plaintiffs' analysis of these and other financial metrics as set forth in the Company's financial statements.  Plaintiffs also reviewed KPMG's audit opinions to make sure they were unqualified, and relied on those unqualified opinions when purchasing Fannie Mae stock.

892.    Plaintiffs relied on these statements not knowing that they were false and misleading.

893.    Plaintiffs' reliance was reasonable, particularly given the unqualified audits opinions from KPMG.

894.    Defendants Raines, Howard, Mudd, Gerrity, Mulcahy, Malek, Pickett, Segue, Harvey, Ashley, Duberstein, Gorelick, Justiz, Korologos, Marron, and Swygert signed the Company's Form 10-K for the year ended 2002.  Spencer signed the Report of Management in the 2002 10-K.

895.    Defendants Raines, Howard, Mudd, Gerrity, Mulcahy, Malek, Pickett, Segue, Harvey, Ashley, Duberstein, Gorelick, Justiz, Korologos, Marron, Rahl and Swygert signed the Company's Form 10-K for the year ended 2003.  Spencer signed the Report of Management in the 2003 10-K.

896.    Defendant Raines signed the Registration Statement.

897.    KPMG issued and signed audit opinions on the Company's annual financial statements for 2002 and 2003, which were included (with KPMG's consent) in the 2002 10-K

and the 2003 10-K, respectively, and which were incorporated by reference in the Registration Statement.

898.    At the time Fannie Mae's securities were purchased and held by Plaintiffs, Plaintiffs did not know of the false and/or misleading statements and omissions.  If Plaintiffs had known the true facts, they either would not have purchased Fannie Mae's securities or would have done so only at substantially lower prices.

899.    When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, Plaintiffs were significantly damaged by the resulting drop in the value of Fannie Mae's stock.

900.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damage in connection with their purchases of shares.

901.    By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

## COUNT IV

### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

902.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

903.    The Officer Defendants, by reason of their executive positions; their direct involvement in the day-to-day operations of Fannie Mae including its financial reporting and accounting functions; their signatures on and participation in the preparation and dissemination of Fannie Mae's false financial statements; their false and misleading press releases and other public statements; and their direction of the Company's employees to engage in fraudulent accounting practices which caused the Company's financial statements to be false and

misleading, were controlling persons of Fannie Mae. As such, the Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Fannie Mae, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

904.    The Audit Committee Defendants, by reason of their responsibility for overseeing Fannie Mae's financial reporting, accounting, and internal controls; their responsibility for overseeing the activities of Fannie Mae's outside auditors; their responsibility for meeting with and making recommendations to the Officer Defendants and the Director Defendants concerning the foregoing activities; and their signatures on the false and misleading financial statements and/or other public statements as referenced herein, were controlling persons of Fannie Mae. As such, the Audit Committee Defendants had the power and influence, and exercised such power and influence, to cause Fannie Mae to engage in the violations of law complained of herein.

905.    The Director Defendants, by reason of their positions as directors of Fannie Mae, with authority to oversee all business and affairs of the Company, and by virtue of their signatures on Fannie Mae's false and misleading financial statements referenced herein, were controlling persons of Fannie Mae. As such, the Director Defendants had the power and influence, and exercised such power and influence, to cause Fannie Mae to engage in the violations of law complained of herein.

906.    As set forth above, Fannie Mae participated in a fraudulent scheme and course of business or conduct, and issued false and misleading statements as a primary violator of Section 10(b) and subsections (a), (b), and (c) of Rule 10b-5. Additionally, Fannie Mae violated Section 18 of the Exchange Act by filing materially false statements with the SEC, as set forth above. By virtue of their positions as controlling persons of Fannie Mae and their culpable participation

in the Company's fraud, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act to the same extent as Fannie Mae for its primary violations of Sections 10(b) and 18 and Rule 10b-5.

907.    As a direct and proximate result of Fannie Mae's primary violations of the Exchange Act, for which the Individual Defendants' are liable pursuant to Section 20(a), Plaintiffs suffered substantial damages in connection with their purchases of the Company's securities during the Loss Period.

## COUNT V

### Violation Of Section 20A Of The Exchange Act
### (Against Raines, Howard, and Spencer)

908.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

909.    This Claim is asserted against the Officer Defendants, and is based upon Section 20A of the Exchange Act, 15 U.S.C. § 78t-1 in connection with their insider trading in Fannie Mae common stock.

910.    The Officer Defendants collectively sold more than 270,000 shares of Fannie Mae common stock between the time they began reporting such sales in 2002 and September 21, 2004, reaping total proceeds of over $20 million.  During the period from November 2003 to September 21, 2004 alone, Raines and Howard sold 41% and 67%, respectively, of the number of shares beneficially owned by each as of April 1, 2003.

911.    The Officer Defendants knowingly or with deliberate recklessness sold their Fannie Mae common stock during this period while in possession of material, adverse, non-public information indicating that the market price of the stock was materially inflated.  As set

forth in Schedule A, attached hereto, Plaintiffs purchased Fannie Mae common stock contemporaneously with sales of Fannie Mae stock by these defendants.

912.    By reason of Plaintiffs' purchases of Fannie Mae stock contemporaneously with sales of stock by the Officer Defendants, Plaintiffs have suffered recoverable damages.  Under Section 20A of the Exchange Act, the Officer Defendants are liable to Plaintiffs for all profits gained and losses avoided by them as a result of these contemporaneous transactions.

## COUNT VI

### Common Law Fraud
### (Against Fannie Mae, the Officer Defendants, the Audit Committee Defendants, and KPMG)

913.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

914.    Plaintiffs assert this cause of action based on common law principles of fraud, against Fannie Mae, the Officer Defendants, the Audit Committee Defendants, and KPMG.

915.    As alleged herein, each of these Defendants made material misrepresentations, or failed to disclose material facts, to Plaintiffs regarding Fannie Mae's financial condition.

916.    These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth above, or acted with reckless disregard for the truth of those representations in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Fannie Mae's true financial condition and future business prospects from Plaintiffs and supporting the artificially inflated price of the Company's securities.   As demonstrated by Defendants' overstatements and misstatements of Fannie Mae's revenues during the Loss Period, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions set forth above, were

reckless in failing to obtain such information by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

917.    The aforesaid misrepresentations and omissions were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs when making investment decisions.

918.    The aforesaid misrepresentations and omissions constitute fraud and deceit under applicable law.

919.    Plaintiffs reasonably relied upon these Defendants' representations when deciding to purchase and refrain from selling Fannie Mae's securities.  Plaintiffs participated in the Company's quarterly conference calls and read the Company's press releases and Form 10-K and 10-Q filings, including the financial statements and audit opinions contained therein. Plaintiffs relied on those statements as being materially complete, and as not omitting material information.  In particular, Plaintiffs read and relied on the line items in the Company's financial statements for revenue, net income, earnings per share, interest income, other comprehensive income, fee and other income, interest expense, total assets, loans held for investment, mortgage related securities, and stockholders' equity.  Plaintiffs' decisions to purchase and hold Fannie Mae stock were based, in significant part, on Plaintiffs' analysis of these financial metrics as set forth in the Company's financial statements.  Plaintiffs also read and relied on KPMG's statements that it had conducted audits in accordance with GAAS and that the Company's financial statements were fairly presented in all material respects in accordance with GAAP.

920.    At the time Fannie Mae's securities were purchased and held by Plaintiffs, Plaintiffs did not know of the false and/or misleading statements and omissions.  If Plaintiffs had known the true facts, they either would not have purchased Fannie Mae's securities or would have done so only at substantially lower prices.

921.    As a direct and proximate result of these Defendants' fraud and deceit, Plaintiffs suffered damages in connection with their purchases and holding of Fannie Mae's securities.

## COUNT VII

### Negligent Misrepresentation
### (Against Fannie Mae and the Individual Defendants)

922.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

923.    This Count is brought by all Plaintiffs against Fannie Mae and the Individual Defendants, under common law principles of negligence.

924.    These Defendants made materially false and misleading statements, as set forth above, regarding *inter alia*, the financial condition and the accounting policies and practices of the Company.

925.    These Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the Company's financial statements, accounting policies and practices, and internal financial controls during the Loss Period were materially false and misleading.

926.    These Defendants owed Plaintiffs a duty of reasonable care in connection with the provision of information concerning the financial condition of Fannie Mae. Fannie Mae and the Individual Defendants breached this duty by including in Fannie Mae's financial statements untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

927.    Plaintiffs, as investors, were entitled to rely upon, and were justified in relying upon, the representations made by these Defendants, set forth above, regarding the Company's

financial statements, accounting policies and practices, internal financial controls, and compliance with GAAP. Plaintiffs relied upon the superior knowledge and expertise of Defendants and justifiably relied to their detriment on these Defendants' representations when deciding to purchase and refrain from selling Fannie Mae's securities.

928.    As alleged above, these Defendants materially misrepresented Fannie Mae's financial results and their compliance with GAAP throughout the Loss Period.

929.    Plaintiffs had no knowledge of the false and misleading nature of these Defendants' statements when purchasing and refraining from selling Fannie Mae's securities, and believed them to be true. Had Plaintiffs been aware of the true facts, they would either not have purchased Fannie Mae's shares, or would not have purchased the shares at inflated prices.

930.    As a direct and proximate result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Fannie Mae's securities was artificially inflated and Plaintiffs sustained damages in connection with their purchases and holding of Fannie Mae's securities when the price of the securities declined.

931.    These Defendants' conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable state law.

## COUNT VIII

### (Aiding and Abetting Common Law Fraud)
### (Against Radian Group and Doe)

932.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

933.    This claim is brought against Radian Group and Doe for aiding and abetting common law fraud.  As set forth herein, the Fannie Mae Defendants (as well as KPMG) committed common law fraud by making materially false and misleading representations of fact, or omitting to state material facts which Fannie Mae had a duty to disclose, to Plaintiffs concerning its purchase of at least one illegally structured, GAAP-violative "finite insurance policy" from Doe.  This "insurance policy" was actually a loan from Doe to Fannie Mae, since no risk was transferred from Fannie Mae to Doe.  However, the Fannie Mae Defendants represented that it was insurance, and accounted for it as such, in Fannie Mae's financial statements for 2002, 2003 and 2004.  The Company has announced that it will restate its previously issued financials as a result of this improper accounting.

934.    Plaintiffs relied upon Fannie Mae's financial results for 2002, 2003 and 2004 in making investment decisions with respect to the securities of Fannie Mae, without knowledge of the falsity of that information.  As a direct and proximate result of the fraudulent conduct of the Fannie Mae Defendants and KPMG, Plaintiffs were injured.

935.    Radian Group and Doe had a duty not to knowingly assist in the perpetration of fraud upon Plaintiffs.

936.    Radian Group and Doe knowingly and/or recklessly aided and abetted the fraud committed by the Fannie Mae Defendants and KPMG by substantially assisting in the fraud with knowledge that fraud was being committed and that Doe's actions were part of an overall fraudulent plan or scheme.

937.    Radian Group's and Doe's assistance in the Fannie Mae Defendant's fraud included, among other things, purporting to sell Fannie Mae a "finite insurance policy" when

Radian Group and Doe knew and/or recklessly disregarded that the Company had purchased and would use it for fraudulent purposes.

938.    Radian Group's and Doe's assistance in the fraud at Fannie Mae was a substantial factor in causing harm to Plaintiffs.

## COUNT IX

**For Violation of California Corporations Code §§ 25400(d) & 25500
(Against Fannie Mae and the Officer Defendants)**

939.    Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

940.    This cause of action is brought pursuant to California Corporations Code § 25400(d) and 25500 against Fannie Mae and the Officer Defendants.

941.    Throughout the Loss Period, Fannie Mae sold and offered its securities for sale.

942.    As alleged herein, Fannie Mae made or caused to be made statements in press releases, Annual Reports, and documents filed with the SEC, including its Form 10-Ks and 10-Qs, which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts or which omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

943.    Fannie Mae knew or had reasonable ground to believe that such statements were false or misleading and made such false and misleading statements with the intent to affect the price of Fannie Mae's securities and to induce the purchase of such securities.

944.    Fannie Mae's false and misleading statements were distributed to Plaintiffs in California.  Fannie Mae has substantial operations in California.  Fannie Mae's securities were sold to Plaintiffs in California.  Fannie Mae's false and misleading statements were intended to

and did enter into and were disseminated in California both directly and by way of SEC filings, the nationwide release of press releases, nationwide telephone conference calls and interviews which Defendants knew or should have known would be disseminated on a national if not worldwide basis.

945.    Fannie Mae and the Officer Defendants willfully participated in Fannie Mae's violations of California Corporations Code § 25400(d).  As set forth above, Fannie Mae and the Officer Defendants participated in the preparation, approval, and dissemination of Fannie Mae's false and misleading statements with knowledge of the falsity of those statements.  Fannie Mae and the Officer Defendants willfully and knowingly disseminated  those false and misleading statements for the purpose of inducing Plaintiffs and other investors to purchase Fannie Mae's securities.

946.    Defendants' materially false and misleading statements proximately caused Plaintiffs to purchase Fannie Mae securities at prices which were affected by Defendants' conduct, and thereby proximately caused Plaintiffs to suffer damages at least equal to the difference between the consideration paid by Plaintiffs for Fannie Mae securities and the value those securities would have had at the time of purchase in the absence of Defendants' false statements.

947.    By virtue of the foregoing, Fannie Mae has violated California Corporation Code § 25400(d) and Fannie Mae and the Officer Defendants are liable pursuant to California Corporation Code § 25500.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment as follows:

A.      Awarding compensatory damages in favor of Plaintiffs and against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

B.      Awarding punitive or exemplary damages in favor of Plaintiffs and against all Defendants on the common law fraud count asserted above and any other counts for which such damages are available, in an amount appropriate to accomplish the purposes and aims of such damages;

C.      Awarding prejudgment interest and/or opportunity cost damages to Plaintiffs and against all Defendants;

D.      Awarding Plaintiffs the fees and expenses incurred in this action, including allowance of fees for Plaintiffs' attorneys and experts; and

E.      Granting such other and further relief as the Court may deem just and proper.


Dated:  June 29, 2006                          /s/ Stuart M. Grant
                                               Stuart M. Grant (D.C. Bar # 450895)
                                               Megan D. McIntyre
                                               Christine M. Mackintosh
                                               GRANT & EISENHOFER P.A.
                                               Chase Manhattan Centre
                                               1201 N. Market St.
                                               Wilmington, DE 19801
                                               (302) 622-7000
                                               (302) 622-7100 (facsimile)
                                               Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that the attached Amended Complaint was served by First Class U.S.

Mail upon the parties listed below on this 29th day of June, 2006:

### **CLASS PLAINTIFFS' COUNSEL**

Joshoua S. Devore
Steven J. Toll
COHEN, MILSTEIN, HAUSFELD & TOLL,
PLLC
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC  20005

Jeffrey C. Block
BERMAN DEVALERIO PEASE TABACCO
BURT & PUCILLO
One Liberty Square
Boston, MA  02169

Stanley M. Chesley
James R. Cummins
WAITE, SCHNEIDER, BAYLESS
 & CHESLEY CO., L.P.A.
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, OH  45202

### **DEFENSE COUNSEL**

Robert M. Stern
Seth Aronson
Michael J. Walsh, Jr.
O'MELVENY & MYERS L.L.P.
1625 I Street, N.W.
Washington, D.C. 20006

*Counsel for Fannie Mae, Thomas Gerrity,*
*Taylor Segue, William Harvey, Joe Pickett,*
*Victor Ashe, Kenneth Duberstein, Manuel*
*Justiz, H. Patrick Swygert, and Leslie Rahl*

Julia E. Guttman
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400

*Counsel for Jamie Gorelick*

James E. Anklam
James Wareham
Carolyn E. Morris
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
875 15th Street, N.W.
Washington, D.C. 20005

*Counsel for Daniel Mudd*

Mark W. Ryan
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, DC 20006

*Counsel for Leanne Spencer*

340

Eric R. Delinsky
Ellen D. Marcus
Steven Mark Salky
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW Suite 1000
Washington, DC 20036

*Counsel for Timothy Howard*

Fred Fisher Fielding
Barbara Ann Van Gelder
WILEY REIN & FIELDING, LLP
1776 K Street, NW
Washington, DC 20006

*Counsel for Anne Mulcahy and Frederic Malek*

Daniel John Healy
John H. Doyle, III
Rhonda D. Orin
ANDERSON KILL & OLICK, LLP
2100 M Street, NW, Suite 650
Washington, DC 20037

*Counsel for Leslie Rahl*

Andrew S. Tulumello
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036

*Counsel for KPMG LLP*

Michelle D. Schwartz
Joseph Marshall Terry, Jr.
WILLIAMS & CONNOLLY, LLP
725 12th Street, NW
Washington, DC 20005

*Counsel for Franklin Raines*

Earl J. Silbert
Erica Lynne Salmon
DLA PIPER RUDNICK GRAY CARY US
LLP
1200 19th Street, NW, Suite 700
Washington, DC 20036

*Counsel for Stephen Ashley, Donald Marron, and Ann Korologos*

David I. Ackerman
James Hamilton
SWIDLER BERLIN, LLP
3000 K Street, NW
Suite 300
Washington, DC 20007

*Counsel for Joe Pickett*

/s/ Megan D. McIntyre
Megan D. McIntyre

341