UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In Re Fannie Mae Securities Litigation | ) ) ) | Consolidated Civil Action No. 1:04-cv-1639 (RJL) |

| | | |
|---|---|---|
| Franklin Managed Trust, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | No. 1:06-cv-00139 (RJL) |
| v. | ) ) ) | |
| Federal National Mortgage Association, et al. | ) ) ) | |
| Defendants. | ) ) | |

## NOTICE OF FILING

TO ALL COUNSEL OF RECORD

PLEASE TAKE NOTICE that Franklin Plaintiffs' Memorandum of Law in Opposition to Defendant KPMG LLP's Motion to Dismiss and a Proposed Order were electronically filed in the action known as *Franklin Managed Trust, et al. v. Federal National Mortgage Association, et al.*, Civil Action No. 06-cv-00139 as Docket No. 83. A courtesy copy of the filing is attached to this notice.

Dated: September 6, 2006

/s/ Stuart M. Grant
Stuart M. Grant (DC Bar ID #450895)
Megan D. McIntyre
Christine M. Mackintosh
GRANT & EISENHOFER P.A.
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
(302) 622-7000
Counsel for Plaintiffs Franklin Managed
Trust, et al.

## CERTIFICATE OF SERVICE

I certify that on September 6, 2006, the attached Notice of Filing was electronically filed using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF. Service was accomplished on counsel not registered through the CM/ECF system via regular U.S. mail, as indicated below.

### VIA U.S. MAIL:

Fred Fisher Fielding
Barbara Ann Van Gelder
WILEY REIN & FIELDING, LLP
1776 K Street, NW
Washington, DC 20006
*Counsel for Anne Mulcahy and Frederic Malek*

Christian J. Mixter
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
*Counsel for Tom Gerrity*

Daniel John Healy
John H. Doyle, III
Rhonda D. Orin
ANDERSON KILL & OLICK, LLP
2100 M Street, NW, Suite 650
Washington, DC 20037
*Counsel for Leslie Rahl*

### VIA CM/ECF NOTIFICATION:

Jeffrey C. Block
Kathleen M. Donovan-Maher
Julie A. Richmond
BERMAN DEVALERIO PEASE TABACCO
BURT & PUCILLO
One Liberty Square
Boston, MA 02169
*Counsel for State Teachers Retirement System
of Ohio and Ohio Public Employees
Retirement Systems*

James R. Cummins
Melanie S. Corwin
WAITE, SCHNEIDER, BAYLESS
& CHESLEY CO., L.P.A.
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, OH 45202
*Counsel for State Teachers Retirement System
of Ohio and Ohio Public Employees
Retirement Systems*

Seth Aronson
Michael J. Walsh, Jr.
O'MELVENY & MYERS L.L.P.
1625 I Street, N.W.
Washington, D.C. 20006
*Counsel for Fannie Mae, Taylor Segue,
William Harvey, Kenneth Duberstein, Manuel
Justiz, and H. Patrick Swygert*

James D. Wareham
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
875 15th Street, N.W.
Washington, D.C. 20005
*Counsel for Daniel Mudd*

Julia E. Guttman
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
*Counsel for Jamie Gorelick*

Steven Mark Salky
Eric R. Delinsky
Ellen D. Marcus
Holly Ann Pal
Tammy Gershoni
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW Suite 1000
Washington, DC 20036
*Counsel for Timothy Howard*

Francis J. Warin
Andrew S. Tulumello
Melanie L. Katsur
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
*Counsel for KPMG LLP*

Alex Giscard Romain
2842 S. Columbus St
Arlington, VA 22206
*Counsel for Franklin Raines*

James Hamilton
David I. Ackerman
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
*Counsel for Joe Pickett*

David S. Krakoff
Eldad Zvi Malamuth
Christopher F. Regan
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, DC 20006
*Counsel for Leanne Spencer*

Kevin M. Downey
Michelle D. Schwartz
Joseph Marshall Terry, Jr.
Daniel N. Marx
WILLIAMS & CONNOLLY, LLP
725 12th Street, NW
Washington, DC 20005
*Counsel for Franklin Raines*

Erica Lynne Salmon
DLA PIPER RUDNICK, GRAY CARY US
LLP
1200 19th Street, NW, Suite 700
Washington, DC 20036
*Counsel for Stephen Ashley, Donald Marron,
and Ann Korologos*

Jonathan M. Stern
SCHNADER HARRISON SEGAL & LEWIS
LLP
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006-1825
*Counsel for Radian Guaranty Inc*

Jonathan S. Liss
Dionna K. Litvin
David Smith
SCHNADER HARRISON SEGAL & LEWIS
LLP
1600 Market Street, 36th Floor
Philadelphia, PA 19103
*Counsel for Radian Guaranty Inc*

/s/ Megan D. McIntyre
Megan D. McIntyre

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| In Re Fannie Mae Securities Litigation ) | Consolidated Civil Action<br>No. 1:04-cv-1639 (RJL) |
| ) | |
| Franklin Managed Trust, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | No. 1:06-cv-00139 (RJL) |
| ) | |
| v. ) | |
| ) | |
| Federal National Mortgage Association, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## THE FRANKLIN PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT KPMG LLP'S MOTION TO DISMISS

GRANT & EISENHOFER P.A.
Stuart M. Grant (DC Bar ID #450895)
Megan D. McIntyre
Christine M. Mackintosh
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

*Counsel for Plaintiffs Franklin Managed Trust, et al.*

Dated: September 6, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 3

   I        THE FRAUD AT FANNIE MAE ................................................................................ 3

   II.      KPMG'S ROLE IN THE FRAUD ............................................................................. 5

   III     THE REVELATION OF THE FRAUD ...................................................................... 6

ARGUMENT ............................................................................................................................ 8

   I.      THE COMPLAINT STATES A CLAIM AGAINST KPMG FOR
          VIOLATING SECTION 10(B) AND RULE 10b-5 ..................................................... 8

       A.    The Appropriate Standard For Resolving a Motion to Dismiss a
            Section 10(b) Claim Against an Outside Auditor................................................. 8

       B     KPMG Made Materially False Statements in its Audit Reports .................. 10

       C.    Plaintiffs Have Plead Particularized Facts Giving Rise To A
            Strong Inference That KPMG Acted With Scienter In Issuing
            Its Audit Reports............................................................................................... 11

           1.     Plaintiffs Have Alleged KPMG's Actual Knowledge of
                Material GAAP Violations ..................................................................... 12

           2      Alternatively, Plaintiffs Have Alleged KPMG's
                Recklessness ......................................................................................... 18

           3.     KPMG's Attempts To Portray Itself As A Ruthless
                Enforcer Of Proper Accounting Standards Are Contradicted
                By The Complaint's Well-Pleaded Allegations ..................................... 25

           4.     KPMG Had Motive And Opportunity To Commit Fraud .................... 27

           5      The Totality of Plaintiffs' Particularized Allegations Give
                Rise To A Strong Inference of KPMG's Scienter .............................. 30

       D     Plaintiffs Have Pleaded Loss Causation ....................................................... 32

   II      PLAINTIFFS' SECTION 18 CLAIM IS NOT TIME-BARRED ............................. 36

       A.    The Sarbanes-Oxley Act's Two-Year Discovery Rule Applies .................. 36

       B     Plaintiffs Lacked Sufficient Information To File A Non-
            Dismissable Section 18 Claim Until 2005 ..................................................... 38

III    PLAINTIFFS' COMMON LAW FRAUD CLAIM SHOULD NOT BE
       DISMISSED ............................................................................................. 40

       A.    Plaintiffs' State Law Claims Are Not Preempted By SLUSA ............. 40

       B.    Plaintiffs Have Adequately Pleaded The Elements Of Their
             Fraud Claim ................................................................................. 44

CONCLUSION ............................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

\* *In re Adelphia Communications Corp. Securities & Derivative Litigation,*
   No. 03-MD-1529 (LMM), 2005 WL 1679540 (S.D.N.Y. July 18, 2005) ............... 38

*Argent Classic Convertible Arbitrage Fund, L.P. v. Rite Aid Corp.,*
   315 F. Supp. 2d 666 (E.D. Pa. 2004) .................................................. 9

*Arnlund v. Deloitte & Touche LLP,*
   199 F. Supp. 2d 461 (E.D. Va. 2002) .................................................. 9

\* *AUSA Life Ins. Co. v. Ernst & Young,*
   206 F.3d 202 (2d Cir. 2000) ..................................................... 12, 17

\* *In re Baan Co. Sec. Litig.,*
   103 F. Supp. 2d 1 (D.D.C. 2000) ........................................... 8, 11, 18, 25

*In re Bridgestone Sec. Litig.,*
   430 F. Supp. 2d 728 (M.D. Tenn. 2006) ........................................... 32, 34

\* *Burman v. Phoenix Worldwide Indus., Inc.,*
   384 F. Supp. 2d 316 (D.D.C. 2005) ................................................... 44

*Carlson v. Xerox Corp.,*
   392 F. Supp. 2d 267 (D. Conn. 2005) ................................................ 8, 9

*Catton v. Defense Tech. Sys.,*
   No. 05 Civ. 6954 (SAS), 2006 WL 1716862 (S.D.N.Y. June 20, 2006) ................ 32

*In re Cendant Corp. Sec. Litig.,*
   60 F. Supp. 2d 354 (D.N.J. 1999) ................................................... 10

\* *Chu v. Sabratek Corp.,*
   100 F. Supp. 2d 815 (N.D. Ill. 2000) ....................................... 10, 11, 31

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC,*
   423 F. Supp. 2d 348 (S.D.N.Y. 2006) ................................................ 33

*In re CMS Energy Sec. Litig.,*
   403 F. Supp. 2d 625 (E.D. Mich. 2005) .............................................. 33

*Cohen v. Koenig,*
   25 F.3d 1168 (2d Cir. 1994) ........................................................ 44

*Crocker v. Carrier Access Corp.,*
   No. 05-CV-01011, 2006 WL 2035366 (D. Colo. July 18, 2006) .......................... 32

*Cromer Fin. Ltd. v. Berger,*
   Nos. 00 Civ. 2284, 00 Civ. 2498, 2002 WL 826847 (S.D.N.Y. May 2, 2002) ............ 28

*Davis v. SPSS, Inc.,*
   385 F. Supp. 2d 697 (N.D. Ill. 2005) ............................................... 20

*DE&J Ltd P'ship v. Conaway,*
   284 F. Supp. 2d 719 (E.D. Mich. 2003) .................................................................. 31

*Doe v. U.S. Dept. of Justice,*
   753 F.2d 1092 (D.C. Cir. 1985) .............................................................................. 39

\* *Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005) .................................................................................................. 8

*In re Enron Corp. Sec. Litig., Derivative & ERISA Litig.,*
   235 F. Supp. 2d 549 (S.D. Tex. 2002) .............................................................. 9, 29

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976) ........................................................................................... 37, 38

*Firestone v. Firestone,*
   76 F.3d 1205 (D.C. Cir. 1996) .......................................................................... 38, 39

\* *In re First Merchants Acceptance Corp. Sec. Litig.,*
   No. 97-C-2715, 1998 WL 781118 (N.D. Ill. Nov. 4, 1998) .................................. 32

*In re Friedman's, Inc. Sec. Litig.,*
   385 F. Supp. 2d 1345 (N.D. Ga. 2005) ................................................................... 9

\* *Florida State Board of Administration v. Green Tree Fin. Corp.,*
   270 F.3d 645 (8th Cir. 2001) ................................................................................. 18

*In re Global Crossing, Ltd. Sec. Litig.,*
   322 F. Supp. 2d 319 (S.D.N.Y. 2004) ............................................................... 9, 31

*In re Global Crossing, Ltd. Sec.Litig.,*
   313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................................... 37

*Gross v. Diversified Mortgage Investors,*
   438 F. Supp. 190 (S.D.N.Y. 1977) ........................................................................ 39

*In re Health Mgmt., Inc. Sec. Litig.,*
   970 F. Supp. 192 (E.D.N.Y. 1997) ........................................................................ 32

*In re Immune Response Sec. Litig.,*
   375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................... 33

*Jones v. Rogers Mem. Hosp.,*
   442 F.2d 773 (D.C. Cir. 1971) ............................................................................... 39

*Kinney v. Metro Global Media, Inc.,*
   170 F. Supp. 2d 173 (D.R.I. 2001) ........................................................................ 10

*Kozin v. Dunn,*
   No. Civ. A. 04-852 (DRD), 2005 WL 2009918 (D.N.J. 2005) ............................. 45

*Magna Inv. Corp. v. John Does One Through Two Hundred,*
   931 F.2d 38 (11th Cir. 1991) ................................................................................. 39

\*  *In re Microstrategy, Inc. Sec. Litig.,*
    115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................................. 10

    *Musick, Peeler & Garrett v. Employers Ins. of Wausau,*
    508 U.S. 286 (1993) ..................................................................................... 37

\*  *In re Oxford Health Plans, Inc. Sec. Litig.,*
    51 F. Supp. 2d 290 (S.D.N.Y. 1999) ................................................ 8, 10, 11, 25

    *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.,*
    142 F. Supp. 2d 589 (D.N.J. 2001) ............................................................... 10

\*  *In re Parmalat Sec. Litig.,*
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) ........................................................ 6, 35

    *In re Philip Servs. Corp. Sec. Litig.,*
    383 F. Supp. 2d 463 (S.D.N.Y. 2004) ............................................................. 9

    *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.,*
    411 F. Supp. 2d 1172 (N.D. Cal. 2005) ........................................................ 33

    *PR Diamonds, Inc. v. Chandler,*
    364 F.3d 671 (6th Cir. 2004) .................................................................. 11, 30

\*  *In re Qwest Comm. Int'l, Inc. Sec. Litig.,*
    396 F. Supp. 2d 1178 (D. Colo. 2004) ................................................ 9, 17, 30

    *In re Raytheon Sec. Litig.,*
    218 F.R.D. 354 (D. Mass. 2003) ..................................................................... 6

\*  *Rehm v. Eagle Fin. Corp.,*
    954 F. Supp. 1246 (N.D. Ill. 1997) ............................................................... 19

    *In re Rent-Way Sec. Litig.,*
    209 F. Supp. 2d 493, 506 (W.D. Pa. 2002) ................................................... 18

\*  *Rocker Mgmt., LLC v. Lernout & Hauspie Speech Prods., N.V.,*
    No. Civ. A. 00-5965 (JCL), 2005 WL 1366025 (D.N.J. June 8, 2005) ........... 9, 35

\*  *In re Royal Dutch/Shell Transp. Sec. Litig.,*
    404 F. Supp. 2d 605 (D.N.J. 2005) ..................................................... 9, 10, 17, 34

    *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    332 F.3d 116 (2d Cir. 2003) ........................................................................ 41

\*  *In re Suprema Specialties, Inc. Sec. Litig.,*
    438 F.3d 256 (3d Cir. 2006) ........................................................................... 9

    *Takara Trust v. Molex Inc.,*
    429 F. Supp. 2d 960 (N.D. Ill. 2006) ............................................................ 30

\*  *Teachers' Retirement System of Louisiana v. Qwest Communications International, Inc.,*
    No. 04-CV-0782, 2005 WL 2359311 (D. Colo. Sept. 23, 2005) ...................... 37

\* *In re Telxon Corp. Sec. Litig.*,
   133 F. Supp. 2d 1010 (N.D. Ohio 2000) ................................................31

*In re Unumprovident Corp. Sec. Litig.*,
   396 F. Supp. 2d 858 (E.D. Tenn. 2005) ...............................................33

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) ..........................................................33

*In re Voluntary Purchasing Groups, Inc. Litig.*,
   2003 WL 21501775 (N.D. Tex. June 25, 2003) .....................................45

*Wafra Leasing Corp. v. Prime Capital Corp.*,
   247 F. Supp. 2d 987 (N.D. Ill. 2002) ......................................................9

*In re Williams Sec. Litig.*,
   339 F. Supp. 2d 1242 (N.D. Okla. 2003) .................................................9

\* *In re Winstar Commc'ns, Inc.*,
   No. 01-CV-3104, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ..............35

*In re WorldCom Sec. Litig.*,
   Nos. 02-Civ. 3288, 03 Civ. 4490, 2004 WL 315143 (S.D.N.Y. Feb. 20, 2004) ..........41

*In re WorldCom, Inc. Sec. Litig.*,
   2004 WL 692746 (S.D.N.Y. Apr. 2, 2004) ...........................................43

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 431 (S.D.N.Y. 2003) ...................................................37

## Rules

Fed. R. Civ. P. 12(b)(6) .................................................................................8

Fed. R. Civ. P. 9(b) ...........................................................................8, 44, 45

## Statutes

15 U.S.C. § 77p(f)(2)(A)(i)(I) .....................................................................44

15 U.S.C. § 78bb(f)(1) ..................................................................................41

15 U.S.C. § 78bb(f)(5)(B) .............................................................................42

15 U.S.C. § 78r(c) ...................................................................................36, 38

15 U.S.C. § 78u-4(b)(2) ...............................................................9, 10, 11, 44

15 U.S.C. § 78u-4(e)(1), (2) ........................................................................34

\* 28 U.S.C. § 1658(b) ...............................................................................36, 37

## PRELIMINARY STATEMENT

Plaintiffs, affiliates of Franklin Templeton Investments,[1] purchased over $350 million in common stock of Federal National Mortgage Association ("Fannie Mae" or the "Company") in reliance on financial statements audited by defendant KPMG LLP ("KPMG"). When it was later revealed that those financial statements were materially misstated due to fraudulent accounting – and that KPMG's audit reports on those financial statements were materially false – Plaintiffs lost over $45 million as the price of their Fannie Mae securities collapsed.

With an estimated $11 billion in restatements being necessary to correct Fannie Mae's accounting for 2000-2003, the fraud at Fannie Mae will go on record as one of the worst corporate frauds in U.S. history. Moreover, according to top officials at OFHEO – the agency that investigated the fraud – "**KPMG was aware**" of Fannie Mae's non-compliance with Generally Accepted Accounting Principles ("GAAP"), and these violations involved "black and white accounting issues" and "not issues where reasonable people can disagree." ¶¶ 13, 686.[2]

Despite these damning allegations, and despite its 35-year tenure as Fannie Mae's auditor and its key role in monitoring and reporting to the public on Fannie Mae's compliance with GAAP, in its Motion to Dismiss (the "Motion") KPMG attempts to secure a "get out of jail free" card with respect to any and all liability to Plaintiffs. In furtherance of that goal, it tries to

---

[1] Plaintiffs Franklin Managed Trust, Institutional Fiduciary Trust, Franklin Investors Securities Trust, Franklin Value Investors Trust, Franklin Strategic Series, Franklin Capital Growth Fund, Franklin Templeton Investment Funds, Franklin Templeton Variable Insurance Products Trust, Franklin Custodian Funds, Inc., Franklin Templeton International Trust, Templeton MPF Investment Funds, Franklin Flex Cap Growth Corporate Class, Franklin Templeton Funds, Franklin Templeton Global Fund Bissett Canadian Equity Fund, Bissett Institutional Balanced Trust, Franklin Templeton U.S. Rising Dividends Fund, Franklin World Growth Corporate Class, Franklin Global Trust, Franklin MPF U.S. Equity Fund, Lyxor/Templeton Global Long Short Fund Limited, Templeton Global Long-Short Fund PLC, Templeton Global Long-Short Fund Ltd., University of Hong Kong General Endowment Fund, and University of Hong Kong Staff Provident Fund are referred to herein collectively as "Plaintiffs."

[2] Citations herein to "¶ __" are to Plaintiffs' Second Amended Complaint Although KPMG's moving papers refer to Plaintiffs' First Amended Complaint (which was the operative complaint at the time KPMG filed its motion, Plaintiffs understand that KPMG is going to file a revised copy of its motion, replacing the citations to the First Amended Complaint with citations to the Second Amended Complaint

rewrite Plaintiffs' complaint to cast Plaintiffs' claims as mere negligence-based claims that KPMG "incorrectly" audited Fannie Mae's financial statements or that it permitted Fannie Mae to misapply "complicated" accounting principles. *See* KPMG Mem at 1. In reality, however, Plaintiffs' case against KPMG rests on the fact that it issued "clean" audit reports on Fannie Mae's financial statements for the 2000, 2001, 2002 and 2003 fiscal years (the "Audit Reports"), attesting to KPMG's own compliance with Generally Accepted Auditing Standards ("GAAS") and to the financial statements' compliance with GAAP, when in fact KPMG (a) violated GAAS in material respects, (b) knew of material GAAP violations, and (c) was reckless in the conduct of its audits. Plaintiffs' allegations are sufficient to plead KPMG's scienter for purposes of Plaintiffs' claims pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as common law fraud.

KPMG also seeks to avoid liability under Section 10(b) by claiming that Plaintiffs have not alleged "loss causation." KPMG does not dispute that the market value of Plaintiffs' Fannie Mae stock dropped precipitously when the fraud was revealed. Instead, KPMG contends that Plaintiffs cannot recover because they have not alleged that they monetized their losses by selling their shares. There is no such requirement. The decline in the market value of Plaintiffs' stock constitutes "damage" under Section 10(b) regardless of whether they sell the stock. Having alleged that this decline was the result of the revelation of the fraud, and having alleged KPMG's role in the fraud, Plaintiffs have alleged loss causation.

Plaintiffs have also asserted a claim against KPMG pursuant to Section 18 of the Exchange Act. KPMG contends that this claim is time-barred because it was brought more than one year after the initial revelation of fraud at Fannie Mae. However, it was not until 2005 that Plaintiffs "discover[ed] . . . the facts constituting the cause of action" against KPMG under

Section 18, and Plaintiffs filed the claim within one year thereafter. In any event, Plaintiffs'

Section 18 claim is timely under the Sarbanes-Oxley Act's extended two-year statute of repose

Finally, KPMG seeks dismissal of Plaintiffs' state law claims as preempted by the

Securities Litigation Uniform Standards Act ("SLUSA"). The purpose of SLUSA is to prevent

plaintiffs from pursuing state law claims in **class actions** – or in individual actions which operate

as *de facto* class actions. That is not what Plaintiffs are doing. This is a legitimate *individual*

action, which has been consolidated with the pending class action to promote judicial economy

and efficiency  The procedural act of consolidating these cases cannot, as KPMG contends, have

the effect of depriving Plaintiffs of substantive legal rights  Having filed this action as a

legitimate individual action, Plaintiffs should be permitted to pursue their state law claims and

KPMG's motion to dismiss should be denied.

## STATEMENT OF FACTS

### I.    THE FRAUD AT FANNIE MAE

Space does not permit a detailed recitation in this memorandum of the multi-faceted and

long-term fraud that was perpetrated upon Plaintiffs and other Fannie Mae investors. As alleged

in detail in the Complaint, that fraud involved at least twenty-two different accounting

improprieties (¶¶ 133-401), among the most significant of which was the failure to properly

account for derivative instruments under Statement of Financial Accounting Standards No. 133

("SFAS 133"). The restatement is expected to be in the $11 billion range and to have a material

impact on the Company's financial statements for many, if not all, of the Company's financial

periods from 2000 through early 2004.  ¶¶ 13, 701. As the Chairman of the SEC has noted:

> **The significance of the corporate failings at Fannie Mae cannot
> be overstated.** The [C]ompany has said that it estimates the
> restatement of its financial statements for the years ended
> December 31, 2003, and 2002, and for the quarters ended June 30,
> 2004, and March 31, 2004, will result in at least an $11 billion

reduction of previously reported net income **In all likelihood this will be one of the largest restatements in American corporate history.**

¶ 11 (emphasis added).

The fraud at Fannie Mae has been the subject of extensive investigations by OFHEO, the SEC, and the Company's own Special Review Committee (through its counsel, the law firm of Paul, Weiss, Rifkind, Wharton & Garrison, LLP ("Paul Weiss")). OFHEO's investigation revealed that Fannie Mae had systematically manipulated its earnings in order to minimize fluctuations and meet compensation targets for its senior executives. ¶ 1. Moreover, as OFHEO stated in the cover letter accompanying its initial report, the GAAP violations at Fannie Mae "cannot be explained as mere differences in interpretation of accounting principles" but instead involved "clear instances in which management sought to misapply and ignore accounting principles for the purposes of meeting investment analyst expectations; reducing volatility in reported earnings; and enabling fragmented process and systems, and an ineffective controls environment to exist." ¶ 2.

Similarly, when asked during his Congressional testimony whether Fannie Mae's SFAS 91 and SFAS 133 violations were "just a matter of interpretive judgment where two people could have come to varying conclusions, or [whether they were] clearly outside professional accounting standards," the SEC's Chief Accountant testified that they were "outside professional accounting standards." ¶ 699. He expressly rejected the suggestion that "it is so difficult for a public operating company to comply with [SFAS] 91 and 133 that it is a pattern and practice within the rest of the public operating company world that companies just don't get it right," and testified that other companies were complying and that he had "reason to believe that the standards are workable and are being followed." *Id.* Indeed, he stated that "[t]he basic principle

is pretty straightforward," and while each company will have some interpretive issues to address, "they are very crystal-clear rules." ¶ 700

Paul Weiss concluded that Fannie Mae's accounting practices violated GAAP "in virtually all of the areas that [Paul Weiss] reviewed" and that there was "evidence amply supporting the conclusion that management's adoption of certain accounting policies and financial reporting procedures was motivated by a desire to show stable earnings growth, achieve forecasted earnings, and avoid income statement volatility." ¶ 6.

## II.    KPMG'S ROLE IN THE FRAUD

KPMG served as Fannie Mae's outside auditor from 1969 through its dismissal on December 21, 2004. ¶ 73. As such, it was responsible for auditing Fannie Mae's financial statements in accordance with GAAS, reporting the results of those audits to Fannie Mae and the investing public, and examining Fannie Mae's systems of internal controls to identify any material weaknesses that might impact the accuracy or reliability of its financial statements. ¶ 745. At the conclusion of each of its audits, KPMG issued unqualified, "clean" Audit Reports on the Company's annual financial statements, stating that it had conducted its audits in accordance with GAAS and that the financial statements fairly presented the Company's financial condition in all material respects in accordance with GAAP. See ¶¶ 469, 496, 528, 621. Plaintiffs relied on those Audit Reports when making their decisions to invest in Fannie Mae. ¶ 668.

While KPMG attempts to downplay its own significance through repeated references to the purportedly "limited role of an outside auditor" (KPMG Mem. at 5-6), investors and the courts take quite a different view of auditors' importance. As one court has explained:

> Independent auditors serve a crucial role in the functioning of world capital markets because they are reputational intermediaries. In certifying a company's financial statements, their reputations for independence and probity signal the accuracy of the information

5

> disclosed by the company, the managers of which typically are
> unknown to most of the investing public.

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 289 (S.D.N.Y. 2005). *See also In re Raytheon Sec. Litig.*, 218 F.R.D. 354, 360 (D. Mass. 2003) ("Auditors have historically played an important role as the principal gatekeepers of corporate governance.").

As alleged in the Complaint, KPMG failed in its gatekeeping duties by issuing unqualified Audit Reports based on audits that did not comply with GAAS when it knew that the Company had violated GAAP in preparing its financial statements. In its Motion, KPMG does not (nor can it) challenge Plaintiffs' allegations of the falsity of its Audit Reports. Instead, it asserts that Plaintiffs have failed to adequately allege KPMG's scienter – *i.e.*, that KPMG acted intentionally or recklessly. That assertion is belied by the allegations of the Complaint, including that at the conclusion of OFHEO's investigation, OFHEO's Acting Director stated his view of KPMG's culpability:

> [E]xternal audits performed by KPMG failed to include an adequate review of Fannie Mae's significant accounting policies for GAAP compliance. **KPMG was aware of the non-GAAP provisions of Fannie Mae's FAS 91 policy as well as the non-GAAP practices the Enterprise was using in the application of FAS 133. That notwithstanding, KPMG issued unqualified opinions on Fannie Mae's financial statements for the years in question when these statements included significant departures from GAAP.**

¶ 13 (emphasis added). Plaintiffs' additional particularized allegations regarding KPMG's knowledge and recklessness are discussed in detail below, in response to KPMG's argument that Plaintiffs have inadequately pleaded KPMG's scienter.

## III.    THE REVELATION OF THE FRAUD

On September 22, 2004, Fannie Mae disclosed OFHEO's findings of systematic earnings manipulation by Fannie Mae. ¶ 1. OFHEOs report was released to the public after the close of

6

trading that day. *Id.* In response to these disclosures, Fannie Mae's stock price dropped significantly, from $75.65 on September 21, 2004, to $70.69 following the Company's announcement of September 22, 2004, to $67.15 on September 23, 2004, to $63.40 on September 30, 2004. ¶ 3. This represents a decline in market capitalization of over $11.85 billion during the 9 days following the initial disclosure. *Id.* On December 22, 2004, Fannie Mae announced that it would restate its financial results for 2001, 2002, 2003 and the first two quarters of 2004 to correct the misstatements resulting from its violations of SFAS 133 and SFAS 91 (¶ 696), and Fannie Mae estimated that the impact of these restatements would be approximately $9 billion. ¶ 701.

Unfortunately, the revelations of 2004 were only the tip of the iceberg. On February 23, 2005, Fannie Mae announced that OFHEO had identified additional accounting and internal control issues at Fannie Mae, including violations of SFAS 149 – an amendment of SFAS 133 relating to derivatives accounting. Fannie Mae stated that the proper application of SFAS 149 alone could cause it to record an additional net cumulative after-tax loss of $2.4 billion, thereby increasing the impact of the expected restatement by over 25%. ¶ 703. Fannie Mae's stock price dropped from $57.80 to $56.95 in response to this announcement. *Id.* Then, on September 28, 2005, Dow Jones reported that the Paul Weiss investigation had revealed "new and pervasive accounting violations" that had not previously been disclosed. ¶ 711. Fannie Mae's stock price fell to an 8-year low of $41.71 in response to that disclosure. *Id.*

Plaintiffs, having purchased Fannie Mae stock at prices that were artificially inflated by the fraud, lost over $45 million when the price of that stock dropped as a result of the revelations of the fraud. ¶ 864.

## ARGUMENT

### I. THE COMPLAINT STATES A CLAIM AGAINST KPMG FOR VIOLATING SECTION 10(B) AND RULE 10b-5

#### A. The Appropriate Standard For Resolving a Motion to Dismiss a Section 10(b) Claim Against an Outside Auditor

To prevail on their 10(b) claim, Plaintiffs must plead (1) that KPMG made a material misrepresentation or omission; (2) in connection with the purchase and sale of Fannie Mae securities; (3) with scienter; (4) reliance; and (5) causation. *See, e.g., Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341-42 (2005).

KPMG moves to dismiss on the grounds that Plaintiffs have failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). However, such dismissal "is not warranted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief.'" *Carlson v. Xerox Corp.,* 392 F. Supp. 2d 267, 279 (D. Conn. 2005) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, "[t]he task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Id.* at 279-80 (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.,* 748 F. 2d 774, 779 (2d Cir. 1984)). Finally, in "deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all of the well-pleaded facts as true and draw all reasonable inferences from those allegations in favor of plaintiffs." *In re Oxford Health Plans, Inc. Sec. Litig.,* 51 F. Supp. 2d 290, 293 (S.D.N.Y. 1999) (internal citation omitted). Accordingly, KPMG shoulders the heavy burden of demonstrating that the Complaint is so deficient that the Court can determine, as a matter of law, that Plaintiffs can prove no set of facts entitling them to relief.

"Because a claim under 10(b) involves fraud, Fed. R. Civ. P. 9(b) requires plaintiffs to state 'the circumstances constituting fraud' with particularity." *In re Baan Co. Sec. Litig.,* 103 F.

8

Supp. 2d 1, 12 (D.D.C. 2000). In addition, the "Private Securities Litigation Reform Act of 1995 (PSLRA) provides that where plaintiffs allege that the defendant made a misleading statement or omission, the complaint must specify each such statement or omission and explain why it is misleading." *Id.* Finally, the PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)).[3]

From a reading of KPMG's Motion, one would think that Section 10(b) claims against auditors are subject to a stricter pleading standard than claims against other defendants. Indeed, KPMG claims that the standard for pleading a Section 10(b) claim against an outside auditor is a virtually insurmountable burden. KPMG Mem. at 20-22. However, that claim is belied by the sheer number of cases in which plaintiffs have been found to have stated Section 10(b) claims against outside auditors—including KPMG itself—in the years since the PSLRA's adoption.[4]

---

[3] KPMG erroneously asserts that Rule 9(b) and the PSLRA "together require Plaintiffs to plead each element of their claim for securities fraud with particularity." KPMG Mem. at 18 (emphasis added). In fact, the PSLRA only requires Plaintiffs to plead with particularity (1) the false statements KPMG is alleged to have made; and (2) facts giving rise to a strong inference that KPMG acted with scienter. *See* 15 U.S.C. § 78u-4(b)(2). KPMG cites no authority – nor can it – which would require Plaintiffs to plead the remaining elements of their 10(b) claim with particularity. In fact, in ruling on the standards for pleading loss causation, the Supreme Court in *Dura* assumed that "neither the Rules [of Civil Procedure] nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss." *Dura*, 544 U.S. at 346.

[4] *See, e.g., In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) (denying motion of defendant BDO Seidman LLP ("BDO") to dismiss); *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267 (D. Conn. 2005) (denying **KPMG's** motion to dismiss); *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345 (N.D. Ga. 2005) (denying, in part, motion of defendant Ernst & Young LLP ("E&Y") to dismiss); *In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509 (D.N.J. 2005) (denying motion to dismiss by **KPMG** Accountants NV, the Dutch affiliate of KPMG); *Rocker Mgmt., LLC v. Lernout & Hauspie Speech Prods., N.V.*, No. Civ. A. 00-5965 (JCL), 2005 WL 1366025 (D.N.J. June 8, 2005) (denying **KPMG** Belgium's motion to dismiss); *In re Qwest Comm. Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178 (D. Colo. 2004) (denying, in part, motion of Arthur Andersen LLP ("Andersen") to dismiss); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) (denying Andersen's motion to dismiss); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463 (S.D.N.Y. 2004) (denying motion of Deloitte & Touche LLP ("Deloitte") to dismiss); *Argent Classic Convertible Arbitrage Fund, L.P. v. Rite Aid Corp.*, 315 F Supp. 2d 666 (E.D. Pa. 2004) (denying **KPMG's** motion to dismiss); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242 (N.D. Okla. 2003) (denying E&Y's motion to dismiss); *Wafra Leasing Corp. v. Prime Capital Corp.*, 247 F. Supp. 2d 987 (N.D. Ill. 2002) (denying **KPMG's** motion to dismiss with respect to one of two securities fraud claims); *In re Enron Corp. Sec. Litig., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002) (denying Andersen's motion to dismiss); *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461 (E.D. Va. 2002) (denying

As in those cases, the Court here should find that Plaintiffs have adequately pleaded their Section 10(b) claim by alleging KPMG's knowing and/or reckless publication of false Audit Reports.

**B.    KPMG Made Materially False Statements in its Audit Reports**

Plaintiffs' 10(b) claim against KPMG is based on KPMG's issuance of false Audit Reports.[5] The Complaint identifies the Audit Reports with specificity (¶¶ 469, 496, 528, 550, 621) and explains in detail why they were materially false and misleading (¶¶ 133-388, 661-666, 754-797). This satisfies the PSLRA's requirement of pleading KPMG's false statements with particularity. *See* 15 U.S.C. § 78u-4(b)(2). Moreover, the Court should reject KPMG's assertion that a higher pleading standard applies where the false and misleading statements at issue are contained in audit opinions. KPMG Mem. at 22. The courts routinely hold auditors liable for issuing unqualified audit opinions on financial statements that are materially false. *See, e.g., Royal Dutch/Shell Transp.*, 380 F. Supp. 2d at 566-68; *Rocker Mgmt.*, 2005 WL 1366025, at *6; *Oxford Health Plans*, 51 F. Supp. 2d at 295; *Chu*, 100 F. Supp. 2d at 820-21; *Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 163 (D. Mass. 2002); *Kinney v. Metro Global Media, Inc.*, 170 F. Supp. 2d 173, 178-79 (D.R.I. 2001); *P. Schoenfeld Asset Mgmt. LL*, 142 F. Supp. 2d at 609-610. The same result is appropriate here, where Plaintiffs' allegations establish that KPMG had no reasonable basis for the statements in its Audit Reports, given its knowledge of significant GAAP violations and its recklessness in conducting its audits.

---

Deloitte's motion to dismiss); *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589 (D.N.J. 2001) (denying E&Y's motion to dismiss); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815 (N.D. Ill. 2000) (denying, in part, **KPMG**'s motion to dismiss); *In re Microstrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000) (denying PwC's motion to dismiss); *In re Cendant Corp. Sec. Litig.* 60 F. Supp. 2d 354 (D.N.J. 1999) (denying E&Y's motion to dismiss); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290 (S.D.N.Y. 1999) (denying **KPMG**'s motion to dismiss); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192 (E.D.N.Y. 1997) (denying BDO's motion to dismiss).

[5] To the extent KPMG argues that it cannot be held liable for the false financial statements themselves, that is a non-issue. Plaintiffs do not seek to hold KPMG liable for the false financial statements, but rather for KPMG's own materially false and misleading Audit Reports.

### C.    Plaintiffs Have Plead Particularized Facts Giving Rise To A Strong Inference That KPMG Acted With Scienter In Issuing Its Audit Reports

The PSLRA requires Plaintiffs to plead "facts giving rise to a strong inference that the defendant acted with the required state of mind " 15 U S C. § 78u-4(b)2). In determining whether Plaintiffs have met that burden, the Court should examine the Complaint's factual allegations in their totality, not on a *seriatim* basis as KPMG suggests. *See, e g , PR Diamonds, Inc v. Chandler,* 364 F 3d 671, 683 (6th Cir. 2004) (the scienter determination involves a "totality of the circumstances analysis whereby the facts argued collectively must give rise to a strong inference of at least recklessness"); *In re Baan Co Sec Litig ,* 103 F Supp 2d at 23 (denying motion to dismiss where, "[i]n combination, plaintiffs' allegations are sufficient to support a strong inference of recklessness or knowledge").

Although the United States Court of Appeals for the District of Columbia Circuit has yet to rule "as to how a 'strong inference' of scienter may be established," *In re Baan Co Sec. Litig ,* 103 F. Supp 2d at 19, other courts in this District have held that plaintiffs may establish a strong inference of scienter by alleging facts to show either "(1) that the defendants had motive and opportunity to commit fraud or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id* "Recklessness requires 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care '" *Chu,* 100 F Supp 2d at 823 (citation omitted) (finding that plaintiffs had adequately pleaded that **KPMG** was reckless in issuing unqualified audit opinions). "In the context of an audit, . . . '[a]n inference of 'recklessness' satisfying the scienter requirement may be drawn from facts demonstrating . . . that the defendant disseminated material 'knowing [it was] false **or** that the method of preparation was so egregious as to render [the] dissemination reckless '" *Oxford Health Plans,*

11

51 F. Supp. 2d at 295 (emphasis added) (citation omitted) (finding that plaintiff had adequately pleaded that KPMG acted recklessly in issuing unqualified audit opinions).

Thus, KPMG vastly overstates Plaintiffs' pleading burden when it argues that "Plaintiffs must plead and prove that KPMG **deliberately** participated with Fannie Mae and its executives to defraud investors" (KPMG Mem. at 1 (emphasis added)) and that Plaintiffs must allege facts that "warrant the inference that KPMG **knowingly conspired** with Fannie Mae to make any of the four KPMG audit opinions intentionally false or misleading" (KPMG Mem. at 22 (emphasis added)). Plaintiffs need not allege that KPMG conspired to commit intentional fraud; they need only allege facts that, examined in their totality, demonstrate that KPMG either **knew or recklessly disregarded** that its Audit Reports were false. Plaintiffs have done exactly that.

### 1. Plaintiffs Have Alleged KPMG's Actual Knowledge of Material GAAP Violations

In each of its Audit Reports, KPMG stated that Fannie Mae's financial statements "present[ed] fairly, in all material respects, the financial position of Fannie Mae ... in accordance with [GAAP]." ¶¶ 469, 496, 528, 621. Plaintiffs have alleged particularized facts indicating that, in fact, KPMG knew Fannie Mae had violated GAAP in material respects when preparing its financial statements. These allegations are sufficient to establish KPMG's scienter. *See, e.g.*, *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 221 (2d Cir. 2000) (plaintiff pleaded scienter by alleging that auditor was aware of accounting improprieties yet issued certifications of company's financial statements).

First and foremost, at the conclusion of OFHEO's investigation into the fraud at Fannie Mae, OFHEO's Acting Director testified before the Senate Committee on Banking, Housing and Urban Affairs that:

> **KPMG was aware of the non-GAAP provisions of Fannie Mae's FAS 91 policy as well as the non-GAAP practices the**

12

> **Enterprise was using in the application of FAS 133.** That
> notwithstanding, KPMG issued unqualified opinions on Fannie
> Mae's financial statements for the years in question when these
> statements included significant departures from GAAP.

¶ 13 (emphasis added). Fannie Mae has estimated that its restatement to correct its violations of

FAS 91 and FAS 133 would have an approximate **$9 billion** impact on earnings. ¶ 80. These

GAAP violations – of which KPMG had actual knowledge – were clearly material, rendering

KPMG's Audit Reports materially false.

But Plaintiffs go further and plead additional particularized allegations of KPMG's

knowledge of Fannie Mae's GAAP violations. For example, KPMG **knew** that Fannie Mae

violated SFAS 133 in accounting for the instruments in its huge derivatives portfolio, yet issued

unqualified Audit Reports stating that the Company had complied with GAAP. *See, e.g.*, ¶¶ 186,

193, 194-202. Among other things, KPMG's own workpapers acknowledge that it reviewed and

approved Fannie Mae's policy of permitting up to a seven-day mismatch on reset dates between

the hedged item and the swap in cash flow hedges, and that it knew this policy violated SFAS

133. ¶ 193. Plaintiffs also allege that "KPMG signed off on Fannie Mae's policy of using the

matched terms method to account for hedges of forecasted transactions whose maturities did not

match, despite knowing that this policy amounted to a plain violation SFAS 133." ¶ 195.

Indeed, KPMG had knowledge of **all** of Fannie Mae's accounting policies regarding derivatives,

because KPMG approved Fannie Mae's internal "Derivatives Accounting Guidelines," and was

actively involved in Fannie Mae's SFAS 133 implementation project. ¶¶ 171, 177-178, 757.

The goal of that implementation project was to treat all of the Company's hedge transactions as

"perfect hedges," thereby avoiding the earnings volatility that would result from the recognition

of ineffectiveness. ¶¶ 171, 173, 174.

Because KPMG knew that Fannie Mae's financial statements would be rendered virtually useless if derivatives were misstated due to the significant number of metrics that depended upon such instruments being properly accounted for, its failure to insist on rigid adherence to SFAS 133 – and, even worse, its continued issuance of unqualified Audit Reports in the face of the known SFAS 133 violations discussed above – is particularly egregious  ¶ 752. Fannie Mae has announced that it expects to record an estimated net cumulative after tax loss of approximately **$8.4 billion** as a result of its misapplication of SFAS 133.  ¶ 205.

KPMG also **knew** that Fannie Mae violated SFAS 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases,* in accounting for the nonrefundable fees and costs associated with lending, committing to lend, and purchasing loans or groups of loans. Specifically, KPMG knew that Fannie Mae was managing "catch up" prospectively by using a Company-created materiality threshold (*i e ,* determining that "catch up" below a certain level was "immaterial" and therefore did not have to be recorded in the current period). KPMG knew that this "materiality threshold" concept had no support in GAAP  ¶ 141. Fannie Mae's SFAS 91 violations caused it to misstate mortgage related securities, loans (held for investment) and total assets on its balance sheets, along with interest income (mortgage and non-mortgage), interest expense, net income, and earnings per share (basic and diluted) on its income statements in every quarterly and annual period during the Loss Period.  ¶ 158.

Further, a KPMG workpaper demonstrates that KPMG **knew** Fannie Mae had adopted a policy that permitted it to classify the securities in its portfolio as "held-to-maturity," "available-for-sale," or "trading" in the month of acquisition, rather than at the time of acquisition.  ¶ 233. This policy was in direct violation of SFAS 115, and resulted in misstatements of the value of

numerous accounts on Fannie Mae's balance sheets and income statements in every quarterly and annual period during the Loss Period. ¶¶ 232, 237

KPMG also **knew** that Fannie Mae lacked the documentation needed to support its allowances for loan losses, in violation of SFAS 5 and SFAS 114. ¶ 245. Indeed, those allowances were not calculated through any accepted methodology and bore no relation to the Company's actual loss exposure. ¶ 240. KPMG's failure to insist that Fannie Mae provide appropriate documentation for its allowances enabled Fannie Mae to create a "war chest" to be used to offset unrelated events down the road, in violation of GAAP. ¶¶ 250-253. Fannie Mae's failure to comply with GAAP in setting its allowance caused it to misstate its balance sheet accounts for loan losses, along with its provision for loan losses on its income statements, in every quarterly and annual period during the Loss Period. ¶ 249.

Additionally, KPMG **knew** that Fannie Mae was using a discounted cash flow model, rather than market data, to estimate the impairment loss for its manufactured housing bonds ("MH Bonds") during 2002 and most of 2003. ¶ 299. This was another clear violation of SFAS 115. ¶ 300. Fannie Mae's failure to properly account for its MH Bonds caused it to misstate its income statement line items for "fee and other income, net," and its balance sheet accounts for the held-to-maturity and available-for-sale categories of the non-mortgage investments. ¶ 305.

Further, KPMG permitted Fannie Mae to combine interest-only mortgage-backed securities ("IO MBS") with Real Estate Mortgage Investment Conduit ("REMIC") securities to create "Synthetic REMICs," when there was no justification for doing so under GAAP. ¶ 309. Even worse than the fact that it allowed Fannie Mae to engage in such improper accounting in the first place, KPMG then ignored the transactions completely, thus giving Fannie Mae carte blanche to continue improperly combining such securities on its books. ¶ 310. The result was

misstatement of the Company's income statement line items for interest income- mortgage portfolio and its balance sheet accounts for mortgage-related securities held-to-maturity and available-for-sale in every quarterly and annual period during the Loss Period. ¶ 313

KPMG also **knew**, as evidenced by a 2004 workpaper, that Fannie Mae was carrying an excess reserve for its investment in synfuel partnerships on its balance sheet at the end of 2002 in violation of Accounting Principles Board of Opinion No. 20, *Accounting Changes* ("APB 20") ¶¶ 386-387. While Fannie Mae was required under APB 20 to release this amount the moment it determined it was over-reserved, KPMG permitted Fannie Mae to carry the excess reserve into 2003—far beyond the point permitted under GAAP. ¶ 387.

As the foregoing demonstrates, KPMG **knew** – not merely should have known – that Fannie Mae continually violated GAAP in preparing its financial statements. Nonetheless, KPMG certified in each of its Audit Reports that Fannie Mae's financial statements fairly presented the results of the Company's operations in accordance with GAAP. KPMG's issuance of these unqualified Audit Reports delayed the detection of Fannie Mae's fraud and caused Plaintiffs to purchase Fannie Mae securities at artificially inflated prices.

In an effort to escape the impact of these particularized allegations of its actual knowledge of GAAP violations, KPMG contends that the application of GAAP involves "complex and subjective accounting judgments, creating a heavy burden for Plaintiffs to demonstrate that KPMG *deliberately* misapplied these standards ...." KPMG Mem. at 13 (emphasis in original). KPMG misstates the legal standard, as Plaintiffs need only demonstrate KPMG's knowledge or reckless disregard of the GAAP violations. Moreover, KPMG's argument regarding the subjectivity of these accounting issues is contradicted by the allegations of the Complaint, including the testimony of OFHEO's Director that:

16

> ...[T]hese are black and white accounting issues. These are not
> issues of interpretation. They are not issues where reasonable
> people can disagree. We have taken prompt, strong action in
> trying to deal with this because we do think they were clear
> violations of accounting principles.

¶ 686. The SEC's Chief Accountant similarly testified that Fannie Mae had violated "very

crystal-clear rules," and he rejected the notion that the violations were a matter of interpretive

judgment, stating instead that they were "outside professional accounting standards." ¶ 699.

KPMG also tries to downplay Plaintiffs' specific allegations of its actual knowledge by

portraying them as negligence allegations and arguing that "these more specific allegations are

another way of saying KPMG 'should have' applied these complex and contested accounting

standards differently." KPMG Mem. at 26-27. Of course, just because these standards "should

have" been applied differently does not mean the failure to do so was merely negligent.

Plaintiffs allege that KPMG's issuance of its Audit Report was, at best, reckless in light of what

it knew about Fannie Mae's accounting policies and practices.[6]  *See, e.g.,* ¶¶ 758, 761, 762.

In sum, Plaintiffs' allegations of KPMG's actual knowledge of numerous GAAP

violations by Fannie Mae are sufficient to plead KPMG's scienter. *See, e.g., AUSA Life Ins. Co.*

*v. Ernst & Young*, 206 F.3d at 221; *In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d at 1206-

07 (allegations of auditor's knowledge of accounting improprieties involving the recognition of

hundreds of millions of dollars in revenue, with a material effect on the company's financial

statements, were sufficient to allege scienter); *Royal Dutch/Shell Transp.*, 380 F. Supp. 2d at 570

(KPMG NV's knowledge of improper accounting practices, coupled with allegations of specific

---

[6] KPMG also points to selected paragraphs in the Complaint as "demonstrat[ing] that KPMG *did not know of fraud at Fannie Mae...*" (KPMG Mem. at 25 & n.13). The cited passages merely refer to *aspects* of the fraud which, from what Plaintiffs can determine without discovery, KPMG did not discover. They do not change the fact that KPMG is alleged to have known about other significant aspects of the fraud. "It is elementary that, on a motion to dismiss, the Complaint must be read as a whole,' and [KPMG] cannot secure dismissal by cherry-picking those allegations susceptible to rebuttal and disregarding the remainder." *Philip Servs.*, 383 F. Supp. 2d at 476 (quoting *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985))

GAAS and GAAP violations, were sufficient to plead scienter). While KPMG's efforts to sugar-

coat its conduct may create factual issues for the jury, they do not overcome the allegations of

the Complaint so as to warrant a dismissal of Plaintiffs' claims. As one court explained:

> Undoubtedly, the accounting issues are complex; whether they
> were handled within the parameters of good-faith decision-making
> or whether the decisions amounted to recklessness will surely be
> the focus of any trial of this case. We will not prejudge that
> issue.... Rather, we must assume the truth of the allegations
> pleaded with particularity in the complaint. **The strong-inference**
> **pleading standard does not license us to resolve disputed facts**
> **at this stage of the case.**

*Florida State Bd. of Admin v Green Tree Fin Corp*, 270 F 3d 645, 666 (8th Cir. 2001)

(emphasis added) (denying motion to dismiss by defendants alleged to know facts contradicting

their public statements)

## 2.    Alternatively, Plaintiffs Have Alleged KPMG's Recklessness

Even if Plaintiffs had not alleged KPMG's actual knowledge of facts rendering its Audit

Reports materially false – which they clearly have – the Court should deny KPMG's motion to

dismiss because Plaintiffs have pleaded KPMG's recklessness in issuing those Audit Reports.

As alleged in the Complaint, there were widespread and recurring GAAP violations at Fannie

Mae during the 2000-2003 period, which will require a restatement of over $11 billion to correct.

While the magnitude of the fraud alone may not establish scienter, it is a factor weighing in favor

of finding that an outside auditor acted with scienter. *See, e.g, Rocker Mgmt.*, 2005 WL

1366025 at *8 ("The magnitude of any given misstatement or overstatement may help support an

inference of scienter."); *In re Rent-Way Sec Litig.*, 209 F Supp. 2d 493, 506 (W.D. Pa. 2002)

("[A] number of courts have recognized that the magnitude of the fraud, while not determinative

of scienter, is probative of it") (citing cases); *In re Baan Co. Sec Litig.*, 103 F. Supp 2d at 21

("Specific attributes of a GAAP violation may give rise to a stronger, or weaker, inference of

scienter  For example, the magnitude of the error can play a role.")  Certainly, the greater the magnitude of the restatement and GAAP violations, the less likely it becomes that the violations were due to mere negligence  As one court has explained:

> [C]ommon sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly  This, of course, is a matter of degree, but **it cannot be gainsaid that some violations of GAAP and some restatements of financials are so significant that they, at the very least, support the inference that conscious fraud or recklessness as to the danger of misleading the investing public was present.**

*Microstrategy*, 115 F. Supp. 2d at 636-37 (emphasis added). *See also Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) (".... [T]he magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors  The more serious the error, the less believable are defendants' protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy.").

Plaintiffs have also alleged KPMG's failure to comply with GAAS in the conduct of its audits  For example, KPMG failed to follow GAAS procedures for evaluating the effectiveness of Fannie Mae's hedge transactions (¶ 758), failed to develop adequate audit procedures to evaluate the reasonableness of the market data and modeling factor estimates Fannie Mae used to determine premium and discount amortization amounts (¶¶ 782-785); failed to obtain competent evidential matter to support the numerous "on-top" adjustments made by Fannie Mae (¶¶ 786-788); and failed to insist that Fannie Mae disclose its non-GAAP accounting policies in its financial statements (¶¶ 789-791).

Additionally, Plaintiffs have alleged KPMG's reckless disregard of numerous "red flags" which should have (a) alerted KPMG to a heightened risk of fraud, (b) caused it to adjust its

19

auditing procedures accordingly, and (c) resulted in KPMG's discovery of the fraud and refusal to issue an unqualified audit opinion. ¶¶ 771-773. As KPMG acknowledges, "[r]ed flags are 'specific, highly suspicious facts and circumstances available to the auditor at the time of the audit.'" *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 718 (N.D. Ill. 2005) (quoting *Riggs Partners, LLC v. Hub Group, Inc.*, No. 02 C 1188, 2002 WL 31415721, at *9 (N.D. Ill. Oct. 25, 2002))

The Complaint details a number of "highly suspicious facts and circumstances" that were available to KPMG during its audits, not the least of which were the actual GAAP violations of which KPMG was aware. *See, e.g.*, ¶¶ 141, 186, 193, 194-202, 233, 245, 299, 386-387. KPMG misguidedly argues that "the very accounting errors that KPMG is alleged to have missed cannot be 'red flags' for those same accounting errors." KPMG Mem. at 32. But Plaintiffs do not contend that the GAAP violations that KPMG "missed" were red flags for those same GAAP violations. Rather, Plaintiffs allege that **GAAP violations and other facts of which KPMG was aware** were "red flags" that should have heightened KPMG's suspicions as to the existence of fraud and other GAAP violations. These facts included, among other things:

- that, as acknowledged in KPMG's workpapers, the Company's executive compensation program created incentives for management to manipulate the Company's accounting and that the impact of such an occurrence would be "high" (¶¶ 759-760, 772);

- management's intense focus on meeting EPS compensation targets (¶ 772);

- management's deferral of expenses in 1998 for the sole purpose of manipulating EPS to maximize management's bonuses (¶¶ 92, 747, 772);

- management's ambitious goal of doubling EPS by 2003 (¶ 772);

- the Company's strong desire to maintain a smooth earnings history, and KPMG's acquiescence in numerous non-GAAP accounting methods which had the purpose and effect of reducing earnings volatility (¶¶ 762, 772);

- that Fannie Mae's computer systems were incapable of performing long haul accounting for derivatives (¶ 772);

- the absence of any supporting model to evaluate the adequacy of Fannie Mae's loan allowance until 2003 (¶ 772);

- that Fannie Mae's loan allowance remained unchanged for seven years, despite significant improvement in its credit experience (¶ 772);

- Fannie Mae's implausible yet consistent reporting of stable and growing financial results, despite the Company's vulnerability to changes in interest rates (¶ 772);

- the importance of derivatives to Fannie Mae's financial statements, and the fact that Fannie Mae's sister company, Freddie Mac, had materially misstated its financial statements due to improper accounting for derivatives (¶ 753);

- the vesting of inordinate responsibility in the Chief Financial Officer, who was also the Chief Risk Officer and Vice Chairman of the Board (¶ 772);

- the CFO's overlapping responsibilities for both setting and meeting financial targets (¶ 772);

- the centralization of responsibility for modeling, reporting, and accounting for purchase premiums and discount amortization in a single person (¶ 772);

- the lack of appropriate documentation for numerous accounting entries (¶ 772);

- the internal audit department's lack of independence because its compensation was set by the CFO and its staff bonuses were tied to EPS (¶ 772);

- that the head of the internal audit department reported to the CFO and could not have direct communication with the Audit Committee (¶ 772); and

- the making of "on top" adjustments to the Company's books at the corporate level (¶ 772)

While KPMG attempts to characterize many of these facts as "general, in-and-of-themselves innocent features of Fannie Mae's accounting and management structure" (KPMG Mem. at 32), the point is that these facts, both individually and collectively, indicated a heightened risk of fraud by Fannie Mae's management, and it was KPMG's duty -- as the Company's auditor -- to conduct its audits with particular scrutiny in light of the heightened risk *See* ¶¶ 753, 758, 761, 771, 773. As for KPMG's contention that "[t]he complaint never says that KPMG *knew* of any particularized *facts* specifically alerting it to material accounting errors" (KPMG Mem. at 33), it is simply not true. The Complaint is rife with allegations that Fannie

21

Mae's management engaged in accounting fraud to further their goals of achieving EPS targets and reducing earnings volatility. *See, e.g.*, ¶¶ 1, 2, 6, 11. This is precisely the type of fraud which KPMG should have tailored its audit to detect, in light of the red flags discussed above. *See, e.g.*, ¶ 761 ("Given its knowledge of Fannie Mae management's incentives to manage earnings, KPMG had a duty to closely scrutinize whether that conduct was occurring, and to plan its audits to counter this serious risk of fraud. Given the extent of such earnings management, KPMG's failure to discover the fraud compels the conclusion that KPMG acted, at the very least, recklessly with regard to its audits of Fannie Mae.").

Continuing its ploy to rewrite Plaintiffs' Complaint, KPMG brushes aside most of the red flags alleged in the Complaint so that it can focus only on two, which it claims are insufficient to establish scienter: (1) KPMG's knowledge of the deferral of $199 million in premium and amortization expenses from 1998 to future periods, and (2) KPMG's knowledge of the allegations of accounting improprieties by Roger Barnes. KPMG Mem. at 31-32. These allegations – discussed in more detail below -- are among the more egregious examples of specific facts known to KPMG which put it on notice of the likelihood of fraud at Fannie Mae, and they support a strong inference of KPMG's recklessness.

KPMG **knew** that the deferral of expenses in 1998 was a violation of GAAP, and that it had resulted in the Company's management receiving the maximum possible bonuses, whereas they would have received no bonuses whatsoever if they had complied with GAAP. ¶ 747. In fact, KPMG identified this as an "audit difference" – *i.e.*, an item it believed to have been improperly accounted for – but then allowed it to slide by as "immaterial" despite its own internal guidance against using materiality as a basis for excusing deliberate misstatements. ¶¶ 747-750. KPMG also did not alter its audit approach in response to its knowledge of

management's propensity toward deliberate accounting manipulations for their own personal gain. ¶¶ 747, 759, 761. In its Motion, KPMG's response to these allegations is that they "do nothing to support an inference that KPMG intentionally participated in Fannie Mae's fraud" (KPMG Mem. at 33), and that "[i]f KPMG intended to defraud Fannie Mae's investors, it certainly would not have bothered to list an audit difference ...." (KPMG Mem. at 34). That is a red herring. Plaintiffs are not required to plead or prove that KPMG set out in the first instance to defraud them. All Plaintiffs' allegations must do is support an inference of KPMG's **recklessness** with regard to the statements in its Audit Reports. KPMG's knowledge of management's deliberate earnings management in 1999, its refusal to require reversal of the improper entries, and its failure to apply increased scrutiny to Fannie Mae's accounting in subsequent periods in light of that knowledge, support a strong inference of its recklessness.

KPMG was also informed when Roger Barnes leveled serious allegations of accounting fraud and earnings management against members of Fannie Mae management in 2003. Barnes' allegations included matters which OFHEO later found to have significantly contributed to the fraud, including flaws in the modeling of amortization factors, significant internal control deficiencies in the Company's Amortization Integration Modeling System, and insufficient segregation of duties and responsibilities among Fannie Mae employees. ¶¶ 404, 407-409. Although KPMG attempts to rewrite the Complaint to demonstrate that the Barnes allegations were "indeed taken seriously" (KPMG Mem. at 32), the Complaint actually alleges that KPMG did nothing in response to these allegations but rubber-stamp a perfunctory, seven-day investigation by the Company's internal audit department – which was essentially auditing its own work – into a memorandum that contained sixty specific examples of misconduct. ¶¶ 412-420. Based on that investigation alone, KPMG and the Company decided, conveniently, that the

issues had been adequately investigated just in time for the Company's executives to sign their Sarbanes-Oxley certifications for the Company's 10-Q filing. ¶¶ 412-420. As OFHEO found, "KPMG had not performed sufficient review or test work to make a determination about the merits of Barnes' accounting allegations and ... KPMG audit partners had misrepresented their position to Fannie Mae staff, to Mr. Barnes, and to the Audit Committee." ¶ 823. KPMG's blind acceptance of the results of the Company's abbreviated and conflicted investigation are yet another indication of its reckless approach to its audits. ¶¶ 420-423, 751.

Finally, Plaintiffs' allegations regarding Fannie Mae's internal controls support a finding of KPMG's scienter. Plaintiffs allege that KPMG was responsible for examining Fannie Mae's systems of internal controls and identifying and material weaknesses which might impact the accuracy or reliability of the Company's financial statements. ¶¶ 745, 763. KPMG was also required, under GAAS, to obtain a sufficient understanding of Fannie Mae's internal controls to enable it to plan an effective audit. ¶ 763. As alleged in the Complaint, and as both OFHEO and Paul Weiss determined in their investigations, the material weaknesses in Fannie Mae's internal control systems were legion. See ¶¶ 429-454, 765. OFHEO characterized the Company's internal controls as "grossly inadequate" in numerous respects (¶ 429), and stated that "there were almost no controls in some instances." ¶ 461.

Under the circumstances as alleged in the Complaint, which include not only widespread GAAP violations but also KPMG's GAAS violations and its disregard of obvious red flags and internal control deficiencies, a jury could reasonably conclude – and a strong inference can be drawn – that KPMG's issuance of unqualified Audit Reports was reckless. See, e.g., Suprema, 438 F.3d at 279 ("At the pleading stage, courts have recognized that allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to

withstand a motion to dismiss "); *In re Baan Co Sec Litig,* 103 F Supp 2d at 21-22 (noting

that "courts have found GAAP violations to be extremely probative of scienter," and finding

scienter allegations sufficient where based on GAAP violations, defendants' positions and access

to information, and defendants' "reason to be aware" of GAAP violations); *Oxford Health Plans,*

51 F. Supp 2d at 295 (allegations of GAAP and GAAS violations, plus "numerous red flags that

KPMG must have been aware of, if it were conducting any kind of audit" were sufficient to

"give rise to a strong inference that when KPMG audited Oxford's 1996 financial statements and

issued its clean opinion, it recklessly disregarded or outright ignored the risk of falsity of the

1996 financial statements").

### 3. KPMG's Attempts To Portray Itself As A Ruthless Enforcer Of Proper Accounting Standards Are Contradicted By The Complaint's Well-Pleaded Allegations

KPMG disingenuously suggests that Plaintiffs' allegations negate, rather than support, its

scienter Specifically, it argues that the Complaint shows that KPMG "actively policed Fannie

Mae's accounting" (KPMG Mem at 23) and tried to prevent fraud at Fannie Mae Far from it.

What the Complaint actually shows is that while KPMG occasionally spoke up about the

improper accounting it encountered at Fannie Mae, it invariably buckled under pressure from its

client and issued unqualified Audit Reports in spite of known GAAP violations

For example, KPMG makes much of the fact that it "asked" Fannie Mae to formalize its

SFAS 91 policy. ¶ 140. KPMG ignores, however, that the policy Fannie Mae ultimately

developed in response to this request violated SFAS 91—a fact of which KPMG was well aware.

¶ 141. Further, KPMG's "defense" that it permitted Fannie Mae to violate GAAP by deferring

catch-up only in amounts that passed muster under a Company-created materiality threshhold

flies in the face of SEC warnings against the propriety of using such self-created materiality

thresholds. ¶ 148. That KPMG was the impetus for the formalization of this GAAP-violative policy does not negate its scienter

KPMG further argues that its initial objection to Fannie Mae's deferral of $199 million in expenses in 1998 (and its decision to inform the Audit Committee that it disagreed with this deferral) somehow militates against a finding that it acted with scienter. KPMG Mem at 23. This assertion barely warrants a moment's pause, as KPMG not only waived its audit difference relating to this incident, but did so on the grounds that it deemed the deferral "immaterial." ¶ 748 In allowing a self-determined "materiality" concept to inform its decision, KPMG ignored warnings issued by both its own Department of Professional Practice and the SEC of the impropriety of this approach. ¶ 748. This incident, far from demonstrating KPMG's role in policing Fannie Mae's accounting, demonstrates that KPMG was not ignorant of the fraud, but rather spineless, willing to reverse its own decisions on accounting propriety when pressed by the Company.

Similarly, that KPMG "urged Fannie Mae to eliminate a miscellaneous account of $3 9 million in aged credit items" (KPMG Mem at 24) does not negate its scienter. KPMG, knowing that this account was a problem, plainly did not **insist** that Fannie Mae eliminate it, because the account remained on the books until the Officer Defendants made use of it four years later to manipulate the Company's reported earnings to secure their maximum bonuses for the year. ¶¶ 94-95 Although KPMG unquestionably had the ability to withhold its Audit Reports unless this account was eliminated, it affirmatively and consciously chose not to. Far from advancing KPMG's cause, its weak request for elimination of the account actually supports a finding of its willful conduct

KPMG also claims that Fannie Mae prevented it from discovering the Company's fraud by hiding information from it. KPMG Mem. at 24. As its sole support for this argument, KPMG posits that Fannie Mae "concealed from KPMG that it was using synthetic mortgage-backed securities to manage earnings." KPMG Mem. at 24. To the contrary, the Complaint alleges that KPMG was well-aware of Fannie Mae's use of synthetic REMICs, but that KPMG had simply "lost track" of the issue over time. ¶¶ 309-310. Fannie Mae's failure to "remind" KPMG of its improper accounting does not excuse KPMG from forgetting.

Finally, KPMG's argument that its "efforts were undermined by some members of Fannie Mae's management" and that "Fannie Mae delayed informing KPMG of new accounting policies ... depriving KPMG of sufficient time to review them" show the disconnect between KPMG's approach to these audits and what it should have done were it not reckless. If KPMG felt that its efforts to ensure the accuracy of Fannie Mae's financial statements were being undermined by management, or that it was being given insufficient time to review the Company's accounting policies, it held the ultimate trump card: it could have refused to issue an unqualified audit report. If it had done that rather then rubber-stamping the Company's financial statements each year, perhaps the fraud would not have occurred (or would have been detected earlier). Certainly, KPMG cannot now blame Fannie Mae for the fact that KPMG lacked the backbone to stand up to its client when it really mattered.

### 4.    KPMG Had Motive And Opportunity To Commit Fraud

In light of Plaintiffs' allegations of KPMG's knowledge and recklessness, they need not allege KPMG's motive and opportunity to commit fraud. Nonetheless, Plaintiffs' allegations of motive and opportunity add weight to the inference of KPMG's scienter.

As Fannie Mae's longstanding auditor and as the signatory on the Audit Reports that Fannie Mae needed to file its Form 10-Ks, KPMG had the opportunity to commit fraud. KPMG

had virtually unfettered access to the Company, its officers and directors, and its business records ¶ 768. In fact, the Complaint alleges that KPMG had access to (and in some cases actually reviewed and approved) the very GAAP-violative accounting policies that Fannie Mae used to perpetrate its fraud. For example, KPMG had access to, among other things, Fannie Mae's SFAS 91 policy (¶ 153); its derivatives accounting policy (¶ 180); its SFAS 115 policy (¶ 233); its dollar-roll accounting policy (¶ 262); and its amortization of callable debt expense policy (¶ 319). Accordingly, KPMG plainly had the opportunity to commit fraud.

As alleged in the Complaint, from 2000 through 2003 KPMG received over $36 million in fee revenue from Fannie Mae. These fees were particularly significant for KPMG's engagement partners on the Fannie Mae account, who were responsible not only for the conduct of the audits and the issuance of the Audit Reports, but also for maintaining and increasing KPMG's revenue stream from the account. ¶ 767. These engagement partners thus had a strong motive – which is imputable to KPMG[7] – to turn a blind eye to fraud at Fannie Mae.

KPMG asserts that "[i]t simply belies common sense" that it "would invite massive legal liability and risk its reputation for $25.3 million in audit fees." KPMG Mem. at 28. However, that argument assumes that KPMG, the partnership, is the one making the decision to risk that reputation. In fact, those decisions are typically made at the individual partner level, and it does not belie common sense that individual partners within KPMG might risk the firm's reputation for the sake of advancing their own personal careers and substantial compensation.

Furthermore, even if the motivations are viewed from the perspective of KPMG as a whole, recent corporate scandals tell us that those who engage in fraud do not always act in an

---

[7] *See e.g. Cromer Fin. Ltd. v. Berger*, Nos. 00 Civ. 2284, 00 Civ. 2498, 2002 WL 826847, at **7-8 (S.D.N.Y. May 2, 2002) (scienter of partner in charge of audits may be imputed to accounting firm itself under traditional agency principles).

economically rational manner. Certainly, it was not economically rational for Martha Stewart to

risk her reputation and her billion-dollar empire for the sake of avoiding a $45,000 stock market

loss. Nor was it economically rational for Dennis Kozlowski, the former CEO of Tyco

International, Ltd., to risk his reputation (not to mention his liberty and substantial personal

wealth) by committing tax fraud to save $1 million in state sales tax. Yet, they did exactly that.[8]

As the court stated in *Enron*, in rejecting an argument similar to that made by KPMG here:

> A number of Defendants argue that Lead Plaintiff's allegations that
> Defendants knew of the Ponzi scheme and yet poured millions of
> dollars into it or risked their reputations to conceal the scheme
> merely for fees, payments and profits . . . are inherently irrational,
> implausible, and/or illogical and the alleged actions are against
> Defendants' own self-interest. This Court notes that what may
> have been implausible two or three years ago is hardly so today, in
> light of a plethora of revelations, investigations, evidence,
> indictments, guilty pleas, and confessions of widespread corporate
> corruption and fraud by companies, auditors, brokerage houses,
> and banks. **Lining one's pockets with gold, at the expense of
> investors, employees, and the public, appears too often to be a
> dominating ambition**, and public skepticism about the market is
> very prevalent.

*Enron*, 235 F. Supp. 2d at 686 (emphasis added).

But perhaps most significantly, just last year **KPMG itself** admitted to criminal tax fraud

and agreed to pay $456 million in penalties in connection with its creation of tax shelters to

generate phony tax losses for its wealthy clients.[9] These tax shelters generated an average of

$360,000 in fees, per transaction, for KPMG.[10] This admission takes all of the wind out of the

sails of KPMG's argument that it would not commit fraud for the sake of a lucrative fee.

---

[8] *See, e.g.*, Constance L. Hays and Leslie Eaton, *The Martha Stewart Verdict: The Overview, Stewart Found Guilty of Lying in Sale of Stock*, The New York Times (March 6, 2004); Andrew Ross Sorkin, *Ex-Chief and Aide Guilty of Looting Millions at Tyco*, The New York Times (June 18, 2005).

[9] *See* Internal Revenue Service, "KPMG to Pay $456 Million for Criminal Violations," IR-2005-83 (Aug. 29, 2005) (available at http://www.irs.gov/newsroom/article/0,,id=146999,00.html)

[10] *See* United States Senate Permanent Subcommittee on Investigations, Report entitled "U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals," at 28 (Nov. 2003) (available at http://levin.senate.gov/newsroom/supporting/2003/111803TaxShelterReport.pdf)

Accordingly, Plaintiffs' allegations that KPMG —and its engagement partners in particular—were motivated by a desire to continue to earn fees from the Fannie Mae account and had the opportunity to commit fraud, are facts contributing to a strong inference of KPMG's scienter. *See, e.g., Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960 (N.D. Ill. 2006) (plaintiffs established strong inference of scienter where they alleged numerous GAAP violations, defendants' prior notice of the violations, and defendants' motive and opportunity to commit fraud); *Qwest*, 396 F. Supp. 2d at 1208 (finding that "[a] desire to retain the business of a client who paid fees [of nearly $8 million] could motivate an auditor to disregard a client's accounting machinations," and finding scienter adequately pleaded based on allegations of auditor's motive, knowledge of accounting improprieties, and magnitude of improprieties).

### 5. The Totality of Plaintiffs' Particularized Allegations Give Rise To A Strong Inference of KPMG's Scienter

In its Motion, KPMG masterfully tries to parse out each of Plaintiffs' scienter-related allegations, and to establish that each, standing alone, is insufficient to give rise to a strong inference of KPMG's scienter. It then proclaims that, because "each of Plaintiffs' numerous individual bids to plead KPMG's scienter fails . . . [i]t follows that the allegations as a whole fail to do so as well." KPMG Mem. at 37. Not so! The law is clear that, in evaluating Plaintiffs' allegations of scienter, the Court must consider the **collective** impact of those allegations. *See, e.g., PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 683 (6th Cir. 2004) (the scienter determination involves a "totality of the circumstances analysis whereby the facts argued collectively must give rise to a strong inference of at least recklessness"); *Florida State Bd. Of Admin.*, 270 F.3d at 660 ("under the Reform Act, a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind") (emphasis

added); *DE&J Ltd P'ship v Conaway,* 284 F. Supp. 2d 719, 741 (E.D. Mich. 2003) (same). As

one court explained:

> [T]he PSLRA's only requirement is that the facts alleged must give
> rise to a 'strong inference' of the defendant's scienter. The *types*
> of facts with which a plaintiff pleads scienter factor little into [a
> court's] analysis, as long as the **overall facts** give rise to 'a strong
> inference' of scienter. Thus, a plaintiff may use 'motive and
> opportunity' or 'circumstantial evidence' to establish scienter
> under the PSLRA, as long as those facts support a strong inference
> 'that the defendant acted recklessly or knowingly.'

*Chu,* 100 F. Supp. 2d at 823 (italics in original; other emphasis added) (internal quotation

omitted).

Plaintiffs' allegations, viewed in their totality, demonstrate that (1) KPMG knew that

Fannie Mae engaged in significant GAAP violations in preparing its financial statements; (2) the

magnitude of the fraud was massive; (3) KPMG failed to comply with GAAS in conducting its

audits of Fannie Mae; (4) KPMG knew of, or recklessly disregarded, a number of "red flags"

alerting it to Fannie Mae's penchant to violate GAAP when needed to suit its purposes; (5)

KPMG knew, or recklessly disregarded, that Fannie Mae's internal controls were virtually non-

existent; (6) KPMG knew that Fannie Mae failed to investigate thoroughly the complaints of at

least one whistleblower; and (7) KPMG and its engagement partners had motive and opportunity

to look the other way in the face of known fraud. Collectively, these allegations are more than

sufficient to establish that KPMG acted with scienter in issuing its Audit Reports. *See, e g.,*

*Global Crossing,* 322 F. Supp. 2d at 347 ("the enormous amount at stake coupled with the

detailed allegations regarding the nature and extent of [the client's] fraudulent accounting and

[the auditor's] failure to conduct a thorough and objective audit create a strong inference that

[the auditor] was reckless in not knowing that its audit opinions materially misrepresented [the

company's] financial state.") (citation omitted); *In re Telxon Corp Sec Litig.,* 133 F. Supp. 2d

31

1010, 1030 (N.D. Ohio 2000) ("[A]llegations of obvious 'red flags,' or warning signs that financial reports are misstated, can, where the misrepresentations are of a substantial magnitude, give rise to a strong inference of fraudulent intent."); *In re First Merchants Acceptance Corp Sec Litig*, No. 97-C-2715, 1998 WL 781118, *11 (N.D. Ill. Nov. 4, 1998) ("[T]he allegations in the complaint, including the magnitude of the misstatements, the specific GAAP and GAAS violations and the 'red flags' together support an inference that [the] audit amounted to no audit at all or an egregious refusal to see the obvious or investigate the doubtful.") (internal quotations omitted); *In re Health Mgmt, Inc. Sec. Litig*, 970 F. Supp. at 203 (plaintiffs pleaded strong inference of scienter by alleging GAAP and GAAS violations, the auditor's six-year engagement, the magnitude of the misrepresentations, and the auditor's ignorance of red flags)

### D.    **Plaintiffs Have Pleaded Loss Causation**

In their complaint, Plaintiffs allege that the defendants' fraud was gradually revealed to the market through a series of disclosures beginning on September 22, 2004, although the full extent of the fraud remains unknown. ¶¶ 676-714, 864. Plaintiffs allege that "these revelations caused progressive declines in the price of Fannie Mae's stock, causing Plaintiffs – who continued to hold Fannie Mae stock at the time of these disclosures – to suffer significant losses." ¶ 864. In other words, having purchased their Fannie Mae stock at prices that were artificially inflated as a result of the fraud alleged in the complaint, Plaintiffs were left with shares worth significantly less than what they had paid for them when the artificial inflation was removed from the stock price because of the disclosures of the fraud. The courts have uniformly held that allegations of price drops following disclosures of previously misrepresented or omitted facts are sufficient to allege loss causation. *See, e.g., Crocker v. Carrier Access Corp*, No. 05-CV-01011, 2006 WL 2035366, *8 (D. Colo. July 18, 2006); *Catton v. Defense Tech Sys*, No. 05 Civ. 6954 (SAS), 2006 WL 1716862, *6 (S.D.N.Y. June 20, 2006); *In re Bridgestone Sec. Litig*,

430 F. Supp. 2d 728, 737-38 (M.D. Tenn. 2006); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 234 (S.D.N.Y. 2006); *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 899 (E.D. Tenn. 2005); *In re CMS Energy Sec. Litig.*, 403 F. Supp. 2d 625, 630 (E.D. Mich. 2005); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1025 (S.D. Cal. 2005); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F. Supp. 2d 1172, 1177-78 (N.D. Cal. 2005).

In an effort to portray Plaintiffs' loss causation allegations as insufficient, KPMG grossly mischaracterizes them by arguing that "[l]ike the complaint the Supreme Court held insufficient in *Dura Pharm*, Plaintiffs allege little more than that they purchased shares at 'artificially inflated prices' as a result of the various defendants' misrepresentations." KPMG Mem. at 38. That simply isn't true. In *Dura Pharmaceuticals*, the plaintiffs claimed that they had suffered damages solely by virtue of having paid artificially inflated prices for Dura stock, and the Supreme Court noted that "[t]he complaint's failure to claim that Dura's share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient." 544 U.S. 336, 347 (2005). The Supreme Court disagreed, holding that loss causation was not adequately pleaded because the artificially inflated purchase price was "not itself a relevant economic loss." *Id.* Here, unlike in *Dura*, Plaintiffs allege more than the mere purchase of securities at artificially inflated prices. Plaintiffs also allege that revelations of the truth caused those prices to decline, resulting in economic loss to Plaintiffs. As the cases cited in the preceding paragraph demonstrate, these allegations are sufficient to plead loss causation.

There is also no support – and none has been cited – for KPMG's contention that Plaintiffs cannot plead loss causation without pleading that they sold their shares. Indeed, that argument runs contrary to the language of the PSLRA – which expressly contemplates that plaintiffs may recover damages even if they continue to hold their shares[11] – and ignores the long-standing rule that securities plaintiffs may recover damages without ever selling their shares. "Both prior to and after the enactment of the PSLRA in 1995, '[t]he damages of a purchaser were always understood to be the difference between the purchase price and the true value of the shares … as disclosed after the revelation of the fraud to the public, followed by a reasonable period … during which the market took cognizance of the fraud and the publicly traded price was presumed … to reflect an adjustment for the fraud.'" *In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d 605, 610 (D.N.J. 2005) (quoting *In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 250 (S.D.N.Y. 2000)). "Since both the traditional out-of-pocket loss rule and Section 21D(e) of the PSLRA provide that a purchaser's loss may be calculated by reference to the amount that the purchaser overpaid and the true value of the securities, a purchaser has not needed to sell the securities to have suffered or to recover 'actual damages.'" *Id.* For these reasons (among others), the courts have found it unnecessary for plaintiffs to allege that they sold their shares in order to plead loss causation. *See, e.g.*, *In re Bridgestone Sec. Litig.*, 430 F. Supp. 2d at 738; *In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d at 607-12.

---

[11] The PSLRA limits a plaintiff's damages to either (1) the difference between the purchase price and the mean trading price of the security during the 90-day period beginning on the corrective disclosure date, or (2) "*if the plaintiff sells* … the subject security prior to the expiration of the 90-day period," the difference between the purchase price and the mean trading price from the corrective disclosure date through the date of sale. 15 U.S.C. § 78u-4(e)(1), (2) (emphasis added). Part (1) of this provision would be unnecessary if only those plaintiffs who sell their securities are entitled to damages. *Accord In re Royal Dutch/Shell*, 404 F. Supp. 2d at 608-09 (PSLRA does not require a sale as a prerequisite to recovery, and "[r]equiring a sale of the subject security … would be inconsistent with [the PSLRA's] statutory scheme.")

Finally, KPMG erroneously contends that Plaintiffs' loss causation allegations are insufficient because "Plaintiffs do not attempt to isolate the effect of KPMG's particular audit opinions on the decline in Fannie Mae's stock price." KPMG Mem. at 38. There is no such requirement. Plaintiffs have alleged that they suffered economic loss due to the decline in price of Fannie Mae's stock, and that the price decline was caused by "the market's reaction to revelations of accounting fraud at Fannie Mae, and to its adjustment of the stock price to reflect the newly emerging truth about Fannie Mae's financial condition and results." ¶ 865. These "revelations" included the fact that, contrary to KPMG's audit reports, Fannie Mae's financial statements did not comply with GAAP and would have to be restated. *See, e.g.*, ¶¶ 1, 676-680, 694-696, 699-706, 711. Plaintiffs have also alleged in detail KPMG's role in the accounting fraud (¶¶ 745-797) and that KPMG's issuance of materially false audit opinions prevented and delayed Plaintiffs from learning of the risks associated with investing in Fannie Mae stock (¶ 781) – risks that later materialized when the truth began to come out and the price of Fannie Mae's stock dropped. ¶ 781. These allegations are sufficient to plead a causal connection between KPMG's conduct and Plaintiffs' loss. *See, e.g.*, *In re Winstar Commc'ns, Inc.*, No. 01-CV-3104, 2006 WL 473885, *16 (S.D.N.Y. Feb. 27, 2006) (plaintiff adequately alleged loss causation against auditor by pleading that the stock price declined following revelation of the truth about the financial statements underlying the audit report); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 306-07 (allegations that auditor falsely certified financial statements that understated company's debt, and that the undisclosed debt led to the company's financial collapse, were sufficient to allege loss causation); *Rocker Mgmt.*, 2005 WL 1366025, at *7 (plaintiff sufficiently pleaded loss causation against KPMG Belgium by alleging increase in

stock price due to fraudulent scheme which included publication of false financial reports, followed by price drop when scheme unraveled).

## II.    **PLAINTIFFS' SECTION 18 CLAIM IS NOT TIME-BARRED**

Section 18 states that an action thereunder must be brought "within one year after the discovery of the facts constituting the cause of action." 15 U.S.C. § 78r(c). KPMG contends that Plaintiffs' Section 18 claim is time-barred because it was not asserted within one year after September 22, 2004. That argument should be rejected for two reasons: First, the statute of repose on Plaintiffs' Section 18 claim was extended to two years under the Sarbanes-Oxley Act. Second, even if a one-year period were applicable, it was not until 2005 that Plaintiffs "discover[ed] ... the facts constituting the cause of action" against KPMG under Section 18, and Plaintiffs filed the claim within one year after that date.[12]

### A.    **The Sarbanes-Oxley Act's Two-Year Discovery Rule Applies**

Under the Sarbanes-Oxley Act, Congress extended the statute of repose to "2 years after discovery of the facts constituting the violation" for any "private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws ...." 28 U.S.C. § 1658(b). Under this extended two-year statute, Plaintiffs' January 2006 filing of their Section 18 claim was timely even if September 22, 2004 were the appropriate triggering date, as KPMG contends. However, KPMG argues that this extension of the statute of repose does not apply to Section 18 because Section 18 is not an "antifraud" provision. KPMG Mem. at 41. Plaintiffs disagree. While true that Plaintiffs need not plead or prove scienter to prevail under Section 18, their Section 18 claim nonetheless

---

[12] Plaintiffs do **not** contend that the filing of the class action tolled the statute of limitations as to claims against KPMG (which was not initially named in the class action). Accordingly, the Court need not address the arguments at pp. 42-44 of KPMG's memorandum.

"involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws ..." 28 U.S.C. § 1658(b).

As the Supreme Court has recognized, Section 18 "'target[s] the precise dangers that are the focus of § 10(b),'    and the intent motivating [both] sections is the same—'to deter fraud and manipulative practices in the securities markets, and to ensure full disclosure of information material to investment decisions.'" *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286, 296 (1993) (internal citation omitted). Plaintiffs' Section 18 claim arises out of false statements in KPMG's Audit Reports regarding Fannie Mae's compliance with GAAP and KPMG's compliance with GAAS, as set forth in Fannie Mae's Form 10-K filings with the SEC. Under applicable regulatory requirements, these statements were required to be truthful and not misleading, and the financial statements were required to be prepared in accordance with GAAP. *See* ¶ 125; 17 C.F.R. §§ 210.4-01(a), 240.10b-5; 12 C.F.R. § 1730.3. Thus, Plaintiffs' Section 18 claim is premised on allegations of fraud, deceit, and contrivance in contravention of regulatory requirements concerning the securities laws. The extended two-year statute of repose under the Sarbanes-Oxley Act should therefore apply.

KPMG overstates its position when it claims that the courts have "repeatedly and squarely held that the general language of Sarbanes-Oxley does not modify the specific statutes of limitations applicable to non-fraud claims like Section 18."[13] KPMG Mem. at 42. In reality, several courts have expressly held that Sarbanes-Oxley's extended limitations periods *do* apply to Section 18 claims. For example, in *Teachers' Retirement System of Louisiana v. Qwest*

---

[13] KPMG's citation of *In re WorldCom, Inc. Securities Litigation*, 294 F. Supp. 2d 431, 444 (S.D.N.Y. 2003) and *In re Global Crossing, Ltd. Securities Litigation*, 313 F. Supp. 2d 189, 198 (S.D.N.Y. 2003) is inapposite, because those cases did not involve Section 18 claims. Rather, the courts in those cases held that negligence-based claims under Sections 11 and 12 of the Securities Act of 1933 and Section 14 of the Securities Exchange Act of 1934 are not subject to the Sarbanes-Oxley limitations periods. The Supreme Court, however, has suggested that "something more than negligence" is required for a plaintiff to recover under Section 18. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 211 n.31 (1976).

*Communications International, Inc*, No. 04-CV-0782, 2005 WL 2359311, at *3 (D. Colo. Sept.

23, 2005), the court held that Section 18 "easily" fell within the parameters of a claim involving

"fraud, deceit, manipulation, or contrivance" to which the Sarbanes-Oxley Act's extended

limitations periods apply. *Id.* Similarly, in *In re Adelphia Communications Corp. Securities &*

*Derivative Litigation*, No. 03-MD-1529 (LMM), 2005 WL 1679540, at *4 (S.D.N.Y. July 18,

2005), the court found that Section 18 claims are claims involving "fraud, deceit, manipulation,

or contrivance" for purposes of the Sarbanes-Oxley limitations periods. Citing to a Supreme

Court opinion, the court explained:

> Unlike negligence or strict liability-based claims, "the [§ 18]
> defendant is accorded the defense that he acted in 'good faith and
> had no knowledge that such statement was false or misleading.'" .
> Thus, the Supreme Court opined, "something more than negligence
> on the part of the defendant is required for recovery." ... Given
> that § 18 involves more than negligence, this Court finds that the
> extended two-year/five-year limitations period applies.

*Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 211 n.31 (1976))

### B.     Plaintiffs Lacked Sufficient Information To File A Non-Dismissable Section 18 Claim Until 2005

Even assuming *arguendo* that the statute of limitations set forth in Section 18 had not

been superseded by the Sarbanes-Oxley Act, the clock did not begin running on Plaintiffs' time

to file suit under Section 18 until "discovery of the facts constituting the cause of action." 15

U.S.C. § 78r(c). Plaintiffs asserted their Section 18 claim against KPMG in a complaint filed on

January 25, 2006. Thus, to prevail on its statute of limitations argument, KPMG would have to

establish that Plaintiffs discovered "the facts constituting the cause of action" under Section 18

by January 25, 2005. Moreover, to succeed on this defense on a motion to dismiss, KPMG must

show that it is clear from the face of the Second Amended Complaint – with any ambiguities

construed in Plaintiffs' favor – that the claim is conclusively time-barred. *Firestone v. Firestone*,

76 F.3d 1205, 1209 (D.C. Cir. 1996); *Doe v. U.S. Dept. of Justice*, 753 F.2d 1092, 1115 (D.C.

Cir. 1985); *Jones v. Rogers Mem. Hosp.*, 442 F.2d 773, 775 & n.2 (D.C. Cir. 1971). KPMG has

not met that burden.

To state a claim under Section 18, a plaintiff must "plead ... that the defendant made or

caused to be made a material misstatement or omission in a document filed with the Securities

Exchange Commission and that the plaintiff relied on the misstatement or omission." *Magna*

*Inv. Corp. v. John Does One Through Two Hundred*, 931 F.2d 38, 39 (11th Cir. 1991). Courts

have held that a presumption of reliance is not available under Section 18, and that actual

reliance must be established. *See, e.g., Gross v. Diversified Mortgage Investors*, 438 F. Supp.

190, 195 (S.D.N.Y. 1977). Thus, Plaintiffs could not assert a Section 18 claim merely by

alleging that there were false statements in an SEC filing; they had to allege which specific

statements were untrue, and their actual reliance on those statements. Prior to January 25, 2005,

Plaintiffs lacked sufficient information to plead with particularity why KPMG's Audit Reports

were false, or to plead actual reliance on specific false statements, because many of the

Company's GAAP violations had not yet been disclosed.[14]

The Second Amended Complaint establishes that, as of January 25, 2005, only the "tip of

the iceberg" of the accounting fraud at Fannie Mae had been disclosed. ¶¶ 4, 701. Specifically,

until February 2005, the disclosures regarding accounting improprieties at Fannie Mae had

focused on violations of SFAS 91 and 133 alone, and on Fannie Mae's management as the

---

[14] KPMG misleadingly claims that "Plaintiffs admit that they knew of KPMG's alleged misrepresentations, at the latest, by September 22, 2004." KPMG Mem. at 40. To support that statement, they quote language – purportedly from paragraph 870 of the Amended Complaint – that appears nowhere in the Amended Complaint. *Id.* What the Amended Complaint actually says is that "Plaintiffs did not know, and could not reasonably have discovered before September 22, 2004, that Fannie Mae's financial statements and Defendants' other public statements regarding the Company's financial condition were materially false and misleading." ¶ 867. Plaintiffs go on to allege that, although some information was disclosed on September 22, 2004, "the Company failed to reveal the full magnitude and extent of the fraud," and "Defendants' continued fraudulent concealment of ... material aspects of the fraud caused the statutes of limitations on Plaintiffs' claims to remain tolled through September 28, 2005." *Id.*

culpable parties. *See* ¶¶ 79-80, 671, 676-82, 694-95. On February 23, 2005, however, Fannie

Mae announced that OFHEO had uncovered violations of numerous other GAAP provisions,

including SFAS 46, 65, 115, 140, and 149, plus additional violations of SFAS 91. ¶ 702. Then,

in the Fall of 2005, reports came out of "new and pervasive accounting violations" beyond those

uncovered by OFHEO. ¶¶ 711-712. These post-January 25, 2005 revelations significantly

increased the scope of the known fraud and GAAP violations at the Company, and called

KPMG's good faith into serious question.

     Given the plethora of GAAP violations and misstatements that Defendants were

continuing to conceal from investors as of January 25, 2005, Plaintiffs could not have discovered

(much less pleaded with particularity) critical elements of their Section 18 claim prior to that

date, including the ways in which Fannie Mae's financial statements had been manipulated to

violate GAAP (and thus the reasons why KPMG's Audit Reports were materially false), and

which of the specific statements upon which Plaintiffs had relied when purchasing Fannie Mae

stock were false. Certainly, KPMG has not met its burden of establishing – from the face of the

Second Amended Complaint – that Plaintiffs "discover[ed] the facts constituting the cause of

action" under Section 18 more than one year prior to filing their complaint on January 25, 2006.

Consequently, KPMG's motion to dismiss the claim as time-barred should be denied, even if a

one-year statute of repose applies.

## III.    PLAINTIFFS' COMMON LAW FRAUD CLAIM SHOULD NOT BE DISMISSED

### A.    Plaintiffs' State Law Claims Are Not Preempted By SLUSA

     As Plaintiffs predicted in their objection to the consolidation of this action with the class

action, KPMG contends that the consolidation of those actions has caused Plaintiffs' common

law fraud claim to be preempted by the Securities Litigation Uniform Standards Act of 1998

("SLUSA"). In other words, although Plaintiffs had an undisputed right to assert and pursue

state law claims in their individual action prior to consolidation, KPMG argues that the consolidation of Plaintiffs' action with the class action – which was done to promote efficiency and judicial economy – has divested Plaintiffs of the right to pursue those state law claims. Plaintiffs are unaware of any courts having interpreted SLUSA in this way (and KPMG has cited none), and this Court should not do be the first to do so.

SLUSA provides that "[n]o covered class action based upon the statutory or common law of any State . . may be maintained in any State or Federal court by any private party alleging (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1). SLUSA was enacted in an effort to close a loophole left by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), whereby plaintiffs were circumventing the PSLRA's restrictive pleading requirements and mandatory discovery stays by filing class actions in state court instead of federal court. *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc*, 332 F.3d 116, 122-123 (2d Cir. 2003); *In re WorldCom Sec. Litig*, Nos. 02-Civ. 3288, 03 Civ. 4490, 2004 WL 315143, **7-9 (S.D.N.Y. Feb. 20, 2004).

Because the PSLRA only governs class actions, SLUSA is specifically tailored to prevent plaintiffs from circumventing the PSLRA by filing **class actions** — or individual actions that have the characteristics of class actions — in state court. SLUSA does **not** prevent plaintiffs from pursuing state law claims in legitimate individual actions, like this one.

Specifically, the preemption provisions of SLUSA apply only to "covered class actions," which the statute defines, in pertinent part, as:

      (i)    any single lawsuit in which--

41

> > (I)    damages are sought on behalf of more than 50
> >        persons or prospective class members   ; or
>
> > (II)   one or more named parties seek to recover damages
> >        on a representative basis on behalf of themselves
> >        and other unnamed parties similarly situated ...; or
>
> (ii)   any group of lawsuits filed in or pending in the same court
>        and involving common questions of law or fact, in which--
>
> > (I)    damages are sought on behalf of more than 50
> >        persons; and
>
> > (II)   the lawsuits are joined, consolidated, or otherwise
> >        proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B). Part (i) of this definition does not apply here, because this action was

brought on behalf of only twenty-four plaintiffs, and was not brought on a representative basis.

Instead, KPMG has latched onto part (ii), and contends that this action is part of a "covered class

action" due to its consolidation with the class action.

The result urged by KPMG would be manifestly unfair and contrary to public policy and

to the purpose of SLUSA. Plaintiffs did not file a class action, nor did they file an individual

action with the characteristics of a class action  Instead, they filed an individual action for the

very purpose of pursuing their claims independently of the class action. In fact, because KPMG

was not named as a defendant in the class action until just last month, Plaintiffs felt they had no

alternative but to file an individual action if they wanted to be certain that their claims against

KPMG would be pursued. Plaintiffs also named other defendants (such as Radian Guaranty Inc.

and certain Fannie Mae directors) and asserted other claims (such as a Section 18 claim and

several state law claims) that were not included in the class action  Far from being an effort to

circumvent the PSLRA, these actions reflect Plaintiffs' legitimate and good faith exercise of their

rights to pursue their own claims separately from other plaintiffs, through counsel of their own

choosing. SLUSA was never intended to preempt claims such as these.

Seeing consolidation as an opportunity to limit Plaintiffs' ability to pursue their claims, KPMG and the other defendants argued vociferously in favor of consolidation. Despite Plaintiffs' strenuous objection, the cases were consolidated. KPMG's sole basis for claiming preemption is grounded in the consolidation of this action with the class action for purposes of efficiency; but the benefits of efficiency – which are largely benefits enjoyed by the defendants and the Court – should not come at the expense of Plaintiffs' substantive rights.

This situation is very different from the *WorldCom* case, upon which KPMG relies. In *WorldCom*, the Court found that ten purportedly individual actions were actually "proceed[ing] as a single action" where the plaintiffs' counsel had intentionally structured the filing of the ten actions to evade SLUSA's removal and preemption provisions, the actions were collectively brought on behalf of 293 plaintiffs, the complaints were verbatim copies of each other, and the plaintiffs had consented to the consolidation of their cases. *See In re WorldCom, Inc Sec Litig.*, 308 F. Supp. 2d 236 (S.D.N.Y. 2004); *In re WorldCom, Inc Sec. Litig.*, 2004 WL 692746, *5 (S.D.N.Y. Apr. 2, 2004). The Court stated: "This is simply not a case in which an individual or even a group of individuals have in good faith decided to pursue individual actions in state court as permitted by SLUSA. From the inception of this litigation, these plaintiffs have operated a *de facto* class action in state court in the face of the explicit prohibitions of SLUSA." 2004 WL 692746, at *5. To prevent the plaintiffs from benefiting from their efforts to circumvent SLUSA, the Court in *WorldCom* disregarded the separateness of the individual actions and treated them as a single "covered class action." Here, by contrast, there are only two individual actions (one of which does not name KPMG), which collectively involve fewer than 30 plaintiffs, and which

43

were filed in good faith and not in an effort to evade SLUSA.[15] Moreover, Plaintiffs here did not consent to, but rather opposed, consolidation.

In the event the Court rules against Plaintiffs on this issue and finds that SLUSA bars Plaintiffs' state law claims based purely on the consolidation of Plaintiffs' individual action with the class action over Plaintiffs' objection, Plaintiffs respectfully request that the Court certify that ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

### B.    Plaintiffs Have Adequately Pleaded The Elements Of Their Fraud Claim

KPMG also seeks dismissal of Plaintiffs' common law fraud claim based on a purported failure to adequately plead scienter or loss causation. In support, KPMG simply refers back to its arguments for dismissal of Plaintiffs' Section 10(b) claim. Plaintiffs likewise refer the Court to their responses to those arguments, but also note that less stringent pleading standards apply to Plaintiffs' common law fraud claim than to their Section 10(b) claim. *See Burman v. Phoenix Worldwide Indus., Inc.*, 384 F. Supp. 2d 316, 336 (D.D.C. 2005) ("The PSLRA imposes a pleading standard that exceeds that required to establish a claim for common law fraud …").[16] For purposes of Plaintiffs' common law fraud claims, Plaintiffs' scienter allegations are governed by Rule 9(b), which provides that a defendant's state of mind may be averred generally. *See* Fed. R. Civ. P. 9(b). *See also Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) ("great specificity [is] not required with respect to … allegations of … scienter" under Rule 9(b); plaintiff need only plead "circumstances that provide at least a minimal factual basis

---

[15]  The other individual action is *Evergreen Equity Trust, et al. v. Federal National Mortgage Ass'n, et al.*, No. 1:06-CV-00082. That action was filed on behalf of four plaintiffs, and KPMG is not named as a defendant. Unlike the 293 plaintiffs in *Worldcom*, if all of the plaintiffs in these two individual actions had joined together in a single opt-out action, they would not have met the threshold of 50 plaintiffs that would cause the action to be deemed a "covered class action" under SLUSA. *See* 15 U.S.C. § 77p(f)(2)(A)(i)(I). Clearly, the filing of these two individual actions was not an attempt to evade SLUSA, and there has been no suggestion that it was.

[16]  The PSLRA, by its terms, does not apply to common law fraud claims. *See* 15 U.S.C. § 78u-4(b)(2) ("*In any private action arising under this chapter* … the complaint shall … state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.") (emphasis added).

for their conclusory allegations of scienter") (citations omitted); *Kozin v Dunn*, No. Civ. A. 04-852 (DRD), 2005 WL 2009918, *4 (D.N.J. 2005) (denying motion to dismiss common law fraud claim where "Plaintiffs have alleged knowledge (or scienter) generally, which they are permitted to do under the Federal Rules of Civil Procedure"); *In re Voluntary Purchasing Groups, Inc Litig*, 2003 WL 21501775, *9 n 17 (N.D Tex June 25, 2003) (intent to defraud may be averred generally for common law fraud claim). Because Plaintiffs' scienter allegations satisfy even the heightened pleading standard of the PSLRA, they surely satisfy the relatively minimal Rule 9(b) standard as well.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that KPMG's motion to dismiss be denied in its entirety

Dated: September 6, 2006

/s/ Stuart M. Grant
Stuart M. Grant (DC Bar ID #450895)
Megan D. McIntyre
Christine M. Mackintosh
GRANT & EISENHOFER P A
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
(302) 622-7000
Counsel for Plaintiffs Franklin Managed
Trust, et al.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In Re Fannie Mae Securities Litigation | ) ) ) | Consolidated Civil Action No. 1:04-cv-1639 (RJL) |

| | | |
|---|---|---|
| Franklin Managed Trust, et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 1:06-cv-00139 (RJL) |
| v. | ) ) | |
| Federal National Mortgage Association, et al. | ) ) | |
| Defendants. | ) ) | |

## CERTIFICATE OF SERVICE

I certify that on September 6, 2006, the Franklin Plaintiffs' Memorandum of Law in

Opposition to Defendant KPMG LLP's Motion to Dismiss and a Proposed Order were

electronically filed using the CM/ECF system, which will send notification of such filing to the

counsel of record in this matter who are registered on the CM/ECF. Service was accomplished

on counsel not registered through the CM/ECF system via regular U.S. mail, as indicated below.

**VIA U.S. MAIL:**

Fred Fisher Fielding
Barbara Ann Van Gelder
WILEY REIN & FIELDING, LLP
1776 K Street, NW
Washington, DC 20006
*Counsel for Anne Mulcahy and Frederic Malek*

Daniel John Healy
John H. Doyle, III
Rhonda D. Orin
ANDERSON KILL & OLICK, LLP
2100 M Street, NW, Suite 650
Washington, DC 20037
*Counsel for Leslie Rahl*

Christian J. Mixter
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
*Counsel for Tom Gerrity*

**VIA CM/ECF NOTIFICATION:**

Jeffrey C. Block
Kathleen M. Donovan-Maher
Julie A. Richmond
BERMAN DEVALERIO PEASE TABACCO
BURT & PUCILLO
One Liberty Square
Boston, MA 02169
*Counsel for State Teachers Retirement System*
*of Ohio and Ohio Public Employees*
*Retirement Systems*

James R. Cummins
Melanie S. Corwin
WAITE, SCHNEIDER, BAYLESS
 & CHESLEY CO., L.P.A.
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, OH 45202
*Counsel for State Teachers Retirement System*
*of Ohio and Ohio Public Employees*
*Retirement Systems*

Seth Aronson
Michael J. Walsh, Jr.
O'MELVENY & MYERS L.L.P.
1625 I Street, N.W.
Washington, D.C. 20006
*Counsel for Fannie Mae, Taylor Segue,*
*William Harvey, Kenneth Duberstein, Manuel*
*Justiz, and H. Patrick Swygert*

James D. Wareham
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
875 15th Street, N.W.
Washington, D.C. 20005
*Counsel for Daniel Mudd*

Julia E. Guttman
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
*Counsel for Jamie Gorelick*

David S. Krakoff
Eldad Zvi Malamuth
Christopher F. Regan
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, DC 20006
*Counsel for Leanne Spencer*

Steven Mark Salky
Eric R. Delinsky
Ellen D. Marcus
Holly Ann Pal
Tammy Gershoni
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW Suite 1000
Washington, DC 20036
*Counsel for Timothy Howard*

Kevin M. Downey
Michelle D. Schwartz
Joseph Marshall Terry, Jr.
Daniel N. Marx
WILLIAMS & CONNOLLY, LLP
725 12th Street, NW
Washington, DC 20005
*Counsel for Franklin Raines*

Francis J. Warin
Andrew S. Tulumello
Melanie L. Katsur
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
*Counsel for KPMG LLP*

Erica Lynne Salmon
DLA PIPER RUDNICK, GRAY CARY US
LLP
1200 19th Street, NW, Suite 700
Washington, DC 20036
*Counsel for Stephen Ashley, Donald Marron,*
*and Ann Korologos*

Alex Giscard Romain
2842 S. Columbus St
Arlington, VA 22206
*Counsel for Franklin Raines*

James Hamilton
David I. Ackerman
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
*Counsel for Joe Pickett*

Jonathan M. Stern
SCHNADER HARRISON SEGAL & LEWIS
LLP
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006-1825
*Counsel for Radian Guaranty Inc*

Jonathan S. Liss
Dionna K. Litvin
David Smith
SCHNADER HARRISON SEGAL & LEWIS
LLP
1600 Market Street, 36th Floor
Philadelphia, PA 19103
*Counsel for Radian Guaranty Inc.*

/s/ Megan D. McIntyre
Megan D. McIntyre

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In Re Fannie Mae Securities Litigation | ) | Consolidated Civil Action<br>No. 1:04-cv-1639 (RJL) |
| | ) | |
| Franklin Managed Trust, *et al*, | ) | |
| Plaintiffs, | ) | No. 1:06-cv-00139 (RJL) |
| v. | ) | |
| Federal National Mortgage Association, *et al.*, | ) | |
| Defendants. | ) | |

## [PROPOSED] ORDER DENYING DEFENDANT KPMG LLP'S MOTION TO DISMISS

The Court having considered KPMG LLP's Motion to Dismiss and the supporting documents thereto, the opposition papers and supporting documents thereto, the authorities cited by the parties, the oral argument of counsel, and the record in this case:

IT IS HEREBY ORDERED:

The motion by KPMG LLP to dismiss Plaintiffs' Second Amended Complaint in the matter of *Franklin Managed Trust, et al v Federal National Mortgage Association, et al.*, No. 1:06-cv-00139 (RJL) is DENIED in its entirety.

Dated this _____ day of _____, 2006.

_____
Judge Richard J. Leon
United States District Court Judge