## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE FANNIE MAE SECURITIES LITIGATION | No. 1:04-cv-01639 (RJL) |
| FRANKLIN MANAGED TRUST *et al*., <br><br> *Plaintiffs*, <br> v. <br><br> FEDERAL NATIONAL MORTGAGE ASSOCIATION *et al*., <br><br> *Defendants*. | No. 1:06-cv-00139 (RJL) |

## <u>MOTION OF DEFENDANT KPMG LLP TO DISMISS</u>
## <u>SECOND AMENDED CLASS ACTION COMPLAINT</u>

Defendant KPMG LLP respectfully moves to dismiss the claims against it in the Second

Amended Class Action Complaint. KPMG also adopts and incorporates by reference the

arguments raised by Fannie Mae and the individual defendants to the extent those arguments

apply to the claims against KPMG.

Respectfully submitted this 28th day of September 2006.

> /s/ Andrew S. Tulumello
> F. Joseph Warin (D.C. Bar No. 235978)
> Andrew S. Tulumello (D.C. Bar. No. 468351)
> Melanie L. Katsur (D.C. Bar No. 484969)
> Henry C. Whitaker (D.C. Bar No. 499210)
> GIBSON, DUNN & CRUTCHER LLP
> 1050 Connecticut Avenue, N.W.
> Washington, D.C. 20036
> Telephone: (202) 955-8500
> Facsimile: (202) 467-0539
>
> *Counsel for KPMG LLP*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE FANNIE MAE SECURITIES LITIGATION | No. 1:04-cv-01639 (RJL) |
| FRANKLIN MANAGED TRUST *et al.*, <br><br> *Plaintiffs*, <br> v. <br><br> FEDERAL NATIONAL MORTGAGE ASSOCIATION *et al.*, <br><br> *Defendants*. | No. 1:06-cv-00139 (RJL) |

**MEMORANDUM OF DEFENDANT KPMG LLP IN SUPPORT OF
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

F. Joseph Warin (D.C. Bar No. 235978)
Andrew S. Tulumello (D.C. Bar. No. 468351)
Melanie L. Katsur (D.C. Bar No. 484969)
Henry C. Whitaker (D.C. Bar No. 499210)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for KPMG LLP*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 4

      A.    Procedural History ........................................................................ 4

      B.    Plaintiffs' Liability Allegations Against KPMG ......................... 5

      C.    KPMG's Attempts To Prevent Fraud At Fannie Mae ................. 6

      D.    Plaintiffs' Reliance And Loss Allegations .................................. 8

SUMMARY OF ARGUMENT ....................................................................... 8

ARGUMENT ................................................................................................ 10

    I.    The Complaint Does Not Adequately Allege That KPMG Violated
        Section 10(b) And Rule 10b-5. ....................................................... 10

      A.    The Complaint Does Not Allege Facts With Particularity That
           Create A Strong Inference That KPMG Acted With Scienter. ....... 11

          1.    Plaintiffs' Allegations Demonstrate That KPMG Attempted
              To Prevent Fraud At Fannie Mae And Therefore Refute
              The Allegation That KPMG Conspired To Commit Fraud. .......... 14

          2.    Plaintiffs' Allegations That KPMG Violated GAAS And
              GAAP Do Not Establish Scienter. ................................................ 16

          3.    Allegations That Fannie Mae's Alleged Fraud Had A Large
              Effect On The Financial Statements Do Not Establish That
              KPMG Acted With Scienter. ......................................................... 19

          4.    Allegations That KPMG Received Fees From Fannie Mae
              Do Not Establish That KPMG Acted With Scienter. .................... 20

          5.    Allegations That KPMG Had Access To Fannie Mae's
              Records Do Not Establish That KPMG Acted With
              Scienter. ....................................................................................... 22

6.      Allegations That KPMG Knew Of What Plaintiffs Characterize As "Red Flags" Do Not Establish That KPMG Acted With Scienter. .......................................................................23

7.      The Allegations Regarding Roger Barnes And The Audit Difference Posted By KPMG In 1998 Do Not Establish That KPMG Acted With Scienter. .................................25

8.      Plaintiffs Have Not Pleaded Facts With Particularity That Collectively Warrant A Strong Inference That KPMG Acted With Extreme Recklessness. .................................28

B.      Plaintiffs Have Not Adequately Pleaded Loss Causation. .........................29

II.     Any Reliance On KPMG's Audit Opinions After September 21, 2004, Was Unreasonable As A Matter Of Law. ............................................................32

CONCLUSION .........................................................................................................................36

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................................32

*D.E. & J. Ltd. P'ship v. Conaway*,
284 F. Supp. 2d 719 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005)..............3, 13

*Davis v. SPSS, Inc.*,
385 F. Supp. 2d 697 (N.D. Ill. 2005) .............................................................24

*Decker v. Massey-Ferguson, Ltd.*,
681 F.2d 111 (2d Cir. 1982)............................................................................12

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ..........................................................................20

*DSAM Global Value Fund v. Altris Software, Inc.*,
288 F.3d 385 (9th Cir. 2002) .............................................................12, 18, 22

*Duncan v. Pencer*,
94 Civ. 0321, 1996 WL 19043 (S.D.N.Y. Jan. 18, 1996)................................21

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)............................................................................ *passim*

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
343 F.3d 189 (2d Cir. 2003)............................................................................31

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)..................................................................................11, 18

*Ezra Charitable Trust v. Tyco Int'l, Ltd.*,
No. 05-2762, 2006 WL 2742561 (1st Cir. Sept. 27, 2006).........................16, 17, 18

*Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*,
395 F.3d 851 (8th Cir. 2005) .....................................................................16, 19

*Fidel v. Farley*,
392 F.3d 220 (6th Cir. 2004) .............................................................4, 16, 19, 22

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ..........................................................................11

*Glaser v. Enzo Biochem, Inc.*,
    05-1920, 2006 WL 2692848 (4th Cir. Sept. 21, 2006)............................................30

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ................................................................................11

*Helwig v. Vencor, Inc.*,
    251 U.S. 540 (6th Cir. 2001) ................................................................................11

*In re Bisys Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)....................................................................4

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)................................................................................6

*In re CMS Energy Secs. Litig.*,
    236 F.R.D. 338 (E.D. Mich. 2006) ......................................................................34

*In re Data Access Sys. Sec. Litig.*,
    103. F.R.D. 130 (D.N.J. 1984)..............................................................................34

*In re Direct General Corp. Sec. Litig.*,
    398 F. Supp. 2d 888 (M.D. Tenn. 2005) ................................................................4

*In re Ikon Office Solutions Inc.*,
    277 F.3d 658 (3d Cir. 2002)................................................................13, 15, 25

*In re Interbank Funding Corp. Sec. Litig.*,
    329 F. Supp. 2d 84 (D.D.C. 2004), *vacated and remanded in part on other
    grounds sub. nom, Belizan v. Hershon*, 434 F.3d 579 (D.C. Cir. 2006)............22, 24

*In re LTV Sec. Litig.*,
    88 F.R.D. 134 (N.D. Tex. 1980) ..........................................................................34

*In re Melridge, Inc. Sec. Litig.*,
    No. 87-1426-JU, 1990 WL 117822  (D. Or. July 25, 1990)..................................34

*In re PEC Solutions, Inc. Sec. Litig.*,
    418 F.3d 379 (4th Cir. 2005) ................................................................................2

*In re Raytheon Sec. Litig.*,
    157 F. Supp. 2d 131 (D. Mass. 2001) ....................................................................4

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002)................................................................................11

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
    351 F. Supp. 2d 334 (D. Md. 2004)..........................................................4, 15, 23

iv

*In re SCB Computer Tech., Inc. Sec. Litig.*,
    149 F. Supp. 2d 334 (W.D. Tenn. 2001)..............................................................18, 19, 25, 26

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
    124 F. Supp. 2d 505 (S.D. Ohio 2000) ...............................................................................12

*In re Spear & Jackson Sec. Litig.*,
    399 F. Supp. 2d 1350 (S.D. Fla. 2005) .................................................................................4

*In re Stone & Webster, Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005)..........................................................................................22, 24

*In re Sunterra Corp. Sec. Litig.*,
    199 F. Supp. 2d 1308 (M.D. Fla. 2002)..............................................................................23

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
    382 F. Supp. 2d 1173 (N.D. Cal. 2004) ..............................................................................29

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) .......................................................................................2, 21

*Kriendler v. Chem. Waste Mgmt., Inc.*,
    877 F. Supp. 1140 (N.D. Ill. 1995) .....................................................................................34

*Mittman v. Rally's Hamburgers, Inc.*,
    278 F. Supp. 2d 831 (W.D. Ky. 2003)................................................................................18

*Nappier v. Pricewaterhouse Coopers LLP*,
    227 F. Supp. 2d 263 (D.N.J. 2002) .......................................................................................4

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ...................................................................................... *passim*

*Reiger v. PriceWaterhouseCoopers LLP*,
    117 F. Supp. 2d 1003 (S.D. Cal. 2000)...................................................................2, 3, 6, 19

*Riggs Partners LLC v. Hub Group, Inc.*,
    No. 02 C 1188, 2002 WL 31415721 (N.D. Ill. Oct. 25, 2002)..............................................24

*Robbins v. Koger Props., Inc.*
    116 F.3d 1441 (11th Cir. 1997) ..........................................................................................30

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..................................................................................................12

*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ............................................................................................11

*Semerenko v. Cendant Corp.*,
　223 F.3d 165 (3d Cir. 2000)..........................................................................30, 34, 35

*Shalala v. Guernsey Mem'l Hosp.*,
　514 U.S. 87 (1995).............................................................................................13

*Sparrow v. United Air Lines, Inc.*,
　216 F.3d 1111 (D.C. Cir. 2000)..........................................................................14

*Thor Power Tool Co. v. Comm'r*,
　439 U.S. 522 (1979)............................................................................................13

## Statutes

15 U.S.C. § 78u-4(b)(2) ........................................................................................10

15 U.S.C. § 78u-4(b)(4) ........................................................................................29

## Rules

Fed. R. Civ. P. 9(b) ...............................................................................................10

## Other Authorities

Staff Accounting Bulletin 99, 64 Fed. Reg. at 45152 ............................................26

## INTRODUCTION

Stripped of its conclusory and overheated rhetoric, the class plaintiffs' securities fraud case against KPMG LLP boils down to the allegation that KPMG made an incorrect auditing judgment that Fannie Mae's financial statements were materially compliant with GAAP. The class complaint therefore suffers from the same defect as the Franklin-Templeton complaint—a failing that is especially telling given that the class plaintiffs amended their complaint with the benefit of KPMG's already-filed motion to dismiss in the Franklin-Templeton action. Here, plaintiffs' *own* allegations, fairly construed, state that KPMG had a good faith basis for determining that Fannie Mae's financial statements complied with GAAP; that KPMG pushed Fannie Mae to improve its accounting practices; and that Fannie Mae withheld information that would have helped KPMG uncover the alleged fraudulent conduct of the company.

The law requires plaintiffs to plead much more than a misapplication of accounting principles to state a claim for securities fraud. The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes demanding pleading requirements on plaintiffs to plead securities fraud. And that demanding burden is at its apex in cases against auditors. Auditors are secondarily responsible for a company's financial statements—financial statements are the responsibility of *management*—and auditors have little incentive to participate in a company's fraud on its investors. Unlike Fannie Mae and its senior executives (whose compensation was allegedly tied directly to financial performance metrics), KPMG stood to gain nothing from such a conspiracy. Its incentive, and the incentive of its individual partners, would be to avoid any such "plot" and the onslaught of civil liability and reputational harm prompted by eventual revelation of the scheme.

The distinctive features of an auditor's role make plaintiffs' burden of pleading that KPMG committed fraud heavy indeed. Under the precedent established in Section 10(b) cases

against accountants, plaintiffs must plead and prove that KPMG deliberately participated with Fannie Mae and its executives to defraud investors. This is, after all, a *fraud* case. And that charge finds no support in the complaint's allegations. Whatever the legal sufficiency of plaintiffs' claims against Fannie Mae and the individual defendants may be, plaintiffs have not pleaded legally sufficient facts to support their fraud claims against KPMG.

Plaintiffs must overcome many legal obstacles that are unique to auditors to state a valid securities fraud claim. Those obstacles include:

- **"[M]isapplication of accounting principles by an independent auditor does not establish scienter**." *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 389 (4th Cir. 2005) (emphasis added; internal quotation marks and citation omitted).

- **"[T]he meaning of recklessness in securities fraud cases is especially stringent when the claim is brought against an outside auditor. Recklessness on the part of an independent auditor entails a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company."** *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004) (emphasis added; internal quotation marks, alteration, and citation omitted).

- **"Scienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all . . . ."** *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (emphasis added; internal quotation marks, alteration, and citation omitted).

The court in *Reiger v. PriceWaterhouseCoopers LLP*, 117 F. Supp. 2d 1003 (S.D. Cal. 2000), summarized the reasons why these stringent *pleading* requirements apply to auditors:

First, a large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud. Unlike the officers and directors of the companies it represents, an independent accountant has no ability to line its pockets through insider trading, and no incentive to cover up corporate mismanagement. The accountant's success depends on maintaining a reputation for honesty and integrity, **requiring a plaintiff to overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud of a single client**.

*Id.* at 1007 (emphasis added).

Second, an auditor necessarily possesses less information concerning the financial data that support the financial documents than does its client. Auditors, by definition, audit the financial statements that are *prepared by management*. Hence, "it is almost always more difficult to establish scienter on the part of the accountant than on the part of its client." *Id.* at 1007-08 (internal citations omitted).

> Finally,
>
> the report generated by an independent accountant often represents a **professional opinion** based on numerous and complex factors. Although ultimately expressed in shorthand form, the report is the final product of a complex process involving discretion and judgment on the part of the auditor at every stage. Using different initial assumptions and approaches, different sampling techniques, and the wisdom of 20-20 hindsight, few CPA audits are immune from criticism.

*Id*. at 1008 (emphasis added and internal quotation marks, alteration, and citation omitted). These considerations are simply not present in a claim against an issuer, and "make it **exceedingly** difficult for a securities plaintiff to plead facts suggesting that an independent accountant acted with the deliberate state of mind now required to withstand a motion to dismiss." *Id*. (emphasis added).

Not only must plaintiffs satisfy this particularly high pleading standard, but they also must do so with specific and particularized *facts*—not boilerplate legal conclusions. *See D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 740 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005) (noting that the PSLRA's pleading standards are even more stringent as against auditors because of the "auditor's dependence on information supplied by the client, application of complex accounting and auditing standards, and varying degrees of professional judgment") (citing *Reiger*, 117 F. Supp. 2d at 1008).

Given the more demanding pleading standard applicable to outside auditors, it is not surprising that courts regularly *grant* motions to dismiss by outside auditors while denying such

motions brought by defendants affiliated with the auditor's client.[1]  And dismissal of the claims

against KPMG is precisely what is warranted—and legally mandated—here.

## BACKGROUND

KPMG has already described the general background and context surrounding Fannie

Mae, KPMG, and the accounting standards Fannie Mae is alleged to have misapplied in its

motion to dismiss the Franklin-Templeton complaint.  *See* Mot. of Def. KPMG LLP to Dismiss

Am. Compl. at 4-13 [No. 06cv00139 D.E. 60][2] (July 17, 2006).  This memorandum will focus on

the specifics of the class plaintiffs' allegations.

### A.    Procedural History

As the court is aware, on September 23, 2004—the day after OFHEO released its interim

report detailing allegations of accounting fraud at Fannie Mae—plaintiffs filed the first of several

putative class actions against Fannie Mae and several of its senior executives.  The actions were

consolidated; the Court appointed lead plaintiffs and counsel; and in March 2005, the lead

plaintiffs filed a single, consolidated complaint on behalf of the class.

---

[1]  *See, e.g.*, *Fidel v. Farley*, 392 F.3d 220, 223 (6th Cir. 2004) (noting that the district court denied motions to dismiss brought by the company defendants but granted it as to the outside auditor, and affirming district court's judgment as to the outside auditor); *In re Cardinal Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 719, 779-80 (S.D. Ohio 2006) (finding that plaintiffs adequately pleaded scienter against executives but not against outside auditor); *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 898-900 (M.D. Tenn. 2005) (same); *In re Bisys Sec. Litig.*, 397 F. Supp. 2d 430, 449-50 (S.D.N.Y. 2005) (same); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 385 (D. Md. 2004) (same); *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1359, 1362-64 (S.D. Fla. 2005) (same); *Nappier v. Pricewaterhouse Coopers LLP*, 227 F. Supp. 2d 263, 268, 281-82 (D.N.J. 2002) (noting that motions to dismiss were denied against company defendants in related proceedings but granting outside auditors' motion to dismiss as to claim arising out of the same facts); *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 154, 156 (D. Mass. 2001) (same).

[2]  "D.E." refers to the docket entry and is followed by the docket entry number.

In January 2006, the Franklin-Templeton funds filed a separate opt-out action asserting claims virtually identical to those asserted in the class action complaint. The Franklin-Templeton plaintiffs also named numerous additional defendants, including Fannie Mae's board of directors and audit committee, and KPMG. On May 15, 2006, KPMG moved to dismiss the *Franklin-Templeton* action, asserting, among other arguments, that the opt-out complaint insufficiently pleaded the scienter and loss causation elements of the Section 10(b) cause of action asserted against KPMG.

On June 29, 2006—the day before their opposition to KPMG's motion to dismiss was due—the Franklin-Templeton plaintiffs filed an amended complaint. The complaint asserted a host of new allegations against KPMG purportedly based on the February 2006 release of the Rudman Report and the May 2006 release of OFHEO's final investigative report on Fannie Mae's accounting practices. KPMG moved to dismiss that complaint on July 17, 2006.

On August 14, 2006, the class plaintiffs filed their own amended Second Amended Class Action Complaint. Like the Franklin-Templeton plaintiffs' amended complaint, the new allegations in plaintiffs' amended complaint heavily relied on the Rudman Report and the final OFHEO report. For the first time in this litigation, class plaintiffs' complaint named KPMG as a defendant, along with Goldman Sachs.

### B.    Plaintiffs' Liability Allegations Against KPMG

Plaintiffs' complaint largely tracks the Franklin-Templeton plaintiffs' allegations against KPMG. Plaintiffs allege that KPMG violated GAAS in its audits of Fannie Mae and issued fraudulent audit opinions on Fannie Mae's financial statements for the years ending on December 31, 2001, 2002, and 2003. Second Am. Class Action Compl. ¶¶ 8, 24, 316, 403-407. Acknowledging the heavy burden they bear of pleading that KPMG acted with the required scienter, plaintiffs labor mightily to state a claim against KPMG in a section entitled "KPMG

Knew or Recklessly Disregarded That Its 2001, 2002, and 2003 Audit Opinions Were Materially

False and Misleading."  Second Am. Class Action Compl. ¶¶ 316-407 at pp. 269-307.[3]

Plaintiffs allege various facts that they claim show KPMG participated in the alleged

fraud at Fannie Mae, including:

1. KPMG objected to Fannie Mae's deferral of a $199 million expense in 1998, and then listed the $199 million as an "audit difference" when Fannie Mae rejected KPMG's recommendation.  Second Am. Class Action Compl. ¶¶ 320-324.

2. After hearing the concerns expressed by Roger Barnes (a Fannie Mae employee) about Fannie Mae's internal accounting controls and management's response, KPMG performed an investigation of Mr. Barnes' complaints that was insufficient and dismissed his concerns.  Second Am. Class Action Compl. ¶¶ 338-346.

3. KPMG reviewed and approved Fannie Mae's FAS 91 and 133 accounting policies and mistakenly concluded that they were materially compliant with GAAP.  Second Am. Class Action Compl. ¶¶ 84, 90, 326-337, 352-381.

4. KPMG violated GAAS by not investigating Fannie Mae's accounting practices with sufficient thoroughness.  Second Am. Class Action Compl. ¶¶ 385-394.

5. KPMG should have known about Fannie Mae's GAAP violations because of the scope and magnitude of Fannie Mae's alleged fraud and because Fannie Mae's corporate culture stressed excellent earnings performance.  Second Am. Class Action Compl. ¶396-398.

6. KPMG had a financial motive to participate in Fannie Mae's fraud because of the fees it received from Fannie Mae.  Second Am. Class Action Compl. ¶¶ 318, 400-402.

## C.    KPMG's Attempts To Prevent Fraud At Fannie Mae

While plaintiffs' complaint is notably bereft of any specific allegation that KPMG

knowingly participated in the alleged scheme to smooth Fannie Mae's earnings and hit earnings

---

[3] GAAP "comprise[s] a set of basic postulates and broad accounting principles pertaining to business enterprises.  These principles, approved by the [AICPA], establish guidelines for measuring, recording and classifying the transactions of a business entity."  *Reiger*, 117 F. Supp. 2d at 1009.  GAAP does not prescribe a fixed set of rules, but rather represents "the range of reasonable alternatives that management can use."  *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1421 n.10 (3d Cir. 1997) (citation omitted).  In contrast, GAAS "embod[ies] the general standards prescribed by the AICPA for the conduct of auditors in the performance of an examination."  *Reiger*, 117 F. Supp. 2d at 1009.

targets to help management reap bonuses, the allegations of the complaint demonstrate that

KPMG pushed Fannie Mae to improve its accounting practices.  According to plaintiffs' own

allegations, KPMG repeatedly refused to rubber-stamp Fannie Mae's accounting practices.

KPMG listed formal audit differences with Fannie Mae's accounting when it disagreed with

Fannie Mae.  *See* Second Am. Class Action Compl. ¶¶ 84, 320-322, 359 ("KPMG . . . proposed

an audit difference for the unrecorded catch-up calculation.").  KPMG also prodded Fannie Mae

to develop better accounting policies and systems, Second Am. Class Action Compl. ¶¶ 324, 329

("KPMG requested that management develop a policy formalizing the Company's SFAS 91

accounting practice."), and performed testing of the company's systems for complying with FAS

133, Second Am. Class Action Compl. ¶¶ 380, 393 (describing KPMG's "testing of Fannie

Mae's systems to implement SFAS 133").  KPMG also pushed Fannie Mae to investigate

whether "whistleblowers" within the company had raised concerns about Fannie Mae's

accounting.  Second Am. Class Action Compl. ¶ 344.  After Roger Barnes alleged that Fannie

Mae's accounting practices were improper, KPMG "recommended that Fannie Mae examine

employees' e-mails to determine if other employees in the Controller's office had raised issues

internally that had not been addressed properly."  Second Am. Class Action Compl. ¶ 344.

Notably, according to the complaint, KPMG's efforts were also undermined by Fannie

Mae's management.  According to plaintiffs, Fannie Mae deliberately *withheld* from KPMG

information that might have led KPMG to conclude that its accounting practices were not GAAP

compliant.  Second Am. Class Action Compl. ¶ 88.  For example, plaintiffs allege that, in an

internal memorandum, management specifically noted that it was concealing from KPMG the

fact that its accounting for interest-only mortgage-backed securities was flawed.  *See* Second

Am. Class Action Compl. ¶ 88 ("[W]e have not brought these issues to their attention . . . .  [I]f

they [KPMG] stumble across these packages, may [sic] not be as easily convinced of the current accounting treatment."). Fannie Mae's management also concealed KPMG's objections from the Board when KPMG posted an audit difference. Second Am. Class Action Compl. ¶ 83 ("Further, the Individual Defendants withheld this information from the Board and also withheld from the Board the fact that KPMG had noted an audit difference for the remaining $199 million."). As set forth below, these allegations conflict with—if not entirely undermine—the theory that KPMG deliberately perpetrated a Section 10(b) fraud on investors.

### D. Plaintiffs' Reliance And Loss Allegations

Plaintiffs represent a putative class generally comprised of those who invested in Fannie Mae stock and options from April 17, 2001 through September 27, 2005. Second Am. Class Action Compl. ¶¶ 1, 440. Plaintiffs ask the Court to presume that, throughout this period, the class members invested in Fannie Mae stock and options in reliance on KPMG's purportedly false audit opinions. Second Am. Class Action Compl. ¶¶ 449-452. They claim that the price of these holdings dropped significantly between September 21, 2004 and September 28, 2005, and that this drop was attributable to the revelation of Fannie Mae's accounting fraud that "was gradually revealed to the market" throughout that time. Second Am. Class Action Compl. ¶ 454. Notably, there is no allegation that any of the class members have realized these losses by selling their stock, much less when such sales occurred or what loss the class purportedly sustained.

## SUMMARY OF ARGUMENT

This complaint must be dismissed as to KPMG for several reasons.

*First*, the complaint fails to allege particular facts that lead to the strong inference that KPMG acted with extreme recklessness or fraudulent intent, or deliberately conspired to enrich Fannie Mae officers by committing fraud. To begin with, plaintiffs' own allegations establish that KPMG tried to prevent, not abet, Fannie Mae's fraud by policing Fannie Mae's accounting

8

practices.  These allegations are entirely inconsistent with plaintiffs' 10(b) fraud theory.

Plaintiffs' allegations, moreover, in substance amount to nothing more than the claim that Fannie

Mae's application of GAAP was incorrect and that KPMG failed to follow GAAS procedures.

But these allegations—which are not uncommon in securities fraud suits against accountants—at

most state a claim for professional negligence, not fraud.  Courts have repeatedly rejected efforts

by plaintiffs to meet the scienter requirements simply by pleading that there were GAAP and

GAAS errors and that both were dramatic and obvious.

Second, plaintiffs also fail to plead specific facts showing that KPMG's conduct caused

the losses they allege they sustained.  Under Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S.

336 (2005), plaintiffs must allege that conduct by KPMG—and not some other source—

proximately caused their loss.  Plaintiffs make no effort to establish that KPMG's audit work—

as opposed to the many alleged acts of the Fannie Mae defendants (such as the allegedly

misleading public statements made by Fannie Mae's officers to the marketplace)—was the legal

cause of their loss.  Moreover, the complaint is devoid of any specific allegation identifying

when plaintiffs sold their shares or what loss they suffered.

Third, at a bare minimum, the court should dramatically truncate the alleged loss period

of the putative class.  Plaintiffs apparently seek to recover damages for the drop in Fannie Mae's

stock price that occurred from September 22, 2004 through September 27, 2005—a period that

would cover stock purchases by investors for more than a full year after OFHEO published its

detailed report and after the first of the putative class actions were filed.  Any reliance on Fannie

Mae's financial statements and KPMG's audit opinions after the disclosure of the OFHEO

report—which alleged that Fannie Mae's financial statements were pervaded by serious

accounting errors—would have been unreasonable as a matter of law.  At the very least, there is

no way any investor reasonably could have relied on Fannie Mae's financial statements after December 22, 2004, when Fannie Mae publicly warned investors that its financial statements "should no longer be relied upon because such financial statements were prepared applying accounting practices that did not comply with generally accepted accounting principles." Second Am. Class Action Compl. ¶ 61. And yet, that is precisely what plaintiffs allege. *See* Second Am. Class Action Compl. ¶¶ 449-452.

## ARGUMENT

**I.    The Complaint Does Not Adequately Allege That KPMG Violated Section 10(b) And Rule 10b-5.**

Plaintiffs have failed to state a legally sufficient claim that KPMG violated Section 10(b) and Rule 10b-5. To state a claim for relief under those provisions, they must allege that KPMG (1) made a material misrepresentation or omission, (2) in connection with the purchase and sale of a security, and (3) acted with scienter; that (4) plaintiffs relied on these misrepresentations; and that (5) KPMG's misrepresentation caused plaintiffs economic loss. *Dura Pharm.*, 544 U.S. at 341-42.

Plaintiffs shoulder a heavy burden of pleading that KPMG made these statements with scienter. Federal Rule of Civil Procedure 9(b) and the PSLRA together require plaintiffs to plead elements of their claim for securities fraud with particularity. "In all averments of fraud or mistake," Rule 9(b) instructs, "the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). And the PSLRA imposes *additional*—and even more stringent—pleading requirements. It requires not simply that the complaint state facts (as opposed to legal conclusions) "with particularity" with respect "to each act or omission alleged," but also that the particular facts "giv[e] rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "In other words, not only must the

complaint make particular factual allegations, but the inference of scienter which those allegations generate must be strong."  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 682 (6th Cir. 2004).

The PSLRA therefore significantly differs from traditional pleading standards.  The particular facts pleaded in the complaint must give rise to a strong inference of scienter.  That means that if the complaint admits two or more reasonable inferences—fraud and no fraud—the court can, and should, infer that no fraud occurred.[4]  Plaintiffs' complaint does not satisfy these pleading requirements.

**A.**    **The Complaint Does Not Allege Facts With Particularity That Create A Strong Inference That KPMG Acted With Scienter.**

Plaintiffs have failed to "state with particularity facts giving rise to a strong inference that" KPMG "acted with the required state of mind."  Section 10(b) makes actionable only false statements that are "knowing or intentional."  *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197 (1976).  That standard "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially [inflating] the price of securities."  *Id.* at 199.  In the D.C. Circuit, this standard is demanding.  It means "**extreme** recklessness" indicating an "**extreme** departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been

---

[4]  *See Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (holding that PSLRA requires "**all** reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs" (emphasis in original)); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (holding that the "strong inference" requirement means that "plaintiffs are entitled only to the most plausible of competing inferences"); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001) (holding that under the PSLRA, "inferences of scienter survive a motion to dismiss only if they are both reasonable and strong inferences" (internal quotation marks and citation omitted)); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 224 (3d Cir. 2002).

aware of it." *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992) (quotation marks omitted) (emphases added).

As high as that burden is, it is even higher where, as here, the defendant is an independent auditor alleged to have issued misleading audit opinions in violation of the federal securities laws. To begin with, "[r]ecklessness on the part of an independent auditor entails a mental state **so culpable that it 'approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company**.'" *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004) (quoting *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982)) (emphasis added); *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (same). "When the standard of recklessness for an auditor is overlaid with the pleading requirements of the PSLRA, a simple rule emerges: to allege that an independent accountant or auditor acted with scienter, the complaint must allege specific facts showing that the deficiencies in the audit were so severe that they strongly suggest that the auditor must have been aware of the corporation's fraud." *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 505, 514 (S.D. Ohio 2000); *see DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388-89 (9th Cir. 2002) (plaintiffs "must 'plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct'" (citation omitted)).

This standard is even more exacting where the statement is an opinion, rather than a historical fact. All of the "misrepresentations" the complaint attributes to KPMG fall squarely within the realm of opinion. Plaintiffs point only to three opinions attributable to KPMG: audit opinions KPMG issued on Fannie Mae's financial statements for the years ending on December 31, 2001, 2002, and 2003. Second Am. Class Action Compl. ¶¶ 403-407. In those opinions, KPMG noted that while Fannie Mae's "financial statements are the responsibility of Fannie

Mae's management," "[i]n our opinion," the financial statements "present[ed] fairly, in *all material respects*, the financial position of Fannie Mae" in those calendar years "in conformity with" GAAP (emphasis added).

"[I]n issuing an opinion," however, "the auditor certifies only that it exercised appropriate, not flawless, levels of professional care and judgment." *In re Ikon Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 673 (3d Cir. 2002); *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995) (noting that "GAAP is not [a] lucid or encyclopedic set of pre-existing rules"). Audit opinions do not guarantee the accuracy of Fannie Mae's financial data. *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979) (noting that GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management").

Indeed, it is widely recognized that a "statement of opinion is not the same as a statement of historical fact. Instead, it is an expression of belief, made by an actor at a particular time, under particular conditions, and based on known information." *D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 740 (E.D. Mich. 2003), *aff'd,* 133 F. App'x 994 (6th Cir. 2005). Opinions by auditors "generally involve issues such as the auditor's dependence on information supplied by the client, application of complex accounting and auditing standards, and varying degrees of professional judgment." *Id.* The burden is therefore much higher for plaintiffs to plead scienter in this context.

Plaintiffs' complaint alleges no particular facts, either taken individually or collectively, that warrant the strong inference that KPMG knowingly conspired with Fannie Mae or otherwise engaged in conduct to make any of the three KPMG audit opinions otherwise intentionally false or misleading. Instead, plaintiffs have alleged, at most, that KPMG mistakenly concluded that

Fannie Mae's financial statements materially complied with GAAP.  That is simply not enough to establish Section 10(b) liability.

> **1.      Plaintiffs' Allegations Demonstrate That KPMG Attempted To Prevent Fraud At Fannie Mae And Therefore Refute The Allegation That KPMG Conspired To Commit Fraud.**

Far from showing that KPMG intentionally participated in fraud at Fannie Mae, plaintiffs' complaint in fact alleges that KPMG conducted a rigorous audit and that Fannie Mae deliberately concealed information that would have enabled KPMG to uncover fraud.  Those allegations doom plaintiffs' complaint, for it is well established that a plaintiff can plead himself out of court by alleging facts showing that he is *not* entitled to relief.  *See, e.g.*, *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000).

Plaintiffs' own allegations belie the notion that KPMG was complicit in fraud at Fannie Mae.  KPMG did not rubber stamp Fannie Mae's accounting.  Instead, it posted audit differences when it disagreed with Fannie Mae, even though KPMG concluded that the differences were immaterial to the financial statements as a whole.  *See* Second Am. Class Action Compl. ¶¶ 83, 320-322, 359.  If KPMG intended to defraud Fannie Mae's investors, it surely would not have posted formal audit differences.  Moreover, KPMG prodded Fannie Mae to improve its accounting when it disagreed with Fannie Mae.  For example, "[i]n January 1999, after noting its audit difference for the unrecognized catch-up expense of $199 million . . . KPMG requested that management develop a policy formalizing the Company's SFAS 91 accounting practice."  Second Am. Class Action Compl. ¶ 324.  That allegation is fundamentally at war with the suggestion that KPMG intended to deceive investors.  KPMG also tested the company's systems for complying with FAS 133.  Second Am. Class Action Compl. ¶¶ 380, 393.  And when Roger Barnes alleged that Fannie Mae's accounting practices were improper, KPMG "recommended that Fannie Mae examine employees' e-mails to determine if other employees in the Controller's

office had raised issues internally that had not been addressed properly." Second Am. Class Action Compl. ¶ 344.

Those allegations fatally undermine any suggestion that this complaint adequately pleads scienter under Section 10(b) standards. And other courts have dismissed Section 10(b) claims against accountants precisely on this basis. *See In re Royal Ahold N.V. Sec. & ERISA Litig*, 351 F. Supp. 2d 334, 389 (D. Md. 2004) (finding that plaintiffs inadequately pleaded scienter against an auditor because plaintiffs' scienter allegations were "contradicted by other allegations in the plaintiffs' complaint, which demonstrate that the [auditor] defendants had in fact encouraged [the audited company] to improve [its] internal controls"). In *In re Royal Ahold*, as in this case, the plaintiffs alleged that the auditor knew of accounting problems at the company. The court granted the auditor's motion to dismiss, noting that the auditor's alleged "awareness" of accounting problems cut against scienter where the auditor was "actively raising the issue of weak internal controls with Royal Ahold's management." *Id.* at 387; *see also In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 690, 698 (E.D. Pa. 2001), *aff'd* 277 F.3d 658 (3d. Cir. 2002) (finding that allegations that showed an auditor's efforts to "to try to ferret out and improve the faulty controls" undercut plaintiffs' scienter claims).

A complaint that concedes that an auditor did much to encourage its client to present its statements in accordance with GAAP cannot create a strong inference that the auditor was extremely reckless or intentionally fraudulent in concluding that the company's financial statements materially complied with GAAP. This principle is dispositive here, and requires dismissal.

2.    **Plaintiffs' Allegations That KPMG Violated GAAS And GAAP Do Not Establish Scienter.**

The vast bulk of plaintiffs' scienter allegations founder on the settled rule that allegations of violations of GAAP and GAAS do not in and of themselves establish at the pleading stage that an outside auditor engaged in the type of extremely reckless or intentional misconduct that creates liability under Section 10(b) and Rule 10b-5.  *See*, *e.g.*, *Fidel*, 392 F.3d at 230 ("the failure to follow generally accepted accounting procedures does not in and of itself lead to an inference of scienter"); *PR Diamonds*, 364 F.3d at 694 ("[i]t is well-settled that violations of GAAP and GAAS, standing alone, do not create an inference of scienter, much less a strong one"); *Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395 F.3d 851, 855 (8th Cir. 2005) (citing cases).

And that is the core of the class plaintiffs' claims.  A large portion of plaintiffs' scienter allegations, for example, consist of a list of various accounting errors at Fannie Mae, lists of various GAAS principles, coupled with a conclusory allegation that KPMG violated GAAS by virtue of issuing unqualified audit opinions on Fannie Mae's financial statements.  Second Am. Class Action Compl. ¶¶ 385-394.  These are pure allegations of accounting errors, and it is well settled that they are not sufficient to plead extremely reckless or intentional misconduct sufficient to show securities fraud.  *See Ezra Charitable Trust v. Tyco Int'l, Ltd.*, No. 05-2762, 2006 WL 2742561 (1st Cir. Sept. 27, 2006) (slip. op. at 27) (rejecting argument that a "conclusorily presented 'laundry list' of alleged GAAS violations" contributed significantly to a strong inference of an auditor's scienter); *PR Diamonds*, 364 F.3d at 694; *Ferris, Baker Watts*, 395 F.3d at 855.

Plaintiffs' complaint also alleged that KPMG "knew" of the various accounting policies the SEC and OFHEO found, with the benefit of hindsight, not to be compliant with GAAP.

Second Am. Class Action Compl. ¶¶ 326-331 (alleging that KPMG knew about Fannie Mae's amortization policy), 332-338 (alleging that KPMG knew about discretionary adjustments to Fannie Mae's income statement), 357-364, 366-367, 369-370, 372 (alleging that KPMG knew about Fannie Mae's FAS 133 policy), 382-384 (KPMG knew about the company's practice of classifying securities under FAS 115, and of accounting for accrued interest expense). But these add nothing to plaintiffs' other allegations of accounting errors—particularly given the complexity of these standards. Plaintiffs have acknowledged the complexity of these allegations. Lead Pls' Mem. in Opp'n to Defs' Mots. to Dismiss the Am. Consolidated Class Action Compl. and Def. Fannie Mae's Request for Judicial Notice at 5 [04cv01639 D.E. 190] (July 25, 2006) (calling the accounting at issue in this case "highly technical"). In *Ezra*, for example, the First Circuit affirmed the dismissal of a Section 10(b) complaint against an auditor on the ground that scienter had not been properly pleaded. The court held that scienter had not been established given the "complex" nature of the allegedly misapplied accounting principles. *See Ezra*, 2006 WL 2742561 (slip op. at 25).

Plaintiffs also note instances in which KPMG allegedly observed that Fannie Mae's accounting for certain issues did not strictly comply with GAAP. *See* Second Am. Class Action Compl. ¶¶ 357, 365, 368, 371. These allegations are nothing but red herrings. Although the complaint alleges some instances in which KPMG (allegedly) observed that Fannie Mae's accounting was not compliant with GAAP *as to that issue*, there is no allegation—not one—that KPMG *ever* believed that the statements in its audit opinions—e.g., that it had a reasonable basis for its opinions that the financial statements present fairly in all material respects the financial position in conformity with GAAP—was false. Whether those opinions were wrong or right, the complaint does not allege that KPMG ever *believed* they were wrong—an allegation necessary to

support its fraud claim. *See* Second. Am. Class Action Compl. ¶¶ 403-406; *compare* Second

Am. Class Action Compl. ¶ 359 (incorrectly stating that KPMG's audit opinions represented that

Fannie Mae's derivative accounting "complied with GAAP"), *with* Second Am. Class Action

Compl. ¶ 403-04, 406 (alleging that KPMG's three audit opinions represented that Fannie Mae's

financial statements were in material compliance with GAAP).

Indeed, *all* of plaintiffs' allegations of accounting errors reveal that KPMG purportedly

approved of Fannie Mae's alleged deviations from GAAP only because it determined that the

deviations were immaterial. *See* Second Am. Class Action Compl. ¶¶ 322, 329, 333-334, 336,

350, 353, 359, 368, 371-372. Although plaintiffs obviously disagree with that accounting

judgment, that is not a reason to hold KPMG liable for securities fraud. *See Mittman v. Rally's

Hamburgers, Inc.*, 278 F. Supp. 2d 831, 837 (W.D. Ky. 2003) (concluding that an auditor did not

act with scienter where it "evaluated the impact of the recommended adjustment on the financial

statements taken as a whole and concluded that the recommended adjustments were not

material"); *In re SCB Computer Tech., Inc. Securities Litigation*, 149 F. Supp. 2d 334, 367 (W.D.

Tenn. 2001) (finding that an auditor's knowledge of a deviation from GAAP did not contribute

to an inference of scienter where the auditor did not "act[] in bad faith in treating the proposed

adjustments as immaterial").

The key point is that the complaint's allegations of accounting errors here lack particular

facts showing that KPMG issued false audit opinions intentionally or with extreme recklessness

in order to help Fannie Mae and certain officers achieve bonus targets and smooth earnings

growth. Even if plaintiffs *had* properly pleaded a claim that that KPMG did not exercise the

appropriate duty of care, that its audits were fundamentally flawed, that accounting for certain

issues did not comply with GAAP, and that its practices did not reflect the exercise of ordinary

diligence, dismissal would be appropriate, because such claims of purported negligence are not cognizable under Section 10(b). "Even if one deemed [an auditor's] failure to discover a problem negligent or perhaps **inexcusably negligent**, that is well short of the conscious misconduct or extreme recklessness necessary to allege scienter." *Ezra*, 2006 WL 2742561 (slip op. at 26 n.10); *see also Ernst & Ernst*, 425 U.S. at 215; *DSAM*, 288 F.3d at 390 ("mere allegations that an accountant negligently failed to closely review files or follow GAAP cannot raise a strong inference of scienter"). Even a "**seriously botched audit**," *id.* at 387—one that plainly does not comply with GAAS—is not actionable under Section 10(b) as a matter of law. *See, e.g.*, *Fidel*, 392 F.3d at 230; *PR Diamonds*, 364 F.3d at 694; *Ferris, Baker Watts*, 395 F.3d at 855. Yet that is at most what plaintiffs have alleged here.

### 3. Allegations That Fannie Mae's Alleged Fraud Had A Large Effect On The Financial Statements Do Not Establish That KPMG Acted With Scienter.

Plaintiffs also allege that the size of the restatement is so large as to establish that KPMG must have acted with scienter when issuing its audit opinions. Second Am. Class Action Compl. ¶¶ 396-397. But the size of the restatement is largely an artifact of how large Fannie Mae's investment portfolio is and is not an allegation sufficient to show that KPMG committed fraud. In any event, "[a]llowing an inference of scienter based on the magnitude of fraud 'would eviscerate the principle that accounting errors alone cannot justify a finding of scienter.'" *Fidel*, 392 F.3d at 231 (quoting *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 359 (W.D. Tenn. 2001)). Moreover, "[i]t would also allow the court to engage in speculation and hindsight, both of which are contrary to the PSLRA's mandates." *Id.* In particular,

> [i]nferring scienter from the magnitude of fraud invites a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show that the accountant acted with scienter . . . and obscure[s] the potentially infinite number of innocuous reasons an accountant may fail to detect a fraud of large magnitude. For example, the magnitude of the fraud could flow from improprieties in transactions that

fell outside the scope of the audit, or from manipulations the company concealed from its accountant and the public.

*Reiger v. PriceWaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000).  The

PSLRA does not permit this:  it requires securities fraud plaintiffs to plead particular *facts*

demonstrating KPMG's awareness of the fraud, not simply the fraud itself.

> **4.    Allegations That KPMG Received Fees From Fannie Mae Do Not Establish That KPMG Acted With Scienter.**

Nor do plaintiffs adequately allege scienter by alleging that KPMG had a motive to

commit fraud.  Second Am. Class Action Compl. ¶¶ 400-402.  Notably, KPMG entirely lacks the

principal motive the complaint attributes to the Fannie Mae's executives who orchestrated the

alleged fraud:  to reap lucrative financial rewards by hitting earnings targets and selling Fannie

Mae stock at artificially inflated prices.  Second Am. Class Action Compl. ¶¶ 186-209.  KPMG's

"motive" for perpetrating this purported fraud, the complaint alleges, was quite different and far

more modest:  to earn fees from Fannie Mae from 1998-2003 for professional services rendered.

Second Am. Class Action Compl. ¶¶ 400-402.

Plaintiffs' theory is inadequate to establish scienter as a matter of law.  Absent

particularized factual allegations, the law does not permit an inference that KPMG would invite

massive legal liability and risk its reputation for $53 million in fees in a time period in which the

firm earned billions of dollars in revenue annually.  Indeed, plaintiffs allege misconduct by

KPMG from 2001-2003, during which time KPMG earned only about $6.1 million in audit fees

from the Fannie Mae engagement.  *See* Second Am. Class Action Compl. ¶ 400.  There is no

allegation or explanation, moreover, for why KPMG's professionals would jeopardize their

careers by defrauding investors in this way.  Plaintiffs in securities fraud cases are not permitted

to have the court draw illogical and fundamentally irrational "inferences" at the motion to

dismiss stage.  As Judge Easterbrook has explained, "[a]n accountant's greatest asset is its

reputation for honesty, followed closely by its reputation for careful work.  Fees for two years'

audits"—no less than the three years of audits at issue here—"could not approach the losses

[KPMG] would suffer from a perception that it would muffle a client's fraud," *DiLeo v. Ernst &*

*Young*, 901 F.2d 624, 629 (7th Cir. 1990), let alone from the resulting legal liability.  *See also In*

*re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 n.7 (9th Cir. 1994) ("[i]t is highly

improbable that an accountant would risk surrendering a valuable reputation for honesty and

careful work by participating in a fraud merely to obtain increased fees" (citation and internal

quotation marks omitted)).

Judge Preska similarly concluded that it is irrational to "infer" that an accounting firm

would commit fraud to procure fees:

> I am not prepared to assume . . . that a Big Six (or, indeed, other) accounting firm like
> Coopers & Lybrand would knowingly condone a client's fraud in order to preserve a fee
> that, at best, is an infinitesimal percentage of its annual revenues and, by doing so,
> jeopardize its reputation and license, as well as subject itself to potential damages literally
> tens of thousands of times as large as its fee and subject the partner involved to potential
> professional and financial extinction.  Such action by certified public accountants would
> be economically irrational.  As such, it makes no sense . . . and no court should leap to
> this conclusion absent facts from which one could infer such manifestly economically
> irrational behavior by these professionals.

*Duncan v. Pencer*, No. 94 Civ. 0321, 1996 WL 19043, at *10 (S.D.N.Y. Jan. 18, 1996)

(citation omitted).  That principle is conclusive here.  *See*, *e.g.*, *In re Rockefeller Ctr. Props., Inc.*

*Sec. Litig.*, 311 F.3d at 224.

Even an allegation that KPMG's fees from Fannie Mae were a "large percentage" of its

total revenue would have been insufficient to plead KPMG's scienter—and plaintiffs have not

even made such an allegation.  *See In re Cardinal Health*, 426 F. Supp. 2d at 766 (declining to

infer an auditor's scienter from allegation that auditor "received a large percentage of its total

fees for its non-audit work" from the client accused of accounting fraud).  Otherwise, any auditor

who did not work for free would face liability for securities fraud for audit failures.  If these facts were sufficient to establish that an auditor knowingly engaged in fraud, the PSLRA would be a dead letter.  That is why courts have recognized that "absent truly extraordinary circumstances, an auditor's motivation to continue a profitable business relationship is not sufficient by itself to support a strong inference of scienter."  *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 215 (1st Cir. 2005).  Plaintiffs' allegations create no "strong inference" that KPMG knew of any misconduct on Fannie Mae's part.

> **5.    Allegations That KPMG Had Access To Fannie Mae's Records Do Not Establish That KPMG Acted With Scienter.**

Also insufficient is plaintiffs' allegation that KPMG had the "opportunity" to commit fraud because it had access to Fannie Mae's internal financial and corporate business information.  Second Am. Class Action Compl. ¶ 372.  Allegations that an auditor "had access to . . . documents that revealed" accounting fraud do "not strongly compel an inference of intentional or deliberately reckless conduct."  *DSAM*, 288 F.3d at 390.  Nowhere do plaintiffs allege what KPMG "might have learned from its access to the company's confidential information, what [it] might have known based on its consulting engagement, or even what documents [it] reviewed as part of its 'unfettered access.'"  *Fidel*, 392 F.3d at 229-30.  Indeed, as Judge Bates observed, "were plaintiffs' theory correct, all GAAP violations of a certain magnitude would give rise to a cause of action under Section 10(b) and Rule 10b-5 against an issuer's brokers and accountants."  *In re Interbank Funding Corp. Sec. Litig.*, 329 F. Supp. 2d 84, 90 (D.D.C. 2004), *vacated and remanded in part on other grounds sub nom. Belizan v. Hershon*, 434 F.3d 579 (D.C. Cir. 2006).

Every auditor has access to a company's internal books and records and charges fees.  To hold that these generic allegations of "motive and opportunity" give rise to the strong inference

that an auditor engaged in extremely reckless conduct would eviscerate the PSLRA's requirement to plead particular facts demonstrating fraud. As Judge Bates has noted, "that is not the law." *In re Interbank Funding Corp. Sec. Litig.*, 329 F. Supp. 2d at 90.

6.    **Allegations That KPMG Knew Of What Plaintiffs Characterize As "Red Flags" Do Not Establish That KPMG Acted With Scienter.**

Plaintiffs also allege that KPMG acted with scienter because it overlooked "red flags." Second Am. Class Action Compl. ¶¶ 397-398. "However, the mere fact that an auditor missed what a plaintiff labels warning signs gives little support on its own to the conclusion that an auditor was reckless, much less wilfully blind, with respect to the falsity of information in a financial statement." *In re Stone & Webster, Inc.*, 414 F.3d at 214. Here, as in *In re Stone & Webster*, "the so-called 'red flags' [are] so described without particularized allegations supporting the recklessness of [KPMG] in missing them when conducting its audits." *Id.*

The only "red flags" plaintiffs allege are that Fannie Mae's executive compensation was tied to earnings, and that Fannie Mae had a corporate culture that stressed meeting earnings expectations. Second Am. Class Action Compl. ¶¶ 397-398. "It is not uncommon, however, for large, publicly held companies to tie compensation to earnings results or to have aggressive growth strategies," and therefore these features are not inherently suspicious. *In re Royal Ahold*, 351 F. Supp. 2d at 388; *see also In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1334 (M.D. Fla. 2002) (rejecting argument that a company's "aggressive growth strategy" was a "red flag" showing an auditor's scienter). Many companies have such compensation structures and those structures align management's interests with those of shareholders. And virtually *all* companies aim to meet earnings expectations. What is notably lacking from plaintiffs' complaint is any allegation that KPMG knew that any of the accounting judgments it approved were specifically tailored to meeting earnings goals or that KPMG itself had a motive to benefit

23

from meeting those earnings targets.  Indeed, Fannie Mae's management affirmatively concealed the earnings-management motives for its various accounting judgments.  *See* Second Am. Class Action Compl. ¶ 88 (alleging that Fannie Mae's executives failed to bring problematic accounting to KPMG's attention).  The mere fact that Fannie Mae's executives had compensation that was tied to financial performance and stressed meeting earnings expectations says nothing about whether KPMG knew of "[r]ed flags", that is, "'specific, highly suspicious facts and circumstances available to the auditor at the time of the audit.'"  *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 718 (N.D. Ill. 2005) (quoting *Riggs Partners LLC v. Hub Group, Inc.*, No. 02 C 1188, 2002 WL 31415721, at *9 (N.D. Ill. Oct. 25, 2002)).

Similar pleading infirmities led the First Circuit to uphold the dismissal of a securities fraud complaint containing comparable allegations of GAAS violations.  *See In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187 (1st Cir. 2005).  In that case, the plaintiffs alleged that an outside auditor had violated GAAS by ignoring various "red flags" indicating that the financial statements it was auditing were false and misleading.  Though the complaint asserted that the auditor "missed various 'red flag' warning signs," the court held that the complaint nonetheless "lack[ed] concreteness as to how the conduct of the audit **related** to the missed warning signs." *Id.* at 214 (emphasis added); *see also In re Interbank Funding*, 329 F. Supp. 2d at 92 (dismissing securities fraud complaint for failure to comply with this requirement because "plaintiffs' factual allegations as a whole are plagued with imprecision").  That is the case here:  as in *In re Stone & Webster*, nowhere does the complaint say how these general facts specifically should have alerted KPMG to Fannie Mae's alleged fraud.

7. **The Allegations Regarding Roger Barnes And The Audit Difference Posted By KPMG In 1998 Do Not Establish That KPMG Acted With Scienter.**

Plaintiffs also point to two additional instances in which KPMG purportedly acknowledged that Fannie Mae violated GAAP: a disagreement KPMG noted with Fannie Mae's accounting in 1998, and KPMG's investigation into Roger Barnes' allegations that Fannie Mae's accounting was improper. Second Am. Class Action Compl. ¶¶ 320-322, 344. Neither of these contributes to or suffices to create a strong inference that KPMG acted with scienter; they again reduce to plaintiffs' disagreement with KPMG on the application of accounting principles.

Plaintiffs first allege that KPMG objected to a $199 million deferral of the amortization catch-up that they say should have been recognized in 1998. They note that KPMG audited Fannie Mae's FAS 91 accounting at the end of 1998, and that KPMG's position was that Fannie Mae should record $439 million of expense in that year. Second Am. Class Action Compl. ¶¶ 320-323. They also allege that KPMG noted an audit difference of $199 million. Second Am. Class Action Compl. ¶ 323. An "audit difference," however, merely represents a difference in judgment between the management of an issuer's numbers and the auditor regarding a specific item, *see In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 676 (3d Cir. 2002), and is not inherently nefarious. If KPMG intended to defraud Fannie Mae's investors, it certainly would not have posted an audit difference. This Court, once again, is not required to draw illogical and irrational inferences in plaintiffs' favor. *See* cases cited *supra* n. 4.

In any event, *In re SCB* forecloses plaintiffs' claim that KPMG's failure to post an audit difference is evidence of scienter. In that case, an auditor recommended changes to a company's financial statements. 149 F. Supp. 2d at 365. The company refused to do so, yet the auditor issued an unqualified audit opinion. Nonetheless, the court rejected the argument that the auditor's accounting disagreement with management contributed to an inference of the auditor's

scienter.  The court noted that "when an auditor concludes that a company's financial statements are not materially misstated, the auditor has no duty to add any disclosures to the audit opinion even if the company does not make recommended changes to its financial statements."  *Id.* at 366 (citing AU § 312).  Because the auditor did not act "in bad faith in treating the proposed adjustments as immaterial," the court found the auditor did not act with scienter in certifying the company's financial statements.  *Id.* at 367.

Exactly the same is true of plaintiffs' complaint.  The complaint specifically alleges that KPMG thought the amount to be *immaterial* in the context of Fannie Mae's financial statements as a whole.  Second Am. Class Action Compl. ¶ 320.  In particular, the complaint alleges that KPMG agreed to issue an unqualified audit opinion because "management stated [that] 'the calculation and projection of premium/discount amortization is complicated and imprecise.'"  Second Am. Class Action Compl. ¶ 321.  But the SEC has since specifically recognized that "whether the misstatement arises from an estimate and the degree of imprecision inherent in that estimate are factors which an auditor must consider and which is a reason why a deviation from GAAP may be immaterial, *see* Staff Accounting Bulletin 99, 64 Fed. Reg. at 45152.  That judgment was well within KPMG's professional discretion.  *Id.*

Plaintiffs do make the vague and conclusory allegation that KPMG knew that the $240 million deferral "was manipulated by management."  Second Am. Class Action Compl. ¶ 322.  But they do not allege particularized facts demonstrating how or when KPMG acquired this knowledge, or showing that KPMG knew that the deferral was for the purpose of managing earnings.  Here again, therefore, plaintiffs' allegations evince their disagreement with KPMG over the application of materiality principles.  But they do not state the case for fraud.

Plaintiffs also allege that KPMG knew of Fannie Mae's accounting irregularities because KPMG accountants were present at a meeting at which a lone Fannie Mae employee claimed that the company was not following GAAP with respect to certain accounting issues, and then allegedly performed only "a cursory review" of those allegations. Second Am. Class Action Compl. ¶¶ 338-346. But that allegation says absolutely nothing about whether KPMG had a reasonable basis for the audit opinions it issued for the years 2001-2002, each of which *predated* KPMG's knowledge of Roger Barnes' allegations. *See* Second Am. Class Action Compl. ¶¶ 340, 403-404.

And even as to the only audit opinion to which the Barnes allegations could conceivably be relevant—the audit report issued on Fannie Mae's 2003 financial statement—the complaint sheds no light on how Roger Barnes' particular allegations affected the accuracy of that opinion, much less whether Barnes' allegations of accounting mistakes concerned *material* misstatements in Fannie Mae's accounting, and much, much less whether any such errors were corrected prior to KPMG's issuance of its unqualified audit opinion in connection with Fannie Mae's 2003 10-K filing.

In any event, plaintiffs' assertion that Barnes' allegations support an inference of scienter fail on their own terms. Plaintiffs' complaint tells us that KPMG performed only a "cursory review" of Barnes' allegations. Second Am. Class Action Compl. ¶ 346. But days after Barnes made his allegations known to Fannie Mae, KPMG and the internal audit team launched an investigation, holding a meeting with Barnes to address his allegations. Second Am. Class Action Compl. ¶ 341. Everyone except for Barnes at the meeting agreed that Barnes was wrong that Fannie Mae was not following GAAP. Second Am. Class Action Compl. ¶ 341. KPMG specifically determined that the Fannie Mae team responsible for the investigation was

independent, allowing KPMG reasonably to rely on their investigation. Second Am. Class Action Compl. ¶ 344.

None of that states a claim for fraud. KPMG could have reasonably believed, consistent with the unqualified auditor's report it provided on Fannie Mae's 2003 financial statements, that Barnes' allegations were overheated and insubstantial. Plaintiffs' complaint inadvertently *confirms* this by alleging that KPMG *disagreed* with Barnes' assessment that Fannie Mae was violating GAAP. Second Am. Class Action Compl. ¶ 341. That KPMG disagreed would explain why (according to plaintiffs' allegations at least) KPMG thought Fannie Mae's investigation was sufficient. Plaintiffs cannot satisfy their pleading obligation by invoking a theory of scienter that is at war with their own particularized factual allegations. And KPMG followed up on the investigation by "recommend[ing] that Fannie Mae examine employees' e-mails to determine if other employees in the Controller's office had raised issues internally that had not been addressed properly"—hardly the actions of a company bent on helping Fannie Mae's executives enrich themselves at the expense of Fannie Mae's investors. Second Am. Class Action Compl. ¶ 344.

### 8. Plaintiffs Have Not Pleaded Facts With Particularity That Collectively Warrant A Strong Inference That KPMG Acted With Extreme Recklessness.

Even taking plaintiffs' allegations as a whole, they still fail to give rise to a strong inference that KPMG acted with the required scienter. Because "[p]laintiffs have failed to allege [the auditor's] scienter as to any of these alleged mistakes **individually**, their allegations must also fail when considered in their totality." *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d at 777 (emphasis in original). As the Third Circuit has explained, "fraud allegations should be analyzed individually to determine whether each alleged incident of fraud has been pleaded with particularity." *In re Rockefeller Ctr. Props. Inc. Sec. Litig.*, 311 F.3d 198, 224 (3d Cir.

2002). Thus, "[i]f, after alleging a number of events purportedly substantiating a claim of fraud, none of those events independently satisfies the pleading requirement of factual particularity, the complaint is subject to dismissal under" the PSLRA. *Id.* For the reasons explained above, each of plaintiffs' numerous individual bids to plead KPMG's scienter fails. It follows that the allegations as a whole fail to do so as well.

### B. Plaintiffs Have Not Adequately Pleaded Loss Causation.

Plaintiffs also have failed to plead loss causation in a manner that complies with *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). The PSLRA provides that in all private actions brought under the Exchange Act, the plaintiff has the burden of "proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). The standard requires that plaintiffs demonstrate not simply that they purchased Fannie Mae stock in reliance on an actionable misrepresentation, but also that they show how the misrepresentation "proximately cause the relevant economic loss." *Dura Pharm.*, 544 U.S. at 342. Moreover, Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead loss causation with particularity. *See In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1188 (N.D. Cal. 2004).

*Dura Pharm* makes clear that plaintiffs' burden of pleading this element is no empty formality. In *Dura Pharm*, the plaintiffs claimed that they purchased stock at prices "artificially inflated" by defendant's misrepresentations, and that these allegations satisfied their burden of pleading that the misrepresentations caused them economic harm. The Supreme Court disagreed. The Court noted that these allegations did not establish loss causation because "at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment . . . **at that instant** possesses equivalent value." *Dura Pharm.*, 544 U.S. at 342 (emphasis in original). The Court observed that if "the purchaser sells the shares quickly before

29

the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Id.*
Finally, it noted that, even if the purchaser subsequently resells shares at a loss, "that lower price
may reflect, not the earlier misrepresentation, but changed economic circumstances, changed
investor expectations, new industry-specific or firm-specific facts, conditions, or other events,
which taken separately or together account for some or all of that lower price." *Id.* at 343.

     *Dura Pharm* demonstrates that plaintiffs' complaint fails to allege that plaintiffs'
economic loss was caused by the three audit opinions issued in connection with Fannie Mae's
2000-2003 financial statements.  Like the complaint the Supreme Court held insufficient in *Dura
Pharm*, plaintiffs allege little more than that the class members purchased shares at "artificially
inflated prices" as a result of the various defendants' misrepresentations.  Second Am. Class
Action Compl. ¶¶ 34, 453.  Plaintiffs do say that when the alleged fraud was revealed, Fannie
Mae's stock price dropped and caused them unspecified "losses."  Second Am. Class Action
Compl. ¶¶ 455-456.  But plaintiffs never back up that conclusion with *particular* factual
allegations demonstrating the causal connection, if any, between that stock drop and injury to
them and the other putative class members—whether or, if so, when, they *sold* their shares, and
hence realized those losses.  *See Glaser v. Enzo Biochem, Inc*., No. 05-1920, 2006 WL 2692848,
at *8 (4th Cir. Sept. 21, 2006) (granting auditor's motion to dismiss because plaintiffs make "no
effort to link the drop in stock price to any revelation of the true facts behind any of the alleged
misrepresentations by the defendants, let alone to one of the eight actionable misrepresentations
remaining after this Court's prior opinion.").

     Moreover, plaintiffs do not attempt to isolate the effect of KPMG's particular audit
opinions on the decline in Fannie Mae's stock price.  The complaint elides the distinction
between KPMG's conduct and the conduct of the rest of the defendants, instead simply alleging

that the purportedly false statements of "the Fannie Mae Defendants and KPMG," *en masse*, caused the decline in Fannie Mae's stock. Second Am. Class Action Compl. ¶ 452. This is insufficient; plaintiffs' burden is to show that *KPMG's* audit opinions were an independently substantial factor in causing the loss. *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (noting that the plaintiff must prove that the defendant's act was a "significant, contributing cause"); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 187 (3d Cir. 2000) (requiring the defendant's "alleged misrepresentations [to be] a substantial cause of the inflation in the price of a security and in its subsequent decline in value"). This failure to allege anything that separates the effect of KPMG's purportedly misleading fraudulent statements from the conduct of the rest of the defendants fails to satisfy plaintiffs' burden of pleading with particularity that KPMG's audit opinion specifically caused their loss, if any.

Plaintiffs do allege that the class members relied on KPMG's unqualified audit opinions on Fannie Mae's financial statements to invest in Fannie Mae's stock at the price they did. Second Am. Class Action Compl. ¶ 24. That allegation, however, at most addresses the distinct element of *transaction* causation, not *loss* causation. Transaction causation concerns whether a defendant's misrepresentation induced the plaintiff to enter into a transaction, not whether the misrepresentation caused the plaintiff's loss. *See, e.g.*, *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 35 n.5 (D.C. Cir. 1987) (noting that "under § 10(b) a plaintiff must show not only that the fraud caused economic harm, or 'loss causation,' but also that the fraud caused the plaintiff to engage in the transaction in question, which is 'transaction causation'"); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196-97 (2d Cir. 2003). The two elements are fundamentally distinct, as *Dura Pharm* makes clear by holding that a securities fraud plaintiff must "show not only that had he known the truth he would not have acted, **but also** that he

31

suffered actual economic loss" as a result of the defendant's misrepresentation. 544 U.S. at 344 (emphasis added). The complaint therefore does not allege with particularity that KPMG's audit opinions caused plaintiffs any loss whatsoever.

## II.    Any Reliance On KPMG's Audit Opinions After September 21, 2004, Was Unreasonable As A Matter Of Law.

Even if plaintiffs have otherwise stated a cognizable Section 10(b) claim against KPMG, the Court should exclude from the class period the time *after* the disclosure of OFHEO's interim report, which exposed the alleged flaws in Fannie Mae's financial statements. Plaintiffs' own allegations reveal that any reliance on Fannie Mae's financial statements or KPMG's audit opinions on and after that date—September 22, 2004—would be unreasonable as a matter of law.

Reliance is an element of plaintiffs' cause of action under Section 10(b). *E.g.*, *Basic, Inc. v. Levinson*, 485 U.S. 224, 243 (1988). Plaintiffs do not contend the class members individually and actually relied on KPMG's purportedly false audit opinions. Instead, they ask the Court to "presume" that the class members relied on them because during the class period they purchased Fannie Mae stock in an efficient market that incorporated into the market price the purportedly misleading public statements of the defendants. *See* Second Am. Class Action Compl. ¶ 449. The Supreme Court has recognized such a presumption, *see Basic*, 485 U.S. at 245-46, but that presumption is rebuttable, *id.* at 245. In particular, "[a]ny showing that severs the link between the alleged misrepresentation" and plaintiffs' "decision to trade at a fair market price will be sufficient to rebut the presumption of reliance." *Id.* at 248.

Here, plaintiffs' own allegations show that any causal link between KPMG's three audit opinions on Fannie Mae's financial statements and the class members' decision to purchase Fannie Mae stock evaporated on September 22, 2004, the date OFHEO issued its preliminary report alleging that Fannie Mae's financial statements could not be relied upon. That report

announced to the world "serious" flaws in Fannie Mae's financial statements and expressed

grave "concerns regarding the validity of previously reported financial results, the adequacy of

regulatory capital, the quality of management supervision, and the overall safety and soundness

of the enterprise." Second Am. Class Action Compl. ¶ 40. The OFHEO report, which plaintiffs'

complaint incorporates by reference, Second Am. Class Action Compl. ¶ 38, went on to detail, at

great length, not only specific accounting principles that Fannie Mae misapplied, but also

pervasive internal control problems. In a letter made public that same day, OFHEO concluded

that these "findings warrant immediate remedial action." Second Am. Class Comp. ¶ 38. The

day after the release of that report, plaintiffs immediately filed the first of these class action

complaints against Fannie Mae and the individual defendants.

Numerous other sources swiftly confirmed those serious allegations. On September 27,

2004, OFHEO announced that Fannie Mae's board had consented to a comprehensive

examination of its accounting practices, had admitted that it had engaged in improper

accounting, and had agreed to alter seriously Fannie Mae's internal accounting controls. Second

Am. Class Action Compl. ¶ 47. On September 30 and October 12, 2004, the public learned that

the Department of Justice and the U.S. Attorney's Office for the District of Columbia had both

opened criminal investigations into Fannie Mae's accounting practices. Second Am. Class

Action Compl. ¶¶ 48-49. On November 15, 2004, Fannie Mae disclosed in an SEC filing that, if

it were required to restate its financial statements from 2001 to 2004, it would have to recognize

in earnings a cumulative $9 billion dollar loss. Second Am. Class Action Compl. ¶ 52. On

December 15, 2004, the SEC formally ordered Fannie Mae to restate its financial results from

2001 to mid-2004. Second Am. Class Action Compl. ¶ 55. Finally, on December 22, 2004,

Fannie Mae in an SEC filing informed investors that it had agreed to restate those financial

statements and that its "previously filed interim and audited financial statements and the

independent auditors' reports thereon for the periods from January 2001 through the second

quarter of 2004 should no longer be relied upon because such financial statements were prepared

applying accounting principles that did not comply with generally accepted accounting

principles."  Second Am. Class Comp. ¶ 61 (emphasis omitted).

The class plaintiffs are not entitled to a presumption that they relied on Fannie Mae's

financial statements and KPMG's audit opinions after these dramatic public disclosures.  No

reasonable investor could have relied on KPMG's unqualified audit opinions after the issuance

of OFHEO's preliminary report on September 22, 2004, and certainly not after December 22,

2004, when Fannie Mae specifically stated that KPMG's audit opinions could not be relied upon.

As multiple courts have held, such public warnings that serious accounting irregularities affect a

company's financial statements *rebut* the presumption the investors have relied on unqualified

audit opinions concerning those statements.[5]  Indeed, to allow plaintiffs to extend the class

---

[5]  *See Semerenko*, 223 F.3d at 181 (holding that disclosure of "accounting irregularities" and an investigation into Cendant's financial statements made unreasonable after that disclosure reliance on an auditor's purportedly misleading audit opinions and partially granting auditor's motion to dismiss); *In re CMS Energy Secs. Litig.*, 236 F.R.D. 338 (E.D. Mich. 2006) (limiting the class period to the time before disclosure of a company's alleged accounting fraud, despite the plaintiffs' argument that the full extent of the fraud was revealed only later); *Kriendler v. Chem. Waste Mgmt., Inc.*, 877 F. Supp. 1140, 1160 (N.D. Ill. 1995) (granting motion to dismiss and shortening class period in securities fraud class action case following the disclosure of "a possibility or risk" that prior alleged misrepresentations were false); *In re Data Access Sys. Sec. Litig.*, 103. F.R.D. 130, 144 (D.N.J. 1984) (holding that an "announcement that the financial information appeared to be false" made it "not reasonable for individuals or the market to rely on that financial information"); *In re Melridge, Inc. Sec. Litig.*, No. 87-1426-JU, 1990 WL 117822, at *3  (D. Or. July 25, 1990) (holding that an announcement that there would be "material adverse adjustments" to a company's financial statements made reliance on prior misleading statements unreasonable); *In re LTV Sec. Litig.*, 88 F.R.D. 134, 147-48 (N.D. Tex. 1980) (finding that class period should not be extended beyond announcement of material accounting errors, despite plaintiffs' argument that the full extent of the restatement had not been revealed by then).

period beyond September 22, 2004—to a point more than *one year* after the first of the putative class actions was filed—would invite class members to be "disguised purchasers of a lawsuit." *In re CMS*, 236 F.R.D. at 342 (rejecting plaintiffs' attempt to extend a securities-fraud class period after the date on which the first of the securities-fraud actions were filed). It is inconceivable that members of a putative class can claim the "presumption of reliance" for securities purchases made *after* they have filed suit.

*Semerenko*, in particular, devastates plaintiffs' attempt to expand the class period beyond the date of the public disclosure of the OFHEO report. In that case, Cendant announced that it had discovered "potential accounting irregularities" in its financial statements, and that it had commissioned an independent investigation into its accounting practices. 223 F.3d at 170. A putative class of securities fraud plaintiffs sued Cendant and its auditor for securities fraud. The court held, however, that no reasonable member of the class could have relied on the audit opinions following disclosure of the accounting irregularities, *id.* at 181, despite the fact that all the details of the alleged fraud did not emerge until later, *id.* at 170-71, and even though the court refused to extend that holding to Cendant and its officers, *id.* at 181-84. After the company informed the public that the financial statement the auditor opined on could not be relied upon, management continued to make representations about the company's accounting. *Id.* at 182-84. The court concluded that these additional statements could be a basis for holding *management* liable, but could *not* be basis for holding the auditor liable because—as in this case—the auditor made no representations with respect to those follow-on statements from management. *Id.* The court therefore upheld the district court's decision to dismiss on the pleadings the claims against the auditor. *Id.* at 181. The same result should follow here: whatever the merits of plaintiffs' attempt to extend the class period beyond September 22, 2004 as to Fannie Mae and the

individual defendants, plaintiffs' attempt to do so as to KPMG and its audit opinions is legally groundless.

## CONCLUSION

For the foregoing reasons, KPMG's motion to dismiss the Second Amended Class Action Complaint should be granted.

Respectfully submitted this 28th day of September 2006.

/s/ Andrew S. Tulumello
F. Joseph Warin (D.C. Bar No. 235978)
Andrew S. Tulumello (D.C. Bar. No. 468351)
Melanie L. Katsur (D.C. Bar No. 484969)
Henry C. Whitaker (D.C. Bar No. 499210)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for KPMG LLP*

## CERTIFICATE OF SERVICE

I hereby certify that I caused electronic copies of the foregoing to be transmitted on

September 28, 2006, to the following counsel registered to receive electronic service:

Joshua S. Devore
Steven J. Toll
Matthew K. Handley
Daniel S. Sommers
Cohen, Milstein, Hausfeld & Toll P.L.L.C
West Tower, Suite 500
1100 New York Ave., N.W.
Washington, D.C. 20005
*Counsel for Plaintiffs Vincent Vinci*; *State Teachers Retirement System of Ohio*; *Anne E. Flynn; Robert L. Garber*

James R. Cummins
Melanie S. Corwin
Waite, Schneider, Bayless & Chesley Co., L.P.A.
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, OH 45202
*Counsel for Plaintiffs Ohio Public Employees Retirement System*; *State Teachers Retirement System of Ohio*

Julie A. Richmond
Kathleen M. Donovan-Maher
Jeffery C. Block
Berman Devalerio Pease Tabacco Burt & Pucillo
One Liberty Square
Boston, MA 02190
*Counsel for Plaintiffs Ohio Public Employees Retirement System*; *State Teachers Retirement System of Ohio*

Alan J. Statman
Jeffery P. Harris
Statman, Harris & Eyrich LLC
3700 Carew Tower
441 Vine Street
Cincinnati, OH 45202
*Counsel for Plaintiffs Ohio Public Employees Retirement System*; *State Teachers Retirement System of Ohio*

Frank J. Johnson
Brett M. Weaver
Law Office of Frank J. Johnson
402 W. Broadway 27th Floor
San Diego, CA 92101
*Counsel for Plaintiff Sassan Shahrokhinia*

Robert W. Liles
Martyn Liles, PLLC
1054 31st Street, N.W.
Suite 415
Washington, D.C. 20007
*Counsel for Plaintiff Sassan Shahrokhinia*

Stuart M. Grant
Christine M. MacKintosh
Megan D. McIntyre
Grant & Eisenhofer, P.A.
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
*Counsel for the Franklin Templeton Plaintiffs*

Jeffrey W. Kilduff
Seth A. Aronson
Michael J. Walsh, Jr.
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
*Counsel for Defendant Fannie Mae, Thomas P. Gerrity, Taylor C. Segue, III, William R. Harvey, Joe Pickett, Kenneth M. Duberstein, Manuel Justiz, H. Patrick Swygert, and Leslie Rahl*

Kevin M. Downey
Alex G. Romain
Daniel N. Marx
Joseph M. Terry, Jr.
Michelle D. Schwartz
Matthew L. Fore
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5091
*Counsel for Defendant Franklin D. Raines*

Steven M. Salky
Eric R. Delinsky
Ellen D. Marcus
Holly Ann Pal
Tammy Gershoni
Zuckerman Spaeder LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036-2638
*Counsel for Defendant Timothy J. Howard*

David S. Krakoff
Christopher F. Regan
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006-1101
*Counsel for Defendant Leanne G. Spencer*

Robert Romano
Bonnie Altro
Morgan, Lewis & Bockius
101 Park Avenue
New York, NY 10178-0060
*Counsel for Defendant Thomas P. Gerrity*

Fred F. Fielding
Barbara Van Gelder
Wiley Rein & Fielding LLP
1776 K Street, N.W.
Washington, D.C. 20006
*Counsel for Defendants Anne M. Mulcahy and Frederic V. Malek*

David I. Ackerman
Bingham McCutchen, LLP
2020 K Street, N.W.
Washington, DC 20006

James Hamilton
Swidler Berlin LLP
3000 K Street, N.W. Suite 300
Washington, D.C. 20007
*Counsel for Defendant Joe Pickett*

Erica Lynne Salmon
Piper, Rudnick, Gray & Carey LLP
1200 19th Street, N.W. Suite 700
Washington, D.C. 20036
*Counsel for Defendants Stephen B. Ashley,*
*Donald B. Marron, and Ann Korologos*

James D. Wareham
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005
*Counsel for Defendant Daniel H. Mudd*

Shannon Ratliff
Ratliff Law Firm
600 Congress Avenue
Suite 3100
Austin, TX 78701
*Counsel for Manuel Justiz*

Richard H. Klapper
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498
*Counsel for Goldman Sachs*

Julie E. Guttman
Baker Botts LLP
The Warner
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
*Counsel for Defendant Jamie S. Gorelick*

Daniel John Healy
John H. Doyle, III
Rhonda D. Orin
Anderson Kill & Olick LLP
2100 M Street, N.W. Suite 650
Washington, D.C. 20037
*Counsel for Defendant Leslie Rahl*

David Smith
Dionna K. Litvin
Jonathan S. Liss
Jonathan Michael Stern
Schnader Harrison Segal & Lewis LLP
1600 Market Street
Philadelphia, PA 19103-7286
*Counsel for Radian Group Inc.*

I hereby certify that I caused copies of the foregoing to be transmitted on September 29,

2006, to the following counsel by U.S. mail:

Fred F. Fielding
Barbara Van Gelder
Wiley Rein & Fielding LLP
1776 K Street, N.W.
Washington, D.C. 20006
*Counsel for Defendants Anne M. Mulcahy and*
*Frederic V. Malek*

Robert Romano
Bonnie Altro
Morgan, Lewis & Bockius
101 Park Avenue
New York, NY 10178-0060
*Counsel for Defendant Thomas P. Gerrity*

Shannon Ratliff
Ratliff Law Firm
600 Congress Avenue
Suite 3100
Austin, TX 78701
*Counsel for Manuel Justiz*

Daniel John Healy
John H. Doyle, III
Rhonda D. Orin
Anderson Kill & Olick LLP
2100 M Street, N.W. Suite 650
Washington, D.C. 20037
*Counsel for Defendant Leslie Rahl*

Richard H. Klapper
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498
*Counsel for Goldman Sachs*

/s/ Henry C. Whitaker
Henry C. Whitaker