UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In Re Fannie Mae Securities Litigation | ) ) ) | Consolidated Civil Action No. 1:04-cv-1639 (RJL) |
| Evergreen Equity Trust, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No. 1:06-cv-00082 (RJL) |
| v. | ) ) | |
| Federal National Mortgage Association, *et al.*, | ) ) | |
| Defendants. | ) ) | |
| Franklin Managed Trust, *et al.*, | ) ) | |
| Plaintiffs, | ) ) | No. 1:06-cv-00139 (RJL) |
| v. | ) ) | |
| Federal National Mortgage Association, *et al.*, | ) ) | |
| Defendants. | ) ) | |

**THE EVERGREEN PLAINTIFFS' AND FRANKLIN PLAINTIFFS'
JOINT MEMORANDUM OF LAW IN OPPOSITION TO THE
MOTIONS TO DISMISS BY FANNIE MAE, THE DIRECTOR DEFENDANTS,
RADIAN GUARANTY, AND DEFENDANTS HOWARD, RAINES, AND SPENCER**

GRANT & EISENHOFER P.A.
Stuart M. Grant (DC Bar ID #450895)
Megan D. McIntyre
Christine M. Mackintosh
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

*Counsel for Plaintiffs Evergreen Equity Trust, et al.
and Plaintiffs Franklin Managed Trust, et al.*

Dated: October 13, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF FACTS ................................................................................. 5

    I.      THE OFFICER DEFENDANTS' ROLES IN THE FRAUD ................................ 5

    II.     THE AUDIT COMMITTEE DEFENDANTS' ROLE ................................ 8

    III.    THE DIRECTOR DEFENDANTS' ROLE ............................................ 11

    IV.    RADIAN'S ROLE ................................................................ 13

PROCEDURAL BACKGROUND ...................................................................... 13

ARGUMENT ............................................................................................ 14

    I.      PLAINTIFFS' SECTION 18 CLAIM IS NOT TIME-BARRED ....................... 14

        A.    The Sarbanes-Oxley Act's Two-Year Discovery Rule Applies ............. 15

        B.    Plaintiffs Lacked Sufficient Information To File A Non-Dismissable ................................................................ 16

        C.    The Statute of Limitations on Plaintiffs' Claims Against Fannie Mae, Howard and Spencer Was Tolled By The Filing of the Class Action ............................................................... 18

            1.    Class Action Tolling Is Not Limited to the Precise Claims Asserted in the Class Action ............................... 20

            2.    Class Action Tolling Applies in this Case, Even Though Class Certification Has Not Been Resolved ..................... 21

    II.     PLAINTIFFS HAVE STATED CLAIMS BASED ON STATEMENTS MADE AFTER SEPTEMBER 21, 2004 ............................................. 24

        A.    Fannie Mae Is Unable To Meet Its Heavy Burden Of Establishing The Unreasonableness of Plaintiffs' Reliance As A Matter of Law .......... 26

        B.    Plaintiffs Have Stated Section 10(b) Claims Based Upon the Statements Contained in the December 22, 2004 Release .................. 30

    III.    PLAINTIFFS HAVE ADEQUATELY PLEADED SECTION 10(b) CLAIMS ..................................................................... 32

        A.    The Audit Committee Defendants Made False Statements ................. 32

            1.    The Audit Committee Defendants "Made" the Statements in the Forms 10-K By Signing Those Documents ................................................... 33

2.     The Audit Committee Defendants' Approval of the
       Company's Financial Statements Subjects Them to
       Section 10(b) Liability With Respect to Documents
       Reflecting the Company's Financial Results ................................ 35

B.     Radian Engaged in Conduct That Violated Rule 10b-5(a) and (c) ............ 37

C.     Plaintiffs' Allegations Give Rise to a Strong Inference of Scienter ......... 42

       1.     Howard and Raines ........................................................ 44

       2.     The Audit Committee Defendants .................................... 48

       3.     Radian .......................................................................... 55

D.     Plaintiffs Have Adequately Alleged Causation as to Radian .................... 56

       1.     Transaction Causation .................................................... 56

       2.     Loss Causation .............................................................. 57

IV.    PLAINTIFFS HAVE STATED A CLAIM FOR CONTROL PERSON
       LIABILITY ................................................................................ 58

A.     Plaintiffs Are Not Required to Plead Culpable Participation ................... 59

B.     Plaintiffs Have Adequately Alleged the Director Defendants'
       "Control" ................................................................................ 64

       1.     Allegations of Control Are Subject to the Notice
              Pleading Requirements of Rule 8(a) ............................... 64

       2.     Control Is a Factual Issue That Should Not Be
              Resolved on a Motion to Dismiss .................................. 64

       3.     Plaintiffs' "Control" Allegations Are Sufficient ............................ 65

V.     PLAINTIFFS HAVE STATED A CLAIM FOR INSIDER TRADING IN
       VIOLATION OF §20A .................................................................. 73

A.     Plaintiffs Have Alleged Contemporaneous Transactions ......................... 73

       1.     Franklin Plaintiffs' Contemporaneous Trades with
              Howard .......................................................................... 75

       2.     Franklin Plaintiffs' Contemporaneous Trades with
              Raines and Spencer ........................................................ 76

       3.     Evergreen Plaintiffs' Contemporaneous Trades with
              Howard .......................................................................... 77

       4.     Evergreen Plaintiffs' Contemporaneous Trades with
              Raines and Spencer ........................................................ 77

B.    Howard's Purported Trading Plan Does Not Entitle Him to Dismissal................................................................................78

VI.    PLAINTIFFS' STATE LAW CLAIMS SHOULD NOT BE DISMISSED.........79

A.    SLUSA Does Not Bar Plaintiffs' Claims....................................79

B.    Plaintiffs Have Stated Claims For Common Law Fraud ...........83

C.    Plaintiffs Have Stated Claims For Negligent Misrepresentation ..............84

D.    The Franklin Plaintiffs Have Stated A Claim For Violation of the California Corporations Code ....................................................88

E.    The Evergreen Plaintiffs Have Stated A Claim For Violation of Massachusetts General Laws Chapter 93A.................................89

    1.    Fannie Mae and the Joining Defendants Have Engaged In Unfair and Deceptive Acts and Practices in the Conduct of "Trade" or Commerce," as Defined by Chapter 93A..........................................89

    2.    The Violation of Chapter 93A Occurred Primarily and  Substantially In Massachusetts ...............................92

F.    Plaintiffs Have Stated An Aiding and Abetting Claim Against Radian .......................................................................................94

    1.    Pennsylvania Law Does Not Apply .................................94

    2.    Aiding and Abetting Fraud Claims Are Available Under Massachusetts, California and District of Columbia Law..................................................................96

    3.    Plaintiffs' Claims For Aiding And Abetting Fraud Are Timely Whether California, Massachusetts or District of Columbia Law Applies..................................97

CONCLUSION............................................................................................. 100

## <u>TABLE OF AUTHORITIES</u>

### CASES

*In re AFC Enter., Inc. Sec. Litig.*,
   348 F. Supp. 2d 1363 (N.D. Ga. 2004) .....................................................................70

*ARB, Inc. v. Luz Const. Inc.*,
   No. 91-55758, 1992 WL 164487 (9th Cir. July 16, 1992)..........................................97

*Adams Public Sch. Dist. v. Asbestos Corp., Ltd.*,
   7 F.3d 717 (8th Cir. 1993) ..........................................................................................21

\*  *Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ..................................................................................61

\*  *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
   No. 03-MD-1529 (LMM), 2005 WL 1679540 (S.D.N.Y. July 18, 2005).................15

\*  *Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972)..............................................................................................38, 58

\*  *Alvarado v. Morgan Stanley Dean Witter, Inc.*,
   No. CIV 05-1149 (JP), 2006 WL 2587496 (D.P.R. Aug. 30, 2006) ..............61, 63, 64

\*  *In re American Bank Note Holographics, Inc.*,
   93 F. Supp. 2d 424 (S.D.N.Y. 2000)..........................................................................54

*American Gen. Ins. Co. v. Equitable Gen. Corp.*,
   493 F. Supp. 721 (E.D. Va. 1980) ..............................................................................67

\*  *American Pipe & Constr. Co. v. Utah*,
   414 U.S. 538 (1974)............................................................................................ *passim*

*Angrisani v. Capital Access Network, Inc.*,
   175 Fed. Appx. 554 (3d Cir. 2006)..............................................................................27

*Ansin v. River Oaks Furniture, Inc.*,
   105 F.3d 745 (1st Cir. 1997), *cert. denied*, 522 U.S. 818 (1997) ...............................91

*Asher v. Baxter Int'l Inc.*,
   377 F.3d 727 (7th Cir. 2004) ......................................................................................27

*Auto Shine Car Wash Sys., Inc. v. Nice N Clean Car Wash, Inc.*,
   792 N.E.2d 682 (Mass. App. 2003) ............................................................................94

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005).........................................................................60

\*  *In re Baan Co. Sec. Litig.*,
   103 F. Supp. 2d 1 (D.D.C. 2000) .......................................................................... *passim*

*Bamberg v. SG Cowen*,
    236 F. Supp. 2d 79 (D. Mass. 2002) .............................................................97

*Barnebey v. E.F. Hutton & Co.*,
    715 F. Supp. 1512 (M.D. Fla. 1989) ...........................................................21

*Barron v. Fidelity Magellan Fund*,
    784 N.E.2d 634 (Mass. App. 2003) ......................................................90, 91

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..........................................................................................26

*In re Blech Sec. Litig.*,
    928 F. Supp. 1279 (S.D.N.Y. 1996) ......................................................39, 40

*In re Bridgestone Sec. Litig.*,
    430 F. Supp. 2d 728 (M.D. Tenn. 2006)......................................29, 57, 58

\*    *Brown v. Enstar Group, Inc.*,
    84 F.3d 393 (11th Cir. 1996) ...............................................................59, 65, 66

\*    *Burman v. Phoenix Worldwide Ind., Inc.*,
    384 F. Supp. 2d 316 (D.D.C. 2005)......................................................26, 83, 87

*Bussineau v. President & Directors of Georgetown College*,
    518 A.2d 423 (D.C. 1986) ...............................................................................99

*In re CMS Energy Sec. Litig.*,
    403 F. Supp. 2d 625 (E.D. Mich. 2005).........................................................57

*In re Cable & Wireless*,
    321 F. Supp. 2d 749 (E.D. Va. 2004) ...........................................................65

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002).........................................................................34, 65

*In re Cambrex Corp. Sec. Litig.*,
    No. 03-CV-4896 (WJM), 2005 WL 2840336 (D.N.J. Oct. 27, 2005).........................60

*Cambridge Plating Co., Inc. v. Napco, Inc.*,
    991 F.2d 21 (1st Cir. 1993) ..............................................................................99

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) .............................................................60

*In re Cardinal Health Inc. Sec. Litig.*,
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ....................................................79

*Carlson v. Xerox Corp.*,
    392 F. Supp. 2d 267 (D. Conn. 2005) ..........................................................44

*Carpenter v. Harris, Upham & Co., Inc.*,
    594 F.2d 388 (4th Cir. 1979), *cert. denied*, 444 U.S. 868 (1979)........................59, 60

*Catton v. Defense Tech. Sys., Inc.*,
No. 05-CIV-6954 (SAS), 2006 WL 1716862 (S.D.N.Y. June 20, 2006) ........57, 58, 64

*In re Charter Comm., Inc. Sec. Litig.*,
443 F.3d 987 (8th Cir. 2006) .................................................................................38

*Chase-Walton Elastomers, Inc. v. Bennett*,
No. 02-1304, 2002 WL 31235508 (Mass. Super. Ct. Oct. 1, 2002) ...........................93

*Cheney v. Cybergurard Corp.*,
No. 98-6879-CIV-GOLD, 2000 WL 1140306 (S.D. Fla. Jul. 31, 2000) ...................86

*Chu v. Sabratek Corp.*,
100 F. Supp. 2d 827 (N.D. Ill. 2000) ....................................................................64

*Clinton Hosp. Assoc. v. Corson Group, Inc.*,
907 F.2d 1260 (1st Cir. 1990) ...............................................................................93

*Cohen v. Koenig*,
25 F.3d 1168 (2d Cir. 1994) ..................................................................................84

*Compagnie de Reassurance D'Ile de Fr. v. New England Reinsurance Corp.*,
57 F.3d 56 (1st Cir. 1995) .....................................................................................98

*In re Conner Bonds Litig.*,
No. 88-3-5, 1988 WL 110054 (E.D.N.C. July 21, 1988)..........................................61

*Cosme v. Whitin Machine Works, Inc.*,
632 N.E. 2d 832 (Mass. 1994) ..............................................................................96

*In re Cray Inc.*,
431 F. Supp. 2d 1114 (W.D. Wash. 2006)..............................................................78

*Crocker v. Carrier Access Corp.*,
No. 05-CV-01011, 2006 WL 2035366 (D. Colo. July 18, 2006) ..............................57

* *Crown, Cork & Seal Co., Inc. v. Parker*,
462 U.S. 345 (1985)...............................................................................19, 20, 22

* *Cullen v. Margiotta*,
811 F.2d 698 (2d Cir.), *cert. denied*, 483 U.S. 1021 (1987)................................20, 21

*In re Cypress Semiconductor Sec. Litig.*,
836 F. Supp. 711 (N.D. Cal. 1993) .......................................................................75

* *Daisley v. Riggs Bank, N.A.*,
372 F. Supp. 2d 61 (D.D.C. 2005) ........................................................................84

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ..............................................................................57

*Derensis v. Coopers & Lybrand Chartered Accountants*,
930 F. Supp. 1003 (D.N.J. 1996) ..........................................................................60

*Dietrich v. Bauer*,
    76 F. Supp. 2d 312 (S.D.N.Y. 1999)....................................................................39, 40

*Doe v. U.S. Dept. of Justice*,
    753 F.2d 1092 (D.C. Cir. 1985) ....................................................................................17

*Dowling v. Narragansett Capital Corp.*,
    735 F. Supp. 1105 (D.R.I. 1990).................................................................................67

*In re Dynegy, Inc. Sec. Litig.*,
    339 F. Supp. 2d 804 (S.D. Tex. 2004) ..................................................................85, 86

*Ehlen v. Lewis*,
    984 F. Supp. 5 (D.D.C. 1997) .....................................................................................97

*In re Eng'g Animation Sec. Litig.*,
    110 F. Supp. 2d 1183 (S.D. Iowa 2000) ....................................................................75

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    No. MDL-1446, 2003 WL 21418157 (S.D. Tex. Apr. 24, 2003) ...............................37

*In re Enron Corp. Sec., Derivative, & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ......................................................................38

\*   *In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) ................................................................34, 35

*Firestone v. Firestone*,
    76 F.3d 1205 (D.C. Cir. 1996) ..............................................................................17, 83

*In re FirstEnergy Corp.*,
    316 F. Supp. 2d 581 (N.D. Ohio 2004).................................................................31-32

\*   *In re First Merchants Acceptance Corp. Sec. Litig.*,
    No. 97-C-2715, 1998 WL 781118 (N.D. Ill. Nov. 4, 1998) ...........................66, 69, 72

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005)...................................................................65, 68

*Freeland v. Iridium World Commc'ns, Ltd*,
    233 F.R.D. 40 (D.D.C. 2006)................................................................................28, 29

\*   *In re Friedman's, Inc. Sec. Litig.*,
    385 F. Supp. 2d 1345 (N.D. Ga. 2005) ......................................................................87

*Fujisawa Pharm. Co., Ltd. v. Kapoor*,
    115 F.3d 1332 (7th Cir.1997) ...............................................................................16-17

*G.A. Thompson & Co. v. Partridge*,
    636 F.2d 945 (5th Cir. 1981) ......................................................................................59

*Ganino v. Citizens Utility Co.*,
    228 F.3d 154 (2d Cir. 2000)........................................................................................27

\*    *In re Global Crossing, Ltd. Sec. Litig.*,
     322 F. Supp. 2d 319 (S.D.N.Y 2004) ............................................................ *passim*

     *In re GlobalStar Sec. Litig.*,
     No. 01 Civ. 1748 (SHS), 2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003).................27

     *Gomez v. Toledo*,
     446 U.S. 635 (1980).................................................................................................61

     *Gross v. Diversified Mortgage Investors*,
     438 F. Supp. 190 (S.D.N.Y. 1977)...........................................................................17

\*    *Halberstam v. Welch*,
     705 F.2d 472 (D.C. Cir. 1983) .................................................................................96

\*    *Harrison v. Dean Witter Reynolds, Inc.*,
     79 F.3d 609 (7th Cir. 1996) ........................................................................61, 63, 73

     *Harrison v. Dean Witter Reynolds, Inc.*,
     974 F.2d 873 (7th Cir. 1992) ...................................................................................59

     *In re Hayes Lemmerz Int'l., Inc. Equity Sec. Litig.*,
     271 F. Supp. 2d 1007 (E.D. Mich. 2003)............................................................65, 72

     *Hercules & Co. v. Shama Rest. Corp.*,
     566 A.2d 31 (D.C. App. 1989)..................................................................................95

     *In re Hienergy Tech., Inc.*,
     No. SACV04-1226 (JTLX), 2005 WL 3071250 (C.D. Cal. Oct. 25, 2005)...............61

\*    *Howard v. Everex Sys., Inc.*,
     228 F.3d 1057 (9th Cir. 2000) ...........................................................................34, 65

     *Howard v. S.E.C.*,
     376 F.3d 1136 (D.C. Cir. 2004) ...............................................................................53

     *Hudson v. Capital Mgmt. Int'l, Inc.*,
     No. 81-1737, 1982 WL 1385 (N.D. Cal. Aug. 24, 1982) .........................................96

     *In re Immune Response Sec. Litig.*,
     375 F. Supp. 2d 983 (S.D. Cal. 2005)..................................................................27, 57

     *In re Independent Serv. Org. Antitrust Litig.*,
     Civ. No. MDL-1021, 1997 WL 161940 (D. Kan. Mar. 12, 1997)........................20, 21

\*    *In re Initial Public Offering Sec. Litig.*,
     241 F. Supp. 2d 281 (S.D.N.Y. 2003)................................................................39, 60, 62

     *In re Intelcom Group Sec. Litig.*,
     169 F.R.D. 142 (D. Colo. 1996) ...............................................................................29

     *International Telecomms. Satellite Org'n v. Colino*,
     Nos. 88-1266 & 87-2749 (RCL), 1992 WL 93129 (D.D.C. Apr. 15, 1992) ..............97

*In re Interpublic Sec. Litig.*,
No. 02-CV-6527 (DLC), 2003 WL 22509414 (S.D.N.Y. Nov. 6, 2003) ...................29

\* *In re JWP Inc. Sec. Litig.*,
928 F. Supp. 1239 (S.D.N.Y. 1996)................................................................36, 37, 65, 71

*Jacobs v. Coopers & Lybrand, L.L.P.*,
No. 97 Civ. 3374 (RPP),  1999 WL 101772 (S.D.N.Y. Mar. 1, 1999).......................68

*Johnson v. Long Beach Mortgage Loan Trust 2001-4*,
No. CIVA 05-0644 (CKK), 2006 WL 2244599 (D.D.C. Aug. 4, 2006) ...................98

*Jones v. Intelli-Check, Inc.*,
274 F. Supp. 2d 615 (D.N.J. 2003) ...............................................................................60

*Jones v. Rogers Mem. Hosp.*,
442 F.2d 773 (D.C. Cir. 1971)......................................................................................17

\* *Joseph v. Wiles*,
223 F.3d 1155 (10th Cir. 2000) ....................................................................................21

*King v. E.F. Hutton & Co., Inc.*,
No. 86-0211, 1987 WL 8733 (D.D.C. Mar. 13, 1987) .........................................66, 69

*In re Kirschner Med.  Corp. Sec. Litig.*,
139 F.R.D. 74 (D. Md. 1991).........................................................................................28

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994)......................................................................................44

*Kozin v. Dunn, No. Civ.*
A. 04-852 (DRD), 2005 WL 2009918 (D.N.J. Aug. 17, 2005) ...................................84

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
781 N.E.2d 787 (Mass. 2003) ..................................................................................92, 93

*In re LaBranche Sec. Litig.*,
405 F. Supp. 2d 333 (S.D.N.Y. 2005)...........................................................................62

*Landry v. Price Waterhouse Chartered Accountants*,
715 F. Supp. 98 (S.D.N.Y. 1989)..................................................................................65

\* *Lantner v. Carson*,
373 N.E.2d 973 (Mass. 1978) .......................................................................................91

*Law v. Medco Research, Inc.*,
113 F.3d 781 (7th Cir. 1997) .........................................................................................16

*Lawson v. Affirmative Equities Co.*,
341 F. Supp. 2d 51 (D. Mass. 2004) .............................................................................96

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
108 F.3d 1531 (2d Cir. 1997)........................................................................................26

\*    *Lehman v. United Parcel Service, Inc.*,
    No. 06-4020-CV-C-NKL, 2006 WL 2280186 (W.D. Mo. Aug. 9, 2006)............21, 22

\*    *In re Lernout & Hauspie Sec. Litig.*,
    236 F. Supp. 2d 161 (D. Mass. 2003) ..................................................38, 56

\*    *In re Lernout & Hauspie Sec. Litig.*,
    286 B.R. 33 (D. Mass. 2002) ........................................................34, 68, 72

*In re Linerboard Antitrust Litig.*,
    223 F.R.D. 335 (E.D. Pa. 2004)..........................................................21

*Liu v. Republic of China*,
    892 F.2d 1419 (9th Cir. 1989) ............................................................96

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)..........................................26, 31, 71

*In re Livent, Inc. Sec. Litig.*,
    78 F. Supp. 2d 194 (S.D.N.Y. 1999).......................................... *passim*

*In re MTC Elect. Tech. S'holders Litig.*,
    898 F. Supp. 974 (E.D.N.Y. 1995) ................................................. 32-33

*Magna Inv. Corp. v. John Does One Through Two Hundred*,
    931 F.2d 38 (11th Cir. 1991) ............................................................17

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
    927 F. Supp. 1297 (C.D. Cal. 1996) ....................................................86

*Marram v. Kobrick Offshore Fund, Ltd.*,
    809 N.E.2d 1017 (Mass. 2004) ..........................................................92

*Mathews v. Centex Telemanagement, Inc.*,
    No. C-92-1837-CAL, 1994 WL 269734 (N.D. Cal. June 8, 1994) ............53

*McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*,
    295 F.3d 380 (3d Cir.), *cert. denied*, 537 U.S. 1088 (2002)....................22

*Metge v. Baehler*,
    762 F.2d 621 (8th Cir. 1985) ............................................................59

\*    *In re Microstrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ........................................ *passim*

*Milford Power L.P. v. New England Power Co.*,
    918 F. Supp. 471 (D. Mass 1996) ......................................................96

*In re Miller Indus., Inc. Sec. Litig.*,
    12 F. Supp. 2d 1323 (N.D. Ga. 1998) .................................................70

*Miller v. Premier Corp.*,
    608 F.2d 973 (4th Cir. 1979) ............................................................27

*Mitzner v. Hastings*,
No. C04-3310 FMS, 2005 WL 88966 (N.D. Cal. Jan. 14, 2005) ................................32

*Morton v. National Medical Enters.*
725 A.2d 462 (D.C. App. 1999).................................................................................98

*Musick, Peeler & Garrett v. Employers Ins. of Wausau*,
508 U.S. 286 (1993)...................................................................................................15

*In re NYSE Specialists Sec. Litig.*,
405 F. Supp. 2d 281 (S.D.N.Y. 2005)........................................................................62

*Nanopierce Tech. v. Southridge Capital Mgmt.t LLC*,
No. 02 Civ. 0767, 2003 WL 21507294 (S.D.N.Y. June 30, 2003)............................39

*In re National Century Fin. Enters., Inc. Inv. Litig.*,
No. 2:03-MD-1565, 2006 WL 469468 (S.D. Ohio Feb. 27, 2006) ....................39, 61

*In re National Health Laboratories Sec. Litig.*,
No. 92-1949, 1993 WL 331002 (S.D. Cal. July 2, 1993) ...........................................61

*In re National Media Sec. Litig.*,
No. 93-2977, 1994 WL 397398 (E.D. Pa. July 27, 1994) ..........................................72

*Nelson v. Nationwide Mortgage Corp.*,
659 F. Supp. 611 (D.D.C. 1987)................................................................................94

*Neubauer v. Eva-Health USA, Inc.*,
158 F.R.D. 281 (S.D.N.Y. 1994) ...............................................................................64

*Neubronner v. Milken*,
6 F.3d 666 (9th Cir. 1993) .........................................................................................74

\*   *In re Newbridge Networks Sec. Litig.*,
926 F. Supp. 1163 (D.D.C. 1996) ........................................................................28, 68

*Newton v. Uniwest Fin. Corp.*,
802 F. Supp. 361 (D. Nev. 1990)...............................................................................53

*No. 84 Employer-Teamster Joint Council Pension Trust v. America W. Holding
Corp.*, 320 F.3d 920 (9th Cir.), *cert. denied,* 540 U.S. 966 (2003).............................65

*Norman v. Brown, Todd & Heyburn*,
693 F. Supp. 1259 (D. Mass. 1988) ...........................................................................97

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).......................................................................................55

*O'Connor & Associates v. Dean Witter Reynolds, Inc.*,
559 F. Supp. 800 (S.D.N.Y. 1983)............................................................................74

*Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*,
277 B.R. 20 (Bankr. S.D.N.Y. 2002).........................................................................22

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ........................................................ *passim*

*PR Diamonds, Inc. v. Chandler*,
   364 F.3d 671 (6th Cir. 2004) ...................................................................42, 43

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996) ...........................................................................59

*In re Parmalat Sec. Litig.*,
   383 F. Supp. 2d 616 (S.D.N.Y. 2005)...........................................................64

\*   *In re Parmalat Sec. Litig.*,
   414 F. Supp. 2d 428 (S.D.N.Y. 2006).................................................39, 56, 60

\*   *In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005) ........................................... *passim*

*Peabody N.E., Inc. v. Town of Marshfield,*,
   689 N.E.2d 774 (Mass. 1998) .................................................................91, 92

*The Pension Committee of the Univ. of Montreal Pension Plan v. Banc of Am.
   Sec., LLC*, No. 05-CIV-9016 (SAS), 2006 WL 2053326 (S.D.N.Y. Jul. 20,
   2006) .................................................................................................................60

\*   *In re Philip Serv. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004)................................................45, 64, 68

*Phillips v. Scientific-Atlanta, Inc.*,
   374 F.3d 1015 (11th Cir. 2004) ......................................................................33

*Pinker v. Roche Holdings, Ltd.*,
   292 F.3d 361 (3d Cir. 2002)............................................................................28

\*   *Quaak v. Dexia*,
   357 F. Supp. 2d 330 (D. Mass. 2005) .............................................................42

*In re Qwest Commc'ns Int'l., Inc. Sec. Litig.*,
   387 F. Supp. 2d 1130 (D. Colo. 2005)............................................................61

*In re Raytheon Sec. Litig.*,
   157 F. Supp. 2d 131 (D. Mass. 2001) .............................................................44

*Realmonte v. Reeves*,
   169 F.3d 1280 (10th Cir. 1999) ......................................................................19

*Rehm v. Eagle Fin. Corp.*,
   954 F. Supp. 1246 (N.D. Ill. 1997) ................................................................54

*In re Reliance Sec. Litig.*,
   135 F. Supp. 2d 480 (D. Del. 2001)....................................................34, 63, 64

*In re Rent-Way Sec. Litig.*,
   209 F. Supp. 2d 493 (W.D. Pa. 2002)..................................................53, 54, 60

*River Colony Estates Gen. P'ship v. Bayview Fin. Trading Group, Inc.,*
  287 F. Supp. 2d 1213 (S.D. Cal. 2003)........................................................................98

*Robbins v. Moore Med. Corp.,*
  788 F. Supp. 179 (S.D.N.Y. 1992)..............................................................................68

\* *Roche v. Royal Bank of Canada,*
  109 F.3d 820 (1st Cir. 1997)..................................................................................93, 94

*Rocker Mgmt., LLC v. Lernout & Hauspie Speech Products, N.V.,*
  No. Civ. A. 00-5965 (JCL), 2005 WL 1366025 (D.N.J. June 8, 2005)......................53

\* *In re Royal Ahold N.V. Sec. & ERISA Litig.,*
  351 F. Supp. 2d 334 (D. Md. 2004) ................................................................... *passim*

\* *In re Royal Dutch/Shell Transport Sec. Litig.,*
  380 F. Supp. 2d 509 (D.N.J. 2005) ......................................................................29, 30

\* *S.E.C. v. First Jersey Sec. Inc.,*
  101 F.3d 1450 (2d Cir. 1996).................................................................................61, 62

\* *S.E.C. v. Zandford,*
  535 U.S. 813 (2002).....................................................................................................37

*Salkind v. Wang,*
  No. 93-10912 (WGY), 1995 WL 170122 (D. Mass. Mar. 30, 1995) ..........................92

*In re Salomon Analyst AT&T Litig.,*
  No. 02 Civ. 6801, 2004 WL 2757398 (S.D.N.Y. Dec. 2, 2004).................................38

*San Francisco-Oklahoma Petroleum Exploration Corp. v. Carstan Oil Co.,*
  765 F.2d 962 (10th Cir. 1985) ....................................................................................65

*Saunders v. Superior Court,*
  27 Cal. App. 4th 832 (Cal. App. 1994) ......................................................................97

\* *Schimmer v. State Farm Mutual Automobile Ins. Co.,*
  Civ. A. No. 05-CV-02513-MSK, 2006 WL 2361810 (D. Colo. Aug. 15, 2006) ........21

*Schlaifer Nance & Co. v. Estate of Warhol,*
  119 F.3d 91 (2d Cir. 1997)...........................................................................................26

*Schleicher v. Wendt,*
  No. 1:02CV1332DFHTAB, 2005 WL 1656871 (S.D. Ind. Jul. 14, 2005).................68

*In re Secure Computing Corp. Sec. Litig.,*
  120 F. Supp. 2d 810 (N.D. Cal. 2000) ........................................................................32

*Sedona Corp. v. Ladenburg Thalmann & Co.,*
  No. 03-CIV-3120 (LTS) (THK), 2006 WL 2034663 (S.D.N.Y. July 19, 2006).........60

*Semerenko v. Cendant Corp.,*
  223 F.3d 165 (3d Cir. 2000).................................................................................30, 31

*Sennott v. Rodman & Renshaw*,
  414 U.S. 926 (1973).................................................................62

\* *Seymour v. Summa Vista Cinema, Inc.*,
  809 F.2d 1385 (9th Cir. 1987) .................................................63

*Shahmirzadi v. Smith Barney, Harris Upham & Co., Inc.*,
  636 F. Supp. 49 (D.D.C. 1985).................................................84

*Shapiro v. Merrill, Lynch, Pierce Fenner & Smith, Inc.*,
  495 F.2d 228 (2d Cir. 1974)......................................................75

*Silvestris v. Tantasqua Reg'l Sch. Dist.*,
  847 N.E.2d 328 (Mass. 2006) ...................................................99

*Simpson v. AOL Time Warner*,
  452 F.3d 1040 (9th Cir. 2006) ..................................................41

*Smith v. Egan*,
  No. 94-3909, 1994 WL 902940 (Mass. Super. Nov. 3, 1994).....................97

*Smith v. Network Equip. Tech., Inc.*,
  Nos. C-90-1138, C-90-1281 & C-90-1372 (DLJ), 1990 WL 263846 (N.D.
  Cal. Oct. 19, 1990).................................................................61

*Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*,
  365 F.3d 353 (5th Cir. 2004) ....................................................34

\* *In re Spiegel, Inc. Sec. Litig.*,
  382 F. Supp. 2d 989 (N.D. Ill. 2004) ........................................54

*Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  332 F.3d 116 (2d Cir. 2003)......................................................80

*In re Storage Tech. Corp. Sec. Litig.*,
  630 F. Supp. 1072 (D. Colo. 1986)............................................67

*Suez Equity Investors L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001)........................................................60

*Sutton v. Bernard*,
  No. 00 C 6676, 2001 WL 897593 (N.D. Ill. Aug. 9, 2001)..................44, 45

*In re Syncor Int'l Corp. Sec. Litig.*,
  327 F. Supp. 2d 1149 (C.D. Cal. 2004) ....................................34

*Takara Trust v. Molex Inc.*,
  429 F. Supp. 2d 960 (N.D Ill. 2006) .........................................34

*Teachers' Ret. Sys. of LA v. Qwest Commc'ns Int'l., Inc.*,
  No. 04-CV-0782, 2005 WL 2359311 (D. Colo. Sept. 23, 2005)................15

*Thomson Kernaghan & Co. v. Global Intellicom, Inc.*,
  Nos. 90-CIV-3005 & 99-CIV-3105 (DLC), 2000 WL 640653 (S.D.N.Y. May
  17, 2000) .................................................................................................68

\* *Tosti v. City of Los Angeles*,
  754 F.2d 1485 (9th Cir. 1985) ..................................................................20

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005).......................................................62

*In re Verifone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992) ..........................................................75

*In re Vivendi Universal S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)........................................................62

*Wachovia Bank & Trust Co., N.A. v. National Student Mktg. Corp.*,
  650 F.2d 342 (D.C. Cir. 1980) ...................................................................19

\* *Wafra Leasing Corp. 1999-1 v. Prime Capital Corp.*,
  No. 01C4314, 2004 WL 1977572 (N.D. Ill. Aug. 31, 2004).....................72

*In re Wall Data Sec. Litig.*,
  No. C95-05287, 1996 WL 585596 (W.D. Wash. June 25, 1996)...............61

*Wilson v. Comtech Telecommunications Corp.*,
  648 F.2d 88 (2d Cir. 1981)..........................................................................74

\* *Workgroup Tech. Corp. v. MGM Grand Hotel, LLC*,
  246 F. Supp. 2d 102 (D. Mass. 2003) ...................................................93, 94

\* *In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003)................................................ *passim*

*In re WorldCom, Inc. Sec. Litig.*,
  308 F. Supp. 2d 236 (S.D.N.Y. 2004).........................................................82

*In re WorldCom, Inc. Sec. Litig.*,
  No. 02 Civ 3288 (DLC), 2004 WL 692746 (S.D.N.Y. Apr. 2, 2004) ........82

*In re WorldCom, Inc. Sec. Litig.*,
  No. 02-Civ. 3288, 2004 WL 315143 (S.D.N.Y. Feb. 20, 2004)................80

*In re Worldcom, Inc. Sec. Litig.*,
  No. 02 Civ. 3288, 2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) ...............60

*Yanes v. The Minute Maid Co.*,
  No. Civ. A. 02-2712 (MLC), 2006 WL 1207992 (D.N.J. May 3, 2006)....27

*ZZZZ Best Sec. Litig.*,
  864 F. Supp. 2d 960 (C.D. Cal. 1994) .......................................................56

## STATUTES AND RULES

15 U.S.C. § 78bb(f)(1) ...........................................................................80

15 U.S.C. § 78bb(f)(5)(B) .....................................................................81

15 U.S.C. § 78r ...............................................................................14, 16

15 U.S.C. § 78t(a) ..................................................................................58

15 U.S.C. § 78u-4(b)(2) ........................................................................42

15 U.S.C. § 78u-5(a) .............................................................................31

15 U.S.C. § 78t-1 ..................................................................................73

28 U.S.C. § 1658(b) ..............................................................................15

17 C.F.R. § 230.405 ..............................................................................65

\* 17 C.F.R. § 240.10b5-1(c)(1) ...............................................................78

17 C.F.R. § 240.12b-2 ..........................................................................65

Fed. R. Civ. P. 9(b) .......................................................................*passim*

\* Mass. Gen. L. 93A, § 1(b) ..............................................................90, 91

Mass. Gen. L. 93A, § 2(a).....................................................................89

Mass. Gen. L. 93A, § 11 .......................................................................92

## MISCELLANEOUS

H.R. Rep. No. 910, 100th Cong., 2d Sess. 27 (1988), *reprinted in* 1988
U.S.C.C.A.N. 6043, 6064 ......................................................................74

Restatement (Second) Conflict of Law § 145................................................95

Restatement (Second) Conflict of Law § 148................................................95

Webster's II New College Dictionary (1995)..................................................75

## PRELIMINARY STATEMENT

The Federal National Mortgage Association ("Fannie Mae" or the "Company") perpetrated more than an $11 billion fraud on the investing public by systematically manipulating its reported financial results in every quarterly and annual period for more than four years.  By developing and implementing accounting policies that were designed to minimize the Company's reported earnings volatility—even if Generally Accepted Accounting Principles ("GAAP") had to be ignored to get there—Defendants Howard, Raines and Spencer (the "Officer Defendants") caused the Company to materially misstate its financial results and lined their own pockets with ever-increasing salary and bonus compensation.  Among the schemes the Officer Defendants used was the purchase of a sham "finite insurance policy" from Defendant Radian Guaranty Inc. ("Radian") which Radian knew had no purpose other than to manipulate Fannie Mae's earnings.  Meanwhile, the members of the Company's audit committee (the "Audit Committee Defendants"), who were charged with overseeing the Company's auditors and the financial reporting process, including reviewing the Company's accounting policies and internal controls, turned a blind eye to clear warnings signs and recklessly enabled the fraud to continue undetected.[1]

Fannie Mae's fraudulent accounting has been extensively investigated by the Office of Federal Housing Enterprise Oversight ("OFHEO") and the Securities & Exchange Commission ("SEC").  OFHEO found that Fannie Mae and its executives violated GAAP in ways that "cannot be explained as mere differences in interpretation of accounting principles" but instead involved "clear instances in which management sought to misapply and ignore accounting principles for the purposes of meeting investment analyst expectations; reducing volatility in

---

[1] The Audit Committee Defendants are defendants Thomas P. Gerrity (as Chairman), William R. Harvey, Anne M. Mulcahy, Taylor C. Segue, Frederick V. Malek, and Joe Pickett.

reported earnings; and enabling fragmented process and systems, and an ineffective controls environment to exist."   Evergreen ¶ 2; Franklin ¶ 2.[2]  OFHEO also found that the Company's Board of Directors had enabled the fraud to occur by falling asleep at the wheel:

> The Board of Directors, the last line of defense, failed to be sufficiently informed and independent.  Their oversight failings meant that they did not discover, let alone correct, the unsafe and unsound practices at Fannie Mae . . .

Evergreen ¶ 12; Franklin ¶ 12.  The result:  a fraud whose magnitude and scope is virtually unparalleled in the annals of American history.  According to SEC Chairman Christopher Cox:

> **The significance of the corporate failings at Fannie Mae cannot be overstated.**  The [C]ompany has said that it estimates the restatement of its financial statements for the years ended December 31, 2003, and 2002, and for the quarters ended June 30, 2004, and March 31, 2004, will result in at least an $11 billion reduction of previously reported net income.  **In all likelihood this will be one of the largest restatements in American corporate history.**

Evergreen ¶ 11; Franklin ¶ 11 (emphasis added).

Plaintiffs have opted out of the class action currently pending in this Court, electing instead to pursue their claims independently – including some claims that overlap with those in the class action, and some claims and defendants that are not part of the class action.  In response to Plaintiffs' Complaints, Fannie Mae, the Officer Defendants, the Audit Committee Defendants, and Radian have made a panoply of arguments in favor of dismissal of certain of Plaintiffs' claims.  Each of those arguments should be rejected.

First, Plaintiffs' Section 18 claims were asserted within two years after discovery of the facts giving rise to those claims, which is the appropriate limitations period under the Sarbanes-

---

[2] Citations herein to "Evergreen ¶ __" are to the Second Amended Complaint in the *Evergreen* action, while citations to "Franklin ¶ __" are to the Second Amended Complaint in the *Franklin* action.  These complaints are collectively referred to herein as the "Complaints."

Oxley Act – not the one-year period asserted by Defendants. Even if a one-year limitations period were applied, however, Plaintiffs claims were brought within one year after they learned sufficient facts to assert non-dismissable Section 18 claims. Additionally, the statute of limitations on Plaintiffs' claims against Fannie Mae, Howard, Raines, and Spencer was tolled by the filing of the class action against those defendants, and thus Plaintiffs' Section 18 claims against those defendants are unquestionably timely.

Second, Defendants' motion to dismiss Plaintiffs' claims based on purchases after September 21, 2004 should be denied. The reasonableness of Plaintiffs' reliance after that date is a question of fact for the jury, and it cannot be said that Plaintiffs were unreasonable as a matter of law. Although certain aspects of the fraud were disclosed in 2004, the message that was conveyed to investors was that the fraud was limited to two accounting areas, and had a $9 billion impact on earnings. Plaintiffs were not unreasonable – certainly not as a matter of law – to believe that the Company's financial statements were accurate in all other respects.

Plaintiffs' Section 10(b) claims are adequately pleaded. Radian's conduct in structuring a sham insurance transaction is precisely the type of conduct that courts have found to violate Rule 10b-5(a) and (c), and Plaintiffs have alleged that the Officer Defendants and Audit Committee Defendants each made material false statements for which they are subject to liability under Rule 10b-5(b). Plaintiffs have alleged with particularity each of these Defendants' reckless, if not knowing, misconduct which is sufficient to plead their scienter. Indeed, in the class action, the Court has already ruled that the plaintiffs' allegations of scienter against the Officer Defendants and Fannie Mae were sufficient. Plaintiffs have made similar allegations, plus others based on facts that have come to light since the class action was filed. Contrary to the Officer Defendants' argument, the Court need not revisit their scienter on an accounting issue-by-accounting issue

basis; it is sufficient that Plaintiffs' allegations collectively give rise to an inference that the Officer Defendants knew or recklessly disregarded that their statements regarding the Company's financial condition were false.

Plaintiffs' insider trading claims pursuant to Section 20A of the Exchange Act are also appropriately pleaded. Plaintiffs have alleged that they purchased Fannie Mae stock contemporaneously with – *i.e*, within a week or less after – sales by the Officer Defendants. And although Raines claims to have made *some* of his sales pursuant to a trading plan, that plan provides no defense because it was adopted after the fraud was well underway, and after many of Raines' insider sales.

Plaintiffs' claims for controlling person liability under Section 20(a) are appropriately pleaded, because Plaintiffs have alleged that each of the Director Defendants and Officer Defendants had the power to control Fannie Mae for purposes of the statute, and because Plaintiffs are not required to prove – much less plead – the defendants' culpable participation in Fannie Mae's securities law violations. Nonetheless, even if culpable participation were required to be pleaded, Plaintiffs' allegations of these defendants' scienter and/or lack of good faith are sufficient.

Turning to Plaintiffs' state law claims, the Court should reject Defendants' argument that Plaintiffs' claims are barred by SLUSA. SLUSA is intended to prevent plaintiffs from evading the PSLRA by pursuing state law claims in class actions, or in individual actions that are merely class actions in disguise. It should not bar plaintiffs from pursuing legitimate state law claims in individual, non-class actions, merely because those actions have been consolidated with a related class action to promote efficiency. Such a result would unfairly deprive individual plaintiffs of substantive legal rights in virtually every case where their individual cases are consolidated with

other cases.  Plaintiffs have adequately pleaded the basis for state law claims of common law fraud, negligent misrepresentation, aiding and abetting fraud, and violations of Massachusetts and California statutory law, and the Court should deny Defendants' motions to dismiss those claims – and Plaintiffs' federal claims as well – so Plaintiffs can proceed with the important task of taking discovery and obtaining redress for the significant losses they sustained as a result of the fraud at Fannie Mae.

## STATEMENT OF FACTS

Plaintiffs' Complaints set forth in detail the Company's systematic violation of at least twenty-two different accounting standards, and its consistent issuance of materially false and misleading financial statements throughout the time period when Plaintiffs were purchasing Fannie Mae securities.  Evergreen ¶¶ 110-358; Franklin ¶¶ 133-388.  The particulars of those accounting violations are, for the most part, not relevant for purposes of these motions, because there is no dispute that a significant and pervasive accounting fraud has been perpetrated.  Instead, Defendants' arguments focus on legal issues, and on the sufficiency of Plaintiffs' allegations regarding the Defendants roles in the fraud.  The allegations pertinent to these motions – including those demonstrating Defendants' scienter – are discussed in detail in the Argument section below.  However, for the Court's convenience we provide a brief overview of those allegations here.

## I.    THE OFFICER DEFENDANTS' ROLES IN THE FRAUD

Raines, as CEO and Chairman, set a "tone at the top" that encouraged his subordinates to hit the Company's overly aggressive earnings per share ("EPS") goals at any costs, in the process creating an environment in which such a massive fraud could occur.  In furtherance of this goal, Raines allowed his lieutenant and partner-in-fraud, Howard, to serve in the dual role of the CFO and its Chief Risk Officer ("CRO"), despite the inherent conflicts between those positions.  Even

after being warned of the dangers of combining such duties, Raines went forward with appointing Howard to both roles. Evergreen ¶¶ 418-419; Franklin ¶¶ 448-49.

Howard (the Chief Financial Officer) and Spencer (the Controller) followed through on Raines' "hit the numbers at any cost" philosophy by, *inter alia*, crafting GAAP-violative accounting policies that the Company used to prepare its fraudulent financial statements. These included policies for accounting for the nonrefundable fees and costs associated with lending, committing to lend, or purchasing loans (the "SFAS 91 Policy") and for accounting for hedge transactions (the "SFAS 133 Policy") which were designed with an eye toward minimizing earnings volatility, rather than actually complying with GAAP. Evergreen ¶¶ 117-128, 148, 150, 160; Franklin ¶¶ 140-52, 173, 174, 184.

In addition to crafting accounting policies that suited the Company's earnings management goals, Howard and Spencer were either directly involved in, or knew about, numerous transactions and accounting gimmicks that the Company used to manage earnings and smooth income. For example, in early 1999 Spencer directed a subordinate to run various alternative expense reporting scenarios to determine how much interest expense the Company could record while still achieving the target EPS for the prior year. Spencer and Howard then presented the alternatives to Raines, and convinced him to record an amount that (almost to-the-penny) would achieve the EPS trigger for executive bonuses, even though the full amount should have been recorded pursuant to SFAS 91.

Additionally, Howard knew the Company did not have any documentation to support the reasonableness of its allowance for loan losses, but nonetheless refused to change the Company's allowance-setting methodology. Evergreen ¶ 216; Franklin ¶ 243. In fact, Howard and Spencer knew as early as September 1997 that the amount the Company had set for the allowance

exceeded its actual credit loss experience, yet rather than reduce the allowance they kept it in place as a "war chest" to exploit down the road.  Evergreen ¶ 222; Franklin ¶ 250.  Howard also reviewed and approved the Company's decision to enter into a "finite insurance" transaction with Radian for the sole purpose of shifting income between reporting periods (Evergreen ¶¶ 243- 248; Franklin ¶¶ 272-77), and played a significant role in the Company's use of debt buybacks to enable it to meet its targets by managing EPS growth (Evergreen ¶¶ 365-371; Franklin ¶¶ 395-401).  In addition, Howard and Spencer spearheaded an effort to identify transactions that would enable the Company to shift earnings from one period to another by accelerating the recording of expenses.  Evergreen ¶ 363; Franklin ¶ 393.

Raines' and Howard's willingness to perpetrate such a fraud is not surprising given the compensation bonanza that awaited them if the Company met its aggressive EPS targets.  Raines received almost $15 million in bonus compensation between 1999 and 2003 as a direct result of the Company meeting its EPS targets, while Howard received over $3.7 million in bonuses – significantly more than his base salary compensation – during the same period.  Evergreen ¶ 76; Franklin ¶ 99.

After conducting an extensive investigation into the fraud at Fannie Mae, the Paul Weiss law firm concluded that Howard and Spencer were "primarily responsible for adopting or implementing accounting practices that departed from GAAP."  Evergreen ¶ 6; Franklin ¶ 6.  While OFHEO noted that "[t]he problems relating to these accounting areas differ[ed] in their specifics," it found that they all "emerged from a culture and environment" that had made them possible in the first place.  Evergreen ¶ 642; Franklin ¶ 681.  According to Paul Weiss, Raines – as the Company's CEO – "was ultimately responsible for the failures that occurred on his watch."

## II.     THE AUDIT COMMITTEE DEFENDANTS' ROLE

The Audit Committee Defendants were the members of the Fannie Mae Board who were expressly charged with overseeing the Company's financial reporting, internal controls, and accounting – the very areas in which the fraud occurred.  The Audit Committee Defendants' performance of their duties was grossly deficient, to the point of recklessness.

Among the Audit Committee Defendants' most critical functions was their responsibility for monitoring and reviewing the adequacy of the Company's internal controls (Evergreen ¶ 712; Franklin ¶ 804) – *i.e.*, the systems that were supposed to prevent and/or detect fraud or misstatement of the Company's financial results.  However, there were rampant internal control deficiencies at Fannie Mae, which simply could not have existed if the Audit Committee Defendants had come anywhere close to doing their jobs.  For example, although the Audit Committee's duties specifically included oversight of Fannie Mae's Internal Audit function (Evergreen ¶ 711; Franklin ¶ 803), that function was riddled with obvious problems.   First, the head of the Internal Audit department, Sam Rajappa, had no accounting or auditing background. Evergreen ¶ 720; Franklin ¶ 812.  Instead, he was a former subordinate of Howard, who continued to report directly to Howard when he led the Internal Audit group, despite the obvious conflicts of interest that created.  Rajappa's compensation was set, at least in part, by Howard, while the Internal Audit staff's compensation was tied to EPS targets, thereby creating incentives for all of them that conflicted with their roles as earnings management watchdogs.  Evergreen ¶¶ 721-22; Franklin ¶¶ 813-14.  Even Rajappa himself recognized the potential conflicts that might be raised by shifting his reporting relationship to Howard, and he voiced his concerns to Gerrity, the Audit Committee Chairman, who ignored them.  Evergreen ¶ 722; Franklin ¶ 814.

Gerrity's reaction to these concerns is particularly troubling, given his knowledge that, in 1999, the Officer Defendants had manipulated the Company's earnings – defying the advice of

KPMG – so they could achieve the EPS targets that triggered their maximum bonuses. Evergreen ¶ 69; Franklin ¶ 92.  That situation was brought to the Audit Committee's attention in 1999, while Gerrity was its Chairman.  *Id.*  They did nothing about it then, and Gerrity apparently ignored the red flags that it should have raised for him in terms of management's approach to financial reporting.

Additionally, the Audit Committee Defendants were well-aware that properly accounting for derivatives was of vital importance to ensuring the accuracy of the Company's financial statements.  Evergreen ¶ 716; Franklin ¶ 808.  Despite the fact that GAAP's requirements for accounting for such instruments fundamentally changed in January 2001—and that several entities had already found themselves in dire financial straits as a consequence of their improper use of derivatives—the Audit Committee Defendants failed to properly review the Company's SFAS 133 policy as mandated by their charter.  Evergreen ¶¶ 712, 716; Franklin ¶¶ 804, 808 (noting that the Audit Committee Defendants' duties and responsibilities included "receiv[ing], review[ing] and discuss[ing] reports from the outside auditors on all critical accounting policies and practices to be used").

The Audit Committee Defendants similarly failed in their duties to monitor the development and implementation of the Company's SFAS 91 Policy.  OFHEO found that the Audit Committee Defendants knew that the Company was experiencing problems in its accounting for the amortization of purchase premiums and discounts, yet failed to "demand that a formal policy for FAS 91 be put in place and that such a policy, when put into place, be endorsed by the Financial Standards group of the Enterprise and the external auditor." Evergreen ¶ 725; Franklin ¶ 817.  The Audit Committee Defendants' failure to properly monitor

the Company's SFAS 91 implementation effort put the integrity of its financial results in jeopardy.  *Id.*

Further, the Audit Committee Defendants were aware that a Company employee, Roger Barnes, had submitted a memorandum to the Officer Defendants on August 5, 2003 in which he raised concerns about serious accounting problems and earnings manipulation at Fannie Mae. The memo described no less than sixty specific examples of questionable accounting maneuvers covering a wide range of issues, including the use of a manual factor change in Fannie Mae's amortization system to increase its net interest income for the third quarter of 2003 so it could meet management's projections.  Evergreen ¶ 381; Franklin ¶ 411.  Gerrity was fully briefed on Barnes' allegations shortly after the Officer Defendants' receipt of Barnes' memo (Evergreen ¶ 384; Franklin ¶ 414), and on August 8, 2003 – a mere three days after the date of the memo – he was told that the Internal Audit department had purportedly completed the testing needed to investigate Barnes' allegations.  Evergreen ¶¶ 382, 388; Franklin ¶¶ 412, 418.  Then, on August 12, 2003—only seven days after Barnes had given his memorandum to Spencer—the Audit Committee Defendants participated in a telephone conference to discuss the certification of the third quarter financial results.  Evergreen ¶ 389; Franklin ¶ 419.  Rajappa informed the Audit Committee Defendants that the Company had fully investigated Barnes' allegations and found that they posed no obstacle to Raines' and Howard's ability to certify the Company's results for the quarter.  *Id.*  The Audit Committee Defendants never sought to meet with Barnes directly, and blindly accepted the implausible statement by Rajappa – who reported to Howard and had other conflicting interests as discussed above – that Barnes' allegations had been fully investigated and debunked in only one week.  Evergreen ¶ 390; Franklin ¶ 420.  Given the nature

and extent of the allegations, the Audit Committee Defendants had to know that thorough testing could not possibly have been completed in such a short timeframe.

After rubber-stamping the conclusion of the "investigation" into Barnes' allegations, the Audit Committee Defendants swiftly approved the Company's quarterly financial statements. Had they taken their obligations to oversee the integrity of the Company's financial statements more seriously, they would undoubtedly have discovered that the investigation had not been completed (Evergreen ¶ 715; Franklin ¶ 803), and that Barnes' allegations of earnings manipulation and fraud were correct. The Audit Committee Defendants' failure to investigate and uncover the fraud is rendered all the more unforgivable by the fact that Freddie Mac— Fannie Mae's sister organization—was in the midst of its own accounting debacle involving allegations shockingly similar to those with which Fannie Mae is now charged. Evergreen ¶¶ 93-95; Franklin ¶¶ 116-18.

OFHEO's investigation confirmed that the Audit Committee Defendants fell down on the job in numerous respects, including by failing to oversee the Company's crucial Internal Audit function (Evergreen ¶ 720; Franklin ¶ 812); failing to properly oversee the development and implementation of a number of the Company's most critical accounting policies (Evergreen ¶ 723; Franklin ¶ 815); failing to adequately oversee the Company's Sarbanes-Oxley Section 404 compliance implementation (Evergreen ¶ 729; Franklin ¶ 821); and failing to adequately oversee KPMG (Evergreen ¶ 730; Franklin ¶ 822).

## III.   **THE DIRECTOR DEFENDANTS' ROLE**

OFHEO also laid blame at the feet of the full Fannie Mae Board of Directors, finding that they had fallen asleep at the wheel and failed to exercise the requisite oversight over the Company's activities. Evergreen ¶ 9; Franklin ¶ 9. Not only did the Director Defendants sign Fannie Mae SEC filings containing materially false financial information (*see* Evergreen ¶¶ 33-

48; Franklin ¶¶ 55-70), but pursuant to OFHEO regulations, the Director Defendants were responsible for "direct[ing] the conduct and affairs of [Fannie Mae] in furtherance of the safe and sound operation of the Enterprise," including "having in place adequate policies and procedures to assure its oversight of … [i]ntegrity of accounting and financial reporting systems of the Enterprise, including independent audits and systems of internal control … [and] adequacy of reporting disclosures, and communications to shareholders, investors, and potential investors." Evergreen ¶ 736; Franklin ¶ 829.  Although the Director Defendants could establish committees (like the Audit Committee) to take the lead role in overseeing certain aspects of the Company's management, OFHEO's regulations specifically provide that "no committee shall operate to relieve the board of directors or any board member of a responsibility imposed by applicable law, rule, or regulation."  Evergreen ¶ 737; Franklin ¶ 830.

Among other things, OFHEO found that the Director Defendants had contributed to the fraud by "inappropriately reinforced rather than checked the tone and culture" set by senior management (Evergreen ¶ 735; Franklin ¶ 828); "failed to be sufficiently informed and independent" (*id.*); "approved an executive compensation program that created incentives to manipulate earnings" and then "failed to monitor against such manipulations" (Evergreen ¶ 738; Franklin ¶ 831); "failed to ensure the effective operation of [the] Audit and Compensation Committees" (*id.*); failed to "act as a check" on Raines' authority (*id.*); "failed to initiate an independent inquiry into Fannie Mae's accounting following the announcement of Freddie Mac's restatement and subsequent investigation or allegations of Roger Barnes, both of which involved earnings management" (*id.*); and "failed to ensure timely and accurate reports to Federal regulators" (*id.*).

IV.    **RADIAN'S ROLE**

Radian Guaranty, Inc. ("Radian") participated in Fannie Mae's fraudulent scheme by structuring and selling the Company a sham insurance policy for the purpose of enabling the Officer Defendants to manipulate the Company's earnings.  In January 2002, Fannie Mae executed a transaction with Radian under which it arranged to pay Radian $35 million over a three year period to offset $39 million in claim reimbursements it knew it would receive over that same period.  Evergreen ¶ 247; Franklin ¶ 276.  Radian and Fannie Mae termed this transaction "insurance" even though it involved no risk transfer.  Specifically, both Radian and Fannie Mae knew that the "premium payments" made under the "policy" were equal in value to the "insurance coverage" that Radian would provide and, thus, that the "policy" was not true insurance.  Evergreen ¶ 249; Franklin ¶ 278.  Radian knew that Fannie Mae was buying the "insurance policy" not to guard against unexpected losses but to manage its reported earnings. *Id*.  By purchasing this sham policy, Fannie Mae was able to meet its goal of reporting smooth earnings in 2002, 2003 and 2004 in furtherance of its fraudulent scheme.

**PROCEDURAL BACKGROUND**

On September 22, 2004, Fannie Mae disclosed that OFHEO had issued a report finding that Fannie Mae had systematically manipulated its earnings in order to minimize fluctuations (thus understating risk) and to meet compensation targets for senior executives.  Evergreen ¶ 1; Franklin ¶ 1.  The following day, a securities class action complaint was filed in this Court, asserting claims on behalf of Fannie Mae stockholders against Fannie Mae, Raines, Howard, and Spencer pursuant to Section 10(b), Rule 10b-5 and Section 20(a) of the Exchange Act. Evergreen ¶ 775; Franklin ¶ 868.  Plaintiffs, having collectively purchased hundreds of millions of dollars of Fannie Mae stock at prices that were artificially inflated by the fraud, were members of the putative class in the class action.

In January 2006, in lieu of remaining in the class action, Plaintiffs elected to file individual actions to recover their significant losses on Fannie Mae securities. In those actions, Plaintiffs asserted claims that, although arising out of the same facts, involved different legal theories than the claims in the class action. These included claims pursuant to Section 18 of the Exchange Act and under state law. Additionally, Plaintiffs asserted claims against defendants who had not been named as defendants in the class action, including KPMG, Radian, and the Director Defendants. After the release of the final OFHEO report and the Paul Weiss report, Plaintiffs filed Amended Complaints, followed by Second Amended Complaints (which differed from the Amended Complaints only with respect to the designation of Radian) approximately six weeks later.

On February 10, 2006, the Court denied the defendants' motions to dismiss the class action complaint in all respects. For the reasons discussed below, like the claims in the class action complaint, all of Plaintiffs' claims have been adequately pleaded, were filed within the applicable statutes of limitations, and should be permitted to proceed to trial.

## ARGUMENT

## I.    PLAINTIFFS' SECTION 18 CLAIM IS NOT TIME-BARRED

Section 18 provides a cause of action for investors who purchase securities in reliance upon a false or misleading statement in a document filed with the SEC. 15 U.S.C. § 78r. The language of Section 18 states that an action thereunder must be brought "within one year after the discovery of the facts constituting the cause of action." 15 U.S.C. § 78r(c). Fannie Mae, the Director Defendants, Spencer, and Howard contend that Plaintiffs' Section 18 claims are time-barred because they were not asserted within one year after the release of the initial OFHEO report on September 22, 2004. That argument should be rejected for at least three reasons: First, the statute of repose on Plaintiffs' Section 18 claims was extended to two years under the

Sarbanes-Oxley Act.  Second, even if a one-year period were applicable, it was not until 2005 that Plaintiffs "discover[ed] …the facts constituting the cause of action" under Section 18, and Plaintiffs asserted their claims within one year after that date.  Third, as to Fannie Mae, Howard and Spencer, the statute of limitations on Plaintiffs' Section 18 claims was tolled by the filing of the class action.

### A.    The Sarbanes-Oxley Act's Two-Year Discovery Rule Applies

Under the Sarbanes-Oxley Act, Congress extended the statute of repose to "2 years after discovery of the facts constituting the violation" for any "private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws …"  28 U.S.C. § 1658(b).  As the Supreme Court has recognized, Section 18 "'target[s] the precise dangers that are the focus of § 10(b),' … and the intent motivating [both] sections is the same—'to deter fraud and manipulative practices in the securities markets, and to ensure full disclosure of information material to investment decisions.'"  *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286, 296 (1993) (internal citation omitted).  Thus, Plaintiffs' Section 18 claim is premised on allegations of fraud, deceit, and contrivance in contravention of regulatory requirements concerning the securities laws, and is subject to the extended two-year statute of repose under the Sarbanes-Oxley Act.

Indeed, several courts have expressly found Sarbanes-Oxley's extended limitations periods to be applicable to Section 18 claims.  For example, in *Teachers' Retirement System of Louisiana v. Qwest Communications International, Inc*., No. 04-CV-0782, 2005 WL 2359311, at *3 (D. Colo. Sept. 23, 2005), the court held that Section 18 "easily" fell within the parameters of a claim involving "fraud, deceit, manipulation, or contrivance" to which the Sarbanes-Oxley Act's extended limitations periods apply.  *Id.*  Similarly, in *In re Adelphia Communications Corp. Securities & Derivative Litigation*, No. 03-MD-1529 (LMM), 2005 WL 1679540, at *4

(S.D.N.Y. July 18, 2005), the court found that Section 18 claims are claims involving "fraud,

deceit, manipulation, or contrivance" for purposes of the Sarbanes-Oxley limitations periods.

Citing to a Supreme Court opinion, the court explained:

> Unlike negligence or strict liability-based claims, "the [§ 18]
> defendant is accorded the defense that he acted in 'good faith and
> had no knowledge that such statement was false or misleading.'" ...
> Thus, the Supreme Court opined, "something more than negligence
> on the part of the defendant is required for recovery." … Given
> that § 18 involves more than negligence, this Court finds that the
> extended two-year/five-year limitations period applies.

*Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 211 n.31 (1976)).

Applying the two-year statute of repose under the Sarbanes-Oxley Act, Plaintiffs' Section

18 claims are unquestionably timely because they were brought in January 2006, less than two

years after Defendants contend that Plaintiffs had notice of the claim.

**B.    Plaintiffs Lacked Sufficient Information To File A Non-Dismissable
Section 18 Claim Until 2005**

Even assuming *arguendo* that the statute of limitations set forth in Section 18 was not

superseded by the Sarbanes-Oxley Act, the clock did not begin running on Plaintiffs' time to file

suit until "discovery of the facts constituting the cause of action."  15 U.S.C. § 78r(c).  The

Evergreen Plaintiffs and the Franklin Plaintiffs asserted their Section 18 claims in complaints

filed on January 17, 2006 and January 25, 2006, respectively.  Thus, to prevail on their statute of

limitations argument, Defendants would have to establish that the Evergreen Plaintiffs and the

Franklin Plaintiffs discovered "the facts constituting the cause of action" under Section 18 by

January 17, 2005 and January 25, 2005, respectively.  More specifically, Defendants must show

that Plaintiffs "had enough facts in hand to enable them to file a complaint that would comply

with the requirements of the Federal Rules of Civil Procedure …"  *Law v. Medco Research, Inc.*,

113 F.3d 781, 785 (7th Cir. 1997).  *See also Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d

16

1332, 1337 (7th Cir.1997) (statute does not begin to run until plaintiff has "possession of, or …

ready access to, the essential facts that he needs in order to be able to sue.")  Moreover, to

succeed on this defense on a motion to dismiss, Defendants must show that it is clear from the

face of the Complaints – with any ambiguities construed in Plaintiffs' favor – that the claims are

conclusively time-barred.  *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996); *Doe v.

U.S. Dept. of Justice*, 753 F.2d 1092, 1115 (D.C. Cir. 1985); *Jones v. Rogers Mem. Hosp.*, 442

F.2d 773, 775 & n.2 (D.C. Cir. 1971).  Defendants have not met that burden.

To state a claim under Section 18, a plaintiff must "plead … that the defendant made or

caused to be made a material misstatement or omission in a document filed with the Securities

Exchange Commission and that the plaintiff relied on the misstatement or omission."  *Magna

Inv. Corp. v. John Does One Through Two Hundred*, 931 F.2d 38, 39 (11th Cir. 1991).  Courts

have held that a presumption of reliance is not available under Section 18, and that actual

reliance must be established.  *See, e.g., Gross v. Diversified Mortgage Investors*, 438 F. Supp.

190, 195 (S.D.N.Y. 1977).  Thus, Plaintiffs could not assert a Section 18 claim merely by

alleging that there were false statements in an SEC filing; they had to allege which specific

statements were untrue, and their actual reliance on those statements.  As of January 2005,

Plaintiffs lacked sufficient information to plead with particularity why Fannie Mae's Form 10-K

filings were false, or to plead actual reliance on specific false statements, because many of the

Company's GAAP violations had not yet been disclosed.

The Complaints establish that, as of January 2005, only the "tip of the iceberg" of the

accounting fraud at Fannie Mae had been disclosed.  Evergreen ¶¶ 4, 664; Franklin ¶¶ 4, 701.

Specifically, until February 2005, the disclosures regarding accounting improprieties at Fannie

Mae had focused on violations of SFAS 91 and 133 alone.  *See* Evergreen ¶¶ 56-67, 632, 637-43,

655-56; Franklin ¶¶ 79-80, 671, 676-82, 694-95.  On February 23, 2005, however, Fannie Mae

announced that OFHEO had uncovered violations of numerous other GAAP provisions,

including SFAS 46, 65, 115, 140, and 149, plus additional violations of SFAS 91.  Evergreen ¶

665; Franklin ¶ 702.  Then, in the Fall of 2005, reports came out of "new and pervasive

accounting violations" beyond those uncovered by OFHEO.  Evergreen ¶¶ 674-75; Franklin ¶¶

711-712.  These post-January 2005 revelations significantly increased the scope of the known

fraud.

Given the plethora of GAAP violations and misstatements that Defendants were

continuing to conceal from investors as of January 2005, Plaintiffs could not have discovered

(much less pleaded with particularity) critical elements of their Section 18 claims prior to that

time, including the ways in which Fannie Mae's financial statements had been manipulated to

violate GAAP, and which of the specific statements upon which Plaintiffs had relied when

purchasing Fannie Mae stock were false.  Because Defendants have not met their burden of

establishing – from the face of the Complaints – that Plaintiffs "discover[ed] the facts

constituting the cause of action" under Section 18 more than one year prior to filing their

Complaints, Defendants' motion to dismiss these claims as time-barred should be denied even if

a one-year statute of repose applies.

C.    **The Statute of Limitations on Plaintiffs' Claims Against Fannie Mae,
Howard and Spencer Was Tolled By The Filing of the Class Action**

Alternatively, even if the Court were to find that a one-year limitations period applies and

would otherwise have expired by January 2005, that period was tolled as to defendants Fannie

Mae, Howard, and Spencer (as well as Raines) by the filing of the class action against those

defendants.  Specifically, on September 23, 2004 – the day after the release of the first OFHEO

report – a securities class action was filed in which claims pursuant to Sections 10(b) and 20(a)

of the Exchange Act were asserted against Fannie Mae, Raines, Howard, and Spencer.  Those

claims were premised on the same facts and circumstances as Plaintiffs' Section 18 claims:  the

defendants' making of materially false and misleading statements in, among other places, the

Company's Form 10-K filings.  *See Vinci v. Federal Nat'l Mortgage Ass'n*, No. 1:04-CV01639,

Complaint (Dkt. No. 1), at ¶¶ 50, 67, 68.  As purchasers of Fannie Mae stock during the class

period, Plaintiffs were members of the putative class in that action.

In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the Supreme Court

held that the commencement of a class action "tolls" the running of the statute of limitations for

all class members who make timely motions to intervene.  Then, in *Crown, Cork & Seal Co.,*

*Inc. v. Parker*, 462 U.S. 345 (1985), the Supreme Court extended the holding of *American Pipe*

to class members who opt out of the class action and bring individual actions.  Under *American*

*Pipe* and its progeny, class members are protected from the running of the statute of limitations

until either (i) class certification is denied or (ii) they opt out of the class.  *See Realmonte v.*

*Reeves*, 169 F.3d 1280, 1284 (10th Cir. 1999).  Thus, as of the filing of Plaintiffs' actions, only

one day of the applicable statute of limitations had run (from September 22 to September 23,

2004).[3]

Defendants nonetheless contend that the class action did not toll the statute of limitations

because: (1) the class plaintiffs did not assert a Section 18 claim, and (2) Plaintiffs opted out

prior to a decision on class certification.  Both arguments should fail.

---

[3] Defendants cite *Wachovia Bank & Trust Co., N.A. v. National Student Marketing Corp.*, 650 F.2d 342, 336 n.7
(D.C. Cir. 1980), for the proposition that the D.C. Circuit has found *American Pipe* tolling inapplicable to plaintiffs
who opt out prior to a class certification decision.  However, that decision was rendered five years before the
Supreme Court's holding in *Crown, Cork & Seal* that tolling extends to class members who opt out of the class
action and bring individual actions, not just those who intervene in the class action.  Thus, the D.C. Circuit's holding
– that tolling did not apply where "no intervention was ever attempted" (*Wachovia*, 650 F.2d at 336 n.7) – is
inapposite.

1.      **Class Action Tolling Is Not Limited to the Precise Claims Asserted in the Class Action**

Tolling under *American Pipe* applies not just to claims that were asserted in the class action, but also to claims arising out of the same operative facts. *See Crown, Cork & Seal*, 462 U.S. at 355 (Powell, J., concurring) (individual suit should "'concern the same evidence, memories, and witnesses as the subject matter of the original class suit,' so that 'the defendant will not be prejudiced'") (quoting *American Pipe*, 414 U.S. at 562); *Cullen v. Margiotta*, 811 F.2d 698, 721 (2d Cir.), *cert. denied*, 483 U.S. 1021 (1987) ("[W]e do not regard the fact that the [class] action was premised on different legal theories as a reason not to apply *American Pipe* tolling . . . [B]ecause the asserted factual basis of the [class] claims was the same as that of the claims asserted here . . . the running of the statute on the claims of the absent class members . . . was thereby tolled."); *Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985) (individual action need not be identical in all respects to class action for *American Pipe* to apply); *In re Indep. Serv. Org. Antitrust Litig. ("ISO Antitrust")*, Civ. No. MDL-1021, 1997 WL 161940, at **3-6 (D. Kan. Mar. 12, 1997) (claims seeking different remedies but based on the same facts are tolled under *American Pipe*).

Plaintiffs' Section 18 claims arise under the same statutory scheme – the Securities Exchange Act of 1934 – as the class plaintiffs' Section 10(b) claims. Both claims are premised on the same factual allegations – *i.e.*, Defendants' publication of false and misleading financial statements in the Company's Form 10-K filings. Additionally, the elements of Plaintiffs' Section 18 claims – the making of false statements, and Plaintiffs reliance thereon – are also elements of the class plaintiffs' Section 10(b) claim. Therefore, *American Pipe* tolling should be applied to Plaintiffs' Section 18 claims because these claims are "sufficiently similar to give defendant ample notice of plaintiff's individual claims." *ISO Antitrust*, 1997 WL 161940, at *3

(citing *Tosti*, 754 F.2d at 1489). *Cullen*, 811 F.2d at 721 (tolling applies where claims have same

factual basis); *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 351 (E.D. Pa. 2004) ("For

tolling to apply, claims do not have to be identical but only substantially similar to those brought

in the original class action."); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1528 (M.D.

Fla. 1989) ("*American Pipe* tolling is properly extended where as here the individual claims

involve the same 'evidence, memories, and witnesses' as are involved in the putative class

action," even if the legal theories are not identical) (citation omitted).

### 2.  Class Action Tolling Applies in this Case, Even Though Class Certification Has Not Been Resolved

Defendants also contend that *American Pipe* tolling is only available to class members

who wait until *after* a decision on class certification before bringing an individual action.

However, numerous courts have applied *American Pipe* tolling in favor of plaintiffs who filed

individual actions before class certification was addressed. *See, e.g.*, *Joseph v. Wiles*, 223 F.3d

1155, 1167 n.9 & 1168 (10th Cir. 2000) (holding that *American Pipe* applied to toll the claims of

a putative class member who opted out before a class was certified); *Adams Public Sch. Dist. v.

Asbestos Corp., Ltd.*, 7 F.3d 717, 718 n.1 (8th Cir. 1993) ("The fact that [a class member's]

participation [in the class action] ended with a decision to 'opt out' rather than with denial of

class certification is irrelevant to the applicability of the *American Pipe* rule"); *Schimmer v. State

Farm Mut. Auto. Ins. Co.*, Civ. A. No. 05-CV-02513-MSK, 2006 WL 2361810, at *6 (D. Colo.

Aug. 15, 2006) ("To deny a putative class member the benefit of class action tolling because he

elected to protect his rights in a separate action before a ruling was made on class certification is

inconsistent with the premise for the tolling doctrine."); *Lehman v. United Parcel Service, Inc.*,

No. 06-4020-CV-C-NKL, 2006 WL 2280186, at *4 (W.D. Mo. Aug. 9, 2006) (after a "thorough

review" of the law, the court could find "no logical or jurisprudential basis" to deny *American*

*Pipe* tolling to plaintiff who filed individual action before class certification); *Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 32 (Bankr. S.D.N.Y. 2002) (applying *American Pipe* tolling to opt-out action brought prior to class certification decision).[4]

The case for application of *American Pipe* tolling is even stronger in this case, when one considers that the policies behind the *American Pipe* doctrine are the promotion of judicial efficiency and the avoidance of *unnecessary* litigation. As the Third Circuit has explained:

> [C]lass actions are 'designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions.' If the claims of unnamed plaintiffs were not tolled, claimants would have an incentive to file claims themselves to protect their causes of action, 'precisely the multiplicity of activity which Rule 23 was designed to avoid.'

*McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*, 295 F.3d 380, 384-85 (3d Cir.), *cert. denied*, 537 U.S. 1088 (2002) (internal citations omitted). These goals are furthered by applying *American Pipe* to toll Plaintiffs' claims.

While Fannie Mae argues that it would lead to "needless lawsuits" to apply *American Pipe* tolling to plaintiffs who file individual actions before a decision on class certification, that argument presupposes – incorrectly – that if Plaintiffs had waited until after class certification, they might have avoided filing suit. Fannie Mae ignores the fact that Plaintiffs *had to* file individual actions in order to preserve claims that were not brought in the class action, including

---

[4] Admittedly, there are courts that have reached a different conclusion. However, as the Court explained in *Lehman*, 2006 WL 2280186, at \*5, "it is difficult to square their reasoning with the Supreme Court's language" in *Crown, Cork & Seal*, where the Court stated clearly that:

> the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.

462 U.S. at 353-354 (quoted in *Lehman*, 2006 WL 2280186, at \*5). "There is nothing in that language that suggests the statute of limitations is only tolled for those plaintiffs who wait to file suit until there is a ruling on class certification." *Lehman*, 2006 WL 2280186, at \*5.

state law claims and claims against defendants whom the class plaintiffs did not name.  Because *American Pipe* tolling may not apply to those claims and defendants, Plaintiffs could not afford to wait until after the resolution of class certification to file suit.  The question is, could Plaintiffs assert all of their claims in that suit, or were they required to assert only the non-class claims, and wait until after class certification to assert their claims that are similar to the class claims?  To accept Defendants argument would be to require Plaintiffs to assert their claims piecemeal, because bringing their class claims prior to class certification would cause them to lose the benefit of *American Pipe* tolling.  That result is plainly inconsistent with the goal of efficiency that underlies *American Pipe*.  Not only would it place Plaintiffs' own claims on different timetables, but it would likely require duplication of discovery and other pre-trial proceedings.

Incredibly, the same defendants who now claim that Plaintiffs should have waited *longer* to assert their claims, have previously taken Plaintiffs to task for not asserting them *earlier*. When it suited their purposes in opposing Plaintiffs' motion to lift the discovery stay, the Director Defendants accused Plaintiffs of "[sitting] on the sidelines for more than a year" and of "sleep[ing] on their rights."  *See* Mem. of Law of Newly Named Director Defs. in Opp. to Mot. to Lift Automatic Stay of Disc. Prior to Decision on Mot. to Dismiss, at 2.  In making these arguments, the Director Defendants recognized that the interests of efficiency favor the *early* filing of opt-out cases.  Their newfound argument – that Plaintiffs should be forced to wait *longer* to assert their claims in order to get the benefit of tolling – may be consistent with Defendants' own interests *du jour*, but is totally inconsistent with the interests of efficiency which *American Pipe* was intended to further.[5]

---

[5] To the extent that some courts have found that plaintiffs who file individual actions prior to a decision on class certification lose the benefits of *American Pipe*, their rationale is based on the promotion of judicial economy to prevent duplicative litigation.  That rationale does not apply where, as here, a plaintiff opts out in order to pursue non-class claims, and simultaneously asserts claims similar to those advanced in the class action in order to *prevent*

In sum, because Plaintiffs had to file individual actions to assert their state law claims regardless of the Court's decision on class certification, their inclusion of their federal claims in those actions actually promotes, rather than frustrates, judicial efficiency. The Court should therefore apply *American Pipe* tolling to Plaintiffs' Section 18 claims.

## II.    PLAINTIFFS HAVE STATED CLAIMS BASED ON STATEMENTS MADE AFTER SEPTEMBER 21, 2004

Fannie Mae has moved to dismiss the Complaints to the extent they assert reliance-based claims for damages for any period subsequent to September 21, 2004, "or at the very latest, December 22, 2004," because – according to Fannie Mae – "Plaintiffs cannot claim to have reasonably relied on Fannie Mae's prior financials after that date, and they fail to allege adequately that Fannie Mae made any false or misleading statements on or after December 22, 2004." *See* Fannie Mae Mem. of Law in Supp. of Mot. to Dismiss Complaint ("Fannie Mae Mem.") at 15. Fannie Mae's position regarding post-September 21, 2004 purchases is disingenuous, given its own public statement on November 15, 2004, that it and KPMG continued to believe its accounting to have been appropriate. *See* Stern Decl. Ex. 5 (Form NT 10-Q filing dated Nov. 14, 2004). Fannie Mae can hardly argue that Plaintiffs were unreasonable as a matter of law to rely on financial statements which the Company, at least until December 22, 2004, claimed were accurate.

On December 22, 2004, the Company admitted that its financial statements were false, although it led Plaintiffs and other Fannie Mae investors to believe that the problems at Fannie

---

duplicative litigation. For example, *In re WorldCom Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 451 (S.D.N.Y. 2003) the court refused to allow a group of 147 opt-out plaintiffs to benefit from the *American Pipe* tolling doctrine in the absence of a decision on class certification, because to do so would violate the underlying policies of *American Pipe* of promoting judicial efficiency and discouraging unnecessary litigation and protective filings. *WorldCom*, 294 F. Supp. 2d at 452. The situation in *WorldCom* presented an egregious example of duplicative litigation, where application of *American Pipe* to individual plaintiffs asserting identical claims as those in the class action would not promote judicial efficiency. However, the concerns of the Court in *WorldCom* have no application where the plaintiff seeks to add new defendants or pursue additional, non-class claims.

Mae were limited to violations of two GAAP provisions, SFAS 91 and SFAS 133, and that the correction of these violations would reduce earnings by approximately $9 billion. Evergreen ¶¶ 57, 664; Franklin ¶¶ 80, 701. Subsequent disclosures revealed that the fraud at Fannie Mae was far more pervasive. On September 28, 2005, *Dow Jones* published a story detailing significant additional accounting violations. Evergreen ¶ 674; Franklin ¶ 711. The revelation of these additional problems caused a significant drop in the Company's stock price, demonstrating that the problems had not previously been known or anticipated by the market. *Id.*

Plaintiffs *do not claim* to have relied lock-stock-and-barrel upon the Company's prior financial statements when making their purchases after December 22, 2004. Rather, those purchases were made in reliance upon the total mix of information that was available to Plaintiffs at the time – which included the prior financial statements, *as modified* by the subsequent disclosures. Therefore, the question is not whether wholesale reliance upon the prior financial statements could have been reasonable after December 22, 2004; the question is whether Plaintiffs could reasonably have relied upon those aspects of the prior financial statements which they had no reason to believe were false.[6]

As discussed below, Plaintiffs' claims based on post-December 22, 2004 purchases should not be dismissed, because (a) given the incomplete nature of the disclosures as of that date, Defendants cannot establish that Plaintiffs' continued reliance (at least in part) on pre-December 22, 2004 financial information was unreasonable as a matter of law; and (b) even if Plaintiffs were not entitled to rely on the Company's pre-December 22, 2004 disclosures, they were entitled to rely on the Company's Form 8-K filing of December 22, 2004. That Form 8-K

---

[6] Stated simply, if a company stated that its earnings were $100 million, then later disclosed that those earnings were overstated by $20 million, a plaintiff may well be unreasonable in continuing to rely upon the $100 million earnings figure. However, it cannot be said that the plaintiff would be unreasonable—at least as a matter of law—to rely upon the combination of these two disclosures to conclude that the company's earnings were $80 million.

filing, unbeknownst to Plaintiffs, was itself materially false and misleading because it failed to disclose the full extent of the fraud.[7]

### A. Fannie Mae Is Unable To Meet Its Heavy Burden Of Establishing The Unreasonableness of Plaintiffs' Reliance As A Matter of Law

"[T]he absence of reasonable reliance is in the nature of an affirmative defense, and therefore, the defendant bears the burden of establishing that the plaintiff's reliance was unreasonable." *Burman v. Phoenix Worldwide Indus., Inc.*, 384 F. Supp. 2d 316, 329 (D.D.C. 2005) (citations and internal quotations omitted). Here, Plaintiffs have alleged, and Defendants do not challenge, the applicability of the presumption of reliance that is available to securities fraud claimants under the "fraud-on-the-market" doctrine announced in *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) (holding that "an investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentation, therefore, may be presumed for purposes of a Rule 10b-5 action."). To rebut this presumption of reliance, Defendants must show that the market was "privy to the truth … and thus that the market price would not have been affected by [Defendants'] misrepresentations…." *Id.* at 248. This "truth-on-the-market defense is intensely fact-specific

---

[7] Fannie Mae's argument that Plaintiffs are subject to an "enhanced duty to obtain available information" due to their sophistication as institutional investors is a non-starter. *See* Fannie Mae Mem. at 18. The *Livent* case upon which Fannie Mae relies, and the *Lazard Freres* and *Schlaifer Nance* decisions cited therein, simply recognized that *when information is readily available* to a sophisticated investor, that will be taken into account when evaluating the reasonableness of that investor's reliance. *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 439 (S.D.N.Y. 2001) ("if basic inquiries would have revealed the truth, the [plaintiffs] could not have reasonable relied on defendants' alleged misrepresentations); *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ("[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance"); *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541-42 (2d Cir. 1997) (same, but holding that "[w]hen matters are held to be peculiarly within defendant's knowledge, … plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth") (citation omitted). These cases do not hold that sophisticated investors to a heightened duty to uncover information (such as the perpetration of fraud) that is exclusively within the defendants' possession, and indeed the *Lazard Freres* case held that there is no such duty. 108 F.3d at 1542.

and is rarely an appropriate basis for dismissing a § 10(b) complaint …" *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).[8]

Similarly, to the extent Plaintiffs' claims require proof of actual reliance (and thus do not involve the fraud-on-the-market rule), the reasonableness of Plaintiffs' post-September 21, 2004 reliance is a factual question, as to which Defendants bear the burden of proof, and which typically should not be resolved at the pleadings stage. *See Miller v. Premier Corp.*, 608 F.2d 973, 982 (4th Cir. 1979) (recognizing that even when sophisticated investors are involved, "issues of reliance and its reasonableness, going as they do to subjective states of mind and applications of objective standards of reasonableness, are preeminently factual issues for the trier of fact."); *Angrisani v. Capital Access Network, Inc.*, 175 Fed. Appx. 554, 557 (3d Cir. 2006) (same); *Yanes v. The Minute Maid Co.*, No. Civ. A. 02-2712 (MLC), 2006 WL 1207992, at *5 (D.N.J. May 3, 2006) ("Challenging the reasonableness of [plaintiff's] reliance … is a defense to an element of the fraud claim, and is a question of fact.  It does not relate to the sufficiency of the pleadings … for purposes of a motion to dismiss.").

To succeed in its bid for partial dismissal of Plaintiffs' claims for failure to plead "reasonable reliance" for purchases after the September or December 2004 disclosures, Fannie Mae would have to conclusively establish – based on the allegations in the Complaints – that those disclosures cured the market of *all* of its fraud.  *See, e.g., In re Newbridge Networks Sec. Litig.*, 962 F. Supp. 166, 178 (D.D.C. 1996) (denying a § 10(b) defendant's truth-on-the-market defense at the motion to dismiss stage because, among other things, the existence of one

---

[8] *See also Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 735 (7th Cir. 2004) ("the 'truth-on-the-market' defense is available in principle … but not at the pleading stage."); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1037 (S.D. Cal. 2005) (denying a motion to dismiss based upon the truth-on-the-market defense because of the "the extremely high burden posed by this fact-based inquiry"); *In re GlobalStar Sec. Litig.*, No. 01 Civ. 1748 (SHS), 2003 WL 22953163, at *9 (S.D.N.Y. Dec. 15, 2003) ("[t]he question of whether, and when, the market had received enough information to counteract the allegedly misleading statements is best resolved on a summary judgment motion or at trial …").

potentially curative disclosure "does not mean that the market knew all of the material

undisclosed facts concerning the problems the Company was having").[9]  To make such a

showing, Fannie Mae must establish that its September and December 2004 releases conveyed

the supposedly curative information to the investing public "with the degree of intensity and

credibility sufficient to effectively counter-balance any misleading impression created by the

insiders' one-sided representations."  *Newbridge*, 962 F. Supp. at 178-79 (citing *In re Apple

Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)).

 Fannie Mae cannot meet its heavy burden because nowhere in the Complaints does it say

that the September or December 2004 disclosures cured the false information in the market.  The

September 22, 2004 disclosure was followed by a November 15, 2004 disclaimer by the

Company, indicating that it believed its accounting to be appropriate.  *See* Stern Decl. Ex. 5.

Additionally, the Complaints are full of factual details regarding Fannie Mae's accounting

manipulations and fraud that were not disclosed until well after December 22, 2004.[10]  On

September 28, 2005, the marketplace learned of numerous *new* and *serious* accounting violations

which caused Fannie Mae's stock price to drop to an eight-year low.  Evergreen ¶ 674; Franklin

---

[9] *See also Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 375 (3d Cir. 2002) (plaintiff adequately pleaded reasonable reliance where the complaint suggested "that the full truth about [the defendant's illegal] activity had not yet emerged by the time at which [plaintiff] purchased his [securities]"); *Freeland v. Iridium World Commc'ns, Ltd*, 233 F.R.D. 40, 44 (D.D.C. 2006) (denying a § 10(b) defendant's attempt to limit the class period on the basis of a purportedly curative disclosure because "the Court is not persuaded that the alleged fraud was cured by March 31 rather than May 13.  There is simply not enough information before the Court at this stage in the litigation to say conclusively that [defendant's] March 29 press release cured any fraud on the market."); *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 82 (D. Md. 1991) (applying a longer class period because plaintiffs alleged that the curative disclosures "did not disclose the full extent of the misrepresentations that had occurred previously.")

[10] *See, e.g.,* Evergreen ¶ 4; Franklin ¶ 4 ("[T]he revelations of September 2004 were only the tip of the iceberg."); Evergreen ¶ 58; Franklin ¶ 84 ("During the course of the restatement process, Fannie Mae's new management … uncovered additional accounting problems not addressed in the Interim OFHEO Report, which have been disclosed in various public filings, including a form 8-K filed on February 23, 2005; the November 2005 Form 12b-25; the March 2006 Form 12b-25; and the May 2006 Form 12b-25."); Evergreen ¶ 112; Franklin ¶ 137 (listing twenty-two separate accounting machinations employed by Fannie Mae that violated GAAP, only two of which (i.e. SFAS 91 and SFAS 133) were referenced in the September 22, 2004 or December 22, 2004 releases).

¶ 714.  Courts typically reject the "truth-on-the-market" defense and extend the recoverable loss period where, as here, subsequent corrective disclosures caused a further decline in the Company's stock price.[11]

The case of *In re Royal Dutch/Shell Transport Securities Litigation*, 380 F. Supp. 2d 509 (D.N.J. 2005) is instructive.  There, the company announced on January 9, 2004 that it was reducing its previously reported proved reserves by 20%.  *Id.* at 517.  The company later reduced its proved reserves by an additional 3%.  *Id.*  When a complaint was filed on behalf of persons who purchased the company's securities through March 18, 2004, the defendants argued that "as a matter of law, any purchases made after the January 9, 2004 announcement, which disclosed the majority of the proved reserves recategorization, could not have been made in reasonable reliance upon any prior alleged misstatements about proved reserves."  *Id.* at 554.  The Court rejected that argument, finding reasonable reliance to be adequately pleaded (and distinguishing *Semerenko*, cited by Defendants) because the January 9, 2004 announcement "was not entirely curative" and was "only 'a partial revelation of the truth,' and the Companies' securities, therefore, remained artificially inflated."  *Id.* at 555.  Likewise, here, the disclosures in September and December 2004 were not entirely curative.  Fannie Mae's stock price remained artificially inflated until September 28, 2005, when it dropped precipitously upon the disclosure

---

[11] *See, e.g., Freeland,* 233 F.R.D. at 47 (extending class period due to the stock price decline that followed disclosures subsequent to the alleged curative disclosure); *In re Bridgestone Sec. Litig.*, 430 F. Supp. 2d 728, 736 (M.D. Tenn. 2006) (denying a § 10(b) defendant's motion to dismiss claims for purchases subsequent to a corrective disclosure, because "the market still had not been fully informed of the extent of Defendants' knowledge, actions, and inactions," and the additional revelations of wrongdoing "prompted renewed depreciation in the value of [the] stock."); *In re Interpublic Sec. Litig.*, No. 02-CV-6527 (DLC), 2003 WL 22509414, at *5 (S.D.N.Y. Nov. 6, 2003) ("[A] broader class period is appropriate when questions of fact remain as to whether a purportedly curative press release effected a complete cure on the market or was itself fraudulent…. Indeed, that [the] stock lost 30% of its value immediately following the October 16 Announcement is evidence that the August 13 Press Release did not fully disclose the extent of the [accounting] inaccuracies to the public."); *In re Intelcom Group Sec. Litig.*, 169 F.R.D. 142, 151 (D. Colo. 1996) (rejecting a § 10(b) defendant's attempt to limit the class period where there was a substantial question of fact as to whether the corrective disclosure cured the market or was itself misleading because, among other things, defendants did not disclose other adverse news that, when revealed, caused the stock price to drop even further.).

of additional accounting violations.  Therefore, Plaintiffs' Section 10(b) claims should not be dismissed for post-September 21, 2004 purchases.

**B.     Plaintiffs Have Stated Section 10(b) Claims Based Upon the Statements Contained in the December 22, 2004 Release.**

Even if the Court were to find that Plaintiffs cannot establish that their post-December 22, 2004 purchases were made in reasonable reliance upon the Company's prior financial statements, the Court should not dismiss Plaintiffs' claims based on those purchases.  Rather, losses arising out of those purchases are actionable due to material misstatements and omissions in the December 22, 2004 Form 8-K filing itself.  In particular, the Form 8-K falsely suggested that the Company's accounting problems were limited to only two discrete areas – SFAS 91 and SFAS 133 – and that the correction of those problems would impact earnings by approximately $9 billion.  Evergreen ¶¶ 57, 632; Franklin ¶¶ 80, 671.  In reality, the Company had violated more than twenty GAAP provisions, and the impact of the restatement is in excess of $11 billion. Evergreen ¶¶ 58, 774; Franklin ¶¶ 81, 867.  Under similar circumstances, in *Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000), the Third Circuit reversed the district court's dismissal of Section 10(b) claims for purchases made in reliance on a press release announcing the need to restate, when that press release understated the scope and impact of the accounting irregularities.  *Id.* at 170-71, 181-83.  The Court held:

> In our opinion, a reasonable investor may be willing to rely on the announcement's specific calculations concerning the restatement in the absence of a … detailed explanation of the reasons that the calculations might be incorrect and of the effect of any error.  The announcement's blanket warning—that the amount of the restatement could later turn out to be wrong—was simply not sufficient to caution reasonable investors against relying on the defendants' representations.

*Id.* at 183.[12]

Although Fannie Mae goes to great lengths to argue that the statements in its December 22, 2004 Form 8-K are protected by the PSLRA's safe harbor provision (*see* Fannie Mae Mem. at 19-24), that safe harbor applies only to forward-looking statements. *See* 15 U.S.C. § 78u-5(a) ("This section shall apply only to a forward-looking statement …"). Statements regarding the magnitude and scope of the fraud at Fannie Mae were statements of present or historical facts, not forward-looking statements.[13] The safe harbor is thus inapplicable.

Therefore, even if the Court were to find (as a matter of law) that Plaintiffs' post-December 22, 2004 purchases could not have been the product of reasonable reliance upon pre-December 22, 2004 financial information, Plaintiffs were reasonable to rely upon the December 22, 2004 Form 8-K filing – which failed to disclose material aspects of the fraud at Fannie Mae. The Court should therefore reject Defendants' invitation to dismiss Plaintiffs' claims to the extent they are based upon purchases after December 22, 2004.

---

[12] Fannie Mae cites *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001), where the Court held that the plaintiffs could not establish reasonable reliance upon press releases announcing the discovery of accounting irregularities. *Id.* at 440. The Court's circular explanation for that holding was that the press releases conveyed a "clear message that Livent's prior financial statements could no longer be relied upon" and that this "precludes [plaintiffs] from establishing the reasonable reliance necessary to state a § 10(b) claim based on Livent's … Press Releases." *Id.* However, no explanation is provided – and Plaintiffs can conceive of none – for the Court's leap of logic that a plaintiff's inability to rely on prior financial statements necessarily translates into an inability to rely on *independent* false statements in the press releases announcing the need to restate those financial statements. Plaintiffs respectfully submit that this Court should decline to follow *Livent*, and should consider Plaintiffs' reliance on the December 22, 2004 Form 8-K independently of the reasonableness of their reliance on the prior financials.

[13] Even if the statements were forward-looking, as in *Semerenko* they were not accompanied by meaningful cautionary language. The purportedly cautionary language in the Form 8-K stated simply that "[a] number of factors could cause actual results to differ materially from those contained in any forward looking statement" and the "[e]xamples of such factors include, but are not limited to, the timing and nature of the final resolution of the accounting issues discussed in this notice and those raised in the OFHEO report discussed in this notice, and the outcome of the investigation being conducted by independent counsel on behalf of the company's Board of Directors." *See* Stern Decl. at Ex. 2. Like the warning in *Semerenko*, this disclosure is not specifically tailored to the risks that ultimately came to pass (*i.e.*, that there were numerous *additional* accounting manipulations and fraud afoot at the Company) and fails to apprise a reasonable investor as to any reason why the projected $9 billion restatement could, in fact, be billions of dollars more. *See also In re FirstEnergy Corp.*, 316 F. Supp. 2d 581, 596 n.9 (N.D. Ohio 2004) (warning that "[a]ctual results may differ materially due to a number of factors including, but not limited to, the speed and nature of regulatory approvals" was insufficient to invoke PSLRA safe harbor).

## III.    PLAINTIFFS HAVE ADEQUATELY PLEADED SECTION 10(b) CLAIMS

### A.    The Audit Committee Defendants Made False Statements

There is no dispute that Plaintiffs have alleged the making of false statements by Fannie Mae and the Officer Defendants.  The Audit Committee Defendants, however, contend that Plaintiffs' claims against them amount to "group pleading," and should be dismissed because the "group pleading doctrine" did not survive the PSLRA and is not available to audit committee members.  Plaintiffs fundamentally disagree with both points, because (a) numerous courts, including one in this Circuit, have held that the group pleading doctrine is alive and well in the post-PSLRA world,[14] and (b) the group pleading doctrine has been applied to audit committee members.[15]  However, the Court does not have to reach these issues, because Plaintiffs need not rely on the group pleading doctrine to state a claim against the Audit Committee Defendants.

The group pleading doctrine "allows plaintiffs to 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.'"  *Baan Co.,* 103 F. Supp. 2d at 17 (quoting *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 142 (S.D.N.Y. 1999).  This presumption is only needed when plaintiffs are unable to plead *directly* that a defendant was involved in the making of a false

---

[14] *See, e.g.*, *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 17 (D.D.C. 2000) (noting that the group pleading doctrine is not "incompatible with the PSLRA" and relying upon the doctrine to deny motions to dismiss); *In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 821 (N.D. Cal. 2000) ("the majority of the district courts in the Ninth Circuit that have addressed the issue have concluded that the group published information presumption survives the PSLRA"); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999) ("[T]he PSLRA has not altered the group pleading doctrine …"); *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 219 (S.D.N.Y. 1999) (recognizing vitality of group pleading doctrine after the PSLRA).

[15] *See, e.g.*, *Livent*, 78 F. Supp. 2d at 219; *Mitzner v. Hastings*, No. C04-3310 FMS, 2005 WL 88966, at *6 (N.D. Cal. Jan. 14, 2005) (allegations of membership on audit committee may suffice to warrant application of group pleading doctrine); *In re MTC Elect. Tech. S'holders Litig.*, 898 F. Supp. 974, 980 (E.D.N.Y. 1995) (denying motions to dismiss by defendants who signed prospectuses containing false statements, and were members of the audit committee "charged with overseeing the conduct of MTC's accountants"), *vacated in part on other grounds*, 993 F. Supp. 160 (E.D.N.Y. 1997).

statement.  *See Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1019 (11th Cir. 2004) (finding it unnecessary to address group pleading doctrine because plaintiffs had directly linked each defendant to false statements).  Plaintiffs' Section 10(b) claims against the Audit Committee Defendants are based upon statements of Fannie Mae's financial results that were contained in the Company's Forms 10-K, annual reports, proxy statements, and press releases.  Plaintiffs have specifically alleged – separately for each Audit Committee Defendant – that he or she *signed* the Forms 10-K and "participated in the review and approval of the financial statements" contained therein.  Evergreen ¶¶ 33-38; Franklin ¶¶ 55-60.  Plaintiffs have also alleged in detail the Audit Committee Defendants' critical role in overseeing the work of the Company's auditors, reviewing and monitoring the Company's internal controls and accounting policies, and reviewing and approving the financial statements that formed the basis of the false statements in the Company's SEC filings and press releases.  Evergreen ¶¶ 707-13; Franklin ¶¶ 799-805.  Thus, Plaintiffs do not need a presumption of the Audit Committee Defendants' responsibility for those false statements; they have pleaded it directly.

### 1.    The Audit Committee Defendants "Made" the Statements in the Forms 10-K By Signing Those Documents

The Complaint alleges that each of the Audit Committee Defendants "signed Fannie Mae's Form 10-K filings for 2002 and 2003."  *See* Evergreen ¶¶ 33-38; Franklin ¶¶ 55-60.  *See also* Evergreen ¶¶ 503, 582; Franklin ¶¶ 539, 619.  It is well-settled that "[a]n officer or director who signs a fraudulent Form 10-K with the requisite level of scienter can be liable as a violator of section 10(b) for making false statements."  *In re Syncor Int'l Corp. Sec. Litig.,* 327 F. Supp. 2d 1149, 1168 (C.D. Cal. 2004).  *See also Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 365 (5th Cir. 2004) (corporate officer may be held liable for corporate statements if his signature links him thereto); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir. 2002)

33

(reversing dismissal of Section 10(b) claim against outside directors who "signed the Form 10-K and accepted responsibility for its contents"); *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1061-1063 (9th Cir. 2000) (officer who signed false statements could be held liable as a primary violator); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 973 (N.D Ill. 2006) (plaintiffs "adequately alleged that Defendants made false or misleading statements or omissions," where Defendants signed the Company's Form 10-K without disclosing a known accounting error); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 587 (S.D. Tex. 2003) (corporate official "who on behalf of the corporation signs a document that is filed with the SEC … regardless of whether he participated in the drafting of the document, 'makes' a statement and may be liable as a primary violator under § 10(b)"); *In re Lernout & Hauspie Sec. Litig.,* 286 B.R. 33, 37 (D. Mass. 2002) (signatures of audit committee members on statements filed with the SEC "satisfy the requirement that defendants make a fraudulent statement" for liability under Section 10(b)); *In re Reliance Sec. Litig.,* 135 F. Supp. 2d 480, 504 (D. Del. 2001) ("by signing the documents CTFG filed with the SEC, defendants made statements under section 10(b)").

As Judge Harmon noted in *Enron*, it is consistent with the SEC's policy goals to subject signatories of SEC filings to liability under Section 10(b) for false statements therein:

> The SEC has attempted to make signatures on corporate documents that are filed with the SEC carry significant weight. Noting that the signature requirements for Form 10-K … were amended in 1980 to "'enhance director awareness of and participation in the preparation of the Form 10-K information,'" the SEC has explained that "by signing documents filed with the Commission, board members implicitly indicate that they believe that the filing is accurate and complete." "Audit Committee Disclosure" (S.E.C. Release No. 41987), 1999 WL 955908 at *29 n. 57, *9 (Oct. 7, 1999). Similarly, in a brief submitted to the Ninth Circuit during the litigation of *Howard*, the SEC stated, "'When the public sees a corporate official's signature on a document, it understands that the official is thereby stating that he believes that the statements in the document are true.'" *Id.* at *9, citing Brief for

34

SEC, Amicus Curiae, at 7, *Howard v. Everex Systems, Inc.*, 228
F.3d 1057 (9th Cir.1999).

258 F. Supp. 2d at 587-88 (footnote omitted).

Thus, the fact that the Audit Committee Defendants signed the Forms 10-K is sufficient to establish that they "made" the statements therein for Section 10(b) purposes.  However, as discussed below, the Audit Committee Defendants did much more than sign the Forms 10-K; they also played a direct and significant role in the preparation and approval of the false statements contained therein and in other public statements.

### 2. The Audit Committee Defendants' Approval of the Company's Financial Statements Subjects Them to Section 10(b) Liability With Respect to Documents Reflecting the Company's Financial Results

As set forth at length in the Complaint, the Audit Committee Defendants were "responsible for overseeing the Company's financial reporting and accounting, the integrity of the Company's financial statements, the Company's internal controls, and the performance of the Company's internal and outside auditors."  Evergreen ¶ 707; Franklin ¶ 799.  Each Audit Committee Defendant is alleged to have "participated in the review and approval of the financial statements" that were contained in the Company's SEC filings and formed the basis for the Company's false statements in its earnings releases.  Evergreen ¶¶ 33-38; Franklin ¶¶ 55-60. The Complaint details the steps the Audit Committee Defendants were required to take under their operating charter, including:

- **Reviewing and discussing with management and KPMG the Company's annual audited and quarterly unaudited financial statements**, including KPMG's judgment as to the quality of the Company's accounting principles, significant financial reporting issues and judgments made in connection with the preparation of the financial statements, and any significant changes in the Company's selection or application of accounting principles and financial statement presentations;

- **Reviewing and discussing with KPMG the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"**

- **Reviewing earnings releases, and reviewing and discussing the types of information to be disclosed and the type of presentations to be made**;

- Reviewing and discussing with the CEO and CFO the basis for the certifications provided in the Company's Form 10-K and 10-Q filings;

- Assuming direct responsibility for the appointment, compensation, retention, and oversight of KPMG's work;

- Reviewing and discussing with KPMG the scope and results of its audits;

- Reviewing and discussing reports from KPMG on all critical accounting policies and practices used by the Company, including all alternative treatments within GAAP that may have been considered; and

- Reviewing and discussing with management and KPMG the adequacy and effectiveness of the Company's internal controls and disclosure controls.

Evergreen ¶¶ 709-12; Franklin ¶¶ 801-04.

These allegations are sufficient to allege the Audit Committee Defendants' responsibility under Section 10(b) for the content of the Company's SEC filings and press releases containing the Company's financial results. *See, e.g., Livent,* 78 F. Supp. 2d at 219 (allegations that audit committee members "were responsible for reviewing [the company's] reporting procedures, internal controls, and management information systems, and the performance of [the outside auditor], and primarily responsible for reviewing the unaudited quarterly financials" were sufficient to plead Section 10(b) violation); *In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1256

(S.D.N.Y. 1996) (audit committee defendants "made" the statements in the Forms 10-K which

they signed, as well as other statements in proxy statements and note agreements which the audit

committee authorized);[16] *In re Enron Corp.*, No. MDL-1446, 2003 WL 21418157, at *12 (S.D.

Tex. Apr. 24, 2003) (denying motion to dismiss where plaintiffs alleged that defendant "signed

or reviewed and approved various false and misleading statements, including two registration

statements, filed with the SEC, and thereby 'made a statement' within the meaning of § 10(b)").

### B.    Radian Engaged in Conduct That Violated Rule 10b-5(a) and (c)

Radian alleges that Plaintiffs' Section 10(b) claim against it should be dismissed because

"there is no private right of action for aiding and abetting a violation of Section 10(b)."  Mem. in

Supp. of Mot. by Radian Guaranty Inc. to Dismiss the Second Am. Complaints ("Radian Mem.")

at 4.  This non-controversial legal proposition is irrelevant here, because Plaintiffs' claims are

based on Radian's *direct violation* of Rule 10b-5(a) and (c).[17]  *See* Evergreen ¶ 785; Franklin ¶

878.  The United States Supreme Court has expressly recognized that Section 10(b) liability is

not limited to those who make false statements, and that Rule 10b-5(a) and (c) liability extends

to persons who engage in other fraudulent or deceptive conduct.  *See S.E.C. v. Zandford*, 535

U.S. 813, 820 (2002) ("neither the SEC nor this Court has ever held that there must be a

misrepresentation about the value of a particular security in order to run afoul of the Act");

---

[16] In *JWP*, the Court held that the audit committee members did not "make" statements in the company's press releases because they had not expressly authorized those statements.  928 F. Supp. at 1256.  The situation here is different, because the Audit Committee's charter required it to review Fannie Mae's earnings releases, and to review and discuss the types of information to be disclosed and the type of presentations to be made."  Evergreen ¶ 712(i); Franklin ¶ 804(i).  Thus, unlike the JWP audit committee, the Audit Committee Defendants had direct involvement in the preparation and/or approval of the Company's earnings releases.

[17] Plaintiffs have not, as Radian contends, "concede[d]" that Radian's "involvement is as an aider and abettor of Fannie Mae's bad conduct."  Radian Mem. at 4.   Although Plaintiffs have asserted a state law aiding and abetting claim against Radian, Plaintiffs' decision to bring multiple causes of action under different legal theories does not amount to a concession that one of their theories is somehow infirm.  Moreover, allegations of aiding and abetting common law fraud and allegations of direct Rule 10b-5(a) or (c) violations are not mutually exclusive; the same conduct may be actionable under both theories.

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152-53 (1972) ("the Court of

Appeals erred when it held that there was no violation of the Rule unless the record disclosed

evidence of reliance on material facts misrepresented by [the bank employees].  We do not read

Rule 10b-5 so restrictively.  *To be sure, the second subparagraph of the rule specifies the making*

*of an untrue statement of material fact and the omission to state a material fact.  The first and*

*third subparagraphs are not so restricted*.") (citations omitted) (emphasis added).[18]

Accordingly, Radian is subject to primary liability for its own deceptive acts in furtherance of the

fraud, even though it never made any false statements directly to investors.[19]

   "All that is required in order to state a claim for a primary violation under Rule 10b-5(a)

or (c) is an allegation that the defendant (1) committed a manipulative or deceptive act (2) in

furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance.'"  *In re Global*

*Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d at 336 (citation omitted).  Significantly, the PSLRA's

pleading requirements *only* apply to the scienter element of a Rule 10b-5(a) and (c) claim; the

---

[18] *See also In re Global Crossing, Ltd. Sec. Litig.,* 322 F. Supp. 2d 319, 335 (S.D.N.Y. 2004) ("It is apparent from
Rule 10b-5's language and caselaw interpreting it that a cause of action exists under subsections (a) and (c) for
behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant.")
(citing *Affiliated Ute,* 406 U.S. at 152-53); *In re Salomon Analyst AT&T Litig.,* No. 02 Civ. 6801, 2004 WL
2757398, at *15 (S.D.N.Y. Dec. 2, 2004) ("Defendants are incorrect that *Central Bank* means that section 10(b)
suits cannot be maintained against anyone other than those who personally speak, write or disseminate false or
misleading statements."); *In re Lernout & Hauspie Sec. Litig.,* 236 F. Supp. 2d 161, 173 (D. Mass. 2003) ("[T]he
better reading of § 10(b) and Rule 10b-5 is that they impose primary liability on any person who substantially
participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive
device . . .  intended to mislead investors, even if a material misstatement by another person creates the nexus
between the scheme and the securities market."); *In re Enron Corp. Sec., Derivative, & ERISA Litig.*, 235 F. Supp.
2d 549, 577 (S.D. Tex. 2002) (subsections (a) and (c) of Rule 10b-5 "allow suit against defendants who, with
scienter, participated in a course of business or a device, scheme or artifice that operated as a fraud on sellers or
purchasers of stock even if these defendants did not make a materially false or misleading statement or omission")
(internal citations and quotations omitted).

[19] Radian cites *In re Charter Communications, Inc. Securities Litigation*, 443 F.3d 987 (8th Cir. 2006) for the
proposition that a defendant who does not make a false statement or omission or engage in manipulative trading
practices cannot be held liable under Section 10(b).  Plaintiffs respectfully submit that this decision is contrary to the
language of Rule 10b-5, and to the Supreme Court's holdings in *Affiliated Ute* and *Zandford*, discussed above.

defendant's commission of a manipulative or deceptive act need only be pleaded in accordance with Rule 9(b).[20]

To plead a violation of Rule 10b-5(a) or (c) in accordance with Rule 9(b), a plaintiff need only "specify, with particularity, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue.'" *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d at 432; *In re National Century Fin. Enter., Inc. Inv. Litig.*, 2006 WL 469468, at *21. Plaintiffs have satisfied these pleading standards by alleging that Radian committed the deceptive and manipulative act of structuring a sham insurance policy which it sold to Fannie Mae at the end of January 2002 for the express purpose of enabling the Company to "spread its losses in order to manage earnings," resulting in artificial inflation of Fannie Mae's stock price. *See* Evergreen ¶¶ 247-49, 789; Franklin ¶¶ 276-78, 882. To the extent that Radian challenges the particularity of these allegations, it overlooks the fact that "the level of specificity required by Rule 9(b) is somewhat relaxed" in comparison to what is required for a Rule 10b-5(b) misrepresentation claim. *Dietrich v. Bauer,* 76 F. Supp. 2d 312, 339 (S.D.N.Y. 1999). Therefore, where a defendant is charged with participation in a fraudulent scheme under Rule 10b-5(a) and (c), "[m]ore generalized allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient." *Id.* at 339.[21] The Complaints satisfy these standards.

---

[20] *See In re National Century Fin. Enter., Inc., Inv. Litig.*, 2006 WL 469468, at *21 (S.D. Ohio Feb. 27, 2006); *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 372 n.25 (D. Md. 2004). *See also In re Initial Public Offering Sec. Litig.,* 241 F. Supp. 2d 281, 335 (S.D.N.Y. 2003) ("Congress intended that the PSLRA supersede the Federal Rules only as to those elements which the PSLRA explicitly mentions (*i.e.,* scienter and material misstatements and omissions).").

[21] *See also Nanopierce Tech. v. Southridge Capital Mgmt. LLC,* No. 02 Civ. 0767, 2003 WL 21507294, at *9 (S.D.N.Y. June 30, 2003) ("The import of Rule 9(b) in this area is thus that 'deceptive or manipulative conduct in a market manipulation claim, while still requiring particularity, may be pled with less specificity than that required in claims alleging material misstatements or omissions.'") (internal quotations omitted); *In re Blech Sec. Litig.,* 928 F. Supp. 1279, 1290-91 (S.D.N.Y. 1996) ("In the case at bar, where the principal allegations of wrongdoing involve

Not only are Plaintiffs' allegations sufficiently particularized, but Radian's structuring of the sham insurance policy constitutes more than mere aiding and abetting. The court's decision in *In re Parmalat Securities Litigation*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005), upon which Radian relies, demonstrates why Plaintiffs' claims are proper. In *Parmalat*, the plaintiffs brought Rule 10b-5(a) and (c) claims against two banks that allegedly securitized and factored worthless invoices which Parmalat, in turn, used to falsify its financial statements. The banks made the same arguments raised by Radian here, namely, that they were "at most aiders and abettors" of Parmalat's fraudulent scheme. *Id.* at 504. The court rejected these arguments, finding that the banks' conduct was sufficient to warrant liability under Rule 10b-5(a) and (c):

> The Court concludes that the arrangements involving the regular factoring and securitization of worthless invoices were deceptive devices or contrivances for purposes of Section 10(b). **These were inventions, projects, or schemes with the tendency to deceive because they created the appearance of a conventional factoring or securitization operation when, in fact, the reality was quite different. BNL knew when it paid Parmalat for the invoices that they were worth nothing and were in fact a trick to disguise its loans to Parmalat.** The same is true of Citigroup's purchase of certain invoices. If the allegations of the complaint are accepted, the banks used these devices. **In the language of Rule 10b-5(c), the banks engaged in acts, practices, or courses of business that would operate as a fraud or deceit upon others**. In these circumstances, it cannot be said that the banks' conduct fell outside of Rule 10b-5 or Section 10(b).
>
> **The defendants' argument that they were at most aiders and abettors of a program pursuant to which Parmalat made misrepresentations on its financial statements misses the mark. The transactions in which the defendants engaged were by nature deceptive. They depended on a fiction, namely that the invoices had value. It is impossible to separate the deceptive nature of the transactions from the deception actually**

---

market manipulation rather than false statements, the Complaint sets forth a sufficient level of detail by alleging the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants. *Although it does so in broad strokes, at this stage no more can be required to give Defendants fair notice of Plaintiffs' claims and thereby to satisfy Rule 9(b).*") (internal citations omitted) (emphasis added).

> **practiced on Parmalat's investors.  Neither the statute nor the
> rule requires such a distinction.**

*Id.* at 504 (emphasis added).

Plaintiffs' claims against Radian are remarkably similar to the factoring transactions in *Parmalat*.  Plaintiffs allege that "Radian knew that Fannie Mae needed to spread its losses in order to manage earnings, which is the essence of finite insurance policies and what makes them attractive to Radian's customers."  *Id*.  Plaintiffs further allege that "[i]n collusion with Fannie Mae, Radian disguised its product as legitimate insurance, when it was actually only a loan to Fannie Mae …"  Evergreen ¶ 51; Franklin ¶ 74.  *See also* Evergreen ¶ 249; Franklin ¶ 278 (Radian made a loan to Fannie Mae "under the guise of a sham insurance policy").  Accordingly, like the banks in *Parmalat*, Radian is alleged to have engaged in a transaction whose very nature was deceptive—leaving aside how Fannie Mae accounted for it—because it created the appearance that Fannie Mae was buying insurance when, in reality, it was simply paying Radian "premiums" to offset claim reimbursements it expected to receive in future years, all as a means to disguise known losses.  Evergreen ¶¶ 247-49; Franklin ¶¶ 276-78.  As the Ninth Circuit recognized in *Simpson v. AOL Time Warner*, 452 F.3d 1040 (9th Cir. 2006)—cited by Radian— "conduct by a defendant that ha[s] the *principal purpose and effect of creating a false appearance in deceptive transactions as part of a scheme to defraud* is conduct that uses or employs a deceptive device within the meaning of § 10(b)."  *Id.* at 1052 (emphasis added).[22] That is precisely what occurred here.  *See also Quaak v. Dexia,* 357 F. Supp. 2d 330, 342 (D.

---

[22] In *Simpson*, the court found that the plaintiffs had not pleaded a violation of Rule 10b-5(a) and (c) because they had failed to "allege that AOL itself entered into a transaction that had no legitimate economic value or created a false appearance."  *Id.* at 1053.  Here, by contrast, Plaintiffs have alleged that the Radian transaction created the false appearance that Fannie Mae had incurred premium expenses (Evergreen ¶¶ 247-49; Franklin ¶¶ 276-78), and that Fannie Mae received "nothing of value" from Radian because "Fannie Mae's premium payments were equal to the value of Radian's 'insurance coverage.'"  *Id*.  Because this transaction had the "principal purpose and effect of creating a false appearance," *Simpson* is inapposite.

Mass. 2005) (claim stated where defendant bank, among other things, structured loans to artificially inflate company's revenues); *In re Global Crossing Sec. Litig.,* 322 F. Supp. 2d at 337 ("[s]chemes used to artificially inflate the price of stocks by creating phantom revenue" constitute "manipulative" conduct which violates Section 10(b)).

Attempting to use the *Parmalat* case to its advantage, Radian argues that its "insurance policy" was analogous to a different transaction – one between Parmalat and Bank of America – that the *Parmalat* court found was not deceptive. That transaction involved sales of interests in a Brazilian Parmalat subsidiary that were coupled with an option to "put" the investments back to Parmalat if the subsidiary did not become publicly listed. The plaintiffs claimed that this transaction was deceptive because Bank of America and Parmalat purportedly knew that such a listing was economically impractical and thus not likely to occur. *Parmalat,* 376 F. Supp. 2d at 485. However, because there was "no suggestion that the transactions were something other than what they appeared to be," the court found that "[a]ny deceptiveness resulted from the manner in which Parmalat or its auditors described the transactions on Parmalat's balance sheets and elsewhere." *Id.* at 505. In contrast, the deceptiveness of the Radian policy stems not from how Fannie Mae described it in the Company's financial statements but, rather, from the nature of the transaction itself. This policy was not real "insurance" but, rather, a vehicle through which Fannie Mae could manage its earnings. Accordingly, the Radian policy qualifies as a "sham transaction," and Radian is subject to liability under Rule 10b-5(a) and (c).

C. **Plaintiffs' Allegations Give Rise to a Strong Inference of Scienter**

The PSLRA requires that Plaintiffs plead with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In determining whether Plaintiffs have met that burden, the Court should examine the Complaint's factual allegations in their totality. *See, e.g., PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 683

(6th Cir. 2004) (the scienter determination involves a "totality of the circumstances analysis whereby the facts argued collectively must give rise to a strong inference of at least recklessness"); *Baan Co.,* 103 F. Supp. 2d at 23 (denying motion to dismiss where, "[i]n combination, plaintiffs' allegations are sufficient to support a strong inference of recklessness or knowledge").

Although the United States Court of Appeals for the District of Columbia Circuit has yet to rule "as to how a 'strong inference' of scienter may be established," *Baan Co.,* 103 F. Supp. 2d at 19, other courts in this Circuit have applied the Second Circuit's standard and have held that plaintiffs may establish a strong inference of scienter by alleging facts to show either "(1) that the defendants had motive and opportunity to commit fraud or (2) strong circumstantial evidence of conscious misbehavior **or recklessness**." *Id.* (emphasis added).

Fannie Mae does not challenge Plaintiffs' pleading of scienter.  The Officer Defendants acknowledge that the Court has already found the class plaintiffs' allegations of their scienter sufficient, and they do not seek to revisit the issue of their scienter with respect to the Company's SFAS 91 and 133 violations.  However, Howard and Raines (but not Spencer) argue that Plaintiffs have not adequately alleged their scienter with respect to "new" accounting violations not addressed in the class complaint.  The Audit Committee Defendants and Radian contend that Plaintiffs have not adequately pleaded their scienter.  As discussed below, Plaintiffs allegations are sufficient to raise a strong inference of recklessness by the Audit Committee Defendants and Radian.  As for Raines and Howard, it is not necessary for Plaintiffs to allege their scienter with respect to every accounting issue in the Complaints.  Rather, the question under Section 10(b) is whether they knew or recklessly disregard that the Company's financial statements and other public statements contained material false statements.  The Court has already found that the

43

SFAS 91 and 133 violations raise a strong inference of the Officer Defendants' scienter

regarding those statements.  Accordingly, Defendants' motions to dismiss should be denied to

the extent they rely on Plaintiffs' alleged failure to plead scienter.

### 1.    Howard and Raines

Plaintiffs allege that Howard and Raines made numerous false statements, all of which

centered around the Company's financial results and stability.  As alleged in the Complaints,

these statements were materially false for a number of reasons, including that the Company's

accounting violated numerous GAAP provisions.  Howard and Raines are asking the Court to

parse out Plaintiffs' allegations on an accounting issue-by-accounting issue basis, and excise out

those GAAP violations as to which Plaintiffs have not alleged Howard's and Raines' scienter.

This approach distorts the nature of the scienter requirement.  Under Rule 10b-5(b), a defendant

is liable if he "knowingly or recklessly made a false or misleading statement of material fact …"

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  If a statement is false for

more than one reason, a plaintiff need not plead or prove the defendant's scienter with respect to

each *reason* for the statement's falsity; rather, it is sufficient to allege that the defendant made

the statement either knowing or recklessly disregarding that it was false for *any* reason.  *See, e.g.,*

*Carlson v. Xerox Corp.,* 392 F. Supp. 2d 267, 286-87 (D. Conn. 2005) (finding scienter

adequately pleaded, and rejecting defendants' "attempt to isolate [one] part of the overall

fraudulent scheme alleged by the plaintiffs from the rest of the scheme of which it was an

integral part"); *In re Raytheon Sec. Litig.,* 157 F. Supp. 2d 131, 149 n. 14 (D. Mass. 2001)

("Because the allegations with respect to the write-offs in Group 1 at RE & C are plainly

sufficient to create a strong inference of scienter, I do not address the other alleged GAAP

violations like acceleration of revenue and the contracts is ADR.  These are better resolved on a

full record."); *Sutton v. Bernard,* No. 00 C 6676, 2001 WL 897593, at *4 (N.D. Ill. Aug. 9, 2001)

("[W]e need not parse through each and every alleged misstatement contained in the complaint to determine if it is actionable. It is sufficient for pleading purposes that at least some of the GAAP violations . . . alleged by plaintiffs are actionable."). *See also In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 476 (S.D.N.Y. 2004) (defendants "cannot secure dismissal by cherry-picking" plaintiffs' allegations).

Accordingly, the Court should reject Howard's and Raines' gambit to have their scienter evaluated separately with respect to each of the "new" accounting allegations in Plaintiffs' Complaints, as such an analysis is irrelevant under Section 10(b). The Court's task is simply to determine whether Plaintiffs' allegations collectively give rise to a strong inference that Howard and Raines acted with scienter regarding the accuracy of the Company's reported financial results, not whether Plaintiffs have linked them to each and every GAAP violation. The Court has already found, based on the allegations in the class action, that Raines and Howard acted with scienter regarding the false statements of the Company's financial results.[23] Plaintiffs' Complaints contain substantially similar allegations, as well as additional allegations based on facts that were not known to the class plaintiffs when they filed their complaint. Plaintiffs' allegations that give rise to a strong inference of Raines' and Howard's scienter include:

- Raines' and Howard's receipt of an inter-office memorandum in September 2002, informing them of numerous accounting problems, including intentional manipulation of financial results (Evergreen ¶ 681; Franklin ¶ 718);

---

[23] Contrary to Raines' and Howard's arguments, that decision was not based solely on allegations of violations of SFAS 91 and 133. The class action complaint explicitly referenced and relied upon a much wider variety of GAAP violations than that. *See* Consol. Class Action Compl., ¶ 116 (noting that Fannie Mae announced on February 23, 2005 that OFHEO had found evidence of violations of SFAS 115, SFAS 140, SFAS 65, SFAS 149, and FIN 46). Moreover, the class action plaintiffs relied upon these additional accounting violations in pleading Raines' and Howard's scienter. *See* Lead Plaintiffs' Mem. of Law in Supp. of Opp. to Franklin D. Raines' and J. Timothy Howard's Mot. to Dismiss, Section II.C.1, *The Size, Duration, And Scope of the Accounting Violations Give Rise to a Strong Inference of Scienter* at 20 ("Moreover, on February 23, 2005, Fannie Mae reported that in addition to violations of SFAS 91 and 133, OFHEO had also identified additional accounting errors—citing GAAP violations in virtually every major rule that applies to mortgage finance.").

- Raines' and Howard's manipulation of the Company's accounting for the sole purpose of hitting the targets that were necessary to trigger their lucrative bonuses (Evergreen ¶¶ 67-68; Franklin ¶¶ 90-91);

- Barnes' Congressional testimony that "[t]he atmosphere and culture, particularly within the Controllers' division, is one of intimidation, restraint of dissenting opinions, and pressure to be part of the 'Team' giving Chairman Franklin Raines and Vice Chairman Tim Howard the numbers the Office of the Chairman desired to please the markets" (Evergreen ¶ 91; Franklin ¶ 114);

- OFHEO's finding that Raines established earnings targets with the expectation that management would achieve them "through any means necessary" (Evergreen ¶ 368; Franklin ¶ 398);

- Raines' directive for his staff to look for ways to shift income earned in 2001 to future years, to ensure that Fannie Mae would continue to meet its EPS goals in future years (Evergreen ¶ 241; Franklin ¶ 270);

- Paul Weiss' conclusion that Howard was directing a broad effort to identify transactions for which the recognition of expenses could be accelerated to the present reporting period, to increase reported earnings in subsequent years (Evergreen ¶ 363; Franklin ¶ 393);

- Howard's approval of the Radian "insurance policy" despite being told in an e-mail that it was simply a means to "'move' $40 million of income" (Evergreen ¶ 246; Franklin ¶ 275);

- Howard's key role in the development and approval of Fannie Mae's GAAP-violative SFAS 91 accounting policy (Evergreen ¶¶ 120-28; Franklin ¶¶ 144-52);

- Howard's admission that he decided the Company would smooth out some of the earnings volatility that would result from a strict application of SFAS 91 (Evergreen ¶ 132; Franklin ¶ 157);

- Howard's key role in the development and approval of a SFAS 133 accounting policy which placed a greater priority on reducing volatility than on compliance with GAAP (Evergreen ¶¶ 146, 148-51, 160; Franklin ¶¶ 171, 173-76, 184);

- OFHEO's finding that Howard knew or should have known that the Company's approach to hedge accounting was motivated by improper concepts, including the desire to minimize earnings volatility, to leverage existing accounting systems so as to avoid the expense of creating new systems to properly implement SFAS 133, and to simplify the Company's financial reporting (Evergreen ¶ 683; Franklin ¶ 721).

- The Company's maintenance of an insupportably high loss allowance – which Howard refused to change despite being informed that it had been improperly calculated – because Howard and Spencer wanted a "war chest" to tap into

should they need it to smooth earnings, meet EPS targets, or offset unrelated expenses (Evergreen ¶¶ 213, 216-17, 222-24; Franklin ¶¶ 240, 243-44, 250-52);

- Howard's involvement in two REMIC transactions which had no economic purpose other than to shift income between accounting periods, including his selection of the REMIC with the greatest income-shifting effect from a list of possible transactions, and his work on the public response to rumors circulating on Wall Street about the REMICs (Evergreen ¶¶ 336, 343, 345; Franklin ¶¶ 366, 373, 375).

- Howard's knowledge of the Company's consideration of over-reserving for potential tax liabilities as a means to manage earnings (Evergreen ¶ 355; Franklin ¶ 385);

- Howard's manipulation of the discounted cash flow model to distort the amount of impairment loss for its manufactured housing bonds and thereby reduce earnings volatility  (Evergreen ¶¶ 271-73; Franklin ¶¶ 299-302);

- Fannie Mae's repurchase of debt securities at Howard's direction, to achieve specific, to-the-penny EPS figures (Evergreen ¶¶ 366-70; Franklin ¶¶ 396-400);

- Howard's failure to establish adequate internal controls, which he admitted was his responsibility to do (Evergreen ¶ 682; Franklin ¶ 720);

- Howard's directive that the head of the internal audit department could not communicate directly with the Audit Committee (Evergreen ¶ 411; Franklin ¶ 441);

- Howard's disregard of warnings about understaffing in the internal audit department (Evergreen ¶ 416; Franklin ¶ 446);

-  Raines' disregard of warnings about the breadth of Howard's responsibilities (Evergreen ¶¶ 418-19; Franklin ¶¶ 448-49); and

- The extreme magnitude of the fraud which occurred under Raines' and Howard's watch as CEO and CFO:  over $11 billion (Evergreen ¶ 195; Franklin ¶ 211).

Because Plaintiffs' allegations collectively demonstrate that Howard and Raines acted with scienter regarding the accuracy of Fannie Mae's financial statements, their motions to dismiss should be denied.

## 2.     <u>The Audit Committee Defendants</u>

The Audit Committee Defendants' job was to oversee and monitor the Company's accounting and financial reporting.  Evergreen ¶¶ 54, 711; Franklin ¶¶ 77, 803.  On their watch, Fannie Mae and the Officer Defendants perpetrated one of the worst frauds in the history of corporate America, involving more than 20 GAAP violations and overstating earnings by over $11 billion.  As discussed below, the allegations of the Complaints give rise to a strong inference that the Audit Committee Defendants were reckless in the performance of their duties and in approving the Company's materially false financial statements.[24]

### (a)     **The Audit Committee Defendants Recklessly Failed to Fulfill Their Duty to Ensure the Effectiveness of the Company's Internal Controls**

The Audit Committee Defendants were in charge of ensuring that the Company had adequate and effective internal controls, including an internal audit department.  *See* Evergreen ¶ 425; Franklin ¶ 457.  According to the Audit Committee's charters, the committee was responsible for, *inter alia*:

- "Monitoring the integrity of the corporation's financial statements and the independence and performance of its internal … auditors …": and

- Reviewing the Company's "major risks and risk management processes, including the **quality and effectiveness of internal controls.**"

*Id.*

The Audit Committee Defendants failed miserably in their performance of these duties, as the internal audit department lacked independence and was severely understaffed, and there

---

[24] The Audit Committee Defendants falsely contend that Plaintiffs have improperly "group pleaded" their scienter. Plaintiffs should not be penalized because they opted to define Messrs. Gerrity, Malek, Segue, Harvey and Pickett and Ms. Mulcahy as the "Audit Committee Defendants" for convenience in drafting their Complaints.  Where a fact was known or an allegation relates to only certain members of the Audit Committee, Plaintiffs so indicated by referring only to those Audit Committee members to whom the allegation related.  In many instances, however, the Audit Committee Defendants were made aware of certain facts by virtue of their positions on the Audit Committee and their attendance of meetings of said Committee.  In those instances, there is nothing wrong with Plaintiffs' allegations regarding the knowledge or recklessness of "the Audit Committee Defendants" as a group.

were rampant deficiencies in the Company's internal control systems which enabled the fraud to occur. Indeed, OFHEO found that "Fannie Mae's internal control system was grossly inadequate and contravened OFHEO's supervisory standards" – to the point where "there were almost no controls in some instances" – and that these internal control deficiencies contributed to the fraud. Evergreen ¶¶ 398-99, 429; Franklin ¶¶ 428-29, 461. OFHEO's Acting Director testified before Congress that he considered the weaknesses in internal controls to be as serious as, if not more serious than, the GAAP violations:

> I view the weaknesses in internal controls as very significant. As you know, there are many examples in history where lapses in internal controls have brought down large old financial institutions almost overnight. Barings Bank is one example of how internal controls can bring down a company, even a well-capitalized company. So lapses in internal controls, even though we often speak of them after the accounting issues, I think, are just as, if not more, serious than the accounting problems.

Evergreen ¶ 670; Franklin ¶ 707.

Among the internal control deficiencies at Fannie Mae were:

- insufficient segregation of duties and key person dependencies – an issue that was raised with the Audit Committee Defendants and yet nothing was done to correct it (Evergreen ¶ 400(a); Franklin ¶ 430(a));

- manipulation of the amortization modeling system to produce desired results (Evergreen ¶ 400(b); Franklin ¶ 430(b));

- the lack of adequate, integrated technology systems to support the closing process (Evergreen ¶ 408; Franklin ¶ 438);

- the frequent use of manual adjustments to reconcile differences between computer systems (Evergreen ¶ 400(c); Franklin ¶ 430(c));

- a "circular" accounting policy development structure, where the Financial Standards group essentially developed and also approved accounting policies (Evergreen ¶ 401; Franklin ¶ 431);

- Howard's overly broad and overlapping responsibilities (Evergreen ¶ 401; Franklin ¶ 431);

- a lack of technical accounting expertise and a shortage of resources in the Controller's office (Evergreen ¶¶ 401-04; Franklin ¶¶ 431-34);

- significant resource deficiencies in the internal audit department (Evergreen ¶¶ 413-14; Franklin ¶¶ 443-44);

- in experience (*e.g.*, no auditing background) of the head of the internal audit department (Evergreen ¶ 410; Franklin ¶ 440); and

- the lack of independence of the head of the internal audit department, who (i) was the Company's former Controller, (ii) served as Senior Vice President-Operations Risk while simultaneously leading the internal audit group; (iii) reported to Howard instead of exclusively to the audit committee, (iv) received EPS-based bonuses, and (v) whose compensation was set by Howard (Evergreen ¶¶ 401, 410-12; Franklin ¶¶ 431, 440-42).

The Audit Committee Defendants try to cast these allegations as insufficient because Plaintiffs do not allege what facts were brought to the Audit Committee Defendants' attention. That argument ignores the fact that *it was the Audit Committee Defendants' job to review the effectiveness of internal controls.* They cannot avoid liability for their reckless disregard of that obligation, simply by stating that no one informed them of any problems. Moreover, Plaintiffs have alleged that, even when internal control problems *were* brought to the Audit Committee Defendants' attention, they did nothing to cure them. For example:

> … The Company's Internal Audit Department raised concerns about [Jeff Juliane's responsibility for both the modeling and accounting for amortization] during the August 8, 2003 meeting, while discussing Barnes' allegation that Juliane was involved in making amortization factor adjustments to cause actual amortization to more closely align with forecasts – an allegation that indicated that the failure to segregate those … functions was not merely a theoretical problem, but was resulting in actual manipulation of the Company's financial results. Yet, nothing was done to address those concerns, even though they were brought to the attention of … the Audit Committee …

Evergreen ¶ 400(a); Franklin ¶ 430(a). Plaintiffs' allegations regarding the Audit Committee Defendants' reckless disregard of severe internal control deficiencies – which led to the fraud, and which it was their job to oversee and monitor – are sufficient to plead their scienter.

> **(b)** **The Audit Committee Defendants Recklessly Ignored Red Flags**

Plaintiffs also allege that the Audit Committee Defendants were aware of, yet recklessly ignored, a number of red flags that should have alerted them to the fraud, including: (1) that the Officer Defendants had in the past demonstrated a willingness to play "fast and loose" with accounting rules; (2) that the Company had been put on notice via a whistle-blowing employee of potentially serious accounting problems; and (3) that the Company had conducted only a perfunctory seven-day investigation into these allegations while a Sarbanes-Oxley certification deadline loomed.  Evergreen ¶¶ 399-91, 714, 715, 724; Franklin ¶¶ 418-21, 806, 807, 816.

First, KPMG informed the Audit Committee in early 1999 that it disagreed with the Officer Defendants' deferral of $199 million in expenses from 1998 to subsequent years, and that management had insisted upon the deferral of these expenses despite KPMG's recommendation to the contrary.   Evergreen ¶ 714; Franklin ¶ 806.  The deferral of these expenses enabled the Officer Defendants to achieve their financial targets and receive bonuses they would not otherwise have received.  *Id.*  Thus, Gerrity (a member of the Audit Committee in 1999) had knowledge of management's willingness to bend the rules in order to achieve desired financial results.  *Id.*  This should have caused him to keep a particularly watchful eye on management, and to question KPMG and management closely about the aggressiveness and propriety of the Company's other accounting practices, but he failed to do so.[25]  *Id.*  While Defendants seek to

---

[25] The Audit Committee Defendants argue that the 1998 expense deferral incident is irrelevant because it "came years before any of the financial statements at issue" in the Complaints were disseminated.  Director Defendants' Mem. of Law in Supp. of Mot. to Dismiss ("Director Defs. Mem.") at 19.  That this incident occurred before the false and misleading statements at issue were disseminated does nothing to detract from the fact that it alerted Defendant Gerrity—who continued to serve as Audit Committee Chairman throughout the Loss Period—to the Officer Defendants' willingness to manipulate the Company's accounting for their personal benefit.  Nor does it detract from the fact that Gerrity should have been on heightened alert for the possibility of fraud during the Loss Period.

characterize this as mere negligence, a jury could reasonably find that Gerrity's inaction in response to this information was reckless.

Plaintiffs have also alleged that Barnes raised significant concerns regarding earnings management and improper accounting at Fannie Mae, which the Audit Committee Defendants either knew or should have known could not possibly have been fully investigated in the seven days between Barnes' initial August 5, 2003 report and the "conclusion" of the Company's investigation. Evergreen ¶ 390; Franklin ¶ 420. Plaintiffs allege that the Audit Committee Defendants, in reckless disregard for their responsibilities to investors, never spoke directly with Barnes about his concerns or initiated their own investigation into his allegations. Evergreen ¶ 715; Franklin ¶ 807. Instead, they voted a mere two days later to approve the Company's financial statements and Form 10-Q filing for the quarter ended June 30, 2003. *Id.* In response to these allegations, the Audit Committee Defendants contend that "a nebulous assertion that the Audit Committee defendants should have done more than they did … fail[s] to create a strong inference of scienter because … they amount, at best, to nothing more than allegations of negligence." Director Defs. Mem. at 21-22. However, accepting Plaintiffs' allegations as true, as the Court must for purposes of ruling on the instant motions to dismiss, they support the conclusion that the Audit Committee Defendants were more than negligent, and that they recklessly rubber-stamped the Company's cursory "investigation" of Barnes' serious allegations, despite the serious implications those allegations had for the integrity of Fannie Mae's financial statements – which the Audit Committee Defendants were charged with monitoring.[26]

---

[26] There is no merit to the Director Defendants' argument that "no matter how stringent the duty, an allegation that a director failed to comply with that duty is an allegation of negligence, not fraud." Director Defs. Mem. at 25 n.27. If the violation rises to the level of recklessness as opposed to mere negligence, the director is subject to liability for securities fraud. *Baan Co.,* 103 F. Supp. 2d at 19 (recklessness constitutes scienter).

The Audit Committee Defendants' response (or lack thereof) to Barnes' allegations was particularly reckless when one considers their knowledge, at the time, of severe accounting problems at Fannie Mae's sister enterprise, Freddie Mac.  That the Audit Committee Defendants did not take a closer look at Fannie Mae's accounting given Freddie Mac's woes—and that Defendant Gerrity *did not even take the rudimentary step of reading the Baker Botts Report* to see if it raised any concerns that could have been applicable to Fannie Mae (Evergreen ¶ 761; Franklin ¶ 854)—further supports an inference of recklessness.[27]

### (c)    The Magnitude of the Fraud Supports an Inference of Scienter

Finally, the Complaints describe a massive fraud involving no less than twenty-two separate GAAP violations perpetrated over more than four years, that resulted in over $11 billion in misstatements.  That such systematic and pervasive wrongdoing occurred within the Audit Committee Defendants' sphere of oversight cannot be ignored.  Although the magnitude of the fraud alone does not necessarily create an inference of scienter, it is an important factor to be considered, and can give rise to a strong inference of scienter in combination with other factors. *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003); *Global Crossing*, 322 F. Supp. 2d at 347; *Rocker Mgmt., LLC v. Lernout & Hauspie Speech Prods., N.V.,* No. Civ. A. 00-5965 (JCL), 2005 WL 1366025, at *8 (D.N.J. June 8, 2005); *In re Rent-Way Sec. Litig.,* 209 F. Supp. 2d 493, 506 (W.D. Pa. 2002).  As one court has explained:

> [T]he magnitude of reporting errors may lend weight to allegations
> of recklessness where defendants were in a position to detect the
> errors.    The more serious the error, the less believable are
> defendants' protests that they were completely unaware of [the

---

[27] To the extent the Audit Committee Defendants claim that their reliance upon KPMG negates their scienter, that raises factual questions (including the extent and reasonableness of their reliance) which should not be resolved at the pleading stage.  Indeed, each of the cases they cite on this issue was rendered either at the summary judgment or post-trial stage.  *See Mathews v. Centex Telemanagement, Inc.*, No. C-92-1837-CAL, 1994 WL 269734, at *7 (N.D. Cal. June 8, 1994) (summary judgment); *Newton v. Uniwest Fin. Corp.*, 802 F. Supp. 361, 368 (D. Nev. 1990) (same); *Howard v. S.E.C.*, 376 F.3d 1136, 1147 (D.C. Cir. 2004) (review after evidentiary hearing).

company's] true financial status and the stronger is the inference
that defendants must have known about the discrepancy.

*Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) (internal citations omitted).

*See also In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636-37 (E.D. Va. 2000)

("[C]ommon sense and logic dictate that the greater the magnitude of a restatement or violation

of GAAP, the more likely it is that such a restatement or violation was made consciously or

recklessly.").

### (d)    Plaintiffs' Allegations, Taken as a Whole, Raise a Strong Inference of Scienter

Although the Audit Committee Defendants attempt to dilute the strength of Plaintiffs'

scienter allegations by attacking them *seriatim*, Plaintiffs' allegations must be considered in their

totality to determine whether they raise a strong inference of scienter.   Those allegations –

including the Audit Committee Defendants' reckless disregard of internal control deficiencies

and red flags, and the magnitude of the fraud – considered in their totality, are sufficient to give

rise to a strong inference of the Audit Committee Defendants' scienter.  *See, e.g., In re Spiegel,*

*Inc. Sec. Litig.,* 382 F. Supp. 2d 989, 1020 (N.D. Ill. 2004) (allegations that audit committee

members "had access to information about the company's financial practices during the Class

Period, and that they had specific knowledge of [the company's] credit-related problems,"

coupled with allegations of red flags and a massive fraud, were sufficient to plead scienter); *In re*

*American Bank Note Holographics, Inc.*, 93 F. Supp. 2d 424, 447 (S.D.N.Y. 2000) ("the

admitted falsity of the statements, the extraordinary degree to which they were false, the length

of time (covering several years) that the statements were false, and [the defendants'] access [to

the company's] actual sales and revenue information . . . combine to raise a strong inference that

[the defendants] engaged in conduct that was either conscious or reckless").

### 3.    <u>Radian</u>

Urging this Court to adopt a scienter standard different from that mandated by controlling precedent in this Circuit, Radian argues that Plaintiffs have failed to plead facts demonstrating that it acted with the requisite state of mind in selling Fannie Mae a sham insurance policy. Specifically, Radian contends that "Plaintiffs must allege with particularity Radian's motive and opportunity [to commit fraud], including the specific benefits to Radian from the alleged misrepresentation or scheme and the means and likely prospect of Radian achieving concrete benefits through those means."  Radian Mem. at 14-15 (citing *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir. 2000)).  But neither *Novak*, nor any other case of which Plaintiffs are aware, ever held that a plaintiff *must* allege "motive and opportunity" to plead scienter.  Rather, *Novak* held that "[t]he requisite 'strong inference' of fraud may be established **either** (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, **or** (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.* at 307, 311 (emphasis added).  Moreover, because courts in this Circuit have applied the Second Circuit standard for pleading scienter (*see, e.g., Baan Co.,* 103 F. Supp. 2d at 19), it seems clear that Plaintiffs may satisfy their burden by pleading **either** Radian's conscious misconduct, recklessness, **or** motive and opportunity.

Plaintiffs have met this standard by alleging that Radian (1) "knew that Fannie Mae needed to spread its losses in order to manage earnings, which is the essence of finite insurance policies and what makes them attractive to Radian's customers"; (2) "knew that since Fannie Mae's premium payments were equal to the value of Radian's 'insurance coverage,' there was no risk transfer and therefore Fannie Mae received nothing of value from Radian"; (3) "knew or recklessly disregarded that it was merely loaning money to Fannie Mae under the guise of a sham insurance policy"; and (4) "knew or recklessly disregarded … that Fannie Mae was

fraudulently recording its transactions with Radian in the Company's financials as 'insurance' premium payments to Radian in violation of GAAP." Evergreen ¶ 249; Franklin ¶ 278. Plaintiffs' Complaints plainly allege that Radian knew that its sale of the "insurance policy" to Fannie Mae formed a vital part of the Company's fraudulent scheme, yet recklessly proceeded with the transaction anyway. These allegations are sufficient to plead Radian's conscious misbehavior and/or recklessness. *See, e.g., Parmalat,* 376 F. Supp. 2d at 507 (allegations that defendant structured and participated in transactions so Parmalat could manipulate its financial results were sufficient to plead scienter); *Parmalat,* 414 F. Supp. 2d at 438 (same holding; different defendant).

### D. **Plaintiffs Have Adequately Alleged Causation as to Radian**

The only Defendant to challenge Plaintiffs' pleading of causation is Radian, which contends that Plaintiffs have not alleged a causal link between Radian's sale of a sham policy to Fannie Mae, and Plaintiffs' purchases of Fannie Mae stock.

### 1. **Transaction Causation**

By arguing that Plaintiffs have not pleaded that they purchased Fannie Mae stock specifically in reliance on Radian's sale of the sham insurance policy to Fannie Mae, Radian ignores that where, as here, a Rule 10b-5(a) and (c) violation is at issue, Plaintiffs need merely plead "(1) that defendants substantially participated in a fraudulent scheme; and (2) *when the scheme is viewed as a whole, the plaintiffs relied on it.*" *Lernout & Hauspie,* 236 F. Supp. 2d at 174 (emphasis added). *See also ZZZZ Best Sec. Litig.,* 864 F. Supp. 2d 960, 973 (C.D. Cal. 1994) (noting that "the market's overall reliance on the Z Best fraudulent scheme . . . is sufficient to satisfy the reliance element in the Rule 10b-5(a) and (c) claims"). Plaintiffs' reliance upon the overall fraudulent scheme may be established either by allegations of actual reliance, or through the presumption of reliance under the fraud-on-the-market theory. *Id.*.

Plaintiffs have alleged that Radian's sale of the sham insurance policy to Fannie Mae was part of the Company's broader scheme to minimize its reported earnings volatility, and that Radian's wrongful conduct—as part of the Company's overall fraudulent scheme—caused the artificial inflation of Fannie Mae securities.  Evergreen ¶ 789; Franklin ¶ 882.  Plaintiffs have also alleged that they bought their Fannie Mae securities in reliance on the integrity of the market prices, and that had they known the truth, they either would not have purchased Fannie Mae securities or would have done so only at substantially lower prices.  Evergreen ¶ 789-90; Franklin ¶¶ 882-83.  This is sufficient to plead transaction causation.  *See, e.g., Parmalat,* 376 F. Supp. 2d at 508-09 (plaintiffs pleaded transaction causation where they "contend[ed] that they would not have purchased Parmalat's stocks or bonds, or at least not done so at the same prices, had they known its true financial condition").

## 2. <u>Loss Causation</u>

Plaintiffs' Complaints not only allege that Radian's conduct and the overall scheme caused the artificial inflation of Fannie Mae's securities (Evergreen ¶ 789; Franklin ¶ 882), but also that the price of Fannie Mae's securities sharply declined when the market learned of Fannie Mae's fraud (Evergreen ¶¶ 634-679; Franklin ¶¶ 673-716).  These allegations are sufficient to plead loss causation.  *See, e.g., In re Daou Sys., Inc.,* 411 F.3d 1006, 1026 (9th Cir. 2005); *Crocker v. Carrier Access Corp.*, No. 05-CV-01011, 2006 WL 2035366, at *8 (D. Colo. July 18, 2006); *Catton v. Defense Tech. Sys.*, No. 05 Civ. 6954 (SAS), 2006 WL 1716862, at *6 (S.D.N.Y. June 20, 2006); *In re Bridgestone Sec. Litig.*, 430 F. Supp. 2d 728, 737-38 (M.D. Tenn. 2006); *In re CMS Energy Sec. Litig.*, 403 F. Supp. 2d 625, 630 (E.D. Mich. 2005); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1025 (S.D. Cal. 2005).

As with its transaction causation argument, Radian misses the mark by focusing on whether "Fannie Mae's accounting treatment of the Policy was the proximate cause of their

injury." Radian Mem. at 20. As the court noted in *Parmalat*, in a Rule 10b-5(a) and (c) case,

"the loss causation requirement will be satisfied if [the deceptive and manipulative] conduct *had*

*the effect of concealing the circumstances that bore on the ultimate loss*." *Parmalat,* 376 F.

Supp. 2d at 510 (emphasis added). Here, the "circumstances that bore on the ultimate loss" were

Fannie Mae's systematic manipulations of its reported earnings to conceal its earnings volatility.

Once this fraudulent scheme was revealed, the price of Fannie Mae's securities precipitously

declined. Because Fannie Mae used the Radian policy to manipulate its reported earnings to

conceal volatility, the issuance of the policy had the effect of "concealing the circumstances that

bore on the ultimate loss" and was a proximate cause of Plaintiffs' losses.[28]

## IV.    PLAINTIFFS HAVE STATED A CLAIM FOR CONTROL PERSON LIABILITY

Pursuant to Section 20(a) of the Exchange Act, persons who "control" a corporation that

violates other provisions of the Exchange Act (such as Sections 10(b) and 18) may be held

jointly and severally liable for the corporation's violation. 15 U.S.C. § 78t(a). Plaintiffs have

asserted Section 20(a) claims against Raines, Howard, Spencer, and the Director Defendants,

based upon Fannie Mae's violations of Sections 10(b) and 18 of the Exchange Act. The only

Defendants who have moved to dismiss those Section 20(a) claims in their entirety are Howard

and the Director Defendants, who claim that Plaintiffs have failed to allege their "culpable

---

[28] Radian's contention that its sham policy actually served a "corrective function"—and that "it would make no sense for Plaintiffs to claim that they paid higher prices for Fannie Mae's stock because Fannie Mae reduced its income in 2002" (Radian Mem. at 21) (emphasis added)—reveals its fundamental misunderstanding of the nature of Plaintiffs' claims and of the very purpose of the securities laws. Plaintiffs allege that Fannie Mae systematically manipulated its reported financial results throughout the Loss Period for a variety of reasons, including (1) to assure the market that Fannie Mae was a safe and sound investment; (2) to refute the contentions of the Company's detractors that all the perks it enjoyed were not warranted; and (3) to ensure the Officer Defendants' continued receipt of lavish compensation. Under these circumstances, it is disingenuous to suggest that Plaintiffs complain only of "overstated earnings." Rather, Plaintiffs complain of a Company's fundamental failure to make full and fair disclosures concerning its overall financial picture, its business model, the reasons for its "success," and the risks associated with Plaintiffs' investments therein. Moreover, Radian's backhanded suggestion that there is "no harm, no foul" in misstating earnings, as long as earnings are *under*stated, flouts Congress's intent to "substitute a philosophy of full disclosure for the philosophy of caveat emptor" by enacting the 1934 Act in the first place. *Affiliated Ute,* 406 U.S. at 151 (quoting *SEC v. Capital Gains Res. Bureau,* 375 U.S. 180, 186 (1963)).

participation" in Fannie Mae's violations.[29]  The Director Defendants also contend that that they

did not "control" Fannie Mae for purposes of Section 20(a).  Howard, however, does not dispute

that he was a "controlling person" of Fannie Mae during his tenure at the Company.

As discussed below, Plaintiffs' Section 20(a) claims should be upheld because there is no

requirement that they plead Defendants' "culpable participation," and because they have

adequately alleged the Director Defendants' "control" of Fannie Mae.

### A.    Plaintiffs Are Not Required to Plead Culpable Participation

Section 20(a) imposes liability upon controlling persons "unless the controlling person

acted in good faith and did not directly or indirectly induce the act or acts constituting the

violation or cause of action."  15 U.S.C. § 78t(a).  The majority of the Courts of Appeals, and at

least one Court within this District, have recognized that the *defendant* bears the burden of proof

as to the "good faith" defense.  *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151,

1161 (9th Cir. 1996); *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996); *Harrison*

*v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992); *Metge v. Baehler*, 762 F.2d

621, 630-31 (8th Cir. 1985); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir.

1981); *Carpenter v. Harris, Upham & Co., Inc.*, 594 F.2d 388, 394 (4th Cir. 1979), *cert. denied*,

444 U.S. 868 (1979) ("[i]n order to satisfy the requirement of good faith *it is necessary for the*

---

[29] Raines and Howard also assert several arguments that, if accepted, would result in dismissal of Plaintiffs' Section 20(a) claims only in part.  Specifically, they seek dismissal of Plaintiffs' Section 20(a) insofar as they are based on: (1) Fannie Mae's violation of Section 18, (2) purchases by Plaintiffs after September 21, 2004, or (3) violations by Fannie Mae after Raines and Howard left the Company.  The first two arguments are merely outgrowths of the underlying challenges to the timeliness of Plaintiffs' Section 18 claims, and to Plaintiffs' ability to pursue claims based on post-September 21, 2004 purchases.  If the Court rejects those challenges – as it should for the reasons discussed above – then Plaintiffs' Section 20(a) claims against Raines and Howard should survive in their entirety.  As to Raines' and Howard's third argument, there is nothing in dispute; Plaintiffs do not seek to hold Raines and Howard liable under Section 20(a) for violations by Fannie Mae that occurred after their departures from the Company in December 2004.

*controlling person to show* that some precautionary measures were taken to prevent an injury ...") (emphasis added); *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 23 (D.D.C. 2000).[30]

As Judge Green explained in *Baan*, requiring plaintiffs to prove a defendant's culpability "would erode the distinction between direct liability under 10(b) and control person liability under 20(a)."  103 F. Supp. 2d at 23.  Similarly, in *Microstrategy*, the Court held that "to construe Section 20(a) to require Plaintiffs to demonstrate culpable participation ... would effectively conflate the requirements for secondary liability under Section 20(a) and those for primary liability under Section 10(b) and Rule 10b-5, thereby reducing Section 20(a) to surplusage."  115 F. Supp. 2d at 659.  Since "courts should be loathe to interpret Congress's pronouncements to be redundant," *id.* at 659-60, Section 20(a) should be interpreted in the manner recognized by the majority of the Courts – that a plaintiff need not prove culpability in order to prevail on "controlling person" claims.

Because *Defendants* bear the burden of proving their lack of culpability, Plaintiffs are not required to plead Defendants' culpable participation in order to state claims under Section 20(a).

---

[30] The D.C. Circuit and the First and Sixth Circuits have yet to decide whether culpable participation must be pleaded or proven in a Section 20(a) case.  Only the Second and Third Circuits have held that plaintiffs must prove culpable participation.  Neither of those Courts, however, has held that a plaintiff must *plead* culpable participation, and in fact the decisions of the Second Circuit indicate that there is no such pleading requirement.  *See, e.g., Suez Equity Investors L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (allegation that defendant "was an officer of the Bank and that he had primary responsibility for the dealings of that Bank and the other corporate defendants" was "sufficient to plead controlling-person liability").  Likewise, numerous district courts within those Circuits have held that, even if culpable participation must be proven by the plaintiff, it need not be *pleaded* in the complaint.  *See, e.g., The Pension Committee of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05-CIV-9016 (SAS), 2006 WL 2053326, at *13 (S.D.N.Y. Jul. 20, 2006); *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. at 395-96; *Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03-CIV-3120 (LTS) (THK), 2006 WL 2034663, at *3 (S.D.N.Y. July 19, 2006); *Parmalat*, 414 F. Supp. 2d at 439; *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 450-51 (S.D.N.Y. 2005); *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 638268, at *13 (S.D.N.Y. Mar. 21, 2005); *In re Cambrex Corp. Sec. Litig.*, No. 03-CV-4896 (WJM), 2005 WL 2840336, at *16 (D.N.J. Oct. 27, 2005) ("there is an 'overwhelming trend' in [the Third] Circuit that plaintiffs need only plead simple control in order to withstand a motion to dismiss" a Section 20(a) claim); *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 645 (D.N.J. 2003) (same); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 523 (W.D. Pa. 2002); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 600 (D.N.J. 2001); *Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1013 (D.N.J. 1996).

*See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1109 (10th Cir. 2003); *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, No. 2:03-MD-1565, 2006 WL 469468, at *24 (S.D. Ohio Feb. 27, 2006); *In re Hienergy Tech., Inc.*, No. SACV04-1226 (JTLX), 2005 WL 3071250, at *12 (C.D. Cal. Oct. 25, 2005); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1148-49 (D. Colo. 2005); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 408 (D. Md. 2004); *In re Microstrategy*, 115 F. Supp. 2d at 660; *In re Wall Data Sec. Litig.*, No. C95-05287, 1996 WL 585596, at *7 (W.D. Wash. June 25, 1996); *In re Nat'l Health Labs. Sec. Litig.*, No. 92-1949, 1993 WL 331002, at *3 (S.D. Cal. July 2, 1993); *Smith v. Network Equip. Tech., Inc.*, Nos. C-90-1138, C-90-1281 & C-90-1372 (DLJ), 1990 WL 263846, at *6 (N.D. Cal. Oct. 19, 1990); *In re Conner Bonds Litig.*, No. 88-3-5, 1988 WL 110054, at *6 (E.D.N.C. July 21, 1988); *see also* cases cited *supra* in note 30.  *See also generally Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (burden of pleading affirmative defense rests with defendant).

Significantly, however, even if Plaintiffs were required to plead "culpable participation" by Howard and the Director Defendants, they have done so.  Although Defendants try to equate culpable participation with scienter, "[t]he seminal case adopting the 'culpable participant' requirement, equates culpable participation with lack of good faith."  *Alvarado v. Morgan Stanley Dean Witter, Inc.*, No. CIV 05-1149 (JP), 2006 WL 2587496, at *6 (D.P.R. Aug. 30, 2006) (citing *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir.1973)).  "Good faith in this context requires a reasonable system of supervision, enforced with reasonable diligence."  *Id.* (citing *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 615 (7th Cir. 1996).  *See also S.E.C. v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) ("in order to escape controlling-person liability, [defendant] had the burden of showing that he did not induce the Firm's violations and that he maintained and enforced a reasonable and proper system of supervision

61

and internal control over the pertinent personnel"). "The holding that Section 20(a) has no scienter element is also commanded by the congressional intent underlying Section 20(a), namely the desire to hold 'a person who controls a person subject to the act or a rule or regulation thereunder … liable to the same extent as the person controlled *unless* the controlling person acted in good faith and did not induce the act in question.'" *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 395 (emphasis in original) (quoting S.Rep. No. 73-792, at 22; H.R. Conf. Rep. No. 73-1383, at 26 (1934)). Section 20(a) "is remedial and is to be construed liberally" in furtherance of its purpose "to expand, not restrict, the public's remedies." *Sennott v. Rodman & Renshaw*, 414 U.S. 926, 929 (1973) (*Douglas, dissenting from denial of certiorari*). "Finding a scienter requirement where none exists in the plain text would … undercut the remedial purpose of the statute." *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 396.

Although not required under Section 20(a), as discussed above Plaintiffs have pleaded detailed facts supporting an inference of scienter by Howard and the Audit Committee Defendants. Because scienter is a much higher pleading threshold to meet than the lack of "good faith," Plaintiffs have pleaded the "culpable participation" of Howard and the Audit Committee Defendants.[31]

Plaintiffs have also pleaded the "culpable participation" of those Director Defendants who did not serve on the Audit Committee. Plaintiffs have alleged (and OFHEO has concluded)

---

[31] Within the small minority of courts that have required plaintiffs to plead culpable participation, there is a split of authority regarding the applicable pleading standard. Many decisions have held that allegations of culpable participation need not be pled with particularity, and need only satisfy the notice pleading requirements of Rule 8. *See, e.g.*, *In re Vivendi Universal S.A.*, 381 F. Supp. 2d 158, 190 (S.D.N.Y. 2003); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 413 (S.D.N.Y. 2005); *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 363 (S.D.N.Y. 2005); *In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 320 (S.D.N.Y. 2005). In the event this Court decides to follow the minority rule and require pleading of culpable participation, it should likewise apply the Rule 8 pleading standard, because "[t]he concept of culpable participation describes that degree of control which is sufficient to render a person liable under Section 20(a)," and "the extent to which the control must be alleged [is] governed by Rule 8's pleading standard." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y.2003) (cited in *In re Van der Moolen*, 405 F. Supp. 2d at 413).

that the Director Defendants "inappropriately reinforced rather than checked the tone and

culture" set by senior management (Evergreen ¶ 735; Franklin ¶ 828); "failed to be sufficiently

informed and independent" (*id.*); "failed to exercise the requisite oversight" (*id.*); "approved an

executive compensation program that created incentives to manipulate earnings" and then "failed

to monitor against such manipulations" (Evergreen ¶ 738; Franklin ¶ 831); failed to properly

discharge OFHEO's corporate governance regulations (*id.*); failed to properly delegate authority

(*id.*); "failed to ensure the effective operation of [the] Audit and Compensation Committees"

(*id.*); failed to "act as a check" on Raines' authority (*id.*); "failed to initiate an independent

inquiry into Fannie Mae's accounting following the announcement of Freddie Mac's restatement

and subsequent investigation or allegations of Roger Barnes, both of which involved earnings

management" (*id.*); and "failed to ensure timely and accurate reports to Federal regulators" (*id.*).

These allegations of the Director Defendants' failure to act with reasonable diligence, or to

implement a reasonable system of supervision, are sufficient to plead their culpable participation.

*See Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 615 (7th Cir. 1996) (jury's finding of

control person liability was adequately supported by evidence of controlling person's "total lack

of sufficient diligence," "casual or grossly indifferent" supervision of controlled person, and

disregard of "obvious warning signs"); *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385,

1388 (9th Cir. 1987) (culpable participation "may be proven indirectly by showing that

[defendant] failed to establish a reasonable system of supervision and control"); *Alvarado*, 2006

WL 2587496, at *6 (failure to adequately supervise controlled person would be sufficient to

plead culpable participation, if such a requirement existed); *In re Reliance Sec. Litig.*, 135 F.

Supp. 2d 480, 519 (D. Del. 2001) (denying defendants' motion for summary judgment, where "a

reasonable juror could conclude that defendants culpably participated in the fraud by approving

the allegedly misleading SEC document" and where plaintiffs "identifies facts which may

support a finding that defendants acted negligently or recklessly in performing their duties of

oversight as directors").

Therefore, although Plaintiffs are not required to plead culpable participation to state a

Section 20(a) claim, their allegations against Howard and the Director Defendants are sufficient

even if there were such a requirement.

**B.     Plaintiffs Have Adequately Alleged the Director Defendants' "Control"**

**1.     Allegations of Control Are Subject to the Notice Pleading Requirements of Rule 8(a)**

The relaxed notice-pleading standard of Rule 8(a) applies to allegations of control,

because "the allegation of control is not an averment of fraud and therefore need not be made

with particularity." *Neubauer v. Eva-Health USA, Inc*., 158 F.R.D. 281, 284-85 (S.D.N.Y.

1994). *See also Catton v. Defense Tech. Sys., Inc.*, No. 05-CIV-6954 (SAS), 2006 WL 1716862,

at *6 (S.D.N.Y. June 20, 2006); *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 627 & n.53

(S.D.N.Y. 2005); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 408 (D. Md.

2004); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 843 (N.D. Ill. 2000). Therefore, a "short,

plain statement that gives the defendant fair notice of the claim that the defendant was a control

person and the ground on which [the plaintiff] rests its assertion that a defendant was a control

person is all that is required." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d at 415-16;

*accord In re Philip Servs. Corp. Sec. Litig*., 383 F. Supp. 2d at 485.

**2.     Control Is a Factual Issue That Should Not Be Resolved on a Motion to Dismiss**

Determining whether an defendant is a control person presents "an intensely factual

question." *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d at 24 (quoting *Paracor Fin. Inc.*, 96 F.3d

at 1161). Thus, the issue of control "is not ordinarily subject to resolution on a motion to

dismiss," and "dismissal is appropriate only when a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 661 (E.D. Va. 2000) (citing *Maher v. Durango Metals, Inc.*, 144 F. 3d 1302, 1306 (10th Cir. 1998)). *See also No. 84 Employer-Teamster Joint Council Pension Trust v. America W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir.), *cert. denied,* 540 U.S. 966 (2003); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir. 2002); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 409 (D. Md. 2004); *In re Cable & Wireless*, 321 F. Supp. 2d 749, 775 (E.D. Va. 2004); *In re Hayes Lemmerz Int'l Inc. Equity Sec. Litig.,* 271 F. Supp. 2d 1007, 1022-23 (E.D. Mich. 2003); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. at 143.

### 3.    Plaintiffs' "Control" Allegations Are Sufficient

The SEC's regulations define "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §§ 230.405, 240.12b-2.  It is not necessary that one actually exercise control in order to qualify as a controlling person, but merely that one possesses the power to do so.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *San Francisco-Oklahoma Petroleum Exploration Corp. v. Carstan Oil Co.*, 765 F.2d 962, 965 (10th Cir. 1985); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005); *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d at 24; *In re JWP Inc. Sec. Litig.*, 928 F. Supp. at 1260.  Thus, control only requires some "'indirect means of discipline or influence short of actual direction'" to hold a controlling person liable.  *Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98, 102 n.11 (S.D.N.Y. 1989) (quoting *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir. 1967)).

For pleading purposes, to state a Section 20(a) claim a plaintiff need only allege that the defendant "had the power to control the general affairs of the entity primarily liable at the time

the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996); *Microstrategy*, 115 F. Supp. 2d at 661; *Royal Ahold*, 351 F. Supp. 2d at 408-09. *See also King v. E.F. Hutton & Co., Inc.*, No. 86-0211, 1987 WL 8733, at *4 (D.D.C. Mar. 13, 1987) ("There is no requirement that the controlling person *exercise* control over the particular transaction which gives rise to the violation.") (emphasis added). In this case, the "specific corporate policy" that resulted in the primary violations was the preparation and dissemination of financial statements, including those contained in the Company's SEC filings. *See Brown*, 84 F.3d at 397 (where fraud is alleged to have occurred in dissemination of a prospectus relating to restructuring, control person status is evaluated with respect to the issuance of the prospectus, not the decision to restructure); *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97-C-2715, 1998 WL 781118, at *13 (N.D. Ill. Nov. 4, 1998) (in accounting fraud case, allegations that defendants "exercised general control over the content of the Company's public representations and had the ability to control the specific misrepresentations in the Registration Statements, prospectuses and financial statements" were sufficient to allege control). Plaintiffs' Section 20(a) claims should be upheld because, as discussed below, Plaintiffs have pleaded that the Director Defendants had the power to control the Company's general affairs and to influence its financial reporting.

### (a)    **All Director Defendants**

Each of the Director Defendants was a member of Fannie Mae's Board of Directors at a time when the Company is alleged to have violated Sections 10(b) and/or 18 of the Exchange Act. *See* Evergreen ¶¶ 33-48; Franklin ¶¶ 55-70. Several courts have held that "directors are prima facie considered 'controlling persons,'" and that any claim that they exercised insufficient

control over the company to warrant holding them liable as controlling persons "is a factual question that cannot be properly resolved by a motion to dismiss." *Dowling v. Narragansett Capital Corp.*, 735 F. Supp. 1105, 1122 (D.R.I. 1990). *See also American Gen. Ins. Co. v. Equitable Gen. Corp.*, 493 F. Supp. 721, 752 (E.D. Va. 1980) ("The individual defendants, by virtue of their positions as directors of [the company], clearly possessed the 'power to direct or cause the direction of the management and policies' of [the company] through actions as directors, thus these defendants are prima facie controlling persons"); *In re Storage Tech. Corp. Sec. Litig.*, 630 F. Supp. 1072, 1079 (D. Colo. 1986) (same).

Plaintiffs do not, however, base their claims solely on allegations that these defendants were members of the Board of Directors. In addition, each of the Director Defendants is alleged to have approved and signed at least one of the Company's SEC filings containing false or misleading statements. *See* Evergreen ¶¶ 33-48, 503, 582; Franklin ¶¶ 55-70, 539, 619. This fact is indicative of their ability to control or influence the contents of those filings, and a number of courts have found it sufficient to allege control. As the Court held in *In re WorldCom, Inc. Securities Litigation*:

> Where it is alleged that a defendant signed an SEC filing that contained the misrepresentations that are the subject of the Section 10(b) claim, this is sufficient to allege control of the authors of the filing, and the management and policies of the corporation behind the misrepresentations.
>
> *        *        *
>
> [J]ust what is a signature on an SEC filed document meant to represent if it does not represent a degree of responsibility for the material contained in that document? The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents.

294 F. Supp. 2d 392, 419-20 (S.D.N.Y. 2003) (citations omitted). *See also In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1174 (D.D.C. 1996) (allegation that defendants signed an SEC filing containing false statements was "sufficient, at least at the pleading stage, to create an inference that they had at least a modicum of control over the content" of the document) (quoting *In re the Leslie Fay Cos., Inc. Sec. Litig.*, No. 92-CIV-8036, 1993 WL 438927, at *5 & n.11 (S.D.N.Y. Oct. 27, 1993)); *Schleicher v. Wendt*, No. 1:02CV1332DFHTAB, 2005 WL 1656871, *6 (S.D. Ind. Jul. 14, 2005) ("[t]he fact that each defendant signed at least one of the SEC filings alone satisfies [the] standard" for pleading control); *In re Philip Serv. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (it "comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report") (citation omitted); *Thomson Kernaghan & Co. v. Global Intellicom, Inc.*, Nos. 90-CIV-3005 & 99-CIV-3105 (DLC), 2000 WL 640653, at *7 (S.D.N.Y. May 17, 2000) ("This court agrees with those finding that the signing of a fraudulent SEC filing raises a sufficient inference of control"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 457 (S.D.N.Y. 2005) (denying dismissal of control person claims as to all defendants who "signed the Registration Statement"); *Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 Civ. 3374 (RPP), 1999 WL 101772, at *18 (S.D.N.Y. Mar. 1, 1999) (allegation that outside director signed Form 10-K is sufficient to plead Section 20(a) claim); *Robbins v. Moore Med. Corp.*, 788 F. Supp. 179, 189 (S.D.N.Y. 1992) (same).[32]

---

[32] The Director Defendants cite a single case -- *In re Lernout & Hauspie Securities Litigation*, 286 B.R. 33 (Bankr. D. Mass. 2002) -- for the proposition that a director's signature on an SEC filing is insufficient to plead control. In that case, the Court found that the audit committee members were control persons, but dismissed the Section 20(a) claim against the non-audit committee outside directors. The Court reasoned that "[t]he distinction lies in the director's ability to control the content of the financial documents," and that a director's signature on an SEC filing may be sufficient to allege control, where the director "has the power to exercise content control over financial documents." *Id.* at 44. As discussed *infra*, Plaintiffs have alleged the Director Defendants' control over the content of Fannie Mae's financial statements, and therefore *Lernout & Hauspie* is readily distinguishable.

In addition, Plaintiffs have alleged that, pursuant to OFHEO regulations, the Director

Defendants were responsible for "direct[ing] the conduct and affairs of [Fannie Mae] in

furtherance of the safe and sound operation of the Enterprise," including "having in place

adequate policies and procedures to assure its oversight of …[the] [i]ntegrity of accounting and

financial reporting systems of the Enterprise, including independent audits and systems of

internal control … [and the] adequacy of reporting disclosures, and communications to

shareholders, investors, and potential investors."  Evergreen ¶ 736; Franklin ¶ 829.  The fact that

the Board of Directors delegated certain aspects of its responsibilities to various Board

committees (*e.g.*, the Audit Committee) does not absolve the full Board of those responsibilities.

To the contrary, OFHEO's corporate governance regulations specifically provide that "no

committee shall operate to relieve the board of directors or any board member of a responsibility

imposed by applicable law, rule, or regulation."  Evergreen ¶ 737; Franklin ¶ 830.  Thus,

Plaintiffs have alleged the Director Defendants' *ability* to control and influence the affairs of the

Company generally, and its accounting and financial reporting specifically.  "There is no

requirement that the controlling person *exercise* control over the particular transaction which

gives rise to the violation."  *King*, 1987 WL 8733, at *4 (emphasis added).

Taken as a whole, and particularly in light of the relaxed pleading standard of Rule 8,

Plaintiffs' allegations are sufficient to allege that the Director Defendants were control persons

of Fannie Mae.  *See In re First Merchants Acceptance Corp.*, 1998 WL 781118, at **12-13

(denying motion to dismiss control person claim where plaintiff alleged that the defendant

directors had the power to control the contents of the company's public statements; were

provided with the company's statements prior to their issuance and had the opportunity to correct

them or prevent their issuance; and signed the registration statements or otherwise participated in

69

offering process); *In re AFC Enter., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363 (N.D. Ga. 2004) (denying motion to dismiss Section 20(a) claims against directors, where plaintiffs alleged that the directors could control the company's general affairs, including the content of its public statements and financial statements); *In re Miller Indus., Inc. Sec. Litig.*, 12 F. Supp. 2d 1323, 1333 (N.D. Ga. 1998) (same).

### (b)    The Audit Committee Defendants

As discussed above, Plaintiffs have alleged that all of the Director Defendants were "control" persons of Fannie Mae for purposes of Plaintiffs' Section 20(a) claim. Plaintiffs' allegations of control are even stronger against defendants Gerrity, Mulcahy, Malek, Segue, Harvey, and Pickett, who were members of Fannie Mae's Audit Committee[33] and, as such, were responsible for overseeing the Company's financial reporting and accounting, the integrity of its financial statements, the effectiveness of its internal controls, and the performance of its internal and outside auditors. *See* Evergreen ¶¶ 706-13; Franklin ¶¶ 798-805. The Audit Committee's own charters specifically required the committee to, *inter alia*:

- monitor the integrity of the corporation's financial statements (Evergreen ¶¶ 708, 711; Franklin ¶¶ 800, 803);

- review the results of the auditors' activities (Evergreen ¶¶ 709(b), 712(f); Franklin ¶¶ 801(b), 804(f));

- review the Company's financial reporting practices including the significant issues and judgments made in connection with the preparation of the audited financial statements (Evergreen ¶¶ 709(c), 712(g); Franklin ¶¶ 801(c), 804(g));

- review and discuss with management and the outside auditor the Company's annual audited and quarterly unaudited financial statements (Evergreen ¶ 712(g); Franklin ¶ 804(g)).

---

[33] For the 2001 audit year, the Audit Committee was composed of Gerrity (as Chairman), Harvey, Mulcahy, Segue, and non-defendant Vincent Mai. For the 2002 audit year, it was composed of Gerrity (as Chairman), Harvey, Mulcahy, Segue, and Malek. For the 2003 audit year, it was composed of Gerrity (as Chairman), Harvey, Mulcahy, Segue, Malek, and Pickett. Evergreen ¶ 706; Franklin ¶ 798.

- receive, review, and discuss reports from the outside auditor on all critical accounting policies and practices to be used, all alternative treatments that have been discussed with management, and other material written communications between the outside auditor and management (Evergreen ¶ 712(h); Franklin ¶ 804(h));

- review the status of compliance with significant accounting developments (Evergreen ¶¶ 709(e), 712(p); Franklin ¶¶ 801(e), 804(p)); and

- review the Company's major risks and risk management processes, including the quality and effectiveness of internal controls, and compliance with established limits on derivative risk (Evergreen ¶¶ 709(g), 712(j), 712(m); Franklin ¶¶ 801(g), 804(j), 804(m)).

These allegations of the Audit Committee Defendants' responsibility for overseeing the Company's accounting, internal controls, and financial reporting, are sufficient to plead their "control" for purposes of Section 20(a).[34]  As stated in *In re JWP Inc. Securities Litigation*, 928 F. Supp. at 1260:

> [T]he audit committee was clearly the body charged with specific responsibility of overseeing JWP's accounting and financial reporting and, therefore with keeping JWP on the straight and narrow.  A reasonable jury could find that the audit committee's recommendations would carry sufficient weight with the full Board, JWP's officers and [the outside auditor] that the audit committee had the practical ability to direct JWP's accounting policies.  The audit committee defendants need not, of course, have actually exercised that authority to be held liable as control persons.

---

[34] The Audit Committee Defendants contend that Plaintiffs' allegations "do not establish that the Audit Committee [Defendants] actually had the power to control the accounting decisions alleged in the Amended Complaints," and that "[t]hose decisions were made by the accounting officers of the company, in conjunction with the outside auditors, and presented to the Audit Committee as accurate."  Director Defs. Mem. at 31 (emphasis added).  This argument is not supported by the allegations of the Complaints cited by the Audit Committee Defendants, which say nothing about who made the accounting decisions at Fannie Mae.   See Evergreen ¶¶ 440, 465, 496, 507, 588; Franklin ¶¶ 472,473, 499, 500, 531, 532, 543, 620, 626).  In any event, it is irrelevant who actually made the accounting decisions; the question for purposes of Section 20(a) is whether the Audit Committee Defendants had the power to "directly or indirectly control or influence" the Company's financial reporting.  *Brown*, 84 F.3d at 396.  Plaintiffs have clearly alleged that the Audit Committee Defendants were responsible for overseeing the Company's financial reporting and for reviewing the Company's accounting decisions (*see* Evergreen ¶¶ 709, 712; Franklin ¶¶ 801, 804).  Those responsibilities would be meaningless if the Audit Committee Defendants had no power to "control or influence" those matters.  *See In re Livent*, 78 F. Supp. 2d at 222 ("[a]n outside director and audit committee member who signs off on the financials can be presumed to have 'the power to direct or cause the direction of the management and policies of' the corporation").

Similarly, in one of the cases the Director Defendants themselves cite – *Lernout & Hauspie Securities Litigation* – the Court found the plaintiffs to have stated a Section 20(a) claim against audit committee members who, like the Audit Committee Defendants in this case, signed the Company's SEC filings and met with the outside auditors to review the Company's financial statements before they were released.  286 B.R. at 39-40.  *See also Wafra Leasing Corp. 1999-1 v. Prime Capital Corp.*, No. 01C4314, 2004 WL 1977572, at **8-9 (N.D. Ill. Aug. 31, 2004) (denying audit committee members' motion for summary judgment on Section 10(a) claim, due to their responsibility for overseeing and reviewing the results of the company's audits and internal controls); *In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*, 271 F. Supp. 2d 1007, 1023 (E.D. Mich. 2003) (upholding § 20(a) claim against audit committee members who "review[ed] the scope of the audits and the accounting principles being applied in financial reporting" and met regularly with management and the auditors); *In re Livent*, 151 F. Supp. 2d at 437 ("[a]n outside director and audit committee member who is in a position to approve a corporation's financial statements can be presumed to have 'the power to direct or cause the direction of the management and policies of' the corporation, at least insofar as the 'management and policies' referred to relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign"); *In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 78118, at **12-13 (plaintiffs stated control person claim against audit committee members by alleging that they had the power and influence to control the contents of the company's public filings); *In re Nat'l Media Sec. Litig.*, No. 93-2977, 1994 WL 397398, at *5 (E.D. Pa. July 27, 1994) ("Allegations that each defendant was an officer, a director, or both and possessed 'the potential power to influence or control, directly or indirectly, the accounting and auditing activities of [the corporation]' suffice to state a claim for purposes of a motion to dismiss.").[35]

---

[35] The Director Defendants acknowledge the case law holding that audit committee members are control persons,

Given their direct oversight over the Company's accounting and financial reporting, the fact-intensive nature of the "control" inquiry, and the lenient Rule 8 pleading standard, the Audit Committee Defendants' motion to dismiss Plaintiffs' Section 20(a) claims should be denied.

## V.    PLAINTIFFS HAVE STATED A CLAIM FOR INSIDER TRADING IN VIOLATION OF §20A

To allege a claim of insider trading in violation of Section 20A, a plaintiff must allege that (i) the defendant sold shares of stock (ii) while in possession of inside information (iii) contemporaneously with purchases of the stock by the plaintiff. *See* 15 U.S.C. § 78t-1.  In addition, the statute requires that a plaintiff allege a predicate violation of the Securities Exchange Act of 1934. *Id.*   The Officer Defendants only challenge Plaintiffs' allegations regarding one element of their Section 20A claim:  the "contemporaneous" trading requirement. Additionally, Howard – relying on documents outside the Complaint – claims that certain of his sales were pursuant to pre-established trading plan, and that he is not subject to insider trading liability for those sales.  As discussed below, all of these arguments should be rejected.

### A.    Plaintiffs Have Alleged Contemporaneous Transactions

Contending that Section 20A requires "same day" sales and purchases, the Officer Defendants parse through their trades and ask for dismissal of all claims relating to insider sales that did not occur on the same day as purchases by Plaintiffs.  Notably, even under this "same day" standard the Officer Defendants acknowledge that they are not entitled to wholesale dismissal of Plaintiffs' Section 20A claims, because at least one of his/her insider sales occurred

---

but contend that this result "only makes sense in circuits … where culpable participation is also required," because otherwise any director who serves on an audit committee may be subjected to control person liability.  However, it is perfectly appropriate for those directors who undertake to oversee the financial reporting process to be subject to control person liability when the company misstates its financial results.  This does not mean they are automatically liable; they can avoid liability by establishing their "good faith" affirmative defense. *See Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d at 614 (rejection of culpable participation requirement does not make control person an "insurer" of its controlled person, due to availability of good faith defense).

on the same day (January 21, 2003) as a purchase by the Evergreen Select Equity Trust. *See* Def. Spencer's Mem. of Law in Supp. of Mot. to Dismiss ("Spencer Mem.") at 4-5; Mem. of Law in Supp. of Def. Raines's Mot. to Dismiss ("Raines Mem.") at 6; Mem. of Law in Supp. of Def. Howard's Mot. to Dismiss ("Howard Mem.") at 3 n.1, 7 (identifying 9 same-day transactions alleged by Plaintiffs, but arguing that only his January 21, 2003 sale is actionable).[36]

More importantly, however, the Officer Defendants' "same day" rule is unduly narrow. As the Ninth Circuit has recognized, "Congress did not define the term 'contemporaneous' as used in § 20A, but instead apparently intended to adopt the definition 'which has developed through the case law.'" *Neubronner v. Milken*, 6 F.3d 666, 669 n.5 (9th Cir. 1993) (quoting H.R. Rep. No. 910, 100th Cong., 2d Sess. 27 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6043, 6064). The legislative history cites three cases as examples of the development of this definition, none of which required same-day transactions. *See* H.R. Rep. No. 910, at 27; *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88 (2d Cir. 1981) (transactions one month apart were not contemporaneous); *Shapiro v. Merrill, Lynch, Pierce Fenner & Smith, Inc.*, 495 F.2d 228 (2d Cir. 1974) (trades up to four trading days apart were contemporaneous); *O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 559 F. Supp. 800, 805 n.5 (S.D.N.Y. 1983) (transactions up to one week apart were contemporaneous).

Numerous other courts have found, like *Shapiro* and *O'Connor*, that transactions occurring up to a week apart are sufficiently contemporaneous to support an insider trading claim. *See, e.g.*, *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 144 (S.D.N.Y. 1999) ("Five trading days is a reasonable period between the insider's sale and the plaintiff's

---

[36] Howard's argument for dismissal of the eight remaining same-day sales is based upon his claim —addressed below — that those sales were accomplished pursuant to a pre-announced trading plan. Howard Mem. at 7.

purchase to be considered contemporaneous …"); *In re Engineering Animation Sec. Litig.*, 110 F. Supp. 2d 1183 (S.D. Iowa 2000) (three-day gap); *In re Cypress Semiconductor Sec. Litig.*, 836 F. Supp. 711, 714 (N.D. Cal. 1993) (five-day gap); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1489 (N.D. Cal. 1992) (interval between trades "could be as short as a few days, but no longer than a month").  These holdings are consistent with the common usage of the term "contemporaneous," which is defined as "arising, existing, or occurring during the same *period* of time," not at the same *exact* time.  Webster's II New College Dictionary (1995) (emphasis added).

        The Court should reject Defendants' narrow reading of Section 20A as requiring "same day" sales, and should hold – as many other courts have done – that purchases and sales are contemporaneous for purposes of Section 20A if they occur less than one week apart.  Applying this definition, as discussed below, Plaintiffs have alleged contemporaneous trades with each of the Officer Defendants.

                **1.    Franklin Plaintiffs' Contemporaneous Trades with Howard**

        As set forth in Schedule A to the Franklin Complaint, the Franklin Plaintiffs have alleged the following purchases which occurred within one week after sales by Howard:

- a January 16, 2003 purchase occurring one trading day after Howard's January 15, 2003 sale;

- a January 23, 2003 purchases occurring two trading days after Howard's January 21, 2003 sales;

- purchases on November 12, 2003 and November 18, 2003, one and three trading days after Howard's November 13, 2003 sales;

- purchases on January 9, 2004, four trading days after Howard's January 5, 2004 sale;

- a March 18, 2004 purchase occurring on the same day or one day after Howard's March 17 and March 18, 2004 sales;

- purchases on March 31, 2004, the same day as sales by Howard;

- purchases on April 1 and April 2, 2004, the same day or one day after Howard's April 1, 2004 sales;

- purchases on April 28, 2004, the same day as sales by Howard;

- purchases on April 29, 2004, the same day as sales by Howard;

- purchases on May 27, 2004, one day after and on the same day as Howard's May 26 and May 27, 2004 sales;

- a June 28, 2004 purchase occurring three trading days after Howard's June 23, 2004 sales, and two trading days after Howard's June 24, 2004 sales;

- a July 9, 2004 purchase occurring two days after Howard's July 7, 2004 sales, and one day after Howard's July 8, 2004 sales;

- purchases on August 6, 2004, two days after Howard's August 4, 2004 sales, and one day after Howard's August 5, 2004 sales;

- an August 25, 2004 purchase occurring four and five trading days after Howard's August 18 and August 19, 2004 sales; and

- a September 2, 2004 purchase occurring just one day after or on the same day as Howard's September 1 and September 2, 2004 sales;

- purchases on September 21 and September 22, 2004, just two to four trading days after Howard's September 15 and September 16, 2004 sales.

### 2.    Franklin Plaintiffs' Contemporaneous Trades with Raines and Spencer

Schedule A to the Franklin Complaint identifies the following purchases which were contemporaneous with sales by Raines and Spencer:

- purchases on January 23, 2003, just two trading days after Raines' and Spencer's January 21, 2003 sales;

- purchases on January 9, 2004, four trading days after Raines' and Spencer's January 5, 2004 sales;

- purchases on February 24, 2004, three trading days after Spencer's February 19, 2004 sales; and

- purchases on May 24, 2004, four trading days after Spencer's May 18, 2004 sales.

### 3.    Evergreen Plaintiffs' Contemporaneous Trades with Howard

As set forth in Schedule A to the Evergreen Complaint, the Evergreen Plaintiffs have alleged the following purchases which were contemporaneous with sales by Howard:

- purchases on January 16, 2003, one day after Howard's January 15, 2003 sales;

- a January 21, 2003 purchase occurring on the same day as a sale by Howard;

- a January 9, 2004 purchase occurring four trading days after Howard's January 5, 2004 sale;

- purchases on March 29, 2004 and April 5, 2004, two and three trading days after Howard 's March 31, 2004 and April 1, 2004 sales;

- a May 17, 2004 purchase occurring two and three trading days after Howard's May 12 and May 13, 2004 sales;

- a June 10, 2004 purchase occurring on the same day as and one day after Howard's June 10 and June 11, 2004 sales;

- a July 13, 2004 purchase occurring three and four trading days after Howard's July 7 and July 8, 2004 sales; and

- purchases on September 17, 2004, one and two days after Howard's September 15 and September 16, 2004 sales.

### 4.    Evergreen Plaintiffs' Contemporaneous Trades with Raines and Spencer

Schedule A to the Evergreen Complaint identifies the following purchases which were contemporaneous with sales by Raines and Spencer:

- a January 21, 2003 purchase occurring on the same day as sales by Raines and Spencer; and

- a January 9, 2004 purchase occurred four trading days after Raines' and Spencer's January 5, 2004 sales.

Accordingly, the Officer Defendants' motion to dismiss Plaintiffs' Section 20A claims for failure to allege "contemporaneous" trades should be denied.

**B.**    **Howard's Purported Trading Plan Does Not Entitle Him to Dismissal**

In an attempt to evade liability for insider sales that occurred contemporaneously with Plaintiffs' purchases even under his own "same day" standard, Howard proclaims that those sales were pursuant to a pre-established trading plan and therefore cannot form the basis of a Section 20A claim. Howard Mem. at 6. Plaintiffs do not concede that the Court can or should take judicial notice of Howard's trading plan for purposes of these motions. However, the Court need not address that issue because, even assuming the existence of that plan, it provides no basis for dismissal

The adoption of a trading plan *only* provides an affirmative defense to an insider trading claim when the defendant establishes, among other things, that: he adopted the plan "[b]efore becoming aware of the [material nonpublic] information," 17 C.F.R. § 240.10b5-1(c)(1)(i)(A); the plan satisfied certain statutory criteria, *id.* § 240.10b5-1(c)(1)(i)(B); the sale was pursuant to the plan, *id.* § 240.10b5-1(c)(1)(i)(C); and the plan was entered into in good faith and not as part of a plan or scheme to evade insider trading liability, *id.* § 240.10b5-1(c)(1)(ii). Given the fact-intensive nature of these inquiries, the assertion of this affirmative defense on a motion to dismiss is premature and inappropriate. *See, e.g., In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006) (declining to consider the assertion of a 10b5-1 trading plan as an affirmative defense to insider trading allegations because it is "typically premature to raise affirmative defenses in a motion to dismiss."); *In re Cray Inc.*, 431 F. Supp. 2d 1114, 1131 (W.D. Wash. 2006) (declining to dismiss insider trading claim based on 10b5-1 trading plan, because plan is affirmative defense on which defendant bears burden of proof).

Moreover, the allegations of the Complaints – which must be taken as true – actually negate Howard's entitlement to a trading plan-based defense, because Howard acknowledges that his trading plan was not adopted until February 27, 2004. *See* Howard Mem. at 3 n.2. This

was *more than five years after Howard is alleged to have begun to fraudulent manipulate the Company's financial results*. *See* Evergreen ¶¶ 66-72; Franklin ¶¶ 89-95. Therefore, the plan was not adopted before he became aware of the material nonpublic information, as Rule 10b5-1 requires. Moreover, given the timing of the plan – which followed the disclosure of OFHEO's findings of financial improprieties at Fannie Mae's sister company, Freddie Mac (Evergreen ¶¶ 94, 97; Franklin ¶¶ 117, 120) – there is serious doubt that Howard can establish that the plan was adopted in good faith and not as part of a scheme to evade liability for insider trading. Plainly, Howard's trading plan does not entitle him to dismissal of Plaintiffs' Section 20A claims as a matter of law. *See In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d at 734 & n.58 (declining to consider trading plan on motion to dismiss, and recognizing that "[t]he timing of the plan is crucial" to its effect on defendant's liability).

## VI.    PLAINTIFFS' STATE LAW CLAIMS SHOULD NOT BE DISMISSED

### A.    SLUSA Does Not Bar Plaintiffs' Claims

As Plaintiffs predicted in their objection to the consolidation of this action with the class action, Defendants contend that the consolidation of those actions has caused Plaintiffs' state law claims to be preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").[37] In other words, although Plaintiffs had an undisputed right to assert and pursue state law claims in their individual actions prior to consolidation, Defendants argue that the consolidation of Plaintiffs' actions with the class action – which was done to promote efficiency and judicial economy – has divested Plaintiffs of the right to pursue those state law claims. Plaintiffs are unaware of any courts having interpreted SLUSA in this way (and Defendants have cited none), and this Court should not do be the first to do so.

---

[37] Defendant KPMG LLP made a similar argument in its motion to dismiss, to which Plaintiffs responded on September 6, 2006. At the risk of being repetitive, Plaintiffs' response is restated herein.

SLUSA provides that "[n]o covered class action based upon the statutory or common law of any State . . . may be maintained in any State or Federal court by any private party alleging (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1).  SLUSA was enacted in an effort to close a loophole left by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), whereby plaintiffs were circumventing the PSLRA's restrictive pleading requirements and mandatory discovery stays by filing class actions in state court instead of federal court.  *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F.3d 116, 122-123 (2d Cir. 2003); *In re WorldCom, Inc. Sec. Litig.*, No. 02-Civ. 3288, 2004 WL 315143, at **7-9 (S.D.N.Y. Feb. 20, 2004).

Because the PSLRA only governs class actions, SLUSA is specifically tailored to prevent plaintiffs from circumventing the PSLRA by filing **class actions** — or individual actions that have the characteristics of class actions — in state court.  SLUSA does **not** prevent plaintiffs from pursuing state law claims in legitimate individual actions, like this one.  Specifically, the preemption provisions of SLUSA apply only to "covered class actions," which the statute defines, in pertinent part, as:

(i)     any single lawsuit in which--

(I)     damages are sought on behalf of more than 50
        persons or prospective class members …; or

(II)    one or more named parties seek to recover damages
        on a representative basis on behalf of themselves
        and other unnamed parties similarly situated …; or

(ii)    any group of lawsuits filed in or pending in the same court
        and involving common questions of law or fact, in which--

(I)     damages are sought on behalf of more than 50
        persons; and

> (II)    the lawsuits are joined, consolidated, or otherwise
>         proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B).  Part (i) of this definition does not apply here, because the Evergreen

and Franklin actions were each brought on behalf of less than 50 plaintiffs,[38] and neither action

was brought on a representative basis.  Instead, Defendants rely on part (ii) of the definition, and

contend that these actions are part of a "covered class action" due to their consolidation with the

class action.

      The result urged by Defendants would be manifestly unfair and contrary to public policy

and to the purpose of SLUSA.  Plaintiffs did not file a class action, nor did they file individual

actions with the characteristics of a class action.  Instead, they filed individual actions for the

very purpose of pursuing their claims independently of the class action – including claims (such

as Section 18 and state law claims) that were not asserted in the class action, and claims against

defendants (such as KPMG, Radian, and certain Fannie Mae directors) who were not named in

the class action.  Far from being an effort to circumvent the PSLRA, these actions reflect

Plaintiffs' legitimate and good faith exercise of their rights to pursue their own claims separately

from other plaintiffs, through counsel of their own choosing.  SLUSA was never intended to

preempt claims such as these.

      Nonetheless, seeing consolidation as an opportunity to limit Plaintiffs' ability to pursue

their claims, Defendants argued vociferously in favor of consolidation, arguing that it would

promote efficiency and avoid duplication.  The Court accepted that argument over Plaintiffs'

objection, and the cases are now consolidated.[39]  However, the procedural benefits and

---

[38] There are four plaintiffs in the Evergreen action, and twenty-four in the Franklin action.  Therefore, even if the two actions were combined they would fall far short of the 50-plaintiff threshold for application of SLUSA.

[39] Radian incorrectly asserts that Plaintiffs "conceded in their opposition to consolidation that their state law claims would be preempted if their cases were consolidated  with the main class action."  Radian Mem. at 23.  While Plaintiffs predicted that Defendants would *argue* that consolidation leads to preemption, and that there was a risk

efficiencies that Defendants will enjoy as a result of consolidation should not come at the expense of Plaintiffs' substantive rights.

This situation is very different from the *WorldCom* case, upon which Defendants rely.  In *WorldCom*, the Court found that ten purportedly individual actions were actually "proceed[ing] as a single action" where the plaintiffs' counsel had intentionally structured the filing of the ten actions to evade SLUSA's removal and preemption provisions, the actions were collectively brought on behalf of 293 plaintiffs, the complaints were verbatim copies of each other, and the plaintiffs had consented to the consolidation of their cases.  *See In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp. 2d 236 (S.D.N.Y. 2004); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 692746, at *5 (S.D.N.Y. Apr. 2, 2004).  The Court stated:  "This is simply not a case in which an individual or even a group of individuals have in good faith decided to pursue individual actions in state court as permitted by SLUSA.  From the inception of this litigation, these plaintiffs have operated a *de facto* class action in state court in the face of the explicit prohibitions of SLUSA."  2004 WL 692746, at *5.  Here, by contrast, there are only two individual actions, which collectively involve fewer than 30 plaintiffs, and which were filed in good faith and not in an effort to evade SLUSA.  Moreover, Plaintiffs here did not consent to, but rather opposed, consolidation.

In the event the Court rules against Plaintiffs on this issue and finds that SLUSA bars Plaintiffs' state law claims based purely on the consolidation of Plaintiffs' individual action with

---

that the Court *may* accept that argument, it has always been Plaintiffs' position that preemption would be improper.  *See, e.g.*, Plaintiffs' Response to Fannie Mae's Supplemental Reply Regarding Plaintiffs' Objection to Consolidation, at 3 (arguing that a finding that consolidation results in preemption "would be fundamentally unjust, because SLUSA is intended to apply only to class actions and individual actions which operate as *de facto* class actions, whereas Plaintiffs' actions are non-class actions, brought in good faith to assert Plaintiffs' individual claims").

the class action over Plaintiffs' objection, Plaintiffs respectfully request that the Court certify that

ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

     **B.**     **Plaintiffs Have Stated Claims For Common Law Fraud**

     Plaintiffs have asserted claims for common law fraud against Fannie Mae, the Officer

Defendants, the Audit Committee Defendants, and (in the case of the Franklin Plaintiffs only)

KPMG.  Aside from their SLUSA arguments, none of these defendants except the Audit

Committee Defendants have challenged the viability of these claims.[40]

     The basis for the Audit Committee Defendants' challenge to Plaintiffs' common law

fraud claim is their contention that Plaintiffs have not satisfy the "heightened pleading

requirements of Federal Rule of Civil Procedure 9(b)."  Director Defs. Mem. at 38.  However,

the pleading requirements for common law fraud are less stringent than the PSLRA's pleading

requirements for Section 10(b) claims.  *See Burman v. Phoenix Worldwide Indus., Inc.*, 384 F.

Supp. 2d 316, 336 (D.D.C. 2005) ("The PSLRA imposes a pleading standard that exceeds that

required to establish a claim for common law fraud …").  Under Rule 9(b), a plaintiff need only

plead with particularity "the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

The Complaints identify the Audit Committee Defendants' false statements and the documents in

which they appeared, explains why those statements were false and misleading, and identifies the

securities that were purchased in reliance on those statements.  *See* Evergreen ¶¶ 23, 432-628 &

Ex. A; Franklin ¶¶ 21-45, 464-667 & Ex. A.  This is sufficient to satisfy Rule 9(b).  *See*

*Firestone v. Firestone,* 76 F.3d 1205, 1211 (D.C. Cir. 1996) (plaintiff satisfies Rule 9(b) by

---

[40] In a footnote, Howard asserts that the common law fraud claim against him should be dismissed for the same reason as the Section 10(b) claim – *i.e.*, for Plaintiffs' purported failure to allege his scienter.  Howard Mem. at 11 n.6.  However, Plaintiffs have adequately pleaded Howard's scienter for purposes of Section 10(b) and, as discussed *infra*, the pleading standard for common law fraud is less stringent.

alleging the "'time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud.'") (citation omitted).

To the extent the Audit Committee Defendants contend that Rule 9(b) imposes a heightened pleading requirement for the scienter element of a common law fraud claim, they are incorrect; a defendant's state of mind may be averred generally under Rule 9(b).  *See* Fed. R. Civ. P. 9(b); *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61 (D.D.C. 2005) (defendant's state of mind may be pleaded generally for purposes of a common law fraud claim); *Shahmirzadi v. Smith Barney, Harris Upham & Co., Inc.*, 636 F. Supp. 49, 54 (D.D.C. 1985) ("under Rule 9(b), scienter may be alleged generally in the complaint").[41]  In any event, as discussed above in the context of Plaintiffs' Section 10(b) claims, Plaintiffs have alleged specific facts to support an inference of the Audit Committee Defendants' scienter.  The Audit Committee Defendants' motion to dismiss Plaintiffs' common law fraud claims should therefore be denied.

### C.    Plaintiffs Have Stated Claims For Negligent Misrepresentation

Plaintiffs have asserted claims for negligent misrepresentation against all of the Defendants except Radian.  The only defendant to seek dismissal of those claims on grounds other than SLUSA preemption are the Director Defendants, who contend – incorrectly – that "Plaintiffs' own allegations establish that the [Director Defendants] had no reasonable grounds to believe that Fannie Mae's financial statements were materially false and misleading."  Director Defs. Mem. at 39.  However, the Director Defendants' "support" for that argument does not come from Plaintiffs' Complaints, but from the Director Defendants' selective citations to

---

[41] *See also Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) ("great specificity [is] not required with respect to … allegations of … scienter" under Rule 9(b); plaintiff need only plead "circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter") (citations omitted); *Kozin v. Dunn*, No. Civ. A. 04-852 (DRD), 2005 WL 2009918, at *4 (D.N.J. Aug. 17, 2005) (denying motion to dismiss common law fraud claim where "Plaintiffs have alleged knowledge (or scienter) generally, which they are permitted to do under the Federal Rules of Civil Procedure").

documents beyond the four corners of the Complaints.  None of these citations establishes the Director Defendants' lack of negligence as a matter of law, and in fact the Complaints contain allegations that negate any claim of "reasonable reliance" by the Director Defendants.

The Director Defendants claim that they could not have been negligent, because they "relied on the information and assurances provided to them by KPMG and the Company's internal accountants …"  *Id*.  They follow that statement with citations to several paragraphs in the Complaints which say nothing whatsoever about the Director Defendants' purported reliance on others.  *See* Evergreen ¶ 440, 465, 496, 507, 588; Franklin ¶¶ 473, 500, 531, 532, 543, 624, 626.  The Director Defendants then cite Plaintiffs' allegations that KPMG reviewed and approved the Company's accounting policies and financial results, and that Howard and Spencer stated that they believed the financial statements to comply with GAAP.  Director Defs. Mem. at 40-41.  Notably absent, however, is any allegation that the Director Defendants relied on KPMG or the Officer Defendants, much less that any such reliance was reasonable.

That leaves the Director Defendants with only one "source" to support their claim of reliance:  a Statement by Warren Rudman which is neither cited nor referenced in the Complaints.  As discussed in the accompanying Opposition to Fannie Mae's and the Director Defendants' Joint Request for Judicial Notice, the Rudman statement is not an appropriate subject of judicial notice, because the Director Defendants are not asking the Court to take notice of its existence, but rather to accept its contents as true.  However, even if the Court were to consider the Rudman statement, it does not aid the Director Defendants because the mere fact that they relied on others does not relieve them of liability.  The Director Defendants may still be found negligent if their reliance was unreasonable under the circumstances.  *See In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 872 (S.D. Tex. 2004) ("whether the Director Defendants

reasonably relied on management's presentations is a question of fact that cannot be decided on

the pleadings alone"); *Cheney v. Cyberguard Corp.*, No. 98-6879-CIV-GOLD, 2000 WL

1140306, at *6 (S.D. Fla. Jul. 31, 2000), *modified on other grounds*, 2001 WL 1916564 (S.D.

Fla. Mar, 21, 2001) (rejecting argument that defendant's purported reliance upon outside auditor

negated its scienter as a matter of law); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927

F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996) (same).

As alleged in the Complaints, OFHEO's investigation uncovered significant evidence

that the Director Defendants acted recklessly, or at best negligently, with respect to the fraud at

Fannie Mae.  For example, OFHEO's Final Report stated:

> The actions and inactions of the Board of Directors inappropriately
> reinforced rather than checked the tone and culture set by Mr.
> Raines and other senior managers.  The Board failed to be
> sufficiently informed and independent of its chairman, Mr. Raines,
> and senior management, and failed to exercise the requisite
> oversight to ensure that the Enterprise was fully compliant with
> applicable laws and safety and soundness standards.  Those
> failures signaled to management and other employees that the
> Board did not in fact place a high value on strict compliance with
> laws, rules, and regulations.  That message contributed to the
> Enterprise's many failures to comply with safety and soundness
> standards and the many unsafe and unsound practices documented
> in this report.

Evergreen ¶ 735; Franklin ¶ 828.  Plaintiffs also allege that the Director Defendants had

affirmative duties under OFHEO's corporate governance regulations, which they failed to

properly discharge.  Evergreen ¶¶ 736-38; Franklin ¶¶ 829-30.  According to OFHEO's Final

Report, as quoted in the Complaints:

> Fannie Mae's full Board of Directors failed in numerous ways that
> put the safety and soundness of the Enterprise at risk.  The Board
> of Directors failed to stay informed about Fannie Mae corporate
> strategy, major plans of action, and risk policy.  Having approved
> an executive compensation program that created incentives to
> manipulate earnings, members of the Board of Directors failed to
> monitor against such manipulations.  The Board failed to provide

> delegations of authority to management that reflected the current
> size and complexity of the Enterprise.  The Board failed to ensure
> the effective operation of its own Audit and Compensation
> Committees.  The Board of Directors failed to act as a check on the
> authority of Chairman and CEO Franklin Raines.  The Board failed
> to initiate an independent inquiry into Fannie Mae's accounting
> following the announcement of Freddie Mac's restatement and
> subsequent investigation or allegations of Roger Barnes, both of
> which involved earnings management.  The Board failed to assure
> itself that Fannie Mae's regulators were properly informed of Mr.
> Barnes' allegations.   Finally, the Board of Directors failed to
> ensure timely and accurate reports to Federal regulators.

Evergreen ¶ 738; Franklin ¶ 831.  The Complaints discuss in detail the Director Defendants'

failures in many of these areas.  Evergreen ¶¶ 739-63; Franklin ¶¶ 832-56.

In light of these allegations, it is inconceivable how the Director Defendants can claim

that "Plaintiffs have effectively established through their own allegations an affirmative defense

of reasonable reliance."  Director Defs. Mem. at 41-42.  To the contrary, Plaintiffs have pleaded

detailed allegations of the Director Defendants' negligence – allegations which need only

comply with the notice pleading requirements of Rule 8.  *See Burman*, 384 F. Supp. 2d at 337.

The Director Defendants' "reasonable reliance" defense is not supported by Plaintiffs'

allegations, and it does nothing but create a factual question which cannot be resolved on a

motion to dismiss – *i.e.*, whether the Director Defendants' purported reliance upon KPMG and

the Officer Defendants was reasonable, given the Director Defendants' own negligent and/or

reckless disregard of their own responsibilities.  *See In re Friedman's, Inc. Sec. Litig.*, 385 F.

Supp. 2d 1345, 1369 (N.D. Ga. 2005) ("As determinations of the reasonableness of a defendant's

investigation or a defendant's reliance on expert opinion are fact-intensive inquiries, they are

generally not properly resolved on motions to dismiss.") (citation omitted).  The Court should

therefore deny the motion to dismiss Plaintiffs' negligent misrepresentation claims.

### D.    The Franklin Plaintiffs Have Stated A Claim For Violation of the California Corporations Code

Aside from their arguments regarding SLUSA preemption, only one defendant (Spencer) has asserted an additional ground for dismissal of the Franklin Plaintiffs' claim pursuant to the California Corporations Code.  According to Spencer, the Franklin Plaintiffs have failed to state a claim against her because they have not alleged that she acted "willfully." Spencer Mem. at 9-13.  In support of that argument, Spencer hones in on certain allegations by the Franklin Plaintiffs that Spencer "knew or should of known" about the making of certain materially misleading statements or the concealment of certain facts.  *See id.* at 12.  In doing so, Spencer conveniently ignores the Franklin Plaintiffs' numerous other allegations which specifically allege her willful and knowing misconduct.  *See, e.g.,* Franklin ¶ 187 ("Spencer and Howard *knew* that Fannie Mae did not properly apply SFAS 133, and *manipulated Fannie Mae's accounting policy to suit their own purposes*.") (emphasis added); Franklin ¶¶ 721 ("[T]he Officer Defendants *had actual knowledge of serious misconduct* and internal control deficiencies in the Company's Controller's Office – which had responsibility for the Company's accounting and financial reporting.  For example, in September 2002, Barnes sent Raines and Howard an inter-office memorandum, which Spencer also received, advising them of the following accounting problems….) (emphasis added); Franklin ¶¶ 90-91 (Spencer directed employee to run alternative expense reporting scenarios so she and others could manipulate the recognition of expense to ensure that EPS targets were met); Franklin ¶¶ 94-95 (Spencer kept Account 1622000 "up [her] sleeve to solve an earnings shortfall," then reversed it into income when needed to trigger EPS bonus targets); Franklin ¶ 743 ("Spencer led discussions concerning the management of 'catch-up' to meet EPS targets"); Franklin ¶¶ 741-747 (showing Spencer's deliberate but failed attempt to conceal documents that demonstrated her knowing and willful participation in the fraud);

Franklin ¶ 942 ("Fannie Mae and the Officer Defendants participated in the preparation, approval and dissemination of Fannie Mae's false and misleading statements *with knowledge of the falsity of those statements*…. [and] *willfully and knowingly* disseminated those false and misleading statements for the purpose of inducing Plaintiffs and other investors to purchase Fannie Mae securities." [emphasis added]).

Spencer's argument for dismissal of the Franklin Plaintiffs' California Corporations Code claim is therefore without merit, because the Franklin Plaintiffs have more than sufficiently pleaded that Spencer acted willfully.

### E.     The Evergreen Plaintiffs Have Stated A Claim For Violation of Massachusetts General Laws Chapter 93A

Fannie Mae has set forth two arguments in an effort to secure the dismissal of the Evergreen Plaintiffs' claim pursuant to § 11 of the Massachusetts General Law Chapter 93A. First, Fannie Mae argues that its conduct did not constitute "trade or commerce" as defined by Chapter 93A, and therefore the unfair and deceptive acts and practices described throughout the Evergreen Complaint fall outside of the language proscribed by Chapter 93A.  Fannie Mae Mem. at 30-31.  Second, Fannie Mae argues that Chapter 93A does not apply because the alleged acts of misconduct did not occur "primarily and substantially" in Massachusetts, but rather in the District of Columbia.[42]  *Id.* at 31 n.22.  Neither of these arguments provides a basis for dismissal.

### 1.     Fannie Mae and the Joining Defendants Have Engaged In Unfair and Deceptive Acts and Practices in the Conduct of "Trade" or Commerce," as Defined by Chapter 93A

Under § 2 of Chapter 93A, "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce are … declared unlawful."  Mass. Gen. L. 93A, § 2(a).  Section 11 of Chapter

---

[42] Both of these arguments are joined and adopted by the Director Defendants (Director Defs. Mem. at 42), Howard (Howard Mem. at 7-8), and Raines (Raines Mem. at 1).  Spencer, however, does not adopt or incorporate these arguments as her own and only moves to dismiss the Evergreen Plaintiffs' Chapter 93A claim on the ground of SLUSA preemption.

93A provides a private right of action in favor of persons who suffer losses "as a result of the use or employment by another person who engages in any trade or commerce of … an unfair or deceptive act or practice declared unlawful by section two." *Id.* § 11.  Until 1988, remedies under Chapter 93A were not available to purchasers of securities.  However, the Massachusetts legislature expressly amended the definition of "trade" and "commerce" in 1988 to include transactions in securities.  *See Barron v. Fidelity Magellan Fund*, 784 N.E.2d 634, 639 (Mass. App. 2003).  Chapter 93A now provides:

> "Trade" and "commerce" shall *include the advertising, the offering for sale*, rent or lease, *the sale*, rent, lease *or distribution* of any services and any property, tangible or intangible, real, personal or mixed, *any security* as defined in subparagraph (k) of section four hundred and one of chapter one hundred and ten A and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.

Mass. Gen. L. 93A, § 1(b) (emphasis added).

Fannie Mae does not dispute that Plaintiffs have alleged "unfair or deceptive acts or practices" by Fannie Mae and the individual defendants.  Those acts and practices included, in particular, the making of materially false statements regarding the Company's financial condition for the purpose of convincing investors that Fannie Mae was a safe and stable investment. Evergreen ¶¶ 844-46.  Nonetheless, Fannie Mae seeks to avoid Chapter 93A liability by arguing that neither it nor the individual defendants actually advertised or offered to sell Fannie Mae common stock, and that their conduct therefore falls outside the definition of "trade" or "commerce" under Chapter 93A.  Fannie Mae Mem. at 30-31.

While "trade" and "commerce" are defined to "*include*" the advertising and offering for sale of securities, they are not limited to those activities.  *See* Mass. Gen. L. 93A § 1(b) (emphasis added).  As the Massachusetts Supreme Court has stated:

> [The definition of "trade" and commerce" in § 1 of Chapter 93A]
> is of minimal utility in construing this phrase. The statutory
> definition … merely "recites certain activities which are included
> within those terms and concludes by incorporating … 'any trade or
> commerce directly or indirectly affecting the people of this
> commonwealth.'"

*Lantner v. Carson*, 373 N.E.2d 973, 976 n.4 (Mass. 1978) (citing *Commonwealth v. DeCotis*, 316 N.E.2d 748, 752 (Mass. 1974)). Therefore, Defendants' focus on the terms "advertising" and "offering for sale" is misplaced, because "trade or commerce" covers much more. *See, e.g., Barron*, 784 N.E.2d at 638-40 (investment manager was liable under "security" prong of Chapter 93A for failure to maintain adequate records and for improperly surrendering the plaintiff's account – conduct that was unrelated to advertising, offering, or sale of securities).

It is well-settled under Massachusetts law that "[a] party is engaging in 'trade or commerce,' as required under [Chapter] 93A, when it acts "in a business context." *Peabody N.E., Inc. v. Town of Marshfield*, 689 N.E.2d 774, 778 (Mass. 1998); *Lantner*, 373 N.E.2d at 976. *See also Ansin v. River Oaks Furniture, Inc.*, 105 F.3d 745, 760-61 (1st Cir. 1997), *cert. denied*, 522 U.S. 818 (1997) ("trade or commerce" includes "public market situation[s]" but not transactions "principally private in nature.") (citations omitted). Whether an activity occurs in a "business context" depends, in turn, on factors such as the character of the parties involved, the nature of their activities, and whether they were motivated by business or personal concerns. *Peabody N.E., Inc.*, 689 N.E.2d at 778 n.6 (citation omitted).

The Evergreen Plaintiffs are institutional investors – *i.e.*, they are in the business of investing money. Fannie Mae is also a commercial entity, and the individual defendants were officers and/or directors of Fannie Mae whose deceptive activities were undertaken in their roles as such. As alleged in the Complaint, Fannie Mae and the individual defendants made false statements to investors "for the purpose of convincing Plaintiffs and the investing public that

Fannie Mae was a conservative, safe and stable investment," and the dissemination of these statements "caused Plaintiffs to purchase Fannie Mae securities at artificially inflated prices." Evergreen ¶¶ 846-47.  Because these activities unquestionably occurred in the business context, the "trade or commerce" requirement of Chapter 93A is satisfied.[43]

> ### 2.    The Violation of Chapter 93A Occurred Primarily and  Substantially In Massachusetts

Section 11 of Chapter 93A permits the victim of unfair or deceptive practices to bring a civil action to remedy the violation, provided that "the actions and transactions constituting … the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth [of Massachusetts]."  Mass. Gen. L. 93A, § 11.  Contrary to typical standards for the burden of proof on jurisdictional matters, § 11 expressly provides that the *defendants* bear the burden of proving that the alleged misconduct *did not* occur primarily and substantially in Massachusetts.  *Id*.; *Roche v. Royal Bank of Canada*, 109 F.3d 820, 829 (1st Cir. 1997) ("§11 provides an exemption from 93A liability, available as a defense, rather than a jurisdictional prerequisite to suit.") (citation omitted).

Fannie Mae has attempted to argue (albeit in a footnote) that the unfair and deceptive acts and practices at issue in this case did not occur "primarily and substantially" in Massachusetts. *See* Fannie Mae Mem. at 31, n.22.  Fannie Mae's argument fails for at least two reasons.  First, the Massachusetts Supreme Court has held that resolution of this issue is subject to a "fact intensive" analysis in which "a judge should, *after making findings of fact*, and after considering

---

[43] To the extent the District Court opinion in *Salkind v. Wang*, No. 93-10912 (WGY), 1995 WL 170122 (D. Mass. Mar. 30, 1995) suggests otherwise, it should be disregarded as contrary to Massachusetts law.  No Massachusetts state court has ever cited *Salkind*'s Chapter 93A holding with approval, and in fact *Salkind* is inconsistent with a later Massachusetts Supreme Court opinion which recognized that a defendant may be liable under Chapter 93A even if its statements do not lead to a purchase by the plaintiff.  *See Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1033 (Mass. 2004) (hedge fund was subject to Chapter 93A liability for "postinvestment misrepresentations about [Kobrick's] investment portfolio").  The Court could not have reached that result in *Marram* if, as Defendants suggest, liability is limited to sellers of securities.

those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 798-99 (Mass. 2003) (emphasis added).  Therefore, determination of whether the violation of Chapter 93A occurred "primarily and substantially" in Massachusetts is premature at this stage in the proceedings.  *See Workgroup Tech. Corp. v. MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 118 (D. Mass. 2003) (determination of center of gravity "must be made on the basis of factual findings," and "[s]ince a Court does not make such findings when ruling on a motion to dismiss, it would seem that a motion to dismiss is no longer an appropriate vehicle for raising the issue."); *Chase-Walton Elastomers, Inc. v. Bennett*, No. 02-1304, 2002 WL 31235508, at *6 (Mass. Super. Ct. Oct. 1, 2002) ("given the fact-specific nature of this inquiry it would be premature to dispose of this matter at [the motion to dismiss] stage of the proceedings.").

Second, even if the Court were to tackle the "center of gravity" analysis at this stage, Fannie Mae has failed to carry its burden of proof.  While Fannie Mae argues that the District of Columbia is the "center of gravity" of Plaintiffs' claim because many of Defendants' wrongful acts took place there, the First Circuit has held that the site of Defendants' misconduct is the "least weighty" of the factors to be considered.  *Roche*, 109 F.3d at 829.  Far more important are where the plaintiff was deceived and acted on the deception, and where the plaintiff suffered harm.  *Id.*; *Clinton Hosp. Ass'n. v. Corson Group, Inc.*, 907 F.2d 1260, 1266 (1st Cir. 1990) ("The victim's ingestion of a deceptive statement and the subsequent effects from reliance on it are what give the deceptive statement its venomous sting.  The site of the victim's ingestion is therefore critical to a determination of whether the deceptive or unfair acts were committed primarily and substantially in the Commonwealth."); *Workgroup Tech. Corp.*, 246 F. Supp. 2d at

117 ("It is the location of the person to whom the deceptive statements are made rather than the location of the person who uttered the deceptive or unfair statements that is significant."); *Auto Shine Car Wash Sys., Inc. v. Nice 'N Clean Car Wash, Inc.*, 792 N.E.2d 682, 685-86 (Mass. App. 2003) (decision based on "the deception and resulting harm" was proper).

The Evergreen Plaintiffs have alleged that they received the misrepresentations at issue in this case, relied on them, and suffered harm in Massachusetts. Evergreen ¶ 848. These allegations – if not dispositive of the issue – at least point strongly to Massachusetts as the "center of gravity" of the Evergreen Plaintiffs' Chapter 93A claim. Defendants' motion to dismiss that claim should therefore be denied.

F.    **Plaintiffs Have Stated An Aiding and Abetting Claim Against Radian**

Radian has moved to dismiss Plaintiffs' claim for aiding and abetting fraud, on the grounds that such a claim is not recognized under the laws of Pennsylvania or the District of Columbia, and would be time-barred even if it was an otherwise viable claim. Radian is wrong on several fronts, because: Pennsylvania law does not apply; the laws of the other jurisdictions with a connection to the claim (including this District) recognize the cause of action; and the claim was brought within only a few months after Plaintiffs first had reason to know of any wrongdoing by Radian.

1.    **Pennsylvania Law Does Not Apply**

Under the *Erie* doctrine, where (as here) a federal court's subject matter jurisdiction over non-federal claims is based upon diversity of citizenship or pendent jurisdiction, the Court must apply the forum state's choice of law rules. *Nelson v. Nationwide Mortgage Corp.*, 659 F. Supp. 611, 615-616 (D.D.C. 1987) (citing *Klaxon Co. v. Stentor Elec. Manufacturing Co.*, 313 U.S. 487, 496 (1941) and *McSurely v. McClellan*, 753 F.2d 88, 110 (D.C. Cir.), *cert. denied*, 474 U.S. 1005 (1985)). The District of Columbia applies a modified governmental interest test, which is

guided by four considerations enumerated under § 145 of the Restatement (Second) Conflict of Law:  (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile[,]…place of incorporation…and place of business of the parties; and (d) the place where the relationship is centered.  *See Hercules & Co. v. Shama Restaurant Corp.*, 566 A.2d 31, 40-42 (D.C. App. 1989).  The touchstone of this test is to apply the law of the state with the "most significant relationship" to the cause of action because that is the state whose policies are most advanced by application of its law.  *Id.* at 41-42, n.18.  The District of Columbia Court of Appeals has also recommended in cases involving fraud or misrepresentation that district courts apply § 148 of the Restatement, which lists the following six factors as helpful to the choice-of-law analysis:

> (a)    the place where the plaintiff relied on the defendant's misrepresentations;
>
> (b)    the place where the plaintiff received the misrepresentations;
>
> (c)    the place where the defendant made the misrepresentations;
>
> (d)    the domicile and place of incorporation and place of business of the parties;
>
> (e)    the place where the tangible thing which is the subject of the transaction between the parties was situated at the time; and,
>
> (f)    the place where the plaintiff is rendered performance under the contract which he had allegedly been induced to enter by fraud.

The only relationship between Pennsylvania and this action is that Radian is a Pennsylvania corporation with its principal place of business in Pennsylvania.  All other contacts, both quantitatively and qualitatively, militate strongly in favor of applying the law of the District of Columbia, Massachusetts or California.  Thus, with respect to Evergreen's claims against Radian, the Court should apply either District of Columbia or Massachusetts law, and with respect to Franklin's claims against Radian, the Court should apply either District of

Columbia or California law.[44]  Under the substantive laws of each jurisdiction, aiding and

abetting fraud claims are recognized and actionable.[45]

> ### 2.    Aiding and Abetting Fraud Claims Are Available Under Massachusetts, California and District of Columbia Law.

Contrary to the arguments raised by Radian, claims for aiding and abetting fraud are

recognized and available under District of Columbia law.  In fact, in the very (and only) case

cited by Radian, *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), the Court predicted that

District of Columbia courts *would* recognize a cause of action for aiding and abetting:

> The separate tort of aiding-abetting has not yet, to our knowledge,
> been recognized explicitly in the District, but the existence of the
> civil conspiracy action suggests a *high probability* that the legal
> rationale underlying aiding–abetting would also be accepted:  The
> District law recognizes that a person's actions in support of a
> wrong may make him liable for the tortious injury….    An
> agreement to participate in a wrongful course of action suffices to
> create vicarious liability.  It seems *likely* that the District's courts
> would also find vicarious liability for support of wrongful action
> through knowing substantial aid or encouragement.

---

[44] Plaintiffs urge the Court to apply the laws of their respective home jurisdictions (California and Massachusetts) by weighing more heavily factors (a) and (c) of Section 145 of the Restatement, and factors (a), (b) and (d) of Section 148.  Plaintiffs received the misrepresentations of Fannie Mae (which Radian substantially assisted), relied upon them, and suffered injuries in their home states.  Further, both California and Massachusetts have significant interests in having their own laws apply when their residents fall victim to tortious conduct by an out-of-state party. *See, e.g., Hudson v. Capital Mgmt. Int'l, Inc.,* No. 81-1737, 1982 WL 1385, at *10 (N.D. Cal. Aug. 24, 1982) (California's interest in protecting innocent California purchasers of securities overrode Florida's interest in protecting its residents from liability); *Liu v. Republic of China,* 892 F.2d 1419, 1426 (9th Cir. 1989) (in case alleging that Chinese nationals committed torts against a California resident, court applied California law because "California…has a significant interest in ensuring that its residents are compensated for torts committed against them …"); *Cosme v. Whitin Machine Works, Inc.,* 632 N.E.2d 832, 836 (Mass. 1994) ("Massachusetts has a significant interest in seeing that its resident plaintiff be compensated" for the tortious injuries suffered in Massachusetts.); *Lawson v. Affirmative Equities Co.,* 341 F. Supp. 2d 51, 62 (D. Mass. 2004) ("Massachusetts has a substantial interest in redressing harms inflicted on its citizens by out-of-state defendants…."); *Milford Power L.P. v. New England Power Co.,* 918 F. Supp. 471, 481 (D. Mass 1996) ("Massachusetts has a significant interest in protecting its citizens from the alleged tortious injury caused by foreign defendants in this Commonwealth.").

[45] Even in the event Pennsylvania law were found applicable, the Pennsylvania Supreme Court has never addressed the availability of a claim for aiding and abetting fraud.  Thus, although the cause of action has not been recognized in Pennsylvania, it also has not been rejected.

*Id.* at 479 (emphasis added). The Court then went on to affirm the district court's decision finding a defendant liable under a civil aiding and abetting theory. *Id.* at 488-89. Courts since *Halberstam*, applying District of Columbia law, have similarly recognized the availability of recovery based upon an aiding and abetting fraud theory. *See, e.g., Ehlen v. Lewis*, 984 F. Supp. 5, 10-11 (D.D.C. 1997) (finding defendants liable for aiding and abetting fraud and aiding and abetting breach of fiduciary duty); *International Telecomms. Satellite Org'n v. Colino*, Nos. 88-1266 & 87-2749 (RCL), 1992 WL 93129, at **13-14 (D.D.C. Apr. 15, 1992) (granting summary judgment to plaintiff on aiding and abetting fraud claim).

Similarly, both Massachusetts and California law recognize claims for aiding and abetting fraud (and Radian does not contend otherwise). *See, e.g., Bamberg v. SG Cowen*, 236 F. Supp. 2d 79, 90-91 (D. Mass. 2002);[46] *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 846 (Cal. App. 1994) ("Liability may also be imposed on one who aids and abets the commission of an intentional tort …") (citing Restatement (Second) Torts, § 876(b)).[47]

Accordingly, when the Court applies appropriate choice-of-law principles and then applies the law of an appropriate jurisdiction, Plaintiffs claims' for aiding and abetting fraud are fully recognized and legally sufficient.

### 3.    Plaintiffs' Claims For Aiding And Abetting Fraud Are Timely Whether California, Massachusetts or District of Columbia Law Applies.

Radian asserts that Plaintiffs' aiding and abetting claims are barred by the statute of limitations, but in doing so it erroneously contends that the statute of limitations began to run when "Fannie Mae purchased the Policy from Radian at the end of January 2002." Radian Mem.

---

[46] *See also Norman v. Brown, Todd & Heyburn*, 693 F. Supp. 1259, 1264 (D. Mass. 1988); *Smith v. Egan*, No. 94-3909, 1994 WL 902940, at *2 (Mass. Super. Nov. 3, 1994).

[47] *See also ARB, Inc. v. Luz Constr. Inc.*, No. 91-55758, 1992 WL 164487, at *3 (9th Cir. July 16, 1992).

at 27.  This argument should be rejected because Plaintiffs could not have had any knowledge of

Radian's illegal conduct before September 2005, when *Dow Jones* disclosed that Fannie Mae

had engaged in accounting manipulations relating to a finite insurance policy.  Evergreen ¶ 674;

Franklin ¶ 711.  Plaintiffs' claims for aiding and abetting were asserted in January 2006, only

four months after learning of these transactions.[48]

Under the laws of California, Massachusetts, and the District of Columbia, the statute of

limitations for fraud-based claims (such as aiding and abetting fraud) is three years. *See, e.g.,*

*River Colony Estates Gen. P'ship v. Bayview Fin. Trading Group, Inc.*, 287 F. Supp. 2d 1213,

1220 (S.D. Cal. 2003) (applying California law and citing Cal. Code Civ. Proc. § 338(d));

*Compagnie de Reassurance D'Ile de Fr. v. New England Reinsurance Corp.*, 57 F.3d 56, 88 (1st

Cir. 1995) (Under Massachusetts law, "[t]he applicable statute of limitations for fraud is three

years") (citing Mass. Gen. L. ch. 260. § 2A); *Morton v. Nat'l Med. Enters.*, 725 A.2d 462, 467

n.18 (D.C. App. 1999) ("The statute of limitations for fraud is three years.") (citing D.C. Code §

12-301(8) (1995)); *Johnson v. Long Beach Mortgage Loan Trust 2001-4*, No. CIVA 05-0644

(CKK), 2006 WL 2244599, at *23 (D.D.C. Aug. 4, 2006) (applying three-year statute of

limitations to claims for aiding and abetting fraud).

Furthermore, in each of these jurisdictions, the three-year statute on fraud-related claims

does not begin to run until the plaintiff discovers, or has reason to suspect, that it has been

harmed by wrongful conduct by the defendant.  *See, e.g.,* Cal. Code Civ. P. § 338(d) (cause of

action based in fraud "is not deemed to have accrued until the discovery, by the aggrieved party,

---

[48] Plaintiffs' claims for aiding and abetting fraud were first asserted in their original complaints filed in January 2006.  At that time, Plaintiffs did not know the identify of the insurance company that had issued the finite insurance policies to Fannie Mae, so the aiding and abetting claims were asserted against a "John Doe" defendant.  In June 2006, upon learning of Radian Group's identify, Plaintiffs amended the complaint to name Radian.  Both of these complaints were filed less than one year after Plaintiffs learned of the fraud relating to the finite insurance policy.

of the facts constituting the fraud"); *Silvestris v. Tantasqua Reg'l Sch. Dist.*, 847 N.E.2d 328, 336 (Mass. 2006) ("pursuant to the so-called 'discovery rule,' the statute of limitations for a particular cause of action does not begin to run until the plaintiff knows, or should have known, that she has been harmed by the defendant's conduct") (citations and quotations omitted); *Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21, 25 (1st Cir. 1993) ("Massachusetts courts have recognized that it would be unfair to begin running the statute of limitations before a plaintiff is put on notice that she has a claim," and therefore "a cause of action does not accrue until a plaintiff discovers, or reasonably should have discovered, that she may have been injured as a result of the defendant's conduct") (citations omitted); *Bussineau v. President & Dirs. of Georgetown Coll.,* 518 A.2d 423, 425 (D.C. 1986) ("[I]n cases where the relationship between the fact of injury and the alleged tortious conduct is obscure when the injury occurs, we apply a 'discovery rule' to determine when the statute of limitations commences. [citations omitted] … For a cause of action to accrue where the discovery rule is applicable, one must know or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing."); *Johnson*, 2006 WL 2244599, at *17 (applying discovery rule to claims of fraud and aiding and abetting fraud under D.C. law).

The first time that Plaintiffs had any hint that an insurance company had aided and abetted Fannie Mae's fraud was on September 25, 2005, when *Dow Jones* reported that Fannie Mae had purchased finite insurance policies to hide earnings losses after they were incurred. Evergreen ¶ 674; Franklin ¶ 711. Plaintiffs' claims against Radian for aiding and abetting fraud are timely because they were asserted in January 2006, less than three years – indeed less than one year – after Plaintiffs first had reason to suspect finite insurance-related misconduct.

## <u>CONCLUSION</u>

WHEREFORE, for all of the foregoing reasons, the Evergreen Plaintiffs and the Franklin

Plaintiffs respectfully request that the Court deny the Defendants' motions to dismiss in their

entirety.


Dated:  October 13, 2006

/s/ Stuart M. Grant
Stuart M. Grant (D.C. Bar # 450895)
Megan D. McIntyre
Christine M. Mackintosh
GRANT & EISENHOFER P.A.
Chase Manhattan Centre
1201 N. Market St.
Wilmington, DE 19801
(302) 622-7000
(302) 622-7100 (facsimile)
Attorneys for the Evergreen Plaintiffs and
the Franklin Plaintiffs

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on October 13, 2006, The Evergreen Plaintiffs' and Franklin Plaintiffs' Joint Memorandum of Law in Opposition to the Motions to Dismiss by Fannie Mae, The Director Defendants, Radian Guaranty, and Defendants Howard, Raines and Spencer and a Proposed Order were electronically filed using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF. Service was accomplished on counsel not registered through the CM/ECF system via First Class U.S. Mail, as indicated below.

<u>**VIA U.S. MAIL:**</u>

Fred Fisher Fielding
Barbara Ann Van Gelder
WILEY REIN & FIELDING, LLP
1776 K Street, NW
Washington, DC 20006
*Counsel for Anne Mulcahy and Frederic Malek*

Christian J. Mixter
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
*Counsel for Thomas Gerrity*

Daniel John Healy
John H. Doyle, III
Rhonda D. Orin
ANDERSON KILL & OLICK, LLP
2100 M Street, NW, Suite 650
Washington, DC 20037
*Counsel for Leslie Rahl*

<u>**VIA CM/ECF NOTIFICATION:**</u>

Jeffrey C. Block
Kathleen M. Donovan-Maher
Julie A. Richmond
BERMAN DEVALERIO PEASE TABACCO
BURT & PUCILLO
One Liberty Square
Boston, MA 02169
*Counsel for State Teachers Retirement System of Ohio and Ohio Public Employees Retirement Systems*

James R. Cummins
Melanie S. Corwin
WAITE, SCHNEIDER, BAYLESS
& CHESLEY CO., L.P.A.
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, OH 45202
*Counsel for State Teachers Retirement System of Ohio and Ohio Public Employees Retirement Systems*

Seth Aronson
Michael J. Walsh, Jr.
O'MELVENY & MYERS L.L.P.
1625 I Street, N.W.
Washington, D.C. 20006
*Counsel for Fannie Mae, Taylor Segue, William Harvey, Kenneth Duberstein, Manuel Justiz, and H. Patrick Swygert*

James D. Wareham
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
875 15th Street, N.W.
Washington, D.C. 20005
*Counsel for Daniel Mudd*

Julia E. Guttman
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
*Counsel for Jamie Gorelick*

Steven Mark Salky
Eric R. Delinsky
Ellen D. Marcus
Holly Ann Pal
Tammy Gershoni
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW Suite 1000
Washington, DC 20036
*Counsel for Timothy Howard*

Francis J. Warin
Andrew S. Tulumello
Melanie L. Katsur
Henry Charles Whitaker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
*Counsel for KPMG LLP*

Alex Giscard Romain
2842 S. Columbus St
Arlington, VA 22206
*Counsel for Franklin Raines*

James Hamilton
David I. Ackerman
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
*Counsel for Joe Pickett*

David S. Krakoff
Eldad Zvi Malamuth
Christopher F. Regan
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, DC 20006
*Counsel for Leanne Spencer*

Kevin M. Downey
Michelle D. Schwartz
Joseph Marshall Terry, Jr.
Daniel N. Marx
Matthew L. Fore
John E. Clabby
WILLIAMS & CONNOLLY, LLP
725 12th Street, NW
Washington, DC 20005
*Counsel for Franklin Raines*

Erica Lynne Salmon
DLA PIPER RUDNICK, GRAY CARY US LLP
1200 19th Street, NW, Suite 700
Washington, DC 20036
*Counsel for Stephen Ashley, Donald Marron, and Ann Korologos*

Jonathan M. Stern
SCHNADER HARRISON SEGAL & LEWIS LLP
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006-1825
*Counsel for Radian Guaranty Inc.*

Jonathan S. Liss
Dionna K. Litvin
David Smith
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, 36th Floor
Philadelphia, PA 19103
*Counsel for Radian Guaranty Inc.*

Daryl A. Libow
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC  20006
*Counsel to Goldman, Sachs & Co*

Richard H. Klapper
Michael T. Tomaino, Jr.
Daniel H. R. Laguardia
Jeremy C. Bates
Patrice A. Rouse
SULLIVAN  & CROMWELL LLP
125 Broad Street
New York, NY 10004
*Counsel to Goldman, Sachs & Co.*

Aaron Futch
1615 L. Street, NW, Suite 1300
Washington, DC 20036-5694
*Counsel to Paul, Weiss, Rifkind, Wharton &
Garrison LLP*

/s/ Megan D. McIntyre
Megan D. McIntyre