## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE FANNIE MAE SECURITIES LITIGATION | No. 1:04-cv-01639 (RJL) |
| FRANKLIN MANAGED TRUST *et al*., <br><br> *Plaintiffs*, <br> v. <br><br> FEDERAL NATIONAL MORTGAGE ASSOCIATION *et al*., <br><br> *Defendants*. | No. 1:06-cv-00139 (RJL) |

### <u>MOTION OF DEFENDANT KPMG LLP TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT</u>

Defendant KPMG LLP respectfully moves to dismiss the claims against it in the second amended complaint in this action.[1]  KPMG also adopts and incorporates by reference the arguments raised by Fannie Mae and the individual defendants to the extent those arguments apply to the claims against KPMG.

Respectfully submitted this 9th day of November 2006.

/s/ Andrew Tulumello
F. Joseph Warin (D.C. Bar No. 235978)
Andrew S. Tulumello (D.C. Bar. No. 468351)
Melanie L. Katsur (D.C. Bar No. 484969)

---

[1] This motion to dismiss and supporting memorandum are identical to KPMG's Motion to Dismiss Plaintiffs' Amended Complaint and supporting memorandum filed July 17, 2006 (D.E. 60).  After KPMG filed that motion, the plaintiffs amended their complaint a second time.  Plaintiffs' Second Amended Complaint named Radian Group as a new defendant but did not change any of the allegations with respect to KPMG.  KPMG files this motion to ensure that, as a technical matter, its motion to dismiss is applicable to the operative complaint.  In addition, citations to the Amended Complaint in the original motion to dismiss have been updated with citations to the relevant paragraphs of the Second Amended Complaint.  Plaintiff's Opposition (D.E. 83) and KPMG's reply brief (D.E. 102) both already cite to the Second Amended Complaint.

Henry C. Whitaker (D.C. Bar No. 499210)
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for KPMG LLP*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE FANNIE MAE SECURITIES LITIGATION | No. 1:04-cv-01639 (RJL) |
| FRANKLIN MANAGED TRUST *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION *et al.*,<br><br>*Defendants*. | No. 1:06-cv-00139 (RJL) |

<u>**MEMORANDUM OF DEFENDANT KPMG LLP IN SUPPORT
OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**</u>

F. Joseph Warin (D.C. Bar No. 235978)
Andrew S. Tulumello (D.C. Bar. No. 468351)
Melanie L. Katsur (D.C. Bar No. 484969)
Henry C. Whitaker (D.C. Bar No. 499210)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for KPMG LLP*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... i

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 4

      A.     KPMG And Its Role As An Independent Auditor ...................................... 5

      B.     Fannie Mae ......................................................................................... 6

      C.     The Role Of Derivatives In Fannie Mae's Mission ................................... 7

      D.     Allegations Of Accounting Errors ............................................................ 8

             1.     FAS 133 ..................................................................................... 8

             2.     FAS 91 .................................................................................... 10

             3.     Accounting For Loan Losses ....................................................... 12

             4.     Other Accounting Issues ............................................................ 12

      E.     Plaintiffs' Liability Allegations ............................................................. 13

      F.     KPMG's Attempts To Prevent Fraud At Fannie Mae ............................... 14

      G.     Plaintiffs' Loss Allegations .................................................................. 15

SUMMARY OF ARGUMENT .............................................................................. 15

ARGUMENT ................................................................................................... 17

    I.     The Complaint Does Not Adequately Allege That KPMG Violated
           Section 10(b) And Rule 10b-5. ............................................................. 17

      A.     To The Extent The Complaint Alleges That KPMG Merely
            "Reviewed And Approved" Statements Made By Fannie Mae, The
            Complaint Must Be Dismissed. ............................................................. 19

      B.     The Complaint Does Not Allege Facts With Particularity That
            Give Rise To A Strong Inference That KPMG Acted With
            Scienter. ........................................................................................... 20

1.    Plaintiffs' Allegations Demonstrate That KPMG Attempted To Prevent Fraud At Fannie Mae And Hence Refute The Notion That KPMG Conspired To Commit It. ............................22

2.    Plaintiffs' Allegations That KPMG Violated GAAS And GAAP Are Insufficient To Establish Scienter. ..............................24

3.    Allegations That The Effect On The Financial Statements Of Fannie Mae's Fraud Was Large Do Not Establish That KPMG Acted With Scienter. .........................................................27

4.    Allegations That KPMG Received Audit Fees For Professional Services From Fannie Mae Do Not Establish That KPMG Acted With Scienter. ..................................................28

5.    Allegations That KPMG Had Access To Fannie Mae's Records Do Not Demonstrate That KPMG Acted With Scienter. ......................................................................................30

6.    Allegations That KPMG Knew Of What Plaintiffs Characterize As "Red Flags" Do Not Establish That KPMG Acted With Scienter. ....................................................................31

7.    Plaintiffs Have Not Pleaded Facts With Particularity That Collectively Warrant A Strong Inference That KPMG Acted With Extreme Recklessness. ...............................36

C.    Plaintiffs Have Not Adequately Pleaded Loss Causation. .........................36

II.    Plaintiffs' Claim Against KPMG Under Section 18 Of The Exchange Act Is Time-Barred. ...................................................................................39

A.    Plaintiffs' Section 18 Claim Is Governed By A One-Year Statute Of Limitations. ...........................................................................40

B.    Sarbanes-Oxley Did Not Alter The Limitations Period Applicable To Plaintiffs' Section 18 Claim. ................................................40

C.    The Putative Class Actions In *In Re Fannie Mae Securities Litigation* Did Not Toll The Statute Of Limitations Applicable To Plaintiffs' Claims. ...................................................................42

III.    Plaintiffs' Common Law Fraud Claim Must Be Dismissed. .................................44

CONCLUSION ...........................................................................................45

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974) ............................................................................ 42, 43, 44

*Anixter v. Home-Stake Production Co.*,
    77 F.3d 1215 (10th Cir. 1996) .................................................................... 20

*Bily v. Arthur Young & Co.*,
    834 P.2d 745 (Cal. 1992) ............................................................................ 6

*Burns v. Ersek*,
    591 F. Supp. 837 (D. Minn. 1984), *partially abrogated on other grounds by Agency*
    *Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987) .............................. 44

*Caulfield v. Stark*,
    893 A.2d 970 (D.C. 2006) ......................................................................... 45

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver N.A.*,
    511 U.S. 164 (1994) ................................................................................ 16

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983) ................................................................................ 42

*D.E. & J. Ltd. P'ship v. Conaway*,
    284 F. Supp. 2d 719 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005) ....... 3, 22

*Davis v. SPSS, Inc.*,
    385 F. Supp. 2d 697 (N.D. Ill. 2005) ............................................................ 31

*Decker v. Massey-Ferguson, Ltd.*,
    681 F.2d 111 (2d Cir. 1982) ..................................................................... 21

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ..................................................................... 28

*DSAM Global Value Fund v. Altris Software, Inc.*,
    288 F.3d 385 (9th Cir. 2002) ............................................................ 21, 26, 30

*Duncan v. Pencer*,
    94 Civ. 0321, 1996 WL 19043 (S.D.N.Y. Jan. 18, 1996) ...................................... 29

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) ...................................................................... 16, 18, 37, 39

## TABLE OF AUTHORITIES—*Cont'd*

Page

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003) .................................................................. 39

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) .................................................................... 20, 26

*Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*,
    395 F.3d 851 (8th Cir. 2005) ..................................................... 24, 26

*Fidel v. Farley*,
    392 F.3d 220 (6th Cir. 2004) ................................................... passim

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ............................................................ 18

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ............................................................... 8

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ........................................................... 18

*Helwig v. Vencor, Inc.*,
    251 U.S. 540 (6th Cir. 2001) ........................................................... 18

*In re Alstom SA*,
    406 F. Supp. 2d 402 (S.D.N.Y. 2005) .............................................. 42

*In re Bisys Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................ 3

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ........................................................... 13

*In re Direct General Corp. Sec. Litig.*,
    398 F. Supp. 2d 888 (M.D. Tenn. 2005) ............................................ 3

*In re Global Crossing, Ltd. Sec. Litig.*,
    313 F. Supp. 2d 189 (S.D.N.Y. 2003) .............................................. 41

*In re Hollinger Int'l, Inc. Sec. Litig.*,
    No. 04-C-0834, 2006 WL 1806382 (N.D. Ill. June 28, 2006) ......... 42

*In re Ikon Office Solutions Inc.*,
    277 F.3d 658 (3d Cir. 2002) ................................................. 21, 33, 34

**TABLE OF AUTHORITIES**—*Cont'd*

Page

*In re Interbank Funding Corp. Sec. Litig.*,
329 F. Supp. 2d 84 (D.D.C. 2004), *vacated and remanded in part on other grounds sub. nom*, *Belizan v. Hershon*, 434 F.3d 579 (D.C. Cir. 2006)........................................... 30, 32

*In re PEC Solutions, Inc. Sec. Litig.*,
418 F.3d 379 (4th Cir. 2005) ................................................................................... 1

*In re Raytheon Sec. Litig.*,
157 F. Supp. 2d 131 (D. Mass. 2001) ....................................................................... 3

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
311 F.3d 198 (3d Cir. 2002)...................................................................................... 18

*In re SCB Computer Tech., Inc. Sec. Litig.*,
149 F. Supp. 2d 334 (W.D. Tenn. 2001)................................................................. 27, 34

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
124 F. Supp. 2d 505 (S.D. Ohio 2000) .................................................................. 21

*In re Spear & Jackson Sec. Litig.*,
399 F. Supp. 2d 1350 (S.D. Fla. 2005) .................................................................. 3

*In re Stone & Webster, Inc. Sec. Litig.*,
414 F.3d 187 (1st Cir. 2005)............................................................................... 30, 32, 33

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
382 F. Supp. 2d 1173 (N.D. Cal. 2004) ................................................................ 37

*In re WorldCom, Inc.  Sec. Litig.*,
294 F. Supp. 2d 431 (S.D.N.Y. 2003)................................................................ 41, 42, 43

*In re WorldCom, Inc. Sec. Litig.*,
308 F. Supp. 2d 236 (S.D.N.Y. 2004)................................................................ 44

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) .............................................................................. 2, 28

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
501 U.S. 350 (1991)............................................................................................ 40

*Lindner Dividend Fund, Inc. v. Ernst & Young*,
880 F. Supp. 49 (D. Mass. 1995) ........................................................................ 44

*Magna Inv. Corp. v. John Does One through Two Hundred*,
931 F.2d 38 (11th Cir. 1991) .............................................................................. 40

### TABLE OF AUTHORITIES—*Cont'd*

Page

*Nappier v. Pricewaterhouse Coopers LLP*,
    227 F. Supp. 2d 263 (D.N.J. 2002) .................................................................. 3

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ..................................................................... 2, 18

*Rahr v. Grant Thornton LLP*,
    142 F. Supp. 2d 793 (N.D. Tex. 2000) ............................................................ 43

*Reiger v. Price Waterhouse Coopers LLP*,
    117 F. Supp. 2d 1003 (S.D. Cal. 2000).............................................. 2, 3, 13, 27

*Riggs Partners LLC v. Hub Group, Inc.*,
    No. 02 C 1188, 2002 WL 31415721 (N.D. Ill. Oct. 25, 2002)........................ 31

*Robbins v. Koger Props., Inc.*
    116 F.3d 1441 (11th Cir. 1997) ....................................................................... 38

*Ross v. A.H. Robins Co.*
    607 F.2d 545 (2d Cir. 1979)............................................................................. 41

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)............................................................................... 21

*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ........................................................................ 20

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000)............................................................................. 38

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87  (1995).......................................................................................... 22

*Shapiro v. Cantor*,
    123 F.3d 717 (2d Cir. 1997)............................................................................. 20

*Sparrow v. United Air Lines, Inc.*,
    216 F.3d 1111 (D.C. Cir. 2000) ...................................................................... 23

*Thor Power Tool Co. v. Comm'r*,
    439 U.S. 522 (1979)......................................................................................... 22

*Wachovia Bank & Trust Co., N.A. v. Nat'l Student Mktg. Corp.*,
    650 F.2d 342 (D.C. Cir. 1980) ........................................................................ 43

*WM High Yield Fund v. O'Hanlon*,
    No. Civ. A. 04-3423, 2005 WL 1017811 (E.D. Pa. Apr. 29, 2005) ................ 42

## TABLE OF AUTHORITIES—*Cont'd*

Page

*Wright v. Ernst & Young LLP*,
152 F.3d 169 (2d Cir. 1998) .......................................................................... 20

*Wyser-Pratte Mgmt. Co. v. Telxon Corp.*,
413 F.3d 553 (6th Cir. 2005) ....................................................................... 43

*Zoelsch v. Arthur Andersen & Co.*,
824 F.2d 27 (D.C. Cir. 1987) ................................................................ 20, 39

**Statutes**

12 U.S.C. § 1716 .............................................................................................. 7

15 U.S.C. § 78bb(f) .................................................................................. 19, 48

15 U.S.C. § 78r(a) ......................................................................................... 43

15 U.S.C. § 78u-4(b)(2) ........................................................................... 20, 37

15 U.S.C. § 78u-4(b)(4) ................................................................................. 39

28 U.S.C. § 1658(b) ............................................................................ 37, 44, 45

**Rules**

Fed. R. Civ. P. 9(b) .........................................................................................20

**Other Authorities**

Statement 114, *Accounting by Creditors for Impairment of a Loan*, available at
http://www.fasb.org/pdf/fas114.pdf (last visited July 10, 2006) ...................... 12

Statement 115, *Accounting for Certain Investments in Debt and Equity Securities*, available at
http://www.fasb.org/pdf/fas91.pdf (last visited July 10, 2006) ........................ 12

Statement 133, *Accounting for Derivative Instruments and Hedging Activities*, available at
http://www.fasb.org/pdf/fas133.pdf (last visited July 10, 2006) .................. 8, 10

Statement 137, *Accounting for Derivative Instruments and Hedging Activities, FASB Statement No. 137—Deferral of the Effective Date of FASB Statement No. 133*, available at
http://www.fasb.org/pdf/fas137.pdf (last visited July 10, 2006) ...................... 10

Statement 138, *Accounting for Certain Derivative Instruments and Certain Hedging Activities* 10

Statement 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities* (Issued April 2003) ...................................................................................... 10

TABLE OF AUTHORITIES—*Cont'd*

Page

Statement 155, *Accounting for Certain Hybrid Financial Instruments—an amendment of FASB Statements No. 133 and 140* (Issued February 2006) ....................................................... 10

Statement 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases*, available at http://www.fasb.org/pdf/fas91.pdf (last visited July 10, 2006) .................................. 11, 12

The American Institution of Certified Public Accountants Statements on Auditing Standards § 110.03.............................................................................................................................. 6

Todd Davenport, *The Uneven Evolution of Accounting Standards*, American Banker, July 28, 2004....................................................................................................................................... 10

## **INTRODUCTION**

Plaintiffs' case against KPMG LLP rests, at bottom, on the claim that KPMG incorrectly audited Fannie Mae's financial statements and permitted Fannie Mae to misapply complicated accounting principles. The law requires more—*much more*—for Plaintiffs to plead a successful claim against KPMG. The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes demanding requirements on securities fraud plaintiffs. And that demanding burden is at its apex when the plaintiffs seek to proceed against outside auditors like KPMG, because there is a distinctive legal regime that defines the liability of outside auditors in the securities fraud context.

Under the precedent established in Section 10(b) cases against accountants, Plaintiffs must plead and prove that KPMG deliberately participated with Fannie Mae and its executives to defraud investors. That charge finds no support in the complaint's allegations and flies in the face of common sense. Unlike Fannie Mae and its executives (whose compensation was tied directly to financial performance metrics), KPMG stood to gain nothing from such a conspiracy. Its incentive would be to avoid any such "plot" and the onslaught of civil liability prompted by eventual revelation of the scheme. Whatever the merits of Plaintiffs' claims against Fannie Mae and the individual defendants, Plaintiffs have not pleaded legally sufficient facts to support their fraud claims against KPMG.

Indeed, Plaintiffs must overcome many legal obstacles that are unique to auditors to state a valid securities fraud claim. These obstacles include:

- **"[M]isapplication of accounting principles by an independent auditor does not establish scienter**." *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 389 (4th Cir. 2005) (emphasis added, internal quotation marks and citation omitted).

- **"[T]he meaning of recklessness in securities fraud cases is especially stringent when the claim is brought against an outside auditor. Recklessness on the**

> **part of an independent auditor entails a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company.**" *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004) (emphasis added; internal quotation marks, alteration, and citation omitted).

- **"Scienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all . . . ."** *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (emphasis added; internal quotation marks, alteration, and citation omitted).

The court in *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1007-08 (S.D. Cal. 2000), summarized the reasons why these stringent *pleading* requirements apply to auditors:

> First, a large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud. Unlike the officers and directors of the companies it represents, an independent accountant has no ability to line its pockets through insider trading, and no incentive to cover up corporate mismanagement. The accountant's success depends on maintaining a reputation for honesty and integrity, **requiring a plaintiff to overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud of a single client**.

*Id.* at 1007 (emphasis added).

Second, an auditor necessarily possesses less information concerning the financial data that support the financial documents than does its client. Auditors, by definition, audit the financial statements that are *prepared by management*. Hence, "it is almost always more difficult to establish scienter on the part of the accountant than on the part of its client." *Id.* at 1007-08.

Finally,

> the report generated by an independent accountant often represents a **professional opinion** based on numerous and complex factors. Although ultimately expressed in shorthand form, the report is the final product of a complex process involving discretion and judgment on the part of the auditor at every stage. Using different initial assumptions and approaches, different sampling techniques, and the wisdom of 20-20 hindsight, few CPA audits are immune from criticism.

*Id.* at 1008 (emphasis added and internal quotation marks, alteration, and citation omitted).

These considerations are simply not present in a claim against an issuer, and "make it

**exceedingly** difficult for a securities plaintiff to plead facts suggesting that an independent

accountant acted with the deliberate state of mind now required to withstand a motion to

dismiss." *Id.* (emphasis added).

Not only must Plaintiffs satisfy this particularly high pleading standard, but they also

must do so with specific and particularized *facts*—not boilerplate legal conclusions. S*ee D.E. &

J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 740 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994

(6th Cir. 2005) (noting that the PSLRA's pleading standards are even more stringent as against

auditors because of the "auditor's dependence on information supplied by the client, application

of complex accounting and auditing standards, and varying degrees of professional judgment")

(citing *Reiger*, 117 F. Supp. 2d at 1008).

Given the more demanding pleading standard applicable to outside auditors, it is not

surprising that courts regularly grant motions to dismiss by outside auditors while denying such

motions brought by defendants affiliated with the auditor's client.[1]  And dismissal of the claims

against KPMG is precisely what is warranted—and legally mandated—here.

---

[1] *See, e.g.*, *Fidel v. Farley*, 392 F.3d 220, 223 (6th Cir. 2004) (noting that the district court
denied motions to dismiss brought by the company defendants but granted it as to the outside
auditor, and affirming district court's judgment as to the outside auditor); *In re Cardinal
Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 719, 779-80 (S.D. Ohio 2006) (finding that
plaintiffs adequately pleaded scienter against executives but not against outside auditor); *In
re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 898-900 (M.D. Tenn. 2005) (same); *In
re Bisys Sec. Litig.*, 397 F. Supp. 2d 430, 449-50 (S.D.N.Y. 2005) (same); *In re Spear &
Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1359, 1362-64 (S.D. Fla. 2005) (same); *Nappier v.
Pricewaterhouse Coopers LLP*, 227 F. Supp. 2d 263, 268, 281-82 (D.N.J. 2002) (noting that
motions to dismiss were denied against company defendants in related proceedings but
granting outside auditors' motion to dismiss as to claim arising out of the same facts); *In re
Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 154, 156 (D. Mass. 2001) (same).

## BACKGROUND

This is an unusual securities fraud case, in that it is uncontested that Fannie Mae was a successful and profitable enterprise throughout the period of the alleged fraud, and remains so today.  In most securities fraud cases, the central allegation is that the defendants deceived investors about the financial health of the company and papered over substantial losses.  But unlike the typical case, no one has alleged that Fannie Mae was losing money—or even that its business was faltering in any significant way.  Fannie Mae's underlying economic health has forced Plaintiffs to make an innovative claim:  KPMG participated in a massive accounting fraud to help certain Fannie Mae executives secure large bonuses and to "smooth" earnings growth.

It is also customary for securities fraud plaintiffs to draft allegations in a relative vacuum about the underlying facts; frequently, the central facts are limited to what the plaintiffs have gleaned from statements by the company.  In contrast, Plaintiffs here have at their disposal a wealth of public information about the purported accounting irregularities at Fannie Mae.  On September 17, 2004, the Office of Federal Housing Enterprise Oversight ("OFHEO") issued a 198-page report detailing what it believed were deficient accounting practices at Fannie Mae. Second Am. Compl. ¶ 1.  That report was based on a review of more than "200,000 documents," as well "as interviews and sworn testimony from numerous current and former Fannie Mae employees."  Second Am. Compl. ¶ 1.  Subsequently, Congress held hearings to investigate these allegations, producing yet more testimony and documents.  And as extensive as these investigations were, they were dwarfed by the special report issued by Paul Weiss attorney Senator Warren Rudman (the "Rudman Report").  The 615-page Rudman Report was commissioned by a special review committee of Fannie Mae's Board of Directors.  In preparing the Rudman Report, Paul Weiss conducted 241 interviews of Fannie Mae employees and

reviewed more than four million documents. Rudman Report at 13-14. In addition, OFHEO on May 23, 2006, issued another report ("Final Report"), this one 340 pages, which discusses Fannie Mae's accounting in still more detail. Second Am. Compl. ¶ 9. That report was based on OFHEO's review of approximately 7.5 million pages of documents, in addition to numerous interviews and transcripts of interviews conducted by the SEC. Final Report at 19.

Notwithstanding this veritable mountain of information upon which the two OFHEO reports and the Rudman Report were based, Plaintiffs have resorted to rote and conclusory allegations of accounting mistakes that provide no connective tissue between Fannie Mae's purported misconduct and KPMG's culpability.

## A.    KPMG And Its Role As An Independent Auditor

KPMG is one of the "Big 4" accounting and professional services firms in the United States and served as the independent auditor of Fannie Mae's financial statements from 1969 to December 2004. Second Am. Compl. ¶ 73.

Plaintiffs' allegations against KPMG arise from KPMG's role as Fannie Mae's independent auditor. It is essential for the Court to keep in mind the unique and limited role of an outside auditor when considering this motion to dismiss. Generally Accepted Auditing Standards ("GAAS") make it crystal clear that the company's management—not the independent, outside auditor—is responsible for preparing the company's financial statements:

> The financial statements are management's responsibility. The auditor's responsibility is to express **an opinion** on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.

The American Institution of Certified Public Accountants Statements on Auditing Standards ("AU") § 110.03 (emphasis added).[2]  Indeed, even the Lead Plaintiffs (in the class case) repeatedly acknowledge this point.  *See*, *e.g*., Lead Pls.' Second Am. Class Compl. ¶ 98 ("[m]anagement is responsible for preparing financial statements that conform to GAAP").

In *Bily v. Arthur Young & Co.*, 834 P.2d 745, 762 (Cal. 1992), the California Supreme Court explained the auditor's limited role (compared to the company) in presenting the company's financial statements:

> An auditor is a watchdog, not a bloodhound.  As a matter of commercial reality, audits are performed in a client-controlled environment.  The client typically prepares its own financial statements; it has direct control over and assumes primary responsibility for their contents. . . .  Because the auditor cannot in the time available become an expert in the client's business and record-keeping systems, the client necessarily furnishes the information base for the audit.

*Id*.  (citations omitted).

Put in the proper context of KPMG's limited role as outside auditor, and the stringent pleading standards that apply under the PSLRA and Federal Rule of Civil Procedure 9(b), the complaint's pleading deficiencies are glaring.

**B.    Fannie Mae**

The Federal National Mortgage Association, known colloquially as "Fannie Mae," is a federally chartered corporation established in 1938 to increase the availability and affordability of homeownership for low-, moderate-, and middle-income Americans.  Fannie Mae operates primarily in the secondary mortgage market, replenishing the supply of money available for

---

[2] The American Institute of Certified Public Accountants is the main professional organization for accountants.  It is responsible for promulgating GAAS.  For most of the period in question it had the responsibility for promulgating audit standards, a role that the Public Company Accounting Oversight Board (PCAOB) assumed for public company audits performed after 2003.  The PCAOB, however, has largely adopted GAAS, on an interim basis, for its audit standards.

housing loans by buying mortgages and mortgage securities from primary lenders.  Second Am. Compl. ¶ 46.  Fannie Mae has been shareholder-owned since 1968.  Second Am. Compl. ¶ 47.

Fannie Mae is a unique institution.  Unlike wholly private financial institutions, Fannie Mae's public charter requires it to buy mortgages and thereby maintain liquidity in the housing market.  *See* 12 U.S.C. § 1716.  In carrying out its congressionally mandated role, Fannie Mae has become the nation's largest mortgage lender.  Second Am. Compl. ¶ 46.  Its role in the market and the sheer volume of transactions create substantial accounting challenges.

Fannie Mae's size is critical to putting any alleged accounting errors in context.  In 2003, Fannie Mae had over $1 trillion in assets and $7.9 billion in net income.  2003 10-K at 24.  These numbers were similar from 2000 ($675.2 billion in assets, $4.4 billion in net income) through 2003 ($1.009 trillion in assets, $7.9 billion in net income).

Fannie Mae is subject to significant public regulation.  It is supervised by many agencies, including the Department of Housing and Urban Development ("HUD"), OFHEO, the United States Department of Treasury, and, of course, the Securities and Exchange Commission ("SEC").  Second Am. Compl. ¶ 48.  Indeed, in 1992 Congress created OFHEO principally to regulate Fannie Mae and Freddie Mac.  *See* Second Am. Compl. ¶ 49; OFHEO Mission Statement, available at http://www.ofheo.gov/mission.asp (last visited July 10, 2006).

### C.     The Role Of Derivatives In Fannie Mae's Mission

Derivatives are an integral part of Fannie Mae's statutory mission.  In furtherance of its purpose to create liquidity in the secondary market for mortgages, Fannie Mae maintains a large and diverse portfolio of assets and liabilities whose value is tied to interest rates.  Fannie Mae uses derivatives to guard against the risk that Fannie Mae's assets, liabilities, and cash flows will dramatically fluctuate as interest rates rise and fall.  For example, when Fannie Mae purchases derivatives whose value increases as interest rates rise, it offsets the decreases in value of

mortgage-based securities whose value decreases when interest rates rise—a form of "insurance" against interest-rate changes.  Fannie Mae employs derivatives to hedge against interest-rate risk and its hedging strategies are driven by highly quantitative formulae and models.  But Fannie Mae does not make directional "bets" on interest-rate movements.  Unlike many other derivative investors, "Fannie Mae does not trade or speculate in derivatives to make money."  Fannie Mae 2003 Annual Report at 6, *cited in* Second Am. Compl. ¶¶ 634-36.  Instead, Fannie Mae relies on derivatives to reduce risk and volatility.

### D.    Allegations Of Accounting Errors

Plaintiffs allege that Fannie Mae misapplied numerous, complicated accounting principles.  To illustrate the complexity of these standards, KPMG briefly describes those that pertain most directly to the allegations against it.

### 1.    FAS 133

Statement 133, *Accounting for Derivative Instruments and Hedging Activities*, available at http://www.fasb.org/pdf/fas133.pdf (last visited July 10, 2006) ("FAS 133"), is a relatively new and highly complex accounting standard promulgated by the Financial Accounting Standards Board ("FASB").[3]  Absent hedge accounting treatment under FAS 133, holders of derivative hedging instruments are required to recognize changes in value of such instruments in ways that may not reflect the underlying economic values of the hedging relationship.  FAS 133 permits companies not to recognize in income changes in the fair value of instruments that qualify for "hedge accounting"; in these circumstances, the company simply calculates and discloses such gains and losses elsewhere in its financial statements.

---

[3] FASB is the standard-setting body for the application of accounting and audit principles.  "The SEC treats the FASB's standards as authoritative."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 n.4 (2d Cir. 2000).

If Fannie Mae were not able to apply hedge accounting treatment, Fannie Mae's earnings could be subject to volatility that did not match economic reality. Without hedge accounting, for instance, there would be a mismatch between the accounting treatment of Fannie Mae's debt securities and the instruments it uses to hedge against the interest-rate risk of those securities. Take, for example, a debt security tied to a fixed interest rate—the holder of that security has a right to receive interest payments at a fixed rate. If interest rates rise, the value of that security decreases. The value of any hedge, however, would increase, offsetting the decline in value of the security. Economically, nothing has happened. But absent hedge accounting, earnings would nonetheless increase: earnings would reflect the increased value of the hedge, but not the decreased value of the debt security. The increase is artificial because the company's economic position has not changed; only the earnings figure has.

For most companies, derivatives play only a minor role in their business, so the mismatch between economic reality and financial-statement presentation may not cause complications. But it is a significant concern for Fannie Mae, which maintains a huge and complex portfolio of derivatives. Absent hedge accounting, FAS 133 would lead to fluctuations in Fannie Mae's financial statements that would not reflect economic reality.

Hedge accounting solves this problem, but it is far from straightforward to apply. FAS 133 imposes a complex and confusing set of rules concerning when hedge accounting is appropriate. Since its inception in 2001, FAS 133 has been the subject of much disagreement, even bewilderment, over its meaning. *See, e.g.*, Todd Davenport, *The Uneven Evolution of Accounting Standards*, American Banker, July 28, 2004, at 16 ("It is hard to make the case for generally accepted accounting principles when they are not even generally understood.") (discussing FAS 133). The standard spans more than 870 pages, including hundreds of

implementation issues. It proved so impracticable upon promulgation that there already have

been three amendments.[4] Indeed, FAS 133 was so mystifying and unworkable that FASB

(which has issued more than a hundred accounting statements) took the unprecedented step of

creating a special task force just to oversee this single accounting standard—the Derivatives

Implementation Group ("DIG"). Despite FASB's and DIG's best efforts, implementation

problems with FAS 133 were so widespread that in June 1999, its effective date was delayed for

one year until June 15, 2000. *See* Statement 137, *Accounting for Derivative Instruments and*

*Hedging Activities, FASB Statement No. 137—Deferral of the Effective Date of FASB Statement*

*No. 133* ¶ 3, available at http://www.fasb.org/pdf/fas137.pdf (last visited July 10, 2006). FAS

133 accounting was first implemented by Fannie Mae for its financial statements for the year

commencing January 1, 2001.

      FAS 133's complex mandate produced widespread confusion. Difficulties implementing

FAS 133 are legion, and have plagued public company clients of all the Big Four accounting

firms, including many of the most prominent financial corporations in the United States.

According to publicly available information at least *117 public companies* have restated their

earnings since 2003 because of difficulties of complying with FAS 133. Among these are 79

companies audited by *all* of the "Big Four" accounting firms, and major corporations such as

AIG, Bank of America, CIT Corp, Freddie Mac, and Toyota Motor Credit.

      **2.    FAS 91**

      Statement 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating*

*or Acquiring Loans and Initial Direct Costs of Leases*, available at

---

[4]  Statement 138, *Accounting for Certain Derivative Instruments and Certain Hedging Activities*. (Issued June
2000); Statement 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities* (Issued
April 2003); Statement 155, *Accounting for Certain Hybrid Financial Instruments—an amendment of FASB
Statements No. 133 and 140* (Issued February 2006).

http://www.fasb.org/pdf/fas91.pdf (last visited July 10, 2006) ("FAS 91"), governs the amortization of purchase premiums and discounts on securities and loans, including mortgage loans that Fannie Mae purchases from primary lenders. When Fannie Mae purchases mortgage loans from primary lenders (like a bank), it usually does not do so at face value. Instead, it pays a premium or a discount—depending on whether interest rates have risen or fallen since the loan was issued to the homebuyer.[5] FAS 91 requires this premium or discount to be amortized—that is, spread—over the life of the mortgage, in accordance with FAS 91.

The proper application of FAS 91 depends on a host of complex and subjective judgments. To take just one example, it is very difficult to predict what the "life" of a mortgage will be. To be sure, mortgages have a specified term (such as 30 years). But prepayments and refinances are not uncommon, making it probable in a declining interest rate environment that any given mortgage will be paid in full before its term is reached. For instance, if interest rates fall, many people will refinance and pay off their original mortgages. Or if a family moves into a new home, they may sell their old home and use the proceeds to pay off their existing mortgage. These and other factors make it difficult to predict the "life" of a mortgage, and thus the proper rate of amortization under FAS 91.

Notably, FAS 91 *does not* specify how expectations of prepayments should be reflected in an amortization calculation. The standard simply states that:

> [i]f the enterprise holds a large number of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated, the enterprise may consider estimates of future principal prepayments in the calculation of the constant effective yield necessary to apply the interest method.

---

[5] If interest rates have risen since the mortgage was originally issued to the home buyer, Fannie Mae will get a discount because the mortgage loan (assuming the interest rate is fixed) is not as valuable as a loan issued at the new, higher rate. Conversely, if interest rates have fallen, then Fannie Mae will pay a premium to reflect the fact that the mortgage's interest rate is better than the present rate.

FAS 91 ¶ 19.  The standard is silent as to how and by what method a company should "reasonably estimate[]" future principal prepayments.  This terse provision is the sole guidance provided by FAS 91, and it is left to individual companies to fashion a reasonable methodology for predicting the life of a mortgage.

### 3.    Accounting For Loan Losses

Both Statement 115, *Accounting for Certain Investments in Debt and Equity Securities*, available at http://www.fasb.org/pdf/fas115.pdf (last visited July 10, 2006) ("FAS 115") and Statement 114, *Accounting by Creditors for Impairment of a Loan*, available at http://www.fasb.org/pdf/fas114.pdf (last visited July 10, 2006) ("FAS 114"), tell creditors and holders of loan-backed securities how to account for the chance that their debtors will default on their loan-backed securities.  If the probability of default rises, for example, FAS 114 requires the creditor to record as an expense the amount of the decrease in the fair value of the loan.  *See* Second Am. Compl. ¶ 241.  The accumulated expenses are called the "allowance for loans."  Similarly, FAS 115 requires companies to "write them down" to fair value, and include the change in value in earnings, loan-backed securities whose fair value has decreased.  Second Am. Compl. ¶ 295.  These calculations are subjective.  The probability a loan will default is highly uncertain.  As Plaintiffs' complaint makes clear, this calculation depends on numerous subjective factors—"among other things, loss experience, economic conditions, and geographic concentrations."  Second Am. Compl. ¶ 242.  In addition, calculating the fair market value of these assets under FAS 115 can be complex; a company has "some flexibility in determining fair value."  Second Am. Compl. ¶ 296.

### 4.    Other Accounting Issues

Plaintiffs also discuss other alleged accounting errors in relation to KPMG, including the company's treatment of held-to-maturity and available-for-sale classifications, "dollar roll"

repurchase agreements, other-than-temporary impairment of both manufactured housing bonds and aircraft-asset-backed securities, synthetic REMICs, amortization of callable debt expense, the estimated impact of Fannie Mae's so-called "Security Master" project, and investments in synthetic fuel partnerships. Second Am. Compl. ¶¶ 233, 262, 300, 309-10, 318, 329-32, 388. It is impossible in this short space to explain all of these issues in any detail, much less their application to a complex business like Fannie Mae. Suffice it to say that these accounting standards all involve equally complex and subjective accounting judgments, creating a heavy burden for Plaintiffs to demonstrate that KPMG *deliberately* misapplied these standards to abet a vast conspiracy to "smooth" Fannie Mae's earnings.

### E.    Plaintiffs' Liability Allegations

Plaintiffs allege that KPMG issued fraudulent audit opinions on Fannie Mae's financial statements for the years ending on December 31, 2000, 2001, 2002, and 2003. Second Am. Compl. ¶ 73. The bulk of Plaintiffs' complaint consists of allegations of GAAP violations at Fannie Mae, the occasional statement that KPMG "reviewed and approved" Fannie Mae's financial statements,[6] and the conclusory allegation that "KPMG either knew or should have known of all the flaws" in Fannie Mae's accounting, Second Am. Compl. ¶ 456. Plaintiffs' only meaningful attempt to state a claim against KPMG comes in the section entitled "KPMG's Scienter And Violations Of GAAS In Its Audits Of Fannie Mae's Financial Statements." Second Am. Compl. ¶¶ 745-797.[7] At bottom, Plaintiffs' allegation is that KPMG was complicit in fraud

---

[6] Second Am. Compl. ¶¶ 472, 480, 484, 487, 499, 507, 514, 518, 554, 568, 591, 600, 605, 614, 638, 641, 650, 653.

[7] "[GAAP] comprise[s] a set of basic postulates and broad accounting principles pertaining to business enterprises. These principles, approved by the [AICPA], establish guidelines for measuring, recording and classifying the transactions of a business entity." *Reiger*, 117 F. Supp. 2d at 1009. GAAP does not prescribe a fixed set of rules, but rather represents "the range of reasonable alternatives that management can use." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 n.10 (3d Cir. 1997). In contrast, GAAS "embod[ies]

at Fannie Mae given the "pervasive nature and magnitude of the Company's . . . GAAP

violations." Second Am. Compl. ¶ 762.

Plaintiffs allege various facts that purport to show KPMG participated in fraud,

including:

1.  KPMG objected to Fannie Mae's deferral of a $199 million expense in 1998, and then listed the $199 million as an "audit difference" when Fannie Mae rejected KPMG's recommendation.  Second Am. Compl. ¶¶ 92, 747.

2.  After hearing the concerns expressed by Roger Barnes (a Fannie Mae employee) about Fannie Mae's internal controls and management's response, KPMG performed an "investigation" of Mr. Barnes' complaints that was "insufficient."  Second Am. Compl. ¶ 420.

3.  KPMG had access to Fannie Mae's files and employees, and thus the opportunity to commit fraud.  Second Am. Compl. ¶ 768.

4.  KPMG had a financial motive and sought to "reap rich rewards" from the accounting fees it collected from Fannie Mae.  Second Am. Compl. ¶¶ 766-67.  There is no allegation or explanation for why KPMG's professionals would jeopardize their careers (or, if Plaintiffs are to be believed, their freedom) by defrauding investors in this way.

5.  Plaintiffs also include a table of what they term "Red Flags," which Plaintiffs claim should have put KPMG on notice of the purported fraud.  Second Am. Compl. ¶ 772.  For the most part, this table of Red Flags simply restates the alleged GAAP and GAAS violations recited elsewhere in the complaint.  It also states various "facts" about management, such as the fact that "[b]onuses [for Fannie Mae management] were tied to meeting certain EPS levels."  Second Am. Compl. ¶ 772.  There are no allegations that KPMG knew that any of Fannie Mae's accounting judgments were tailored to achieve earnings targets.

6.  KPMG knew that Fannie Mae tied its executives' compensation to earnings targets, giving them an incentive to manipulate earnings.  Second Am. Compl. ¶¶ 759-61.

**F.    KPMG's Attempts To Prevent Fraud At Fannie Mae**

While Plaintiffs' complaint is notably bereft of any specific allegation that KPMG

engaged in a scheme to inflate Fannie Mae's earnings, the allegations of the complaint

demonstrate that KPMG pushed Fannie Mae to improve its accounting practices.  KPMG

---

the general standards prescribed by the AICPA for the conduct of auditors in the performance of an examination."  *Reiger*, 117 F. Supp. 2d at 1009.

repeatedly disagreed with Fannie Mae's accounting, *see* Second Am. Compl. ¶¶ 95, 203, going so far as to list formal audit differences, *see* Second Am. Compl. ¶¶ 92, 747. It kept the audit committee informed of the disagreements and of management's refusal to accept KPMG's advice. Second Am. Compl. ¶ 819. KPMG also prodded Fannie Mae to develop better accounting policies and systems, Second Am. Compl. ¶¶ 140-42, 153, and pointed out to the audit committee deficiencies in its current systems, Second Am. Compl. ¶ 816. It also planned extensive test work of Fannie Mae's new system of derivative accounting, with a focus on testing the changes in the Company's systems. Second Am. Compl. ¶ 819.

Notably, according to the complaint, KPMG's efforts were undermined by some members of Fannie Mae's management. Fannie Mae deliberately withheld from KPMG information about its accounting system. *See* Second Am. Compl. ¶¶ 310-12. In addition, Fannie Mae delayed informing KPMG of new accounting policies, Second Am. Compl. ¶ 212, depriving KPMG of sufficient time to review them.

## G.    Plaintiffs' Loss Allegations

Plaintiffs are various investment companies affiliated with Franklin Templeton Investments. They allege that they purchased Fannie Mae common stock between January 26, 2001, and September 28, 2005, in reliance on Fannie Mae's financial statements. Second Am. Compl. ¶¶ 15, 20-45. They claim that the price of these holdings dropped significantly between September 21, 2004, and September 28, 2005, and that this drop was attributable to the revelation of Fannie Mae's accounting fraud in Fall 2004 and the release of the OFHEO report. Second Am. Compl.¶¶ 688, 865. Notably, there is no allegation that the stocks were sold, when they were sold, or what loss was actually sustained.

## SUMMARY OF ARGUMENT

This complaint must be dismissed as to KPMG for several reasons.

*First*, Plaintiffs' allegations that KPMG "reviewed and approved" financial statements by Fannie Mae are not actionable under Section 10(b) as a matter of law. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver N.A.*, 511 U.S. 164, 191 (1994). The vast majority of allegations against KPMG relate to "statements" that were made by Fannie Mae, not KPMG. Because KPMG cannot be held liable for statements it did not make, the complaint must be dismissed as to those allegations.

*Second*, the complaint fails to allege particular facts that lead to the strong inference that KPMG acted with extreme recklessness or fraudulent intent, or deliberately conspired to enrich Fannie Mae officers by committing fraud. To begin with, Plaintiffs' allegations show that KPMG tried to prevent, not abet, Fannie Mae's fraud by policing Fannie Mae's accounting practices. Plaintiffs' allegations, moreover, amount to nothing more than the claim that Fannie Mae's application of GAAP was incorrect and that KPMG failed to follow GAAS procedures. But these allegations—which are not uncommon in securities fraud suits against accountants—at most state a claim for professional negligence, not deliberate fraud, and courts have repeatedly rejected efforts by Plaintiffs to meet the scienter requirements simply by pleading that GAAP and GAAS errors were dramatic and obvious.

*Third*, Plaintiffs also fail to plead specific facts showing that KPMG's conduct caused the losses they allege they sustained. Under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), Plaintiffs must allege that conduct by KPMG—and not some other source—proximately caused their loss. But nowhere in their complaint is there any specific allegation identifying when Plaintiffs sold their shares and what loss they suffered. Moreover, Plaintiffs make no effort to establish that KPMG's audit work—as opposed to the many alleged acts of the Fannie

16

Mae defendants (such as the allegedly misleading public statements made by Fannie Mae's officers to the marketplace)—was the legal cause of their loss.

*Fourth*, Plaintiffs' claim under Section 18 of the Exchange Act (which imposes liability for misleading statements contained in documents filed with the SEC) is time-barred. Section 18 claims must be brought within a year that the alleged wrong was discovered, and Plaintiffs—who commenced this action in January 2006, but who allege to have discovered the fraud in September 2004, Second Am. Compl. ¶ 867—missed that one-year window.

*Fifth*, Plaintiffs' state common law fraud claim is preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). SLUSA preempts state law claims that are based on securities fraud. SLUSA's preemptive scope reaches any lawsuit brought by at least fifty plaintiffs that "proceed as a single action for **any purpose**" in the same court. 15 U.S.C. § 78bb(f)(5)(B)(ii) (emphasis added). Here Plaintiffs' action has been consolidated with the consolidated class action brought by Lead Plaintiffs, and hence is proceeding together with that action within the meaning of SLUSA. Plaintiffs' state law claim is therefore preempted. In any event, Plaintiffs' failure to plead a securities fraud claim with particularity also dooms their common-law fraud claim, which also requires knowing or intentional misconduct to be pleaded with particularity.

## ARGUMENT

### I.    The Complaint Does Not Adequately Allege That KPMG Violated Section 10(b) And Rule 10b-5.

Plaintiffs have failed to state a legally sufficient claim that KPMG violated Section 10(b) and Rule 10b-5. To state a claim for relief under those provisions, they must allege that KPMG (1) made a material misrepresentation or omission, (2) in connection with the purchase and sale of a security, and (3) acted with scienter; that (4) Plaintiffs relied on these misrepresentations;

and that (5) KPMG's misrepresentation caused Plaintiffs economic loss. *Dura Pharm.*, 544 U.S. at 341-42.

Plaintiffs shoulder a heavy burden of pleading these elements. Federal Rule of Civil Procedure 9(b) and the PSLRA together require Plaintiffs to plead each element of their claim for securities fraud with particularity. "In all averments of fraud or mistake," Rule 9(b) instructs, "the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). And the PSLRA imposes *additional*—and even more stringent—pleading requirements. It requires not simply that the complaint state facts (as opposed to legal conclusions) "with particularity" with respect "to each act or omission alleged," but also that the particular facts "giv[e] rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "In other words, not only must the complaint make particular factual allegations, but the inference of scienter which those allegations generate must be strong." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 682 (6th Cir. 2004).

The PSLRA therefore significantly differs from traditional pleading standards. The particular facts pleaded in the complaint must give rise to a strong inference. This means that if the complaint admits two or more reasonable inferences—fraud and no fraud—the court can, and should, infer that no fraud occurred.[8] Plaintiffs' complaint does not satisfy these pleading requirements.

---

[8] *See Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (holding that PSLRA requires "**all** reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs" (emphasis in original)); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (holding that the "strong inference" requirement means that "plaintiffs are entitled only to the most plausible of competing inferences"); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001) (holding that under the PSLRA, "inferences of scienter survive a motion to dismiss only if they are both reasonable and strong inferences" (internal quotation marks and citation omitted)); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 224 (3d Cir. 2002).

A.     **To The Extent The Complaint Alleges That KPMG Merely "Reviewed And Approved" Statements Made By Fannie Mae, The Complaint Must Be Dismissed.**

According to the complaint, KPMG is the author of only *four* of the allegedly misleading statements it recites at great length in the complaint. Those four statements are the professional opinions it rendered on Fannie Mae's financial statements from 2000-2003.

As the complaint itself recognizes, all the other statements are attributable to Fannie Mae and its executives.[9]  KPMG's only alleged association with those statements is Plaintiffs' boilerplate allegation, repeated throughout the complaint, that KPMG "reviewed and approved" certain financial data that Fannie Mae executives incorporated into these statements.[10]  Those paragraphs do not allege that KPMG ratified, adopted, or otherwise endorsed these financial figures—only that KPMG "reviewed and approved" them.

Plaintiffs' "reviewed and approved" allegations do not state claims against KPMG for securities fraud.  In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver N.A.*, 511 U.S. 164, 191 (1994), the Court held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)."  As several courts have recognized, *Central Bank* means that an auditor is liable for securities fraud only for misstatements attributable to it, *not* for misstatements attributable to others.[11]  To hold otherwise would subject accounting firms to

---

[9]  Second Am. Compl. ¶¶ 465, 491-92, 504-05 (speeches by Fannie Mae's executives); 467, 494-95, 526-27, 531, 533, 535, 537, 540, 544-45, 547, 549, 551, 553, 557, 559, 563, 567, 590-91, 592, 597, 599, 604-05, 607, 611, 613, 619-20, 623, 627, 629, 632, 635-36, 637, 640-41, 643, 647, 649, 652-53, 655, 659 (financial statements and other representations contained in annual reports and SEC filings); 470, 476, 497, 529-30 (statements directed to shareholders); 472-73, 475, 480-82, 484-85, 487-89, 499-500, 502, 507-09, 514-15, 517-19, 521, 554, 568-69, 600-01, 614, 638, 650 (press releases issued by Fannie Mae); 511-12, 522-24, 565, 571-72, 574, 576-80, 582-83, 586, 588, 616-18 (news conferences, and both conference calls and interviews with securities analysts and reporters).

[10]  Second Am. Compl. ¶¶ 472, 480, 484, 487, 499, 507, 514, 518, 554, 557, 568, 591, 600, 605, 614, 638, 641, 650, 653.

[11]  *See*, *e.g.*, *Fidel v. Farley*, 392 F.3d 220, 235 (6th Cir. 2004) (holding that auditor cannot be liable for "either its alleged implicit endorsement of . . . financial figures or for its failure to insist on a correction to these figures"

liability on the theory that they "facilitated" or "aided" a fraud. Indeed, even before *Central Bank*, it was the law in this Circuit that an accountant who "is not alleged to have prepared or certified any part of the audit report that was distributed to the investors" is not liable under Section 10(b) and Rule 10b-5. *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 35 (D.C. Cir. 1987). Thus, Plaintiffs' allegations that KPMG "reviewed and approved" various statements by the other defendants are simply irrelevant to KPMG's liability for securities fraud and the complaint should be dismissed as to all of those allegations.

### B. The Complaint Does Not Allege Facts With Particularity That Give Rise To A Strong Inference That KPMG Acted With Scienter.

The complaint's allegations regarding the statements directly attributable to KPMG are also legally insufficient, because Plaintiffs have failed to "state with particularity facts giving rise to a strong inference that" KPMG "acted with the required state of mind." Section 10(b) makes actionable only false statements that are "knowing or intentional." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197 (1976). That standard "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially [inflating] the price of securities." *Id.* at 199. In the D.C. Circuit, this standard is demanding. It means "**extreme** recklessness" indicating an "**extreme** departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992) (emphases added).

---

because to do so "would effectively revive aider and abettor liability in contravention of the Supreme Court's holding in" *Central Bank*); *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175-76 (2d Cir. 1998) (holding that auditor was not liable for allegedly misleading financial statements where plaintiff alleged that accountant "reviewed and approved" statements because the complaint failed to allege that the auditor "communicated misrepresentations to investors"); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996) ("in order for accountants to 'use or employ' a 'deception' actionable under the antifraud law, they must **themselves** make a false or misleading statement (or omission) that they know or should know will reach potential investors" (emphasis added)).

As high as that burden is, it is even higher where, as here, the defendant is an independent auditor alleged to have issued misleading audit opinions in violation of the federal securities laws. To begin with, "[r]ecklessness on the part of an independent auditor entails a mental state **so culpable that it 'approximates an actual intent to aid in the fraud being perpetrated by the audited company**.'" *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004) (quoting *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982)) (emphasis added); *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (same). "When the standard of recklessness for an auditor is overlaid with the pleading requirements of the PSLRA, a simple rule emerges: to allege that an independent accountant or auditor acted with scienter, the complaint must allege specific facts showing that the deficiencies in the audit were so severe that they strongly suggest that the auditor must have been aware of the corporation's fraud." *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 505, 514 (S.D. Ohio 2000); *see DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388-89 (9th Cir. 2002) (plaintiffs "must 'plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct'").

This standard is even more exacting where the auditor's statement is an opinion, rather than a historical fact. All of the "misrepresentations" the complaint attributes to KPMG fall squarely within the realm of opinion. The complaint alleges that KPMG issued four misleading audit opinions stating that, in its view, Fannie Mae's annual financial statements from the years 2000 through 2003 were stated "fairly" and were compliant with GAAP in all "material" respects. *See* Second Am. Compl. ¶¶ 469, 496, 528, 621. "[I]n issuing an opinion," however, "the auditor certifies only that it exercised appropriate, not flawless, levels of professional care and judgment." *In re Ikon Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 673 (3d Cir. 2002);

*see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995) (noting that "GAAP is not [a] lucid or encyclopedic set of pre-existing rules"); *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979) (noting that GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management"). The statements do not guarantee the accuracy of Fannie Mae's financial data.

But a "statement of opinion is not the same as a statement of historical fact. Instead, it is an expression of belief, made by an actor at a particular time, under particular conditions, and based on known information." *D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 740 (E.D. Mich. 2003), *aff'd* 133 F. App'x 994 (6th Cir. 2005). Opinions by auditors "generally involve issues such as the auditor's dependence on information supplied by the client, application of complex accounting and auditing standards, and varying degrees of professional judgment." *Id.* The burden is therefore much higher for plaintiffs to plead scienter in this context.

Plaintiffs' complaint alleges no particular facts, either taken individually or collectively, that warrant the inference that KPMG knowingly conspired with Fannie Mae to make any of the four KPMG audit opinions intentionally false or misleading. Indeed, far from demonstrating that KPMG participated in the fraud, the allegations of Plaintiffs' complaint demonstrate that KPMG vigorously attempted to prevent it.

      **1.**      **Plaintiffs' Allegations Demonstrate That KPMG Attempted To Prevent Fraud At Fannie Mae And Hence Refute The Notion That KPMG Conspired To Commit It.**

Far from showing that KPMG intentionally participated in fraud at Fannie Mae, Plaintiffs' complaint demonstrates that KPMG actively policed Fannie Mae's accounting, and that Fannie Mae deliberately concealed information from KPMG that would have enabled KPMG to uncover fraud. These allegations doom Plaintiffs' complaint, for it is well established

that a plaintiff can plead himself out of court by alleging facts showing that he is *not* entitled to relief.  *See, e.g.*, *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000).

Plaintiffs have done so here, because Plaintiffs' own allegations demonstrate that KPMG attempted to prevent fraud at Fannie Mae.  Most notably, KPMG prodded Fannie Mae to improve its FAS 91 accounting—one of the central accounting standards at issue here.  Fannie Mae, in particular, developed its formal FAS 91 policy only "in response to a direct request from KPMG to develop such a Policy."  Second Am. Compl. ¶ 153; *see also* Second Am. Compl. ¶ 142 (noting that KPMG "asked [Fannie Mae] to develop a formal [FAS 91] policy").  Once adopted, KPMG allowed Fannie Mae to limit the amount of catch-up it could defer from any given reporting period only to the extent the amounts were immaterial.  Second Am. Compl. ¶ 141.  KPMG later pointed out to the audit committee deficiencies in the Company's FAS 91 systems.  Second Am. Compl. ¶ 816.

KPMG policed Fannie Mae's accounting in other ways as well.  KPMG, for example, prevented Fannie Mae from expanding the categories of derivatives that would qualify for hedge accounting, contrary to Fannie Mae's wishes.  Second Am. Compl. ¶ 203.  KPMG also objected to Fannie Mae's decision to defer $199 million in expense in 1998, and excused the error only because it believed the amount was not material to the financial statements taken as a whole.  Second Am. Compl. ¶¶ 92, 747-48.  Indeed, it affirmatively recommended that Fannie Mae recognize this expense and even informed the chairman of the audit committee that management had refused to follow KPMG's guidance.  Second Am. Compl. ¶ 806.  Finally, KPMG urged Fannie Mae to eliminate a miscellaneous account of $3.9 million in aged credit items that Fannie Mae instead allegedly employed to smooth its earnings.  Second Am. Compl. ¶ 95.  These efforts

on KPMG's part to prevent misstatement of the financial statements are wholly inconsistent with the notion that it deliberately participated in any accounting fraud at Fannie Mae.

The complaint indicates, in addition, that Fannie Mae hid from KPMG vital information needed to uncover accounting fraud. Fannie Mae concealed from KPMG that it was using synthetic mortgage-backed securities to manage earnings. Second Am. Compl. ¶¶ 310, 312. Fannie Mae, indeed, "made every effort" to keep that fact from KPMG, Second Am. Compl. ¶ 310. Faced with a client that refused to tell KPMG the whole story, it is not surprising that, as Plaintiffs allege, KPMG "fail[ed] to discover" the fraud. Second Am. Comp. ¶ 761. All of this, once again, is impossible to square with the idea that KPMG was complicit in any fraud.

### 2. Plaintiffs' Allegations That KPMG Violated GAAS And GAAP Are Insufficient To Establish Scienter.

The bulk of Plaintiffs' scienter allegations can be set aside without extended discussion under the settled rule that allegations of violations of GAAP and GAAS do not in and of themselves establish at the pleading stage that an outside auditor engaged in extremely reckless or intentional misconduct. *See*, *e.g.*, *Fidel*, 392 F.3d at 230 ("the failure to follow generally accepted accounting procedures does not in and of itself lead to an inference of scienter"); *PR Diamonds*, 364 F.3d at 694 ("[i]t is well-settled that violations of GAAP and GAAS, standing alone, do not create an inference of scienter, much less a strong one"); *Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395 F.3d 851, 855 (8th Cir. 2005) (citing cases).

And that is the core of Plaintiffs' claims. Plaintiffs' allegations consist almost entirely of the claim that Fannie Mae departed from GAAP, and that KPMG misapplied GAAS by failing to discover accounting fraud at Fannie Mae. The complaint is replete with long quotations pulled from auditing standards promulgated by the American Institute of Certified Public Accountants, followed by assertions that Fannie Mae's financial statements were false and misleading, topped

off with a conclusory assertion that KPMG "must have" violated GAAS because of its failure to detect these mistakes. Second Am. Compl. ¶¶ 754-57, 763-64, 771, 773-80, 783-84, 786-87, 789-91, 794. To give a representative example, in paragraph 774, Plaintiffs allege that Fannie Mae's financial statements contained "misstatements," that KPMG issued unqualified audit opinions on Fannie Mae's annual financial statements and, "[a]ccordingly," that KPMG "violated the reporting standards of GAAS."[12]

This is a far cry from pleading particular facts showing that KPMG issued false audit opinions intentionally or with extreme recklessness in order to help Fannie Mae and certain officers achieve bonus targets and smooth earnings growth. On the contrary, these allegations, by their plain terms, demonstrate that KPMG *did not know of fraud at Fannie Mae*, and hence directly refute Plaintiffs' claim that KPMG was somehow complicit in a plot to defraud investors.[13] Plaintiffs' claim is therefore *not* that KPMG knew of fraud at Fannie Mae, but instead that it misapplied auditing standards—which explains why Plaintiffs frame most of their allegations in terms of how KPMG "should have" scrutinized Fannie Mae's accounting practices.[14] But allegations about what KPMG "should have" done are classic claims of

---

[12] *See also* Second Am. Compl. ¶¶ 763 (arguing, without specific factual support, that "[h]ad KPMG complied with . . . GAAS standards in a non-reckless fashion, it" would have discovered Fannie Mae's accounting errors); 780 (arguing that KPMG violated GAAS by not issuing a qualified audit opinion given the misstatements in Fannie Mae's annual financial statements).

[13] *See* Second Am. Compl. ¶¶ 761 (noting that KPMG "fail[ed] to discover the fraud"); 751 (arguing that if KPMG had applied auditing standards properly, it "would have discovered" fraud); 772 (alleging that various facts "should have tipped [KPMG] off to the fraud").

[14] *See* Second Am. Compl. ¶¶ 753 ("KPMG **should have** been scrutinizing Fannie Mae's accounting for derivatives particularly closely" (emphasis added)); 755 (quoting standards that auditors "**should** follow" (emphasis added)); 756 (alleging that GAAS "**should have** guided KPMG in planning adequate audit procedures . . ." (emphasis added)); 764 (internal control deficiencies "**should have** been readily obvious to KPMG" (emphasis added)); 771 (so-called "'red flags' . . . **should have** caused KPMG to amend and extend its audit procedures" (emphasis added)); 772 ("KPMG ignored the following facts . . . which **should have** tipped it off to the fraud" (emphasis added)); 773 (GAAS "**should have** provided a roadmap for KPMG to uncover the accounting fraud" (emphasis added)); 780 ("KPMG, as Fannie Mae's longstanding auditor and accountant, **should have** uncovered the Company's significant departures from GAAP" (emphasis added)).

negligence.  Claims that KPMG did not exercise the appropriate duty of care; that its audits were

fundamentally flawed; and that its practices did not reflect the exercise of ordinary diligence are

claims of negligence not cognizable under Section 10(b).  *See, e.g.*, *Ernst & Ernst*, 425 U.S. at

215; *DSAM*, 288 F.3d at 390 ("mere allegations that an accountant negligently failed to closely

review files or follow GAAP cannot raise a strong inference of scienter").  Even a "seriously

botched audit," *DSAM*, 288 F.3d at 387—one that plainly does not comply with GAAP or

GAAS—is not actionable under Section 10(b) as a matter of law.  *See, e.g.*, *Fidel*, 392 F.3d at

230; *PR Diamonds*, 364 F.3d at 694; *Ferris, Baker Watts*, 395 F.3d at 855.  Yet that is the core of

what Plaintiffs allege here.

    Plaintiffs also point to several specific instances in which they say that KPMG was aware

that Fannie Mae was violating GAAP.[15]  But these more specific allegations are another way of

saying that KPMG "should have" applied these complex and contested accounting standards

differently.  There are no allegations that KPMG believed the accounting judgments were

unreasonable, much less these accounting judgment were made to defraud investors or help

management reach certain earnings targets.  They add nothing to the more general statements of

accounting violations alleged elsewhere in the complaint.

    For example, Plaintiffs bestow seismic significance on KPMG's unexplained, nonspecific

statement that Fannie Mae's loan-allowance practices were "not preferable," Second Am.

Compl. ¶ 245—without so much as acknowledging the enormously complex variables that factor

into accounting for a loan allowance (such as the difficulty of calculating the probability of

---

[15] Second Am. Compl. ¶¶ 193, 195-96 (KPMG agreed to the seven-day "mismatch" policy under FAS 133); 233 (KPMG was aware that Fannie Mae was misclassifying securities under FAS 115); 245 (KPMG partner thought that Fannie Mae's loan-allowance practices were "not preferable"); 299 (KPMG knew that Fannie Mae was using a discounted cash-flow model to measure whether certain of its assets had decreased in value permanently); 330 (KPMG allowed Fannie Mae to recognize cumulative deferred expense associated with the "Security Master" project); 762 (detailing various accounting violations KPMG allegedly knew about).

default).  The fact that KPMG thought that Fannie Mae's method of accounting for the allowance was "not preferable" says nothing about whether KPMG believed that using the method to calculate the allowance resulted in a material misstatement to Fannie Mae's financial statements in spite of the unqualified audit opinions it issued.  All of this is to say that even Plaintiffs' purportedly specific allegations of accounting errors boil down to a good-faith disagreement in the application of complicated accounting standards—not fraud.

<strong>3.    Allegations That The Effect On The Financial Statements Of Fannie Mae's Fraud Was Large Do Not Establish That KPMG Acted With Scienter.</strong>

Plaintiffs also allege that the size of the restatement is so large as to establish that KPMG issued an audit opinion believing it was false.  Second Am. Compl. ¶¶ 762-63.  But "[a]llowing an inference of scienter based on the magnitude of fraud 'would eviscerate the principle that accounting errors alone cannot justify a finding of scienter.'"  *Fidel*, 392 F.3d at 231 (quoting *In re SCB Computer Tech., Inc. Securities Litigation*, 149 F. Supp. 2d 334, 359 (W.D. Tenn. 2001)).  Moreover, "[i]t would also allow the court to engage in speculation and hindsight, both of which are contrary to the PSLRA's mandates."  *Id.*  In particular,

> [i]nferring scienter from the magnitude of fraud invites a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show the accountant acted with scienter . . . and obscure[s] the potentially infinite number of innocuous reasons an accountant may fail to detect a fraud of large magnitude.  For example, the magnitude of the fraud could flow from improprieties in transactions that fell outside the scope of the audit, or from manipulations the company concealed from its accountant and the public.

*Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000).  The PSLRA does not permit this:  it requires securities fraud plaintiffs to plead particular *facts* demonstrating KPMG's awareness of the fraud, not simply the fraud itself.

27

**4.** **Allegations That KPMG Received Audit Fees For Professional Services From Fannie Mae Do Not Establish That KPMG Acted With Scienter.**

Nor can Plaintiffs sufficiently allege scienter from KPMG's purported "motive and opportunity" to commit fraud. Second Am. Compl. ¶¶ 766-68, 797. Notably, KPMG entirely lacks the principal "motive" the complaint attributes to "[t]he Defendants'": "(1) to achieve earnings targets which triggered the Officer Defendants' entitlement to lucrative bonuses, and (2) to mask volatile earnings in order to reassure the market of Fannie Mae's soundness." Second Am. Compl. ¶ 76. KPMG's "motive" for perpetrating this purported fraud, the complaint alleges, was quite different and far more modest: to earn fees from Fannie Mae from 2000-2003 for professional services rendered.

Plaintiffs' theory is incorrect as a matter of law. It simply belies common sense that a large, respected accounting firm such as KPMG would invite massive legal liability and risk its reputation for $25.3 million in audit fees over a period time in which the firm earned *billions* of dollars in revenue annually. Plaintiffs in securities fraud cases are not permitted to have the court draw illogical and fundamentally irrational "inferences." As Judge Easterbrook has explained, "[a]n accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' audits"—no less than the four years of audits at issue here—"could not approach the losses [KPMG] would suffer from a perception that it would muffle a client's fraud," *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990), let alone from the resulting legal liability. *See also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 n.7 (9th Cir. 1994) ("[i]t is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees" (citation and internal quotation marks omitted)).

Judge Preska similarly concluded that it is irrational to "infer" that an accounting firm

would commit fraud to procure fees:

> I am not prepared to assume . . . that a Big Six (or, indeed, other) accounting firm like
> Coopers & Lybrand would knowingly condone a client's fraud in order to preserve a fee
> that, at best, is an infinitesimal percentage of its annual revenues and, by doing so,
> jeopardize its reputation and license, as well as subject itself to potential damages literally
> tens of thousands of times as large as its fee and subject the partner involved to potential
> professional and financial extinction. Such action by certified public accountants would
> be economically irrational. As such, it makes no sense . . . and no court should leap to
> this conclusion absent facts from which one could infer such manifestly economically
> irrational behavior by these professionals.

*Duncan v. Pencer*, No. 94 Civ. 0321, 1996 WL 19043, at *10 (S.D.N.Y. Jan. 18, 1996) (citation

omitted). That principle is conclusive here. Nothing in the complaint explains why KPMG

would deliberately engage in securities fraud simply to procure an audit fee from Fannie Mae.

*See*, *e.g.*, *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d at 224.

Even an allegation that KPMG's fees from Fannie Mae were a "large percentage" of its

total revenue would have been insufficient to plead KPMG's scienter—and Plaintiffs have not

even made such an allegation. *See In re Cardinal Health*, 426 F. Supp. 2d at 766 (declining to

infer an auditor's scienter from allegation that auditor "received a large percentage of its total

fees for its non-audit work" from the client accused of accounting fraud). Otherwise, any auditor

who did not work for free would face liability for securities fraud for audit failures. If these facts

established that an auditor knowingly engaged in fraud, the PSLRA would be a dead letter. That

is why courts have recognized that "absent truly extraordinary circumstances, an auditor's

motivation to continue a profitable business relationship"—and Plaintiffs do not even trouble to

allege that KPMG's relationship with Fannie Mae was "profitable"—"is not sufficient by itself

to support a strong inference of scienter." *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187,

215 (1st Cir. 2005).  Plaintiffs' allegations create *no* inference—let alone a "strong inference"—that KPMG knew of any misconduct on Fannie Mae's part.

### 5.    Allegations That KPMG Had Access To Fannie Mae's Records Do Not Demonstrate That KPMG Acted With Scienter.

Also insufficient is Plaintiffs' allegation that KPMG had the "opportunity" to commit fraud because it had access to Fannie Mae's internal financial and corporate business information.[16]  Allegations that an auditor "had access to . . . documents that revealed" accounting fraud do "not strongly compel an inference of intentional or deliberately reckless conduct." *DSAM*, 288 F.3d at 390.  Nowhere do Plaintiffs allege what KPMG "might have learned from its access to the company's confidential information, what [it] might have known based on its consulting engagement, or even what documents [it] reviewed as part of its 'unfettered access.'"  *Fidel*, 392 F.3d at 229-30.  Indeed, as Judge Bates observed, "were [P]laintiffs' theory correct, all GAAP violations of a certain magnitude would give rise to a cause of action under Section 10(b) and Rule 10b-5 against an issuer's brokers and accountants."  *In re Interbank Funding Corp. Sec. Litig.*, 329 F. Supp. 2d 84, 90 (D.D.C. 2004), *vacated and remanded in part on other grounds sub. nom.*, *Belizan v. Hershon*, 434 F.3d 579 (D.C. Cir. 2006).

Every auditor has access to a company's internal books and records and charges fees.  To hold that these generic allegations of "motive and opportunity" give rise to the strong inference that an auditor engaged in extremely reckless conduct would eviscerate the PSLRA's requirement to plead particular facts demonstrating fraud.  As Judge Bates noted, "that is not the law."  *In re Interbank Funding Corp. Sec. Litig.*, 329 F. Supp. 2d at 90.

---

[16]  Second Am. Compl. ¶ 768; *see also* Second Am. Compl. ¶¶ 233 (noting that KPMG "had access to Fannie Mae's SFAS 115 policy"); 262 (KPMG "had ready access to the Company's dollar-roll accounting policy"); 319 (KPMG "had access to the Company's policy for the amortization of callable debt expense").

6.     **Allegations That KPMG Knew Of What Plaintiffs Characterize As "Red Flags" Do Not Establish That KPMG Acted With Scienter.**

Plaintiffs also allege that KPMG acted with scienter because it overlooked a laundry-list of what they label to be "red flags."  "However, the mere fact that an auditor missed what a plaintiff labels warning signs gives little support on its own to the conclusion that an auditor was reckless, much less wilfully blind, with respect to the falsity of information in a financial statement."  *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d at 214.  Here, as in *In re Stone and Webster*, "the so-called 'red flags' [are] so described without particularized allegations supporting the recklessness of [KPMG] in missing them when conducting its audits."  *Id.*

Plaintiffs' list of 50 "red flags" is impressive at first glance, but does not withstand cursory analysis.  At least 26 are repetitions of Fannie Mae's accounting errors.[17]  These, of course, add nothing to the analysis:  the very accounting errors that KPMG is alleged to have missed cannot be "red flags" for those same accounting errors; instead "[r]ed flags are 'specific, highly suspicious facts and circumstances available to the auditor at the time of the audit.'"  *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 718 (N.D. Ill. 2005) (quoting *Riggs Partners LLC v. Hub Group, Inc.*, No. 02 C 1188, 2002 WL 31415721, at *9 (N.D. Ill. Oct. 25, 2002)).

The balance of the "red flags" are general, in-and-of-themselves innocent features of Fannie Mae's accounting and management structure.[18]  For example, Plaintiffs allege that

---

[17]  *See* Second Am. Compl. ¶ 772 (labeling as "Red Flags" the "facts" that Fannie Mae violated FAS 5, 91, 114, 115, 133, 140, failed to consolidate financial results properly, recognized income improperly, improperly accounted for investments in low-income housing tax credits, failed to account properly for interest-only mortgage-backed securities, improperly accounted for callable debt expense, improperly accounted for realignments, improperly created REMICs, misapplied GAAP to minimize earnings fluctuations, mistakenly estimated amortization rates for premiums, discounts, and deferred charges on loans, did not properly model its allowance for loans, did not document hedging activities properly, made unsupported adjustments to its financial statements, improperly analyzed "debt buybacks," did not maintain documents supporting that its dollar-roll repurchase agreements were "substantially similar," lacked documentation to support its loan-loss allowance, and mistakenly capitalized adjustment differences over 30 years).

[18]  Second Am. Compl. ¶ 772 (labeling as "Red Flags" the fact that Fannie Mae did not have systems capable of doing long-haul accounting, that Roger Barnes alleged that Fannie Mae misapplied accounting principles, that

KPMG knew that the compensation of Fannie Mae's executives was tied to meeting earnings targets. Second Am. Compl. ¶¶ 759-61, 772. Like the others, however, that allegation is entirely generic. Many companies have incentive-compensation structure tied to financial performance, such as stock options—and with good reason, since such packages align management's interests with those of shareholders'. But that general fact says nothing about whether KPMG knew or believed that any of Fannie Mae's *specific* accounting judgments were motivated by a desire to meet earnings targets necessary to trigger performance bonuses. Taking generic, nonspecific facts—which in themselves are legally insufficient to establish scienter—and putting them into a chart captioned "Red Flags" does not magically transmute the complaint into a legally sufficient pleading. The complaint never says that KPMG *knew* of any particularized *facts* specifically alerting it to material accounting errors.

Similar pleading infirmities led the First Circuit to uphold the dismissal of a securities fraud complaint containing comparable allegations of GAAS violations. *See In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187 (1st Cir. 2005). In that case, the plaintiffs alleged that an outside auditor had violated GAAS by ignoring various "red flags" indicating that the financial statements it was auditing were false and misleading. Though the complaint asserted that the auditor "missed various 'red flag' warning signs," the court held that the complaint nonetheless "lack[ed] concreteness as to how the conduct of the audit **related** to the missed warning signs." *Id.* at 214 (emphasis added); *see also In re Interbank Funding*, 329 F. Supp. 2d at 92 (dismissing

---

Fannie Mae reported stable and growing financial results year after year, that Fannie Mae's loan allowance remained constant, that management was interested in meeting financial goals, that Fannie Mae purchased a finite insurance policy and considered purchasing others, that Fannie Mae vested an "inordinate" amount of responsibility in its CFO, Chief Risk Officer, and Vice Chairman of the Board, that the "culture" in the Controller's Office was to meet financial targets, that a director was responsible for modeling, reporting, and accounting for purchase premiums, that the CFO and Chief Risk Officer were the same, that the compensation levels of Fannie Mae's audit department was set by the CFO, that the audit department was headed by the former Controller, that one of Fannie's auditors reported to the CFO on a "dotted line" basis, that the Company set ambitious earnings goals and met them, and that executive bonuses were tied to meeting earnings goals).

securities fraud complaint for failure to comply with this requirement because "plaintiffs' factual allegations as a whole are plagued with imprecision"). That is the case here: as in *In re Stone & Webster*, the complaint nowhere says how these general facts specifically should have alerted KPMG to Fannie Mae's fraud.

The only facts that even arguably address this point do nothing to support an inference that KPMG intentionally participated in Fannie Mae's fraud. Plaintiffs first point to KPMG's objection to a $199 million deferral of the amortization catch-up that they say should have been recognized in 1998. They note that KPMG audited Fannie Mae's FAS 91 accounting at the end of 1998, and that KPMG recommended that Fannie Mae record $439 million of expense in that year. Second Am. Compl. ¶¶ 90-92. They also note that KPMG consulted with Fannie Mae, objected to Fannie Mae's decision to amortize $199 million of expense, noted an audit difference of $199 million, and reported the difference to the audit committee chair. Second Am. Compl. ¶¶ 747-48, 819. An "audit difference," however, is merely a difference between the issuer's numbers and the auditor's conclusions, *see In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 676 (3d Cir. 2002), and is not inherently nefarious. If KPMG intended to defraud Fannie Mae's investors, it certainly would not have bothered to list an audit difference, and it surely would not have reported the audit difference to the audit committee chairman. This Court, once again, is not required to draw illogical and irrational inferences in Plaintiffs' favor. *See* cases cited *supra* p. 18 n.8.

In any event, Plaintiffs' own complaint explains why KPMG listed an "audit difference": KPMG thought the amount to be *immaterial* in the context of Fannie Mae's financial statements as a whole. Second Am. Compl. ¶ 748. As GAAS recognizes, "when an auditor concludes that a company's financial statements are not materially misstated, the auditor has no duty to add any

33

disclosures to the audit opinion even if the company does not make recommended changes to its financial statements." *Id.* (citing AU § 312). Hence an auditor's "refusal to record the proposed adjustments [is] within the bounds of its discretion." *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 365-66 (W.D. Tenn. 2001). Here again, Plaintiffs' allegations evince their disagreement with KPMG over accounting principles. But they do not state the case for fraud.

Moreover, the audit difference says nothing about whether KPMG knew of accounting difficulties in any of the four audit opinions alleged to have been misleading, none of which concerned fiscal year 1998. *See Fidel*, 392 F.3d at 229 (rejecting relevance to an auditor's scienter of "red flags [that] occurred in 1996, two years before the audit in question in this case"); *In re Ikon Office Solutions Inc.*, 277 F.3d at 670 (rejecting as irrelevant evidence of an auditor's misconduct outside the time period the allegedly fraudulent audit opinion concerned). Plaintiffs do not use KPMG's audit opinions from 1998 as an independent basis for alleging securities fraud—wisely, as any such claim would be time-barred. *See* 28 U.S.C. § 1658(b) (requiring securities fraud plaintiffs to bring their claims no later than five years after the violation). The complaint is silent about whether anything similar occurred during the fiscal years in question in this case—even though the PSLRA requires scienter to be alleged "with respect **to each act or omission alleged to violate this chapter**." 15 U.S.C. § 78u-4(b)(2) (emphasis added). That language precludes Plaintiffs from using prior knowledge of accounting difficulties that occurred years before the audit opinions at issue in this litigation were released.

Plaintiffs also allege that KPMG knew of Fannie Mae's accounting irregularities because KPMG accountants were present at a meeting at which a lone Fannie Mae employee claimed that the company was not following GAAP and then performed only a "perfunctory investigation." Second Am. Compl. ¶¶ 414, 417. That allegation says absolutely nothing about whether KPMG

had a reasonable basis for the audit opinions it issued for the years 2000-2002, all of which predated KPMG's knowledge of Roger Barnes' allegations. *See* Second Am. Compl. ¶ 414.

And even as to the only audit opinion to which it could conceivably be relevant—the audit report issued on Fannie Mae's 2003 financial statement—the complaint sheds no light on how Roger Barnes' particular allegations affected the accuracy of that opinion, much less whether Barnes' allegations of accounting mistakes concerned *material* misstatements in Fannie Mae's accounting, much, much less whether any such errors were corrected prior to KPMG's issuance of its unqualified audit opinion in connection with Fannie Mae's 2003 10-K filing.

In any event, Plaintiffs' allegations fail on their own terms. Plaintiffs' complaint tells us that Barnes' allegations were "shrugged . . . off," Second Am. Compl. ¶ 421, or not taken "seriously," Second Am. Compl. ¶ 751. The rest of Plaintiffs' complaint suggests otherwise. Days after Barnes made his allegations known to Fannie Mae, the internal audit team launched an investigation. Second Am. Compl. ¶¶ 411-13. Fannie Mae notified KPMG of the allegations. Second Am. Compl. ¶ 414. Fannie Mae then investigated one of the specific accounting allegations Barnes had made, Second Am. Compl. ¶¶ 415, 418, and held a meeting allowing Barnes to air his allegations to a wide range of people, including members of KPMG's audit engagement team, Second Am. Compl. ¶ 417. Barnes' concerns were also communicated to the Audit Committee. Second Am. Compl. ¶ 419.

None of this evinces fraud. KPMG could have, consistent with the unqualified auditor's report it provided on Fannie Mae's 2003 financial statements, reasonably believed that Barnes' allegations were overheated and insubstantial. Remarkably, Plaintiffs' complaint inadvertently confirms this by alleging that KPMG *disagreed* with Barnes' assessment that Fannie Mae was violating GAAP. Second Am. Compl. ¶ 417. That KPMG disagreed would explain why

(according to Plaintiffs' allegations at least) KPMG thought Fannie Mae's investigation was sufficient.  Plaintiffs cannot satisfy their pleading obligation by invoking a theory of scienter that is at war with their own factual allegations.

> **7.    Plaintiffs Have Not Pleaded Facts With Particularity That Collectively Warrant A Strong Inference That KPMG Acted With Extreme Recklessness.**

Even taking Plaintiffs' allegations as a whole, they still fail to give rise to a strong inference that KPMG acted with the required scienter.  Because "Plaintiffs have failed to allege [the auditor's] scienter as to any of these alleged mistakes **individually**, their allegations must also fail when considered in their totality."  *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d at 777 (emphasis in original).  As the Third Circuit has explained, "fraud allegations should be analyzed individually to determine whether each alleged incident of fraud has been pleaded with particularity."  *In re Rockefeller Ctr. Props. Inc. Sec. Litig.*, 311 F.3d 198, 224 (3d Cir. 2002).  Thus, "[i]f, after alleging a number of events purportedly substantiating a claim of fraud, none of those events independently satisfies the pleading requirement of factual particularity, the complaint is subject to dismissal under" the PSLRA.  *Id.*  For the reasons explained above, each of Plaintiffs' numerous individual bids to plead KPMG's scienter fails.  It follows that the allegations as a whole fail to do so as well.

> **C.    Plaintiffs Have Not Adequately Pleaded Loss Causation.**

Plaintiffs also have failed to plead loss causation in a manner that complies with *Dura Pharm.*  The PSLRA provides that in all private actions brought under the Exchange Act, the plaintiff has the burden of "proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  The standard requires that Plaintiffs demonstrate not simply that they purchased Fannie Mae stock in reliance on an actionable misrepresentation, but also that they show how the misrepresentation

"proximately cause the relevant economic loss."  *Dura Pharm.*, 544 U.S. at 342.  Moreover, like

all other elements of a fraud claim, Federal Rule of Civil Procedure 9(b) requires Plaintiffs to

plead loss causation with particularity.  *See In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F.

Supp. 2d 1173, 1188 (N.D. Cal. 2004).

     *Dura Pharm* makes clear that Plaintiffs' burden of pleading this element is no empty

formality.  In *Dura Pharm*, the plaintiffs claimed that they purchased stock at prices "artificially

inflated" by defendant's misrepresentations, and that these allegations satisfied their burden of

pleading that the misrepresentations caused them economic harm.  The Supreme Court

disagreed.  The Court noted that these allegations did not establish loss causation because "at the

moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase

payment . . . **at that instant** possesses equivalent value."  *Dura Pharm.*, 544 U.S. at 342

(emphasis in original).  The Court observed that if "the purchaser sells the shares quickly before

the relevant truth begins to leak out, the misrepresentation will not have led to any loss."  *Id.*

Finally, it noted that, even if the purchaser subsequently resells shares at a loss, "that lower price

may reflect, not the earlier misrepresentation, but changed economic circumstances, changed

investor expectations, new industry-specific or firm-specific facts, conditions, or other events,

which taken separately or together account for some or all of that lower price."  *Id.* at 343.

     *Dura Pharm* demonstrates that Plaintiffs' complaint fails to allege that Plaintiffs'

economic loss was caused by the four audit opinions issued in connection with Fannie Mae's

2000-2003 financial statements.  Like the complaint the Supreme Court held insufficient in *Dura*

*Pharm*, Plaintiffs allege little more than that they purchased shares at "artificially inflated prices"

as a result of the various defendants' misrepresentations.  Second Am. Compl. ¶ 863.  By

Plaintiffs' own admission, they are "investors that collectively purchased over $350 million in

Fannie Mae common stock between January 26, 2001 and September 28, 2005." Second Am. Compl. ¶ 15 (emphasis added). Plaintiffs do say that when this fraud was revealed, Fannie Mae's stock price dropped. Second Am. Compl. ¶ 865. They also say that they "lost over $45 million as a result of their purchases of these securities." Second Am. Compl. ¶ 15. But Plaintiffs never back up that conclusion with *particular* factual allegations demonstrating that causal connection—whether or, if so, when, they *sold* their shares, and hence realized those losses. *See* Second Am. Compl. ¶¶ 20-45 (noting Plaintiffs' various stock purchases, but no sales).[19]

Moreover, Plaintiffs do not attempt to isolate the effect of KPMG's particular audit opinions on the decline in Fannie Mae's stock price. The complaint elides the distinction between KPMG's conduct and the conduct of the rest of the defendants, instead simply alleging that "the Defendants' fraudulent scheme" and the "revelations of accounting fraud at Fannie Mae," *en masse*, caused the decline in Fannie Mae's stock. This is insufficient; Plaintiffs' burden is to show that *KPMG's* audit opinions were an independently substantial factor in causing the loss. *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (noting that the plaintiff must prove that the defendant's act was a "significant, contributing cause"); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 187 (3d Cir. 2000) (requiring the defendant's "alleged misrepresentations [to be] a substantial cause of the inflation in the price of a security and in its subsequent decline in value"). This failure to allege anything that separates the effect of KPMG's purportedly misleading fraudulent statements from the conduct of the rest

---

[19] As Fannie Mae and the individual defendants contend, the loss period should end on September 21, 2004, even under Plaintiffs' own theory of loss. The interim OFHEO report was disclosed on September 22, 2004. Second Am. Compl. ¶ 1. The alleged accounting fraud could have caused no losses for stock purchased on or after that date.

of the defendants fails to satisfy Plaintiffs' burden of pleading with particularity that KPMG's audit opinion specifically caused their loss, if any.

Plaintiffs do, of course, sprinkle their complaint with conclusory allegations that had KPMG not issued unqualified audit opinions on Fannie Mae's financial statements, they would not have invested in Fannie Mae stock.  Second Am. Compl. ¶¶ 781, 795.  Those allegations, however, at most address the distinct element of *transaction* causation, not *loss* causation. Transaction causation concerns whether a defendant's misrepresentation induced the plaintiff to enter into a transaction, not whether the misrepresentation caused the plaintiff's loss.  *See, e.g.*, *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 35 n.5 (D.C. Cir. 1987) (noting that "under § 10(b) a plaintiff must show not only that the fraud caused economic harm, or 'loss causation,' but also that the fraud caused the plaintiff to engage in the transaction in question, which is 'transaction causation'"); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196-97 (2d Cir. 2003).  The two elements are fundamentally distinct, as *Dura Pharm* makes clear by holding that a securities fraud plaintiff must "show not only that had he known the truth he would not have acted, **but also** that he suffered actual economic loss" as a result of the defendant's misrepresentation.  544 U.S. at 343 (emphasis added).  The complaint therefore does not allege with particularity that KPMG's audit opinions caused Plaintiffs any loss whatsoever.

## II.    Plaintiffs' Claim Against KPMG Under Section 18 Of The Exchange Act Is Time-Barred.

Plaintiffs' claim under Section 18 of the Exchange Act is time-barred.  Section 18 of the Exchange Act imposes liability on those who make misleading statements in documents filed with the SEC.  15 U.S.C. § 78r(a).  To state a prima facie case under Section 18, a plaintiff must allege: (1) a false and misleading statement made by the defendant; (2) that is material; (3)

contained in an SEC filing; (4) upon which plaintiffs relied in their purchase of a security.  *See Magna Inv. Corp. v. John Does One through Two Hundred*, 931 F.2d 38, 39 (11th Cir. 1991).

Plaintiffs admit that they knew of KPMG's alleged misrepresentations, at the latest, by September 22, 2004.  Am. Compl. ¶ 870 ("Plaintiffs did not know . . . the falsity of [Fannie Mae's financial] statements . . . before September 22, 2004.").  Yet they did not sue KPMG until January 24, 2006, well over a year from the time they discovered the facts that formed the basis of their claim.  This claim comes too late; the statute of limitations applicable to it required Plaintiffs to bring it no later than one year after they discovered its factual basis.

### A.    Plaintiffs' Section 18 Claim Is Governed By A One-Year Statute Of Limitations.

Section 18(c) of the Exchange Act governs the limitations period applicable to Section 18 claims.  It provides that "[n]o action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action" (emphasis added).  This provision is clear:  it directly governs Section 18 actions and requires Plaintiffs to plead this claim less than one year after the date its basis came to light.

### B.    Sarbanes-Oxley Did Not Alter The Limitations Period Applicable To Plaintiffs' Section 18 Claim.

We anticipate Plaintiffs will contend that the longer two-year statute of limitations created for securities fraud actions by the Sarbanes-Oxley Act of 2002, Pub. L. 107-204, § 804(a) (2002) (codified at 28 U.S.C. § 1658(b)), amended this express limitation provision *sub silentio*.  That argument is at war with the text, structure, and history of the Sarbanes-Oxley Act and the federal securities laws.

In the Sarbanes-Oxley Act of 2002, Congress overruled a Supreme Court case called *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991).  *Lampf* held that that federal securities fraud claims brought under Section 10(b) of the Exchange Act are

governed by the statute of limitations set forth in Section 9(e) of the Exchange Act, which requires claims to be brought within one year from the discovery of the violation. *See id.* at 364 & n.9. The Court did so by "borrowing" that limitations period, since no statute of limitation expressly applies to claims brought under Section 10(b). *See id.* at 355. Congress intended Sarbanes-Oxley to supplant *Lampf* and govern fraud actions brought under Section 10(b). By its plain terms, the longer statute of limitations established by Sarbanes-Oxley governs only claims of "fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws." 28 U.S.C. § 1658(b).

Section 18, however, is *not* an "antifraud" provision. As Justice Kennedy explained in his *Lampf* dissent—which Congress cited approvingly when enacting Section 1658(b)—Section 18 does not "rest on the common-law fraud model underlying most § 10(b) actions," 501 U.S. at 376, for unlike Section 10(b), it does not require the same stringent proof of fraudulent intent for the plaintiff to state a prima facie claim, *see Ross v. A.H. Robins Co.*, 607 F.2d 545, 555-56 (2d Cir. 1979). Section 1658(b), however, is applicable only to actions that require proof of fraudulent intent. *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 444 (S.D.N.Y. 2003) (holding that Section 1658(b) extended the statute of limitations "for private causes of action under the securities laws only for claims that involve fraud"); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 197 (S.D.N.Y. 2003).

Moreover, Section 18, unlike Section 10(b), is governed by an express statutory limitations period, which nothing in Sarbanes-Oxley expressly modified, much less impliedly repealed. Courts therefore have repeatedly and squarely held that the general language of Sarbanes-Oxley does not modify the specific statutes of limitations applicable to non-fraud claims like Section 18. *See In re Hollinger Int'l, Inc. Sec. Litig.*, No. 04-C-0834, 2006 WL

1806382, at *15 (N.D. Ill. June 28, 2006); *In re Alstom SA*, 406 F. Supp. 2d 402, 418-21

(S.D.N.Y. 2005); *WM High Yield Fund v. O'Hanlon*, No. Civ. A. 04-3423, 2005 WL 1017811, at

*11 (E.D. Pa. Apr. 29, 2005).

> **C.    The Putative Class Actions In *In Re Fannie Mae Securities Litigation* Did Not Toll The Statute Of Limitations Applicable To Plaintiffs' Claims.**

Plaintiffs also allege that "the statute of limitations on Plaintiffs' claims have been tolled

since September 23, 2004, due to the filing of a securities class action complaint" because

"Plaintiffs were members of the putative class in that action." Second Am. Compl. ¶ 868.

Contrary to this assertion, however, Plaintiffs do not benefit from class tolling as to their Section

18 claim for two reasons. First, class tolling applies only to individuals who opt-out after a

motion for class certification is decided. No such motion has been decided here. Second, class

tolling cannot be applied to claims against defendants not named in the class action—such as

KPMG—or to claims not raised in the consolidated class action—such as Plaintiffs' Section 18

claim.

The filing of a putative class action ordinarily tolls the limitations period applicable to the

claims asserted by the putative class for the putative class members. *See Crown, Cork & Seal*

*Co. v. Parker*, 462 U.S. 345, 350 (1983); *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554-55

(1974). The Court created that rule to avoid encouraging putative class members to file

premature opt-out suits before the district court decides whether to certify the class, creating a

"needless multiplicity of actions." *Crown, Cork, & Seal*, 462 U.S. at 351.

The *American Pipe* rule and its underlying rationale, however, are wholly inapplicable to

Plaintiffs' opt-out action. "*American Pipe* and *Crown, Cork, and Seal* address only actions

brought by putative class members **after** class certification" was decided. *In re WorldCom, Inc.*

*Sec. Litig.*, 294 F. Supp. 2d 431, 451 (S.D.N.Y. 2003) (emphasis in original). And with good

reason. "The purposes of *American Pipe* tolling," as the Sixth Circuit has explained, "are not furthered when plaintiffs file independent actions before decision on the issue of class certification." *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 569 (6th Cir. 2005). Indeed, "[a]pplying the tolling doctrine to separate actions filed prior to class certification would create the very inefficiency that *American Pipe* sought to prevent." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d at 451.

   For these reasons, the D.C. Circuit has held that *American Pipe* tolling is inapplicable where, as here, opt-out plaintiffs bring their action *before* a decision on class certification. *Wachovia Bank & Trust Co., N.A. v. Nat'l Student Mktg. Corp.*, 650 F.2d 342, 346 n.7 (D.C. Cir. 1980). Although the district court was reversed because it applied the incorrect statute of limitations, the D.C. Circuit endorsed the district court's treatment of the class tolling doctrine. *Id.* ("The district court correctly ruled that appellants fail[ed] to qualify for the *American Pipe* tolling rule."). It is not surprising that other courts have repeatedly endorsed the same reasoning. *See Wyser-Pratt*, 413 F.3d at 569-70; *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d at 451-52; *Rahr v. Grant Thornton LLP*, 142 F. Supp. 2d 793, 800 (N.D. Tex. 2000).

   Moreover, *American Pipe* tolling is only applicable where opt-outs assert the *same claims* against the *same defendants* named in the initial putative class action. The initial class action is supposed to "notif[y] the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *American Pipe*, 414 U.S. at 555. KPMG had no such notice. It was not named as a defendant in the initial class action and the initial class action asserted no Section 18 claims. Application of *American Pipe* tolling to KPMG and the other newly named defendants is

therefore improper.[20]  Plaintiffs cannot name Defendants in these new claims—claims of which

no defendant received notice until after the statute of limitations had run.

### III.    Plaintiffs' Common Law Fraud Claim Must Be Dismissed.

Finally, Plaintiffs' common law fraud claim is preempted under the Securities Litigation

Uniform Standards Act of 1998 and should be dismissed because they have not pleaded fraud

with particularity.  SLUSA broadly preempts state law claims based on securities fraud,

including state law claims brought in federal court.  *In re WorldCom, Inc. Sec. Litig.*, 308 F.

Supp. 2d 236, 246 (S.D.N.Y. 2004).  Among other actions, it preempts state law claims in

> any group of lawsuits filed in or pending in the same court and involving common
> questions of law or fact, in which—
>
> (I) damages are sought on behalf of *more than 50 persons*; and
> (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for **any
> purpose**.

15 U.S.C. § 78bb(f) (emphasis added).  Now that Plaintiffs' objection to this Court's

consolidation order has been denied, the instant case is "consolidated" with the lead class

action—which seeks damages on behalf of more than 50 persons—and hence "proceed[s] as a

single action" with the class action.  Indeed, Plaintiffs have essentially conceded that

consolidation with the lead class action would preempt their state law fraud claim.  *See* Pls.' Obj.

to Consolidation ¶ 9 ("consolidating Plaintiffs' claims in the Class Action may prevent Plaintiffs

from pursuing valuable state law claims, which they are entitled to pursue in an individual action

but which cannot be maintained in a class action").  *See also In re WorldCom*, 308 F. Supp. 2d at

---

[20]  *See Wyser-Pratte*, 413 F.3d at 556-68 (refusing to apply *American Pipe* tolling to newly named defendants);
*Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49, 53-55 (D. Mass. 1995) (holding that *American
Pipe* tolling applies only where the opt-outs assert the same claims against the same defendants as the class
action); s*ee also Burns v. Ersek*, 591 F. Supp. 837, 842 (D. Minn. 1984), *partially abrogated on other grounds
by Agency Holding Corp. v. Malley-Duff & Assocs., Inc*., 483 U.S. 143, 148 (1987) ("a defendant is put on
notice by the initial class action only as to the claims that were raised in that action").

246-47 (finding that consolidated cases were a "group of lawsuits . . . proceeding as a single action for any purpose" under SLUSA).

In any event, Plaintiffs' common law fraud claim fails for the same reason as their securities fraud claim.  To state a common law fraud claim under D.C. law, the plaintiff must prove, by clear and convincing evidence, (1) that the defendant made a false representation, (2) of material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) on which the plaintiff relied.  *Caulfield v. Stark*, 893 A.2d 970, 974 (D.C. 2006).  Fraud, moreover, "must be particularly pleaded."  *Id.*

For the same reasons Plaintiffs have failed to plead scienter and causation with particularity under Section 10(b) and Rule 10b-5, they have also failed to show under D.C. law that KPMG made any misleading statements in its audit opinions "with knowledge of its falsity," "with the intent to deceive" or that caused their losses.  *See supra*, at I.B, C.  Therefore, Plaintiffs have not stated a claim for common law fraud.

## CONCLUSION

For the foregoing reasons, KPMG's motion to dismiss Plaintiffs' amended complaint should be granted.

Respectfully submitted this 9th day of November 2006.

　　/s/ Andrew Tulumello
F. Joseph Warin
Andrew S. Tulumello
Melanie L. Katsur
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for KPMG LLP*

45

## CERTIFICATE OF SERVICE

I hereby certify that I caused electronic copies of the foregoing to be transmitted on

November 9, 2006, to the following counsel registered to receive electronic service:

Joshua S. Devore
Steven J. Toll
Matthew K. Handley
Daniel S. Sommers
Cohen, Milstein, Hausfeld & Toll P.L.L.C
West Tower, Suite 500
1100 New York Ave., N.W.
Washington, D.C. 20005
*Counsel for Plaintiffs Vincent Vinci*; *State Teachers Retirement System of Ohio*; *Anne E. Flynn; Robert L. Garber*

James R. Cummins
Melanie S. Corwin
Waite, Schneider, Bayless & Chesley Co., L.P.A.
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, OH 45202
*Counsel for Plaintiffs Ohio Public Employees Retirement System*; *State Teachers Retirement System of Ohio*

Julie A. Richmond
Kathleen M. Donovan-Maher
Jeffery C. Block
Joseph C. Merchman
Berman Devalerio Pease Tabacco Burt & Pucillo
One Liberty Square
Boston, MA 02190
*Counsel for Plaintiffs Ohio Public Employees Retirement System*; *State Teachers Retirement System of Ohio*

Alan J. Statman
Jeffery P. Harris
Statman, Harris & Eyrich LLC
3700 Carew Tower
441 Vine Street
Cincinnati, OH 45202
*Counsel for Plaintiffs Ohio Public Employees Retirement System*; *State Teachers Retirement System of Ohio*

Frank J. Johnson
Brett M. Weaver
Law Office of Frank J. Johnson
402 W. Broadway 27th Floor
San Diego, CA 92101
*Counsel for Plaintiff Sassan Shahrokhinia*

Robert W. Liles
Martyn Liles, PLLC
1054 31st Street, N.W.
Suite 415
Washington, D.C. 20007
*Counsel for Plaintiff Sassan Shahrokhinia*

Stuart M. Grant
Christine M. MacKintosh
Megan D. McIntyre
Grant & Eisenhofer, P.A.
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
*Counsel for the Franklin Templeton Plaintiffs*

Jeffrey W. Kilduff
Seth A. Aronson
Michael J. Walsh, Jr.
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
*Counsel for Defendant Fannie Mae, Thomas P. Gerrity, Taylor C. Segue, III, William R. Harvey, Joe Pickett, Kenneth M. Duberstein, Manuel Justiz, H. Patrick Swygert, and Leslie Rahl*

Kevin M. Downey
Alex G. Romain
Daniel N. Marx
Joseph M. Terry, Jr.
Michelle D. Schwartz
Matthew L. Fore
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5091
*Counsel for Defendant Franklin D. Raines*

Steven M. Salky
Eric R. Delinsky
Ellen D. Marcus
Holly Ann Pal
Tammy Gershoni
Zuckerman Spaeder LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036-2638
*Counsel for Defendant Timothy J. Howard*

David S. Krakoff
Christopher F. Regan
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006-1101
*Counsel for Defendant Leanne G. Spencer*

David I. Ackerman
Bingham McCutchen, LLP
2020 K Street, N.W.
Washington, D.C. 20006

James Hamilton
Swidler Berlin LLP
3000 K Street, N.W. Suite 300
Washington, D.C. 20007
*Counsel for Defendant Joe Pickett*

Erica Lynne Salmon
Piper, Rudnick, Gray & Carey LLP
1200 19th Street, N.W. Suite 700
Washington, D.C. 20036
*Counsel for Defendants Stephen B. Ashley,*
*Donald B. Marron, and Ann Korologos*

Julie E. Guttman
Baker Botts LLP
The Warner
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
*Counsel for Defendant Jamie S. Gorelick*

James D. Wareham
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, D.C. 20005
*Counsel for Defendant Daniel H. Mudd*

David Smith
Dionna K. Litvin
Jonathan S. Liss
Jonathan Michael Stern
Schnader Harrison Segal & Lewis LLP
1600 Market Street
Philadelphia, PA 19103-7286
*Counsel for Radian Group Inc.*

Richard H. Klapper
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498
*Counsel for Goldman Sachs*

I hereby certify that I caused copies of the foregoing to be transmitted on November 10, 2006, to the following counsel by U.S. mail:

Fred F. Fielding
Barbara Van Gelder
Wiley Rein & Fielding LLP
1776 K Street, N.W.
Washington, D.C. 20006
*Counsel for Defendants Anne M. Mulcahy and*
*Frederic V. Malek*

Robert Romano
Bonnie Altro
Rachelle M. Barstow
Morgan, Lewis & Bockius
101 Park Avenue
New York, NY 10178-0060
*Counsel for Defendant Thomas P. Gerrity*

Shannon Ratliff
Ratliff Law Firm
600 Congress Avenue
Suite 3100
Austin, TX 78701
*Counsel for Manuel Justiz*

Daniel John Healy
John H. Doyle, III
Rhonda D. Orin
Anderson Kill & Olick LLP
2100 M Street, N.W. Suite 650
Washington, D.C. 20037
*Counsel for Defendant Leslie Rahl*

/s/ Justin S. Herring
Justin S. Herring