# EXHIBIT

# B

# Report of the Special Examination of Fannie Mae



## May 2006

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

General Corporation Law, Del. Code Ann. tit. 8, as amended.[5]  Delaware statutory and case law, however, is supplemental to OFHEO's corporate governance and safety and soundness standards that OFHEO has imposed since OFHEO's inception.[6]

Well-settled principles of good corporate governance hold that, to be observant of the best interests of the corporation, an independent director must "'exercise a healthy skepticism,'" and an alertness to possible wrongdoing on the part of corporate insiders."[7]  In fact, a director's independence should be her "most distinguishing characteristic."[8]  That said, in order to be effective, a director must do more than simply monitor management's performance.  Applicable standards require that a director must actively undertake vigorous scrutiny of the corporation's affairs, and must be unfailingly vigilant in requiring that management continuously provide an adequate and frequent flow of information concerning the goals, objectives, operations, and financial condition of the corporation.  For efficiency, a board will delegate its oversight work to various committees.  For example, the audit committee, whose members should be independent and free of management influence,[9] is charged with, among other matters, reviewing the internal and external audit functions.  It does not follow, however, that by delegating certain duties a board is absolved of responsibility to ensure that a committee does its work and reports adequately on that work.  To the contrary, OFHEO's corporate governance regulation[10] specifically provides that "no committee shall operate to relieve the board of directors or any board member of a responsibility imposed by applicable law, rule, or regulation."[11]  In the case of Fannie Mae, the Board of Directors imprudently failed to perform those important duties and responsibilities, in contravention of myriad applicable safety and soundness standards.

This chapter chronicles the oversight lapses of Fannie Mae's Board of Directors and, in particular, its Audit and Compensation Committees.  In short, the Board of Directors failed to be sufficiently informed and to act independently of its Chairman, Franklin Raines, and senior management.  The Board failed to exert the requisite oversight over the Enterprise's operations and to assure that the Enterprise was fully compliant with applicable law and safety and soundness standards.  Among the Board's duties was the responsibility to ensure that Fannie Mae's financial reporting and disclosures were in accordance with generally accepted accounting principles (GAAP).[12]  In the absence of policies and procedures adequate to safeguard the integrity of the accounting and financial reporting systems, Fannie Mae issued reports of condition containing materially false annual and quarterly financial statements, requiring the

---

[5]   Fannie Mae complied with the election requirement in 12 C.F.R. § 1710.10(b) by electing to be subject to Delaware law for corporate governance purposes.

[6]   12 C.F.R. § 1710.10 (b) makes clear that federal law supersedes state law where there is any inconsistency. The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, makes clear that OFHEO is primarily in charge of assuring the safety and soundness of Fannie Mae.

[7]   See Knepper, W. Liability of Corporate Officers and Directors, 1.11, p. 27 (3rd Ed. 1978) (internal citations omitted).

[8]   Id., p. 26.

[9]   The New York Stock Exchange instituted the requirement that all listed public companies have an independent audit committee effective June 30, 1978. Id., p. 29.

[10]   As discussed in Chapter III, the corporate governance and safety and soundness regulations promulgated by OFHEO capture these essential tenets and provide the analytical framework for assessing the Board's conduct.

[11]   12 C.F.R. § 1710.12(a).

[12]   See 12 U.S.C. § 1723a(l), (k)(1) and (2).

restatement of results in prior financial reporting periods in an amount currently estimated at $10.6 billion. On the basis of those falsified financial statements, over a period of several years, the Chairman, the Chief Financial Officer, and various officers realized sizeable bonuses to which they were not entitled.

Senior management attributed Fannie Mae's unerring ability to hit pre-set earnings per share targets, and Wall Street analysts' projections, to its supposedly unique business model. That questionable construct went unchallenged by the Board for years. As discussed below, had the Board inquired into management's practices with appropriate vigor, many of the problems discussed in this report might have been avoided or addressed earlier.

The Board refrained from demanding accountability from the Chairman and other senior executives in numerous ways. Specifically, the Board abandoned its checks-and-balances oversight responsibilities; acquiesced in allowing management unbridled authority over its agenda, materials, and minutes; did not adopt and impose policies requiring that all critical accounting policies and major transactions be vetted before it or its designated committee; and acquiesced in allowing the Chairman to concentrate power in the Chief Financial Officer and then to seat him on the Board, which enhanced the power and influence of executive Board members. In fact, the Board allowed management to determine with little opposition the information it received and missed many opportunities for meaningful oversight.

Among those missed opportunities was the failure on the part of the Board, and the Audit Committee in particular, to challenge the Chairman and senior management at several critical points during 2003 when the Board should have required a thorough, independent investigation into Fannie Mae financial accounting and reporting practices. Those critical points included the January 2003 announcement by Freddie Mac, whose business model closely paralleled that of Fannie Mae's, that it was restating its financial statements due to misapplications of GAAP and initiating an internal investigation; the certification of Fannie Mae's financial statements in connection with the registration of its stock effective on March 31, 2003; the management shakeup at Freddie Mac in June 2003; the initiation by OFHEO of the special examination in July 2003; and the August 2003 allegation by an employee turned whistleblower, that certain accounting functions had significantly compromised the validity of the Enterprise's financial reporting just prior to the certification of its financial results in connection with its quarterly financial report (10Q) for the third quarter of 2003. The Board did not question the fast-tracked settlement of the employee's whistleblower claims after management had represented the allegations to be unsubstantiated. During the entire period under review, the Board repeatedly failed to discharge its responsibilities properly, engaged in conduct contrary to standards of prudent operation, and failed to ensure the safe and sound operation of the Enterprise.

The Board delegated important safety and soundness responsibilities to its committees. Of particular importance are the Audit and Compensation Committees. The members of the Fannie Mae Board of Directors were all knowledgeable and qualified individuals, fully capable of understanding the business and corporate governance issues with which they were charged. The chapter proceeds by documenting the responsibilities delegated to the Audit and Compensation Committees and the specific safety and soundness failures of those committees. The failures of those committees reflect failures of the entire Board of Directors. The following

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

section focuses on failures of the full Board to discharge its oversight responsibilities as enumerated in statute, regulation, regulatory guidance, and industry best practice. The members of the Fannie Mae Board of Directors failed to stay appropriately informed of corporate strategy; review major business decisions; ensure appropriate delegations of authority; ensure that Board committees functioned effectively; provide an appropriate check on Chairman and Chief Executive Officer (CEO) Franklin Raines; and adequately oversee the risk policies, programs for legal and regulatory compliance, hiring and retention of qualified senior executive officers, compensation programs, and integrity of accounting and financial reporting systems, including independent audits and system of internal control.

## Board Structure and Composition

To some extent the OFHEO corporate governance regulation allows the Board to rely, in directing the Enterprise, on reports from committees.[13] However as detailed later in this chapter, that reliance does not relieve Board members of their responsibility to oversee the functioning of those committees or of numerous other duties of the full Board. The Board approves Committee assignments, including the designation of committee chairs on an annual basis.[14] In 1998, the Board had six standing committees: Executive, Assets and Liabilities Policy, Audit, Compensation, Nominating and Corporate Governance, and Technology. In December 2003, the Technology Committee dissolved and its responsibilities shifted to the Audit Committee. Fannie Mae established three new Board committees in 2004: Housing and Community Development, Compliance, and Special Review. In 2005, the Assets and Liabilities Policy Committee dissolved and the Risk Policy and Capital Committee was established as its replacement.

Membership on the Fannie Mae Board of Directors was prestigious and provided members a high degree of visibility. Mr. Raines was recognized as a top CEO and served as the co-chairman of Business Roundtable, a prestigious business group of top executives of nationally renowned companies. The Board was comprised of highly knowledgeable and qualified individuals with extensive experience on corporate boards of directors, fully capable of understanding the business and corporate governance issues with which they were charged. Key current members of the Board who served during the period covered by this report include current Board Chairman Board Stephen Ashley, who is also Chief Executive Officer of the Ashley Group and a former president of the Mortgage Bankers Association. Audit Committee Chair Thomas Gerrity is a former Dean of the Wharton School at the University of Pennsylvania. Compensation Committee Chair Joe Pickett is the former Chief Executive Officer of Homeside International, Inc., and a former president of the Mortgage Bankers Association. Howard University President H. Patrick Swygert chairs the Compliance Committee. Housing and Community Development Committee Chair Kenneth Duberstein served as White House Chief of Staff in the Reagan administration. Former Secretary of Labor Ann McLaughlin Korologos chaired Fannie Mae's Nominating and Corporate Governance Committee from 2001 to 2004, and currently serves as Chairman of the Board of Trustees of the RAND Corporation.

---

[13]   12 C.F.R. § 1710.11.
[14]   Fannie Mae Corporate Governance by-laws: Article 4 at
http://fanniemae.com/governance/bylaws/article4.jhtml?p=Corporate+Governance&s=Bylaws&t=Artlice=4:+The+Board-.

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

Other key members of the Board that served during the relevant period included Anne Mulcahy, Chairman and Chief Executive Officer of Xerox Corporation, and Vincent Mai, Chairman and Chief Executive Officer of the private equity firm AEA Investors, LLC, and a former managing partner at Lehman Brothers. Both chaired the Compensation Committee during their tenure at Fannie Mae. Appendix A provides more detail concerning the composition of the Board.

Between 1998 and 2004, management members of the Fannie Mae Board of Directors included James A. Johnson, who served as Chairman and Chief Executive Officer until December 1998, and who served as Chair of the Executive Committee until December 1999; Lawrence Small, who served as President and Chief Operating Officer until January 2000; Franklin Raines, who served as Chairman and Chief Executive Officer-designate from May 1998 to January 1999, and as Chairman and Chief Executive Officer from January 1999 until December 2004; Jamie Gorelick, who served as Vice Chair from May 1997 to May 2003; Daniel Mudd, who served as President and Chief Operating Officer from February 2000 until December 2004, and as President and Chief Executive Officer from December 2004 to the present; and Timothy Howard, who served as Vice Chairman and Chief Financial Officer from May 2003 to December 2004. Due to his material relationship with Fannie Mae as a consultant for the Enterprise, Board member Kenneth Duberstein is considered a non-independent non-management director.

**Failures of the Committees of the Board**

The Audit and Compensation Committees, two of the standing committees of the Board of Directors, failed to meet regulatory and corporate standards in discharging their responsibilities. Of those two, the one with the most far-reaching significance for safety and soundness, both because of the required independence of its members and the scope of its responsibilities, was the Audit Committee. The failures of the Audit Committee were compounded by failures of the Compensation Committee.

<u>Audit Committee</u>

As the standards governing the roles, responsibilities and conduct of audit committees have evolved over the past two decades,[15] one constant has remained: an audit committee acts under the imprimatur of the board of directors pursuant to the delegations of authority and responsibilities in its enabling charter and applicable law. Importantly, a board of directors, having conferred certain duties upon the audit committee by charter, cannot absolve itself of those responsibilities. It follows that any failure by the Audit Committee of the Board of Directors of Fannie Mae to adhere to the requisite standards constituted a failure of the Board.

---

[15] Historically, the standards governing the roles and responsibilities of audit committees evolved in response to a rash of well-publicized cases of fraudulent financial reporting. For example, in 1987, the National Commission on Fraudulent Financial Reporting (the Treadway Commission) recommended that the boards of directors of all public companies be required by Securities Exchange Commission (SEC) rule to establish audit committees composed solely of independent directors, and outlined key recommendations for audit committees to follow in carrying out their responsibilities. *See* Louis Braiotta, Jr., *The Audit Committee Handbook, Third Edition*, 353-354 (1999).

CHAPTER IX.  THE ROLE OF THE BOARD OF DIRECTORS

Chief among the Board's duties was the responsibility to ensure that Fannie Mae's financial reporting and disclosures were in accordance with GAAP, in accordance with the Charter Act.[16]  Of all the Audit Committee's responsibilities—including, for example, the oversight of internal and external auditing and internal controls—its principal obligation was to ensure the fidelity of Fannie Mae's financial reporting and disclosures.[17]

The Audit Committee failed to protect Fannie Mae's safety and soundness by not discharging its duties responsibly and effectively.  This section reviews those duties and the Committee's failures.

*Applicable Standards*

Audit committees are subject to myriad legal and industry standards, which were published throughout the relevant time period, including the 1987 Treadway Commission Report, and two studies released in 1999 that called for strengthening an audit committee's role: the so-called Blue Ribbon Report[18] and the study commissioned by the Committee of Sponsoring Organizations of the Treadway Commission (COSO Report).[19]

Among other matters, the Blue Ribbon Report and the COSO Report called for new audit committee disclosure rules and enhanced auditor independence requirements.  In response, the stock exchanges promulgated revised rules.[20]  As an exchange-listed company, Fannie Mae is subject to the New York Stock Exchange (NYSE) Listing Standards.  Thus, Fannie Mae was required to comply with the NYSE rule changes that required audit committees to consist of at least three independent directors, each of whom should be able to read and understand fundamental financial statements, and one of whom should have accounting or financial expertise.[21]  The NYSE also outlined requirements of independence and required the adoption of a formal written charter.[22]

---

[16]  *See* 12 U.S.C. § 1723a(l), (k)(1) and (2).

[17]  "Audit committees also help the Board [of Directors] by overseeing the conduct and performance of management with respect to the preparation of the company's financial statements and financial disclosures."  *See* Fenwick & West LLP, "Audit Committee Duties and Best Practices" (March 21, 2002). p. 2.

[18]  In 1999, the role of audit committees was revitalized and strengthened by the "Report and Recommendations of the Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees," February 8, 1999, (Blue Ribbon Report).  The Blue Ribbon Report outlined ten specific regulatory changes regarding audit committees and five guiding principles for audit committees to follow when developing their own policies.

[19]  *See* "The COSO Report, Fraudulent Financial Reporting:  1987-1997, An analysis of U.S. Public Companies, Commissioned by the Committee of Sponsoring Organizations of the Treadway Commission," March 1999.  The COSO Report identified and analyzed instances of alleged fraudulent financial reporting by companies investigated by the commission in the ten-year period following the 1987 Treadway Commission Report and highlighted the need for independent and effective audit committee oversight.

[20]  *See* NYSE, Nasdaq and AMEX, Audit Committee Rule Requirements, September 20, 1999.  Those proposed rule changes were approved by the SEC on December 14, 1999.  Securities Exchange Act Release Nos. 34-41, 980-982, October 6 and 13, 1999.

[21]  *See* NYSE Audit Committee Rule 303.01(B)(2), September 20, 1999.  The rule was approved by the SEC on Dec. 14, 1999.

[22]  *See* NYSE Audit Committee Rule 303.01(B)(1), September 20, 1999.  The rule was approved by the SEC on Dec. 14, 1999.

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

Both the SEC and the NYSE again proposed new standards to further strengthen audit committees[23] in response to the enactment of the Sarbanes-Oxley Act (SOX) in 2002,[24] which effectively federalized the role of the public company audit committee. SOX focused more attention on the need for independent oversight by increasing audit committee responsibilities and authority, and by raising committee membership requirements to include a greater number of independent directors.[25]

As discussed below, Fannie Mae's Board revised the Charter of the Audit Committee as new standards proliferated. For example, in early 2000, in response to the newly elucidated 1999 standards, the Board amended the 1996 Audit Committee Charter. The Board again revised the charter in 2003. That those charter revisions were undertaken is not in question; the issue, rather, is whether the Audit Committee complied with them.

In 1998, the responsibilities of the Audit Committee of the Board were set forth in the Audit Committee Charter adopted in 1996.[26] The 1996 Charter delineates the Audit Committee's oversight responsibilities with respect to regulatory compliance, accounting and financial reporting, the external auditor relationship, and internal auditing activities. Among other things, the 1996 Charter required the Audit Committee to:

- Meet with management, internal auditors, and the corporation's independent auditors, and to develop in-depth and specialized knowledge on matters relating to corporate accounting, financial reporting, internal control, auditing, and regulatory compliance activities;

- Review and make recommendations to the Board on the corporation's accounting and financial reporting practices and its annual financial report to shareholders;

- Assess the adequacy and effectiveness of internal controls, including compliance with established limits on derivatives risk;

- Receive periodic reports from management, internal audit, and the corporation's independent auditors on matters relating to corporate accounting, financial reporting, internal control, auditing, and regulatory compliance, and on the activities of management's Business Conduct Committee, including monitoring compliance with the Code of Business Conduct; and

- Recommend to the Board the appointment of the corporation's independent auditors and oversee the activities of the independent auditors.

---

[23] Securities Exchange Release No. 34-48,745, November 4, 2003.
[24] Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 407, 116 Stat. 745, 790 (2002).
[25] Annemarie K. Keinath and Judith C. Walo, "Audit Committee Responsibilities: Focusing on Oversight, Open Communication, and Best Practices," *The CPA Journal*, November 2004.
[26] The Audit Committee Charter, November 19, 1996, was included in the Audit Committee Meeting Package, as part of the of the April 21, 1998, committee meeting minutes.

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

The Charter seemingly limited some of the Committee's authority by requiring the Audit Committee Chair to consult with executive management in overseeing and evaluating the activities and performance of the "Vice President for Auditing," and "the budgets and staffing of the internal audit department." Additionally, the Charter authorized the Audit Committee to "cause an investigation to be made" into any matter under its scope of responsibility that "is brought to its attention." The Charter later underwent wholesale revisions.

In 2000, the Audit Committee Charter revised the responsibilities of the Audit Committee members to include monitoring the integrity of the corporation's financial statements and the independence of internal and external audit functions.[27] The 2000 Charter further required the Audit Committee to review the corporation's financial reporting practices, including the significant issues and judgments made in connection with the preparation of the audited financial statements, and to receive periodic reports relating to the corporation's business environment, major risks, and risk management processes. Additionally, the importance of independent communication flow was emphasized. Again, the Charter provided authority for the Committee to "cause an investigation to be made into any matter within the scope of its responsibility that is brought to its attention." Here, the Committee's authority was expanded to permit it to "engage such independent resources to assist in its investigations, as it deems necessary." Thus, the Committee had full authority to initiate an investigation into any matter under its purview.

The Charter was again restructured in 2003[28] in conjunction with Fannie Mae's first proxy statement to shareholders upon SEC registration. At that time, the charter was amended to include the responsibilities of audit committees required by the Sarbanes-Oxley Act of 2002. The 2003 Charter clarified the Committee's responsibility to monitor independence of the internal audit function by requiring that the Committee ensure that no limitations or restrictions were placed on that function.

In addition to maintaining the pre-existing oversight responsibilities, the 2003 Charter also provided for heightened financial statement and disclosure responsibilities, including:

- A discussion and analysis of the outside auditor's judgment as to the quality of the corporation's accounting principles, significant financial reporting issues, and MD&A [Management Discussion and Analysis] disclosures;

- Review and discuss with the outside auditors all critical accounting policies, any alternative treatments under GAAP, and material communications with management; and

- Review and discuss with management and the outside auditor any correspondence with regulators or governmental agencies which raises material issues regarding Fannie Mae's financial statements, financial disclosures or accounting policies.

---

[27] *See* Audit Committee Charter, July 18, 2000, at FMSE 014495-97.
[28] *See* 2003 Audit Committee Charter included in the Audit Committee Meeting minutes of January 21, 2003. FMSE 504223-228.

CHAPTER IX.  THE ROLE OF THE BOARD OF DIRECTORS

*Failures of the Audit Committee*

The Audit Committee of the Board of Directors failed to safeguard Fannie Mae's safety and soundness by not discharging its duties responsibly and effectively.  Specifically, the Committee failed to evaluate the internal audit function and the performance of the head of the Office of Auditing, to oversee the production of financial statements, to monitor the development and implementation of critical accounting policies, to develop in-depth or specialized knowledge necessary to its oversight responsibilities, and to oversee adequately the work of the external auditor.

The Audit Committee was complacent in the oversight activities required by its Charter and applicable regulations, guidelines, and standards.  Members of the Audit Committee exercised little, if any, meaningful or active oversight.  They failed to perform disciplined and consistent evaluations of internal audit activities, to probe management of the Office of Auditing, or to discuss diligently or inquire adequately with respect to incomplete representations of management and the Office of Auditing regarding critical accounting issues.  Those issues included whether critical accounting policies conformed with GAAP and the uncorroborated representations of management that the external auditor reviewed and approved those policies.  The record fails to demonstrate adequate inquiry or thoughtful requests for additional information or explanation from Audit Committee members in their meetings with the external auditor.

The Audit Committee was required to develop in-depth and specialized knowledge on matters relating to corporate accounting and financial reporting in order to serve its oversight role effectively.  That role encompassed oversight of both the internal and external auditor relationships as well as responsibility for monitoring the integrity of the Fannie Mae's financial statements.  Further, standards during the relevant time period as developed by the Treadway Commission (1987), The Blue Ribbon Commission (1999) and the SEC (1999, 2000, and 2002) required audit committees to engage in vigilant and effective oversight of the Enterprise's financial reporting process and internal controls.

In February 2001, after the Blue Ribbon Report and resulting changes in SEC and NYSE standards, Sampath Rajappa, Senior Vice President for Operations Risk and head of the Office of Auditing, reported to Vice-Chairman Jamie Gorelick, Chairman and CEO Franklin Raines, CFO Timothy Howard, Controller Leanne Spencer, and others that he would address with KPMG how Fannie Mae would "meet all the foregoing requirements at the Audit Committee meeting."[29]  Mr. Rajappa also claimed that "[i]n a nutshell, we are/will be in compliance with all the requirements."  The requirements to which he referred included American Institute of Certified Public Accountants Statements of Auditing Standards SAS-89 and SAS-90, the NYSE's guidelines on audit committee governance standards, the SEC Final Rules on audit committee requirements, and the SEC independence rules as they pertained to the external auditor.  At the

---

[29]  E-mail chain from Sampath Rajappa to Jamie Gorelick with a copy to Franklin Raines, Timothy Howard, Leanne Spencer and others, "Re: Audit Committee Requirements," February 12, 2001, FMSE-KD 016986-88 (in which Mr. Rajappa reported that "KPMG and I will address how we meet all the requirements at the audit committee on Feb. 20.")

CHAPTER IX.  THE ROLE OF THE BOARD OF DIRECTORS

Audit Committee meeting on February 20, 2001, Mr. Rajappa and Ms. Theobald, of KPMG, reported that the Audit Committee either met or exceeded every requirement.[30],[31]

In 2002, Fannie Mae Board policies and practices were reviewed with the goal of ensuring that Fannie Mae corporate governance was "best in class."[32]  That review included an assessment of Fannie Mae's corporate governance policies and practices against the standards contained in SOX, NYSE listing requirements, OFHEO and SEC regulations, and best practices.[33]  In early 2003, the Fannie Mae Board of Directors adopted a variety of enhancements to achieve "best in class" status.[34]  Despite those representations and Fannie Mae's desire to be "best in class," both the Audit Committee and its chairman failed to comply with the Audit Committee Charter and professional standards.

Failure to Oversee the Office of Auditing and the Head of the Office of Auditing.  The Audit Committee's responsibilities include oversight of both the internal and external audit functions independent of management.  Effective execution of fiduciary duty and responsibility requires robust oversight and involvement, including candid discussions, diligent and knowledgeable committee membership, and the use of external consultants as authorized by the Audit Committee Charter.[35]

According to its charter, the Audit Committee has the express duty to oversee the internal audit function, which at Fannie Mae was conducted by the Office of Auditing.  In that capacity, the Audit Committee is responsible for discussing Office of Auditing activities, including the appointment and replacement of its head, and its budget and staffing.  The Audit Committee is also charged with determining the scope and performance of the internal audit function, reviewing the Audit Plan, and ascertaining whether there are any restrictions or limitations on the Office.  In order to fulfill its duty, the Audit Committee also has the responsibility of obtaining periodic reports from the head of the Office regarding the findings of internal audits.

---

[30]  *See* Audit Committee Meeting Minutes of February 20, 2001, FMSE 014870-014876 at 73.

[31]  While Mr. Rajappa, Senior Vice President for Operations Risk and head of the Office of Auditing, was reporting that Fannie Mae is or will be in compliance with all the requirements, including independent communication and information flow between audit committee and internal audit and external audit as well as candid discussions with management and external auditors, he also indicates that he " will meet with KPMG on Wednesday to go over their *exact* talking points. . ." and represents to already know "what they (KPMG) *intend* to say." *See* e-mail chain from Sampath Rajappa to Jamie Gorelick with a copy to Franklin Raines, Timothy Howard, Leanne Spencer, and others, "Re: Audit Committee Requirements," February 12, 2001, FMSE-KD 016986.

[32]  *See* Minutes of the Meeting of the Nominating and Corporate Governance Committee of the Board of Directors of Fannie Mae, July 16, 2002, FMSE 505365-66, at FMSE 505365.

[33]  *See* Minutes of the Meeting of the Nominating and Corporate Governance Committee of the Board of Directors of Fannie Mae, July 16, 2002, FMSE 505365-66, at FMSE 505365; Fannie Mae Corporate Governance Benchmarking Project: Issues for Consideration dated Aug. 6, 2002, FMSE 12859-87.

[34]  *See* Minutes of the Meeting of the Board of Directors of Fannie Mae, January 21, 2003, FMSE 504202-40, at FMSE 504220-21. *See also* Draft Working Scorecard for Benchmarking Project, January 16, 2003, FMSE 13512-16.

[35]  E-mail chain from Sampath Rajappa to Jamie Gorelick with copies to Franklin Raines, Timothy Howard, Leanne Spencer, et al, "Re: Audit Committee Requirements," February 12, 2001; Mr. Rajappa submits the five guiding principles for Audit Committee best practices from the SEC's chief accountant, including "robust oversight" of management and diligent and knowledgeable committee membership, FMSE-KD 016986-88, at 016987.

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

The Audit Committee failed to execute its oversight responsibilities adequately. Those failures primarily involved a lack of appropriate concern for safeguarding the independence of the internal audit function from financial reporting and business functions, and a lack of engagement in the planning and evaluation of internal audits.

*The Appointment of Mr. Rajappa.* While the Board has the overall responsibility for hiring qualified senior officers,[36] the Audit Committee Charter placed the responsibility for hiring and firing of the head of the Office of Auditing on the Audit Committee. In addition to conducting a thorough evaluation of the qualifications and credentials of a candidate, the Audit Committee was responsible for ensuring that the appointment in no way jeopardized the independence of the internal audit function.

As described in Chapter VIII, since Mr. Rajappa served as Fannie Mae Controller directly before his appointment to head the Office of Auditing, his appointment put him in the inappropriate position of auditing his own work. As Controller, Mr. Rajappa was involved in accounting analysis and decisions related to the entire financial operations of Fannie Mae, including Manufactured Housing, Loan Loss Reserves, REMICS, Purchase Premium and Discount Amortization, interest-only securities, impairment and mark-to-market rules, Synthetic MBS, and low-income housing tax credits. Many of those areas will be subject to restatement or have been identified as not in compliance with GAAP.

No discussion of Mr. Rajappa's new position as head of the Office of Auditing appears in the minutes of either the January 19, 1999, Board of Directors meeting or the minutes of the February 16, 1999 Audit Committee meeting. OFHEO found no other evidence of a critical evaluation of the sufficiency of Mr. Rajappa's education, training, experience (for example, the fact that he was not a certified public accountant), or his ability to oversee the internal audit function objectively, given his former position as Controller. Effective, diligent oversight in compliance with the Audit Committee Charter clearly required such a discussion.

When questioned during the OFHEO examination, Mr. Gerrity, the then newly-appointed Audit Committee Chairman, stated that he could not recall specifically whether Ms. Spencer had assumed the position of Controller by the January 1999 board meeting, nor did Mr. Gerrity know why Mr. Rajappa was selected to be the head of the Office of Auditing.[37] Mr. Gerrity also stated that he did not think it was awkward that Mr. Rajappa was formerly the Controller.[38] The Audit Committee clearly was aware of Mr. Rajappa's prior experience as Controller and had a responsibility to ensure there were no known independence violations or conflicts of interest. Instead, the Audit Committee stood silent as the Office of Auditing, under Mr. Rajappa's supervision, conducted audits of his former department.[39] The Audit Committee did not meet its responsibility to question, if not challenge, the appointment of Mr. Rajappa. At a minimum, the Audit Committee should have required Mr. Rajappa to recuse himself from any review function inconsistent with the Institute of Internal Auditors standards discussed in Chapter VII.

---

[36] Title 12 C.F.R. 1710.15(b(2)
[37] Paul Weiss memorandum of interview with Thomas Gerrity, February 28, 2006, FM SRC OFHEO 00713198-218, at 00713203.
[38] OFHEO Interview, Thomas Gerrity, February 28, 2006, p. 87.
[39] OFHEO Interview, Sampath Rajappa, February 23, 2006, p. 13.

CHAPTER IX.  THE ROLE OF THE BOARD OF DIRECTORS

*Inappropriate Compensation of Office of Auditing Staff.*  As discussed in Chapters VII and VIII, compensating senior internal auditors on an EPS-basis creates a problem at least as to the appearance of independence—a problem that was exacerbated by Mr. Rajappa's enthusiasm for EPS compensation.  Although the Compensation Committee was directly responsible for setting bonuses, the Audit Committee was responsible for insuring the independence and objectivity of the internal audit function.    That responsibility required the Committee to consider the independence and objectivity issues created by tying the compensation of the staff of the Office of Auditing to EPS, given the independent oversight role of that office.  The Audit Committee's failure to address the inherent conflict of interest created by that compensation ultimately contributed to the inappropriate admonitions of Mr. Rajappa to his staff members to "live, breathe and dream 6.46" and that they should become "obsessed" with seeing to it that they did their part to help Fannie Mae achieve the EPS goal.[40]  As evidenced by that communication and supported by a recommendation in Ernst and Young's report dated June 30, 2005 on Internal Audit Transformation-Recommendations,[41] the Audit Committee should have considered and recommended that an alternate method to determine incentive compensation be applied to Internal Audit.[42]

*Other Issues Concerning the Independence of the Office of Auditing.*  Internal audit best practices require that "[t]he internal auditors' qualifications, staff, status within the company, reporting lines, [and] relationship with the audit committee of the board of directors must be adequate to ensure the internal audit function's effectiveness and objectivity...."[43]  In order to fulfill its duty to oversee the internal audit function, the Audit Committee has a responsibility to ensure that the independence of the internal audit function is not jeopardized, either in appearance or fact.  The Office of Auditing was supposed to be a direct report to the Audit Committee, with an administrative or "dotted-line" report to management.  In practice those relationships appear to have been reversed.

In 2002, the "dotted line" reporting for the head of the Office of Auditing, Mr. Rajappa, moved from COO Mudd to CFO Howard.[44]  According to Mr. Rajappa, CEO Raines made the decision that the reporting line should shift to the CFO.  That reporting structure had the potential to jeopardize independence and should have been vetted through the appropriate channels, i.e., the Audit Committee.  The minutes do not show that the Audit Committee addressed the issue.  However, Mr. Rajappa recalled that Audit Committee Chair Gerrity approved of the change without discussing the issue with him.  Thereafter, Mr. Rajappa recalls expressing his reservations regarding the reporting shift to Mr. Gerrity.

---

[40] *See* Sampath Rajappa's address to Audit Group on "what we can do to help achieve $6.46 EPS," FM SRC OFHEO 00142373-74.

[41] *See* Ernst and Young report, "Fannie Mae Office of Auditing, Internal Audit Transformation – Recommendations," June 30, 2005, FMSE 510811 - 510833.

[42] *Id., Also see* "Report to the Board Compensation Committee on Appropriate Corporation Structure and Incentives for Fannie Mae Management," February 23, 2005, which recommended that bonus compensation for the head of Internal Audit should not be tied to earnings, FMSE-EC 008826 - 008992, at 909 and 947.

[43] Report of National Commission on Fraudulent Financial Reporting, (Treadway Commission), p.11.

[44] Paul Weiss memorandum of interview with Sampath Rajappa, January 19, 2005, FM SRC OFHEO 00227300-306 at 302.  That page of that memorandum is the source for this and the following paragraph.

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

Mr. Rajappa questioned whether placing the head of the Office of Auditing under the CFO was appropriate from a best practices perspective. He raised those concerns with Mr. Howard who, according to Mr. Rajappa, claims to have unsuccessfully attempted to coordinate a discussion with Mr. Raines on the topic. As Controller, Mr. Rajappa had served as a direct report to Mr. Howard. Review of the integrity of financial information is among the core functions of the Office of Auditing, and Mr. Howard's direct reports (and, ultimately, Mr. Howard) were responsible for the development of accounting policy. Considering those facts, it is easy to understand why Mr. Rajappa was concerned with having the head of the Office of Auditing report to the CFO.

Mr. Gerrity's insensitivity to any perceived or actual breach of independence is evidenced by his failure to conduct any evaluation of the change in reporting or to discuss it with the Audit Committee as a whole. As a result of the inaction of the Audit Committee and the concomitant lack of clear guidelines, Mr. Howard was in a position to exert inappropriate influence on the Office of Auditing.[45] The Audit Committee's failure was further compounded during the annual review process. The Audit Committee Charter dictates that the Audit Committee is jointly responsible for the budget and staffing of the Office of Auditing. However, Mr. Rajappa's performance evaluations were written and presented by his supervisors—COO Small, COO Mudd, and ultimately, CFO Howard—with input from Mr. Gerrity.[46] Those evaluations were the basis for salary increases and bonuses. Mr. Gerrity's involvement in the process appears to have been a limited review of the evaluation prepared by Mr. Howard.[47]

*The Scope of Internal Audits.* The Audit Committee was directed by the Audit Committee Charter to establish the scope and evaluate the performance of the internal audit function. On an annual basis, the Office of Auditing developed its Audit Plan, which was vetted with the Audit Committee. That Audit Plan identified key risks and established audit priorities. Effective interaction between the Office and the Audit Committee regarding the Audit Plan was paramount to the development of an effective oversight mechanism. The Audit Committee expected the Office of Auditing to audit accounting and financial reporting areas for GAAP compliance because those internal audit reports indicated as much. However, as documented in Chapter VII, a communication gap existed between expectations of the Audit Committee and the practices of the Office of Auditing regarding the scope of the reviews. For example, Mr. Rajappa and others in the Office of Auditing have stated that testing for GAAP compliance was not within their mandate. Mr. Gerrity, on the other hand, indicated that the Office of Auditing was to serve as a "watchdog" for GAAP compliance in addition to the external auditor.[48] His understanding was based on his belief that the Office of Auditing understood GAAP and that noncompliance with GAAP would represent a material weakness.[49] That fundamental misunderstanding existed for

---

[45] E-mail from Timothy Howard to Leanne Spencer, "FW: Fannie Scolded for Obsolete Accounting Systems," March 3, 2004, OFH-FNM00126929. In that e-mail, Mr. Howard informed Ms. Spencer that he had made it "blisteringly clear" to Mr. Rajappa that the latter was to run all Audit Committee issues by him before going to the Audit Committee Chair.

[46] Paul Weiss memorandum of interview with Sampath Rajappa, January 19, 2005, FM SRC OFHEO 00227300-306 at 302.

[47] OFHEO Interview, Thomas Gerrity, February 28, 2006, p. 46.

[48] OFHEO Interview, Thomas Gerrity, February 28, 2006, p. 101.

[49] OFHEO Interview, Thomas Gerrity, February 28, 2006 , p.101

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

five years, illustrating the lack of communication between the Audit Committee and the Office of Auditing as well as a lack of the robust oversight that applicable standards require.[50]

*Lack of Timely Internal Audits of Critical Accounting Policies.* In April of each year, the Audit Committee was responsible for approving the Audit Plan. That plan was developed as a roadmap for audit activities and was based on an assessment of critical policies and key control areas.[51] The process of establishing priorities was a function of both the inherent risk of the activity as well as the results of prior audit activities in the respective areas. As described later in this chapter, audit areas were color coded through that process. "Red" audits areas would be reviewed annually, whereas activities deemed "green" would only be examined every three years.[52] The Audit Committee was involved in the process and specifically requested that the Office of Auditing perform an annual review of the accounting for derivatives.[53] Despite audit differences in 1998 and 1999, and after being told by KPMG, in relation to the 1998 audit that a written policy was an absolute necessity, Fannie Mae waited until 2003 to conduct its first substantive review of the implementation of the FAS 91 policy formalized in December 2000.[54] Given that FAS 91 was a critical accounting estimate (as discussed in Chapter VII) and given the magnitude of the reporting errors that could—and did—result from an improper application of FAS 91, the Office of Auditing should have deemed the review of that policy a high audit priority. In the absence of initiative from the Office of Auditing, it was incumbent upon the Audit Committee to require an audit to be done on a more urgent basis prior to 2003.

<u>Failure to Make Adequate Inquiries.</u> Although the Board has the overall responsibility of assuring the integrity of Fannie Mae's accounting and financial reporting systems,[55] the Audit Committee is charged with the specific responsibility of overseeing "the accounting, reporting, and financial practices of the corporation and its subsidiaries, including the integrity of the corporation's financial statements. . . ." Gaining knowledge and making the appropriate inquiries are critical components of any oversight function. Early versions of the Charter even contained an explicit requirement that the Audit Committee "develop in depth and specialized knowledge on matters relating to the Committee's responsibilities . . ." Despite that directive, Mr. Gerrity was aware of neither how Fannie Mae formulated its accounting policies, nor who was responsible for them.[56] Also, as described in detail below, the Audit Committee failed to exhibit an appropriate level of knowledge about several of Fannie Mae's significant accounting policies, such as those related to FAS 91 and the allowance for losses. Furthermore, Mr. Gerrity stated that he "would count on management and/or Internal Audit and/or KPMG to raise [FAS 91, FAS 133, or other FAS issues with the committee]. That's the only way in which we would

---

[50] *See* Audit Committee Certification of FAS 133, FMSE 014893, FMSE 015316, FMSE 016125.

[51] OFHEO Interview, Sampath Rajappa, June 17, 2004, pp. 14-16.

[52] OFHEO Interview, Sampath Rajappa, June 17, 2004, pp. 14-16.

[53] OFHEO Interview, Sampath Rajappa, February 23, 2006, p. 85.

[54] Mr. Gerrity apparently never read Fannie Mae's "Purchase Premium and Discount Amortization Policy" as he had no recollection of seeing the written policy and only learned of the major provisions "in the last year or so." OFHEO Interview, Thomas Gerrity, March 14, 2006, p. 77.

[55] 12 C.F.R. 1710.15(b)(4).

[56] Paul Weiss memorandum of interview with Thomas Gerrity, February 21, 2005, FM SRC OFHEO 00713198-3218.

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

know."[57]    This passive approach to gaining knowledge of critical accounting policies contravenes all applicable governance standards.

*Low-Income Housing Tax Credits (LIHTC) Accounting.* As detailed in Chapter VI, Fannie Mae realized a one-time earnings-per-share (EPS) benefit of $0.10 ($108.1 million)[58] as a result of a change in the method of accounting for the Enterprise's investments in low income housing tax credits (LIHTC) from a non-GAAP to a GAAP method. Without the LIHTC, Fannie Mae would not have met analysts' expectations or the EPS targets required for executives to receive the maximum AIP bonuses for 1998.

Considering that LIHTC represented a one-time benefit which resulted from a change made late in the fourth quarter that enabled Fannie Mae to pay out bonuses and meet Wall Street expectations, the Audit Committee members had an oversight-related duty to obtain additional information. Neither the Audit Committee nor the broader Board sought additional information regarding that accounting change, nor did they question the effect on reported EPS and thus AIP and long-term compensation payouts to executives. Considering that KPMG identified that issue as an area of disagreement in the Q4 1998 completion memo,[59] a reasonable inquiry to management and the external auditor would likely have yielded some clarity as to the components of the benefit. At a minimum, the Audit Committee would have received additional information regarding the magnitude of the EPS effect. As the change in LIHTC accounting materially affected reported EPS, the Audit Committee should have communicated the one-time nature of the change to the Compensation Committee to determine whether non-recurring or "poor quality" earnings should have had a negative impact on EPS bonus calculations. Mr. Mai, as a member of both the Audit Committee and Chair of the Compensation Committee, should have been particularly sensitive to the significance of EPS in terms of management compensation. By failing to make the appropriate inquiries regarding the nature of the change, the Audit Committee failed in its oversight role.

*Allowance for Loan Loss Accounting.* During the period covered by this report, Fannie Mae identified its treatment of the allowance for loan losses as a significant accounting policy.[60] The practice of over-reserving for the purpose of establishing an earnings "cookie jar" had been identified by Arthur Levitt and others as fertile ground for earnings management abuses. Therefore, the Audit Committee had a responsibility to gain sufficient knowledge of Fannie Mae's policy in order to evaluate the appropriateness of its application. Had the Committee members made the appropriate inquiries or conducted a review of the financial statements, they would have noticed that the level of the reserve stood essentially unchanged at approximately $800 million for the period 1997 through 2003.[61] In January 1999, CFO Howard presented the result of operations for 1998 to the Fannie Mae Board of Directors.[62] Mr. Howard told the

---

[57] OFHEO Interview, Thomas Gerrity, March 14, 2006, p. 34.

[58] $108.1 million divided by 1,037 million shares outstanding resulted in an EPS impact of 10.5¢.

[59] *See* Fannie Mae Fourth Quarter Completion Memo, December 31, 1998, KPMG-OFHEO-063945.

[60] *See* Fannie Mae Annual Report 1998, p. 44.

[61] Mr. Gerrity stated that he did not even believe that loan loss reserves were considered "critical accounting policies" at Fannie Mae. OFHEO Interview, Thomas Gerrity, February 28, 2006, p. 75.

[62] *See* Notes for January 19, 1999, Board of Directors Meeting, FM SRC OFHEO 00310536-41 at FM SRC OFHEO 00310536-39.

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

Board that the swing from a credit loss position to net recoveries allowed the company to record a negative provision for losses of $50 million (another of the adjustments that allowed Fannie Mae to reach its maximum EPS target in 1998); however, outstanding allowance for future losses stayed the same. Mr. Howard even highlighted the size of the reserve to the investment community in a conference call related to 1998 earnings, stating that even though the amount seemed conservative, Fannie Mae intended to hold the level at $800 million dollars until the Enterprise got a better sense of where long-term trends settled out.[63] The Audit Committee failed to discharge its financial oversight responsibilities by not inquiring further regarding the amount of the reserve and not following up in subsequent years as the amount remained unchanged.

As detailed in Chapter VI, Fannie Mae methodology for recording adjustments to the reserve did not conform with GAAP. Controller Leanne Spencer explained to the Audit Committee at the February 20, 2001 meeting that the current methodology for recording charge-offs and recoveries was not the "preferable" accounting treatment. Additionally, she indicated that she would be investigating whether a change in accounting was appropriate.[64] The minutes of the Audit Committee do not reflect any inquiries regarding the appropriateness of the absolute level of the loss reserve despite a 27 percent decrease in the dollar value of credit losses in 2000 to the lowest level since 1984, when Fannie Mae's portfolio was one-tenth the current size. Neither does the record reflect any questions from members of the Committee regarding the possible accounting change. Ms. Spencer again addressed the issue in February 2002, informing the Audit Committee of an "alternative method" to reclassify recoveries.[65]

Fannie Mae did not elect to change its accounting treatment until 2003. Audit Committee meeting minutes do not reflect that the Committee sought more information regarding the necessity for a change or followed up to establish why the change was not implemented for fiscal year 2001. The Audit Committee appears not to have asked either management or the external auditor about the magnitude of the reserve.

*"Yellow" Audit Reports.* The Office of Auditing color-coded their audits according to importance, with "red" identifying audits with significant issues that required immediate attention. "Yellow" identified audits where controls needed strengthening and corrective action would be taken during the normal course of business, generally 18 to 24 months, according to Mr. Rajappa.[66] "Green" identified audits that were fairly clean, with issues that could be resolved quickly.[67] "Red" audits were reported to the Office of the Chairman and to the Audit Committee,[68] placed on the Audit Tracking List (ATL), and reviewed. That methodology was utilized in order to prioritize follow-up work and assist in the development of the audit plan.[69]

---

[63] *See* Notes for January 14, 1999, Conference Call, p.4, FM SRC OFHEO 034016 - 19.

[64] There is significant similarity between Ms. Spencer's scheduled presentation, including a modified handwritten script, and the Audit Committee Minutes of February 20, 2001, concerning credit losses, charge-offs, and recoveries. See minutes at FMSE 014869-76 and Ms. Spencer's notes within The Year in Review Presentation, FMSE 367220-36, at FMSE 367227-28.

[65] *See* Audit Committee Minutes, February 19, 2002, p. 3 FMSE 015292.

[66] OFHEO Interview, Sampath Rajappa, June 17, 2004, p. 15.

[67] *Id.*

[68] OFHEO Interview, Thomas Gerrity, February 28, 2006, pp. 27-28.

[69] *See* Fannie Mae Office of Auditing Audit Manual at FNM 00100541 at p.C-3.2-3.3.

CHAPTER IX.  THE ROLE OF THE BOARD OF DIRECTORS

According to Mr. Rajappa, "yellow" audits would go only to the Chairman of Fannie Mae and the Office of the Chairman but not to the Audit Committee.[70]

Several of the "yellow" issues were significant in and of themselves.  In fact, with respect to the Amortization Audit dated July 9, 2003, Ann Eilers, Director for Accounting and Audit, indicated that the audit rating was "yellow" simply because management assured the Office of Auditing that they were working on the problem.[71]  As a result, management was able to circumvent Audit Committee review.

In order to provide effective oversight of the control environment, the Audit Committee must have a reasonable understanding of the depth and breadth of internal control deficiencies. Simply reviewing the most egregious control failures did not provide the Audit Committee with that knowledge.  For example, key-person dependencies and poor documentation might not raise a red flag in an isolated incident; however, a pattern of undocumented decisions (which existed) highlights a more significant breach of internal controls.  The Audit Committee should have had a mechanism in place to understand the scope of internal control problems and management's efforts to address those problems.  The significant lack of oversight by the Audit Committee enabled the Office of Auditing to conduct audits and issue findings with less than appropriate scrutiny.

Failure to Oversee the Development and Implementation of Critical Accounting Policies. Previous chapters have established that accounting policies and estimates that Fannie Mae designated as critical failed to comply with GAAP. In particular, those related to the amortization of purchase premiums and discounts (FAS 91) and accounting for derivatives and hedging activities (FAS 133).  The Audit Committee failed in its responsibility to understand and ensure that appropriate application of critical accounting policies was occurring, as outlined by the Audit Committee charter as well as in standards previously discussed, despite the requirements that audit committees be informed, vigilant, and effective overseers of the financial reporting process and the company's internal controls.

*FAS 91.*  The Fannie Mae Audit Committee did not actively monitor the critical policy of accounting for the amortization of discounts and premiums.  The Audit Committee failed to address the implications of the 1998 FAS 91 audit adjustments, and systems control issues that were brought to the attention of Audit Committee Chair Gerrity in early 1999.  Audit adjustments are proposed corrections identified through the external audit process. Prior to the issuance of Statement on Auditing Standards (SAS) 89 effective December 1999, there was no requirement that an external auditor inform the Audit Committee of those adjustments deemed immaterial.  Following SAS 89, the external auditor was required to notify the Audit Committee of all audit differences, whether or not material.[72]  As detailed in Chapter VI, KPMG identified

---

[70]  OFHEO Interview, Sampath Rajappa, February 23, 2006, pp. 81-82; Mr. Gerrity confirmed that the Audit Committee did not review the yellow audits. OFHEO Interview, Thomas Gerrity, February 28, 2006, p. 33.
[71]  OFHEO Interview, Ann Eilers, July 23, 2004, p. 242. Since the Audit Committee only received reports on 'red' audits, changing the color to "yellow" by promising timely resolution was an easy means to avoid Audit Committee scrutiny.
[72]  Under SAS 89, the external auditor is ". . .required to inform the audit committee about uncorrected misstatements aggregated by the auditor during the current engagement and pertaining to the latest period presented

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

an audit difference of $200 million related to FAS 91, the amortization of premiums and discounts, in 1998. As part of the year-end audit work, KPMG met with Audit Committee Chairman Gerrity in early 1999 and advised him of that audit difference and how it arose and that the FAS 91 systems needed improvements.[73] For several reasons, Mr. Gerrity should have considered the audit difference material. First and foremost, the size of the difference should have been a red flag. Mr. Gerrity has stated that he now would consider a $200 million audit difference to be material.[74] The reduction in amortization expense also had an important effect on executive compensation. It boosted EPS by over 12¢ per share, and without that boost EPS would not have met the minimum needed for an AIP bonus for 1998.[75] That effect on executive compensation alone should have been sufficient to deem the difference material, irrespective of Fannie Mae's quantitative parameters for determining materiality.

Even after the FAS 91 audit differences were disclosed to the Audit Committee by Ms. Spencer in February 2000, the record fails to show that either Mr. Gerrity or the full Audit Committee followed up to confirm that a policy had been implemented or that Mr. Gerrity or the Committee questioned KPMG again. Given KPMG's position that Fannie Mae's practices were imprecise, reasonable inquiry by the Audit Committee would have exposed the lack of a formal policy. In fact, the record fails to show that the Audit Committee members made an effort to familiarize themselves with that critical accounting policy before Ms. Spencer made a presentation to the Audit Committee in November 2003.

The Audit Committee failed in its oversight role by not demanding that a formal policy for FAS 91 be put in place and that such a policy, when put into place, be endorsed by the Financial Standards group of the Enterprise and the external auditor. In doing so, the Committee failed to insure the integrity of financial results. The Audit Committee also failed to adequately oversee the development of the annual audit plan. Armed with the knowledge of KPMG's audit differences in 1998 and 1999 related to amortization of purchase premiums and discounts, the Audit Committee had a responsibility to ensure that the Office of Auditing conducted an internal audit of that area. Such an audit was not conducted until 2003.

*FAS 133.* The Audit Committee had opportunities to question management's implementation of FAS 133 but failed in its duty to do so.

In an Audit Committee update on the FAS 133 effort in April 2000, the minutes of the meeting reflect comments of KPMG partner Julie Theobold that KPMG intended to perform a significant amount of testing of financial reporting and planning during the year 2000. She stated that KPMG's test work would emphasize the system and accounting changes required to account for hedges under the new standard.[76] In his February 2001 report to the Board of

---

that were determined by management to be immaterial, both individually and in the aggregate, to the financial statements taken as a whole. . ." Also See AICPA Practice Alert 94-1: Dealing With Audit Differences, February 1994.

[73] OFHEO Interview, Julie Theobald, February 16, 2005, pp. 47-48.

[74] Paul Weiss Memorandum of Interview with Thomas Gerrity, March 14, 2006, p. 29.

[75] Mr. Gerrity was unaware that there was a "cliff" built into the AIP targets and, as a result, had no understanding of the significance of the audit difference. OFHEO Interview, Thomas Gerrity, March 14, 2006, p. 63.

[76] Audit Committee Minutes, April 18, 2000, p. 5, FMSE 014459-65.

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

Directors, CFO Howard criticized the standard and focused on the effect the standard would have on Fannie Mae's financial statements.[77]  Minutes of those meetings, however, do not reflect any discussion of the principles used to implement FAS 133 at Fannie Mae, the critical decisions that the Enterprise made regarding systems development or accounting, or the results of any KPMG testing that had preceded implementation.  The Audit Committee should have inquired about that information in order to gain sufficient understanding to judge whether appropriate accounting decisions had been made and effective systems were in place.

Furthermore, management represented to the Financial Accounting Standards Board (FASB) and the financial community in 1999 that a delay in implementing FAS 133 was imperative because of the extensive accounting changes the Enterprise was facing when, in fact, one of the three major principles of the Enterprise's implementation of FAS 133 was to leverage off existing accounting systems.  In Mr. Howard's letter to FASB Chairman Edmund Jenkins, Mr. Howard emphasized the need for more time to develop new accounting systems to address the complex changes that FAS 133 would require.  He stated that those changes were further complicated because of requirements resulting from year 2000 system changes.[78]  Mr. Boyles, then Director for Financial Standards, headed a letter-writing campaign with other companies and organizations to convince FASB of the need to delay implementation of FAS 133.[79]  In addition, the Enterprise represented in its financial statements that the delay granted by FASB would give the Enterprise "adequate time to build the accounting and management systems needed to implement the new standard."[80]  The inconsistency between the aggressive lobbying efforts to delay the standard and the ability of Fannie Mae to qualify virtually all of its derivatives for hedge accounting under the "short cut" method, as described in OFHEO's *Report of Findings to Date*, should have prompted the Audit Committee to explore more closely Fannie Mae's implementation of the standard.

Failure to Investigate Allegations Made by Roger Barnes.  Section 301 of the Sarbanes-Oxley Act of 2002 (SOX) requires audit committees of companies that register their stock with the Securities and Exchange Commission (SEC) to establish procedures for the receipt, retention, and treatment of complaints regarding accounting, internal accounting controls, or auditing matters; and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.  Further, SOX requires that each audit committee shall have the authority to engage independent counsel and other advisers, as it determines necessary to carry out its duties.[81]

As described in Chapter VIII, in October 2003 Roger Barnes, a manager in the Office of the Controller, approached Fannie Mae through his lawyer to pursue a settlement of claims of discrimination resulting from allegations he had previously raised regarding Fannie Mae's amortization policies and earnings management.  Fannie Mae entered into a settlement agreement with Mr. Barnes on November 3, 2003.  Given its responsibilities for regulatory

[77]  Board Meeting Minutes, February 20, 2001, pp. 9-10 FMSE 004788-800.
[78]  Letter from Timothy Howard to Edmund Jenkins, April 12, 1999, p. 2 FMSE-SP 074288-90.
[79]  See 1999 self-assessment by Jonathan Boyles, p. 2, FMSE 698829-33.
[80]  Quarterly report Q&A excerpt FMSE 417002.
[81]  The Sarbanes-Oxley Act, 107 Pub. L. No. 204, 116 Stat. 745, July 30, 2002.

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

compliance and investigation of complaints related to accounting, internal controls, and auditing matters, the Audit Committee was required to ensure a timely, thorough, and independent investigation into Mr. Barnes' allegations. The allegations, and the subsequent settlement agreement, should have raised the concern of every member of the Audit Committee, especially when considered against the background of the recently released Baker Botts report on Freddie Mac's internal investigation and the initiation of the OFHEO special examination.

The Audit Committee failed to make further inquiries or convene a special investigation after being informed at the November 17, 2003 Audit Committee meeting that Fannie Mae had reached a settlement with Mr. Barnes.[82] The news of the settlement was received by the Audit Committee just three days after the Committee had been convened in order to discuss certification of the third quarter financial statements. Fannie Mae settled the case without bringing the matter to the Audit Committee and elected to postpone discussion of the matter until after the financial statements had been certified. Given that OFHEO had just announced a special examination of Fannie Mae's accounting practices, the Audit Committee was on notice that such allegations warranted further investigation. At a minimum, the Audit Committee had an obligation to ensure that the matter be disclosed to OFHEO. Instead, the matter was ignored until February 2004, when it was reviewed as part of the special examination.

Failure to Question the Assignment of Both Chief Financial Officer and Risk Policy Functions to Mr. Howard. In 2000, Mr. Howard became a member of the Office of the Chairman. At that time, he also assumed responsibility for all credit and interest rate risk policy functions, becoming the equivalent of a chief risk officer for Fannie Mae. That consolidation gave Mr. Howard direct responsibility "of all people who either set risk policy or did risk analytics"[83] in addition to his core role of overseeing financial and accounting policy as CFO.

As discussed in Chapter VIII, the risk assessment function should be independent from the accounting and reporting functions to assure the fullest exchange of views. Consolidation removes an important control. It creates an environment in which mistakes and inappropriate manipulation may go unchecked as financial reporting results can easily be affected or manipulated by the views of the individual with accounting oversight. The assignment of responsibility for risk policy issues to Mr. Howard should not have been permitted by the Audit Committee or the Board. Fannie Mae's own research found no other peer company having a CFO also serving as CRO.[84]

With the reassignment of Adolfo Marzol, the Chief Credit Officer, in 2004, power was further consolidated as Mr. Howard assumed Mr. Marzol's duties as well. With that move, another source of internal control was removed. Upon the announcement of Mr. Howard increased duties, Board member Ashley voiced his displeasure with management, yet no steps were taken to remedy the situation.[85] The record shows no indication of Audit Committee

---

[82]  The November 17, 2003, meeting is also the meeting that contained a presentation by Ms. Spencer regarding the critical accounting policy for FAS 91. See Audit Committee Meeting Minutes at FMSE 504796-805.

[83]  OFHEO Interview, Timothy Howard, August 5, 2004, p. 7.

[84]  E-mails between Jill Blickstein and Rebecca Senhauser, August 12, 2004, FM SRC OFHEO 00713573-74.

[85]  E-mail from Daniel Mudd to Franklin Raines with copies to Timothy Howard, Thomas Donilon and Jill Blickstein, August 10, 2004, FMSE-E KD0048713.

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

involvement or inquiry. Oversight of the risk management function should have been performed by the Audit Committee by way of the Office of Auditing, according to Fannie Mae's internal audit charter. The record does not show that the Audit Committee reviewed and approved or had any of the required involvement in the consolidation of powers and responsibilities in Mr. Howard. Consequently, the Audit Committee failed in its oversight responsibilities and allowed an inappropriate consolidation of risk and financial accounting and reporting to occur.

Failure to Adequately Oversee Sarbanes-Oxley Section 404 Compliance Implementation. Chapter VII describes the decision of Fannie Mae management to assign responsibility for Sarbanes-Oxley (SOX) 404 compliance to the Office of Auditing and the inadequacy of the resources of that office relative to the task. Ultimately, the Office was diverted from performing its core functions and was unable to perform its new functions.[86]

The Audit Committee is responsible for the budget and staffing of the Office of Auditing, the establishment of the annual audit plan, and evaluation of any restrictions or limitations placed on that office.[87] Thus, the members should have been aware of the heavy workload placed upon the Office of Auditing and the inadequacy of its resources. In April 2004, the Audit Committee was presented with an opportunity to address the staffing limitations that resulted from SOX activities. In contrast to previous years, the Audit Plan for 2004 only scheduled 54 internal audits, compared with an average of 120 audits performed in past years[88] That reduction should have been a clear indication to the Committee that resources in the Office were stressed. While the Audit Committee inquired as to what more could be accomplished were the Office of Auditing to receive additional resources, the Committee fell short by approving an abbreviated Audit Plan and authorizing only temporary contract employees to assist in technical writing and flowcharting.[89]

Even assuming that the Audit Committee possessed a positive view of the Office of Auditing, the importance of ensuring Fannie Mae's SOX compliance required that it obtain sufficient information as to how those SOX responsibilities at Fannie Mae would be carried out. There is no indication of any discussion, let alone debate, in any of the Board Minutes or Audit Committee minutes that OFHEO reviewed. Rather, it appears that Fannie's Mae's management assigned those new responsibilities to the Office of Auditing without any meaningful Audit Committee participation.

Oversight of the Independent Auditor. As described in Chapter VII, KPMG improperly provided unqualified opinions on financial statements that contained significant departures from GAAP. The Audit Committee failed to oversee the independent audit function of the Enterprise as required by OFHEO guidance and regulation. In addition, the Audit Committee missed critical opportunities for meaningful inquiry into KPMG's audit activities associated with Fannie Mae's

---

[86] Memorandum from Kathryn Rock to Robert Levin, "Management's 2004 Assessment of Internal Control over Financial Reporting," August 12, 2005, FMSE 519599-616, at 606, where PricewaterhouseCoopers (PWC) identified hundreds of potential control problems that the Office of Auditing had not identified in 2004.
[87] 2003 Fannie Mae Audit Committee Charter. FMSE 504223 – 228.
[88] See Head Count Request for 3 FTE in 2003, FMSE-IR 284780-781, and Office of Auditing and KPMG Joint Audit Plan 2004.
[89] See Audit Committee Meeting Minutes, April 19, 2004, pp. 2-3, FMSE-SP 082060 - 68.

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

implementation of critical accounting estimates and significant accounting policies that may have revealed deficiencies in the independent audit program. Instead, as confirmed by Mr. Gerrity, the Audit Committee passively waited for KPMG to raise issues to the Audit Committee.[90]

The Audit Committee also failed to inquire about the work KPMG performed, or failed to perform, to determine that Roger Barnes' allegations regarding Fannie Mae's amortization accounting were without merit. Had the Audit Committee questioned KPMG, they would have learned that KPMG had not performed sufficient review or test work to make a determination about the merits of Barnes accounting allegations and that KPMG audit partners had misrepresented their position to Fannie Mae staff, to Mr. Barnes, and to the Audit Committee.

As shown in Table IX-1, the fees that Fannie Mae paid its independent auditor for audit related work accounted for a small fraction of the total fees KPMG received annually from the Enterprise.

Table IX-1: Fees paid to KPMG by Fannie Mae, 2000-2003[91]

| Year | Audit Fees | Other Fees | Total Fees | Audit as Percent of Total |
|------|-----------|-----------|-----------|---------------------------|
| 1998[92] | $ 760,000 | $8,000,000 | $ 8,760,000 | 9 |
| 1999[93] | $ 810,000 | $6,879,000 | $ 7,689,000 | 11 |
| 2000 | $1,199,000 | $6,610,000 | $7,809,000 | 15 |
| 2001 | $1,402,200 | $6,774,036 | $8,176,236 | 17 |
| 2002 | $1,978,955 | $7,511,478 | $9,490,433 | 21 |
| 2003 | $2,721,300 | $8,254,807 | $10,976,107 | 25 |

The increase in audit fees from 9 percent of total fees in 1998 to 25 percent of total fees in 2003 reflects, at least in part, the sharp increase in the number and complexity of accounting policies and practices that the Enterprise had to adopt during that time-frame and dramatic growth in the Enterprise's portfolio business.[94] Furthermore, lower fees before 2002 reflect the fact that

---

[90]  OFHEO Interview, Thomas Gerrity, March 14, 2006, p. 34.

[91]  Fannie Mae *Notice of Annual Meeting of Shareholders,* 1998; Fannie Mae *Notice of Annual Meeting of Shareholders,* March 29, 1999; Fannie Mae *Notice of Annual Meeting of Shareholders,* March 27, 2000; Fannie Mae *Notice of Annual Meeting of Shareholders,* April 2, 2001; Fannie Mae *Notice of Annual Meeting of Shareholders,* April 2, 2002; Fannie Mae *Notice of Annual Meeting of Shareholders,* April 14, 2003; Fannie Mae *Notice of Annual Meeting of Shareholders,* April 14, 2003; Fannie Mae *Notice of Annual Meeting of Shareholders,* April 23, 2004. Other Fees include fees related to REMIC pricing, closing and validation services, due diligence on multifamily loans, assistance on regulatory matters, and tax services.

[92]  KPMG Peat Marwick Trend Analysis Economic Indicators and Audit Fees, KPMG-OFHEO-175801; Fannie Mae presentation, "Discussion of the 1998 Audit," February 16, 1999, p. 7, FMSE 014347-014356 at 353.

[93]  Letter from KPMG to the Audit Committee, February 9, 2000, FMSE 014701.

[94]  Between 1998 and 2004, the Enterprise implemented, among others, the following accounting statements, guidelines, and pronouncements: FAS 133 Accounting for Derivative Instruments and Hedging Activities; FAS 140 Accounting for Transfers and Services of Financial assets and Extinguishment of Liabilities-a Replacement of FASB Statement 125; FAS 148 Accounting for Stock-Based Compensation Transition and Disclosure – An Amendment to FASB Statement 123; FAS 149 Amendment of Statement 133; FAS 150 Accounting for Certain Financial Instruments with Characteristics of Both Liabilities and Equity; Emerging Issues Task Force Issue 99-20

CHAPTER IX. THE ROLE OF THE BOARD OF DIRECTORS

Fannie Mae was not an SEC registrant. For KPMG, Fannie Mae, as one of the largest financial institutions in the country, was a prestigious client; however, the audit engagement was a minor part of the relationship.

One of the primary functions of the Audit Committee is to oversee the engagement of the outside auditors. Over the period covered by this report, that role required the Audit Committee to become increasingly engaged with the outside auditor so it could make knowledgeable, thoughtful, and probing inquiries. Such inquiries are necessary for the Audit Committee to understand the scope and quality of the independent audit work for which they have contracted and to assure the Board that the Enterprise's financial statements present fairly its financial condition and are prepared in accordance with GAAP. The Committee's failure to adequately perform this role contributed to the unsafe and unsound practices of the Enterprise.

Compensation Committee

The duties and responsibilities of the Compensation Committee of the Board of Directors of Fannie Mae (Compensation Committee) are set forth in the Compensation Committee Charter, and OFHEO regulations and guidance,[95] which incorporate the listing standards of the New York Stock Exchange (NYSE) and applicable safety and soundness standards.[96] The primary role of the Compensation Committee is to "discharge the responsibilities of the Board relating to compensation of Fannie Mae executives,"[97] which is achieved principally by overseeing and advising the Board on the adoption of policies governing Fannie Mae's annual compensation and stock ownership plans. The Committee is also responsible for producing the annual report on executive compensation that is included in the Enterprise's annual proxy statement. In accordance with both the Safety and Soundness Act and the Charter Act, Fannie Mae is only authorized to pay compensation that is reasonable and comparable with compensation for employment in similar businesses involving similar duties.[98] Section 309(d)(2) of the Charter Act also requires that a "significant portion of the compensation of all executive officers. . . shall

---

Recognition of Interest Income and Impairment on Purchas and Retained Beneficial Interest in Securitized Financial Assets; Statement of Position 01-0 Accounting for certain Entities (including Entities with Trade Receivables) That Lend To or Finance the Activities of Others; FIN 45 Guarantor Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others – An Interpretation of FASB Statements N5, 57, and 107 and Rescission of FASB Interpretation No. 34; and Consolidation of Variable Interest Entities – An Interpretation of ARB No. 51.

[95] 12 CFR §§ 1710.12(c)(2), 1720 and Appendix A to Part 1720 – Policy Guidance-Minimum Safety and Soundness Requirements.

[96] *See also* Schwartz, B. and Goodman, A. L., "Corporate Governance: Law and Practice, Chapter 10: The Compensation Committee," § 10.01 (2005) (Corporate Governance Law & Practice). The 1992 adoption of federal securities regulations requiring proxy statement disclosures about executive compensation and the enactment in 1993 of section 162(m) of the Internal Revenue Code, which eliminated the corporate income tax deduction for compensation over $1million paid to the CEO and other four most highly compensated executive officers (the so-called "Named Executive Officers"), also have substantively affected the responsibilities of compensation committees.

[97] Compensation Committee Charter, set forth by resolution in the Meeting Minutes of the Nominating and Corporate Governance Committee, dated January 20, 2003. See FMSE 505379, 505390-392.

[98] *See* 12 U.S.C. § 4518 and 12 U.S.C. § 1723a(d)(2), respectively.

301