UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

_____
                                    )
**In Re Federal National Mortgage Association** )
**Securities, Derivative, and "ERISA" Litigation** )   **MDL No. 1668**
                                    )
_____)
                                    )
**In re Fannie Mae Securities Litigation**   )   **Consolidated Civil Action,**
                                    )   **No. 1:04-cv-1639 (RJL)**
_____)


**NON-PARTY DELOITTE & TOUCHE LLP'S RESPONSE
IN OPPOSITION TO LEAD PLAINTIFFS' MOTION TO COMPEL**

**I.   INTRODUCTION**

Lead Plaintiffs' motion to compel misrepresents the facts. First, Deloitte & Touche LLP ("Deloitte")--a non-party in this litigation--has thus far produced hundreds of thousands of pages, and is in the process of completing its production of final working papers with respect to its audit of the year-end 2004 financial statements of Fannie Mae. Clearly Deloitte has no objection to producing the final working papers requested by the parties. As set forth in the attached affidavits, Deloitte anticipates producing the remainder of these final working papers by July 27, 2007. However, as explained in the Declaration of James Woodlock, President and CEO of Solutions Plus+, the technological reality is that it may be impossible for Deloitte to produce all of the remaining final electronic working papers, which have been with Solutions Plus+ and subject to processing since April, within two weeks of the order Lead Plaintiffs request because unanticipated technical issues may continue to arise. *See* Ex. A (Declaration of James Woodlock ("Woodlock Decl.") ¶ 12).

Second, Deloitte provided the final electronic working papers to its vendor in March 2007. Solutions Plus+ began working on the project in April, once Lead Plaintiffs counsel approved the costs for Solutions Plus+ and decided that Xerox, not Solutions Plus+, would provide the OCR. *See* Ex. B (Declaration of Kavita Kumar Puri ("Puri Decl.") ¶¶ 26-27). Had Deloitte been attempting to stall the production, as Lead Plaintiffs' motion suggests, there would have been no reason to turn the documents over to Solutions Plus+ months ago. Finally, entering an order compelling Deloitte, a third party, to produce documents--when those documents have already been transferred to the vendor--would place an extreme and undue burden upon Deloitte, and would make no difference to the vendor's ability to produce them for the reasons stated in Mr. Woodlock's affidavit.

For the reasons set forth herein, third-party Deloitte respectfully requests that the Court deny Lead Plaintiffs' motion to compel.

## II.   BACKGROUND

Deloitte was retained in early 2004 to assist OFHEO in connection with its Special Examination of Fannie Mae. In early 2005, Deloitte became Fannie Mae's auditor and ceased work on the OFHEO engagement. The materials from these two engagements--the Audit and the OFHEO engagement--are potentially responsive to Lead Plaintiffs' subpoena and are the subject of the present discovery dispute. There are two different categories of final working papers relating to Deloitte's audit of Fannie Mae: electronic working papers and manual (hard copy) working papers.

Since receiving these subpoenas, Deloitte and counsel for Deloitte have been working to locate, identify and review responsive materials, and to date, Deloitte has produced approximately 19,946 pages of documents from the OFHEO engagement. Regarding Deloitte's production of material relating to the audit, Deloitte has produced approximately 192,220 pages

of final electronic audit working paper documents, and approximately 103,581 pages of material from the final manual working papers. This is more than 315,000 pages.

The record, outlined in detail below, illustrates that Deloitte has attempted to move the production along as quickly as possible, despite Lead Plaintiffs' unwillingness at times to expedite the process. Specifically, given the sheer volume of the final electronic audit working papers, the index for which alone is over 450 pages, Deloitte gave Lead Plaintiffs the index in January and asked Lead Plaintiffs to select those final working papers they desired. Instead of thoughtfully culling down the volume, which Solutions Plus+ has estimated will be in excess of 2 million pages, Ex. A (Woodlock Decl. ¶ 11), Lead Plaintiffs selected virtually all the documents listed, thus effectively requiring production of all working papers. Further, although Lead Plaintiffs complain about a 4-day time period Deloitte took to review the pricing proposal from Solutions Plus+ to convert the final electronic audit working papers to tiff images before forwarding the proposal to the parties, they themselves took in excess of two weeks to approve the pricing proposal. Finally, with respect to the final manual audit working papers, the bulk would have been produced before Lead Plaintiffs filed the present motion had they not taken over two weeks to authorize the vendor--IKON Office Solutions, Inc. ("IKON") --to start processing the documents for production.

Lead Plaintiffs also mistakenly blame other purported production delays on Deloitte. They suggest that Deloitte produced some 20,000 pages of OFHEO-related materials on May 25, 2007 to stave off a motion to compel from Lead Plaintiffs. However, Deloitte produced those materials on April 9 and April 25 to another counsel, and cannot be blamed for that counsel's failure to post the materials on the shared database in a timely way. They also imply that Deloitte has somehow delayed the production of the final audit working papers, but fail to

mention that they knew Deloitte had provided Solutions Plus+ with a copy of these materials for processing in March, even though the project could not commence until April, when Mr. Block finally approved the costs for Solutions Plus+ and decided that Xerox should provide the OCR Ex. A (Woodlock Dec. ¶8), Ex. B. (Puri Decl. ¶ 27)

### A.     OFHEO Engagement Material

Deloitte has been working with Williams & Connolly, counsel for defendant Franklin D. Raines, to produce materials from the OFHEO engagement that are responsive to its subpoena. To this end, Deloitte has produced approximately 19,946 pages of material, from both hard copy and electronic sources.

Deloitte first reviewed and then produced approximately 13,000 pages of hard copy files retained from the OFHEO engagement to Mr. Marx at Williams & Connolly on April 9. Ex. B (Puri Decl. ¶ 5). On April 6, 2007, counsel for Deloitte made available to Williams & Connolly an index of Deloitte's OFHEO Special Examination "e-room," which contained electronic materials related to the OHFEO engagement, and received the index back from them with the particular documents they wished produced highlighted. *Id.* at ¶ 6. Deloitte then produced approximately 7,000 pages of this material on April 25, 2007. *Id.*

Counsel for Deloitte thus produced nearly 20,000 pages by April 25, 2007. It is not Deloitte's responsibility to ensure that materials, once produced, are distributed amongst the parties in a timely fashion--rather the parties in the litigation have a document-sharing agreement which governs the posting of documents to the shared Xerox database. Deloitte thus takes offense to counsel's blatantly false characterization that Deloitte provided these materials on May 25, 2007 to "keep Lead Plaintiffs' motion to compel at bay." Lead Plaintiffs' Memorandum of Law in Support of their Motion to Compel Production of Documents from Third Party Deloitte & Touche USA LLP ("Motion to Compel"), p. 6.

In addition, Deloitte is working with OFHEO to produce additional electronic materials within the next two weeks.

**B.    Audit:  Audit Final Working Papers**

When the parties initially discussed the subpoena in June 2006, Lead Plaintiff and Deloitte agreed to postpone Deloitte's production of its final working papers until after the audit of Fannie Mae's year-end 2004 financial statements, both because the working papers were not yet completed and because they were needed on hand to complete Deloitte's ongoing audit. Deloitte completed this audit in December 2006.  To date, Deloitte has produced roughly 103,500 pages of documents from the final manual working papers and 192,220 pages of documents from the final electronic working papers.

**1.    Manual Final Working Papers**

With regard to the manual working papers, any delay in their production is the result of Lead Plaintiffs' inability to approve the costs of their production and to authorize the vendor to begin the process.  Deloitte's Fannie Mae audit team needed the manual working papers from the previous audit in order to complete the audit of Fannie Mae's year end 2005 financial statements. When that audit was complete, these materials were then organized and reviewed for confidentiality to determine which materials should bear the legend ATTORNEYS' EYES ONLY, and which materials, if any, should be withheld on the basis of privilege.  Ex. B (Puri Decl. ¶ 11).  On May 11, 2007, at the direction of Deloitte's counsel, the manual audit working papers from Deloitte were collected by IKON for production.  IKON estimated that it would require two weeks to fully process these documents.  *Id.* at ¶ 12.  On May 14, 2007, Ms. Puri called Julie Richmond at Berman DeValerio, counsel for Lead Plaintiffs, to explain that the material at IKON consisted of manual working papers and that IKON needed approval from

Berman DeValerio as to billing arrangement before processing the documents for production. *Id.* at ¶ 13.

Berman DeValerio began negotiating rates with IKON--initially unbeknownst to Deloitte--thus delaying the production. On May 21, 2007, Julie Richmond called Ms. Puri to demand that these materials be sent to a Xerox location for scanning and stamping because of a very slight price differential between the two vendors. *Id.* at ¶ 14. Deloitte was reluctant to ship its original audit working papers to a vendor with which it was unfamiliar, so Ms. Puri immediately called IKON to request that they lower their rate. *Id.* at ¶ 15. She informed Ms. Richmond on May 22, 2007 that IKON's rate had decreased from 14 cents per page to 10 cents per page--just 3 cents off of Xerox's quote. *Id.* at ¶ 16. The expense and time delay of copying and then shipping the voluminous documents to Xerox's location would have greatly exceeded that price differential. Ms. Richmond informed Ms. Puri that she would have to obtain approval from the remainder of the parties before giving IKON the green light to begin processing the material. *Id.*

On the afternoon of May 25, 2007, the Friday before Memorial Day Weekend, Ms. Smith from Berman DeValerio left Ms. Puri a voice mail authorizing the manual working papers production by IKON. *Id.* at ¶ 17. Ms. Puri immediately called IKON to inform them that their work had been approved, but IKON required an approval signature from a Berman DeValerio representative. *Id.* IKON was unable to obtain the requisite approval until Tuesday, May 29. *Id.* That same day, Ms. Smith called Ms. Puri and asked for the status of the electronic and manual working papers. Ms. Puri informed her that she should have a significant portion of the manual working papers by Monday, June 4. *Id.* at ¶ 18.

From June 5 through June 14, Deloitte produced roughly 103,500 pages of this material to Mr. Block. *See* Ex. C (Transmittal Letter from Schreiber to Block (June 14, 2007)). We expect that any remaining final manual working papers will be produced within 2 weeks.

### 2. Electronic Working papers

In December 2006, Deloitte finished the audit of the year-end 2004 financial statements, and in January 2007, Deloitte requested that counsel for Lead Plaintiffs review the audit working papers index and select those materials they were interested in having produced as a means to facilitate document production by managing its volume. The volume of working paper materials is such that the index of the working papers alone is over 450 pages.

Lead Plaintiffs acknowledge that the index was produced to Lead Plaintiffs in mid-February. Motion to Compel, p. 4. Approximately two weeks later, on March 6, Lead Plaintiffs responded by selecting virtually all of the working papers. In fact, Lead Plaintiffs desired so many of the working papers that they chose to identify only those few in which they were not interested instead of selecting those in which they were interested. Deloitte agreed to produce the entire set of working papers, rather than attempting to carve out Lead Plaintiffs' few "selections."

On March 16, representatives from Arnold and Porter, Deloitte, Xerox and Solutions Plus+ held a conference call to discuss what format Deloitte should produce its final audit electronic working papers. Ex. B (Puri Decl. ¶ 20). Deloitte informed Lead Plaintiffs on this call that its working papers were contained on a proprietary system--the AS/2 system--and that they would need to be transferred onto a system that would allow the data to be produced. *Id.* Once transferred the data would have to be extracted, and the files converted to tiff images. Deloitte also explained that Microsoft Excel and other documents might have to be reformatted before conversion to tiff to make the images readable. *Id.* Representatives from Xerox simply

noted that tiff images would be fine as long as they were tiff images with group IV compression and an appropriate load file. *Id.* at ¶ 21.

Deloitte received a proposal from Solutions Plus+ on March 30, 2007, and after reviewing and approving the proposal, sent it to Jeffrey Block at Berman DeValerio on April 3, 2007.[1]  Ex. D (Letter from Kavita Kumar Puri to Jeffrey Block (April 3, 2007)).

Counsel for Deloitte noted in its letter that the schedule was contingent on the timely execution of a protective order, *id,* as Deloitte was concerned that exposing of certain working papers to Fannie Mae employees could affect the audit integrity of Deloitte's ongoing audit of Fannie Mae's financial statements.  On April 9, 2007, Mr. Block informed Scott Schreiber that they were researching which party would bear the costs, and that the issue regarding the protective order "is not [their] issue."  Ex. E (Letter from Jeffrey Block to Scott Schreiber at 1 (April 9, 2007)).

On April 13, 2007, Scott Schreiber and Kavita Kumar Puri of Arnold & Porter, Mr. Block, and Jeffrey Kilduff from O'Melveny & Meyers LLP, counsel for Fannie Mae, participated in a teleconference to discuss the production of Deloitte's final electronic audit working papers.  Mr. Block represented that although he thought the proposal was reasonable, he would have to inquire about whether it would be cheaper for Solutions Plus+ or Xerox to provide an OCR field for the documents.  The processing of these documents was to take place once

---

[1] Although Mr. Block sent Leslie Wharton of Arnold & Porter LLP a letter on April 3, 2007 requesting final resolution of the pricing proposal via e-mail at 1:25 pm, Ms. Puri sent, via facsimile, the proposal to Mr. Block at 1:07 pm without having first seen his letter. Ex. B (Puri Decl. ¶ 25). We thus disagree with Mr. Block's assertion in his April 9 letter that "within two hours of e-mailing my April 3 letter to Leslie Wharton . . . I received a copy of the SolutionsPlus+ pricing proposal." Ex. E (Letter from Jeffrey Block to Scott Schreiber at 2 (April 9, 2007)).

Solutions Plus+ knew whether it would be doing the OCR and the proposal was approved. Ex. B (Puri Decl. ¶ 26).

Mr. Block responded on April 18, 2007, agreeing that "Counsel for the litigants in the above-referenced action will pay the costs, as quoted by Solutions Plus+ in their March 30, 2007 letter." Ex. F (Letter from Jeffrey C. Block to Scott Schreiber at 1 (April 18, 2007)). He further agreed that "no Fannie Mae employee be permitted to review any of the Deloitte working papers" until such time as an amended Protective Order could be executed. *Id.*

Since that time, Solutions Plus+ has been working diligently on processing and converting the data accurately and in the format Xerox requested on the March 16 call. Ex. A (Woodlock Decl. ¶¶ 2, 8). As detailed in his affidavit, there have been numerous technological difficulties, some unanticipated, with respect to the processing of these documents that have made this a labor and time-intensive process. Ex. A (Woodlock Decl. ¶¶ 3-7). As explained to counsel for Lead Plaintiffs previously, producing the electronic working papers is a massive undertaking involving proprietary software and enormous spreadsheets, and the technical personnel from both Deloitte and Solutions Plus+ have been working as fast as possible to resolve the remaining technical issues with the production. Ex. A (Woodlock Decl. ¶¶ 3-8, 10).

On May 29, 2007, Ms. Puri provided Ms. Smith of Berman DeValerio with an update on the status of the electronic and manual working papers. Regarding the electronic working papers, Ms. Smith was informed that Solutions Plus+ expected to have the first batch ready in 10 days, as there were some technical problems with the data, and that the technology people at Solutions Plus+ and Deloitte were working on solving the issues.[2] *See* Declaration of Autumn

---

[2] There appears to have been some miscommunication between Ms. Puri and Ms. Smith. Ms. Puri meant that the first production would consist of documents from the beginning part of the workpapers index, not the index itself. Ex. B (Puri Decl. ¶ 28). Moreover, Ms. Puri tried to
Footnote continued on next page

Smith, *passim*. We have sent approximately 192,200 pages of the final electronic working papers since that time, and expect to complete the production of these materials by July 27, 2007. However, it may be impossible to comply with any order to complete a full production within fourteen days of an order given that unanticipated technical problems might arise. That time frame simply does not account for the technical realities of converting such a large volume of material into the group IV, single-page tiff images required by the parties. To give a sense of the volume, there are over an estimated 1.8 million pages that are still in the process of being made ready for production by the outside vendor.

### III.   ARGUMENT

Deloitte is not a party to this litigation, and as such, special consideration regarding the burden placed on it should be given. In the context of affirming a district court's decision to deny a motion to compel, the First Circuit stated,

> Although discovery is by definition invasive, parties to a law suit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.

*In re Cusumano,* 162 F.3d 708, 717 (1st Cir. 1998). *Cf. North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005) (stating with regard to a motion to quash that non-party status is relevant in considering the burden).

As explained above and in the attached declaration of Mr. Woodlock, the electronic working papers may not be able to produced in two weeks of the entry of an order. Ex. A. (Woodlock Decl. ¶ 12). In *Tavoulareas v. Washington Post Co*, 93 F.R.D. 24, 27 (D.D.C. 1981),

---

Footnote continued from previous page
explain--in a high level manner--that while the initial data issues were resolved there are ongoing data issues that she did not have the technological wherewithal to explain in detail. *Id.*

where a non-party opposed a motion to compel, the court found that "[b]ased upon the representation of counsel and the general magnitude of The Post's document request, the Court has determined that [the non-party] should respond to the subpoenae of The Post within three months [of the date of the opinion]." Solutions Plus+ has represented that the bulk of the electronic working papers should be produced by the end of July. Ex. A (Woodlock Dec. ¶ 12). There may be additional material which Deloitte will need to produce, and therefore, should the Court order compliance with the subpoena, Deloitte respectfully requests that the Court provide more than a two-week time frame for Deloitte to complete its production.

## IV. CONCLUSION

For the foregoing reasons, Deloitte respectfully requests that the Court deny Lead Plaintiffs' Motion to Compel.

Date: July 6, 2007

Respectfully submitted,

ARNOLD & PORTER LLP

__/s/ Scott B. Schreiber_____

Scott B. Schreiber
555 Twelfth Street, N.W.
Washington, DC 20004
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
Email: scott.schreiber@aporter.com
DC Bar Number: 197-681
Counsel for Deloitte & Touche LLP