**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

JUL 3 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation | MDL No. 1668 |
| In re Fannie Mae Securities Litigation | Consolidated Civil Action No. 04-1639 (RJL) |
| Evergreen Equity Trust, *et al.*, v. Federal National Mortgage Association, *et al.* | Civil Action No. 06-0082 (RJL) |
| and | |
| Franklin Managed Trust, *et al.* v. Federal National Mortgage Association, *et al.* | Civil Action No. 06-0139 (RJL) |

**MEMORANDUM OPINION**
(July 31, 2007)

Before the Court are motions to dismiss a myriad of claims in the Evergreen [1] and

Franklin [2] plaintiffs' ("E&F plaintiffs") Second Amended Complaints ("E&F Complaints")

---

[1] The Evergreen plaintiffs include Evergreen Equity Trust, Evergreen Select Equity Trust, Evergreen Variable Annuity Trust, and Evergreen International Trust.

[2] The Franklin plaintiffs include Franklin Managed Trust, Institutional Fiduciary Trust, Franklin Investors Securities Trust, Franklin Value Investors Trust, Franklin Strategic Series, Franklin Capital Growth Fund, Franklin Templeton Investment Funds, Franklin Variable Insurance Products Trust, Franklin Custodian Funds, Inc., Franklin Templeton International Trust, Templeton MPF Investment Funds, Franklin Flex Cap Growth Corporate Class, Franklin Templeton Funds, Franklin Templeton Global Fund, Bennett Canadian Equity Fund, Bissett Institutional Balanced Trust, Franklin Templeton U.S. Rising Dividends Fund, Franklin World Growth Corporate Class, Franklin Global Trust, Franklin MPF U.S. Equity Fund, Lyxor/Templeton Global Long Short Fund Limited, Templeton Global Long-Short Fund PLC, Templeton Global Long-Short Ltd., University of Hong Kong General Endowment Fund, and University of Hong Kong Staff Provident Fund.

against the Federal National Mortgage Association ("Fannie Mae"), its insurance company,

Radian Guaranty, Inc. ("Radian"), and certain current and former officers and members of

Fannie Mae's Board of Directors:  defendants Stephen B. Ashley, Kenneth M. Duberstein,

Thomas P. Gerrity, Jamie S. Gorelick, William R. Harvey, J. Timothy Howard, Manuel J.

Justiz, Ann Korologos, Frederic V. Malek, Donald B. Marron, Daniel H. Mudd, Anne M.

Mulcahy, Joe K. Pickett, Leslie Rahl, Franklin D. Raines, Taylor C. Segue III, Leanne

Spencer, and H. Patrick Swygert.  For the reasons set forth hereafter, the Court GRANTS

defendants' motions to dismiss:  (1) the state law claims against all defendants; (2) the

Section 18 claims under the Securities Exchange Act of 1934 ("Exchange Act") against

Fannie Mae and all individual defendants; (3) the Section 10(b) and 10b-5 claims against

Radian, the outside directors, the Audit Committee directors, and Messrs. Raines and

Howard; (4) the control person liability claims under Section 20(a) against the outside

directors and Mr. Howard; and (5) the insider trading claims under Section 20A against

Messrs. Raines, Howard, and Ms. Spencer as to trades that did *not* occur on the same day as

plaintiffs' trades.  The Court DENIES Mr. Howard's motion to dismiss the insider trading

claims against him for trades that occurred on the same day as plaintiffs' trades.[3]

---

[3] The Court's ruling on these motions does not dispose, however, of the E&F's Second Amended Complaints in their entirety.  The remaining claims include:  (1) various claims brought against KPMG by the Franklin plaintiffs; (2) Section 10(b) claims against Spencer; (3) Section 20(a) claims against Spencer and Raines; and (4)Section 20A claims for same day trades made by Howard.  Otherwise, *all* claims by the E&F plaintiffs against defendants Radian, Ashley, Duberstein, Gerrity, Gorelick, Harvey, Justiz, Korologos, Malek, Marron, Mudd, Mulcahy, Pickett, Rahl, Segue, and Swygert are dismissed.

# BACKGROUND

Fannie Mae is one of two (the other being Freddie Mac) federally-chartered government-sponsored enterprises that serve the public policy of expanding home ownership to moderate and low-income families, in part, by supplying capital and liquidity for residential mortgages. The additional capital and liquidity provided by Fannie Mae, in turn, increases the market for 30-year fixed-rate mortgages and frees up banks' limited capital, allowing them to make more loans. Fannie Mae was established in 1938 by the federal government as a public entity. In 1968, Congress amended Fannie Mae's charter to make it a shareholder-owned company that operates on a self-sustaining basis. Indeed, its Board of Directors is composed principally of outside directors who are elected by the shareholders. The Chairman and officers of the company have neither the power to dismiss the outside directors, nor set their compensation. To the contrary, it is the Board of Directors who set the compensation of the officers and have the authority to remove them from office.

Fannie Mae is regulated by various governmental agencies, including the Office of Federal Housing Enterprise Oversight ("OFHEO"), the United States Department of Housing and Urban Development, the United States Department of Treasury, and the General Accounting Office. OFHEO's "mission" is ensuring the safety and soundness of Fannie Mae. (*See* Federal Housing Enterprises Financial Safety and Soundness Act of 1992, 12 U.S.C. § 4501 *et seq.*; OFHEO Mission Statement, *available at* http://www.ofheo.gov/Mission.asp (last visited July 24, 2007).) OFHEO's oversight

involves reviewing the company's internal controls, corporate structure, financial solvency, capital reserves, and accounting policies. (*See generally* OFHEO Report to Congress, June 15, 2002 ("2002 OFHEO Report") at 22-42 (detailing OFHEO's examination of Fannie Mae's operations) (attached as Ex. 3 to Stern Decl.).) OFHEO then reports annually to Congress on its findings. (*Id.*)

On September 22, 2004, OFHEO released an interim report concluding that Fannie Mae had misapplied FAS 91 and FAS 133, which are generally accepted accounting principles ("GAAP"), that Fannie Mae had inadequate internal controls, and that OFHEO no longer had confidence in certain members of Fannie Mae's management. (Am. Compl. ¶ 49.) Shortly thereafter, the Board expanded the authority of a Special Review Committee that had previously been created and vested it with the authority to investigate the allegations in the OFHEO Report. (*See* Fannie Mae, Form 8-K at 99.2 (Dec. 21, 2004) (attached as Ex. 7 to Stern Decl.).) The Committee retained former United States Senator Warren Rudman and his law firm (*i.e.* Paul, Weiss, Rifkind, Wharton & Garrison LLP) to carry out this investigation.[4] (*Id.*)

_____

[4] The report was issued on February 23, 2006 and concluded that "the Board endeavored to operate in a manner consistent with its fiduciary obligations and evolving corporate governance standards. The Board was open to examination by third parties and responsive to outside commentary, and it generally received high marks from outside observers." Senator Rudman also notes that, "[t]he Board, and in particular the Audit Committee, was sensitive to matters relating to accounting and financial reporting . . . . For example, the Board reacted quickly to the release of Freddie Mac's announcement in 2003 about accounting issues." Senator Rudman concluded that "[t]he Board also responded appropriately when it received indications that there were significant issues at the company. The Board has made considerable effort to examine and improve its structure, composition, policies, and practices." (*See* Report to the

After the Office of Federal Housing Enterprise Oversight ("OFHEO") issued its Report in September 2004 describing these various accounting issues, several shareholders filed various putative class actions beginning on September 23, 2004, under federal securities laws, alleging that the company and executives Franklin Raines, Timothy Howard, and Leanne Spencer had committed securities fraud. This Court entered a Stipulated Order on December 16, 2004 consolidating all cases brought pursuant to the federal securities laws under the caption *In re Fannie Mae Securities Litigation*, Civil Action No. 04-cv-01639. ( *See* Order, Dec. 16, 2004 (approving Stipulated Order of Consolidation).)

Shortly after lead plaintiffs were named, and before a motion for class certification had even been filed, Evergreen and Franklin decided to "opt-out" of the class action. On January 17, 2006, and January 25, 2006, those two institutions brought direct actions of their own that named not only Fannie Mae, Raines, Howard, and Spencer, but also the company's Audit Committee members, Outside Directors, and an insurance company (Radian) asserting certain state law claims arising out of alleged errors in Fannie Mae's accounting (*e.g.* fraud and negligent misrepresentation). The E&F Complaints also assert claims for: (1) control person liability under Section 20(a) of the Exchange Act against the Outside Directors; (2) violations of Section 18 of the Exchange Act against all defendants except Radian; and (3) violations of Section 20A of the Exchange Act against Raines, Howard, and Spencer.

---

Special Review Committee of the Board of Directors of Fannie Mae, Executive Summary, Feb. 23, 2006, at 401 (attached as Ex. 16 to Stern Decl.).)

OFHEO issued its final report on May 23, 2006, but did not uncover any additional accounting irregularities.

Evergreen and Franklin filed Amended Complaints on June 29, 2006, and, on July 25, 2006,

Evergreen and Franklin moved for leave to file another amended complaint. Leave was

granted, and Second Amended Complaints were filed by Franklin on August 14, 2006 and

by Evergreen on August 15, 2006. Defendants now move to dismiss many, if not most, of

the claims contained in the Second Amended E&F Complaints.[5]

## ANALYSIS

### I. Legal Standard

A motion to dismiss for failure to state a claim will not be granted unless the

complaint does not contain "enough facts to state a claim to relief that is plausible on its

face," *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), and there is no

"'reasonably founded hope'" that the plaintiff can make a case, *id.* at 1969 (quoting *Blue

Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975)). In considering a motion to

dismiss for failure to state a claim upon which relief can be granted under Federal Rules of

Civil Procedure 12(b)(6) and 9(b), this Court must view the factual allegations in the light

---

[5] Defendants had argued originally that all claims that relate to transactions that occurred after September 22, 2004 should be dismissed because no investor could reasonably rely on Fannie Mae's financial statements after the release of the OFHEO report on September 22, 2004. Further, defendants have argued that, at least after December 22, 2004, when Fannie Mae publicly warned investors that they should not rely upon previously issued financial statements, no investor could reasonably rely upon those statements when entering into Fannie Mae securities transactions. However, at oral argument on March 1, 2007, counsel for Fannie Mae represented on behalf of all defendants that they will waive their arguments on this point at the present time and instead will address this issue in the context of the pending class certification motion. (Tr. Mar. 1, 2007 at 8-9.) Depending upon this Court's ruling on that motion, defendants may revisit the post-September 22, 2004 claims in the E&F plaintiffs' motions at a later time.

most favorable to the plaintiff. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621,

624-25 (D.C. Cir. 1997). However, even if the Court accepts as true all of the factual

allegations set forth in the complaint, *Doe v. U.S. DOJ*, 753 F.2d 1092, 1102 (D.C. Cir.

1985), and construes the complaint liberally in favor of the plaintiff, *Schuler v. United States*,

617 F.2d 605, 608 (D.C. Cir. 1979), it "need not accept inferences drawn by plaintiff[] if

such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI*

*Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## II. SLUSA Preempts State Law Claims

The E&F plaintiffs assert state law claims for fraud, negligent misrepresentation,

violation of California Corporations Code § 25400, violation of Massachusetts General Law

Chapter 93A § 2, and an unspecified common law claim for aiding and abetting against

Radian. Defendants argue that all of Evergreen's and Franklin's state law claims must be

dismissed because they are preempted under the Securities Litigation Uniform Standards Act

of 1998 ("SLUSA"). For the following reasons, the Court agrees that SLUSA preempts these

state law claims.

The Private Securities Litigation Reform Act ("PSLRA"), codified in part at 15 U.S.C.

§§ 77z-1 and 78u-4, was passed in 1995 "in response to an increase in securities fraud

lawsuits perceived as frivolous." *Newby v. Enron Corp.*, 338 F.3d 467, 471 (5th Cir. 2003).

SLUSA, on the other hand, was enacted in 1998 to close a loophole in the PSLRA through

which plaintiffs filed their securities suits in state court to avoid the more restrictive pleading

requirements and mandatory discovery stays imposed in federal court. *Id.* SLUSA's purpose was "'to prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State, rather than Federal, court.' . . . This problem was addressed in SLUSA in two ways:  (1) by preempting certain securities fraud class actions brought under state law, and (2) by granting power to federal court judges to quash discovery in state court actions if discovery in the state case conflicted with an order of the federal court." *Id.* (citing H.R. 105-640 (1998)).

SLUSA preempts state law claims (i) in a "covered class action" that (ii) allege either "(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p(b).  Here, the E&F plaintiffs essentially concede[6] that each of their state law claims allege false or misleading statements in connection with the purchase or sale of Fannie Mae stock.  Thus, the only disputed question is whether the E&F Complaints constitute "covered class actions" as defined by the statute.

Here, the E&F plaintiffs do not dispute the statute's plain meaning.  The statue defines a "covered class action" to include "any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which (i) damages are sought on behalf of more than 50 persons; and (ii) the lawsuits are joined, consolidated, or otherwise

_____

[6] Plaintiffs do not present any contrary argument on this point.  Nor could they!

proceed as a single action for any purpose." 15 U.S.C. §§ 77p(f)(2), 78bb(f)(5)(B). In this case, the *Evergreen* and *Franklin* actions have been consolidated with *In re Fannie Mae Securities Litigation*, in which plaintiffs seek damages on behalf of more than fifty plaintiffs. *See Stipulated Order of Consolidation*, Evergreen Docket #3; Franklin Docket #6. Instead, the E&F plaintiffs contend that what SLUSA's text plainly requires is "manifestly unfair and contrary to public policy and to the purpose of SLUSA," because they will lose their individual state law claims due to their consolidation with the class action. (Pls.' Opp. at 81.) That is an argument better made to Congress! To put it simply, the E&F's plaintiffs' policy considerations are irrelevant to this Court's analysis. Indeed, the Supreme Court has made it crystal clear that if "the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quoting *United States v. Ron Pair Enter.*, 489 U.S. 235, 241 (1989); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, . . . the judicial inquiry is complete.")) (internal quotation omitted). Moreover, the legislative history for SLUSA overwhelmingly demonstrates that although Congress recognized that it would sometimes be used to preempt individual state law claims, on balance, that was a price worth paying. (*See* sources cited at Fannie Mae Mot. Dismiss at 3-4.) Indeed, the Senate specifically considered, but did not approve, an amendment that would have limited the reach of SLUSA's preemption. *See* 144 Cong. Rec. S4778 (daily ed. May 13, 1998).

9

Accordingly, in light of the plain meaning of the statute and the clear intent of Congress, federal courts have had no hesitation in finding that lawsuits that are consolidated and collectively seek damages on behalf of more than fifty plaintiffs are included in the definition of covered class actions under SLUSA, and, thus, dismissed state law claims as preempted under SLUSA. *See In re Enron Corp. Sec., Derivative & MDL-1446 "ERISA" Litig.* ("*Enron*"), No. 01-3624, 2006 U.S. Dist. LEXIS 90526 (S.D. Tex. Dec. 12, 2006); *In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp. 2d 236, 247 (S.D.N.Y. 2004) (holding that ten individual actions collectively seeking damages on behalf of more than fifty plaintiffs formed a covered class action.). In *Enron*, for example, the district court applied SLUSA to dismiss ten cases asserting individual state law claims similar to the E&F plaintiffs' claims here. In that case, one of the ten actions was filed in the district court where the consolidated class action was pending, and nine were filed in state court but removed to federal court as "related to [the federal court's] bankruptcy jurisdiction." *Enron*, 2006 U.S. Dist. LEXIS 90526, at *6. The cases were then consolidated with the pending class action for pretrial purposes. *Id.* at *11-12. The district court, noting that the *WorldCom* decision was "well reasoned and very persuasive," cited that opinion and found that Congress intended SLUSA to preempt state claims "whenever separately filed suits are consolidated, even where the suits are 'bona fide individual actions.'" *Id.* at *22-23 (quoting *In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp. 2d at 247 (quoting S. Rep. No. 105-182, at 7, 8)).

Here, the E&F plaintiffs' state law claims are unquestionably part of a "covered class action" under SLUSA because the E&F plaintiffs' claims have been consolidated with a larger MDL proceeding that includes class action securities claims under federal law. Accordingly, this Court finds that the Evergreen and Franklin state law claims are preempted by SLUSA.

### III. Section 18 Claims Against Fannie Mae and the Individual Defendants

Plaintiffs assert claims under Section 18 of the Exchange Act, 15 U.S.C. § 78r, against Fannie Mae and the individual defendants, that provides a cause of action for false or misleading statements in an application or document filed pursuant to the Exchange Act or an Exchange Act rule. Defendants argue that these claims are time barred because they were not brought within the one-year statute of limitations expressly provided for in Section 18. Plaintiffs present a multifaceted opposition contending that this statute of limitations was extended to two years by Section 804 of the Sarbanes-Oxley Act ("Sarbanes-Oxley"), 28 U.S.C. § 1658(b), and, even if it were not, that they did not have adequate notice of the facts giving rise to their claims until January 2006.[7] For the following reasons, this Court agrees

---

[7] The E&F plaintiffs also contend that, under the principles announced in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983), the statute of limitations for their Section 18 claims was tolled by the filing of the class action in this case. In *American Pipe* and *Crown*, the Supreme Court created a rule that the filing of a class action tolls the statute of limitations from the time the class action is filed until a ruling on class certification for all purported class members. *American Pipe*, 414 U.S. at 554; *Crown*, 462 U.S. at 350-51.

Some courts, including the D.C. Circuit, have ruled that plaintiffs, such as those here, who file their action before the district court in the lead case has rendered a decision on class certification, have forfeited any tolling benefit provided by the *American Pipe* doctrine.

with defendants and dismisses as time-barred the E&F plaintiffs' Section 18 claims against all the defendants.

To state a claim under Section 18, a plaintiff must allege that:  (i) it actually relied on the misstatement or omission; (ii) the misstatement or omission affected the price of the security; and (iii) plaintiff's reliance on the misstatement or omission caused plaintiff to suffer damages.  *Ross v. A. H. Robins Co.*, 607 F.2d 545, 552-53 (2d Cir. 1979).  Section 18 contains an express statute of limitations, mandating that "[n]o action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause

---

*Wachovia Bank & Trust Co., N.A. v. Nat'l Student Mktg. Corp.*, 650 F.2d 342, 346 n.7 (D.C. Cir. 1980) (stating that "[t]he district court correctly ruled that appellants fail to qualify for the *American Pipe* tolling rule" because they filed their claims before the class certification determination).  However, this Court finds that these new Section 18 claims were not tolled by the filing of the class action because *American Pipe* tolling cannot be asserted by plaintiffs who elected to file their suits before a ruling on class certification in that lead case.  Indeed, the most recent district court to consider the issue compiled a detailed comparison of these cases, yet ultimately concluded that "the *American Pipe* tolling doctrine applies only to opt-out plaintiffs after the district court makes the class certification determination."  *See In re Enron Corp. Sec., Derivative, & "ERISA" Litig*, 465 F. Supp. 2d at 716.  This Court agrees that "the class action tolling doctrine is intended to avoid the injustice and judicial inefficiency of requiring putative class members to file individual suits or to lose their claims.  It is not intended to be a tool to manipulate limitations periods for parties who, intend[] all along to pursue individual claims . . . ."  *Id.* at 716 (quoting *Rahr v. Grant Thornton, LLP*, 142 F. Supp. 2d 793, 799-800 (N.D. Tex. 2000).  Accordingly, under the Section 18 statute of limitations, the E&F plaintiffs had one year to file an action after they were on inquiry notice of the facts and circumstances sufficient to state their claims, which was on September 22, 2004 or, at the very latest, on December 22, 2004.  The E&F plaintiffs failed to do so and cannot benefit from the *American Pipe* equitable tolling doctrine because they filed their claims before this Court ruled on the issue of class certification in the lead case.

of action accrued." 15 U.S.C. § 78r(c); *see Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991).

The E&F plaintiffs initially contend that the statute of limitations set out in Section 18(c) of the Exchange Act was superceded and extended by the enactment of Section 804 of Sarbanes-Oxley. 28 U.S.C. § 1658(b). Section 804 of Sarbanes-Oxley specifically extended the length of limitations for "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws," to "2 years after the discovery of the facts constituting the violation." *Id.* Most of the courts, however, that have considered the scope of the impact of Section 804 have held that the Sarbanes-Oxley limitations period does *not* apply to claims under Section 18(a). *See, e.g., In re Enron Corp. Sec., Derivative, & "ERISA" Litig.: MDL-1446*, 465 F. Supp. 2d 687, 711 (S.D. Tex. 2006); *In re Hollinger Int'l, Inc.*, No. 04-0834, 2006 WL 1806382, at *15 (N.D. Ill. June 28, 2006); *In re Alstom SA Secs. Litig.*, 406 F. Supp. 2d 402, 419-20 (S.D.N.Y. 2005) ("[N]othing in either the statutory framework of 28 U.S.C. § 1658 or the legislative history of Sarbanes-Oxley show a clear intent to overrule express limitations period stated in the securities laws."); *WM High Yield Fund v. O'Hanlon*, No. 04-3423, 2005 WL 1017811, at *11 (E.D. Pa. Apr. 29, 2005) ("the limitations period of the Sarbanes-Oxley Act does not apply to . . . Section 18 claims" because "Section 18 does not require proof of fraud") (citing *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 197 (S.D.N.Y. 2003) (holding that Sarbanes-Oxley extends limitations only for actions under

13

the securities laws that require proof of fraudulent intent)). Indeed, a district court in the

Southern District of New York recently provided the most fulsome analysis of the issue in

*In re Alstom*, 406 F. Supp. 2d 402.[8]

In *Alstom*, the court concluded that the language of the Sarbanes-Oxley statute of

limitations in Section 804 that provides for "a private right of action that involves a claim of

fraud, deceit, manipulation or contrivance," "refer[s] only to causes of action under the

securities laws in which fraudulent intent is an element that plaintiffs are required to plead

as a part of the underlying claim. " *Alstom*, 406 F. Supp. 2d at 420.  It based its decision, in

significant part, on a comparative evaluation of the purpose and underlying rationale of

Section 10(b) claims and Section 18 claims.  Because Section 18 claims neither "rest on the

common-law fraud model underlying most § 10(b) actions," nor "relate[] to a cause of action

of the scope and coverage of an implied action under § 10(b)," that court concluded a single

statutory limitation period was not necessary for both types of actions.  *Id.* (quoting *Lampf*,

501 U.S. at 375-76 (Kennedy, J., dissenting)).  I agree with the reasoning and analysis of

*Alstom*, and, accordingly, conclude as well that the extended statute of limitations in Section

_____

[8] Although other courts to have considered the issue have found that Sarbanes-Oxley changed the statutes of limitations for claims under Section 18, *see Shriners Hospitals for Children v. Qwest Commc'ns Int'l, Inc.*, No. 04-CV-0781, 2005 WL 2350569, at *3-4 (D. Colo. Sept. 23, 2005); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03 MD 1529, 2005 WL 1679540, at *4 (S.D.N.Y. July 18, 2005), the *Alstom* court specifically addressed the holdings of these cases and deemed their reasoning "limited" and "unpersuasive." *Alstom*, 406 F. Supp. 2d at 419.  This Court agrees.

804 of Sarbanes-Oxley does not apply to claims under Section 18. *See In re Enron Corp. Sec., Derivative, & "ERISA" Litig*, 465 F. Supp. 2d at 712-13.

Plaintiffs contend, of course, that even if this Court does not agree with their position on the statute of limitations, they still did not have sufficient notice until January 17, 2006, (Evergreen) and January 25, 2006, (Franklin) to make those claims. I disagree. The one-year statute of limitations in Section 18 begins to run when the plaintiff is on inquiry notice of the facts giving rise to its claim. *See, e.g., Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1336 (7th Cir. 1997) (statute of limitations on Section 18 claim begins to run when the plaintiff learns, or should have learned through the exercise of ordinary diligence, facts sufficient to enable the plaintiff to sue). Inquiry notice occurs "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded," giving rise, in turn, to a duty to inquire lest knowledge be imputed to the investor who stands by idly. *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993).

To say the least, the E&F plaintiffs' argument here that they "lacked sufficient information [until January 2005] to plead with particularity why Fannie Mae's Form 10-K filings were false, or to plead actual reliance on specific false statements, because many of the company's GAAP violations had not yet been disclosed," (Pls. Opp'n. at 17), rings hollow! This is particularly so because the E&F plaintiffs specifically acknowledge that the release of the OFHEO Interim Report on September 22, 2004 put them on notice "that Fannie Mae's financial statements and Defendants' other public statements regarding the Company's

15

financial condition were materially false and misleading." (Evergreen Compl. ¶ 774; Franklin Compl. ¶ 867.)

Moreover, even if the OFHEO report were not sufficient notice, surely Fannie Mae's December 22, 2004 disclosure that its prior financial statements were *not* prepared in accordance with GAAP put the E&F plaintiffs on inquiry notice. Although the E&F plaintiffs contend that the September 2004 OFHEO report and Fannie Mae's December 22, 2004 disclosure put them on notice of some, (*i.e.* the FAS 91 and 133 errors), but not all of the accounting errors, (Pls. Opp'n at 17–18), the standard for inquiry notice of a Section 18 claim does not require notice of *all* accounting issues. *See Fujisawa Pharm.*, 115 F.3d at 1335–36; *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993).

Accordingly, because the E&F plaintiffs did not file their complaints alleging that these prior financial statements were false until well over one year after they were on inquiry notice of sufficient facts and circumstances to support their claim, their Section 18 claims are time-barred against all defendants.

### IV. Section 10(b) and Rule 10b-5 Claims

The E&F plaintiffs next bring claims under Section 10(b) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5(b) promulgated thereunder against Radian, the Audit Committee directors, and Messrs. Howard and Raines.

*Section 10(b) of the Exchange Act states in relevant part:*

> *It shall be unlawful for any person, directly or indirectly . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe as necessary or appropriate in the public interest or for the protection of investors.*

*15 U.S.C. § 78j(b).  Rule 10b-5 implements this statute, stating:*

> *It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,*
>
> *(a) To employ any device, scheme, or artifice to defraud,*
>
> *(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or*
>
> *(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.*

17 C.F.R. § 240.10b-5.

Complaints brought under Section 10(b) and Rule 10b-5 are governed by special pleading standards adopted by Congress in the PSLRA.  These pleading standards are unique to securities fraud cases and were adopted in an attempt to curb abuses of this type of litigation.  *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741-42 (8th Cir. 2002).  Indeed, Congress enacted two heightened pleading requirements in the PSLRA.  First, the statute requires the plaintiff's complaint to specify each misleading statement or omission and

specify why the statement or omission was misleading. 15 U.S.C. § 78u-4(b)(1). If the

allegation "is made on information and belief, the complaint shall state with particularity all

facts on which that belief is formed." *Id.* Similarly, Rule 9(b) of the Federal Rules of Civil

Procedure has long required that "[i]n all averments of fraud or mistake, the circumstances

constituting fraud or mistake shall be stated with particularity." The text of the PSLRA was

designed "to embody in the Act itself at least the standards of Rule 9(b)." *Greebel v. FTP

Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999). Second, Congress stated in the PSLRA

that a plaintiff's complaint must "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Accordingly, the Court must dismiss the complaint if these two requirements are not met.

15 U.S.C. § 78u-4(b)(3).[9]

---

[9] In the securities fraud context, this Court must "disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the [PSLRA]." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001). "[U]nder the Reform Act, a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind." *Id.* "Congress has effectively mandated a special standard for measuring whether allegations of scienter survive a motion to dismiss. While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable . . . . Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." *Id.* (quoting *Greebel*, 194 F.3d at 195-96) (alterations in original).

Moreover, the Supreme Court recently clarified the standard for an inference of scienter under the PSLRA in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, No. 06-484, 2007 WL 1773208 (U.S. June 21, 2007). The Court held that "the inference of scienter must be more than merely 'reasonable' or 'permissible'–it must be cogent and compelling, thus strong in light of other explanations." *Id.* at *10. A complaint will survive a motion to dismiss, the Court held, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

In our Circuit, the required state of mind that must be plead is at least that of "extreme

recklessness," meaning an "extreme departure from the standards of ordinary care, which

presents a danger of misleading buyers or sellers that is either known to the defendant or is

so obvious that the actor must have been aware of it." *SEC v. Steadman*, 967 F.2d 636,

641-42 (D.C. Cir. 1992) (alteration omitted) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*,

553 F.2d 1033, 1045 (7th Cir. 1977)); *see also Howard v. SEC*, 376 F.3d 1136, 1148 (D.C.

Cir. 2004). Moreover, at least one judge on this District Court has held that in order for

reckless conduct to give rise to a strong inference of scienter, it must be "not merely simple,

or even inexcusable negligence, but an extreme departure from the standards of ordinary care

. . . which presents a danger of misleading buyers or sellers that is either known to the

defendant or is so obvious that the actor must have been aware of it." *In re Baan Co. Sec.

Litig.*, 103 F. Supp. 2d 1, 20 (D.D.C. 2000). For the following reasons, the E&F plaintiffs

have failed to meet these high standards as to each of the defendants.

### A. *Radian*

First, the E&F plaintiffs assert claims against Radian under Section 10(b) and Rule

10b-5(a) and (c) based upon its structuring and sale to Fannie Mae of a single mortgage pool

insurance policy in January 2002 for which Fannie Mae paid Radian a $35 million premium

and under which Radian paid claims to Fannie Mae totaling $39 million. (Evergreen Compl.

¶ 247; Franklin Compl. ¶ 276.) They allege, in essence, that what Radian sold to Fannie Mae

was a sham insurance policy for the purpose of enabling the officer defendants to manipulate

19

the company's earnings. Specifically, the E&F plaintiffs claim that both Radian and Fannie

Mae "knew" that the "premium payments" made under the "policy" were equal in value to

the "insurance coverage" that Radian would provide, and, thus, that the "policy" was not true

insurance, but was used to manage earnings.  (Evergreen Am. Compl. ¶ 249; Franklin

Compl. ¶ 278.)  In the final analysis, the E&F plaintiffs allege that Radian knew, or should

have known, that Fannie Mae would use its insurance policy to violate GAAP.

In response, Radian contends that the E&F plaintiffs' allegations, at best, amount to

aiding and abetting liability under Section 10(b) and Rule 10b-5, and are therefore barred by

the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*,

in which the Court held that there is no private cause of action for aiding and abetting

someone else's primary violation of these laws.  511 U.S. 164, 191 (1994).  Indeed, Radian

argues that the claims against it must be dismissed because the E&F plaintiffs have failed to

allege that Radian's conduct *itself* either deceived Fannie Mae shareholders or manipulated

the price of Fannie Mae stock.  For the following reasons, the Court agrees with Radian and

dismisses the E&F plaintiffs' claims against it.

On May 8, 2007, this Court set out in its ruling relating to Goldman Sachs the law

regarding the unavailability of aiding and abetting liability under Section 10(b).  In short, the

Court pointed out that the Supreme Court in *Central Bank* held that "there is no private

aiding and abetting liability under § 10(b)" of the Exchange Act, *id.* at 191, because:

"[Section 10(b)] prohibits only the making of a material misstatement (or omission) or the

commission of a manipulative act . . . . The proscription does not include giving aid to a person who commits a manipulative or deceptive act." *Id*. at 177-78 (citations omitted). In particular, a defendant "who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under Section 10(b) or any subpart of Rule 10b-5." *See Regents of the Univ. of Cal. v. Credit Suisse First Boston, Inc.*, 2007 WL 816518, No. 06-20856, at *10 (5th Cir. Mar. 19, 2007), *petition for cert. filed*, No. 06-1341 (U.S. Mar. 5, 2007). Therefore, a defendant in this case may only have liability to private plaintiffs under Section 10(b) for a *primary* violation of the statute. Thus, for a secondary actor, like Radian, to incur liability, a plaintiff must sufficiently plead "*all* of the requirements for primary liability under Rule 10b-5." *Central Bank*, 511 U.S. at 191 (emphasis in original). And, in keeping with the Supreme Court's ruling in *Central Bank*, the phrase "deceptive acts" will be interpreted restrictively by this Court as it was by the Fifth and Eighth Circuits in *In re Charter* and *Regents of the University of California*. *Regents of the Univ. of Cal.*, 2007 WL 816518, at *10 (quoting *In re Charter*, 443 F.3d at 992); *In re Charter Commc'ns, Inc. Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006)), *cert. granted*, 2007 WL 879583, 75 U.S.L.W. 3034 (U.S. Mar. 26, 2007) (No. 06-43), *but see Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050 (9th Cir. 2006) ("*Homestore*"), *petition for cert. filed*, 75 U.S.L.W. 3236 (U.S. Oct. 19, 2006) (No. 06-560).

21

Accordingly, plaintiffs here must satisfactorily plead each of the following elements of a primary violation: (1) the making of a material misrepresentation, or the use of a manipulative or deceptive device; (2) with scienter (*i.e.*, a wrongful state of mind); (3) in connection with the purchase or sale of a security; (4) reliance by plaintiffs; (5) economic loss; and (6) loss causation (proximate cause). *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Plaintiffs have failed to do so here.

In this case, the E&F plaintiffs allege only that Radian is liable to Fannie Mae's investors on the basis that it engaged in a single business transaction which Fannie Mae, in turn, improperly accounted. The E&F plaintiffs do not allege that Radian made any misstatement, omission, or action at issue or that the E&F plaintiffs relied on any statement, omission, or action made by Radian. Moreover, the E&F plaintiffs do not claim that Radian was responsible for, or was involved in the preparation of: (1) Fannie Mae's allegedly false or misleading financial statements; (2) Fannie Mae's allegedly improper internal accounting practices; or (3) the allegedly false or misleading public statements made by Fannie Mae and its former executives. Moreover, because Radian owed no duty to Fannie Mae investors, it cannot be held liable under Section 10(b) for any purported omissions in Fannie Mae's financial statements. *See Chiarella v. United States*, 445 U.S. 222, 235 (1980) (holding that there can be no liability for fraud under Section 10(b) absent a duty to speak).

Accordingly, because Radian is merely a third party alleged to have provided Fannie Mae with the *means* to misrepresent its finances by entering into a transaction that Fannie

22

Mae *may* have mischaracterized to its investors, the E&F plaintiffs have failed to state a

cause of action for securities liability under Section 10(b) and Rule 10b-5 against Radian.

### B.  Audit Committee Directors

The E&F plaintiffs next assert Section 10(b) and 10b-5 claims against former

members of the Fannie Mae Audit Committee, (the "Audit Committee Defendants,") (*i.e.*

defendants Gerrity, Malek, Segue, Harvey, Pickett, and Mulcahy), under Section 10(b) for

allegedly failing to properly perform their "job . . . to oversee and monitor the Company's

accounting and financial reporting." (*See* Pls.' Opp at 48 (citing Evergreen Compl. ¶¶ 54,

711; Franklin Compl. ¶¶ 77, 803).)  The Audit Committee defendants argue that these claims

against them should be dismissed because the E&F plaintiffs have failed to satisfy the

requirement set out by the PSLRA that they "state with *particularity* facts giving rise to a

strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

4(b)(2) (emphasis added).  I agree.

The E&F plaintiffs do not set forth the requisite particularized factual allegations,

relying instead upon allegations made pursuant to the "group pleading doctrine" to assert

securities violations against the Audit Committee defendants.  This doctrine, of course, is

"'premised on the assumption that in cases of corporate fraud where the false or misleading

information is conveyed in prospectuses, registration statements, annual reports, press

releases, or other 'group-published information,' it is reasonable to presume that these are

the collective actions of the officers.'" *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d

588, 602 (7th Cir. 2006) (quoting *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 689 (6th Cir. 2005)). Not surprisingly, there is serious doubt in the federal courts as to whether this approach actually survived the passage of the PSLRA.[10]

In any event, because the explicit language of the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind," 15 U.S.C. § 78u-4(b) (emphasis added), it is, in this Court's judgment, eminently reasonable to interpret the PSLRA references to "*the* defendant" as only intended to mean *each* defendant in multiple defendant cases. *See Makor Issues*, 437 F.3d at 602-03 (citing *Southland*, 365 F.3d at 365) (emphasis added)[11]; *see also Southland*, 365 F.3d at 365-66 (holding that "the PSLRA requires the plaintiffs to distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud"); *Phillips*, 374 F.3d at 1018 (holding that "the most plausible reading in light of congressional intent is that a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations"). Indeed, it seems to this Court that the requirement in the plain language of the PSLRA of a

---

[10] *Compare Makor Issues*, 437 F.3d at 602; *Southland Sec. Corp. v. Inspire Ins. Solutions*, 365 F.3d 353, 364-65 (5th Cir. 2004); *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004), *with Baan*, 103 F. Supp. 2d at 17; *In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 821 (N.D. Cal. 2000); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999).

[11] Although the Supreme Court recently vacated the Seventh Circuit's decision in *Makor Issue* and remanded for consideration in light of clarified pleading requirements, the Court did "not disturb" the Seventh Circuit's holding with respect to group pleading. *Tellabs*, 2007 WL 1773208, at *11 n.6.

showing of scienter on the part of *each* defendant trumps any reliance on the "group pleading doctrine," and, thus, requires plaintiffs to allege specific facts demonstrating that each of the defendants acted with the requisite state of mind. *Southland*, 365 F.3d at 365.

Accordingly, this Court holds that, under the PSLRA, any alleged false statements must be set forth with particularity as to each defendant, and scienter must be plead as to each act or omission sufficient to give rise to a strong inference that the defendant acted with at least *extreme* recklessness. *See* 15 U.S.C. § 78u-4(b)*; Southland*, 365 F.3d at 364. Moreover, scienter cannot be inferred solely because a defendant is a corporate officer. Indeed, even if his position within the company would support a reasonable inference that he likely would be negligent in not being involved in the preparation of a document or being aware of the falsity its contents, under the PSLRA, allegations of mere negligence are insufficient. *See, e.g., Southland*, 365 F.3d at 365; *In re Advanta Corp.*, 180 F.3d 525, 539 (3d Cir. 1999) ("[A]llegations that a securities fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'") (quoting *Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir. 1998)).

Here, the E&F plaintiffs allege that "[t]he Audit Committee Defendants were in charge of ensuring that the Company had adequate and effective internal controls," but they "failed miserably in the performance of [their] duties." (Pls.' Opp. at 48 (citing Evergreen

Compl. ¶ 425; Franklin Compl. ¶ 457).)  However, the E&F plaintiffs do not specify: (1) what facts, if any, were brought to the attention of the Audit Committee; (2) when these facts were brought; or (3) what, if anything, the Audit Committee did in response.  Without such specific allegations, the E&F plaintiffs' allegations, at best, rise to the level of negligence on that part of the Audit Committee, but do not demonstrate the required state of mind of extreme recklessness.

Moreover, even if the E&F plaintiffs could rest upon mere group pleading, their allegations are still insufficient as a matter of law to demonstrate the requisite state of mind on the part of the Audit Committee defendants.  First, the E&F plaintiffs provide a long list of alleged internal control deficiencies and argue that because it was the "Audit Defendants' job to review the effectiveness of internal controls," (Pls.' Opp. at 49-50), these allegations are sufficient to demonstrate recklessness.  However, allegations that a securities fraud defendant "should have known" of deficient internal controls are insufficient, alone, to demonstrate a strong inference of scienter. *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 253 (5th Cir. 2003); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).

Second, the E&F plaintiffs rely on two "red flags" that "should have alerted [the Audit Committee Directors] to the fraud," (Pls.' Opp. at 51-53), but they concede that five of the six Audit Committee Directors joined the Committee *after* the investigation began. (Evergreen Compl. ¶ 706; Franklin Compl. ¶ 801.)  Specifically, the E&F plaintiffs allege that when KPMG allegedly informed the Audit Committee in early 1999 of an audit

difference regarding the amount of catch-up expenses recorded in 1998, this "should have caused" the Audit Committee to "keep a particularly watchful eye on management . . . ." (Evergreen Compl. ¶ 714; Franklin Compl. ¶ 809). Moreover, as to the one director who was on the Committee at the time, the E&F Complaints' contention that the audit difference "should have caused" Mr. Gerrity to keep a "watchful eye on management," (Evergreen Compl. ¶ 714; Franklin Compl. ¶ 809), is insufficient because, as previously discussed, a claim for securities fraud cannot be premised on allegations of mere negligence concerning what a particular individual "should have" done.

Additionally, the E&F plaintiffs' allegation that the Audit Committee directors failed to address issues about certain aspects of the company's accounting raised by Roger Barnes, a Fannie Mae accounting employee, is similarly to no avail. (Evergreen Compl. ¶ 715; Franklin Compl. ¶ 810.) In fact, the E&F plaintiffs' own allegations belie any negative inferences that can be drawn from this assertion. For example, the E&F plaintiffs allege that defendant Gerrity was briefed about "Fannie Mae's plan to investigate [Barnes'] allegations," and that such an investigation was in fact undertaken. (Evergreen Compl. ¶ 387; Franklin Compl. ¶ 417). The E&F plaintiffs further allege that the Audit Committee was informed that there had been a Legal Department investigation and that the company and KPMG had found that the issues raised by Barnes "posed no obstacles to Raines' and Howard's ability to sign their Sarbanes Oxley certifications as scheduled." (Evergreen Compl. ¶ 389; Franklin Compl. ¶ 419).

Finally, the E&F plaintiffs' argument that the magnitude of the fraud is sufficient itself for an inference that the Audit Committee defendants acted with scienter is plainly contradictory to the purposes of the PSLRA and is, at best, an oversimplification of the scienter concept. As one court noted: "Allowing an inference of scienter based on the magnitude of fraud would eviscerate the principle that accounting errors alone cannot justify a finding of scienter." *Fidel v. Farley*, 392 F.3d 220, 231 (6th Cir. 2004) (internal quotation omitted). Indeed, the E&F plaintiffs themselves concede that "the magnitude of fraud alone does not necessarily create an inference of scienter." (Pls.' Opp. at 53.)

In sum, the Court finds that the allegations in the E&F plaintiffs' complaint do not sufficiently state the role each individual defendant played, nor describe each person's involvement, if any, in preparing the purported misleading statements upon which the E&F plaintiffs claim they relied. Moreover, even taken as a whole, the E&F plaintiffs' allegations do not give rise to a sufficiently strong inference of scienter on the part of the Audit Committee defendants *individually*. Accordingly, the E&F plaintiffs' Section 10(b) and Rule 10b-5 claims against them must be dismissed.

### C. Howard and Raines[12]

Plaintiffs have additionally brought claims against defendants Howard and Raines for violations of Section 10(b) and Rule 10b-5. Defendants seek to dismiss these claims on the ground that the E&F plaintiffs have failed to adequately plead scienter with regard to the additional accounting issues alleged in their complaints other than FAS 91 and FAS 133. In response, the E&F plaintiffs contend that they are not required to allege scienter "with respect to every accounting issue in the Complaints," but that "the Court's task is simply to determine whether Plaintiffs' allegations *collectively* give rise to a strong inference that Howard and Raines acted with scienter regarding the accuracy of the company's reported financial results, not whether Plaintiffs have linked them to each and every GAAP violation." (Pls.' Opp. at 43, 45 (emphasis added).) For the following reasons, the Court disagrees with the E&F plaintiffs' position.

First, the PLSRA plainly requires plaintiffs to plead particularized facts that give rise to a strong inference of fraudulent intent "with respect to each act or omission" alleged to violate Section 10(b). 15 U.S.C. § 78u-4(b)(2). Curiously, with respect to the vast majority of their additional accounting allegations, the E&F plaintiffs do not even invoke the names of defendants Howard and Raines. (Evergreen Compl. ¶¶ 182-358; Franklin Compl. ¶¶ 208-388.) Moreover, when they do make allegations with regard to these defendants, they fail to allege that the defendants were even aware of, or were reckless in being unaware of, the

---

[12] Defendant Spencer has not moved to dismiss the Section 10(b) and Rule 10b-5 claims against her.

accounting treatment at issue or that such treatment may have been in violation of GAAP. (Evergreen Compl. ¶¶ 244-48; Franklin Compl. ¶¶ 273-77.)  Instead, the E&F plaintiffs resort to *generic* allegations that Fannie Mae's accounting treatment violated GAAP and was restated.  Thus, because this Court finds that the E&F plaintiffs have not set forth such particularized facts to support an inference of scienter for each act or omission, the additional accounting claims set forth by the E&F plaintiffs also must be dismissed as to defendants Howard and Raines.

### V.  Control Person Liability

The E&F plaintiffs next allege that Fannie Mae's outside directors and defendants Raines, Howard, and Spencer[13] are liable as "control persons" under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for "directly or indirectly control[ling]" Fannie Mae in its alleged violation of Section 10(b), Rule 10b-5, and Section 18(a).[14]  The outside directors and

---

[13] Defendants Raines and Howard argue that control person liability should not be asserted against them for acts occurring after they left their positions at Fannie Mae.  The E&F plaintiffs agree and state that they "do not seek to hold Raines and Howard liable under Section 20(a) for violations by Fannie Mae that occurred after their departures from the company in December 2004." (Pls.' Opp. at 59.)

Moreover, defendants Raines, Howard, and Spencer have raised arguments regarding whether claims of control person liability may stand against them for purchases made after September 21, 2004.  However, at oral argument on March 1, 2007, counsel for Fannie Mae represented on behalf of all defendants that they will waive, at the present time, their arguments regrading the sufficiency of claims based upon stock transactions after September 22, 2004  and will address this issue in the context of the pending class certification motion.  (Tr. Mar. 1, 2007 at 8-9; *see supra* Section II.)  Accordingly, defendants Raines's, Howard's, and Spencer's arguments on this point are better addressed at that time as well.

[14] As discussed above, this Court has dismissed the E&F plaintiffs' Section 18 Exchange Act claims because they are time-barred.  Accordingly, plaintiff's Section 20(a) claims of control person liability based upon any Section 18 violations are also dismissed.  *See In re Global*

30

Howard, of course, argue that the E&F plaintiffs' Section 20(a) claims fail because they do not adequately allege that they controlled Fannie Mae's accounting decisions or that they "culpably participated" in the allegedly wrongful conduct.  For the following reasons, this Court finds that the E&F plaintiffs' Section 20(a) claims should be dismissed as to the outside director defendants and defendant Howard.

Section 20(a) of the Exchange Act provides for control person liability for underlying securities law violations.  The relevant provision states that

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  The SEC's regulations, define control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.

Courts are divided, however, over the *prima facie* elements of a Section 20(a) claim. Some circuit courts have required plaintiffs to show that the defendants "culpably participated" in the underlying fraud. *See SEC v. J.W. Barclay & Co.*, 442 F.3d 834, 841 (3d

---

*Crossing, Ltd. Secs. Litig.*, 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004) (holding that in the absence of a "primary violation" of the Exchange Act by the controlled entity, there can be no "control person" liability).

Cir. 2006); *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). Others have

held that once the plaintiffs have established the defendants' ability to control, the burden

shifts to the defendants to show that they did not participate in the fraud, and that they acted

in good faith. *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th

Cir. 1996); *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996); *Harrison v.*

*Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992); *Metge v. Baehler*, 762 F.2d

621, 630-31 (8th Cir. 1985); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir.

1981); *Carpenter v. Harris, Upham & Co., Inc.*, 594 F.2d 388, 394 (4th Cir. 1979). While

our Circuit Court has not ruled on this issue to date, based on a review of existing precedent

and the arguments offered in this case, this Court concludes that the rule adopted by the

Second and Third Circuits is the better approach. Accordingly, this Court holds that to state

a Section 20(a) claim, plaintiffs must adequately plead "culpable participation" on the part

of the defendants in the underlying primary securities violation. Why so?

  First, requiring culpable participation on the part of the allegedly controlling

defendants is consistent with the purpose of the Exchange Act and the PLSRA. As the

Second Circuit concluded in *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973):

"[t]he intent of Congress in adding this section, . . . was obviously to impose liability only

on those directors who fall within its definition of control and who are in some meaningful

sense culpable participants in the fraud perpetrated by controlled persons." This, of course,

was not an accident. "Congress intended the PSLRA to make it 'substantively harder for

plaintiffs to bring securities fraud cases,'" *In re Livent Secs. Litig.*, 148 F. Supp. 2d 331, 354

(S.D.N.Y. 2001) (quoting *Greebel v. FTP Software*, 194 F.3d 185, 196 n.9 (1st Cir. 1999)),

and hoped that the heightened pleading standard would relieve from the burdens of litigation

"any parties who as a matter of law did not belong in the action in the first place." *Id.* at 363.

Put simply, if a Section 20(a) claim could be brought without some evidence of malfeasance

on the part of a defendant, any director of any public corporation could be held liable as a

"control person" just because he has some degree of control over the corporation, its policies,

and its employees by virtue of his position. That result, of course, would make a mockery

of Congress's intent in passing the PSLRA.

Second, the requirement of pleading culpable participation is consistent with the

Supreme Court's analysis in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976). In *Ernst*, the

Supreme Court explained that "each of the provisions of the 1934 Act that expressly create

a civil liability . . . contains a state-of-mind condition requiring something more than

negligence." *Hochfelder*, 425 U.S. at 209, n.28. The Supreme Court then explicitly cited

Section 20(a) as an example of these "state-of-mind" provisions. *Id.*; *see Livent*, 148 F.

Supp. 2d at 355 (quoting *Hochfelder*, 425 U.S. at 209, n.28). In so doing, the Supreme Court

suggested, in essence, that for a Section 20(a) claim to succeed, the plaintiff must allege facts

not only indicating culpability, but exceeding mere negligence. *Hochfelder*, 425 U.S. at 209,

n.28; *see Livent*, 148 F. Supp. 2d at 355. And, while the Supreme Court did not spell out

how much more than mere negligence was required, a showing of "at least recklessness" is

the conclusion that some courts that have considered the question have reached. *In re Alstom SA*, 406 F. Supp. 2d 433, 490 (S.D.N.Y. 2005); *In re Livent*, 148 F. Supp. 2d at 355.  I agree.

Reckless conduct, of course, is "at the least, conduct which is 'highly unreasonable' and which represents an extreme departure from the standards of ordinary cases . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Livent*, 148 F. Supp. 2d at 349 (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978); and citing *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)).  And, a director who merely "unknowingly approv[ed] credible but fraudulent financial reports prepared by subordinates" does not have the level of intent necessary for culpable participation. *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 208 (E.D.N.Y. 2000).

Some courts, indeed, have even gone so far to define "culpable participation" to require plaintiffs to allege a level of intent demonstrating conscious misconduct. *See, e.g.*, *In re Tysons Foods*, No. 01-425, 2004 WL 1396269, at *13 (D. Del. June 17, 2004) (explaining that, "[w]hile deliberate inaction can rise to the level of culpable participation, it does so only if the intent is to further the fraud of another"); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001), *aff'd*, 148 Fed. Appx. 66 (2d Cir. 2005) (requiring that plaintiffs plead facts establishing either "conscious misbehavior or recklessness"); *Mishkin v. Ageloff*, No. 97 Civ. 2690, 1998 WL

34

651065, at *25 (S.D.N.Y. Sept. 23, 1998) (requiring that plaintiffs plead "particularized facts

of [the controlling person's] conscious misbehavior as a culpable participant in the fraud").

Either way, however, to plead culpable participation under Section 20(a), plaintiffs

must plead, at a minimum, "particularized facts" of a defendant's culpable participation,

because the Reform Act's heightened pleading standard applies to "any private action arising

under this chapter in which the plaintiff may recover money damages only on proof that the

defendant acted with a particular state of mind." 15 U.S.C. § 78u-4(b)(2); *Mishkin v. Ageloff*,

No. 97 Civ. 2690, 1998 WL 651065, at *25 (S.D.N.Y. Sept. 23, 1998) (quoting 15 U.S.C.

§ 78u-4(b)(2)); *see also In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243, 2006 WL 3026024,

at *23 (S.D.N.Y. Oct. 25, 2006); *In re Global Crossing, Ltd.*, No. 02 Civ. 910, 2005 WL

2990646, at *8 (S.D.N.Y. Nov. 7, 2005); *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004

WL 2190357, at *16 (S.D.N.Y. Sept. 30, 2004). Plaintiffs have not done so here.

The E&F plaintiffs' allegations of culpable conduct by the outside directors merely

describe their allegedly inadequate oversight in terms of a: (1) failure to stay informed; (2)

failure to review major business decisions and ensure the appropriate delegation of authority;

(3) failure to ensure that the committees functioned effectively; (4) failure to act as a check

on management; and (5) failure to order independent investigations of Fannie Mae.

(Evergreen Compl. ¶¶ 739-763; Franklin Compl. ¶¶ 833-856). In short, the E&F plaintiffs

characterize these allegations against the outside directors as constituting their being "asleep

at the switch." (Evergreen Compl. ¶ 739; Franklin Compl. ¶ 832). Mere negligence, as they

35

allege it, however, does not constitute the culpable conduct Congress had in mind. *In re Alstom SA*, 406 F. Supp. at 490; *In re Tysons Foods*, 2004 WL 1396269, at *13 (holding that plaintiff's allegations "would amount to negligence in failing to oversee the actions of corporate officers but that, without more, does not sustain a finding of control person liability").

Moreover, as to the additional accounting violations against Mr. Howard that were not included in the Lead Plaintiffs' Consolidated Class Action Complaint, plaintiffs fail to allege that Howard played a culpable role in those decisions or their execution. (*See* Evergreen Compl. ¶¶ 182-358; Franklin Compl. ¶¶ 208-388.) In fact, for the vast majority of those accounting issues, plaintiffs do not even mention Howard or any particular facts about him. (*See* Howard Mot. Dismiss at 9 n.5.) Indeed, for those allegations where Howard is identified by name, plaintiffs fail to provide any detail that would indicate bad faith on his part. (*See, e.g.*, Evergreen Compl. ¶¶ 272-73, 343, 355; Franklin Compl. ¶¶ 301-02, 373, 385.)

Thus, because plaintiffs have failed to plead culpable conduct of a specific nature as to each director and as to defendant Howard, this Court need not determine whether those defendants had the power to control the general affairs of the primary violator, or the specific corporate policy that led to the primary violation. Accordingly, the Section 20(a) claims against the Audit Committee defendants and the additional accounting claims against defendant Howard are dismissed.

36

## VI. Insider Trading Claims

Finally, the E&F plaintiffs assert claims against defendants Howard, Raines, and Spencer for insider trading pursuant to Section 20A of the Exchange Act for all trades by the E&F plaintiffs that occurred within a week of trades made by those defendants.  Defendants argue that the vast majority of these claims must be dismissed because the E&F plaintiffs did not purchase Fannie Mae securities "contemporaneously" with defendants' sales as required by Section 20A.  Moreover, defendant Howard argues that even as to those shares that were sold the same day as the plaintiffs' trades, a Section 20A claim cannot be brought because his shares were sold pursuant to a trading plan.  For the following reasons, this Court finds: (1) that the E&F plaintiffs' claims for insider trading must be limited to those trades made on the same day as Howard, Raines, and Spencer; and (2) that Howard's trading plan defense is not adequately established, at this point, to warrant dismissing any claim against him regarding trades that did occur on the same day.

Section 20A of the Exchange Act provides relief only to those "who, contemporaneously with the purchase or sale of securities that is the subject of [the] violation, ha[ve] purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class." 15 U.S.C. § 78t-1(a).  Accordingly, to state a claim under Section 20A, the E&F plaintiffs must show that:  (1) defendants Howard, Raines, and Spencer sold Fannie Mae securities while in possession of material non-public information; and (2) plaintiffs purchased Fannie Mae

securities "contemporaneously" with defendants' sale. *See* 15 U.S.C. § 78t-1.  Plaintiffs

must plead this "contemporaneous transaction" component with specificity.  *See, e.g.,*

*Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993); *Copland v. Grumet*, 88 F. Supp. 2d

326, 338 (D.N.J. 1999).

      The contemporaneous trading requirement is meant to substitute for the normal privity

between buyer and seller, *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993), because

"identifying the party in actual privity with the insider is virtually impossible in trades

occurring on an anonymous public market." *In re Enron Corp. Sec., Derivative, & "ERISA"*

*Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003) (quoting *In re Microstrategy, Inc. Sec.*

*Litig.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000)).  Therefore, to limit Section 20A insider

trading claims to those plaintiffs who may have actually traded with the alleged insider,

"courts have interpreted the 'contemporaneous trading' requirement quite strictly."

*Neubronner*, 6 F.3d at 670 (citation omitted); *see also In re AST Research Sec. Litig.*, 887

F. Supp. 231, 233 (C.D. Cal. 1995) ("[T]he growing trend among district courts in a number

of circuits . . . is to adopt a restrictive reading of the term 'contemporaneous' at least with

respect to shares heavily traded on a national exchange.").  Furthermore, courts have rejected

claims where it is apparent that the parties could not have actually traded with each other.

*See Buban v. O'Brien*, No. C 94-0331, 1994 WL 324093, at *3 (N.D. Cal. June 22, 1994)

(holding that "[i]t is manifest that plaintiff could not have traded with defendant" where they

traded three days apart at different prices and where numerous shares changed hands every day).

Thus, it is not surprising that a growing number of courts have held that to be "contemporaneous," plaintiffs' trades must not only take place *after* the insider trading transaction at issue, *see In re Enron Corp.*, 258 F. Supp. 2d at 600 (citing *Alfus v. Pyramid Technology Corp.*, 745 F. Supp. 1511, 1522 (N.D. Cal. 1990)), but also occur on the same day. *See, e.g., In re MicroStrategy,* 115 F. Supp. 2d at 664; *Copland*, 88 F. Supp. 2d at 338; *In re AST Research Sec. Litig.*, 887 F. Supp. at 234; ("The same day standard is the only reasonable standard given the way the stock market functions."); *Buban*, 1994 WL 324093, at *2-3; *In re Aldus Sec. Litig.*, No. C92-885C, 1993 WL 121478, at *7 (W.D. Wash. Mar. 1, 1993); *In re Stratus Computer, Inc. Sec. Litig.*, No. 89-2075-Z, 1992 WL 73555, at *6 (D. Mass. Mar. 27, 1992); *cf. Backman v. Polaroid Corp.*, 540 F. Supp. 667, 671 (D. Mass. 1982) (dismissing insider trading claims because purchases by plaintiff two and seven trading days after defendant's sale were "outside of the period of insider trading"). Indeed, the courts who have adopted this same day standard have concluded that where a large volume of securities are sold on a daily basis on a national exchange, plaintiffs could not have realistically traded with a given defendant *unless* they traded on the same day. *See, e.g., In re Aldus*, 1993 WL 121478, at *7 ("[G]iven the unquestionably high volume of Aldus stock traded daily during the period in question, it is clear that plaintiffs did not trade with defendants other than possibly Mr. McAleer, as no plaintiffs traded on the days of the allegedly wrongful trades.")

(footnote omitted); *In re MicroStrategy*, 115 F. Supp. 2d at 663 ("[A]s the temporal separation between the trades increases, the increasingly dynamic nature of the securities markets, when viewed in light of the trading activity of the securities involved and other circumstances in a particular case, correspondingly makes it less likely that a purchaser traded with the insider . . . .") (footnotes omitted).  Accordingly, those courts have concluded that to expand the reach of Section 20A beyond same day trades would, in effect, permit plaintiffs to assert claims where it is implausible that they traded with defendants.  *See Buban*, 1994 WL 324093, at *3 ("To extend the period of liability well beyond the time of the insider's trading . . . could make the insider liable to all the world") (quoting *Wilson v. Comtech Telecom. Corp.*, 648 F.2d 88, 94 (2d Cir. 1981)).  Based on a review of the existing case law, the Court is satisfied that this same day standard strikes a fair and "feasible" balance – "making it possible for . . . persons to bring suit" while "preserv[ing] the notion that only plaintiffs who were harmed by the insider" have a claim. *Buban*, 1994 WL 324093, at *3.  And, more specifically, its application makes eminent sense in this case.

Here, the E&F plaintiffs' allegations establish that millions of shares of Fannie Mae stock are bought and sold every day.  (Evergreen Compl. ¶ 766(b) ("Fannie Mae's trading volume was substantial"); Franklin Compl. ¶ 859(b) (same).)  For the E&F plaintiffs' trades to be fairly deemed "contemporaneous" with defendants' trades, the E&F plaintiffs must allege that their trades occurred on the same day as defendants' trades.  Thus, except for one purchase of 6,500 shares on January 21, 2003 by plaintiff Evergreen on the same day as

40

trades by defendants Raines, Spencer, and Howard, and eight other trades by defendant Howard (*see* Howard Mot. Dismiss at 3 n.1, 7), all trades by the E&F plaintiffs were *not* made on days on which defendants made trades. (*See* Evergreen Complaint Schedule A.) Accordingly, Section 20A claims for all trades by the E&F plaintiffs that occurred on a different day than defendants' trades will be dismissed.

Finally, defendant Howard argues that because many of his trades were made in accordance with a preestablished trading plan in which sales were entered into weeks or even months in advance, the E&F plaintiffs' same day trades were not contemporaneous with any conduct by him. (*See* Howard Mot. Dismiss at 7.) While the adoption of a trading plan does provide an affirmative defense to an insider trading claim when the defendant establishes certain criteria required by Rule 10b5-1, this Court cannot determine from the face of the pleadings whether these criteria have been sufficiently satisfied to establish this affirmative defense. *See, e.g.*, *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006) (declining to consider 10b5-1 trading plan as an affirmative defense to insider trading allegations because it is "typically premature to raise affirmative defenses in a motion to dismiss."); *In re Cray Inc.*, 431 F. Supp. 2d 1114, 1131 (W.D. Wash. 2006) (declining to dismiss insider trading claim based on 10b5-1 trading plan because plan is affirmative defense on which defendants bear burden of proof). Accordingly, the Court concludes that Howard's motion to dismiss the remaining claims of insider trading against him on the basis of a trading plan is premature, and is, therefore, DENIED.

## CONCLUSION

For all of the foregoing reasons, this Court GRANTS the Motions to Dismiss the Evergreen and Franklin Complaints filed by defendants Stephen B. Ashley, Kenneth M. Duberstein, Thomas P. Gerrity, Jamie S. Gorelick, William R. Harvey, Manuel J. Justiz, Ann Korologos, Frederic V. Malek, Donald B. Marron, Daniel H. Mudd, Anne M. Mulcahy, Joe K. Pickett, Leslie Rahl, Franklin D. Raines, Taylor C. Segue III, Leanne Spencer, H. Patrick Swygert, Fannie Mae, and Radian Guaranty, Inc.  The Court also GRANTS in part and DENIES in part the Motion to Dismiss filed by J. Timothy Howard.[15]  An appropriate Order consistent with this ruling accompanies this Memorandum Opinion.

**RICHARD J. LEON**
**United States District Judge**

---

[15]  Pursuant to Federal Rule of Evidence 201, a court may take judicial notice of "a fact not subject to reasonable dispute in that it is either:  (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Each of the exhibits submitted by the defendants that were attached to the Declaration of Robert M. Stern in Support of Defendant Fannie Mae's Request for Judicial Notice and Appendix of Authorities meets this standard, and, therefore, will be judicially noticed by this Court.